**No. 25-_____**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

In re DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

*Petitioners-Defendants.*

(full caption on inside cover)

———————————————

On Petition for Writ of Mandamus to the United States District Court
for the Northern District of California

———————————————

## PETITION FOR WRIT OF MANDAMUS

———————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

PATRICK D. ROBBINS
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

In re DONALD J. TRUMP, *in his official capacity as President of the United States, et al.,*

DONALD J. TRUMP, *in his official capacity as President of the United States,* UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, *in his official capacity as Director of U.S. Office of Management and Budget;* UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; CHARLES EZELL, *in his official capacity as Acting Director of the U.S. Office of Personnel Management;* DEPARTMENT OF GOVERNMENT EFFICIENCY; ELON MUSK, *in his official capacity;* AMY GLEASON, *in her official capacity as the Acting Administrator of the Department of Government Efficiency;* UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, *in her official capacity as Secretary of the U.S. Department of Agriculture;* UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of the U.S. Department of Commerce;* UNITED STATES DEPARTMENT OF DEFENSE; PETE HEGSETH, *in his official capacity as Secretary of the U.S. Department of Defense;* UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, *in his official capacity as Secretary of the U.S. Department of Energy;* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR., *in his official capacity as Secretary of the U.S. Department of Health and Human Services;* UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security;* UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of the U.S. Department of Housing and Urban Development;* UNITED STATES DEPARTMENT OF JUSTICE; PAM BONDI, *in her official capacity as Attorney General of the U.S. Department of Justice;* UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, *in his official capacity as Secretary of the U.S. Department of the Interior;* UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, *in her official capacity as Secretary of the U.S. Department of Labor;* UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State;* UNITED STATES DEPARTMENT OF TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of the U.S. Department of Treasury;* UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, *in his official capacity as Secretary for the U.S. Department of Transportation;* UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS, *in his official capacity as Secretary of Veterans Affairs;* AMERICORPS (a.k.a. the CORPORATION FOR NATIONAL AND COMMUNITY SERVICE); JENNIFER BASTRESS TAHMASEBI, *in her official capacity as Interim Agency Head of AmeriCorps;* UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, *in his official capacity as Administrator of U.S. Environmental Protection Agency;* UNITED STATES GENERAL SERVICES ADMINISTRATION; STEPHEN EHIKIAN, *in his official capacity as Acting Administrator for U.S. General Services Administration;* NATIONAL LABOR RELATIONS BOARD; MARVIN KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board;* WILLIAM COWEN, *in his official capacity as the Acting General Counsel of the National Labor Relations Board;* NATIONAL SCIENCE FOUNDATION; BRIAN STONE, *in his official capacity as Acting Director of the National Science Foundation;* UNITED STATES SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, *in her official capacity as Administrator of the U.S. Small Business Administration;* UNITED STATES SOCIAL SECURITY ADMINISTRATION; and LELAND DUDEK, *in his official capacity as Acting Commissioner of the U.S. Social Security Administration,*
*Petitioners-Defendants,*

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,
*Respondent,*

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172; SEIU LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL, INC.; NORTHEAST ORGANIC FARMING ASSOCIATION, INC.; VOTEVETS ACTION FUND INC.; WESTERN WATERSHEDS PROJECT; COUNTY OF SANTA CLARA, CALIFORNIA; CITY OF CHICAGO, ILLINOIS; MARTIN LUTHER KING, JR. COUNTY, WASHINGTON; HARRIS COUNTY, TEXAS; CITY OF BALTIMORE, MARYLAND; and CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA,
*Real Parties in Interest-Plaintiffs.*

# TABLE OF CONTENTS

**<u>Page</u>**

INTRODUCTION ................................................................................................ 1

STATEMENT ..................................................................................................... 2

    A.    Statutory and Regulatory Background ........................................ 2

    B.    Factual Background ..................................................................... 4

ARGUMENT ...................................................................................................... 8

I.    Mandamus is warranted to block the disclosure of privileged documents .......... 9

    A.    The district court's order compelling production is clearly
        erroneous. .................................................................................... 9

    B.    The government will suffer irreparable harm absent mandamus
        and a post-judgment appeal does not provide an adequate means
        for relief. .................................................................................... 12

    C.    The issues presented are important and warrant this Court's
        immediate intervention. ............................................................ 13

II.    Mandamus is warranted to block the district court's sweeping injunction ........ 14

CONCLUSION ................................................................................................. 16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENT: DISTRICT COURT ORDER

## INTRODUCTION

Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Rule 21 of the Federal Rules of Appellate Procedure, the federal government respectfully asks this Court to issue a writ of mandamus directing the district court to vacate its order of May 9, 2025, which requires the government to produce privileged documents to plaintiffs and the district court and enjoins 20 federal agencies from carrying out an Executive Order directing agencies to undertake steps to complete reductions in force (RIFs).

The parties have agreed to pause the production deadline, but the district court has not yet acted, so as of now, the government must publicly produce these records by May 13, 2025. The documents the district court ordered the government to produce are plainly covered by the deliberative-process privilege. They are pre-decisional planning tools to memorialize agencies' thinking at one stage of an interagency dialogue about policy choices to be made down the road. They are also highly sensitive and include information like "strategies for agency negotiations with unions," "present and future appropriations requests," and "congressional engagement." Add.421.[1] Although a litigant may sometimes overcome the deliberative-process privilege by showing, inter alia, a strong need for information in litigation, here, the district court conducted no balancing at all. It offered no

---

[1] Citations to "Add." are the addendum to the government's contemporaneously filed stay motion.

explanation for its order other than the *ipse dixit* that the plaintiffs had shown "good cause." That was clear error, and mandamus is warranted to correct it.

Additionally, if this Court concludes that the injunctive relief the district court issued is not an appealable preliminary injunction, this Court should exercise its mandamus jurisdiction to vacate that order as well.

## STATEMENT[2]

### A.    Statutory and Regulatory Background

**1**. The Office of Management and Budget (OMB) is a component of the Executive Office of the President (EOP) that assists the President in preparing the budget and overseeing agencies. *See* 31 U.S.C. §§ 501-503. The Office of Personnel Management (OPM) is an independent establishment in the Executive Branch that assists the President in overseeing the federal workforce. *See* 5 U.S.C. §§ 1101-1104. The U.S. DOGE Service (USDS) is an entity in EOP created to help advise and consult on the President's agenda of "modernizing federal technology and software to maximize governmental efficiency and productivity." Executive Order 14158, 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025).

**2**. Federal law expressly recognizes that the government may conduct RIFs, an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d

---

[2] This section substantially duplicates the statement in the government's contemporaneously filed stay motion.

1310, 1314 (Fed. Cir. 2002); *see* 5 U.S.C. § 3502. OPM has promulgated regulations specifying requirements for RIFs, under which "OPM may examine an agency's preparations for [RIFs] at any stage." 5 C.F.R. § 351.205.

Agencies' authority to conduct RIFs predates the modern civil service. *See* Act of Aug. 15, 1876, 19 Stat. 143, 169; *see generally Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948). Courts have recognized the government's broad discretion to decide which employees to retain or separate. *See, e.g.*, *Keim v. United States*, 177 U.S. 290, 295 (1900). And the President has often set priorities for federal agencies resulting in RIFs. *See, e.g.*, Executive Order 12839, 58 Fed. Reg. 8515, 8515 (Feb. 10, 1993) (directing 4% reduction in civilian workforce to be implemented through "detailed instructions" from OMB).

**3**. The Civil Service Reform Act (CSRA) "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse action to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to RIFs may also pursue a challenge before the MSPB. *See* 5 C.F.R. § 351.901. The MSPB may order relief, including reinstatement with backpay. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review in the Federal Circuit. *Id.* § 7703.

Additionally, the Federal Service Labor–Management Relations Statute

(FSLMRS) governs labor relations between the Executive Branch and its employees.

*See* 5 U.S.C. §§ 7101-7135; *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The

Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor

disputes. 5 U.S.C. § 7105(a)(2). Review of FLRA decisions is available in the courts

of appeals. *Id.* § 7123(a).

### B. Factual Background

**1. a.** In February, the President issued an executive order, directing "Agency

Heads [to] promptly undertake preparations to initiate large-scale reductions in force

(RIFs), consistent with applicable law." Exec. Order No. 14210, 90 Fed. Reg. 9669

(Feb. 11, 2025), Add.118, § 3(c). The order sets priorities for how agencies carry out

RIFs and categorically exempts from RIFs "functions related to public safety,

immigration enforcement, or law enforcement." *Id.*

The Executive Order further provides that, by March 13, 2025, "Agency Heads

shall submit to" OMB "a report that identifies any statutes that establish the agency,

or subcomponents of the agency, as statutorily required entities," and which

"discuss[es] whether the agency or any of its subcomponents should be eliminated or

consolidated." Add.118, § 3(e). The Executive Order again emphasizes that agency

heads need not consider reductions for "any position they deem necessary to meet

national security, homeland security, or public safety responsibilities," Add.118, § 4(b),

and that the order "shall be implemented consistent with applicable law and subject to the availability of appropriations." Add.119, § 5(b).

**b.** Two weeks later, OPM and OMB jointly issued a guidance Memorandum to agencies. Add.121-27. The Memorandum explained that agencies should submit Agency RIF and Reorganization Plans that "seek to achieve" (1) "[b]etter service for the American people"; (2) "[i]ncreased productivity; (3) "[a] significant reduction in the number of full-time … positions by eliminating positions that are not required"; (4) "[a] reduced real property footprint; and (5) "[r]educed budget topline." Add.121-22. OPM and OMB cautioned agencies, in formulating the Plans, to review "their statutory authority and ensure that their plans and actions are consistent with such authority." Add.122.

The Memorandum explains that agencies should submit Plans in two phases. The initial Plans were to be submitted by March 13, 2025, and "focus[ed] on initial agency cuts and reductions." Add.123. The second-phase Plans, to be submitted by April 14, 2025, "outline[d] a positive vision for more productive, efficient agency operations going forward" to be implemented by the end of the fiscal year. Add.124. The Plans were to be submitted to OMB and OPM "for review and approval." Add.123-24.

The Plans do not themselves implement any RIFs. Rather, the Plans describe RIFs that an agency intends to undertake. Add.124-25. Agencies must then follow an

established process to actually reduce their workforce, including providing 30- or 60-days' notice, Add.127. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351 Subpart H.

**2.** Plaintiffs are unions, advocacy organizations, and local governments. Add.13-20. Eleven weeks after the President issued the Executive Order, they sued the President, OPM, OMB, USDS, and twenty-one federal agencies—including every Cabinet-level agency except the Department of Education. Add.20-25. Plaintiffs alleged the President transgressed the separation of powers by directing agencies to prepare for RIFs, *see* Add.98-100; that OMB and OPM usurped other agencies' statutory authority by providing related guidance as the President directed, *see* Add.100-08; and that notice-and-comment rulemaking was required for that interagency guidance, *see* Add.105-06.

Plaintiffs moved for a "temporary restraining order" supported by a 50-page brief, Add.148-98, and more than 1,300 pages of declarations, *see* Dkt.42, 70-1, 70-2, which the government opposed.

**3.** Following a hearing, the district court granted preliminary relief. The court found that at least some plaintiffs have standing, Add.384, and that it could exercise general federal-question jurisdiction notwithstanding the CSRA and the FSLMRS, Add.391. The court then concluded that plaintiffs are likely to succeed on the merits. Add.398, 400, 403. Invoking separation-of-powers principles, the court held that absent express congressional authorization, the President cannot direct agencies to

engage in "large-scale RIFs," Add.397, and that OMB, OPM, and USDS are unlawfully usurping agencies' authority to make RIF determinations, Add.399-403.

While the court captioned its order as a temporary restraining order, it acknowledged that it conducted "substantially identical" analysis as it would for "evaluating injunctive relief." Add.376. The court "enjoined" twenty agencies, as well as "any other individuals acting under their authority or the authority of the President" from "taking any actions to implement or enforce sections 3(c) and 3(e) of Executive Order" or the Memorandum. Add.406. Among other restrictions, the court forbade agencies from approving Plans, issuing or executing RIF notices, or placing any employees on administrative leave. *Id.*

> Additionally, the district court ordered the government to produce:
>
> (1) the versions of all defendant agency [Plans] submitted to OMB and OPM, (2) the versions of all defendant agency [Plans] approved by OMB and OPM, (3) any agency applications for waivers of statutorily-mandated RIF notice periods, and (4) any responses by OMB or OPM to such waiver requests

Add.406. Notably, the court required disclosure of multiple versions of the Plans, *id.*, though plaintiffs only requested "current versions," Add.130. And it required disclosure of "agency applications for waivers," Add.406, even though plaintiffs asked only for disclosure of the "waivers" (and only for the first time at the hearing), Add.355. Nevertheless, the court ordered the government to produce all these documents by May 13. Add.406. The district court explained only that "good cause

[for disclosure] ha[d] been shown pursuant to Federal Rule of Civil Procedure 26(d)." *Id.*

**4.** The government asked the court to stay its order pending appeal, Add.361-62, but the court expressly refused to "consider" that motion, stating only that a stay would "render" its preliminary relief "pointless," Add.408.

The government also moved for reconsideration and a protective order to prevent disclosure of the Plans, Add.409, which remains pending. Plaintiffs have agreed not to oppose an order pausing the government's production obligation until the court rules on the pending motion. Add.424.

## ARGUMENT

Mandamus relief is appropriate where a petitioner has "no other adequate means to attain the relief desired," where "the right to the writ is clear and indisputable," and where "the writ is appropriate under the circumstances." *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (per curiam) (quoting *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380-81 (2004)). This Court considers:

> (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression.

*Id.* (citing *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977)). These factors "serve as guidelines," and "[n]ot every factor need be present at once" or even

"point in the same direction" for a writ of mandamus to issue. *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) (quotation marks omitted).

The government files this abridged petition to establish jurisdiction to stay the district court's imminent compliance deadlines. If required, the government will supplement this petition at a later date.

## I. Mandamus is warranted to block the disclosure of privileged documents.

### A. The district court's order compelling production is clearly erroneous.

The deliberative process privilege is a subset of executive privilege and protects deliberations by shielding from disclosure documents "reflecting advisory opinions, recommendations and comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). "[I]t would be impossible to have any frank discussions of legal or policy matters in writing if all such writings were to be subjected to public scrutiny." *EPA v. Mink*, 410 U.S. 73, 87 (1973).

The privilege may be overcome if a litigant's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *FTC v. Warner Communc'ns*, 742 F.2d 1156, 1161 (9th Cir. 1984) (per curiam). In assessing a claim under the privilege, a court must consider "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the

litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.*

Here, the district court completely failed to consider the deliberative nature of the Plans. As the government explained, "the [Plans] are deliberative agency planning documents that discuss a number of steps the agency plans to take t[o] … improve the agency's efficiency, as well as to focus on statutorily required functions activities that directly serve the public." Add.254; *see also* Add.421. Such documents, "which reflect the agency's group thinking in the process of working out its policy," are definitionally deliberative materials shielded from disclosure. *See Sears, Roebuck & Co.*, 421 U.S. at 153. Without addressing those concerns or purporting to engage in balancing analysis, the district court simply declared that "good cause having been shown pursuant to Federal Rule of Civil Procedure 26(d)," the government must produce the Plans and other documents by 4:00 p.m. on Tuesday, May 13.[3] Add.406.

That analysis is plainly inadequate to override the privilege. In *Karnoski*, this Court issued a writ of mandamus vacating discovery orders because the district court did not perform a sufficiently "granular" balancing analysis before holding that the plaintiffs in that case had overcome the deliberative process privilege. 926 F.3d at 1206("The district court appears to have conducted a single deliberative process privilege analysis covering all withheld documents, rather than considering whether

---

[3] As noted above, the parties have agreed to pause the production deadline, but the district court has not yet acted on that request.

the analysis should apply differently to certain categories."); *see also id.* at 1195 (order covered 15,000 documents). Here, the error is even worse—the district court conducted no analysis at all.

Even if the district court had conducted a balancing analysis, the privilege would not be overcome. Plaintiffs allege that the President has called for "large scale" changes to agencies and that the separation of powers forbids him from so reforming federal agencies absent express statutory authorization. As explained in the government's stay motion, that theory is wrong. But regardless, it does not turn on the specific Plans agencies have prepared. Indeed, plaintiffs do not challenge any Plan at all. Rather, they challenge the President's authority to ask agencies to prepare Plans and OPM and OMB's ability to offer guidance on what those documents should contain. Because the content of the Plans is legally irrelevant to the claims plaintiffs have pleaded, plaintiffs are not entitled to them and the district court clearly erred in concluding otherwise.

Underscoring the court's error, the court ordered disclosure of some documents plaintiffs never even sought—agency "applications" for RIF notice exemptions and interim drafts of Plans, *compare* Add.130, 355, *with* Add.406—and of other documents that plaintiffs requested for the first time near the end of the hearing, Add.355. The district court heard no argument and offered no justification for why it should compel disclosure of these agency records, providing the

government no opportunity to consider whether production would be appropriate, much less object to compelled production.

### B. The government will suffer irreparable harm absent mandamus and a post-judgment appeal does not provide an adequate means for relief.

**1.** Disclosure of confidential information is irreversible. As a party is likely to suffer irreparable harm if required to disclose privileged materials, courts recognize that mandamus is appropriate to review such disclosure orders. *See, e.g.*, *In re von Bulow*, 828 F.2d 94, 98 (2d Cir. 1987) (recognizing that "appeal after judgment" is "inadequate at best" to address compelled disclosure of privileged material). The need for interlocutory review is heighted here given "[t]he unique features of the … deliberative process privilege." *Karnoski*, 926 F.3d at 1203.

Here, disclosure "would seriously undermine agency operations" across the Executive Branch. Add.421. As an OMB declarant explains, the Plans contain "highly sensitive information," which may include labor-negotiation strategies, nascent regulatory plans, and intended approaches for engaging with Congress. *Id.* Releasing such information, before agencies have reached any final decisions, would put agencies at a significant disadvantage when dealing with other stakeholders. Public disclosure might make recruitment or employee retention more difficult. *Id.* For example, a potential new hire may be unwilling to join a component if she knows that an agency had considered eliminating it, even if the agency has confirmed that it wants to keep the office open. There is a panoply of reasons for shielding pre-

decisional, deliberative materials from public scrutiny—nearly all of them implicated by the Plans prepared by the 21 defendant agencies.

**2.** At minimum, this Court should require the district court to enter a protective order. Such an order, which the government has sought, Add.409-19, would at least ameliorate the harm the government would face from public disclosure, though it would do little to temper the discovery order's unwarranted intrusion into the government's privileged deliberations.

Such limited relief, however, would not eliminate the chilling effect created by disclosures of deliberative materials, nor justify disregarding the government's interest in maintaining the documents' confidentiality. *Cf. Perry v. Schwarzenegger*, 591 F.3d 1147, 1163-64 (9th Cir. 2009) (granting defendants' mandamus petition and overruling a district court's order compelling the defendants to produce documents whose disclosure threatened to "inhibi[t] internal campaign communications that are essential to effective association and expression," while emphasizing that "[a] protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened harms").

### C. The issues presented are important and warrant this Court's immediate intervention.

The deliberative process privilege exists because disclosure of deliberative documents chills the willingness of government officials to engage in "open, frank discussion[s]" about difficult policy choices. *Mink*, 410 U.S. at 87. Here, where the

discussion involves top-level officials making long-term policy judgments at the President's request, the government's interest in confidentiality is at its apex. The government cannot function if officials are worried that in writing down their strategies for union negotiations or for budget talks with congressional appropriators, those deliberations may be made public on a whim.

The stakes of disclosure justify this Court's exercise of its mandamus jurisdiction. And the cavalier manner in which the district court disregarded those stakes amplifies the need for this Court to step in. The district court's wholly unreasoned order should not be the final word on whether the Plans and other documents must be disclosed.

## II. Mandamus is warranted to block the district court's sweeping injunction.

As the government explained in its stay motion, the order the district court issued "enjoin[ing]" twenty agencies, as well as "any other individuals acting under their authority . . . of the President" from "taking any actions to implement or enforce sections 3(c) and 3(e) of Executive Order" or the Memorandum, Add.406, is an appealable preliminary injunction in all but name. Stay Mot. 8-9. If, however, the Court disagrees that appellate jurisdiction lies under 28 U.S.C. § 1291(a)(2), it should exercise mandamus jurisdiction over the injunctive portion of the district court's order as well.

14

The factors for mandamus are met here. *See Bauman*, 557 F.2d at 654-55. The district court's order was clearly erroneous, *see* Stay Mot. 10-19; if the district court's order is not construed as an injunction, the government would have no other means to obtain relief from this order; the government will suffer irreparable harm before it could appeal any eventual preliminary injunction, *see* Stay Mot. 19-20; and the district court's unprecedented theory of the separation of powers raises a novel and important issue. The mandamus standard is demanding, but this case satisfies it.

## CONCLUSION

For the foregoing reasons, this court should issue a writ of mandamus compelling the district court to vacate its May 9 order.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

PATRICK D. ROBBINS
*Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*

*(202) 305-1754*

May 2025

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(2) because it contains 3,336 words. This petition also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi

# CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2025, I electronically filed the foregoing

petition with the Clerk of the Court for the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system. Service has been accomplished

via e-mail to the following counsel:

*Counsel for Real Party in Interest-Plaintiffs:*
Molly J. Alarcon (molly.alarcon@sfcityatty.org)
Tiffany Bingham (tiffany.bingham@harriscountytx.gov)
Matthew Stark Blumin (mblumin@afscme.org)
Barbara Jane Chisholm (bchisholm@altber.com)
Bethany Dwyer (bethany.dwyer@harriscountytx.gov)
Norman L. Eisen (Norman@statedemocracydefenders.org)
Sara Jennifer Eisenberg (sara.eisenberg@sfcityatty.org)
Jonathan G.C. Fombonne (jonathan.fombonne@harriscountytx.gov)
Elena Goldstein (egoldstein@democracyforward.org)
Sara Gross (sara.gross@baltimorecity.gov)
Jill Ellen Habig (jill@publicrightsproject.org)
David J Hackett (david.hackett@kingcounty.gov)
Rebecca A. Hirsch (Rebecca.Hirsch2@cityofchicago.org)
Alison Chinn Holcomb (aholcomb@kingcounty.gov)
Alexander Justin Holtzman (alexander.holtzman@sfcityatty.org)
Tsuki Hoshijima (thoshijima@democracyforward.org)
Corinne F Johnson (cjohnson@altber.com)
Meredith Anne Johnson (meredith.johnson@cco.sccgov.org)
Stephen J. Kane (Stephen.kane@cityofchicago.org)
Alex Keiser (alex.keiser@harriscountytx.gov)
Erin King-Clancy (erin.king-clancy@kingcounty.gov)
Spencer W. Klein (Spencer@statedemocracydefenders.org)
Mollie M Lee (mollie.lee@sfcityatty.org)
Danielle Evelyn Leonard (dleonard@altshulerberzon.com)
Stacey M. Leyton (sleyton@altshulerberzon.com)
Anthony J LoPresti (tony.lopresti@cco.sccgov.org)
Yvonne Rosil Mere (yvonne.mere@sfcityatty.org)
Sharanya Mohan (sai@publicrightsproject.org)
Kavita Kandala Narayan (Kavita.Narayan@cco.sccgov.org)
Erica Newland (erica.newland@protectdemocracy.org)

Teague Paterson (TPaterson@afscme.org)
Skye L. Perryman (sperryman@democracyforward.org)
Lucy Prather (lucy.prather@cityofchicago.org)
Jacek Pruski (jacek.pruski@protectdemocracy.org)
Raphael N. Rajendra (raphael.rajendra@cco.sccgov.org)
Rushab Sanghvi (sanghr@afge.org)
Aaron Schaffer-Neitz (aschafferneitz@altshulerberzon.com)
Robin Starr Tholin (rtholin@altshulerberzon.com)
Julia Torti (jules.torti@protectdemocracy.org)
Robert Chan Tysor, Jr (chan.tysor@harriscountytx.gov)
Steven K. Ury (steven.ury@seiu.org)
Sarah Utley (sarah.utley@harriscountytx.gov)
Alice X Wang (awang@altshulerberzon.com)

The district court has been provided with a copy of this petition.

/s/ *Maxwell A. Baldi*
Maxwell A. Baldi

**ATTACHMENT**

**Order Granting Temporary Restraining Order and Compelling Certain Discovery Production, ECF No. 85 (May 9, 2025)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 25-cv-03698-SI |
| Plaintiffs, | **ORDER GRANTING TEMPORARY RESTRAINING ORDER AND COMPELLING CERTAIN DISCOVERY PRODUCTION** |
| v. | |
| DONALD J. TRUMP, et al., | Re: Dkt. No. 37 |
| Defendants. | |

The new presidential administration has made clear that it intends to change the way the federal government operates. An Executive Order issued on February 11, 2025 seeks to "commence[] a critical transformation of the Federal bureaucracy" by "eliminating waste, bloat, and insularity[.]" Exec. Order No. 14210, 90 Fed. Reg. 9,669 (Feb. 11, 2025). It is the prerogative of presidents to pursue new policy priorities and to imprint their stamp on the federal government. But to make large-scale overhauls of federal agencies, any president must enlist the help of his co-equal branch and partner, the Congress. Federal courts should not micromanage the vast federal workforce, but courts must sometimes act to preserve the proper checks and balances between the three branches of government. As a group of conservative former government officials and advisors have written to the Court, "Unchecked presidential power is not what the Framers had in mind." Dkt. No. 69-1 at 1.

The plaintiffs in this case—a collection of unions, non-profit organizations, and local governments—contend that the executive branch cannot lawfully implement large-scale reductions in the federal workforce without the participation of Congress. They bring this suit against President Trump, numerous federal agencies, and their respective agency heads. Specifically, plaintiffs

contest several layers of actions within the executive branch.  First, they argue President Trump exceeded his authority when issuing Executive Order 14210, which directs agency heads "to initiate large-scale reductions in force (RIFs)," focusing on "all agency initiatives, components, or operations that my Administration suspends or closes."  *See* Exec. Order No. 14210 § 3(c).  Second, they argue that a subsequent memo from the Office of Management and Budget and the Office of Personnel Management implementing the executive order exceeded those agencies' authority and violated the Administrative Procedure Act (APA).  And third, they argue that the "Agency RIF and Reorganization Plans" submitted by various agencies across the government likewise violate the Administrative Procedure Act.  With layoffs pending across multiple federal agencies, plaintiffs seek a temporary restraining order to pause any reductions in force and preserve the status quo as this lawsuit moves forward.

The Court GRANTS a temporary restraining order as described below.[1]  The Court finds that plaintiffs are likely to succeed on the merits of at least some of their claims.  The irreparable harm that plaintiffs will suffer in the absence of injunctive relief outweighs any burden placed on the government by this two-week pause.  In the context of a dynamic situation, the Court's temporary order seeks to preserve the status quo and protect the power of the legislative branch.

Plaintiffs have submitted sixty-two sworn declarations to the Court, constituting more than 1,000 pages of evidentiary material.  Before proceeding through technical legal arguments, the Court finds it appropriate to highlight several of these declarations to illustrate what is at stake in this lawsuit and some of the ways in which executive and legislative powers intersect.

The National Institute for Occupational Safety and Health (NIOSH) is part of the Centers for Disease Control in the Department of Health and Human Services.  Dkt. No. 41-1 ("Decl. Niemeier-Walsh AFGE") ¶ 5.  There are (or were) 222 NIOSH employees in the agency's Pittsburgh office that research health hazards faced by mineworkers.  *Id.* ¶ 28.  According to the union that represents many of these employees, the department's reduction-in-force will terminate 221 of 222

---

[1] At the hearing, the Court denied defendants' request to convert plaintiffs' motion for a temporary restraining order into a motion for a preliminary injunction.

United States District Court
Northern District of California

of these positions. *Id.* Congress established NIOSH in the Occupational Safety and Health Act of 1970. Pub. L. 91-596 § 22, 84 Stat. 1590, 1612 (1970).

The Department of Labor houses the Office of Federal Contract Compliance Programs, which ensures that federal contractors do not discriminate on the basis of race, color, religion, sex, national origin, veteran status, or disability. Dkt. No. 37-24 ("Decl. Levin AFGE") ¶ 7. In late January of this year, department leadership directed the employees in this office to stop their enforcement efforts. *Id.* ¶ 9. On April 16, 2025, after giving employees an opportunity to accept a deferred resignation, the department placed remaining employees in the office on administrative leave, effective almost immediately. *Id.* ¶ 14. On May 6, 2025, employee union representatives were informed that a RIF had been approved and that all positions in the Washington, D.C. Enforcement Division of the office were being abolished. Dkt. No. 70-2 ("Decl. Gamble AFGE ISO Reply") ¶ 4, Ex. A. Congress has directed by statute that the Department of Labor "shall promptly investigate" complaints of discrimination against disabled workers or veterans by federal contractors. 29 U.S.C. § 793(b); 38 U.S.C. § 4212.

The federal Office of Head Start resides in the Department of Health and Human Services. Plaintiff Santa Clara County, California runs a childcare and early learning program for 1,200 infants and preschoolers with funding from federal Head Start, but that funding expires June 30, 2025. Dkt. No. 37-26 ("Decl. Neuman SEIU") ¶ 21. County staff worked with Office of Head Start employees to apply for a grant renewal, but those federal employees have now all been laid off and their San Francisco office closed. *Id.* Facing uncertainty about whether its grant will be approved before funding expires, the county has notified more than one hundred early learning program workers that they might lose their jobs on July 1, 2025. *Id.* Congress reauthorized the national Head Start program and provided details for its administration through the Improving Head Start for School Readiness Act of 2007. Pub. L. 110-134, 121 Stat. 1363 (2007).

The Farm Service Agency in the U.S. Department of Agriculture provides specialized, low-interest loans to small farmers not available from the private sector. Dkt. No. 37-37 ("Decl. Davis NOFA") ¶¶ 20-21. After unprecedented flooding in 2024, one Vermont farmer asked the Farm Service Agency for disaster assistance to plant a new crop, but the agency first had to inspect the

fields. *Id.* ¶ 28. Due to low staffing levels, the farmer had to wait three to four weeks for an inspection and consequently missed the planting window that season. *Id.* The department now reportedly intends to further reduce staff at the agency. *Id.* ¶ 18. Other farmers have reported their contacts at the department have been laid off and the remaining staff are not familiar with their farms or their projects. *Id.* ¶¶ 40-41. Congress granted the Secretary of Agriculture the authority to establish the Farm Service Agency in 1994. Pub. L. 103-354 § 226, 108 Stat. 3178, 3214 (1994) (codified at 7 U.S.C. § 6932).

The Social Security Administration seeks to reduce its workforce by 7,000 employees. Dkt. No. 37-11 ("Decl. Couture AFGE") ¶ 9, Ex. C. Since staff reductions began, retirees have reported long wait times to reach an agency representative on the phone, problems with the agency's website, and difficulty making in-person appointments. Dkt. No. 37-39 ("Decl. Fiesta ARA") ¶ 7. One individual got through to a representative only after eleven attempts to call, each involving hours on hold. Dkt. No. 41-2 ("Decl. Nelson AFSCME") ¶ 12. Congress first established the Social Security Administration in the Social Security Act of 1935, known at that time as the Social Security Board. Pub. L. 74-271, § 701 et seq., 49 Stat. 620, 635 (1935) (now codified at 42 U.S.C. § 901 et seq.).

These examples illustrate there are various ways in which Congress is lawfully involved in the activity of administrative agencies. With this basic point in mind, the Court now turns to the facts of this case.

## BACKGROUND

### I.    Executive Order 14210 and the Challenged Memorandum

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." 90 Fed. Reg. 9,669 (Feb. 11, 2025). The order "commences a critical transformation of the Federal bureaucracy[.]" *Id.* § 1. Section 3(c) of the order states,

> Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute

United States District Court
Northern District of California

> or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

*Id.* § 3(c). The order also directs agencies to submit a report within thirty days to the Office of Management and Budget that "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* § 3(e).

In response to Executive Order 14210, the directors of the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) sent a memo to heads of executive departments and agencies on February 26, 2025. Dkt. No. 37-1, Ex. B ("OMB/OPM Memo"). The memo states that "tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens. [¶] The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government." *Id.* at 1. The memo instructed agency heads to submit Agency RIF and Reorganization Plans (ARRPs) to OMB and OPM for review and approval. Agencies were directed to submit a "Phase 1" ARRP by March 13, 2025 that included, among other information, any Congressional statutes that established the agency, whether parts of the agency should be eliminated, a list of essential positions, how the agency intends to reduce positions, a "suggested plan for congressional engagement to gather input and agreement on major restructuring efforts," and the agency's timeline for implementation. *Id.* at 3-4. The memo directs agencies to submit "Phase 2" ARRPs by April 14, 2025 that include, among other information, all reductions that will occur through RIFs, proposed relocations of offices from the Washington, D.C. area to "less-costly parts of the country," "[a]n explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities," a certification that the ARRPs will improve the delivery of direct services, and a timetable for implementation. *Id.* at 4-6. The memo also instructs agencies to send monthly progress reports to OMB and OPM on May 14, June 16, and July 16, 2025. *Id.* at

6.    The memo excludes law enforcement, border security, national security, immigration enforcement, public safety, military personnel, the Executive Office of the President, and the U.S. Postal Service.  *Id.*

## II.    The Agency Defendants and Their Locations within the Federal Bureaucracy

### A.    The Central Agencies: OMB, OPM, and DOGE

In 1970, Congress transferred OMB to the president's authority.  Reorganization Plan No. 2 of 1970, 84 Stat. 2085 (1970) (located at 5 U.S.C. Appendix, page 213).  In 1982, Congress codified OMB's current location in the Executive Office of the President[2] at 5 U.S.C §§ 501-507.  Congress established OPM as an "independent establishment in the executive branch" and the agency resides outside of the Executive Office of the President.  5 U.S.C. § 1101.  In 2025, President Trump refashioned the U.S. Digital Service—an office that President Obama created within OMB[3]—into the U.S. DOGE Service via Executive Order 14158.  90 Fed. Reg. 8,441 (Jan. 20, 2025).  DOGE is known colloquially as the Department of Government Efficiency, but it derives no authority from statutes.

### B.    The Other Federal Agency Defendants

The defendants include twenty-one other federal departments or agencies that are arguably more public facing.  For ease of reference, this order refers to these defendants collectively as the "federal agency defendants."  That term does not include OMB, OPM, or DOGE.  Fourteen of the federal agency defendants are considered "executive departments" under 5 U.S.C. § 101 and have been established by Congressional statute.[4]  *See*, *e.g.*, 7 U.S.C. § 2201 (USDA); 22 U.S.C. § 2651

[2] "Established in 1939, the Executive Office of the President (EOP) consists of a group of federal agencies immediately serving the President."  Harold C. Relyea, Cong. Rsch. Serv., 98-606, *The Executive Office of the President: An Historical Overview* (2008).

[3] *See* Clinton T. Brass and Dominick A. Fiorentino, Cong. Rsch. Serv., IN12493, *Department of Government Efficiency (DOGE) Executive Order: Early Implementation* (2025).

[4] These include the departments of Agriculture (USDA), Commerce, Defense, Energy, Health and Human Services (HHS), Homeland Security (DHS), Housing and Urban Development (HUD), Justice (DOJ), Interior, Labor, State, Treasury, Transportation, and Veterans Affairs (VA). The only executive department not named in this suit is the Department of Education.  Plaintiffs'

(State); 38 U.S.C. § 301 (VA); 42 U.S.C. § 3532 (HUD).

Six additional defendant agencies have a statutory basis elsewhere in the United States Code and one was created by President Nixon under reorganization authority granted by Congress, as follows:

Defendant AmeriCorps, known formally as the Corporation for National and Community Service, received its current statutory formulation through the National and Community Service Trust Act of 1993. Pub. L. 103-82, title II, §§ 202-03, 107 Stat. 785, 873 (1993) (codified at 42 U.S.C. § 12651 et seq.). AmeriCorps is a "government corporation." 42 U.S.C. § 12651 (referring to 5 U.S.C. § 103).

Defendant General Services Administration (GSA) was established by Congress in the Federal Property and Administrative Services Act of 1949. Pub. L. 81-152, 63 Stat. 277 (1949). The structure of the agency is now codified at 42 U.S.C. § 301 et seq.

Defendant National Labor Relations Board (NLRB) was created by the National Labor Relations Act of 1935. Pub. L. 74-198, ch. 372, 49 Stat. 449 (1935). The structure of the agency is codified at 29 U.S.C. § 153.

Defendant National Science Foundation (NSF) was established by the National Science Foundation Act of 1950. Pub. L. 81-507, ch. 171, 64 Stat. 149 (1950). The structure of the agency is codified at 42 U.S.C. § 1861 et seq.

Defendant Small Business Administration (SBA) was established by the Small Business Act of 1953 as amended in 1958. Pub. L. 85-536, 72 Stat. 384 (1958). The structure of the agency is now codified at 15 U.S.C. § 633 et seq.

Defendant Social Security Administration (SSA) was first established by Congress in the Social Security Act of 1935, known at that time as the Social Security Board. Pub. L. 74-271, § 701 et seq., 49 Stat. 620, 635 (1935) (now codified at 42 U.S.C. § 901 et seq.).

Defendant Environmental Protection Agency (EPA) was created by the Reorganization Plan

_____

TRO motion does not implicate the departments of Defense, Justice, or Homeland Security. *See* Dkt. No. 37 at 1.

1     No. 3 of 1970 under statutory reorganization authority granted to the president by Congress at that

2     time.  35 Fed. Reg. 15,623, 84 Stat. 2086 (1970) (located at 5 U.S.C. Appendix, page 216).

3

4     **III.     Agency RIF and Reorganization Plans (ARRPs)**

5               Pursuant to the terms of the OMB/OPM February 26, 2025 memo, federal agencies were

6     directed to submit Phase 1 ARRPs by March 13, 2025 and Phase 2 ARRPs by April 14, 2025.

7     OMB/OPM Memo at 3-4.  Defendants have not publicly released these plans despite requests from

8     the public, employees, and members of Congress.  An agency's action steps would include the

9     following: (1) submitting its ARRP to OMB and OPM; (2) receiving approval of the ARRP by OMB

10    and OPM; (3) sending of RIF notices; (4) placing employees on administrative leave; and

11    (5) terminating employees.

12              As described in sworn declarations submitted by plaintiffs, the defendant agencies appear to

13    be at different points along this continuum of action.  RIFs have started at multiple agencies,

14    including HHS, HUD, Labor, State, AmeriCorps, GSA, and SBA.  After sending RIF notices to

15    employees, agencies have sometimes placed these employees on immediate administrative leave

16    until the termination date set by the RIF, usually sixty days after the notice.  *See*, *e.g.*, Dkt. No. 37-

17    14 ("Decl. Fabris AFGE") ¶¶ 11-15.  The earliest RIF termination date that the Court can discern

18    from the declarations is May 18, 2025, at which point some HUD employees will be terminated.

19    Dkt. No. 41-1 ("Decl. Bobbitt AFGE") ¶¶ 13, 14, Exs. C, D.

20              As directed by Executive Order 14210, the scale of the RIFs is large.  Here are some

21    examples.  HHS is issuing RIF notices to 8,000-10,000 employees.  Dkt. No. 37-17 ("Decl.

22    Garthwaite AFGE") ¶ 7, Ex. A.  Reports indicate the Department of Energy has identified 8,500

23    positions as eligible for cuts, nearly half of its workforce.  Dkt. No. 37-8 ("Decl. Braden AFGE")

24    ¶ 12, Ex. A.  The National Oceanic and Atmospheric Administration is reportedly preparing a RIF

25    to reduce its workforce by more than half.  Dkt. No. 37-40 ("Decl. Molvar WWP") ¶ 23.  Reports

26    also suggest that HUD is preparing to cut half of its staff and close many field offices.  Decl. Bobbitt

27    AFGE ¶¶ 9, 11, Exs. A, B.  Department of Labor management have said internally that they intend

28    to cut the agency's headquarters staff by 70%.  Dkt. No. 37-16 ("Decl. Gamble AFGE") ¶ 12.

United States District Court
Northern District of California

Reports suggest the Internal Revenue Service in the Department of the Treasury plans to cut 40% of its staff. Dkt. No. 37-42 ("Decl. Olson CTR") ¶ 10. The VA is planning to cut 83,000 positions. Dkt. No. 37-5 ("Decl. Bailey SEIU") ¶ 12. AmeriCorps sent an email to employees announcing a reorganization that will cut more than half of its workers. Dkt. No. 37-12 ("Decl. Daly AFSCME") ¶ 14, Ex. A. NSF has been directed to cut about half of its 1,700 staff. Dkt. No. 37-32 ("Decl. Soriano AFGE") ¶¶ 9-10, Ex. A. The SBA announced it planned to cut its workforce by more than 40%. Dkt. No. 37-18 ("Decl. Gustafsson AFGE") ¶ 6, Ex. A.

### IV.    Plaintiffs

The union plaintiffs in this case consist of the American Federation of Government Employees (AFGE) and four of its locals (Local 1122, Local 1236, Local 2110, and Local 3172), the American Federation of State County and Municipal Employees (AFSCME), and the Service Employees International Union (SEIU) and one of its locals (Local 1000). Eleven membership-based non-profit organizations have joined the unions as co-plaintiffs: Alliance for Retired Americans, American Geophysical Union, American Public Health Association, Center for Taxpayer Rights, Coalition to Protect America's National Parks, Common Defense Civic Engagement, Main Street Alliance, Natural Resources Defense Council, Northeast Organic Farming Association, VoteVets Action Fund, and Western Watersheds Project. Six local governments have also joined the suit: Santa Clara County, CA; King County, WA; Baltimore, MD; Harris County, TX; Chicago, IL; and San Francisco, CA.

The plaintiffs in this action are discussed more fully in the Court's consideration of standing below.

### V.    Procedural History

Plaintiffs filed their complaint on Monday, April 28, 2025. Dkt. No. 1. The complaint alleges that President Trump's Executive Order 14210 is *ultra vires* and usurps Congressional authority, in violation of the Constitution's separation of powers (Claim One); that OMB, OPM, and DOGE also acted *ultra vires* or beyond their authority in directing agencies to submit ARRPs and

United States District Court
Northern District of California

engage in RIFs (Claim Two); that the February 26, 2025 memo violated the Administrative Procedure Act in several ways (Claims Three through Five); and that the federal agency defendants' ARRPs also violate the Administrative Procedure Act (Claims Six and Seven).

On Thursday, May 1, 2025, plaintiffs filed a motion for a temporary restraining order. Dkt. No. 37 ("Mot."). Per the Court's schedule, defendants filed an opposition on Wednesday, May 7, 2025, and plaintiffs filed a reply the following day. Dkt. Nos. 60 ("Opp'n"), 70 ("Reply"). The Court has received several briefs from *amici curiae*. Dkt. Nos. 51, 69, 71, 75. The Court heard oral arguments on the motion on Friday, May 9, 2025.

### LEGAL STANDARD

A party may seek a temporary restraining order (TRO) to preserve the status quo and prevent irreparable harm until a preliminary injunction hearing may be held. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974)); Fed. R. Civ. P. 65(b). The standard for evaluating a TRO is "substantially identical" to the standard for evaluating injunctive relief. *Babaria v. Blinken,* 87 F.4th 963, 976 (9th Cir. 2023), *cert. denied sub nom. Babaria v. Jaddou*, 145 S. Ct. 160 (2024) (internal quotation marks and citations omitted).

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). In order to obtain a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citations omitted). When the nonmoving party is the government, the final two factors merge. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met. *All. for the Wild Rockies v. Cottrell*,

632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks and citation omitted).  This formulation recognizes a sliding scale approach, where "a stronger showing of one element may offset a weaker showing of another."  *Id.* at 1131, 1134-35.

## DISCUSSION

### I.       Timing

To start, the Court addresses defendants' argument that plaintiffs' motion for a temporary restraining order should be denied because it was brought too late after the Executive Order was filed and the OMB/OPM Memorandum issued. Opp'n at 19-22.  Defendants' argument is not well-taken.  The details of the ARRPs have only trickled into public view due to defendants' ongoing decision not to release the plans publicly.  Moreover, in a case where other plaintiffs challenged Executive Order 14210 shortly after it was issued, as defendants suggests plaintiffs here should have done, the government's attorneys argued that plaintiffs' harm was too "speculative" to establish injury.  *See Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025).  Defendants cannot have it both ways.  The Court finds that plaintiffs reasonably waited to gather what information they could about the harm they may suffer from the Executive Order, the OMB/OPM Memorandum, and the ARRPs.

### II.      Standing

Federal courts may only hear a case if plaintiffs can show they have standing to sue.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016, revised May 24, 2016).  "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."  *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

To establish standing to sue, plaintiffs must show an injury, trace that injury to the defendants' conduct, and prove that courts can provide adequate redress for the injury.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury "must be concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation

marks and citation omitted). To be imminent, a threatened injury must be "*certainly impending*"—
"allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks, brackets, and
citations omitted). Plaintiffs cannot base standing on a theory of harm that "relies on a highly
attenuated chain of possibilities." *Id.* at 410. The standing inquiry must be "rigorous" where the
court faces claims that Congress or the executive branch has acted unconstitutionally. *Id.* at 408.

Organizational plaintiffs such as trade unions or membership-based non-profit organizations
have two paths to establishing standing. "[A]n association has standing to bring suit on behalf of
its members when: (a) its members would otherwise have standing to sue in their own right; (b) the
interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim
asserted nor the relief requested requires the participation of individual members in the lawsuit."
*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Organizations without
formal members may achieve associational standing if they are "the functional equivalent of a
membership organization." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002)
(citing *Hunt*, 432 U.S. at 342-45).

Injury may come in many forms. The threat of a pending job loss constitutes a concrete
economic injury. *Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1014 (N.D. Cal. 2007). The
possible loss of federal funding is also sufficient to establish injury. *Nat'l Urb. League v. Ross*, 508
F. Supp. 3d 663, 688 (N.D. Cal. 2020). A failure to provide relevant information can constitute
injury where one might be entitled to such information. *Fed. Election Comm'n v. Akins*, 524 U.S.
11, 20 (1998). While the Ninth Circuit has held an organization can meet the injury requirement by
showing it had to divert resources to fight a problem affecting the organization, *La Asociacion de
Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010), the
Supreme Court recently rejected organizations seeking standing "simply by expending money to
gather information and advocate against the defendant's action," *Food & Drug Admin. v. All. for
Hippocratic Med.*, 602 U.S. 367, 394 (2024).

With this framework in mind, the Court now turns to the question of standing as applied to
plaintiffs in this case. Since the Court need not address the standing of each plaintiff to proceed as
long as it finds standing for at least one plaintiff, it limits its discussion below.

**A.      Injury**

The numerous plaintiffs in this case can be divided into three general groups, each with its own set of alleged injuries.

**1.      Union Plaintiffs**

In the declarations filed in support of their motion for a temporary restraining order, the union plaintiffs assert the following categories of harm.

First, and perhaps most obviously, they assert injury on behalf of their federal employee members who have received RIF notices or suffer under the looming threat of such notices. Second, they contend that their federal employees who are not let go will be injured by significantly increased workloads. Third, they assert injury to the unions themselves, in the form of "thousands of hours" of diverted staff resources and the loss in dues revenue that will result from the loss of employee members. *See*, *e.g.*, Dkt. No. 37-23 ("Decl. Kelley AFGE") ¶¶ 12-13, 15, 20.

The unions also assert injury on behalf of their non-federal employee members who stand to lose their jobs as a result of federal workforce reductions. For example, SEIU represents 6,000 federal contract workers at facilities that may face closure in the wake of staff reductions. Dkt. No. 37-3 ("Decl. Adler SEIU") ¶¶ 4, 9. These workers have lost their jobs during government shutdowns, or in the recent contested closure of the U.S. Institute of Peace facility. *Id.* ¶¶ 5, 7. Similarly, if staff reductions lead to the delay in processing of Medicare enrollment or other federal fund sources like grant payments, union members that work in sectors that depend on these revenue streams face layoffs. As just two provided examples, AFSCME members work in local housing authorities and local transit agencies that rely on a steady stream of federal funding. Dkt. No. 41-5 ("Decl. O'Brien AFSCME") ¶¶ 39-40, 45-46.

In response, defendants first argue that the unions do not show that a specific federal employee has been harmed or will imminently be harmed. Opp'n at 32 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Defendants are factually mistaken and overstate their legal case. Factually, multiple declarants have asserted personal harm. *See*, *e.g.*, Decl. Fabris AFGE ¶ 10

(declarant received RIF notice); Dkt. No. 37-24 ("Decl. Levin AFGE") ¶¶ 14-15 (declarant placed on same-day administrative leave); Decl. Bobbit AFGE, Ex. D (declarant received and provided redacted list of employees in RIF notice). As to the doctrine, the Court in *Summers* wanted to ensure that injury had been specifically established by sworn affidavits. The Ninth Circuit has later clarified that naming individuals is not necessary "when it is clear and not speculative that a member of a group will be adversely affected by a challenged action and a defendant does not need to know the identity of a particular member to defend against an organization's claims." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025). It is not speculative here that the union's members are being harmed by defendants' challenged actions.

The unions also establish standing as organizations representing federal employees based on impending direct financial harm to their organizations in the form of lower membership numbers and lower dues.

SEIU has also established standing based on the federal contract workers that it represents. These workers have lost their jobs when federal facilities close. Decl. Adler SEIU ¶¶ 5, 7. The ARRPs are likely to result in the closure of more federal facilities,[5] and when that happens SEIU's contract workers will lose their jobs. This is not like the attenuated five-link chain of cascading events in *Clapper*—given the breadth of the RIFs that have been announced, these injuries are "certainly impending." *See Clapper*, 568 U.S. at 410. AFSCME also represents non-federal employee workers who rely on the federal workforce to process grants to support their work. In the Department of Energy's Weatherization Assistance Program, reports indicate the number of federal staff will decrease by 75%. Dkt. No. 37-15 ("Decl. Gabel AFSCME") ¶ 11. If or when these cuts are implemented, AFSCME workers at a non-profit supported by this program will find it "extremely challenging to get the necessary grant money to operate, and layoffs . . . are almost certain." *Id.* ¶ 12. While slightly more attenuated than the contract workers' basis for standing, the Court finds that these facts support an independent basis for standing as well.

---

[5] One of the principles to inform the ARRPs, per the OMB/OPM Memorandum, is "[a] reduced real property footprint." OMB/OPM Memo at 2.

Defendants also challenge whether the employees who will be saddled with more work will have experienced a concrete harm. Opp'n at 33. The Court need not decide at this stage whether this type of injury is sufficient for standing.

### 2. Non-Profit Plaintiffs

All of these non-profit organizations except for the Natural Resources Defense Council have submitted declarations that detail the harms that significant federal workforce reductions impose upon their members or the organizations themselves. Two consistent themes emerge from these declarations. First, the organizations' members benefit from services provided by federal employees, but significant staffing reductions across various agencies impact their ability to continue to benefit. Second, many of the organizations assert that they have had to divert resources away from their primary mission to respond to the impact of federal staffing cuts on their members.

As defendants note, the diversion of resources theory rests on shakier ground after *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024).[6] But at least some of the organization plaintiffs establish injury on other bases. For example, the American Geophysical Union attests that implementation of ARRPs will cause the organization to lose membership, publication authors, and conference attendees, resulting in a loss of revenue to the organization. Dkt. No. 37-45 ("Decl. Shultz AGU") ¶¶ 9, 28-29. Based on its past experience, the Center for Taxpayer Rights suggests that its low-income members will see delays to the processing of refunds that they rely on for day-to-day expenses. Dkt. No. 37-42 ("Decl. Olson CTR") ¶¶ 35-37. The Executive Director of the Western Watersheds Project finds personal enjoyment from visiting the Arctic grayling in its natural habitat, an enjoyment threatened by further cuts to the agency currently working on Endangered Species Act findings for that species. Dkt. No. 37-40 ("Decl. Molvar WWP") ¶¶ 15-18. Harm that "affects the recreational or even the mere esthetic

---

[6] The Supreme Court there denied standing when plaintiff organizations incurred costs opposing the government's actions but explained that organizations have standing when a defendant's acts "directly affected and interfered with [plaintiff's] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. at 395.

United States District Court
Northern District of California

1    interests of the plaintiff . . . will suffice" for standing.  *Summers*, 555 U.S. at 494 (citing *Sierra Club*

2    *v. Morton*, 405 U.S. 727, 734-736 (1972).

3        The Court finds these types of harm sufficient to establish injury.  None are as attenuated as

4    the causal chain of events leading to potential injury in *Clapper*.  The Court reserves a full discussion

5    of standing for each plaintiff for a later stage.

6

7                    **3.    Local Government Plaintiffs**

8        To establish standing, a local government must assert a harm to its own "proprietary

9    interests," which "are as varied as a municipality's responsibilities, powers, and assets."  *City of*

10   *Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).  Proprietary interests include a local

11   government's ability to enforce regulations, its ability to collect revenue, and its ability to protect

12   its natural resources.  *Id.* at 1198.

13       The local government plaintiffs assert that large-scale reductions in the federal workforce

14   will jeopardize the timely delivery of many different federal funding streams that their budgets rely

15   on.  Baltimore also asserts a more direct financial injury in the form of lost municipal tax revenues,

16   given that 12,400 city residents are (or were) federal employees.  Dkt. No. 37-54 ("Decl. Leach—

17   Baltimore") ¶¶ 5-8.  The local governments also contend that they will be forced to expend more

18   resources in the absence of federal support, in areas like fighting wildfires or the provision of shelter

19   to the unhoused.

20       The Court finds the local governments have standing on the basis of impending financial

21   harm.  For example, King County has a budget that includes more than $200 million in federal

22   revenue for its operating budgets, and $500 million in federal funds in its capital budget for 2025.

23   Dkt. No. 41-6 ("Decl. Dively—King County") ¶¶ 6, 8.  The county communicates with staff across

24   multiple federal agencies to process grants and permits for capital projects; any delay in these

25   communications delays projects and increases costs.  *Id.* ¶¶ 22, 26, 31, 33, 38.  With large-scale

26   RIFs happening across agencies, such delay is likely.[7]  As another example, Harris County Public

27   _____

28          [7] As one example, the County believes the closure of HUD's regional office in Seattle will
     result in delays in disbursement of the County's $47 million in federal grant funds.  Decl. Dively—

                                    16

United States District Court
Northern District of California

1    Health receives grants from the CDC, but has begun to experience a delay in communication after

2    HHS initiated its RIF.  Dkt. No. 37-46 ("Decl. Barton—Harris County") ¶¶ 23, 26.

3        Finding the above sufficient to establish standing for at least some of the local governments,

4    the Court reserves a fuller analysis for another day.

5

6        **4.    Procedural Injury**

7        Lastly, plaintiffs across all of the above categories assert a procedural injury for their notice-

8    and-comment claims, because they contend they would have submitted comments had they been

9    given a chance.  *See*, *e.g.*, Dkt. No. 37-31 ("Decl. Soldner AFGE") ¶ 27.  Some explained that they

10   provided comments in response to notices about similar proposals during President Trump's first

11   administration.  *See*, *e.g.*, *id.*

12       A procedural injury must be related to a plaintiff's concrete interests.  *Summers*, 555 U.S. at

13   496.  As a collection of plaintiffs have established standing based on harm to their concrete interests,

14   the plaintiffs also have standing to challenge a lack of notice and comment procedures.

15

16       **B.    Causation and Redressability[8]**

17       The plaintiffs challenge three layers of action: the president's executive order, the

18   OMB/OPM Memorandum issued pursuant to the executive order, and the agency ARRPs submitted

19   pursuant to the memorandum.  The harm experienced by plaintiffs or imminently threatening them

20   comes from the reorganizations and RIFs established by the ARRPs.  As many declarants have

21   offered, the agencies had not talked about large-scale RIFs or reorganizations prior to President

22   Trump's executive order.  *See, e.g.*, Decl. Bailey SEIU ¶ 10; Decl. Garthwaite AFGE ¶ 6.  These

23   harms are fairly traceable to defendants' actions at all three levels; beyond the defendants, there are

24   no intervening actors causing these harms.  *See Lujan*, 504 U.S. at 560.

25       Finally, the Court can redress the harms by vacating the unlawful actions as allowed by the

26   _____

27   King County ¶¶ 37-38.

28       [8] Defendants do not specifically challenge causation or redressability in their opposition, but
     the Court must complete the standing inquiry regardless.

United States District Court
Northern District of California

1  APA and Supreme Court precedent.

2

3  **C.    Conclusion as to Standing**

4  At this stage, the Court finds at least some collection of the plaintiffs have sufficient

5  standing to bring their claims.

6

7  **III.    Subject Matter Jurisdiction—*Thunder Basin* Preclusion**

8  Courts generally have jurisdiction under 28 U.S.C. § 1331 to review federal government

9  actions. *Califano v. Sanders*, 430 U.S. 99, 105 (1977). But Congress sometimes precludes district

10  court review "by specifying a different method to resolve claims about agency action," *Axon Enter.,*

11  *Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023), often through channeling review to an

12  adjudicative body within an agency. In determining whether Congress has removed district court

13  jurisdiction, courts ask two questions: whether "the 'statutory scheme' displays a 'fairly discernible'

14  intent to limit jurisdiction" and whether "the claims at issue 'are of the type Congress intended to

15  be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,

16  561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).

17  When examining the second question—whether the particular claims should be channeled

18  to agency review—courts consider three factors from *Thunder Basin*: "First, could precluding

19  district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim

20  wholly collateral to the statute's review provisions? And last, is the claim outside the agency's

21  expertise?" *Axon*, 598 U.S. at 186 (internal quotation marks, brackets, and citations omitted).

22  Affirmative answers to these questions suggest that Congress did not intend to limit jurisdiction,

23  "[b]ut the same conclusion might follow if the factors point in different directions." *Id.* Together,

24  these factors recognize that agency action should rarely evade effective judicial review, but

25  channeling from a district court to an agency adjudication may be appropriate "in the matters [an

26  agency] customarily handles, and can apply distinctive knowledge to." *Id.*

27  Defendants argue that the Federal Service Labor-Management Relations Statute and the

28  Civil Service Reform Act of 1978 preclude district court jurisdiction over plaintiffs' claims. Opp'n

United States District Court
Northern District of California

18

United States District Court
Northern District of California

at 23-31.  The Federal Service Labor-Management Relations Statute established a Federal Labor Relations Authority to resolve issues related to collective bargaining between federal employee unions and their employers, including "issues relating to the granting of national consultation rights," "issues relating to determining compelling need for agency rules or regulations," "issues relating to the duty to bargain in good faith," and "complaints of unfair labor practices."  5 U.S.C. § 7105(a)(2).  In passing the statute, Congress specified that its provisions "should be interpreted in a manner consistent with the requirement of an effective and efficient Government."  *Id.* § 7101(b).  The Civil Service Reform Act provides a mechanism for employees who have suffered an adverse action to appeal to the Merit Systems Protection Board.  5 U.S.C. §§ 7512, 7513(d); *see also* 5 U.S.C. § 1204 (delineating functions of the Board).  The Civil Service Reform Act of 1978 excluded reductions in force from the definition of "adverse action" appealable to the Board.  5 U.S.C. § 7512(B); 5 C.F.R. § 752.401(b)(3).  However, per federal regulations issued by OPM, employees who have been furloughed, separated or demoted by a reduction in force can appeal to the Board.  5 C.F.R. § 351.901.[9]  Judicial review of final orders of both the Authority and the Board is available at circuit courts.  5 U.S.C. §§ 7703, 7123(a).

Defendants' opposition cites to courts across the country that have begun to address this question in the context of similar claims.  On February 12, 2025, a District of Massachusetts court declined to enjoin enforcement of the deadline for opting into a deferred resignation program.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *1-3 (D. Mass. Feb. 12, 2025).  The court determined the plaintiff unions lacked standing and that the claims were precluded by the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act of 1978, which establish "exclusive procedures for disputes involving employees and their federal employers and disputes between unions representing federal employees and the federal government."  *Id.*

In a February 20, 2025 ruling, a D.C. district court denied a temporary restraining order and

---

[9] As defendants' opposition notes, some employees may be precluded from appealing to the Board under the terms of their collective bargaining agreements.  Opp'n at 9 n.4.

1   preliminary injunction because it found that the union plaintiffs were precluded by the Federal

2   Service Labor-Management Relations Statute under *Thunder Basin*. *Nat'l Treasury Emps. Union*

3   *v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025).  There, the

4   plaintiffs sought to prevent the termination of probationary employees, anticipated large-scale RIFs,

5   and any renewal of deferred resignation programs. *Id.* at *1.  The court determined that the unions'

6   claimed injuries—financial harm and loss of bargaining power—could be meaningfully reviewed

7   through the Federal Labor Relations Authority, even though that body could not resolve the unions'

8   constitutional claims. *Id.* at *6-7.  The constitutional question could be revived in an appeal of the

9   FLRA's decision. *Id.* at * 7.

10      The next day, February 21, 2025, another D.C. district court rejected the injunctive relief

11  requested by two employee unions that sought to pause the administration's attempt to dismantle

12  the U.S. Agency for International Development. *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-

13  352 (CJN), 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025).  The court held that while "at a high

14  level of generality and in the long run, plaintiffs' assertions of harm could flow from their

15  constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," the court

16  noted that "the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking

17  injunctive relief flow essentially from their members' existing employment relationships with

18  USAID." *Id.* at *7.  The court held that the Federal Service Labor-Management Relations Statute,

19  the Civil Service Reform Act, and the Foreign Service Act of 1980 indicated that Congress intended

20  for these types of claims to be channeled first to the administrative review offered by those statutory

21  schemes. *Id.* at *8-10.  The court noted that the Foreign Service Act's scheme was "even broader"

22  than the other two and reasoned that "plaintiffs have presented no irreparable harm they or their

23  members are *imminently* likely to suffer from the hypothetical future dissolution of USAID" absent

24  immediate judicial review. *Id.*  The court concluded that it likely lacked jurisdiction, so plaintiffs

25  were unlikely to succeed on the merits of their claims. *Id.* at *11.

26      All three of the above opinions relied on *American Federation of Government Employees,*

27  *AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019).  In that case, federal employee unions challenged

28  executive orders regarding federal labor-management relations from President Trump's first term.

United States District Court
Northern District of California

20

*Id.* at 753.  The orders directed federal agencies to remove certain subjects from labor negotiations, limit the time employees could spend on union affairs during their workday, and exclude disputes over for-cause terminations from grievance proceedings.  *Id.*  The appellate court determined that the unions' claims—some of which asserted that the Executive Orders violated the Federal Service Labor-Management Relations Statute itself—must be channeled first to the Federal Labor Relations Authority.  *Id.* at 753-54, 761.

More recently, on April 22, 2025, in a case involving the administration's attempt to dismantle the U.S. Agency for Global Media, the district court held that a conclusion that the claims at issue "boiled down to a quotidian employment dispute . . . would ignore the facts on the record and on the ground."  *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025).  The district court determined that the administrative tribunals "have no jurisdiction to review the cancelation of congressional appropriations" and that the case involved administrative and constitutional law issues, separate from federal employment questions.  *Id.* at *11 n.22.  On appeal, however, a majority opinion from the D.C. Circuit determined that "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'"  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (citation omitted).

Finally, Judge Alsup of this district found that federal employee unions' challenge to the OPM directive to agencies to terminate probationary employees should not be precluded based on the *Thunder Basin* analysis.  *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 3:25-cv-01780-WHA, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025).[10]  First, the court decided that the *ultra vires* and APA claims in that case would not benefit from the administrative expertise of the Federal Labor Relations Authority or the Merit Systems Protection Board.  *Id.* at 3-4.  It also found the claims collateral to the review authority of those agencies, because the claims challenged executive

---

[10] The district court reversed its earlier decision finding preclusion under *Thunder Basin*, upon further briefing.

United States District Court
Northern District of California

power, not a specific personnel action. *Id.* at 5. Lastly, it determined that the district court offered the only opportunity for meaningful judicial review. *Id.* at 6. The court noted that probationary employees could not appeal a decision to the Merit Systems Protection Board and distinguished the claims in this case from the bargaining-related issues sent to the Federal Labor Relations Authority in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). *Id.* at 7-8.[11]

### A.     Federal Employee Union Plaintiffs

The Court starts its analysis with the union plaintiffs. The Court agrees with Judge Alsup in this district that the D.C. Circuit's 2019 decision in *AFGE v. Trump* is not particularly helpful to resolving the claims channeling question here. In that case, the claims involved executive orders that touched directly on matters related to collective bargaining, which are central to the purpose of the Federal Labor Relations Authority. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d at 753-54, 761. To the extent that other recent orders rely on the 2019 opinion, the Court disagrees with their reasoning. Here, the claims are far afield from the central concerns of the Federal Labor Relations Authority, *see* 5 U.S.C. § 7105(a)(2), instead touching on fundamental questions of executive authority and separation of powers.

Defendants' opposition also cites two fresh opinions from the Fourth Circuit and the D.C. Circuit that found it likely that plaintiffs with similar claims to those here would ultimately be channeled to administrative review schemes. Opp'n at 24-25 (citing *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025); *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025)). When considering out-of-circuit authority, the Court looks to its persuasive value. *See Jones v. PGA TOUR, Inc.*, 668 F. Supp. 3d 907, 917 (N.D.

---

[11] The preliminary injunction in Judge Alsup's case is currently on appeal. On April 8, 2025, the Supreme Court granted the government's application for an emergency stay of the injunction pending appeal, stating that the non-profit organization plaintiffs on whose claims the original injunction was based had not sufficiently shown standing. *OPM v. AFGE*, --- S. Ct. ----, No. 24A904, 2025 WL 1035208, at *1 (S. Ct. Apr. 8, 2025) (citing *Clapper*). On return to the district court, the case proceeded and the court granted relief as to the claims of the plaintiff unions and the State of Washington.

United States District Court
Northern District of California

Cal. 2023). Tthe Fourth Circuit offers no reasoning for its conclusion that the district court lacked jurisdiction, and this Court finds the dissenting opinion in that case more robust and more persuasive. The D.C. Circuit provides slightly more (two paragraphs) on the question of jurisdiction, but again the dissenting judge in that case centered the claims in the appropriate context—the comprehensive dismantling of an entire agency—far more concretely and persuasively than the panel majority.

The Court now moves to its own application of *Thunder Basin*. Recognizing, as other courts have, that the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act indicate an intent to limit jurisdiction in some instances, the Court turns to the second inquiry: "whether the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Free Enter. Fund*, 561 U.S. at 489 (internal quotation marks, brackets, and citation omitted). The Court concludes the answer is no. To explain, the Court examines each of the three *Thunder Basin* factors in turn, all three of which favor a finding of subject matter jurisdiction in this Court.

First, precluding district court jurisdiction for the union plaintiffs at this time would foreclose meaningful judicial review. Plaintiffs seek an opportunity to challenge "large-scale reductions in force" happening rapidly across multiple agencies in the federal government. In some offices or agencies, nearly all employees are receiving RIF notices. Defendants contend that plaintiffs must take their concerns to what can be a prolonged administrative process and *then* appeal to present their constitutional claim in federal court. By that point, if they prevailed, they "would return to an empty agency with no infrastructure" to support a resumption of their work. *See Widakuswara*, 2025 WL 1166400, at *11 n.22.

Second, the claims at issue here are wholly collateral to the review authority of the Federal Labor Relations Authority and the Merit Systems Protection Board. As noted above, this lawsuit involves questions of constitutional and statutory authority and the separation of powers. Federal employees are simply the ones to suffer most immediately the collateral damage of allegedly unlawful actions. In other words, "[t]he plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work

of [their offices or agencies] and shutting [them] down." *See Widakuswara*, 2025 WL 1288817, at *8 (Pillard, J., dissenting). Moreover, employees' rights to appeal a RIF to the Merit Systems Protection Board comes not directly from statute but from regulation. *See* 5 C.F.R. § 351.901;[12] *see also* 5 U.S.C. § 7512(B) (excluding reductions in force from the review provisions for "adverse actions").[13] When Congress did not directly specify Board review for reductions-in-force claims, it seems unlikely that Congress intended the Merit Systems Protection Board to be the *exclusive* avenue for such claims, let alone claims that involve broader questions about constitutional and administrative law. The same holds true for the Federal Labor Relations Authority—Congress desired that body's enabling statute to be interpreted "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b). There is nothing efficient about sending constitutional claims to a body that cannot decide them, only to wait for an opportunity to appeal.[14]

Third, the claims here involve issues related to the appropriate distribution of authority to and within the executive branch, not the individual employee or labor disputes these two administrative bodies customarily handle. As the Supreme Court has repeated, "agency adjudications are generally ill suited to address structural constitutional challenges." *Axon,* 598 U.S. at 195. Neither the Merit Systems Protection Board nor the Federal Labor Relations Authority have

---

[12] 5 U.S.C. § 7701 arguably provides *indirect* statutory authority with its rather circular proposition: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation."

[13] Defendants' opposition cites the adverse actions sections without noting that reductions in force are explicitly excluded from those provisions. Opp'n at 12.

[14] In *Elgin v. Department of Treasury*, the Supreme Court decided that there was no exception to Civil Service Reform Act exclusivity for constitutional challenges to federal statutes, in that case a statute that bars those who fail to register for the draft from federal employment. 567 U.S. 1, 12 (2012). The Court held that plaintiffs were obliged to wait to present their constitutional claim to the Federal Circuit after proceeding through the Merit Systems Protection Board. *Id.* at 21. However, the *Elgin* plaintiffs sought to vindicate their own personal rights to employment. Here, the plaintiffs confront an issue much larger in scope: how to interpret the constitutional structure of the federal government. And while the *Elgin* plaintiffs were likely to have a job and an agency to return to in the event they eventually won their case after winding through two layers of administrative and judicial review, the same cannot be said in this case. *See id.* at 25 (Alito, J., dissenting) ("I doubt that Congress intended to channel petitioners' constitutional claims into an administrative tribunal that is powerless to decide them[.]").

special expertise to bear on the questions in this suit.

### B.    Other Plaintiffs

The rest of the plaintiffs in this case, including the non-profit organizations, the local governments, and the unions in their capacity representing non-federal employees, do not have access to the Federal Labor Relations Authority or the Civil Service Reform Act.  Even if the union plaintiffs should be channeled out of court—and this Court thinks they should not—the *Thunder Basin* factors weigh against claims channeling even more strongly when applied to these other plaintiffs.  Defendants fail to show how the cases they cite—involving challenges by federal employees—support the channeling of constitutional and APA claims by non-federal employees, including federal contract workers, non-profit organizations on behalf of their members, or local governments.  In *U.S. v. Fausto*, cited by both defendants and the *amici* states who filed a brief in support of defendants, the Supreme Court held that a type of employee that received lesser privileges in the Civil Service Reform Act was not entitled to district court review that was denied to employees who had more privileges under the Act, because holding otherwise would have flipped the structural logic of the Act.  484 U.S. 439, 448-49 (1988).  But the Civil Service Reform Act says nothing at all about non-federal employee unions, non-profit organizations, or local governments. The Court is not persuaded that, when Congress created the Merit Systems Protection Board or the Federal Labor Relations Authority, it intended for constitutional and APA claims by these sorts of plaintiffs to be precluded from federal court.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (in denying an application for an emergency stay, finding the government had not shown they are likely to establish that Congress intended to channel claims by non-profit organizations to the same administrative agencies).

### IV.    Analysis of the *Winter* Factors

The Court now proceeds to the *Winter* factors, examining whether plaintiffs have established they are likely to succeed on the merits, whether they are likely to suffer irreparable harm in the absence of preliminary relief, if the balance of equities tips in their favor, and whether an injunction

United States District Court
Northern District of California

is in the public interest.  *See Winter*, 555 U.S. at 22.

### A.    Likelihood of Success on the Merits

#### 1.    *Ultra Vires*

Plaintiffs' first and second claims for relief allege that Executive Order 14210, and the actions and orders of OMB, OPM, and DOGE to implement the Executive Order, violate the separation of powers and are therefore *ultra vires*.

"When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."  *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated and remanded on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (quoting *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988)).  The ability to enjoin unconstitutional action by government officials dates back to the courts of equity, "reflect[ing] a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)).  Where the President exceeds his authority, the district court may declare the action unlawful and an injunction may issue.  *Sierra Club*, 963 F.3d at 891 (explaining that, in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), "The [Supreme] Court never questioned that it had the authority to provide the requested relief").

#### a.    Actions by President Trump

Plaintiffs are likely to succeed on their claim that the President's Executive Order 14210 is *ultra vires*, as the President has neither constitutional nor, at this time, statutory authority to reorganize the executive branch.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.  And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute."  *Youngstown*, 343 U.S. at 587.

United States District Court
Northern District of California

Article I of the U.S. Constitution vests in Congress the legislative power. U.S. Const. art. I, § 1. "To Congress under its legislative power is given the establishment of offices, [and] the determination of their functions and jurisdiction . . . ." *Myers v. United States*, 272 U.S. 52, 129 (1926). "Congress has plenary power over the salary, duties, *and even existence* of executive offices." *Free Enter. Fund*, 561 U.S. at 500 (emphasis added). While "[t]he President may create, reorganize, or abolish an office that *he* established," the Constitution does not authorize him "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (emphasis added); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

In 1952, the Supreme Court considered the validity of an Executive Order by President Truman, who ordered the Secretary of Commerce to seize most of the nation's steel mills to prevent strikes from halting steel production during the Korean War. *Youngstown,* 343 U.S. at 582. Although various statutes authorized the President to seize property under certain circumstances, none of the statutory conditions had been met, and so the President claimed the seizures were lawful pursuant to his constitutional authority. In reviewing whether the district court's preliminary injunction to stop enforcement of the order was proper, the Supreme Court explained, "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585. Where President Truman lacked both constitutional and statutory authority to seize the steel mills, the Supreme Court affirmed the district court injunction.

*Youngstown* applies here. Defendants do not claim that Executive Order 14210 issued under the President's constitutional powers. Rather, they attempt to fit the President's actions into existing statutory authority. Such statutory authority, however, is plainly lacking. The Ninth Circuit has explained,

> Justice Jackson's *Youngstown* concurrence provides the operative test in this context:
>
> > When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution,

United States District Court
Northern District of California

> for what is at stake is the equilibrium established by our constitutional system

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)).

As history demonstrates, the President may broadly restructure federal agencies only when authorized by Congress. "Although the U.S. Constitution vests in Congress the authority to organize the Executive Branch,[] former presidential administrations have asked Congress to grant expedited government reorganization authority to execute cross-agency government reorganizations more efficiently." S. Rep. No. 115-381, at 4 (2018). Since 1932, when President Hoover was the first President to request and receive such reorganization authority, Congress has granted this authority "16 times under both Republican and Democratic administrations[,]" to nine different Presidents. *Id.*; John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Found. Legal Memorandum No. 4782, at 3 (Nov. 3, 2017), available at: https://www.heritage.org/sites/default/files/2017-11/IB4782.pdf [https://perma.cc/59KD-JVU5] (hereinafter, "Heritage Found. Legal Memorandum No. 4782"). According to a Senate Report issued during President Trump's first term in office, "[b]etween 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." S. Rep. No. 115-381, at 4 (2018). The most recent statutory authorization for a president to conduct a governmental reorganization expired December 31, 1984. Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch Reorganization* 6-7 & n.23 (2017) (hereinafter, "CRS R44909").

The brief of *amicus curiae* Constitutional Accountability Center recounts the long history of Congress exercising its "power to restructure and abolish federal agencies as it finds necessary . . . ." Dkt. No. 51-1 at 6-9. Defendants' opposition brief also recounts this long history, which supports the proposition that large-scale reorganization of the federal agencies stems from a long-standing partnership between the executive and legislative branches. *See* Opp'n at 5-6 (citing, *inter alia*, 19 Stat. 169; 37 Stat. 413; the Veterans' Preference Act of 1944; the Federal Employee Pay Act of 1945; the 1966 recodification and amendment of the Veterans' Preference Act of 1944).

United States District Court
Northern District of California

In recent history, this congressional check on executive reach has stopped Democratic and Republican presidents alike from restructuring federal agencies. Presidents George W. Bush, Barack Obama, and Donald Trump (in his first term) all sought but did not receive Congressional approval to reorganize the executive branch. CRS R44909 at 7; H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018). Indeed, during the first months of his first term in office, President Trump attempted a large-scale reorganization of federal agencies when he issued Executive Order 13781, entitled, "Comprehensive Plan for Reorganizing the Executive Branch." *See* 82 Fed. Reg. 13,959 (Mar. 16, 2017). That order called for agency heads to submit plans within 180 days "to reorganize the agency, if appropriate, in order to improve the efficiency, effectiveness, and accountability of that agency." *Id.* The accompanying legislation, however, died in Congress. *See* H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018).

The simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial: constitutional commentators and politicians across party lines agree that "sweeping reorganization of the federal bureaucracy requires the active participation of Congress." *See* Heritage Found. Legal Memorandum No. 4782 at 1-2; *see also* Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Found. Legal Memorandum No. 210, at 1 (July 12, 2017), available at: https://www.heritage.org/political-process/report/the-presidents-reorganization-authority [https://perma.cc/2T7K-H6EY] (". . . to accomplish major reorganization objectives, [the President] will need explicit statutory authority from Congress . . ."); Ronald C. Moe, Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority: Review and Analysis* 2 (2001) ("It is Congress, through law, that determines the mission of agencies, personnel systems, confirmation of executive officials, and funding, *and ultimately evaluates whether the agency shall continue in existence*.") (emphasis added). As former government officials note in their *amicus* brief, House Representative James Comer (R-Kentucky) has introduced the Reorganizing Government Act of 2025. *See* H.R. 1295, 119th Cong. (2025). The bill would allow "Congress to fast-track President Trump's government reorganization plans by renewing a key tool to approve them swiftly in Congress." Press Release, House Committee on Oversight and Government Reform, Chairman Comer and Senator Lee Introduce Bill to Fast-Track

President Trump's Government Reorganization Plans (Feb. 13, 2025), https://oversight.house.gov/release/chairman-comer-and-senator-lee-introduce-bill-to-fast-track-president-trumps-government-reorganization-plans/ [https://perma.cc/3XSV-TKWL]. The bill contemplates that the President must partner with Congress on a government reorganization effort, acknowledging that presidential "reorganization authority . . . was last in effect in 1984[.]" *Id.*

In their brief, defendants assert that judicial review of the Executive Order is unavailable, citing *Dalton v. Specter*, 511 U.S. 462, 470 (1994).[15] Opp'n at 34. The facts of *Dalton* could not be more different from the scenario here. In *Dalton*, the Supreme Court held that judicial review of the President's decision is unavailable "[w]here a statute . . . commits decisionmaking to the discretion of the President." 511 U.S. at 476-77. At issue in *Dalton* was a decision by the President to close the Philadelphia Naval Shipyard, pursuant to the Defense Base Closure and Realignment Act of 1990. The Act provided for the Secretary of Defense, following notice and public comment, to prepare closure recommendations, which then went to Congress and to an independent commission, which then held public hearings and prepared a report, which then went to the President for approval, following which Congress then could enact a joint resolution of disapproval. *Id.* at 464-65. As discussed further below regarding the APA claims, nothing close to this level of procedure has occurred here, at least as far as the record shows. More importantly, *Dalton* challenged Presidential action taken pursuant to statutory authority that Congress delegated to the President. Thus, defendants misread plaintiffs' *ultra vires* theory against President Trump. Plaintiffs' claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed. Instead, Claim One is about the President acting without *any* authority, constitutional or statutory. As defendants themselves state in their brief, "[A]n officer may be said to act *ultra vires* 'only when he acts without any authority whatever.'" Opp'n at 44 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984) (internal quotation marks omitted)). This is precisely what plaintiffs

---

[15] Defendants appear to conflate the *ultra vires* and APA claims, arguing that President Trump is not subject to the APA and that his Executive Order is not reviewable under APA standards. *See* Opp'n at 34. However, plaintiffs do not sue President Trump under the APA, and their APA claims challenge the carrying out of the Executive Order by OPM, OMB, DOGE, and the federal agency defendants but do not challenge the Executive Order itself as violating the APA.

1    here have alleged.

2        Defendants also argue that "federal law expressly permits RIFs, the governing statute

3    expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently

4    recognized agencies' authority to engage in RIFs since the nineteenth century." Opp'n at 35.  Maybe

5    so.  However, what plaintiffs allege—and what defendants fail to refute—is that Executive Order

6    14210 reaches so broadly as to exceed what the President can do without Congress.  The Executive

7    Order mandates that "Agency Heads *shall* promptly undertake preparations *to initiate large-scale*

8    *reductions-in-force* (RIFs), consistent with applicable law," including submitting plans that "shall

9    discuss whether the agency or any of its subcomponents should be eliminated . . . ."[16]  Exec. Order

10   14210 § 3(c), (e) (emphasis added).  This is not an instance of the President using his "inherent

11   authority to exercise 'general administrative control of those executing the laws,'" *see* Opp'n at 4,

12   because Congress has passed no agency reorganization law for the President to execute.  Congress

13   may choose to do so.  But as of today, Congress has not.[17]

14       In defendants' interpretation, there is no unlawful action here because the President did not

15   order the agencies to take any specific actions, and OMB and OPM were merely providing guidance

16   about how agencies should conduct RIFs.  The evidence plaintiffs have presented paints a very

17   different picture: that the agencies are acting at the direction of the President and his team.

18   Defendants submitted no evidence of their own in response.  As noted above regarding causation

19   for standing, agencies were not discussing a need for large-scale RIFs prior to the President's

20   order.  In their reply brief, plaintiffs present a declaration that a recently-issued RIF notice at the

21   _____

22   [16] The most recent, now lapsed, Congressional authorization for the President to reorganize
     the federal agencies covered precisely these actions, including "the transfer of the whole or a part
23   of an agency" and "the abolition of all or a part of the functions of an agency, except that no
     enforcement function or statutory program shall be abolished by the plan . . . ."  *See* 9 U.S.C.
24   § 903(a)(1), (2).

25   [17] *Amici* the State of Montana et al. filed a brief in support of defendants.  Dkt. No. 71-1.
     They argue, among other things, that "Article II provides the President with broad authority to
26   manage the federal workforce. . . , and the courts have recognized it for more than two centuries
     except in limited circumstances not relevant here." *Id.* at 3 (citing *Trump v. United States*, 603 U.S.
27   593, 609 (2024)).  However, a closer read of the cited decision shows that the removal power
     defendants cite applies "with respect to executive officers of the United States *whom he has*
28   *appointed*." *See Trump*, 603 U.S. at 609 (emphasis added).  The removal of Presidentially-appointed
     officers is simply not at issue in this case.

United States District Court
Northern District of California

1    Department of Labor attributes the RIF to Executive Order 14210, citing section 3(c) of that order

2    specifically.  Decl. Gamble AFGE ISO Reply ¶ 6, Ex. B.  The Executive Order itself directs agencies

3    to prioritize RIFs of "all agency initiatives, components, or operations that *my* Administration

4    suspends or closes."  Exec. Order 14210 § 3(c) (emphasis added).  In other words, the President will

5    suspend or close agency operations, and that agency must then be prioritized for a RIF, which is

6    what appears on the present record to be happening.  *See id.* ¶¶ 4-6, Ex. B.  The Court reads the

7    mandatory language in the Executive Order as providing specific direction to the agencies.

8         The government also says there are no problems here because the Executive Order and the

9    OMB/OPM Memorandum direct agencies to comply with the law and not to reduce services to the

10   public.  Opp'n at 39-40; Exec. Order 14210 §§ 3(c) ("Agency Heads shall promptly undertake

11   preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law"),

12   5(a)(i).  As defendants note in their papers, "[a] consistent-with-law provision does not categorically

13   immunize an Executive Order or similar directive from review."  Opp'n at 40.  The Ninth Circuit,

14   in considering "whether, in the absence of congressional authorization, the Executive Branch may

15   withhold all federal grants from so-called 'sanctuary' cities and counties[,]" rejected the

16   government's argument that the words "consistent with law" saved the otherwise unlawful

17   Executive Order.  *San Francisco*, 897 F.3d at 1231, 1239-40.  As the court explained, "'It is a

18   commonplace of statutory construction that the specific governs the general[,]' . . . [and t]he

19   Executive Order's savings clause does not and cannot override its meaning."  *Id.* at 1239 (quoting

20   *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

21        The Court finds plaintiffs have shown a likelihood of success on the merits of Claim One,

22   which alleges that Executive Order 14210 usurps Congress's Article I powers and exceeds the

23   President's lawful authority.

24

25              **b.      Actions by OPM, OMB, and DOGE**

26        Plaintiffs also assert that the actions by OPM, OMB, and DOGE in implementing the

27   executive order are *ultra vires* and therefore unlawful.  They argue that none of these defendants

28   "possesses authority to order agencies to reorganize, to engage in 'large-scale' RIFs, or to usurp the

1   decision-making authority delegated by Congress."  Mot. at 35.

2

3       **OPM:** The question of whether the President, acting without Congress, may engage in *en*

4   *masse* termination of rank-and-file employees was recently litigated in a case involving the

5   termination of probationary employees at numerous federal agencies.  In issuing a temporary

6   restraining order, Judge Alsup of this district found plaintiffs likely to succeed on their *ultra vires*

7   claim, explaining, "No statute — anywhere, ever — has granted OPM the authority to direct the

8   termination of employees in other agencies." *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-

9   cv-1780-WHA, 2025 WL 660053, at *4 (N.D. Cal. Feb. 28, 2025).[18]  Rather, as laid out in statute,

10  "Each Executive agency . . . may employ such number of employees of the various classes

11  recognized by chapter 51 of this title [regarding classification] as Congress may appropriate for

12  from year to year." 5 U.S.C. § 3101.  With regard to OPM in particular, Congress vested the Director

13  of OPM with a number of functions, none of which include the termination of employees from, or

14  the restructuring of, other federal agencies outside of OPM.  *See* 5 U.S.C. § 1103(a).  In the

15  probationary employee case, "OPM concede[d] that it lacks the authority to direct firings outside of

16  its own walls . . . ." *Am. Fed'n of Gov't Emps.,* 2025 WL 660053, at *5.

17

18      **OMB:** Housed within the Executive Office of the President, OMB, like OPM, has its

19  functions laid out in statute.  *See* 31 U.S.C. §§ 501-507.  None of the statutes authorize OMB to

20  terminate employees outside of OMB or to order other agencies to downsize, nor do defendants

21  point to any such authority in their brief.  *See also Nat'l Council of Nonprofits v. Off. of Mgmt. &*

22  *Budget*, --- F. Supp. 3d ----, No. CV 25-239 (LLA), 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025)

23  ("the structure and provisions of Section 503 strongly suggest that OMB occupies an oversight role"

24  and 31 U.S.C. § 503(a)(5) "further indicates that OMB's role is mainly supervisory, rather than

25  directly active").

26

27

28

United States District Court
Northern District of California

---

[18] As noted above, the preliminary injunction in Judge Alsup's case is currently on appeal.

33

**DOGE:** As plaintiffs rightly note, DOGE "has no statutory authority at all." Mot. at 37. DOGE was created by Executive Order out of the United States Digital Service, and is housed in the Executive Office of the President. *See* Exec. Order No. 14158. DOGE therefore could not have been acting pursuant to statutory authority in ordering large-scale RIFs of the workforces at the defendant federal agencies.

* * *

In sum, no statute gives OPM, OMB, or DOGE the authority to direct other federal agencies to engage in large-scale terminations, restructuring, or elimination of itself. Such action is far outside the bounds of any authority that Congress vested in OPM or OMB, and, as noted, DOGE has no statutory authority whatsoever. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

Plaintiffs are likely to succeed on the merits of their *ultra vires* claims (Claim Two) against OPM, OMB, DOGE, and their Directors.

### 2.    APA Claims

Plaintiffs also challenge, as violative of the APA: the OMB/OPM Memo; OPM and OMB's approvals of specific agencies' ARRPs; and "DOGE's directives to specific agencies requiring cuts to programs and staffing[.]" Mot. at 37-38. Plaintiffs' Third through Seventh Claims assert violations of the Administrative Procedure Act against OMB, OPM, DOGE, and their directors, under 5 U.S.C. § 706(2)(A), (C), and (D), and against the federal agency defendants, under 5 U.S.C. § 706(2)(A) and (C).

The APA provides, in relevant part, that

The reviewing court shall--
**. . . (2)** hold unlawful and set aside agency action, findings, and conclusions found to be--
**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
**. . .**
**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
**(D)** without observance of procedure required by law; . . . .

United States District Court
Northern District of California

5 U.S.C. § 706(2).

### a.    Final Agency Action

The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.  Because plaintiffs do not allege that any action here was made reviewable by statute, the threshold question is whether the challenged actions constitute "final agency action."  If not, this Court is without subject matter jurisdiction to decide the APA claim.  *See San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 580 (9th Cir. 2017).

The Supreme Court has explained that "two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process . . . —it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).   The Supreme Court has "long taken" a "pragmatic approach" to the question what constitutes final agency action.  *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

The record presently before the Court indicates that the challenged actions are final agency actions under the APA.  While the ultimate impacts of the RIFs may yet be unknown (in part due to defendants' refusal to publicize the ARRPs), and while certain ARRPs are still awaiting OMB/OPM approval, nowhere do defendants assert that the OMB/OPM Memo itself is subject to change or is in draft form.  Nor do any defendants claim that the ARRPs, once approved, may be modified or rescinded.  These actions—the issuance of the OMB/OPM Memo and the approvals of the ARRPs— are done and final.  *See San Francisco Herring Ass'n*, 946 F.3d at 578 ("The Park Service does not suggest it is still in the middle of trying to figure out its position on whether it has jurisdiction over the waters [at issue] . . .").  An agency engages in "final" action, for instance, when it "state[s] a definitive position in formal notices, confirm[s] that position orally, and then send[s] officers out into the field to execute on the directive." *Id.* at 579.

35

So have OMB, OPM, DOGE, and their directors done here.  The OMB/OPM Memo required agencies to submit Phase 1 ARRPs by March 13 and Phase 2 ARRPs by April 14.  As alleged, the ARRPs "are only effectuated by OMB and OPM (and DOGE) approval."  Compl. ¶ 14.  The little evidence presented on how the ARRP approval process has actually played out shows that at least one agency (the National Science Foundation) initially submitted an ARRP that "did not include plans for large-scale RIFs" and that OMB, OPM, and DOGE rejected this plan "and directed the agency to implement large-scale RIFs instead."  Decl. Soriano AFGE ¶¶ 8-9.  According to a Program Director at the National Science Foundation, "NSF is now following the orders of the DOGE team embedded within the agency and plans to cut its staff of approximately 1,700 employees by half."  *Id.* ¶ 9.[19]  "It is the imposition of an obligation or the fixing of a legal relationship that is the indicium of finality of the administrative process."  *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979).  Based on the record to date, the Court finds the OMB/OPM Memo and OMB/OPM approval of the ARRPs constitute final agency action under the APA.

At this time, the Court will refrain from opining on whether DOGE's actions are subject to review under the APA.  The record is less developed as to DOGE's actions and would benefit from further factual development.  Nevertheless, having found above that any actions by DOGE in directing other federal agencies to engage in large-scale RIFs is *ultra vires*, the Court need not reach the APA question specifically in order for injunctive relief to cover DOGE.  *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 & n.3; *Cmty. Legal Servs. in East Palo Alto v. United States Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, No. 25-cv-2847-AMO, 2025 WL 1233674, at *8 (N.D. Cal. Apr. 29, 2025) (plaintiffs "need only show a likelihood of success on one claim to demonstrate likelihood of success in support of a preliminary injunction").

---

[19] Of course, defendants may offer countervailing evidence at the preliminary injunction stage.  At this stage, defendants submitted no evidence in support of their opposition brief.  The Court emphasizes that releasing the ARRPs will be critical to a full understanding of the facts as this case proceeds.

United States District Court
Northern District of California

United States District Court
Northern District of California

### b. Merits

The Court likewise reserves ruling on the merits of the APA claim asserting arbitrary and capricious action by OPM, OMB, and DOGE (Claim Four) and the APA claims asserted against the federal agency defendants (Claims Six and Seven). As discussed at the hearing, the release of the ARRPs will significantly aid the Court's review of the merits of these APA claims.

Plaintiffs' Third Claim—that OMB, OPM, DOGE, and their directors violated the APA by taking action not in accordance with law and exceeding statutory authority—overlaps with the analysis of the *ultra vires* claim. For the same reasons already stated above, plaintiffs have shown a likelihood of success on their claim that at least OPM and OMB are acting outside their statutory authority by directing large-scale layoffs at other federal agencies.

Plaintiffs' Fifth Claim alleges that OMB, OPM, DOGE, and their directors violated the APA by engaging in "rule-making" without publication and opportunity for notice and comment. In their brief, defendants assert, incorrectly, that OPM has simply promulgated regulations as they are statutorily authorized to do. *See* Opp'n at 44 ("Congress expressly empowered OMB [sic] to promulgate regulations governing RIFs, and OPM has done just that."); *see also id.* at 35 ("the governing statute expressly directs OPM to promulgate regulations governing RIFs . . ."); *id.* at 1, 7-8, 40-41 (citing 5 U.S.C. § 3502).[20] OPM did not promulgate regulations here. Promulgating a regulation would have required a public process, including notice and comment under the APA. *See* 5 U.S.C. § 553. This did not occur. Plaintiffs have shown a likelihood of succeeding on their claim that OPM and OMB engaged in rule-making without notice and comment required by the APA, in issuing the February memorandum and in approving the ARRPs.

### B. Irreparable Harm

The Court discussed plaintiffs' injuries in the standing section above, but in the context of

---

[20] 5 U.S.C. § 3502 states, in part, that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to-- (1) tenure of employment; (2) military preference . . .; (3) length of service; and (4) efficiency or performance ratings." 5 U.S.C. § 3502(a).

the *Winter* analysis the Court must also consider whether this injury is irreparable. Plaintiffs assert that constitutional violations constitute irreparable injury, including violations of the separation of powers. Mot. at 48-49. Plaintiffs assert that union members will face irreparable harm when they lose their wages and health benefits and, in some cases, may need to relocate. *Id.* The Court agrees that these losses constitute irreparable harm and notes that RIF terminations are beginning in less than two weeks at some agencies. As the Ninth Circuit has noted, "[l]ack of timely access to health care poses serious health risks," especially for individuals with chronic health conditions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008). Further, facing the potential loss of federal funding, the local government plaintiffs experience irreparable harm when they are forced to plan how to mitigate that loss. *See Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537-38 (N.D. Cal. 2017). These plaintiffs cannot recover damages via an APA claim, making their monetary loss irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Defendants and their supportive *amici* states argue from *Sampson v. Murray* that plaintiffs have not made a sufficient showing of irreparable harm. In *Sampson*, the Supreme Court considered whether to enjoin the dismissal of a single employee and determined the plaintiff had not made a sufficient showing of irreparable harm "in this type of case," even though the plaintiff would suffer at least a temporary loss of income. *Sampson v. Murray*, 415 U.S. 61, 63, 89-90, 92 (1974). But the Court also recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. The present case, simply put, is not the same "type of case" as *Sampson*. The Court here is not considering the potential loss of income of one individual employee, but the widespread termination of salaries and benefits for individuals, families, and communities.

### C.    Balance of Interests

The last two factors—assessing the harm to the opposing party and weighing the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. In this

context, these factors require the Court to ask whether pausing the government's large-scale RIFs and reorganizations harms the government more than it benefits the plaintiffs. Defendants argue, primarily, that there is no public interest in injunctive relief because its actions are lawful. Opp'n at 48. This argument fails, as the Court has found it likely that defendants' actions are not lawful. Notably, defendants do not argue that the government would suffer by a temporary preservation of the status quo, although their *amici* states take up the banner. *Id.*; Dkt. No. 71-1 ("The President suffers harm when he is unable to exercise his Article II powers."). The Court notes again that its order does not prevent the President from exercising his Article II powers, it prevents him from exercising Congress' Article I powers.

The Court finds that temporary relief as ordered below would serve the public interest, because "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations omitted).

## V.    Scope of Remedy and Order

Providing relief beyond the named parties is appropriate where necessary to provide relief to the named parties. *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987). The Court has found that plaintiffs are likely to succeed on the merits of their challenges to Executive Order 14210, the OMB/OPM Memorandum, and OMB/OPM's approval of the ARRPs. The Court acknowledges that its temporary restraining order as detailed below will provide relief beyond the named parties, but to do otherwise is impracticable and unworkable, particularly where the agencies' RIF plans largely remain secret. To be clear, the Court has not ruled on whether plaintiffs are likely to succeed on their APA claims regarding individual agency ARRPs, but finds it necessary to temporarily enjoin further implementation of those plans because they flow from likely illegal directives. Moreover, since the Court requires more information to evaluate the individual ARRPs and what roles OMB, OPM, and DOGE have played in shaping them, it will order their disclosure under the Court's inherent powers to manage discovery. The Court finds it appropriate to order this

1   production on an expedited discovery basis.  The timelines required to be in the ARRPs will be

2   particularly useful to the Court as it determines whether further prompt action is necessary.

3          Holding that the President, OMB, OPM, and DOGE have exceeded their authority naturally

4   raises the question of precisely where the line should be drawn between executive and legislative

5   authority over agency reorganization.  But as Chief Justice Roberts once wrote, in certain cases

6   "[w]e have no need to fix a line . . . . It is enough for today that wherever that line may be, this

7   [action] is surely beyond it."  *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 585.

8          For the foregoing reasons and for good cause shown, the Court therefore ORDERS as

9   follows:

10                 IT IS HEREBY ORDERED that, pending consideration of a
                   preliminary injunction, the agency defendants (as delineated below)
11                 and their officers or employees or any other individuals acting under
                   their authority or the authority of the President  are hereby enjoined
12                 and/or stayed from taking any actions to implement or enforce
                   sections 3(c) and 3(e) of Executive Order 14210 or the February 26,
13                 2025 OMB/OPM Memorandum, including but not limited to:

14                 (1) any further approval of ARRPs or waivers of statutorily-mandated
                   RIF notice periods by OMB and OPM;

15                 (2) any further orders by DOGE to agencies to cut programs or staff
16                 in conjunction with implementing the Executive Order, the
                   OMB/OPM Memorandum, or the ARRPs;

17                 (3) any further implementation of the Executive Order, the
                   OMB/OPM Memorandum, or ARRPs by Federal Agency
18                 Defendants, including but not limited to: execution of any existing
                   RIF notices (including final separation of employees), issuance of any
19                 further RIF notices, placement of employees on administrative leave,
                   and transfer of functions or programs between the agency defendants.

20                 This restraining order shall last fourteen days, through Friday, May
                   23, 2025, unless the Court finds good cause to extend it.  *See* Fed. R.
21                 Civ. P. 65(b)(2).  The restraining order shall apply to the following
                   defendant agencies: OMB, OPM, DOGE, USDA, Commerce,
22                 Energy, HHS, HUD, Interior, Labor, State, Treasury, Transportation,
                   VA, AmeriCorps, EPA, GSA, NLRB, NSF, SBA, and SSA.

23                 IT IS FURTHER ORDERED that, good cause having been shown
                   pursuant to Federal Rule of Civil Procedure 26(d), OMB and OPM
24                 must provide to the Court and to Plaintiffs (1) the versions of all
                   defendant agency ARRPs submitted to OMB and OPM, (2) the
25                 versions of all defendant agency ARRPs approved by OMB and
                   OPM, (3) any agency applications for waivers of statutorily-mandated
26                 RIF notice periods, and (4) any responses by OMB or OPM to such
                   waiver requests, **by 4:00 p.m. (PDT) on Tuesday, May 13, 2025.**

27                 IT IS FURTHER ORDERED that, **by 3:00 p.m. (PDT) on Tuesday,**
28                 **May 13, 2025,** defendants shall serve and file a declaration(s)

40

1

2

verifying that they have complied with this Order, including serving a copy of this order on every defendant agency head, and detailing what additional steps, if any, they have taken to comply.

3

4

## VI.    Rule 65(c) Security

5

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The district court retains discretion "as to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted).

6

7

8

9

10

The government has requested that the Court require plaintiffs give security in an amount "commensurate to the salaries and benefits the government must pay for any employees it would prefer to separate from federal service but is unable to for the duration of any preliminary relief." Opp'n at 50.[21]  The Court notes, first, that defendants have not provided support for security in any fixed amount, and the Court cannot establish such an amount without the ARRPs or some other evidence showing the comprehensive RIF plans.[22]  Second, the Court finds there is significant public interest underlying this action, particularly in light of the constitutional claims raised.  *See Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015) (citing *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005)).  Although defendants allege they will incur costs for retaining federal employees that they would prefer to separate, Opp'n at 50, so too will the government incur costs if the RIFs are implemented hastily and unlawfully.  *See, e.g.*, Compl., Ex.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[21] On March 11, 2025, President Trump issued a memorandum for the heads of executive departments and agencies, stating that the policy of the United States is to demand the posting of a bond when a plaintiff seeks an injunction against the federal government.  Donald J. Trump, *Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)*, The White House (Mar. 11, 2025),    https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/ [https://perma.cc/GF6W-9MPE].

26

27

28

[22] On April 10, 2025, a group of United States Senators sent a letter to the heads of OPM and OMB requesting, among other things, copies of the Phase 1 and Phase 2 ARRPs submitted to OPM and OMB, the impact of the RIFs relating to costs or savings to agency budgets, and the number of people placed on administrative leave.  *See* Dkt. No. 1-3, Compl., Ex. C.  Although the Senators requested a response by April 21, at the hearing in this case government counsel could not confirm whether a response has issued.

United States District Court
Northern District of California

C at 2 (defendant Kennedy stating, with regard to April terminations of HHS employees: "[p]ersonnel that should not have been cut were cut . . . that was always the plan . . . we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."). At this time, the Court waives the requirement that plaintiffs post a bond.

### CONCLUSION

The Court concludes where it began. The President has the authority to seek changes to executive branch agencies, but he must do so in lawful ways and, in the case of large-scale reorganizations, with the cooperation of the legislative branch. Many presidents have sought this cooperation before; many iterations of Congress have provided it. Nothing prevents the President from requesting this cooperation—as he did in his prior term of office. Indeed, the Court holds the President likely *must* request Congressional cooperation to order the changes he seeks, and thus issues a temporary restraining order to pause large-scale reductions in force in the meantime.

A temporary restraining order is, by definition, temporary. The Court will not consider defendants' request for a stay of execution of the temporary restraining order, as doing so would render the exercise pointless. The Court must promptly proceed to consideration of a preliminary injunction.

Plaintiffs' motion for a preliminary injunction shall be filed no later than Wednesday, May 14, 2025 at 4:00 p.m. (PDT) and shall not exceed 25 pages; defendants' opposition is due by Monday, May 19, 2025 at 4:00 p.m. (PDT) and shall not exceed 25 pages. The Court shall hold a preliminary injunction hearing in person on Thursday, May 22, 2025 at 10:30 a.m.


**IT IS SO ORDERED**.

Dated: May 9, 2025

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California