**Nos. 25-3030, 25-3034, 25-3293**

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

————————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Northern District of California

————————————

In re DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

*Petitioner.*

————————————

On Petition for Writ of Mandamus to the United States District Court
for the Northern District of California

————————————

### ADDENDUM TO SUPPLEMENTAL EMERGENCY MOTION
### FOR STAY PENDING APPEAL/PETITION FOR WRIT OF MANDAMUS

————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
PATRICK D. ROBBINS
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

Complaint, Dkt. 1 (Apr. 28, 2025).............................................................Add.1

Exhibit A to Complaint, "Implementing the President's 'Department of
Government Efficiency' Workforce Optimization Initiative" Executive Order
14210, 90 Fed. Reg. 9669 (Feb. 11, 2025), Dkt. 1-1 (Apr. 28, 2025) ...................Add.116

Exhibit B to Complaint, Memorandum from Russell T. Vought, Director,
Office of Management and Budget and Charles Ezell, Acting Director, Office
of Personnel Management, to Heads of Executive Departments and Agencies
(Feb. 26 2025), Dkt. 1-2 (Apr. 28, 2025) ................................................Add.120

Motion for Temporary Restraining Order, Dkt. 37, and Brief in Support of
Motion for Temporary Restraining Order, Dkt. 37-1 (May 1, 2025) ..................Add.128

Opposition to Motion for Temporary Restraining Order, Dkt. 60 ....................Add.220

Reply in Support of Motion for Temporary Restraining Order, Dkt. 70............Add.285

Transcript of Proceedings (May 9, 2025) ................................................Add.313

Order Granting Temporary Restraining Order and Compelling Certain
Discovery Production, Dkt. 85 (May 9, 2025)........................................Add.367

Motion for Protective Order, Dkt. 88 (May 11, 2025) ..............................Add.409

Exhibit A to Motion for Protective Order, Declaration of Stephen M. Billy,
Dkt. 88-1 (May 11, 2025)...............................................................Add.420

Notice re Motion for Protective Order, Dkt. 89 (May 11, 2025)........................Add.423

Order Postponing Production Deadline, Dkt. 92 (May 12, 2025) .....................Add.425

Amended Complaint, Dkt. 100 (May 14, 2025)........................................Add.427

Motion for Preliminary Injunction, Dkt. 101, and Brief in Support of Motion
for Preliminary Injunction, Dkt. 101-1 (May 14, 2025)..........................Add.549

Order Directing In Camera Production, Dkt. 109 (May 15, 2025)......................Add.615

Opposition to Motion for Preliminary Injunction, Dkt. 117 (May 19, 2025).....Add.620

Reply in Support of Motion for Preliminary Injunction, Dkt. 120 (May 20, 2025) ........................................................................................................Add.652

Order Granting Preliminary Injunction, Dkt. 124 (May 22, 2025) ....................Add.673

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice application forthcoming)
Skye Perryman (pro hac vice application forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090

egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*
[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172; SEIU LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL, INC.; NORTHEAST | Case No. **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1  ORGANIC FARMING ASSOCIATION,
   INC.; VOTEVETS ACTION FUND INC.;
2  WESTERN WATERSHEDS PROJECT;
   COUNTY OF SANTA CLARA,
3  CALIFORNIA; CITY OF CHICAGO,
   ILLINOIS; MARTIN LUTHER KING, JR.
4  COUNTY, WASHINGTON; HARRIS
   COUNTY, TEXAS; CITY OF BALTIMORE,
5  MARYLAND; and CITY AND COUNTY OF
   SAN FRANCISCO, CALIFORNIA
6
7          Plaintiffs,
8      v.
9
   DONALD J. TRUMP, in his official capacity
10 as President of the United States;
   UNITED STATES OFFICE OF
11 MANAGEMENT AND BUDGET;
   RUSSELL VOUGHT, in his official capacity
12 as Director of U.S. Office of Management and
   Budget;
13 UNITED STATES OFFICE OF PERSONNEL
   MANAGEMENT;
14 CHARLES EZELL, in his official capacity as
   Acting Director of the U.S. Office of Personnel
15 Management;
   DEPARTMENT OF GOVERNMENT
16 EFFICIENCY;
   ELON MUSK, in his official capacity as the
17 actual head of the Department of Government
   Efficiency;
18 AMY GLEASON, in her official capacity as
   the titular Acting Administrator of the
19 Department of Government Efficiency;
   UNITED STATES DEPARTMENT OF
20 AGRICULTURE;
   BROOKE ROLLINS, in her official capacity
21 as Secretary of the U.S. Department of
   Agriculture;
22 UNITED STATES DEPARTMENT OF
   COMMERCE;
23 HOWARD LUTNICK, in his official capacity
   as Secretary of the U.S. Department of
24 Commerce;
   UNITED STATES DEPARTMENT OF
25 DEFENSE;
   PETE HEGSETH, in his official capacity as
26
27
28

COMPLAINT, No.

**Add.2**

1  Secretary of the U.S. Department of Defense;
   UNITED STATES DEPARTMENT OF
2  ENERGY;
   CHRIS WRIGHT, in his official capacity as
3  Secretary of the U.S. Department of Energy;
   UNITED STATES DEPARTMENT OF
4  HEALTH AND HUMAN SERVICES;
   ROBERT F. KENNEDY JR., in his official
5  capacity as Secretary of the U.S. Department
   of Health and Human Services;
6  UNITED STATES DEPARTMENT OF
   HOMELAND SECURITY;
7  KRISTI NOEM, in her official capacity as
8  Secretary of the U.S. Department of Homeland
   Security;
9  UNITED STATES DEPARTMENT OF
   HOUSING AND URBAN DEVELOPMENT;
10 SCOTT TURNER, in his official capacity as
11 Secretary of the U.S. Department of Housing
   and Urban Development;
12 UNITED STATES DEPARTMENT OF
   JUSTICE;
13 PAM BONDI, in her official capacity as
14 Attorney General of the U.S. Department of
   Justice;
15 UNITED STATES DEPARTMENT OF THE
   INTERIOR;
16 DOUG BURGUM, in his official capacity as
17 Secretary of the U.S. Department of the
   Interior;
18 UNITED STATES DEPARTMENT OF
   LABOR;
19 LORI CHAVEZ-DEREMER, in her official
20 capacity as Secretary of the U.S. Department
   of Labor;
21 UNITED STATES DEPARTMENT OF
   STATE;
22 MARCO RUBIO, in his official capacity as
23 Secretary of the U.S. Department of State;
   UNITED STATES DEPARTMENT OF
24 TREASURY;
   SCOTT BESSENT, in his official capacity as
25 Secretary of U.S. Department of Treasury;
26 UNITED STATES DEPARTMENT OF
   TRANSPORTATION;
27 SEAN DUFFY, in his official capacity as
   Secretary for the U.S. Department of
28 Transportation;

COMPLAINT, No.

**Add.3**

1    UNITED STATES DEPARTMENT OF
     VETERANS AFFAIRS;
2    DOUG COLLINS, in his official capacity as
     Secretary of Veterans Affairs;
3    AMERICORPS (a.k.a. the CORPORATION
     FOR NATIONAL AND COMMUNITY
4    SERVICE);
5    JENNIFER BASTRESS TAHMASEBI, in her
     official capacity as Interim Agency Head of
6    AmeriCorps;
7    UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY;
8    LEE ZELDIN, in his official capacity as
     Administrator of U.S. Environmental
9    Protection Agency;
10   UNITED STATES GENERAL SERVICES
     ADMINISTRATION;
11   STEPHEN EHIKIAN, in his official capacity
     as Acting Administrator for U.S. General
12   Services Administration;
13   NATIONAL LABOR RELATIONS BOARD;
     MARVIN KAPLAN, in his official capacity as
14   Chairman of the National Labor Relations
     Board;
15   WILLIAM COWEN, in his official capacity as
     the Acting General Counsel of the National
16   Labor Relations Board;
17   NATIONAL SCIENCE FOUNDATION;
     BRIAN STONE, in his official capacity as
18   Acting Director of the National Science
     Foundation;
19   UNITED STATES SMALL BUSINESS
     ADMINISTRATION;
20   KELLY LOEFFLER, in her official capacity
     as Administrator of the U.S. Small Business
21   Administration;
22   UNITED STATES SOCIAL SECURITY
     ADMINISTRATION; and
23   LELAND DUDEK, in his official capacity as
     Acting Commissioner of the U.S. Social
24   Security Administration,

25          Defendants.

26

27

28

COMPLAINT, No.
                              **Add.4**

**INTRODUCTION**

Plaintiffs are a coalition of labor organizations, non-profit groups, and local governments that file this complaint to hold unlawful and stop the unconstitutional dismantling of the federal government by the President of the United States on a scale unprecedented in this country's history and in clear excess of his authority.  Plaintiffs are the American Federation of Government Employees, AFL-CIO ("AFGE"); American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"); Service Employees International Union, AFL-CIO ("SEIU"); AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU Local 1000; Alliance for Retired Americans; American Public Health Association; American Geophysical Union; Center for Taxpayer Rights; Coalition to Protect America's National Parks; Common Defense Civic Engagement; Main Street Alliance; Natural Resources Defense Council, Inc.; Northeast Organic Farming Association Inc.; VoteVets Action Fund Inc.; Western Watersheds Project; the County of Santa Clara, California; Martin Luther King, Jr. County, Washington; the City of Baltimore, Maryland; Harris County, Texas; the City of Chicago, Illinois; and the City and County of San Francisco, California (collectively, "Plaintiffs").

By way of Executive Order, President Donald J. Trump has ordered agencies across the entire federal government to engage in a "critical transformation of the Federal bureaucracy" for the purported purpose of "eliminating waste, bloat, and insularity," including by conducting "large-scale" Reductions in Force ("RIFs") to further the reorganization of the federal agencies—all without *any* Congressional authorization.  *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's ''Department of Government Efficiency'' Workforce Optimization Initiative).  Executive Order 14210, and the actions taken by the Administration to implement the President's order, usurp Congress's exclusive Article I legislative authority, exceed the President's Article II Executive or statutory authority, and therefore violate the Constitution's fundamental separation of powers principles.  Plaintiffs seek to declare these acts of the President unconstitutional, unlawful, and otherwise in excess of any constitutional or statutory authority; to hold unlawful and set aside the acts of agency defendants implementing his orders as unlawful and in violation of the

COMPLAINT, No.                                                                                                              1

**Add.5**

Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) and (D); and to enjoin this unconstitutional reorganization of the federal government without legislative authority.  Plaintiffs therefore hereby plead as follows:

1.      The President does not possess authority to reorganize, downsize, or otherwise transform the agencies of the federal government, unless and until Congress authorizes such action. Federal agencies are "creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  Since the founding of the nation, federal courts have recognized that the federal agencies are not created by the President:  "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926).

2.      When the President takes for himself the legislative power of Congress to recreate federal agencies in the manner *he* sees fit, he violates the Constitution.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.… And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.").  And when the President does so across *every* federal agency, he threatens the very constitutional foundation of this nation:  "There can be no liberty where the legislative and executive powers are united in the same person." *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).  Thus, for nearly 100 years, when Presidents have wanted to restructure the government by reorganizing both between and within federal agencies, they have obtained Congressional authorization to do so.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (June 10, 2002).

3.      President Trump contends he was elected with a mandate to radically transform the size and organization of the entire federal government.  Ignoring applicable constitutional law, he has engaged in a campaign unprecedented in American history:  to eliminate entire federal agencies; drastically reduce the number of employees, functions, programs, and offices at others; terminate

COMPLAINT, No.                                                                                          2

**Add.6**

leases for government property; terminate government contracts; and sell off government property, all without Congressional authorization. President Trump has called his plan to downsize and transform the federal government as he desires "The 'Manhattan Project' of our time."[1]

4. As soon as President Trump took office, he immediately began his "large scale structural reform" project. *Id.*

5. First, on January 20, 2025, he created the "Department of Government Efficiency" or "DOGE" out of a former information technology office and charged it with enacting an "18-month DOGE agenda" (which the Administration has never made public) and embedding a "DOGE Team" at every federal agency. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). He also immediately ordered DOGE, along with the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM"), to create "a plan to reduce the size of the Federal Government's workforce." The White House, *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).

6. The President then proceeded to dismantle several government agencies, either eliminating their functions or transferring and subsuming them within other agencies. Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Education); Exec. Order No. 14238, 90 Fed. Reg 13043 (Mar. 14, 2025) (seven agencies); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (four agencies); *see also* Exec. Order No. 14169, 90 Fed. Reg. 8619 (Foreign Aid) and Press Release, U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025) (USAID); *Nat'l Treasury Emps. Union v. Vought*, __ F. Supp. 3d __, No. 25-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) (CFPB).

---

[1] Statement by President-elect Donald J. Trump announcing Department of Government Efficiency, The American Presidency Project (Nov. 12, 2024):

> To drive this kind of drastic change, the Department of Government Efficiency ["DOGE"] will provide advice and guidance from outside of Government, and will partner with the White House and Office of Management & Budget to drive **large scale structural reform**, and create an entrepreneurial approach to Government never seen before.

Available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-that-elon-musk-and-vivek-ramaswamy (emphasis added).

COMPLAINT, No.                                                                                                    3

7.    On February 11, 2025, President Trump issued the Executive Order 14210 that is the subject of this lawsuit.  Executive Order 14210 (hereinafter "Workforce Executive Order" or "Executive Order 14210") ordered all federal agencies to "commence[]" a **critical transformation of the Federal bureaucracy**" for the purported purpose of "eliminating waste, bloat, and insularity." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (emphasis added), attached hereto as Exhibit A.

8.    This Workforce Executive Order, in pertinent part, requires all federal agencies to effectuate President Trump's vision for the radical transformation and downsizing of the federal government by:  1) freezing agency hiring and allowing OMB and DOGE to control future hiring government-wide; 2) commencing "large-scale reductions in force" ("RIFs") that serve the purpose of stripping away agency functions, eliminating the offices and functions that the President chooses to eliminate, and dramatically reducing staffing levels throughout the government; and 3) creating corresponding "reorganization" plans reflecting these RIFs that also address whether the "agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

9.    The Workforce Executive Order does not simply suggest or encourage agencies to exercise their own statutory authority to effectuate a government-wide reorganization: it orders them to act according to the President's vision, *regardless* of that statutory authority.  The Workforce Executive Order imposes the following requirements:

a.    Agencies are *required* to commence large-scale RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions, obligations, and appropriations);

b.    Agencies are *required* to prioritize in RIFs any "agency initiatives, components, or operations that my Administration suspends or closes" (irrespective of statutory requirements, obligations, or authority delegated to the agencies);

c.    Agencies are *required* to prioritize in RIFs levels of staffing equivalent to  government emergency shutdown levels (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.    Agencies are *required* to consider their own abolition, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements, obligations, or authority delegated to the agencies);

COMPLAINT, No.                                                                                           4

**Add.8**

e.    And finally, agencies are required to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

As the President made plain in the White House "Fact Sheet" that accompanied the Executive Order, the Executive Order furthers the President's goals of "reforming the federal workforce" and "reducing the unnecessary footprint of government."[2]

10.    Again and again, the President has explained his plan to reorganize and reform the *entire federal government*: "I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid."  The White House, *Remarks by President Trump after Executive Order Signing* (Feb. 18, 2025); *see also* The White House, *Remarks by President Donald J. Trump in Joint Address to Congress* (Mar. 4, 2025) ("Americans have given us a mandate for bold and profound change.  For nearly 100 years, the federal bureaucracy has grown until it has crushed our freedoms, ballooned our deficits, and held back America's potential in every possible way.  The nation founded by pioneers and risk-takers now drowns under millions and millions of pages of regulations and debt. … My administration will reclaim power from this unaccountable bureaucracy, and we will restore true democracy to America again."); The White House, *Fact Sheet: President Donald J. Trump Continues the Reduction of the Federal Bureaucracy* (Mar. 14, 2025) ("President Trump has made reforming the federal workforce a key priority for his second term.").

11.    At no point has Congress authorized President Trump's actions with respect to the federal agencies that Congress created in an exercise of its Article I legislative authority, which the Constitution grants to Congress, not to the President.  Unlike President Trump, nine Presidents on 16 occasions, across the political spectrum, have been granted authority by Congress to propose fast-tracked legislation before reorganizing federal agencies:  Presidents Herbert Hoover, Franklin D. Roosevelt, Harry S. Truman, Dwight D. Eisenhower, John F. Kennedy, Lyndon B. Johnson, Richard Nixon, Jimmy Carter, and Ronald Reagan.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the*

---

[2] The White House, *Fact Sheet:  President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025).

COMPLAINT, No.                                                                                    5

**Add.9**

1    *Executive Branch in the 20th Century: Landmark Commissions* (June 10, 2002); *see also* Paul Larkin,

2    Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Foundation Legal

3    Memorandum No. 210 (July 12, 2017).  Congress has given no such authority to President Trump.

4              12.      President Trump should well understand the constitutional limits on his authority to

5    reorganize the federal government, because he tried and failed to obtain that authorization during his

6    first term in office.  *See* Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 13, 2017) (Comprehensive

7    Plan for Reorganizing the Executive Branch) (ordering OMB to engage in public and agency

8    processes to create a report with recommendations regarding reorganization); Off. of Mgmt. and

9    Budget, *Delivering Government Solutions in the Twenty-First Century:  Reform Plan and*

10   *Reorganization Recommendations* (June 2018).[3]  As the first-term OMB reorganization report

11   expressly acknowledged, the plans "establish a vision for the Executive Branch that will require

12   further exploration and partnership with the Congress."  *Id.* at 4.  Congress did not re-enact

13   reorganization authority for this first-term plan.  President Trump determined that in his second term

14   he would proceed without Congress.

15             13.      To serve his goals of radical transformation, the President has also enlisted three

16   centralized agencies with government-wide reach.  OMB, OPM, and DOGE are implementing the

17   President's unconstitutional and unlawful orders to federal agencies by way of requiring all those

18   other agencies to present "Agency RIF and Reorganization Plans" ("ARRPs") for *approval*,

19   according to parameters and requirements imposed on those agencies.  *See* Memorandum from

20   Russel Vought, OMB Director, and Charles Ezell, OPM Acting Director, to Heads of Executive

21   Departments and Agencies re: Guidance on Agency RIF and Reorganization Plans Requested by

22   *Implementing The President's "Department of Government Efficiency" Workforce Optimization*

23   *Initiative* (Feb. 26, 2025) (attached hereto as Exhibit B).  DOGE, for its part, has been dictating to

24

25             [3] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-

26   and-Reorg-Plan.pdf.  In 2017, President Trump ordered notice and public comment on the creation of
     these reorganization recommendations:  "The Director shall publish a notice in the *Federal Register*

27   inviting the public to suggest improvements in the organization and functioning of the executive
     branch and shall consider the suggestions when formulating the proposed plan described in

28   subsection (c) of this section."  Exec. Order No. 13781, Sec. 2(b).

COMPLAINT, No.                                                                                          6

**Add.10**

1    each agency the required cuts to staffing and programs, in the name of "fraud and waste":  "We are

2    cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste

3    and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[4]

4         14.    Through these agents, President Trump's orders, effectuated by OMB, OPM, and

5    DOGE, require federal agencies within weeks to create plans to reorganize themselves through

6    massive layoffs, for the purpose of President Trump's desire for "large scale structural reform" and

7    "reducing the size and scope of the federal government."  These orders require agencies to disregard

8    individual authorizing statutes, regulations, and terms that govern each agency, and the requirements

9    of reasoned decision-making.  To be clear, the agencies that are directed to submit ARRPs are *not* the

10   decision-makers here:  even if they are quickly creating and submitting these plans, they are required

11   to submit plans that follow the President's mandate, according to the President's designs, and that are

12   only effectuated by OMB and OPM (and DOGE) approval.

13        15.    Three months into this Administration, there can be no real doubt that impacted

14   federal agencies are acting according to the direction being given by President Trump through

15   DOGE, OMB, and OPM.  Courts throughout the country have rejected this Administration's attempts

16   to blame agencies for action that this Administration required them to take.  *See New York v. Trump*,

17   133 F.4th 51, 65 (1st Cir. 2025) (affirming District of Rhode Island's conclusion that "any

18   'suggest[ion] that the challenged federal funding freezes were purely the result of independent agency

19   decisions' was 'disingenuous.'"); *Am. Fed'n of Gov. Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 25-

20   cv-01780-WHA (N.D. Cal.), ECF Nos. 44, 45, 120, 132 (holding that OPM, not federal agencies,

21   unlawfully ordered the terminations of probationary employees government-wide); *Does v. Musk*, __

22   F. Supp. 3d __, No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025) (holding DOGE is directing

23   agency action); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-

24   239, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025) (rejecting contention that "countless federal

25

26   _____

27   [4] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

28   COMPLAINT, No.                                                                7

agencies ... suddenly began exercising their own discretion to suspend funding across the board at the exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").

16.     Moreover, President Trump himself has touted his ability to control agencies through DOGE, stating that, "after he signs an executive order, it gets 'passed on to [Musk] and his group' and 'they're all getting done.'" *Does v. Musk*, 2025 WL 840574 at *2 (quoting The White House, *Interview of President Trump and Elon Musk by Sean Hannity*, *"the Sean Hannity Show"*, (Feb. 18, 2025)).[5]  The President explained further:

> [H]e would take that executive order that I'd signed, and he would have those people to whatever agency it was – "when are you doing it?  Get it done.  Get it done."  And some guy that maybe didn't want to do it, all of a sudden, he's signing – he just doesn't want to be bothered.

*Id*.; *see also* The White House, *Remarks by President Trump Before Cabinet Meeting*, (Feb. 26, 2025) (President Trump:  "We're cutting down government.  We're cutting down the size of government.  We have to.  We're bloated.  We're sloppy.  We have a lot of people that aren't doing their job").[6]

17.     Those who work for President Trump confirm that the President is controlling federal agencies according to his vision:

- The President's National Economic Council Director Kevin Hassett, White House Press Briefing (Feb. 20, 2025):
  > I'm saying that *we're studying every agency and deciding who to let go and why*, and we're doing so very rationally with a lot of support from analysis. (Emphasis added.)[7]

---

[5] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

[6] Available at: https://www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-before-cabinet-meeting/.

[7] The White House, *Press Briefing by Press Secretary Karoline Leavitt, Deputy Chief of Staff Stephen Miller, National Economic Council Director Kevin Hassett, and National Security Advisor Mike Waltz* (Feb. 20, 20250, available at: https://www.whitehouse.gov/remarks/2025/02/press-briefing-by-press-secretary-karoline-leavitt-deputy-chief-of-staff-stephen-miller-national-economic-council-director-kevin-hassett-and-national-security-advisor-mike-waltz/.

COMPLAINT, No.                                                                    8

**Add.12**

- Elon Musk, who according to the President, is head of DOGE, told reporters on February 11, 2025 that "the people voted for major government reform and that's what people are going to get."[8]  Musk, again on March 27, 2025:  "Well, this is a revolution, and I think it might be the biggest revolution in government since the original revolution."[9]

18.    The Administration has not revealed the transformation and downsizing plans to the press, to the public (even in response to FOIA requests), in response to union information requests, or to Congress.  OMB and OPM required all federal agencies to submit the ARRPs in a two-stage approval process, by deadlines of March 13 and April 14, 2025.  The Administration has refused to make either the March 13 or April 14 version of the ARRPs public, claiming they are "pre-decisional" because they have not been approved by OMB, and that employees and the public will learn what these plans are only when the reorganization occurs and RIF notices come out:

> It's no secret the Trump Administration is dedicated to downsizing the federal bureaucracy and cutting waste, fraud, and abuse. This document is a pre-deliberative draft and does not accurately reflect final reduction in force plans…. When President Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will make those announcements to their respective workforces at the appropriate time.

Email from White House Principal Deputy Press Secretary Harrison Fields, as reported by the Washington Post.[10]

19.    What information Plaintiffs have painstakingly collected is gleaned from RIF notices that have been issued to date, press coverage of agency sources and leaked government documents, and statements by the President and agency heads describing general plans.  That information reveals that the Administration is actively implementing this unprecedented reorganization now.  The

---

[8] Gov't Exec., *Trump orders agencies to plan for widespread layoffs and attrition-based hiring*, (Feb. 11, 2025), available at: https://www.govexec.com/workforce/2025/02/trump-orders-agencies-plan-widespread-layoffs-and-attrition-based-hiring/402938/.

[9] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics*  (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

[10] Washington Post, *Internal White House document details layoff plans across U.S. agencies* (March 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

COMPLAINT, No.                                                                                              9

**Add.13**

American people have a right to know what the President is doing to dismantle their federal government.

20.   Details are emerging: in late March, pursuant to the mandate of Executive Order 14210, the Department of Health and Human Services ("HHS") began eliminating more than 10,000 positions throughout the Center for Disease Control ("CDC"), Food and Drug Administration ("FDA"), the National Institutes of Health ("NIH"), among other programs, throwing the medical, public health, and scientific community into utter chaos.[11]  As of April 15, 2025, the IRS was slated to commence RIFs ultimately totaling 40% of its workforce, including over 50% of the tax enforcement staff (the very staff that *brings in revenue to the government*).[12]  On April 22, 2025, the EPA began sending RIF notices to employees across its headquarters and regional offices.[13] Other agencies are right behind (*see infra* ¶¶189–256):

- The Department of Agriculture will eliminate at least 9,000 positions and entire regional offices and Research Stations within the Forest Service, taking staff down to at least 2019 levels;

- The Department of Energy will terminate 43% of its staff, eliminating offices and functions (including more than 500 positions at the Nuclear National Security Administration and eliminating the Office of Clean Energy Demonstrations entirely);

- The U.S. Environmental Protection Agency will reportedly lose 65% of its staff and effectively the entire Office of Research and Development (over 1,000 chemists, biologists, toxicologists and other scientists), among others;

- The Department of Housing and Urban Development is looking to cut approximately 51% of staff, eliminating and consolidating offices and functions;

---

[11] *See* March 27, 2025 Press Release:  HHS Announces Transformation to Make America Healthy Again, available at: https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

[12] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends*, (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends/.  The IRS began RIFs with one office in March.  Gov't Exec., *IRS sends RIF notices as it begins widespread layoffs* (Apr. 4, 2025), available at: https://www.govexec.com/workforce/2025/04/irs-sends-rif-notices-it-begins-widespread-layoffs/404317/.  On April 23, 2025, the IRS confirmed the RIFs are ongoing.  Fed. News Network, *IRS layoff notices to employees delayed by 'glitches,'* (Apr. 23, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-layoff-notices-to-employees-delayed-by-glitches/.

[13] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

COMPLAINT, No.                                                                                           10

**Add.14**

- The Department of the Interior is going to engage in large-scale RIFs of positions and programs that are deemed not "critical to public safety" or not "linked to highest priority programs";

- The Department of Labor will eliminate the entire Office of Federal Contract Compliance Programs, among other cuts;

- The Small Business Administration will lay off 43% of staff;

- The Social Security Administration will engage in "agency-wide organizational restructuring that will include significant workforce reductions" that the agency describes as "massive reorganizations" eliminating over 5,000 positions and potentially closing up to 47 field offices; and

- The Department of Veterans' Affairs looks to roll back to at least 2019 staffing levels by cutting *over 83,000 jobs across the country*, in critical veterans' service roles.

The list goes on, because the President has directed nearly every agency to make massive cuts to its workforce in furtherance of a reorganization of the entire federal government. These are no minor reforms or policy judgments: this is an express attempt to "transform" the country's federal administrative structure.

21.    By ordering and enacting the radical transformation President Trump contends he was elected to enact, President Trump has exceeded any constitutional authority granted to him in Article II or statutorily delegated by Congress, and has thereby usurped Congress's Article I authority. President Trump's Executive Order 14210 requiring agencies to engage in these large-scale RIF and reorganization plans is therefore *ultra vires* and unconstitutional.

22.    Moreover, neither OMB, OPM, nor DOGE have their own authority to order federal agencies to engage in large-scale RIFs or take any other action in service of government reorganization. The statutory authority defined by Congress does not give OMB or OPM any authority to *require* agencies to RIF employees, or to do so according to specific parameters, including because the President has decided to eliminate programs, functions, or positions, or take agencies down to shutdown levels of staff, or for either OMB or OPM to assert decision-making authority over the agencies. Nor does DOGE have any authority to require agencies to meet targets imposed by DOGE for reductions of staff and/or spending. By implementing the President's orders,

COMPLAINT, No.                                                                                                      11

**Add.15**

OMB, OPM, and DOGE therefore are each exceeding their authority, engaging in arbitrary and capricious action, and ignoring proper procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D).

23.     Finally, the impacted agencies themselves do not have the authority to do the President's unconstitutional bidding, under the terms set by the President rather than by Congress. Over and over, newly appointed agency heads have explained that they are reorganizing, eliminating programs, and cutting thousands upon thousands of jobs, because the President directed them to and because DOGE told them how much and what to cut.  As Veterans Affairs Secretary Doug Collins stated on the "Fox & Friends" program in early March 2025, the VA's plan to cut 80,000 jobs pursuant to the President's Executive Order was not his idea:  "No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across government,…And that is a goal, that is our target."[14]  *See also, e.g.*, U.S. Dep't of Health & Hum. Servs., *Fact Sheet: HHS Transformation to Make America Healthy Again* (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order").[15]  By implementing the President's unconstitutional orders, effectuated by DOGE's, OMB's, and OPM's requirements, these agencies have acted and are acting not in accordance with law and are engaged in arbitrary and capricious action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

24.     The President's insistence on implementing this politically driven "mandate" comes at a nearly immeasurable cost to federal agencies, millions of public employees, state and local governments, and all those who depend on the services the agencies provide every day.  Plaintiffs stand together to name these harms at their source, pursue their right to judicial review, and stop actions that threaten the very foundations of our constitutional democracy.

---

[14] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.

[15] Available at: https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html.

COMPLAINT, No.                                                                                                    12

25.     And so it falls upon this Court to play its Article III role in restraining the President's unconstitutional acts and the unlawful actions of the agencies that implement those directives. *Marbury v Madison*, 5 U.S. 137 (1803).  None of the actions at issue here are dedicated by the Constitution to the President and out of this Court's reach.  Plaintiffs call upon this Court to hold unlawful President Trump's unconstitutional reorganization and dismantling of the federal government by and through Executive Order 14210, and to enjoin the actions of the agencies implementing that unconstitutional presidential order.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

27.     Venue is appropriate in this district under 28 U.S.C. § 1391(e).  Plaintiffs AFGE, AFGE Local 1122, AFGE Local 1236, AFGE Local 2110, AFGE Local 3172, AFSCME, SEIU, and SEIU Local 1000 represent federal, state, and/or local government employees whose place of employment is within the Northern District of California, and Plaintiffs the City and County of San Francisco and the County of Santa Clara are located within the Northern District of California.

28.     Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

## PARTIES

29.     Plaintiff AFGE is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents approximately 800,000 federal civilian employees through its affiliated councils and locals at 192 Departments, agencies and sub-agencies of the federal government, and in every state in the United States.

30.     Plaintiff AFSCME is a labor organization and unincorporated association headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME members include nurses, corrections officers, child care providers, emergency medical

COMPLAINT, No.                                                                                                      13

**Add.17**

technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common:  a dedication to making our communities stronger, healthier, and safer. AFSCME represents federal civilian employees in numerous agencies and departments across the federal government, and state and local government employees who rely on the services of the federal government every day.

31.    Plaintiff SEIU is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide.  SEIU's members work in healthcare, the public sector, and property services.  SEIU has more than 150 affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036.  SEIU members include physicians, technicians, long-term care workers, janitors, security officers, airport workers, librarians, childcare workers, educators, fast food workers, employees who work for city, county, and federal governments, and many more.  SEIU, together with its local affiliates, represent approximately 80,000 federal sector employees in the United States, including nurses, doctors, other healthcare workers, police officers, firefighters, first responders, office workers, scientists, engineers, analysts, maintenance workers, and more.  SEIU federal sector members provide a broad swath of services and bring a substantial amount of expertise to numerous agencies across the federal government.  SEIU also represents about 785,000 care providers and over 700,000 non-federal public sector employees employed by states, counties, cities, and school boards across the country, which rely on federal agencies in order to continue providing essential services to their communities.  SEIU's members also include over 8,000 workers employed by contractors to provide cleaning, security, maintenance, and other services at federally owned and federally leased sites run by numerous federal agencies.

32.    Plaintiff AFGE Local 1122 is a labor organization and unincorporated association headquartered in Richmond, California.  AFGE Local 1122 represents approximately 600 employees at a Social Security Administration Western Program Service Center in Richmond, California, in addition to other units within SSA's San Francisco region.  Those employees work in positions including Claims Specialists, Benefits Authorizers, and other clerical staff.

COMPLAINT, No.                                                                                                 14

**Add.18**

33.     Plaintiff AFGE Local 1236 is a labor organization and unincorporated association headquartered in San Francisco, California.  AFGE Local 1236 represents approximately 74 attorney-advisors at Environmental Protection Agency Region 9 Headquarters in San Francisco, California, and EPA's National Center for Radiation Field Operations in Las Vegas, Nevada.

34.     Plaintiff AFGE Local 2110 is a labor organization and unincorporated association headquartered in Palo Alto, California.  AFGE Local 2110 represents approximately 4,000 employees at the Department of Veterans' Affairs Palo Alto Health Care System, including its Menlo Park and Livermore Divisions, and at several Community-Based Outpatient Clinics in Fremont, San Jose, Monterey, and Capitola.  Those employees work as doctors, nurses, emergency medical services personnel, food service workers, custodial staff, and administrative staff.

35.     Plaintiff AFGE Local 3172 is a labor organization and unincorporated association headquartered in Pacifica, California.  AFGE Local 3172 represents approximately 1,600 employees at SSA field offices in California and Nevada.  Those employees work in positions including Claims Services Representatives, Claims Specialists, Technical Experts, and other administrative and facilities staff.

36.     Plaintiff SEIU Local 1000 is a labor organization and unincorporated association headquartered in Sacramento and has a Coastal & Central Representation office located at 436 14th Street, Suite 200, in Oakland, California.  SEIU Local 1000 represents approximately 96,000 employees who work in the California state government.  Those employees live and work throughout the State, including in San Francisco, Oakland, and Sacramento.  The employees represented by SEIU Local 1000 work in a wide range of positions across the state government, including as office assistants, secretaries, data entry staff, technical assistants, information technology analysts, accounting officers, auditors, and departmental analysts.

37.     Plaintiff Alliance for Retired Americans ("ARA" or the "Alliance") is a grassroots organization with 4.4 million retiree members.  Founded by the AFL-CIO Executive Council in 2001, the Alliance has 40 state alliances and members in every state, including 950,000 members—nearly 300,000 of whom are retirees—in California.  The Alliance's retiree members are from all walks of

COMPLAINT, No.                                                                                                          15

1   life.  They are former teachers, industrial workers, state and federal government workers,

2   construction workers, and community leaders united in the belief that every American deserves a

3   secure and dignified retirement after a lifetime of hard work.

4        38.    Plaintiff American Geophysical Union ("AGU") is a 501(c)(3) membership

5   association for Earth and space scientists.  The organization, founded in 1919, pursues a mission "to

6   support and inspire a global community of individuals and organizations interested in advancing

7   discovery in Earth and space sciences and its benefit for humanity and the environment."  AGU has

8   more than 42,000 members worldwide, with 29,000 residing in the U.S., of whom more than 4,000

9   are in California; approximately 8,400 of those members work in the federal government, 28,000 are

10  university researchers, and 2,000 are scientists at nonprofit organizations.  In addition to traditional

11  career support provided by an association, AGU publishes a portfolio of 24 high-impact scholarly

12  journals and convenes regular scientific meetings, including its Annual Meeting, which had more

13  than 30,000 attendees in 2024.

14       39.    Plaintiff the American Public Health Association ("APHA") is a non-partisan, non-

15  profit organization that champions the health of all people and all communities; strengthens the

16  profession of public health; shares the latest research and information; promotes best practices; and

17  advocates for public health issues and policies grounded in scientific research.  APHA represents

18  more than 23,000 individual members who reside in all 50 states, including 2,100 individual

19  members in California, and also has 52 state and regional affiliates.  APHA's membership also

20  includes organizational members, including groups interested in health, state and local health

21  departments, and health-related businesses.  APHA is the only organization that combines a 150-year

22  perspective, a broad-based member community, and the ability to influence federal policy to improve

23  the public's health.  APHA's membership additionally includes more than 250 California students in

24  university public health schools or related programs, and over 50 California agency or organizational

25  members, including the California Department of Public Health, Contra Costa County Public Health,

26  Marin County Public Health, and the Los Angeles Trust for Children's Health.

27

28

COMPLAINT, No.                                                                                    16

**Add.20**

40.     Plaintiff Center for Taxpayer Rights is a nonpartisan nonprofit organization dedicated to furthering taxpayers' awareness of and access to taxpayer rights.  The Center accomplishes its mission, in part, by educating the public and government officials about the role taxpayer rights play in promoting compliance and trust in systems of taxation.  The Center provides technical support for the establishment and expansion of taxpayer advocate and ombuds offices as independent voices of taxpayer rights and systemic change.  The Center develops materials to educate the public about the function of taxes and taxpayer rights in civil society.  The organization also develops training programs for tax administration officials as a component of leadership training.  Through the Center's Low Income Taxpayer Clinic ("LITC"), the organization provides free representation to low-income taxpayers in disputes with the IRS and in the federal courts.  All of the clients of the Center's LITC are low-income taxpayers.  The Center also operates LITC Connect, a nationwide network of Low-Income Taxpayer Clinics and volunteer attorneys, certified public accountants, and enrolled agents that matches LITCs with tax professionals who can provide pro bono representation to low-income taxpayers and support for specific issues.  The Center, through LITC Connect, provides training when needed to LITC staff and tax professionals supporting LITCs in serving low-income taxpayers and hosts weekly calls with LITCs who are LITC Connect members.  In 2023, LITCs, most of whom are members of LITC Connect and the weekly calls, represented nearly 20,000 taxpayers nationwide, educated over 140,000 taxpayers and service providers about their rights and responsibilities before the IRS, secured over $10 million in tax refunds, and decreased or corrected over $41 million in tax liabilities.

41.     Plaintiff Coalition to Protect America's National Parks ("Parks Coalition") is a non-profit organization made up of over 4,000 members, all of whom are current, former, and retired employees and volunteers of the National Park Service.  Together, they have accumulated over 50,000 years of experience caring for America's most valuable natural and cultural resources.  The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the National Park Service ("NPS") to ensure the survival of the park system for generations to come.  The Coalition's members are regular and avid users of the National

COMPLAINT, No.                                                                                                                    17

**Add.21**

1    Park System and NPS programs, as well as the national forests and other public lands, for recreation

2    and conservation activities.

3        42.    Plaintiff Common Defense Civic Engagement ("Common Defense") is a grassroots

4    membership organization of progressive veterans, military families, and civilian supporters standing

5    up for our communities against the rising tide of racism, hate, and violence. Common Defense

6    invests in the leadership of its members through training and deployment in campaigns that connect

7    directly to their history of service, including voting rights, climate justice, and anti-militarism.

8    Approximately 33,187 of Common Defense's members live in California, including approximately

9    2,000 veterans.

10       43.    Plaintiff Main Street Alliance ("MSA") is a national network of small businesses, with

11   approximately 30,000 members throughout the United States. MSA helps small business owners

12   realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community

13   through organizing, research, and policy advocacy. MSA also seeks to amplify the voices of its small

14   business membership by sharing their experiences with the aim of creating an economy where all

15   small business owners have an equal opportunity to succeed. MSA is nonpartisan and is a Section

16   501(c)(3) organization. MSA has approximately 1,410 small business members in California,

17   including more than 70 small businesses in Alameda, Santa Clara, San Francisco, Sonoma, and

18   Contra Costa Counties.

19       44.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-profit

20   environmental and public health membership organization that works to ensure the rights of all

21   people to clean air, clean water, and healthy communities. NRDC has many hundreds of thousands

22   of members throughout the United States. NRDC engages in research, policy analysis, advocacy,

23   public education, and litigation to protect public health and the environment. As part of its work,

24   NRDC petitions federal agencies for rulemaking and other actions to protect the environment and

25   human health, comments on proposed regulations issued by federal agencies, researches and informs

26   its members about important environmental and public health issues, and publishes scientific papers

27   and advocacy briefs to inform the scientific community, policymakers, and the public.

28

COMPLAINT, No.                                                                                    18

**Add.22**

45.     Plaintiff Northeast Organic Farming Association Inc. ("NOFA") is a non-profit organization of over 5,000 farmers, farmworkers, gardeners, landscape professionals, and consumers working to promote healthy food, organic farming practices, and a cleaner environment.  NOFA is comprised of seven state-chapters:  Connecticut, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, and Vermont.  Each of these organizations offers educational conferences, workshops, farm tours, and printed materials to educate farmers, gardeners, consumers, and land care professionals on organic farming.  NOFA also publishes a quarterly newspaper, *The Natural Farmer*, that provides features on organic farming techniques, certification issues, organic market conditions, and environmental developments that may impact farmers and growers; administers the Organic Land Care program, which trains landscape professionals and others on the principles and practices of organic land care, as laid out by the *NOFA Standards for Organic Land Care*; runs a professional accreditation program; provides advice, support and cross-credentialing to partner institutions engaged in sustainable landscape education; and educates the public about the importance of using standards-based organic landscaping services.

46.     Plaintiff VoteVets Action Fund Inc. ("VoteVets") is a non-partisan, non-profit organization incorporated under the laws of the District of Columbia.  Its purpose is to lift up the voices of veterans on matters of national security, veterans' care, and everyday issues that affect the lives of those who served as well as their families including foreign policy, veterans' unemployment, robust investment in care for veterans, energy security, protecting the rights of those who serve, and upholding the Constitution and democracy that every military member swore to uphold and protect.  VoteVets has nearly two million supporters across the country, in all fifty states, with whom it regularly communicates about issues affecting veterans, including the operations, programs, and services available through the VA.  Approximately 417,000 of VoteVets' supporters live in California, including 131,000 in Northern California.

47.     Plaintiff Western Watersheds Project ("WWP") is a non-profit environmental conservation group that works to influence and improve public lands management throughout the western United States to protect native species and conserve and restore the habitats they depend

COMPLAINT, No.                                                                                              19

**Add.23**

on.  WWP's primary focus is on the negative impacts of livestock grazing, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas, and designated Wilderness.  WWP was founded in 1993 and has more than 14,000 members and supporters and field offices in Colorado, Utah, Idaho, Montana, Wyoming, Arizona, Nevada, and Oregon.  WWP covers over 250 million acres of public land spanning all of the western states.

48.     The Plaintiffs identified in the preceding paragraphs are all proceeding on their own behalf as an organization, including based on injury to their mission and organizational activities, as well as on a representative or associational basis, based on injury to their members.

49.     Plaintiff County of Santa Clara, California ("Santa Clara") is a charter county and political subdivision of the State of California.

50.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

51.     Plaintiff the Mayor and City Council of Baltimore ("Baltimore") is the corporate identity of the Plaintiff City of Baltimore, Maryland, a home-rule jurisdiction created by the Baltimore City Charter as an entity that may sue and be sued.

52.     Plaintiff Harris County, Texas ("Harris County") is a local government entity in the state of Texas.

53.     Plaintiff the City of Chicago, Illinois ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

54.     Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city and county.

55.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

COMPLAINT, No.                                                                                              20

**Add.24**

56.     Defendant Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.  OMB is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

57.     Defendant Russell Vought is the Director of OMB and is sued in his official capacity.

58.     Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

59.     Defendant Charles Ezell has been the Acting Director of OPM since January 20, 2025. He is sued in his official capacity.

60.     Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C.  DOGE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

61.     Defendant Elon Musk is the actual head of DOGE and is sued in his official capacity.

62.     Defendant Amy Gleason is the titular Acting Administrator of DOGE and is sued in her official capacity.

63.     The following federal departments and agencies, including their agency heads, may be referred to collectively herein as "Federal Agency Defendants."  For purposes of this Complaint, the Federal Agency Defendants do not include OMB, OPM, or DOGE, which will be specifically identified.  The Federal Agency Defendants are sued for their own unlawful conduct in Claims Six and Seven below, and also pursuant to Rule 19 for purposes of effectuating complete relief as to Claims One through Five against the President, OMB, OPM, DOGE and their agency heads.

64.     Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

65.     Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

COMPLAINT, No.                                                                                               21

**Add.25**

66.     Defendant United States Department of Commerce ("Commerce") is a federal agency headquartered in Washington, D.C.  Commerce is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

67.     Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

68.     Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C.  Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

69.     Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity.

70.     Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C.  Energy is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

71.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

72.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C.  HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

73.     Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.

74.     Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

75.     Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity.

76.     Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C.  HUD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

77.     Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity.

COMPLAINT, No.

**Add.26**

78.    Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.  DOJ is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

79.    Defendant Pam Bondi is the Attorney General and is sued in her official capacity.

80.    Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C.  Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

81.    Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

82.    Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C.  DOL is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

83.    Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

84.    Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

85.    Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.

86.    Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C.  Treasury is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

87.    Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.

88.    Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C.  DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

COMPLAINT, No.                                                                                          23

**Add.27**

89.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.

90.     Defendant United States Department of Veterans Affairs ("the VA") is a federal agency headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

91.     Defendant Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity.

92.     Defendant AmeriCorps (a.k.a. the Corporation for National and Community Service) is a federal agency headquartered in Washington, D.C.  AmeriCorps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

93.     Defendant Jennifer Bastress Tahmasebi is the Interim Agency Head of AmeriCorps and is sued in her official capacity.

94.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

95.     Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity.

96.     Defendant United States General Services Administration ("GSA") is a federal agency headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

97.     Defendant Stephen Ehikian is the GSA Acting Administrator and is sued in his official capacity.

98.     Defendant National Labor Relations Board ("NLRB") is a federal agency headquartered in Washington, D.C.  NLRB is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

99.     Defendant Marvin Kaplan is the Chairman of the NLRB and is sued in his official capacity.

100.     Defendant William Cowen is the Acting General Counsel of the NLRB and is sued in his official capacity.

101.     Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia.  NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

102.     Defendant Brian Stone is the Acting Director of the NSF and is sued in his official capacity.

103.     Defendant United States Small Business Administration ("SBA") is a federal agency headquartered in Washington, D.C.  SBA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

104.     Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official capacity.

105.     Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

106.     Defendant Leland Dudek is the Acting Commissioner of the SSA and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     The Constitution's Distribution of Legislative and Executive Authority With Respect to the Agencies of the Federal Government

107.     Article I vests in Congress the legislative power to create the departments, agencies, and offices within the executive branch; to define their duties; and to fund their activities.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); *INS v. Chadha*, 462 U.S. 919 (1983).  Thus, "[t]o Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18 ("The Congress shall have Power To…make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer

COMPLAINT, No.                                                                            25

1    thereof."). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v.*

2    *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v.*

3    *Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

4        108.    Among Congress's very first acts were "establishing executive departments and

5    staffs." David Engdahl, Necessary and Proper Clause, *The Heritage Guide to the Constitution*, The

6    Heritage Foundation.[16] When the First Congress created the Treasury Department, for example, it

7    established therein "distinct offices—Secretary, Comptroller, Auditor, Treasurer and Register—and

8    their duties." Harvey C. Mansfield, *Reorganizing the Federal Executive Branch: The Limits of*

9    *Institutionalization*, 35 L. & Contemporary Problems 462, 463 (1970).

10        109.    Those executive agencies of the federal government are identified in various statutes,

11    including 5 U.S.C. §§ 101 (listing Cabinet-level departments), 104 (independent establishments), and

12    105 (defining "agency" to include, inter alia, Cabinet departments and independent establishments).

13    Each agency has its own authorizing statutes that govern its administration, including statutory

14    provisions that authorize one or more individuals to act as the head of the agency. *See e.g.*, 10 U.S.C.

15    §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture/Forest Service); 38 U.S.C. §§ 301, 303 (VA); 42

16    U.S.C. §§ 202, 203 (HHS); 42 U.S.C §§ 281, 282 (NIH); 42 U.S.C. § 7131 (Energy).

17        110.    The President's Constitutional authority is set forth in Article II. U.S. Const. art. II §

18    1, cl. 1. ("The executive Power shall be vested in a President of the United States of America."). The

19    President has no constitutional legislative authority. *INS v. Chadha*, 462 U.S. 919, 951, 956–59

20    (1983); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952). Thus, the President has

21    no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes. *Clinton*

22    *v. City of New York*, 524 U.S. 417, 438–39 (1998). The declared purpose of separating and dividing

23    the powers of government was to "diffuse[] power the better to secure liberty." *Youngstown Sheet &*

24    *Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*,

25    478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu,

26

27    _____

28    [16] Available at: http://www.heritage.org/constitution/#!/articles/1/essays/59/necessary-and-proper-clause.

COMPLAINT, No.                                                                                          26

**Add.30**

1   quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative

2   and executive powers are united in the same person, or body of magistrates'...."  The Federalist No.

3   47, p. 325 (J. Cooke ed. 1961).").

4        111.   The Article II "Take Care Clause" requires that "[the President] shall take Care that

5   the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Take Care Clause "refutes the idea that

6   [the President] is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to

7   the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet*

8   *& Tube Co. v. Sawyer,* 343 U.S. 579, 587 (1952).

9        112.   And yet, the President does not execute the laws alone:  "He must execute them by the

10  assistance of subordinates."  *Myers v. United States*, 272 U.S. 52, 117 (1926).  "To aid him in the

11  performance of these duties, he is authorized to appoint certain officers, who act by his authority and

12  in conformity with his orders."  *Marbury v. Madison*, 5 U.S. 137, 166 (1803).

13       113.   The President's Constitutional authority with respect to those who assist him in taking

14  care that the law is faithfully executed is established in the Appointments Clause which reads, "The

15  President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint …

16  [the] Officers of the United States, whose Appointments are not herein otherwise provided for, and

17  which shall be established by Law."  U.S. Const. art. II, § 2, cl. 2.  That power extends to removal of

18  those appointed officers.*See Myers*, 272 U.S. at 135.

19       114.   This does not mean, however, that the President has carte blanche authority over

20  federal agencies.  The President may exercise Article II authority to create, reorganize, or abolish an

21  office that he established (such as the Executive Office of the President), but Article II does not

22  authorize the President to fundamentally reorganize the executive branch by, for example, ordering

23  government-wide terminations of federal employees, or restricting or abolishing the congressionally

24  authorized work of even a single agency that he did not establish.  *Seila Law LLC v. Consumer Fin.*

25  *Prot. Bureau*, 591 U.S. 197, 217 (2020); *see also Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16,

26  2025 Application to Vacate the Order Issued by the U.S. District Court for the District of Columbia

27

28

COMPLAINT, No.                                                                                              27

**Add.31**

1     and Request for an Immediate Administrative Stay), at *27 (U.S. Solicitor General conceding:

2     *"Agency heads…control hiring and firing decisions for subordinates*." (emphasis added)).

3        115.     "The President's power, if any, to issue [an] order must stem either from an act of

4     Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

5     585 (1952). The President may, therefore, exercise only that legislative authority that Congress has

6     constitutionally delegated. *Id.* at 587.

7        116.     The President does not employ the millions of federal employees; the agencies do. 5

8     U.S.C. § 3101 ("General authority to employ": "Each Executive agency, military department, and the

9     government of the District of Columbia may employ such number of employees of the various

10     classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.").

11     Thus, Congress has largely delegated authority, particularly for employment decisions, to the heads of

12     the federal agencies, not to the President. *Id.*; *see also, e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS: "the

13     Commissioner of Internal Revenue is authorized to employ such number of persons as the

14     Commissioner deems proper for the administration and enforcement of the internal revenue laws, and

15     the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to

16     such persons.").

17        117.     Congress has never delegated corresponding authority to the President to make the

18     employment decision to lay off federal employees. Instead, Congress has delegated to the President

19     only rule-making authority to issue government-wide regulations consistent with merit-systems

20     principles required by Congress. *E.g.*, 5 U.S.C. § 2301 (delegating to President rule-making authority

21     "necessary to ensure that personnel management is based on and embodies the merit system

22     principles."); *id.* § 3301 (regulations for the efficiency of hiring); *id.* § 3302 (authority to create

23     excepted service from the usual competitive requirements). Likewise, to the extent that the authority

24     to engage in reductions-in-force is grounded in statute, that statute only delegates the authority to

25     OPM (not the President) and only to make government-wide rules for the "order of retention," not to

26     make the decisions. 5 U.S.C. § 3502.

27

28

COMPLAINT, No.                                                         28

118. Nor has Congress delegated to the President the authority to transfer or excise specific programs, functions, or offices that Congress established and placed within a specific agency's statutory authority or discretion. Such a delegation would come dangerously close to the line-item veto struck down as unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998). Many of President Trump's recent actions effectively assume that line-item veto power, namely the power to excise programs that do not fall within the President's desired vision.

119. Finally, Congress has not delegated to President Trump the broader authority to impose his transformation on the federal government. When Congress has wanted to grant reorganization authority to a President, it has done so; but that grant of authority that has been used by Presidents over the last century has *not* been reactivated for President Trump.

## II. The 100-Year History of Congressionally Authorized Government Reorganization

120. Congress first delegated to a President the legislative authority to propose reforms to federal agencies in 1932. Economy Act of 1932, Pub. L. 72-212, tit. VI, §§ 401-408, 47 Stat. 413. Since then, from time to time, Congress has delegated to presidential administrations limited authority to propose reorganizations of the executive branch under specified conditions, usually within specified time limits. *See, e.g.*, Economy Act of 1933, Pub. L. 73-2, tit. VI, §§ 401-408, 47 Stat. 1517; Reorganization Act of 1939, Pub. L. 76-19, 53 Stat. 561; Reorganization Act of 1945, Pub. L. 79-263, 59 Stat. 613; Reorganization Act of 1949, Pub. L. 81-109, 63 Stat. 203, as amended by 67 Stat. 4 (1953), 69 Stat. 14 (1955), 71 Stat. 611 (1957), 75 Stat. 41 (1961), 78 Stat. 240 (1964), 79 Stat. 135 (1965), 83 Stat. 6 (1969), and 85 Stat. 574 (1971); and the Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (1977) (codified at 5 U.S.C. §§ 901-913 (1982)), as amended by 94 Stat. 329 (1980) and 98 Stat. 3192 (1984).

121. Nine different Presidents on 16 occasions have been granted this authority to fast-track reorganizations of government, large and small, through the legislative process. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (Dec. 11, 2012) ("Presidents used the authority for a variety of purposes, from relatively minor reorganizations within individual agencies to the creation of large new organizations, including

COMPLAINT, No. 29

**Add.33**

the Department of Health, Education, and Welfare; the Environmental Protection Agency; and the Federal Emergency Management Agency."). Presidents have submitted many other proposals that have not been accepted: "Between 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." *Id.*

122. A House of Representatives committee report for the Reorganization Act of 1977 explained the history of such laws: "Reorganizations, of course, may be made in the executive branch by legislation proposed by the President or originating within the Congress. This reorganization authority [in the Reorganization Act], however, is a cooperative effort by the President and the Congress to expedite needed reorganizations and to respond readily to changed requirements." H.R. Rep. 95-105, 2, 1977 U.S.C.C.A.N. 41, 42.

123. The most recent authorization, the Reorganization Act of 1977, as amended, expired on December 31, 1984, and has not been renewed. 5 U.S.C. § 905(b). The expired law remains codified, however, and is instructive. The law defines reorganization as including changes to the structure of federal agencies effectuated by consolidating and transferring functions *between* agencies, and *within* agencies:

> (2) the abolition of all or a part of the functions of an agency, except that no enforcement function or statutory program shall be abolished by the plan;
> …
> (4) the consolidation or coordination of part of an agency or the functions thereof with another part of the same agency or the functions thereof;
> …
> (6) the abolition of the whole or a part of an agency which agency or part does not have, or on the taking effect of the reorganization plan will not have, any functions.

5 U.S.C. § 903(a).

124. In that same law, Congress imposed requirements on the President, first requiring the President to transmit any reorganization plan to Congress, and then that the President explain how any changes to federal agencies would comport with statutory requirements and congressionally authorized funding levels to facilitate Congress's consideration of the reforms reflected in such a plan:

COMPLAINT, No.                                                                                       30

**Add.34**

1    In his message transmitting a reorganization plan, the President shall specify with
2    respect to each abolition of a function included in the plan the statutory authority for
     the exercise of the function.

3    The message shall also estimate any reduction or increase in expenditures (itemized so
4    far as practicable), and describe any improvements in management, delivery of
     Federal services, execution of the laws, and increases in efficiency of Government
5    operations, which it is expected will be realized as a result of the reorganizations
6    included in the plan.

7    In addition, the President's message shall include an implementation section which
     shall (1) describe in detail (A) the actions necessary or planned to complete the
8    reorganization, (B) the anticipated nature and substance of any orders, directives, and
     other administrative and operational actions which are expected to be required for
9    completing or implementing the reorganization, and (C) any preliminary actions which
     have been taken in the implementation process, and (2) contain a projected timetable
10   for completion of the implementation process.

11   The President shall also submit such further background or other information as the
12   Congress may require for its consideration of the plan.

13   5 U.S.C. § 503(b).

14        125.    On some occasions, Congress has denied presidential requests for reorganization

15   authority, as when President Barack Obama sought such authority in 2012.  *See* S. 2129, 112th Cong.

16   (2012); H.R. 4409, 112th Cong. (2012).  *See also Retooling Government for the 21st Century: The*

17   *President's Reorganization Plan and Reducing Duplication*: *Hearing Before the S. Comm. on*

18   *Homeland Sec. & Gov't Aff.*, 112th Cong. (2012) (S. Hrg. 112-531).  In 2003, reorganization authority

19   for then-President Bush passed the House, but was defeated in the Senate.  CRS Report R42852,

20   *supra*, at 32-33.

21        126.    Congress, exercising its Article I legislative authority, has also over the decades

22   rejected specific presidential reorganization plans presented through the regular legislative process.

23   These have included, for example, proposals to eliminate the Department of Education, *see, e.g.*, H.R.

24   714, 98th Cong. (1983) and H.R. 1510, 115th Cong. (2017); to merge the Department of Labor, the

25   Department of Commerce, and the Small Business Administration, *see, e.g*. S. 1116, 112th Cong.

26   (2011); and to consolidate parts of several agencies into a new Food Safety Administration.  H.R.

27   609, 114th Cong. (2015); among others.

28
     COMPLAINT, No.                                                                              31

**Add.35**

127.    At other times, Congress has authorized reorganizations via regular legislation, after legislative debate and compromise by the people's representatives in Congress, such as when Congress enacted the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135; *Communication from the President of the United States: A Reorganization Plan for the Department of Homeland Sec.*, 108th Cong. 16 (Jan. 7, 2003); Cong. Rsch. Serv., RL31493, *Homeland Security Department of Organization and Management – Legislative Phase* (Feb. 25, 2003).  Congress has also sometimes delegated to the President limited reorganization authority with respect to specific executive agencies, under specific conditions, and for specific periods of time.  One such law, for example, authorized a reorganization of the U.S. Agency for International Development ("USAID") and related foreign affairs agencies in 1998.  *See, e.g.,* Pub. L. 105-277, div. G, subdiv. A, § 1601, 112 Stat. 2681-795 (1998) (codified at 22 U.S.C. § 6601).  Such laws typically set expiration dates for the delegated authority:  that particular law, for example, prohibits presidential reorganization of USAID after the effective date of the reorganization plan authorized in 1998.  22 U.S.C. § 6601(e).

128.    The long history of this reorganization authority legislation makes abundantly clear that the power is legislative, rests with Congress, and is only delegated to the President when Congress expressly decides to do that.

**III.    President Trump's First Unsuccessful Attempt at Government Reorganization**

129.    President Trump should be well aware that he does not possess the constitutional authority to order reorganization of the government and that that is an authority that rests with Congress, as evidenced by his experience during his first term.

130.    On March 13, 2017, during his first term, President Trump issued Executive Order 13781, which required the Director of OMB "to propose a plan to reorganize governmental functions and eliminate unnecessary agencies ... , components of agencies, and agency programs."  Exec. Order No. 13781, 82 Fed. Reg. 13959 (2017).  OMB's implementing memorandum created a process for both agency and public input to contribute to a proposed plan.  Memorandum from Mick Mulvaney, OMB Director, to Heads of Executive Departments and Agencies re: Comprehensive Plan for

COMPLAINT, No.                                                                                                          32

**Add.36**

1    Reforming the Federal Government and Reducing the Federal Civilian Workforce, M-17-22, at 2

2    (Apr. 12, 2017).[17]

3        131.    OMB released its comprehensive plan to the public on June 21, 2018. OMB,

4    *Delivering Government Solutions in the Twenty-First Century: Reform Plan and Reorganization*

5    *Recommendations* (June 2018) (hereinafter "2018 Reorganization Plan").[18]

6        132.    The 2018 Reorganization Plan listed 32 proposals and conceded that "significant

7    changes will require legislative action." *Id.* at 4; *id.* at 21 (emphasizing the Administration's need for

8    "the support of the Congress,"); *id*. at 55 ("Fully and effectively achieving the end-state vision

9    presented here would necessarily require a partnership with the Congress, including the granting of

10   statutory authorities as necessary."). The 2018 Plan committed that, in September 2018, OMB would

11   begin negotiations with Congress for legislative action. *Id*. at 6.

12       133.    In 2018, Rep. Jody Hice (R-GA) introduced a bill that would have resurrected 5

13   U.S.C. ch. 9 to give President Trump reorganization authority. *See* H.R.6787, 115th Congress (2017-

14   2018).[19] Senator Ron Johnson (R-WI) introduced a companion bill in the Senate. *See* S.3137,115th

15   Congress (2018).[20] The Senate bill cleared the committee following a hearing, but it was never

16   brought up for a vote in the Senate. The Senate's committee report does not appear to indicate (or

17   even suggest) that the Trump administration expressly requested authority, but OMB's deputy

18   director testified in support of Trump's reorganization plan at the committee hearing. *See Reforming*

19   *Government Act of 2018 Report of Comm. on Govt'l Aff. to Accompany S. 3137*, 115th Cong. 381

20   (2018).[21]

21

22

23   ────────────────────

24   [17] Available at:
     https://web.archive.org/web/20170716192101/https://www.whitehouse.gov/sites/whitehouse.gov/
25   files/omb/memoranda/2017/M-17-22.pdf.
     [18] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-
26   Reorg-Plan.pdf.
     [19] Available at: https://www.congress.gov/bill/115th-congress/house-bill/6787/subjects.
27   [20] Available at: https://www.congress.gov/bill/115th-congress/senate-bill/3137.
     [21] Available at: https://www.congress.gov/115/crpt/srpt381/CRPT-115srpt381.pdf.
28   COMPLAINT, No.                      33

134.     In 2019, the Trump administration issued an update on the progress of the 2018 Plan. Off. of Mgmt. & Budget, Exec. Off. of the President, *One Year [sic] Update: Reform Plan and Reorganization Recommendations* (2019) (hereinafter "2019 Update").[22]  The update noted that "some proposals require action by Congress."  *Id*. at 2.  Along those lines, the update acknowledged that "Congress has taken action to consider at least 10 of the proposals, via hearings, legislation, or discussions with Members or staff."  *Id.*

135.     Congress gave due consideration to the Trump administration's first-term reorganization ambitions by convening numerous hearings before and after OMB publicly released the 2018 Plan.  *See, e.g.*, *FAA Reauthorization: Administration Perspectives: Hearing Before the S. Comm. on Commerce, Science & Transp.*, 115th Cong. (June 7, 2017) (S. Hrg. 115-221);[23] *Agency Approaches to Reorganization Examining OMB's Memorandum on the Federal Workforce: Hearing Before S. Comm. on Homeland Sec. & Govt'l Aff.*, 115th Cong. (June 15, 2017) (S. Hrg. 115-165);[24] *A Review of the State Department Reauthorization Bill for Fiscal Year 2018 and the State Department Reorganization Plans: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (July 17, 2017) (S. Hrg. 115-704);[25] *Examining OMB's Memorandum on The Federal Workforce Part II: Expert Views on OMB's Ongoing Government-Wide Reorganization: Hearing Before the S. Comm. on Homeland Sec. & Govt'l Aff.*, 115th Cong. (Sep. 13, 2017) (S. Hrg. 115-6177);[26] *Department of Energy: Management and Priorities; Hearing Before the H. Comm. on Science, Space, & Tech.*, 115th Cong. (Jan. 1, 2018) (Serial No. 115-45);[27] *Financing Overseas Development: The Administration's Proposal: Hearing Before the H. Comm. on For. Rel.*, 115th Cong. (Apr. 11, 2018) (Serial No. 115-

---

[22] Available at: https://web.archive.org/web/20200716100903/https://www.performance.gov/GovReform/Reform-and-Reorg-Plan-Update.pdf.
[23] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg29974/CHRG-115shrg29974.pdf.
[24] Available at: https://www.govinfo.gov/content/pkg/CHRG-115shrg27394/pdf/CHRG-115shrg27394.pdf.
[25] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg38105/CHRG-115shrg38105.pdf.
[26] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg28405/CHRG-115shrg28405.pdf.
[27] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg28932/CHRG-115hhrg28932.pdf.

COMPLAINT, No.                                                                                      34

**Add.38**

1    119);[28] *Workforce for the 21st Century: Analyzing the President's Management Agenda: Hearing*

2    *Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. (May 16, 2018) (Serial No. 115-

3    96);[29] *USAID Resources and Redesign: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (June

4    20, 2018) (S. Hrg. 115-791);[30] *Examining the Administration's Government-Wide Reorganization*

5    *Plan: Hearing Before H. Comm. on Oversight & Gov't Reform*, 115th Cong. (June 27, 2018) (Serial

6    No. 115-88);[31] *Reviewing the Administration's Government Reorganization Proposal: Hearing Before*

7    *the S. Comm. on Homeland Sec. & Gov't Aff.,* 115th Cong. (July 18, 2018) (S. Hrg. 115-547);[32]

8    *Administration Reorganization and Modernization Proposals Related to the Department of Energy*

9    *and the Department of the Interior: Hearing Before S. Comm. on Energy and Nat'l Resources*, 115th

10   Cong. (July 19, 2018) (S. Hrg. 115-524);[33] *The Challenges and Opportunities of the Proposed*

11   *Government Reorganization on OPM and GSA: Hearing Before the S. Comm. on Homeland Sec. &*

12   *Gov't Aff.* (July 26, 2018) (S. Hrg. 115-451);[34] *Oversight Hearing on No Road Map, No Destination,*

13   *No Justification: The Implementation and Impacts of the Reorganization of the Department of the*

14   *Interior: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Apr. 30, 2019) (Serial No. 116-

15   13);[35] *The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on*

16   *Gov't Ops., H. Comm on Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26);[36]

17   *Document Production Status Update: OPM, FBI, and GSA: Hearing Before the Subcomm. on Gov't*

18

19

20   ───────────────────

21   [28] Available at: https://www.congress.gov/115/meeting/house/108115/documents/HHRG-115-FA00-Transcript-20180411.pdf.

22   [29] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31422/CHRG-115hhrg31422.pdf.

23   [30] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg40341/CHRG-115shrg40341.pdf.
     [31] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31276/CHRG-115hhrg31276.pdf.

24

25   [32] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg34573/CHRG-115shrg34573.pdf.
     [33] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg30984/CHRG-115shrg30984.pdf.

26   [34] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg32987/CHRG-115shrg32987.pdf.
     [35] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg36257/CHRG-116hhrg36257.pdf.

27   [36] Available at: https://docs.house.gov/meetings/GO/GO24/20190521/109516/HMTG-116-GO24-Transcript-20190521.pdf.

28   COMPLAINT, No.                                                                      35

**Add.39**

*Ops., H. Comm on Oversight & Reform*, 116th Cong. 42 (June 27, 2019);[37] *BLM Disorganization: Examining the Proposed Reorganization and Relocation of the Bureau of Land Management Headquarters to Grand Junction, Colorado: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Sep. 19, 2019) (Serial No. 116-21).[38]

136.    The Congressional Research Service aided Congress in its deliberations by preparing a report, which discussed the 2018 Plan's 32 proposals and 3 significant subproposals.  Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals*, at 1 (July 25, 2018).[39]

137.    Congress largely did not support the proposed reforms.  *See The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Gov't Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26); *see also* Fed. News Network, *Congress not yet convinced of Trump administration's proposed OPM-GSA merger* (May 22, 2019) ("Lawmakers on Tuesday afternoon expressed bipartisan concern and skepticism for the Trump administration's proposed merger of the Office of Personnel Management with the General Services Administration.  And they weren't alone.  The Government Accountability Office, OPM's inspector general and a former agency director said the administration hasn't demonstrated enough evidence to date to show the proposed OPM-GSA merger makes sense.");[40] Gov't Exec., *Omnibus Puts Kibosh on White House Efforts to Unilaterally Reorganize Agencies, Shed Workers*. (Mar. 22, 2018);[41] Gov't Exec., *Congress Begins Formally Blocking Trump's Government Reorganization Plan*. (Sep. 12, 2018).[42]

_____

[37] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37283/CHRG-116hhrg37283.pdf.
[38] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37679/CHRG-116hhrg37679.pdf.

[40] Available at: https://federalnewsnetwork.com/opm-reorganization/2019/05/congress-not-yet-convinced-of-trump-administrations-proposed-opm-gsa-merger/.
[41] Available at: https://www.govexec.com/management/2018/03/omnibus-puts-kibosh-white-house-efforts-unilaterally-reorganize-agencies-shed-workers/146894/.
[42] Available at: https://www.govexec.com/management/2018/09/congress-begins-formally-blocking-trumps-government-reorganization-plan/151218/.

COMPLAINT, No.                                                                                                    36

**Add.40**

### IV.     President Trump's Second-Term Reorganization Without Congressional Authorization

138.     Since Congress, as the representatives duly elected by the American people to the legislative branch of government, may not support his reform proposals, President Trump has chosen to proceed with his "Manhattan project of our time" without first obtaining Congressional authorization—or even providing Congress with clear information about the unprecedented reorganization he intends.  And unlike during President Trump's first term, there has been absolutely no public process by which the Administration's current proposals have been vetted.  Instead, the Administration is proceeding secretly, and by fiat.

139.     The President has acknowledged that he needs and does not have Congressional authorization.  The President responded "Yeah," when asked in a February 18, 2025 interview by TV host Sean Hannity whether his Executive Order would "have to be codified into law" and "need the Republican Congress to follow up."  The White House: *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025).[43]

### A.     The Mandate to OMB, OPM, and DOGE to Reform and Downsize

140.     On January 20, 2025, the President created DOGE to engage in his project of radically transforming the size and scope of the federal government.  Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) (Establishing and Implementing the President's "Department of Government Efficiency').  That Order reorganized and renamed the U.S. Digital Service as DOGE and moved that office from reporting to OMB within the Executive Office of the President to reporting directly to the President's Chief of Staff.  *Id*.  The January 20 Order created two other structures:  a "U.S. DOGE Service Temporary Organization … headed by the [DOGE] Administrator and … dedicated to advancing the President's 18-month DOGE agenda" and "DOGE Teams" embedded at each agency and jointly appointed by DOGE and the agency head.  *Id*.  The Administration has never made public the "18-month DOGE agenda" for the federal government.  *Id*.

---

[43] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

COMPLAINT, No.                                                                                                      37

**Add.41**

141.    On January 20, 2025, the President also issued a Presidential Memorandum imposing a government-wide hiring freeze on all federal agencies, with limited exceptions.  The White House: *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[44]  The President generally ordered: "this freeze applies to all executive departments and agencies regardless of their sources of operational and programmatic funding." *Id.*  The President then ordered DOGE, OMB, and OPM to create a plan to reduce the size of the federal government.  *Id.* ("Within 90 days of the date of this memorandum, the Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition.").

142.    As other federal courts have found, individuals affiliated with DOGE, hired into the federal government on a temporary basis, proceeded to embed within federal agencies and centralize decision-making, with the part of DOGE based in the Executive Office of the President headed by Elon Musk.  *See, e.g.*, *Does v. Musk*, __ F. Supp. 3d __, No. 25-0462, 2025 WL 840574, at *1–4 (D. Md. Mar. 18, 2025); *New York v. Trump*, __ F. Supp. 3d __, No. 25-CV-01144, 2025 WL 573771, at *3–7 (S.D.N.Y. Feb. 21, 2025); *AFL-CIO v. Dep't of Lab.*, __F. Supp. 3d __, No. 25-339, 2025 WL 1129227, at *1–4 (D.D.C. Apr. 16, 2025).

143.    In a March 2025 interview, Elon Musk, on behalf of DOGE, explained the DOGE goals as follows:

> We want to reduce the spending by eliminating waste and fraud, reduce the spending by 15%, which seems really quite achievable.
> …
> We are cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding.[45]

---

[44] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

[45] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

COMPLAINT, No.                                                                                    38

144.    The President issued many other directives aimed at furthering the goals of transformation of the government and federal employment according to his vision, at each step enlisting the aid of OPM, OMB and/or DOGE to implement his directives, including:

- Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing) (OMB and OPM);

- Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 20, 2025) (Reforming the Federal Hiring Process and Restoring Merit to Government Service) (OMB, OPM, DOGE, working with "the Assistant to the President for Domestic Policy");

- Exec. Order No. 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025) (Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce) (OPM); and

- Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) (OMB).

In the President's own words:  "It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state."  Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative) (enlisting DOGE and OMB); *see also* Exec. Order No. 14222, 90 Fed. Reg. 11095  (Feb. 26, 2025) (Implementing the President's Department of Government Efficiency Cost Efficiency Initiative: enlisting DOGE in "a transformation in Federal spending").

145.    The President also eliminated certain agencies with the following proclamation:

It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people.  This order commences a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary.  Reducing the size of the Federal Government will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation.

Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy) (enlisting OMB and OPM to eliminate the Presidio Trust; the Inter-American Foundation; the United States African Development Foundation; and the United States Institute of Peace).

COMPLAINT, No.                                                                                              39

**Add.43**

146.     The President further enlisted OMB to "reduce the performance" of the following agencies to "the minimum presence and function required by law":  the Federal Mediation and Conciliation Service; the United States Agency for Global Media; the Woodrow Wilson International Center for Scholars in the Smithsonian Institution; the Institute of Museum and Library Services; the United States Interagency Council on Homelessness; the Community Development Financial Institutions Fund; and the Minority Business Development Agency.  Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy).  The President explained:  "This order continues the reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary." *Id.*

147.     The President also ordered the "closure" of the entire United States Department of Education and transfer of certain functions to other agencies.  Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Improving Education Outcomes by Empowering Parents, States, and Communities.  The President likewise closed the United States Agency for International Development, firing nearly all of its staff, and subsumed what remained into the State Department,[46] as well as shuttered the Consumer Financial Protection Bureau, attempting to fire nearly all of its staff as well.[47]  Most recently, the President decimated AmeriCorps, ending core programs and placing nearly all staff on leave before later laying them off and cutting the bulk of grants to AmeriCorps grantees.[48]

---

[46] Carnegie Endowment for International Peace, *Trump's Move to Gut USAID Reveals the Crux of His Foreign Policy* (Feb. 4, 2025), available at: https://carnegieendowment.org/emissary/2025/02/usaid-trump-foreign-aid-policy-why.

[47] NBC News, *Trump administration and Musk's DOGE plan to fire nearly all CFPB staff and wind down agency, employees say* (Feb. 28, 2025), available at: https://www.nbcnews.com/business/business-news/trump-administration-musks-doge-plan-fire-cfpb-staff-close-agency-rcna194217.

[48] NY Times, *DOGE Guts Agency That Organizes Community Service Programs* (Apr. 17, 2025), available at: https://www.nytimes.com/2025/04/17/us/politics/doge-cost-americorps-community-service.html; *see also* MSN, *AmeriCorps Faces Major Blow As Elon Musk-Led DOGE Slashes $400 Million In Federal Grants* (Apr. 26, 2025), available at: https://www.msn.com/en-in/news/world/americorps-faces-major-blow-as-elon-musk-led-doge-slashes-400-million-in-federal-grants/ar-AA1DEjSo.

COMPLAINT, No.                                                                                              40

148. DOGE and/or OPM have taken a series of other actions since January 20, 2025 aimed at deconstructing and drastically reducing the size of the federal government, including: the "Fork in the Road" Deferred Resignation Program, announced via e-mail to millions of federal employees; the unlawful termination of probationary employees nationwide; the mandated email reporting ("5 bullets") to all federal employees and corresponding threats for failure to respond; and the placement of employees throughout the federal government on administrative leave for a variety of reasons.

**B.      President's February 11, 2025 Executive Order to All Federal Agencies to Downsize and Reorganize Themselves Via Agency RIF and Reorganization Plans**

149. The President's February 11, 2025 Workforce Executive Order is in the same vein as these other actions, furthering the President's express goal of "transforming" and "deconstruct[ing]" the agencies of the federal government. Ex. A.

150. The Executive Order applies to the executive departments and agencies, including but not limited to the Federal Agency Defendants. *Id.* (citing 44 U.S.C. § 3502). There are currently fifteen executive cabinet-level departments, 5 U.S.C. § 101, and hundreds of federal agencies and commissions.[49]

151. The President ordered, in pertinent part:

a. Reduction of the number of federal employees via hiring freezes, hiring/departure ratios, and OMB and DOGE control of agency hiring. Ex. A, Sec. 3. Specifically, the President required OMB to submit to him a "plan to reduce the size of the Federal Government's workforce" that will "require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan." *Id.* The President allowed limited exceptions for "functions related to public safety, immigration enforcement, or law enforcement." The President required all agency heads to submit *all career federal hiring* to DOGE for approval. *Id.*

b. All federal agencies "shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)." *Id.* In making these cuts, the President ordered that "[a]ll offices that

---

[49] Available at: https://www.usa.gov/agency-index.

COMPLAINT, No.                                                                                  41

perform functions not mandated by statute or other law *shall be prioritized* in the RIFs, including":

- "all agency diversity, equity, and inclusion initiatives";

- "all agency initiatives, components, or operations that my Administration suspends or closes"; and

- "all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website" ("Funding Lapse Plan Staffing Levels").

*Id.* (emphasis added).  The President allowed limited exceptions:  "This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement."  *Id.*

c.      All federal agencies shall submit to OMB a "reorganization plan" that "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

152.    The President's Executive Order removed agency discretion and authority, by ordering agencies to act.  The President's Executive Order necessarily orders agencies to disregard applicable statutory authorizations and appropriations, by implementing the following mandates:

a.      Agencies are *required* to implement "large-scale" RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

b.      Agencies are *required* to prioritize in RIFs "all agency initiatives, components, or operations that [the] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

c.      Agencies are *required* to prioritize in RIFs "all components and employees" not deemed "essential"—and therefore that do not continue working—during a government shutdown when annual appropriations have temporarily lapsed (aka Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.      Agencies are *required* to consider their own destruction, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

COMPLAINT, No.                                                                                          42

**Add.46**

e.   And finally, agencies are *required* to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

153.   The President further granted OPM, rather than the agencies, the power to "grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction." *Id.*, Sec. 4.

154.   The President gave agencies a mere 30 days, after commencing their planning for the massive RIFs, to submit reorganization reports describing how they would pick up and organize the pieces of what will be left. *Id.*, Sec. 3.

155.   Notwithstanding all of these requirements that order agencies to apply parameters that cannot be reconciled with agency statutory authority, the President then stated the Order should be implemented consistent with applicable law. *Id.* Sec. 5.

### C.   OMB, OPM, and DOGE Implementation of the President's Orders: February 26 Directive, March 13 Deadline, and April 14 Deadline

156.   On February 26, 2025, OMB and OPM issued a Memorandum to Heads of Executive Departments and Agencies, including but not limited to the Federal Agency Defendants, regarding "Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative." Ex. B.

157.   OMB and OPM echoed the President's purposes in transforming the federal bureaucracy, explaining:

> The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

> The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

*Id.*

158.   In this Memorandum, OMB and OPM directed federal agencies to comply with the President's Executive Order by submitting the "Agency RIF and Reorganization Plans" ("ARRPs") required by the Workforce Executive Order to OMB and OPM for "review and approval." *Id.*

COMPLAINT, No.                                                                                           43

**Add.47**

159.     The OMB and OPM February 26 Memorandum, by imposing onerous requirements under exceptionally unreasonable time frames, guarantees that agencies will not be able to comply with their statutory and regulatory mandates, will not exercise any existing discretion in a manner that is faithful to those mandates or results from considered, proper decision-making, and will instead do the President's unlawful bidding.  The OMB and OPM February 26 Memorandum, by endowing OMB and OPM with ultimate decision-making power as to the ARRPs, transfers decision-making to those without personal knowledge of or experience with the particular requirements and obligations of these agencies, their component parts, or of the work performed by their employees—and the impacts of eliminating that work.

160.     OMB and OPM set forth requirements for the ARRPs that included instructing that ARRPs "should" include "[a] significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required."  OMB and OPM explained further: "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions."  *Id.*  OMB and OPM further directed that agencies "should also[,]" among other things:

- "seek to consolidate areas of the agency organization chart that are duplicative";
- "consolidate management layers where unnecessary layers exist"; and
- "seek reductions in components and positions that are non-critical[.]"

OMB and OPM further instructed:  "When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees."  *Id.*

161.     OMB and OPM also directed agencies to work with DOGE in planning required RIFs for non-essential positions, and to use 2019 Funding Lapse Plan Staffing Levels as the "starting point" for identifying those positions that are "essential."  Ex. B.

**Add.48**

162.    Among the "tools" OMB and OPM directed agencies could use:  "Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline)."  Then, OMB and OPM directed that agencies must include the following in the plans submitted for approval:

> ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

*Id.*

163.    OMB and OPM required the ARRPs to be submitted for approval in two phases, the first of which was due merely *two weeks* later on March 13, 2025, and the second on April 14, 2025, and then gave specific requirements for each phase.  *Id.*

164.    The March 13 "Phase 1 ARRPs shall focus on initial agency cuts and reductions."  *Id.*  Agencies were required to identify, among other things, Funding Lapse Plan Staffing Levels:

> All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB *in 2019* referenced above.

*Id.* (emphasis added).  Agencies were also required to identify "[w]hether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

165.    The April 14 Phase 2 plans were required to contain further information regarding the reorganization in light of the required RIFs, including a new organization chart and, among other things:

- The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

- Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

- The competitive areas for subsequent large-scale RIFs.

- All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

COMPLAINT, No.                                                                                           45

**Add.49**

- Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

*Id.*

166.    Finally, OMB and OPM instructed once again that "law enforcement, border security, national security, immigration enforcement, or public safety responsibilities" as well as political appointees were exempt from these "transformation" efforts and that agencies providing services to the public were not permitted to implement any RIFs without OMB or OPM sign-off.  *Id.*

167.    On information and belief, it is not possible for any federal agency, let alone all federal agencies, to create an ARRP that both accommodates the specific parameters required by the President, OMB, and OPM *and* complies with all of the federal agency's statutory and regulatory requirements in a mere two weeks, by the March 13 deadline, or even realistically by the April 14 deadline.  The OMB/OPM Memorandum did not provide agencies enough time to properly assess an agency's statutory requirements, let alone assess how to comply with them *and* the President's directives.

168.    The requirements for the ARRPs imposed by OMB and OPM on all federal agencies effectively removed independent decision-making authority from the agencies and required agencies to disregard the statutory authority governing the agency's organization, functions, personnel requirements, and appropriations.  The language directing agencies to comply with applicable law in creating these plans was disingenuous.

169.    The February 26, 2025 OMB and OPM memorandum contained new or modified rules without engaging in notice and comment rule-making, and effectively required agencies (including but not limited to Federal Agency Defendants) to comply with these new and modified rules regardless of any prior existing regulations.

170.    On information and belief, DOGE, via individuals in the Executive Office of the President and DOGE teams embedded at agencies (including but not limited to Federal Agency Defendants), has enforced the requirements of the President's Executive Order and OMB/OPM Memorandum, including by ordering federal agencies to make mandated cuts eliminating positions, programs, offices, and functions.  On information and belief, DOGE has required federal agencies to

COMPLAINT, No.                                                                                              46

**Add.50**

1    comply with required targets imposed by DOGE for spending reductions by eliminating positions,

2    programs, offices, and functions to meet the DOGE stated goal of imposing spending cuts

3    government-wide.

4           171.    In sum, OMB, OPM, and DOGE have usurped agency authority, exceeded their own

5    authority, acted in an arbitrary and capricious manner, and ignored procedural requirements by

6    requiring federal agencies throughout the government, including but not limited to Federal Agency

7    Defendants, to:

8           a.      Submit ARRPs for OMB and OPM approval;

9           b.      Include in those ARRPs large-scale RIFs (irrespective of whether staffing reductions

10                  are necessary or even appropriate in light of agency functions and appropriations);

11          c.       Prioritize in those large-scale RIFs any functions that "[the President's]

12                  Administration suspends or closes" (irrespective of statutory requirements or authority

13                  delegated to the agencies);

14          d.      Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of

15                  staffing (which have nothing to do with the staffing needed to properly run fully appropriated

16                  agencies);

17          e.      Include in their ARRPs consideration of their own destruction, by addressing whether

18                  the agency or any subparts should be eliminated by the President (again, regardless of

19                  statutory requirements or authority delegated to the agencies);

20          f.      Include in their ARRPs a plan to reorganize themselves by picking up and arranging

21                  the pieces that are left, following these large-scale reductions;

22          g.      Submit these plans for approval on timeframes that do not permit agencies to actually

23                  consider and assess their own needs or their statutory authority; and

24          h.      Impose cuts to functions and staffing according to "targets" and "goals" imposed by

25                  DOGE.

26

27

28

COMPLAINT, No.                                                                                    47

**D.     OMB, OPM, and DOGE Lack of Statutory Authority to Order Agencies to Reorganize or Engage in a RIF**

172.     OMB must source its authority either directly from an act of Congress, or a delegation by Congress to the President that the President has in turn delegated to OMB.  OMB lacks the authority to order federal agencies to downsize or reorganize themselves, or to assume final decision-making power by requiring agencies to submit such plans for OMB approval.  31 U.S.C. §§ 501-507.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OMB cannot cloak itself in Presidential authority, either**.**

173.     OPM has no statutory authority to approve agency plans to reorganize or conduct RIFs in service of such a reorganization.  5 U.S.C. §§ 1101-1105.  OPM's statutory authority with respect to RIFs consists of setting government-wide order of retention rules for the release of employees in a RIF.  5 U.S.C. § 3502.  OPM cannot order federal agencies to downsize or reorganize themselves, or assume final decision-making power by requiring agencies to submit such plans for approval.  *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 3:25-cv-01780-WHA (N.D. Cal.), ECF No. 45 (Feb. 28, 2025 Order), ECF No. 132 (Mar. 14, 2025 Order), ECF No. 202 (Apr. 18, 2025 Order).  To the extent that Congress has generally authorized OPM to implement the President's rules for the federal workforce (5 U.S.C. § 1103), that authorization is coextensive with the President's authority and cannot exceed it.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OPM cannot cloak itself in Presidential authority, either**.**

174.     DOGE has no statutory authority at all.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, DOGE cannot cloak itself in Presidential authority, either**.**

**E.     The Administration's Lack of Transparency Regarding Reorganization Plans**

175.     The Trump Administration has never made public the "18-month DOGE agenda" referenced in Executive Order 14158.

COMPLAINT, No.                                                                                                          48

**Add.52**

176.    The Trump Administration has never made public any plan being created by DOGE in conjunction with OPM and OMB pursuant to the President's January 20, 2025 Memorandum requiring a "plan to reduce the size of the Federal Government's workforce."

177.    When asked by Fox News in March 2025 whether DOGE's actions would result in a report ("And the process is a report at some point?  At 100 days?"), Elon Musk responded on behalf of DOGE:  "Not really a report.  We are cutting the waste and fraud in real time.  Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[50]

178.    The Trump Administration has refused to make public the phase-one agency ARRPs that were to be submitted by March 13 to OMB and OPM for approval, including in response to requests from members of the public via the Freedom of Information Act ("FOIA"), federal employee unions, the press, and Congress.

179.    In lawsuits filed against the Trump Administration seeking disclosure under FOIA of the March 13 plans submitted to OMB and OPM, OMB and OPM refused to disclose those plans on the ground that they were "pre-decisional" and described them as pending OMB review and approval. *See, e.g.*, *Democracy Forward Foundation v. Off. of Mgmt. & Budget*, No. 1:25-cv-00858 (D.D.C.), ECF No. 9 (Defendants' Apr. 2, 2025 Motion to Dismiss:  "'[A]gency reduction-in-force plans are still under development by the Executive Branch[,] and OMB is currently actively reviewing these plans as part of Phase 1' … OMB explained, the plans Plaintiff requested 'are part of a longer two-phase process that has just been initiated.'").

180.    Executive Order 14210 did not, in ordering agencies to prepare and submit reorganization plans to OMB and OPM, create any process for notice and public comment, unlike the reorganization Executive Order issued in President Trump's first term.

181.    On March 13, 2025, the Washington Post reported: "Agencies across the federal government faced a Thursday deadline to submit plans for a large-scale firing of employees, but scant

---

[50] *Supra*, n.9.

COMPLAINT, No.                                                                                                          49

**Add.53**

1    details were made public about what the White House said would be a 'mass reduction' of the federal

2    workforce.  The White House did not preview the plans, saying only that it would share their contents

3    'once the plans are enacted.'"  Wash. Post, *White House expects 'mass reduction' of federal*

4    *workforce as deadline looms* (Mar. 13, 2025).[51]  White House press secretary Karoline Leavitt said:

5    "The coming mass reduction will 'streamline our broken bureaucracy, save taxpayers millions of

6    dollars and make the government more efficient for all.'"  *Id.*

7            182.    On March 27, 2025, the Washington Post published a report regarding "an internal

8    White House document obtained by The Washington Post" that "contains closely held draft plans for

9    reshaping the 2.3-million-person bureaucracy."  Wash. Post, *Internal White House document details*

10   *layoff plans across U.S. agencies* (Mar. 27, 2025).[52]  The Post explained:  "The details are compiled

11   from plans that President Donald Trump ordered agencies to submit, according to two people familiar

12   with the document who spoke on the condition of anonymity because they were not authorized to talk

13   about it."  *Id.*  The document shows that "[f]ederal officials are preparing for agencies to cut between

14   8 and 50 percent of their employees as part of a Trump administration push to shrink the federal

15   government."  When confronted with questions regarding this document, the Post reports that White

16   House Principal Deputy Press Secretary Harrison Fields responded by e-mail:

17           "It's no secret the Trump Administration is dedicated to downsizing the federal
             bureaucracy and cutting waste, fraud, and abuse.  This document is a pre-deliberative
18           draft and does not accurately reflect final reduction in force plans…  When President
             Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will
19           make those announcements to their respective workforces at the appropriate time."

20   *Id.*

21           183.    When individuals at agencies have gone public with information regarding the wide-

22   scale (and unlawful) scope of these plans, the Trump Administration has claimed they are

23   "fraudulent."  For example:  On April 9, 2025, the Las Vegas ABC-news affiliate KTNV published a

24   report titled, "As concerns among veterans rise, VA source shares details of workforce reduction

25   _____

26   [51]Available at: https://www.washingtonpost.com/politics/2025/03/13/government-agency-
     reorganization-rif-federal-workers/.

27   [52]Available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-
     government-agencies/.

28   COMPLAINT, No.                                                                                50

**Add.54**

plan."[53]  The source described in detail the plans for cutting 80,000 jobs.  The VA responded by calling the document "fraudulent" and an "intentionally false leaked document."  *Id.*

184.    The Trump Administration has largely refused to make the April 14 ARRPs publicly available either, until it starts issuing RIF notices (and not even then).

185.    Members of Congress have submitted multiple requests for information to the Trump Administration regarding these reorganization plans.

186.    For example, on April 7, the Ranking Member of the Senate Budget Committee sent a demand letter requesting the OMB provide the Senate with documents including the March 13 plans as well as any further plans, and expressing concern that "[t]hese sweeping workforce reductions will not only strain agency operations and delay critical services for seniors and veterans, but they will also harm the government's efforts to protect public health, conserve natural resources, and manage federal lands."[54]

187.    On April 10, another group of Senators wrote to OPM and OMB, requesting documents pertaining to the RIF and Reorganization plans; expressing concern regarding the illegality, harm, and lack of transparency; and noting that the parameter to use government-shutdown levels as a baseline could threaten the jobs of *700,000 federal employees.*  Letter from Senators to Off. of Mgmt. and Budget and Off. of Pers. Mgmt. (Apr. 10, 2025), attached hereto as Exhibit C.  The Senators continued:

> Further, the size and scope of the reported RIF plans are clearly not about government efficiency.  The Department of Education has announced layoffs of 50% and the Department of Veterans Affairs has proposed cuts of over 80,000 employees.  The Department of Defense is seeking to reduce its civilian workforce by 5-8%, or 61,000 employees, and the IRS reportedly plans to cut around 25% of its workforce, or 20,000 employees.  On April 1, 2025, the Department of Health and Human Services began the process of firing 10,000 employees, in addition to 10,000 employees who left their positions through the deferred resignation program and other downsizing efforts.  Two days later, Secretary Kennedy suggested that 20% of these terminations could be mistakes.  The Secretary stated, "[p]ersonnel that should not have been cut were cut…

---

[53] Available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-how-their-workforce-reduction-plan-will-affect-them.

[54] Letter from Jeffrey Merkley, Ranking Member of S. Comm. on the Budget, to Russell Vought, OMB Director (Apr. 7, 2025), available at: https://www.budget.senate.gov/imo/media/doc/letter_to_omb_re_rif_plans.pdf.

COMPLAINT, No.                                                                                                        51

1   that was always the plan.  Part of the DOGE, we talked about this from the beginning,
2   is we're going to do 80% cuts, but 20% of those are going to have to be reinstated,
3   because we'll make mistakes."  The Social Security Administration (SSA) has already
    lost over 7,000 employees through terminations and resignations since February and
4   closed 6 of 10 regional offices, leading to increased wait times and multiple website
    crashes over the past month—yet SSA plans to cut thousands more.

5   *Id.*

6   188.    As a result of the Trump Administration's secrecy, federal employees throughout the

7   federal agencies, their labor representatives, state and local governments, organizations including

8   Plaintiffs, non-profits, and the public have been kept in the dark, intentionally, regarding this

9   Administration's plans.  As late as March 28, 2025, *after* the March 13 ARRPs with the required

10  "large-scale RIFs" had been submitted for approval, Elon Musk and his selected DOGE

11  representatives, sitting down for a lengthy interview with Fox News, minimized the terminations of

12  federal employees:

13  [DOGE lead at OPM] Anthony Armstrong:

14  And President Trump's been very clear: it's scalpel not hatchet.  And that's the way
15  it's getting done.

16  And then once those decisions are made, there's a very heavy focus on being
17  generous, being caring, being compassionate, and treating everyone with dignity and
    respect.  And if you look at how people have started to leave the government, it is
18  largely through voluntary means.  There's voluntary early retirement, there's
19  voluntary separation payments.  We put in place deferred resignation, the eight-month
    severance program.
20
21  So there's a very heavy bias towards programs that are long-dated, that are generous,
    that allow people to exit and go and get a new job in the private sector.  And you've
22  heard a lot of news about RIFs, about people getting fired.  At this moment in time,
23  less than .15, not 1. 5, less than .15 of the federal workforce has actually been given a
    RIF notice.
24
25  Elon Musk:

26  *Basically almost no one's gotten fired, is what we're saying.*[55]

27  _____

28  [55] *Supra*, n.9.

COMPLAINT, No.                                                                            52

**Add.56**

1

**F.** **Current and Impending Implementation of the President's Mandated ARRPs**

2      189.    Despite the Trump Administration's failure to provide the public, federal employees

3 and their labor representatives, the press, and Congress with detailed advance information regarding

4 these plans, information about the ARRPs that Plaintiffs have been able to obtain confirmation that

5 some agencies have already begun to implement the large-scale RIFs and reorganization plans

6 ordered by the President, and many other agencies are poised to do so imminently.  Plaintiffs set forth

7 their current information regarding actual and imminent implementation of President Trump's plans

8 to transform the federal government.

9      **1.** **Ongoing RIFs and Reorganization**

10      190.    At least the following Federal Agency Defendants have begun to implement their

11 ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs:

12    • **Health and Human Services**

13      191.    On March 27, 2025, HHS announced:  "Today, the U.S. Department of Health and

14 Human Services (HHS) announced a dramatic restructuring in accordance with President Trump's

15 Executive Order, 'Implementing the President's 'Department of Government Efficiency' Initiative.'"

16 Press Release, U.S. Dep't of Health and Human Servs., *HHS Announces Transformation to Make*

17 *America Healthy Again* (Mar. 27, 2025).[56]  The restructuring involves "a reduction in workforce of

18 about 10,000 full-time employees who are part of this most recent transformation."  *Id.*

19      192.    HHS explained the restructuring and consolidation of functions that it was engaging in

20 as being pursuant to the President, DOGE, and OMB's orders.  *Id.*  Secretary Kennedy explained,

21 "We aren't just reducing bureaucratic sprawl.  We are realigning the organization…."  *Id.*; *see also*

22 *Fact Sheet: HHS' Transformation to Make America Healthy Again*, U.S. Dep't of Health and Human

23 Servs. (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President

24 Trump's Executive Order").[57]

25

26

27   [56] https://www.hhs.gov/press-room/hhs-restructuring-doge.html

28   [57] https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html

COMPLAINT, No.                                53

193.    HHS also revealed that the immediate 10,000-person reduction was just the beginning of a planned reduction:  "The current 82,000 full-time employees will be reduced to 62,000."  *Id.* The cuts will affect the following subagencies:

- FDA will decrease its workforce by approximately 3,500 full-time employees;

- The CDC will decrease its workforce by approximately 2,400 employees;

- The NIH will decrease its workforce by approximately 1,200 employees;

- CMS will decrease its workforce by approximately 300 employees;

- 28 divisions will be consolidated to 15;

- 10 regional offices will become 5; and

- Human Resources, Information Technology, Procurement, External Affairs, and Policy will be centralized.

*Id.*

194.    Secretary Kennedy told the New York Times, "We're going to do more with less," even as he acknowledged that it would be "a painful period for H.H.S."[58]  Senator Patty Murray "called Mr. Kennedy's comments about doing more with less an 'absurd suggestion' that 'defies common sense.'  Her sentiments were echoed by several agency employees, who spoke on the condition of anonymity to avoid retribution."  *Id.*

195.    HHS has never made public the ARRPs submitted to OMB and OPM for approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Labor**

196.    On April 16, 2025, the Department of Labor sent RIF notices to the "vast majority" of the staff of the Office of Federal Contract Compliance Programs (OFCCP).[59]  That office is responsible for ensuring contractors across government agencies comply with a variety of federal laws.  All employees were not just given notice of the RIF but were also immediately placed on

---

[58] NY Times, *10,000 Federal Health Workers to Be Laid Off*  (Mar. 27, 2025), available at: https://www.nytimes.com/2025/03/27/us/politics/health-department-job-layoffs-rfk-jr.html.

[59] Bloomberg Law, *DOL Puts Contractor Watchdog Employees on Leave as Layoffs Loom* (Apr. 16, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/dol-puts-contractor-watchdog-employees-on-leave-as-layoffs-loom.

COMPLAINT, No.                                                                                                          54

administrative leave.  *Id.*  The email to employees stated they were being terminated "due to the agency's 'significantly reduced scope of mission.'"  *Id.*

197.   Previously, on April 14, 2025, the Secretary of Labor also warned publicly that more layoffs at the Department "should be expected" in the coming weeks.[60]  One protesting employee explained:  "This is no ordinary federal agency.  This is literally the firewall between workers and exploitation.  The people in this building are training people for jobs.  They're ensuring that they come home safe."  *Id.*

198.   DOL has never made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **AmeriCorps**

199.   On April 9, 2025, AmeriCorps announced to employees that the agency would be taking steps to "comply" with the Executive Order and ARRP, including by implementing a RIF of 50% or more of AmeriCorps staff.

200.   On April 16, 2025, AmeriCorps began sending boilerplate notices of administrative leave to AmeriCorps agency staff, both at headquarters in Washington, D.C. and in regional offices across the country, placing the vast majority of them on leave and locking them out of their computer systems shortly thereafter.

201.   AmeriCorps is a federal agency that staffs community service work around the country, including disaster relief.  As the New York Times reported:

> The independent federal agency that organizes community service work in the United States has placed on administrative leave almost all of its federal staff at the direction of Elon Musk's cost-cutting team, according to people familiar with developments at the agency.

NY Times, DOGE Guts Agency That Organizes Community Service Programs (April 17, 2025).

202.   On Thursday, April 24, 2025, the AmeriCorps employees began to receive RIF notices from the agency.

---

[60] Bloomberg Law, *Lawmakers, Workers Push Chavez-DeRemer to Stop Labor DOGE Cuts* (Apr. 14, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/lawmakers-workers-push-chavez-deremer-to-stop-labor-doge-cuts.

COMPLAINT, No.                                                                                            55

**Add.59**

203.    AmeriCorps has not made public the ARRP submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Small Business Administration**

204.    On April 18, 2025, employees at the SBA throughout the COVID-19 Economic Injury Disaster Loan Serving Center were laid off, effective in dates through May 2025.[61]  "They are firing us just to fire us," one SBA employee was quoted as saying.  "We literally made money for the government by taking loan payment and recovering money in bankruptcy."  *Id.*

205.    Between March and April, employees throughout other offices at the SBA also received RIF notices, including the Office of Entrepreneurial Development and Office of Entrepreneurial Education, the procurement office, and positions in field, district, and branch offices. For example, the entire Office of Entrepreneurial Education received RIF notices; that office is responsible for administering a $17 million grant that helps small businesses throughout the country.

206.    Previously, on March 21, 2025, the SBA issued a news release stating that, as required by President Trump's Workforce Executive Order, "the agency will reduce its workforce **by 43%** – ending the expansive social policy agenda of the prior Administration, eliminating non-essential roles, and returning to pre-pandemic staffing levels."[62]  The agency referred to this elimination of over 2,700 jobs as a "strategic reorganization."  *Id.*

207.    The SBA Administrator explained that SBA has "submitted" such a reorganization plan to OMB for approval.  *Id.*  The news release concluded:  "SBA's reorganization plan will provide for the preservation of public services through a strategic transfer of duties.  It will be actioned in the coming weeks."  *Id.*

---

[61] Gov't Exec., *SBA hit with more layoffs* (Apr. 18, 2025), available at: https://www.govexec.com/workforce/2025/04/sba-hit-more-layoffs/404682/.

[62] U.S. Small Bus. Admin., *Small Business Administration Announces Agency-Wide Reorganization* (Mar. 21, 2025), available at: https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization (emphasis added).

COMPLAINT, No.                                                                                          56

208.    Notwithstanding the RIF notices going out by email on April 18, the SBA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Environmental Protection Agency**

209.    On April 22, 2025, the EPA began sending RIF notices to some employees across its headquarters and regional offices.[63]

210.    Previously, both President Trump and EPA Administrator Lee Zeldin expressed that up to 65% of the EPA workforce will eventually be cut.

211.    The New York Times reported on March 17, 2025 that the Trump Administration intends to "dismantle" EPA's Office of Research and Development:

> The Environmental Protection Agency plans to eliminate its scientific research arm, firing as many as 1,155 chemists, biologists, toxicologists and other scientists, according to documents reviewed by Democrats on the House Committee on Science, Space and Technology.  The strategy is part of large-scale layoffs, known as a "reduction in force," being planned by the Trump administration, which is intent on shrinking the federal work force.

NY Times, *Trump Administration Aims to Eliminate E.P.A.'s Scientific Research Arm*  (Mar. 17, 2025).[64]

212.    In response to these public statements, 51 former EPA officials from both Democratic and Republican Administrations sent an "Open Letter" to Congress on March 18, 2025, that explained:

> We are former Senate-confirmed officials and Regional Administrators who served in the U.S. Environmental Protection Agency during Republican and Democratic administrations.   We adhere to EPA's long-held core principles that the agency should be apolitical, professional, transparent, and dedicated to following the law and science.
>
> We are greatly alarmed by President Trump's recent comments that his administration is seeking to cut EPA by 65 percent.  We share the concerns expressed by former EPA administrators who recently wrote that "such cuts would render the agency incapable

---

[63] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

[64] Available at: https://www.nytimes.com/2025/03/17/climate/trump-eliminates-epa-science.html.

COMPLAINT, No.                                                                                              57

**Add.61**

of protecting Americans from grave threats in our air, water and land."

We are writing to urge Congress to ensure that EPA has sufficient staff and funding to effectively implement the Clean Air Act, Clean Water Act, and other bedrock environmental laws for the good of all Americans.

Deep cuts to EPA threaten more than 50 years of bipartisan progress under Republican and Democratic Congresses and presidents.  Actions that diminish EPA's capabilities will place at risk the quality of the air our children breathe, the water we all drink, and the waterways we swim, fish and play in.  They would jeopardize EPA's responses to toxic chemical spills and other disasters as well as basic compliance with America's environmental laws.

Policy changes are to be expected from one administration to the next, but not the dismantling of EPA. …

If the administration does not agree with the laws Congress has passed and the programs it has funded, it should work with Congress to seek changes, not unilaterally and recklessly freeze, delay, or eliminate funding.[65]

213.    Notwithstanding the RIF notices that began going out on or about April 22, the EPA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Housing and Urban Development**

214.    HUD has commenced the RIF of positions in the Office of Field Policy and Management ("FPM") throughout the country, including management analysts, program analysts, customer service representatives, and labor standards specialists.  The FPM serves as the first point of contact for HUD and housing-related questions and concerns within a community

215.    Notwithstanding the RIF notices that have been sent at HUD, it has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

_____

[65] Available at: https://www.environmentalprotectionnetwork.org/wp-content/uploads/2025/03/Senate-Confirmed-Officials-and-RA-Letter-to-Congress-Final.pdf.

COMPLAINT, No.                                                                                                          58

**Add.62**

### 2.     Imminent RIFs in Service of Government-wide Reorganization

216.    At least the following federal agencies will begin to implement their ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs, imminently:

- **USDA**

217.    As of filing, the USDA has not yet made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

218.    However, on April 7, 2025, Government Executive reported from USDA sources:

> Some employees have been told to expect the department to cut back to fiscal 2019 staffing levels—which would lead to USDA slashing around 9,000 of its 98,000 employees—while others have been told there is an overall federal workforce reduction number the administration has developed and the department will do its part proportionally to meet that target.

Gov't Exec., *USDA to slash headquarters, other staff and relocate some to new 'hubs' around the country* (Apr. 7, 2025).[66]

219.    In an email to USDA employees offering them another round of the Fork in the Road Deferred Retirement program, Secretary Rollins stated that RIFs were imminent.  *Id.*

220.    On April 15, 2025, Government Executive reported further:

> The Trump administration is planning to severely scale back or outright eliminate funding for many programs across the Agriculture Department, according to White House documents obtained by Government Executive, as it slashes workers and closes offices at the local level…. The proposed cuts come as USDA is planning to gut its Washington headquarters, consolidate mission areas and administrative functions and relocate some staff to new "hubs" around the country.[67]

- **Department of Commerce**

221.    In March, the press began reporting that the Department of Commerce would seek to cut 20 percent of the NOAA staff.  Later in March, staff at NOAA were told they could take "voluntary" retirement offers rather than be laid off in the coming RIFs.

---

[66] Available at: https://www.govexec.com/workforce/2025/04/usda-slash-headquarters-other-staff-and-relocate-some-new-hubs-around-country/404371/.

[67] Gov't Exec., *White House pitches layoffs, local office closures and program eliminations at USDA* (Apr. 15, 2025), available at: https://www.govexec.com/management/2025/04/white-house-pitches-layoffs-local-office-closures-and-program-eliminations-usda/404580/.

COMPLAINT, No.                              59

222.  The Commerce Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Defense**

223.  In March, Military Times reported on Defense Secretary Hegseth's goal of cutting 5-8 percent of the total Department civilian workforce, which amounts to 50,000 to 70,000 jobs.[68]

224.  The Defense Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Energy**

225.  The Department of Energy's March 13 ARRP submitted to OMB and OPM for approval was, according to press reports, leaked to the press. [69]

226.  According to press reports, that ARRP identified 43 percent of its workforce as "non-essential" according to the provided parameters.  The report admitted:  "While the core group of essential personnel required to remain during a lapse are extremely minimal, such limited capabilities are neither intended nor capable of sustaining ongoing government operations."  *Id.*; *see also* Associated Press, *The Energy Department identifies thousands of nonessential positions at risk of DOGE cuts* (Apr. 4, 2025) ("The Energy Department has identified thousands of federal workers it deems "nonessential" and would not be protected if there is another round of large-scale firings, according to a document obtained by The Associated Press.").[70]

227.  Then, in early April 2025, U.S. Senate Democrats released a fact sheet detailing information in the possession of Senators that:

> DOGE is reportedly proposing staffing cuts of up to 50% of the workforce at the Department of Energy (DOE), with new reductions in force (RIFs) hitting key

---

[68] MilitaryTimes, *Almost 21,000 DOD employees approved to resign amid workforce cuts* (Mar. 18, 2025), available at: https://www.militarytimes.com/news/pentagon-congress/2025/03/18/almost-21000-dod-employees-approved-to-resign-amid-workforce-cuts/.

[69] Fed. News Network, *Energy Department extends hiring freeze, deems 43% workforce non-'essential' in reorganization plan* (Apr. 4, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/energy-department-extends-hiring-freeze-deems-43-workforce-non-essential-in-reorganization-plan/.

[70] Available at: https://apnews.com/article/energy-federal-employees-layoffs-rif-doge-db7b6446928095c26bfe79c608e1e8e7.

COMPLAINT, No.                                                                                    60

priorities such as clean energy, grid resilience, and state and community programs the hardest while even targeting national security programs.

The document summarizes:

The staffing cuts the Department is reportedly contemplating break down as follows:
1. 54% cut (1,800+ positions) to science and innovation programs
2. 61% cut (990+ positions) to energy infrastructure and deployment programs
3. 71% cut (3,000+ positions) to the Deputy Secretary's Office, environmental management programs, and other policy programs
4. 18% cut (540+ positions) to the Nuclear National Security Administration (NNSA)
5. 10% cut (520+ positions) to the Power Marketing Administrations (PMAs)

228.    The Energy Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of the Interior**

229.    The press began reporting the week of April 7, 2025 that a "major reorganization" of the Department of Interior "looms."[71]  "DOGE is leading the reorganization plan," an Interior employee anonymously told the press.  *Id.*  When asked,

Interior spokesperson Elizabeth Peace said that "under President Trump's leadership, we are implementing necessary reforms to ensure fiscal responsibility, operational efficiency, and government accountability."
Peace added, "We do not comment on personnel matters."
*Id.*

230.    On April 17, 2025, the Secretary of the Interior issued a Secretary's Order: Consolidation, Unification and Optimization of Administrative Functions.  The Secretary explained:

The Department is committed to supporting President Trump's Executive Order (EO) No. 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," issued on February 11, 2025.  As part of that commitment, the Department will be unifying and consolidating many of its functions within the Office of the Secretary.

Dept. of the Interior, Order No. 3429.  The Secretary then delegated the authority to "lead and coordinate the consolidation, unification and optimization efforts within the Department and its

---

[71] E&E News, *Major reorganization looms for Interior* (Apr. 10, 2025), available at: https://subscriber.politicopro.com/article/eenews/2025/04/10/major-reorganization-looms-for-interior-00283745.

COMPLAINT, No.                                                                                    61

**Add.65**

1    Bureaus and Offices" to an individual who is the DOGE Team lead at the Department (Tyler

2    Hassen).  *Id.*[72]

3        231.     Then, on April 23, 2025, news broke that "Interior solicits employees' resumes in

4    preparation for widespread layoffs."[73]  The U.S. Geological Service emailed employees regarding

5    coming RIFs, collecting resumes to determine which employees were essential.  The NPS was

6    reportedly not far behind.  Alyse Sharpe, an Interior spokesperson, told Government Executive that

7    the department was "adhering to guidelines as laid out by the Office of Personnel Management but

8    had no further details on RIF plans at this time[,]" according to that publication.[74]

9        232.     Interior has yet to explain the number of employees impacted by this reorganization,

10    or to provide any further details regarding the ARRPs submitted to OMB for approval, including with

11    respect to any of its important subagencies (including the National Park Service, the Bureau of Land

12    Management, and the Bureau of Reclamation).  An earlier memo stated that the Department will

13    implement RIFs "to maximize workforce efficiency," exempting only positions "critical to public

14    safety" or "directly linked to the highest priority programs."

15        233.     On April 9, 2025, Interior Secretary Doug Blumin denied having a "specific

16    headcount" for coming RIFs.[75]  A document provided to the Washington Post previously showed 1 in

17    4 positions at Interior being considered for cuts.[76]

18        234.     The Interior Department has not made public the ARRPs submitted for OMB and

19    OPM approval in conjunction with the March 13 and April 14 deadlines.

20

21

22 _____

23 [72] *See also* The Hill, *Interior Department gives broad powers to DOGE-tied official* (Apr. 21, 2025).

[73] Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23, 2025), available at: https://www.govexec.com/workforce/2025/04/interior-solicits-employees-resumes-preparation-widespread-layoffs/404786/.

24

25 [74] *Id.*

[75] E&E News, *How many Interior jobs will be cut? Doug Burgum's not sure, yet* (Apr. 9, 2025), available at: https://www.eenews.net/articles/how-many-interior-jobs-will-be-cut-doug-burgums-not-sure-yet/.

26

27 [76] Wash. Post, *Internal White House document details layoff plans across U.S. agencies* (Mar. 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

28

COMPLAINT, No.                                      62

- **National Labor Relations Board**

235.    On information and belief, the National Labor Relations Board submitted its ARRP for approval to OMB, telling OMB it had determined it would not engage in any RIF, because the employees' work was too essential to the agency's mission.  On information and belief, OMB rejected the NLRB ARRP and required the agency to submit a different one.

236.    On information and belief, forced to do so, the NLRB now plans to RIF employees.

237.    The NLRB has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **National Science Foundation**

238.    In early April 2025, the press began reporting that the NSF leadership is being forced by the Trump Administration to lay off approximately half of the agency's employees.  NSF also abolished all of its outside advisory committees "in response to President Donald Trump's campaign to shrink the federal government."  Scienceinsider, *NSF scraps most outside advisory panels* (Apr. 15, 2025).[77]

239.    NSF has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Social Security Administration**

240.    On April 7, 2025, Government Executive reported that it had obtained a copy of the SSA's ARRP.[78]  That plan "includes 'field office consolidation' as a goal for next year—even as the agency maintains publicly that it isn't closing field offices."  *Id.*  This was after Elon Musk posted a list of federal real estate for sale that included *47 Social Security Administration field offices*.[79]

---

[77] Available at: https://www.science.org/content/article/nsf-scraps-most-outside-advisory-panels.

[78] Gov't Exec., *SSA reorg plan contemplates field office closures, contradicting public statements* (Apr. 7, 2025), available at: https://www.govexec.com/management/2025/04/ssa-reorg-plan-contemplates-field-office-closures-contradicting-public-statements/404369/.

[79] Associated Press, *A list of the Social Security offices across the US expected to close this year* (Mar. 19, 2025), available at: https://apnews.com/article/social-security-offices-closures-doge-trump-b2b1a5b2ba4fb968abc3379bf90715ff.

COMPLAINT, No.                                                                                                          63

241.    That same leaked document confirmed a planned cut of approximately 5,000 to 7,000 employees. *Id.*

242.    Back in February, the SSA confirmed that it would implement President Trump's executive order by implementing reductions in force that "could include abolishment of organizations and positions" and would "soon implement agency-wide organizational restructuring." Press Release, Social Security Administration, *Social Security Announces Workforce and Organization Plans* (Feb. 28, 2025).[80]

243.    The SSA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **State Department**

244.    In recent days, the State Department has put forward conflicting accounts of a massive reorganization plan. Initially, on April 20, 2025, the New York Times reported on a draft reorganization plan that would require congressional approval and would take the form of another Executive Order.[81] The State Department disclaimed responsibility and claimed that draft was "fake news." *Id.*

245.    On April 22, 2025, the Department officially announced a reorganization plan as follows:

> To deliver on President Trump's America First foreign policy, we must make the State Department Great Again.
> …
> In its current form, the Department is bloated, bureaucratic, and unable to perform its essential diplomatic mission in this new era of great power competition. Over the past 15 years, the Department's footprint has had unprecedented growth and costs have soared. …
>
> That is why today I am announcing a comprehensive reorganization plan that will bring the Department into the 21 Century. This approach will empower the Department from the ground up, from the bureaus to the embassies. Region-specific functions will be consolidated to increase functionality, redundant offices will be removed, and non-statutory programs that are misaligned with America's core national

---

[80] Available at: https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

[81] New York Times, *Trump Administration Draft Order Calls for Drastic Overhaul of State Department* (April 20, 2025), available at https://www.nytimes.com/2025/04/20/us/politics/trump-state-department-overhaul.html.

COMPLAINT, No.                                                                                      64

**Add.68**

1    interests will cease to exist.[82]

2 The announcement explained that "The Department will implement the changes methodically over

3 the next several months."  *Id.*

4    246.    The Department explained in a "Fact Sheet" that:  "As part of the plan, the Under

5 Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with

6 the President's Workforce Optimization Initiative." [83]

7    247.    The Department also issued an "FAQ" that explained the RIFs are coming within the

8 next 60 days.  That FAQ included such questions as "Q: My office is being eliminated.  What

9 happens to me and my colleagues?" and "Q: My bureau is being moved to another office.  What

10 happens to me and my colleagues?"

11    248.    The Department also explained the efforts to integrate the U.S. Agency for

12 International Development (dismantled by prior Executive Order) into the State Department:

13    While implemented separately, these two distinct reorganization efforts are highly
     complementary, and the Secretary and Department leadership continue to carefully consider
14    the integration of former USAID programs and functions in developing and implementing the
     Department's reorganization plan.

15 Secretary of State Rubio explained further:  "To transfer the remaining functions of USAID to such a

16 monstrosity of bureaus would be to undo DOGE's work to build a more efficient and accountable

17 government."[84]

18    249.    The State Department has not made public the ARRPs submitted for OMB and OPM

19 approval in conjunction with the March 13 and April 14 deadlines.

---

[82] U.S. State Dept., Building an America First State Department, available at:
https://www.state.gov/building-an-america-first-state-department/.

[83] Available at: https://www.nbcnews.com/politics/trump-administration/marco-rubio-unveils-
massive-overhaul-state-department-reduction-staff-rcna202458.

[84] Available at: https://statedept.substack.com/p/a-new-state-department-to-meet-the.

COMPLAINT, No.                                                                                    65

- **Department of the Treasury**

250.    On April 15, 2025, an internal IRS memo was leaked to the press detailing planned cuts of up to 40% of its workforce, including approximately 60,000 to 70,000 positions, through bi-weekly RIF notices starting "this week."[85]

251.    Previously, on April 9, 2025, leaked ARRP plans indicated that Treasury plans to cut up to 50% of its tax enforcement staff, and 20% across the board for other components.[86]

252.    The Treasury Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Veterans Affairs**

253.    On March 4, 2025, the Chief of Staff of the Department of Veterans Affairs issued a *Memorandum – Department of Veterans Affairs Agency Reduction in Force (RIF) and Reorganization Plan (ARRP)*, Dep't of Veterans Affairs (Mar. 4, 2025).  That memo implements the President's Executive Order, and explains:  "For planning purposes, the Department's initial objective is to return to our 2019 end-strength numbers of 399,957 employees," which reflects an approximate cut of 80,000 jobs.[87]

254.    In early March, VA Secretary Doug Collins appeared on Fox & Friends and was asked about the plans to cut 80,000 jobs:

> "So, the 80,000 number that has come out, is that number already done? Have you already decided who to let go?" Fox's Brian Kilmeade questioned.
>  *"No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across*

---

[85] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends* (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends; *see also* CNBC, *Tax attorneys say IRS has become a 'zombie' as agency cuts staff and halts audits of the wealthy* (Apr. 17, 2025), available at: https://www.cnbc.com/2025/04/17/irs-staff-cuts-fewer-audits-of-wealthy.html.

[86] Fed. News Network, *Treasury plans to cut up to 50% of IRS enforcement staff, 20% of other components* (Apr. 9, 2025), available at: https://federalnewsnetwork.com/reorganization/2025/04/treasury-plans-to-cut-up-to-50-of-irs-enforcement-staff-20-of-other-components/.

[87] Available at: https://www.afge.org/globalassets/documents/generalreports/2025/va-memo-3-4-25.pdf.

COMPLAINT, No.                                                                                      66

**Add.70**

*government*," Collins replied. "*And that is a goal, that is our target.*"[88]

255.    In April 2025, as the deadline for the April 14 ARRP approached, a VA employee leaked the contents of the plans to the press.  The plan is to RIF the 80,000 employees in four categories, in phases including:

1. Administrative and Support Roles:
   - Policy and program analysts
   - HR personnel
   - IT support staff in non-critical functions
   - Clerical and data entry positions
2. Medical and Healthcare Support Staff
   - Non-patient-facing administrative healthcare roles
   - Some contract positions in VA medical centers
   - Certain research positions with reduced funding
3. Regional and Central Office Staff:
   - Veterans Affairs Central Office (VACO) will see cuts in operational, administrative, and policy roles
   - Reductions in public affairs, strategic planning, and some procurement functions
4. Field Office and Call Center Reductions:
   - VA call centers are expected to be streamlined with automation, reducing the need for live agents
   - Some regional field office roles will be merged or reassigned[89]

The VA responded to this report claiming the document was "fraudulent."  *Id.*

256.    The VA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

***

257.    The agency plans described above are being created and implemented pursuant to the Workforce Executive Order.  Taken alone, as well as in conjunction with other government-wide actions ordered by this Administration, each would have constituted a "reorganization" within the

---

[88] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.

[89] KTNV Las Vegas, *As concerns among veterans rise, VA source shares details of workforce reduction plan* (Apr. 11, 2025), available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-how-their-workforce-reduction-plan-will-affect-them.

COMPLAINT, No.                                                                                    67

1    meaning of the most recent, but now expired, statute authorizing the President to propose

2    reorganizations.  5 U.S.C. § 903.

3        258.    There are no public reports, anywhere, of any federal agency planning to engage in

4    "large-scale" RIFs of employees prior to President Trump's February 11, 2025 Executive Order.

5        259.    On information and belief, no agency had decided such reductions would be consistent

6    with agency mission, statutory obligations, or good policy prior to President Trump's order to plan

7    such reductions.

8        260.    On information and belief, as confirmed by the public statements of VA Secretary

9    Collins, the "target" cuts in staff are being dictated to agencies by DOGE, in service of the

10   President's policy agenda of "transforming" the federal government.

11       261.    On information and belief, no agency has or would independently decide to cut the

12   entire offices, programs and functions that DOGE, acting the President's behalf, is ordering agencies

13   to cut.

14   **V.    Widespread Actual and Imminent Irreparable Harm**

15       262.    The above ongoing and imminent actions taken by the President, OMB and OPM,

16   DOGE, and the Federal Agency Defendants to implement Executive Order 14210 and the

17   OMB/OPM Memorandum and the resulting ARRPs, have and will cause harm, including irreparable

18   harm, to Plaintiffs, their members, and others, including but not limited to the following:

19       263.    Plaintiffs were denied the opportunity for advance notice and to publicly comment on

20   the rules imposed by OMB and OPM in the February 26, 2025 Memorandum and thereby prevented

21   from exercising a right guaranteed by the Administrative Procedure Act.

22       264.    Plaintiffs AFGE, the AFGE locals, AFSCME, and SEIU each represent, and have as

23   members, federal employees who have been or will be laid off as a result of the ARRPs created

24   pursuant to the President's Executive Order No. 14210.  Those federal employees will lose their

25   income, their health benefits, and other incidents of employment, causing severe irreparable harm to

26   them, their families, and their communities.

27

28

COMPLAINT, No.                                                                                      68

**Add.72**

265.     Plaintiffs AFGE, AFGE locals, AFSCME, and SEIU each represent, and have as members, federal employees who, if they keep their job, will be subject to a reorganization resulting from the large-scale RIFs that makes doing their job more difficult as result of the ARRPs created pursuant to the President's Executive Order 14210.  Each federal employee who remains will be required to do more to meet the agency's statutory mission and obligations, without the support of colleagues who, until the implementation of the President's orders, the agency believed were needed to perform the work of the agency.

266.     Each union Plaintiff has the core function of representing employees, including those in federal bargaining units, in collective bargaining and providing counseling, advice, and representation to employees in the event of adverse employment actions.  Each union Plaintiff has and will be imminently prevented, by the mass terminations ordered by the President and directed by DOGE, OMB, and OPM as part of the purported reorganization of the federal government, from exercising those core functions as employee representatives.

267.     Each union Plaintiff has expended substantial time and resources as a result of the President's Executive Order and OMB/OPM's implementing Memorandum, and the federal agencies' implementing ARRPs, addressing member concerns and attempting to provide employees with effective representation.  Each Plaintiff has been forced to divert resources that would be devoted to representing employees who have or will experience adverse employment actions.

268.     Each union Plaintiff has been harmed in multiple other ways by the actual and imminent termination of its members, including by the loss of dues income and bargaining power.  For example, Plaintiffs AFSCME, SEIU, and SEIU Local 1000 have each been harmed because the well-being, job security, and working conditions of their members who work for state, local government, and private employers are significantly and adversely impacted by the reduction in federal government services occasioned by the President's Executive Order, the OMB/OPM implementing Memorandum and the resulting ARRPs.

269.     Each non-profit organization Plaintiff and its members have suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order

COMPLAINT, No.                                                                                              69

**Add.73**

14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

270.    The Plaintiff non-profit organizations are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs across the country and the harms caused by the reductions in staff are and will not be limited to a defined and particular geographic area.

271.    Each local government Plaintiff has suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order 14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

272.    The Plaintiff local governments are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs that have and will result in reductions in staff and services both within and without their borders, and often involve staff performing work in locations across the country not within the geographic borders of the local government.

273.    Plaintiffs describe some of those harms to the Plaintiffs, by Federal Agency Defendant, as follows.  Plaintiffs would also face severe and irreparable injury to the extent that other Federal Agency Defendants that have not publicly announced their plans, or taken action that has been made public, move forward with reorganization and reductions-in-force, including at the Department of Defense, Department of Homeland Security, and Department of Transportation.

- **USDA**

274.    Implementing the Executive Order and USDA ARRP to imminently terminate many thousands of USDA staff, to return staffing to 2019 levels, will irreparably and immediately harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFSCME and Plaintiff AFGE.  It will also irreparably and immediately harm the non-federal employee members of Plaintiffs AFSCME and SEIU who work in food service in K-12 schools that rely on USDA's school food programs for funding and for dietary guidelines or provide family childcare services that rely on USDA's childcare food program reimbursements.

COMPLAINT, No.                                                                                     70

**Add.74**

275.     These actions will also have a direct and severely detrimental impact on Plaintiff NOFA, its members, and the farmers and other communities the USDA serves.  For example, NOFA's members rely financially on the services provided by the Farm Services Agency (FSA) and the Natural Resources Conservation Service (NRCS), including FSA loans to purchase and improve farms, farm equipment, and anything necessary to run the farms, and rely on their local FSA and NRCS officers to understand their specific farm's physical characteristics and business plans and to conduct in-person business because many lack reliable internet access or proficiency.

276.     These actions will also have a severely detrimental impact on the American Geophysical Union as well as its members, who rely on the USDA's funding, collaboration with its scientists, and use of its research, which is vital to, among other things, supporting the health of forests and rangelands in the face of climate change and other ecological stressors.  Western Watersheds Project will also face injury from the impairment of the Department's ability to control livestock grazing on Forest Service lands, causing damage to riparian habitats and spawning streams that are critical to the survival of certain species, including on WWP-owned land.

277.     In addition, the implementation of the Executive Order and USDA ARRP will cause a direct, immediate and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs King County, Harris County, County of Santa Clara, and the City and County of San Francisco.

278.     For example, Plaintiffs King County and Harris County own and/or operate some of the busiest airports and ports of entry in the nation.  The Department of Agriculture provides personnel at these major transportation centers to manage prey animals that attract predatory birds that create hazards to air traffic through risk of bird strikes to aircraft.  The Department also helps Plaintiff Harris County protect the food supply at food manufacturing facilities processing meat and dairy products.  Absent these critical food safety staff provided by the agency, Plaintiff Harris County lacks the staff capacity, expertise, training, and authority to replace these critical food safety roles and would struggle to prevent outbreaks of food borne illnesses and pathogens such as avian flu that necessitate the destruction of food supply.

COMPLAINT, No.                                                                                              71

**Add.75**

279.     Similarly, Plaintiff Santa Clara relies on the USDA Wildlife Services program to depredate predators and other animals, including, for example, mountain lions, bears, and pigs, and then tests them to determine if they have any infectious diseases or pose any other risks.  In a recent example, USDA Wildlife Services staff depredated several feral swine in Santa Clara, and upon testing them learned—and alerted Santa Clara staff—that those specific swine carried diseases threatening residents, pets, agricultural producers, and the human food supply.  Reductions to the USDA Wildlife Services program within and outside Santa Clara, will cause an information gap that will  heighten the risks to Santa Clara, its agriculture industry, and its residents, and that Santa Clara (and no other local government) could make up for.

280.     Local jurisdictions also rely on USDA to prepare for, respond to, and recover from natural disasters and other emergencies.  For instance, in the aftermath of a major wildfire in Summer 2020, Santa Clara's Office of Emergency Management coordinated with USDA to facilitate USDA employees coming to the affected area.  The USDA set up and staffed a field station to help ranchers who lost grazing lands apply for low-interest loans, obtain machinery and tools, and even repair damaged equipment.  Reudcing and relocating staff will necessarily adversely impact Santa Clara's ability to support its residents, including those who live in remote areas that are more difficult to serve, in the aftermath of wildfires and other natural disasters, particularly those that affect the substantial amount of agricultural production in the area.  The results could include a weakened economy, potential loss or relocation of agricultural businesses, diminished community resilience after disasters, and additional costs to Santa Clara itself (in the form of staff time and funds) to support recovery.

281.     Diminishment of the U.S. Forest Service staffing would force local and state firefighting agencies to carry more of the burden of responding to wildfires and go without the assistance on which they often rely. The U.S. Forest Service performs essential work to manage federal wildland, to mitigate the risks of wildfire, and to fight wildfires when they occur.  It is a critical component of the system of mutual aid used by firefighters across the United States.  Santa

COMPLAINT, No.                                                                                                                                72

**Add.76**

1    Clara has experienced several very large wildfires in recent years, including several that were, at the

2    time, the largest in California history.

3    282.    Reduction of the USDA's already understaffed Food Safety Inspection Service, which

4    is responsible for ensuring that the nation's meat supply is free from disease and contamination, will

5    directly impact local governments by increase the risks of suffer foodborne illness and disease, which

6    will burden local governments' health and hospital systems and public health departments, including

7    those operated by Plaintiff Santa Clara.  Reductions to the USDA's Animal and Plant Health

8    Inspection Service will hamper local governments' efforts to monitor and respond to agricultural

9    pests (such as the Mediterranean fruit fly, which was detected in the Bay Area in August 2024, Santa

10    Clara worked with USDA officials to establish a quarantine area to prevent its spread).  Similarly,

11    Santa Clara's Division of Agriculture also relies on USDA's Smuggling Interdiction and Trade

12    Compliance Program and reductions there would hamper local government's ability to detect and

13    respond to  invasive pests arriving from overseas (such as the invasive pests that Santa Clara staff

14    biologists found living in camellias illicitly imported from China, and then coordinated immediately

15    with USDA staff to establish a federal quarantine).  Agriculture Departments across California

16    coordinate with USDA in the same way.

17    • **AmeriCorps**

18    283.    The implementation of the Executive Order and ARRP to virtually eliminate

19    AmeriCorps programs has harmed and will irreparably and immediately harm the employees and

20    members who are terminated, those who remain, and their labor representatives including Plaintiff

21    AFSCME.

22    284.    These actions will also have a detrimental impact on organizations that rely on

23    AmeriCorps programs.  For example, Plaintiff the American Public Health Association has a program

24    working with the CDC on the education and training of Public Health AmeriCorps members, and its

25    decimation will cause harm to the ability of APHA to build capacity to improve community health.

26    285.    In addition, the implementation of the Executive Order and AmeriCorps ARRP will

27    cause a direct and seriously detrimental injury to local governments that interact directly with this

28    COMPLAINT, No.                                                                                          73

**Add.77**

1    agency and rely on its services every day, specifically including but not limited to AmeriCorps' work

2    in schools; AmeriCorps' Disaster Response Team, which is often involved in disaster recovery work

3    for months and years after disasters such as the recent California wildfires; and King County's work

4    with AmeriCorps to expand capacity to deliver public health services, which will face increased costs

5    and reduced program reach if King County's partnerships with AmeriCorps are lost or diminished.

6    • **Department of Commerce**

7    286.    The implementation of the Executive Order and ARRP to imminently reduce of staff in

8    the Department of Commerce, including its announced plan to eliminate thousands of positions at

9    NOAA and closure of the Minority Business Development Agency, will have direct and severely

10    detrimental impacts on federal employees who are terminated, employees who remain, and their labor

11    representatives including Plaintiff AFGE.

12    287.    Terminations of staff at NOAA, which media reports indicate could eliminate 20

13    percent or more of the agency's 13,000 employees, will prevent NOAA from effectively carrying out

14    its critical work, ranging from research supporting the health of the ocean and aquatic species

15    conducted by the National Marine Fisheries Service to the foundational research conducted and data

16    collected by the Office of Oceanic and Atmospheric Research to understand hurricanes, weather

17    forecasts, extreme storms, and natural disasters.

18    288.    These actions will have a severely detrimental impact on Plaintiff AGU and its

19    members, who collaborate with NOAA scientists and rely on funding from NOAA as well as on

20    NOAA's funding, science, and research to provide AGU members with the foundational research and

21    data to understand hurricanes, weather forecasts, extreme storms, climate change, the oceans, and

22    natural disasters, among many other services.  For example, AGU members will be harmed by the

23    loss of NOAA's provision of essential data services that they use to model coastal hazards and

24    research that tailors climate adaptation guidance to community organizations.  These actions will also

25    cause injury to the Plaintiff Western Watersheds Project, which relies on NOAA's climate data, data

26    collected by NOAA's National Weather Service, and conservation services by NOAA's National

27

28    COMPLAINT, No.                                                                                      74

1    Marine Fisheries Service, and Plaintiff NRDC, which relies on research from NOAA and the Census

2    Bureau.

3         289.    In addition, the implementation of the Executive Order and Commerce ARRP will

4    cause a direct and seriously detrimental injury to local governments that interact directly with this

5    agency and rely on its services every day, specifically including but not limited to all Plaintiff local

6    governments.

7         290.    All local government Plaintiffs rely on data, staff, services, and expertise provided by

8    NOAA, including data they need to inform emergency preparations, planning, and response.  For

9    example, Plaintiffs Chicago, King County, Santa Clara, and San Francisco specifically rely on

10    forecasts, modeling, and real-time information for major public event safety planning and weather-

11    related operations at a granular level of detail with real-time updates, and Plaintiffs Harris County,

12    King County, Santa Clara County, and others use this same information for major weather events.

13    Plaintiff Chicago also relies on NWS personnel during large-scale outdoor City events, who are often

14    present on site to assist in real-time assessment and response to weather data as it comes in.  And

15    King County relies on interagency County and National Weather Service teams to coordinate and

16    conduct outreach to communities and provide education before major weather events like the

17    November 2024 "bomb cyclone" windstorm that resulted in several fatalities.  Plaintiff local

18    governments would lose valuable information and services that are essential to human safety and

19    resilience.

20         291.    King County also relies on NOAA Fisheries to assist in the development and

21    implementation of Puget Sound Salmon Recovery Plans that are critical to the recovery, management,

22    and protection of several species of salmon within King County—an essential component of the

23    region's economic, recreational, and cultural life.  Also, NOAA Fisheries' consultation and review of

24    capital projects for Endangered Species Act and Essential Fish Habitat compliance is a critical step in

25    permitting projects.  Delays would escalate construction costs, and elimination of review would

26    undermine progress toward salmon recovery and other marine life management and protection goals.

27    •   **Department of Energy**

28

COMPLAINT, No.              75

292.    The implementation of the Executive Order and ARRP to impose imminent reductions of up to 50% of the staff at the Department of Energy will irreparably and immediately harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

293.    These reductions, which are proposed to cut half of the science and innovation programs, will also have a direct and substantially detrimental impact on the members of Plaintiff American Geophysical Union who rely on research by and funding from the Department and regularly collaborate with its scientists, and will directly impair the AGU's financial resources and mission.  They will also harm Plaintiff NRDC, which relies on publications and databases updated and maintained by the Federal Energy Regulatory Commission, National Renewable Energy Laboratory, and Energy Information Administration.  By eliminating weatherization programs, they will harm Plaintiff AFSCME, which has non-federal-employee members who perform weatherization work funded, overseen, and assisted by the Department, which will be interrupted and injured.  And they will cause substantial harm to members of the public, who depend on the Department to keep them safe including by maintaining the nation's nuclear stockpile and operating environmental management programs that, among other things, clean up radioactive waste and prevent the material from contaminating the soil and groundwater.

294.    In addition, the implementation of the Executive Order and Energy ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day.

295.    Crises stemming from understaffing of the programs of the Department of Energy will enormously burden city and county governments, which will be left to handle environmental disasters, specifically including but not limited to Plaintiffs City and County of San Francisco and the City of Baltimore.

296.    For example, the Executive Order and AARP have already caused, and will continue to cause, disruptions and harms to vital funding sources and supports.  For example, Plaintiff San Francisco has received federal financial support from the Department of Energy to develop green

COMPLAINT, No.                                                                                    76

**Add.80**

building standards, deploy EV charging infrastructure, and continue to transition city vehicles to Zero Emission Vehicles.  Three 2024 Department of Energy grants awarded to San Francisco for these purposes are in stasis awaiting information from San Francisco's last known federal program officers on these grants—several of whom are no longer employed at the Department of Energy.  Similarly, King County expects these actions to delay implementation of critical work funded by grants from the Department of Energy.  As one example, Plaintiff King County is currently implementing a block grant under the DOE's Energy Efficiency and Conservation Block Grant Program.  This grant will allow King County to continue its efforts to reduce fossil fuel emissions and energy use, and improve energy efficiency in various sectors.  On April 24, 2025, Plaintiff King County was advised that the technical project officer for that particular grant was leaving the agency, and that it may reach out to various email addresses unattached to specific people for issues and questions, and that a new technical project officer has not yet been assigned to the grant.  King County expects that the reductions at the Department of Energy have reduced or eliminated its ability to work on this grant.  Likewise, Plaintiff City of Baltimore also relies on the Department's data, models, training, and support and funding for climate goals that affect it as a coastal city.

- **Environmental Protection Agency**

297.    The implementation of the Executive Order and ARRP to impose imminent substantial cuts at EPA—including the initial terminations of nearly 300 employees at environmental justice offices, planned elimination of the Office of Research and Development and layoffs of more than 1,000 employees working there, and targets to cut up to 65 percent of the budget, including employees—will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE and SEIU.

298.    The actions will also have a direct and severely detrimental impact on Plaintiff American Geophysical Union and its members, who collaborate with and rely on the EPA's research and funding, as well as the public.  They will stop the EPA's research, tracking, and responses to health hazards in the air, water, and land.  And they will harm non-profits that rely on data, analysis, and funding from the EPA for their work, including Plaintiffs American Geophysical Union and the

COMPLAINT, No.                                                                                                    77

**Add.81**

1    NRDC.  In particular, the cuts to the EPA include large-scale staffing reductions at the EPA Office of

2    Research and Development, which produces critical research on PFAS and lead contamination on

3    which NRDC relies, as well as at the EPA Office of Environmental Justice and External Civil Rights,

4    which ran EJScreen, an environmental justice screening and mapping tool on which NRDC relies.

5        299.    In addition, the implementation of the Executive Order and ARRP will cause a direct

6    and seriously detrimental injury to local governments, specifically including but not limited to

7    Plaintiffs the City of Baltimore, City of Chicago, County of Santa Clara, City and County of San

8    Francisco, and King County.

9        300.    For example, Plaintiffs including King County and Chicago rely on the EPA in dealing

10   with hazardous materials including Superfund sites, where EPA staffing and support is necessary to

11   protect public health through remediation and technical assistance.  Similarly, local government

12   plaintiffs including Santa Clara rely on the EPA for tracking, tracing, and managing hazardous

13   materials while in transit to, from, or through their jurisdictions, for which they rely on the e-Manifest

14   system and protocols developed and managed by EPA.   Plaintiffs Santa Clara and Chicago also rely

15   on the EPA in the aftermath of disasters, including clearing hazardous waste and determining whether

16   and when it is safe for residents to return to disaster-affected areas.  If the EPA's ARRP diminishes

17   EPA's capacity to deploy staff on-site after fires and other natural disasters, that will make it more

18   difficult and more protracted for Plaintiff Santa Clara to fulfill its role of protecting its residents and

19   the environment from hazardous material leaks and exposures and to facilitate recovery from natural

20   disasters.

21       301.    Localities like Plaintiff King County rely on EPA staff expertise, collaboration, and

22   data sharing to support effective climate and environmental assessments and program

23   implementation.  Diminished access to EPA staff could hinder accurate greenhouse gas inventories

24   and mitigation planning and limit Plaintiff King County's ability to target mitigation efforts in areas

25   with high pollution burdens and vulnerable populations.

26       302.    Localities, including Plaintiffs King County and San Francisco, also rely on EPA staff

27   for funding and resources to support local environmental justice work. Without EPA staff to manage

28

COMPLAINT, No.                                                                          78

**Add.82**

and process grants, support mapping tools and other resources, and provide technical assistance, localities like Plaintiffs will be seriously harmed. Plaintiff San Francisco's Environment Department will also be impaired in fulfilling its mission to promote environmental justice, and these cuts will detrimentally impact communities in San Francisco that are already harder hit by environmental issues.

303.    In addition, the implementation of the Executive Order and ARRP will cause serious injury to local governments with respect to their agricultural work. EPA's ongoing work is a linchpin for the agricultural industry across the country, including, for example, in Santa Clara. Plaintiff Santa Clara's Division of Agriculture regulates and monitors the use of pesticides in this industry, including by issuing use permits and receiving and reviewing reports from producers of when the pesticides are used. But EPA, not local governments, primarily manages and implements the Federal Insecticide, Fungicide, and Rodenticide Act, which governs the registration, labeling, distribution, sale, and use of pesticides in the United States, by determining whether a given manufacturer's product can be registered as a pesticide, which in turn requires EPA to determine its safety for use in the food supply. The EPA's involvement is essential not only for registering new pesticides, but also when Plaintiff Santa Clara detects new invasive species or pests that require urgent response but for which there is not yet a registered pesticide. In those instances, the EPA must issue approvals for "off-label" use of registered pesticides. Execution of EPA's ARRP could diminish if not altogether destroy EPA's ability to register new pesticides and its ability to act promptly to permit famers to protect their crops from new and emerging threats. The risk is especially acute for Plaintiff Santa Clara: because the Bay Area is a site of significant international travel, there is an especially heightened chance that harmful pests will be detected first in or near Santa Clara.

304.    EPA's reorganization could also diminish or altogether block EPA's capacity to deploy the on-scene coordinators who assist local governments including Plaintiff Santa Clara during emergency response to releases of hazardous materials and other harmful chemicals. Plaintiff Santa Clara relies heavily and directly on EPA staff to provide interpretation, guidance, and training for EPA's Spill Prevention, Control, and Countermeasure regulations. Likewise, Plaintiff Santa Clara's

COMPLAINT, No.                                                                           79

**Add.83**

1    Department of Environmental Health also relies on modeling software that EPA develops, maintains,

2    and updates in order to assess potential offsite consequences of catastrophic releases of hazardous

3    substances.  If EPA does not maintain or continue to update this software, it would substantially

4    diminish the ability of Plaintiff Santa Clara—and, on information and belief, other local and state

5    agencies—to respond to these releases in ways that effectively protect residents.

6    • **General Services Administration**

7    305.    The implementation of the Executive Order and ARRP to impose imminent drastic

8    cuts to GSA staff—including a 63 percent reduction in Public Buildings Service staff, which will

9    eliminate more than 3,500 positions—will have direct and severely detrimental impacts on the federal

10   employees who are terminated, employees who remain, their labor representatives including Plaintiff

11   AFGE, and the public.

12   306.    Federal employees who work at and members of the public who visit federal office

13   buildings, courthouses, and other federal facilities rely on Public Buildings Service staff to ensure

14   their health and safety in the facilities by overseeing the testing of water in the buildings for the

15   presence of bacteria, lead, and copper; maintaining fire prevention systems; managing indoor air

16   quality, including during wildfires; and containing the spread of infectious diseases in the buildings.

17   The severe reduction in Public Buildings Service staff will threaten the health and safety of AFGE

18   members, as well as other federal employees and visitors, at federal buildings and facilities

19   throughout the country.  Cuts to other parts of GSA will similarly undermine the agency's ability to

20   provide real estate, facilities management, procurement, technology, and other services to the federal

21   government and the public.

22   307.    SEIU has hundreds of members who are employed by federal contractors to provide

23   cleaning services at GSA locations, who are at risk of losing their jobs due to the reduction in GSA

24   staff.

25   • **Department of Health and Human Services**

26   308.    The implementation of the Executive Order and ARRP has already included RIFs

27   carried out at HHS in late March 2025 that eliminated roughly 10,000 positions across the agency,

28   COMPLAINT, No.                                                                                      80

**Add.84**

including 3,500 at the Food and Drug Administration (FDA), 2,400 at the Centers for Disease Control and Prevention (one-fifth of all CDC employees), 1,200 at the National Institutes of Health (NIH), and 300 at the Centers for Medicare & Medicaid Services (CMS).  Many offices and programs were eliminated entirely or lost the vast majority of their employees, including the National Center for Injury Prevention and Control, National Institute for Occupational Safety and Health, Office of Health Equity, National Center on Birth Defects and Developmental Disabilities, certain programs within the National Center for Environmental Health, and various CDC laboratories.  Five large HHS offices were shuttered: in New York City, Boston, Chicago, Seattle, and San Francisco.

309.     These layoffs have caused immediate and severe harm to the federal employees who were terminated, as well as those who remain, and to their labor representatives including Plaintiffs AFGE.  They are also directly harming Plaintiffs AFSCME and SEIU, and their non-federal employee members, some of whom are employed by Head Start programs that rely on HHS-administered funding, training, technical support, and investigation and enforcement of rules; some of whom are family childcare providers who depend upon HHS's Office of Child Care for the timely receipt of grant funds, regulatory compliance guidance, and oversight; and many of whom work in state administration of Medicaid and in public health positions who have been and will continue to be injured by cuts to CMS and the CDC.  SEIU also has members who are employed by federal contractors to provide cleaning services at HHS locations, who are at risk of losing their jobs due to the reduction in HHS staff.

310.     The actions will also have a direct and severely detrimental impact on Plaintiff American Public Health Association and its members.  Many APHA members are public health officials who work in state and local health departments who have lost access to critical services.  For example, the CDC terminated employees who had been working on the ground responding to the worsening measles outbreak in Texas that has already claimed the lives of two children and lead experts who had been ready to provide essential on-the-ground support to Milwaukee public schools that were closed due to the discovery of widespread presence of lead.  State and local public health officials and offices that relied on data, expertise, and support from HHS will have to expend

COMPLAINT, No.                                                                                                              81

**Add.85**

significant resources in response to these sweeping terminations and reorganization and run the risk of new or worsening public health crises.  The actions will also harm Plaintiff American Geophysical Union and its members, who regularly collaborate with CDC and NIH researchers, as well as Plaintiff NRDC, all of whom rely on CDC and NIH research including on lead contamination.

311.    The virtual elimination of the National Institute for Occupational Safety and Health (NIOSH), which has seen 93% of the staff given RIF notices, will harm non-federal employee members of Plaintiffs SEIU and AFSCME because it will halt NIOSH's research, investigations, and guidance to address occupational injuries and illnesses across all types of workplaces, including coal mines, fire departments, oil and gas wells, healthcare facilities, and small businesses (including Plaintiff Main Street Alliance members) and thereby increase health and safety risks to workers across the country.  Firefighter safety programs, which address exposure to toxins and chemicals and cancer risk, and coal miner health surveillance programs, have been shuttered or virtually eliminated.

312.    In addition, the implementation of the Executive Order and HHS ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to all local government Plaintiffs.

313.    For example, Plaintiff San Francisco operates an extensive public health system that relies on CDC services in numerous ways.  The CDC supports San Francisco's public health efforts, including through trainings, guidance, public health pipeline programs, transportation services for rare but particularly infectious patients who cannot be treated at San Francisco's public hospital, reference lab services, and surveillance support that is crucial for identifying and tracking the spread of infections and diseases, including resistant strains.  Absent adequate CDC support, Plaintiff San Francisco will have to divert and expend resources.

314.    The RIFs and reorganization at HHS are limiting or eliminating national data collection projects, and limiting access to staff with related subject-matter expertise, which will negatively affect the ability of local governments to respond to public health emergencies.  For example, Plaintiff Chicago's Department of Public Health relies upon CDC data and guidance to effectively surveil the spread of sexually transmitted diseases, control the spread of infectious

COMPLAINT, No.                                                                                                    82

**Add.86**

diseases like measles and Mpox, and efficiently allocate resources to address chronic diseases like diabetes and opioid addiction.

315. Local governments, including Plaintiff Santa Clara, also rely heavily on the CDC's Laboratory Response Network, as well as several CDC laboratories that are the only ones authorized or capable of testing for certain infectious diseases, including some sexually transmitted diseases. Delays or disruptions in CDC's ability to test specimens or report results to Plaintiff Santa Clara's Public Health Department will produce information gaps and delays that result in unnecessary spread of infectious diseases as well as inadequate directions or recommendations to affected patients. Indeed, Plaintiff Santa Clara's Public Health Department has protocols that often require its staff to contact and share specimens with the CDC very quickly and to monitor results that the CDC shares not only for its own specimens, but for tests of specimens from other parts of the country. When the CDC operates the only laboratory that can conduct the testing, HHS's reorganization could mean the difference between life and death, between effective and ineffective treatment, between spread or containment of infectious disease, and whether residents suffer.

316. Reductions to the CDC's extensive work developing information about emerging infectious-disease threats in other parts of the world, will directly impact Santa Clara and other local governments where there is frequent travel between Santa Clara and those areas. When the CDC develops and shares information about outbreaks of Ebola, novel influenza, mpox, and other diseases—recently Marburg haemorrhagic fever and COVID-19--, localities including Plaintiff Santa Clara can be better prepared to handle potential cases that may emerge locally. The CDC played a critical role in assisting Santa Clara in its response to these threats, including by sending experts with specific expertise in medicine, epidemiology, infection control, community mitigation, and communications to Santa Clara to coordinate with Santa Clara's Emergency Operations Center, and to develop a community mitigation plan.

317. When there is a terrorist attack, disease outbreak, earthquake, or other emergency, and local government health systems (including both public health departments and hospitals) require use of medicines, including those that are not quickly or commercially available or in quantities that

COMPLAINT, No.                                                                                              83

**Add.87**

would exhaust local supplies, those departments can access medicine from the Strategic National Stockpile, which is administered and staffed by HHS's Administration for Strategic Preparedness and Response (ASPR).  The time-sensitive availability of the Strategic National Stockpile is critical.  If HHS's ARRP closes or reduces the capacity of ASPR to operate the Strategic National Stockpile, CDC to operate the Drug Service, or FDA to operate the expanded access program, it would reduce if not altogether block the ability of Plaintiff Santa Clara's Public Health Department and Health System—and other local and state hospitals, clinics, and public health departments—to access these vital, life-preserving resources in times of emergency.

318.    Additionally, NIOSH provides local governments with essential investigative support in fire safety, particularly in the aftermath of industrial incidents.  Plaintiff Harris County contains extensive petrochemical infrastructure, and has relied on NIOSH to identify causation in fires where initial assessments were inconclusive.  Loss of NIOSH personnel and institutional knowledge will compromise this function, leaving Plaintiff Harris County ill-equipped to respond to industrial hazards and fire risks.

- **Department of Housing and Urban Development**

319.    The implementation of the Executive Order and ARRP to impose an imminent RIF of up to 50 percent reduction in HUD staff, which will eliminate certain offices and more than 4,000 positions, will directly and significantly harm the federal employees who are terminated, those who remain, their labor representatives including Plaintiff AFGE, and members of the public who depend on HUD's services.  It will prevent individuals and communities across the country from being able to access funding and support for disaster relief, community development, rental assistance, homeownership, homelessness, and housing discrimination complaints, and exacerbate the housing crisis and housing-related issues throughout the country.

320.    These actions will also cause irreparable injury to Plaintiff AFSCME and SEIU, and their non-federal employee members, who work at housing authorities across the country—including in California—that depend on the regular and timely distribution of HUD funding and who will be harmed by the closure of local HUD offices.  SEIU also represents hundreds of members employed

COMPLAINT, No.                                                                                                         84

by service contractors who provide cleaning, security, and other services at housing authorities in numerous states, and risk losing their jobs due to the significant reduction in HUD staff and closure of offices. SEIU Local 1000 members work at a California state agency that administers affordable housing programs funded exclusively by HUD, and the cuts to HUD staff and dozens of office closures will imperil the agency's critical functions and services, impede oversight and enforcement, diminish critical technical assistance and support, and threaten affordable housing programs and projects, harming SEIU Local 1000's members and the members of the public whom they serve.

321.    These actions will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs City of Baltimore, County of Santa Clara and King County.

322.    For example, delays in receiving technical assistance and guidance from HUD staff on topics critical to the governance of the Community Development Block Grant, HOME programs, and Section 108 Loan Programs will impact localities like Plaintiff Baltimore. These programs rely on HUD staff to, *inter alia*, review and provide approvals necessary for processing the flow of funds under these programs; reduced staff will hamper the ability of localities like Plaintiff Baltimore to use these funds and to refinance loans through the 108 Loan program, causing financial and economic harms.

323.    In addition, HUD's reorganization will cause delays in processing invoices and payment to local governments and nonprofits in connection with nationwide housing assistance and grant programs. HUD's inability to timely process invoices and payments to grantees, provide technical assistance, or manage future grant cycles will not only hamper the ability of local governments to assist beneficiaries through housing support offices such as Plaintiff Santa Clara's Office of Supportive Housing, but will also cause more residents to experience homelessness due to lack of availability of shelters and services.

- **Department of Interior**

324.    The implementation of the Executive Order and ARRP to impose imminent mass layoffs at the Department of the Interior will have an immediate and detrimental impact on the federal

1    employees who are terminated, those who remain, and their labor representatives including Plaintiffs

2    AFGE and SEIU.

3      325. These actions will also inflict irreparable injury upon Plaintiff American Geophysical

4    Union and its members, who regularly collaborate with and depend on the agency—in particular, on

5    the U.S. Geological Survey (USGS), Bureau of Land Management, and Fish and Wildlife—for

6    funding and research.  The targeting of USGS will compromise vital public services, including

7    providing reliable science to resource managers, emergency response, other scientists who rely on it,

8    and the public.  For example, the planned reductions of 20 percent will eliminate regional centers that

9    partner with local natural resource managers and communities to help them deal with mounting

10   challenges of climate change, from wildfires to sea level rise.

11     326. The reductions in staffing will also harm Plaintiff NRDC, which relies on publications

12   and databases updated and maintained by the Fish and Wildlife Service, U.S. Geological Survey, and

13   the Bureau of Land Management; and Plaintiff Coalition to Protect America's National Parks and its

14   members, because inadequate staffing will endanger animal and plant species and compromise park

15   functioning and operations, harming the recreational activities of members in national parks.  It will

16   harm Plaintiff Western Watersheds Project, by impeding timely access to public records necessary to

17   accomplish its conservation mission, adversely affecting the Bureau of Land Management's

18   prevention of ecologically destructive grazing on federal public lands, hindering WWP's ability to

19   research and obtain information related to conservation efforts, impacting the U.S. Fish and Wildlife

20   Service's ability to categorize and protect endangered species such as the Wyoming toad and Arctic

21   grayling, and causing other adverse effects that will decimate the National Wildlife Refuge, harm

22   WWP's ability to protect native wildlife, and impede the enjoyment of land by WWP's members.

23     327. In addition, the implementation of the Executive Order and the Interior ARRP will

24   cause a direct and seriously detrimental injury to local governments, specifically including but not

25   limited to Plaintiffs Santa Clara and King County.  It will harm Plaintiff Santa Clara's emergency-

26   planning efforts and capabilities, which rely on information about earthquake hazards developed by

27   USGS to plan for and respond to earthquakes.  Indeed, Plaintiff Santa Clara is a member of the

28   COMPLAINT, No.              86

**Add.90**

Association of Bay Area Governments, which partners closely with USGS to provide resources and guidance related to earthquakes. Similarly, implementation of the Executive Order and the Interior ARRP would significantly slow Plaintiff King County's ability to complete infrastructure, transportation, and environmental projects, increase costs, and reduce the effectiveness of efforts to protect endangered species and historic resources. It would result in Plaintiff King County experiencing, among other things, increased uncertainty and project delays due to extended consultation and permit review and issuance in ESA and EFH reviews conducted by U.S. Fish and Wildlife Service along with NOAA Fisheries, which oversee species like Chinook Salmon and Bull Trout. It would also cause delays in compliance with federal laws requiring consultation with the Bureau of Indian Affairs and other DOI agencies on the impacts of federally funded or permitted projects on historic properties, potentially stalling project approvals.

- **Department of Labor**

328. The implementation of the Executive Order and ARRP to impose imminent large-scale layoffs at the Department of Labor will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE. For example, the Department has eliminated the enforcement division of the Office of Federal Contract Compliance Programs (OFCCP) and plans to cut OFCCP by 90 percent.

329. These actions will also have a direct and severely detrimental impact on Plaintiffs AFSCME and SEIU, whose non-federal employee members depends on many programs and subagencies of the Department including the Occupational Health and Safety Administration, Wage and Hour Division, Bureau of Labor Statistics, and Employee Benefits Security Administration. SEIU also represents members employed by service contractors who provide cleaning services at DOL offices, and risk losing their jobs due to the significant reduction in staff.

330. In addition, the implementation of the Executive Order and the Labor ARRP will cause a direct and seriously detrimental injury to local governments.

COMPLAINT, No.                                                                                     87

**Add.91**

- **National Labor Relations Board**

331.     The implementation of the Executive Order and ARRP to impose a large-scale reduction-in-force at the NLRB will have a direct and severely detrimental impact on the federal employees who are terminated, those that remain, and their labor representatives.

332.     In addition, these actions will also have a direct and severely detrimental impact on Plaintiffs AFSCME and SEIU, both of whom represent private-sector members who depend on the NLRB and who regularly file unfair practice charges and representation petitions at the NLRB.  Due to flat-line budgeting, case processing time has increased over the past decade from 100 days to 444 days.  Decreasing staff will further extend the time it takes for the NLRB to prosecute violations of federal labor law, leaving workers and unions unprotected.  Plaintiffs AFSCME and SEIU who regularly file unfair practice charges at the NLRB presently have significant pending petitions for representation and unfair labor practice charges that are not being timely processed due to current low staffing levels.  The delay will mean that NLRA violations will effectively go unremedied and workers will be thwarted in having unions certified as their collective bargaining representatives because the NLRB will not be able to conduct timely elections.

**National Science Foundation**

333.     The implementation of the Executive Order and ARRP to impose imminent layoffs of up to half of NSF staff will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

334.     They will also cause severe harm to science in the United States.  NSF has already abolished eleven of its thirteen advisory panels.  It is a major funder of critical scientific research, and the elimination of staff will cause serious disruptions in funding that created chaos and instability among researchers.  For these reasons, the reduction in NSF staff will have a direct and substantially detrimental impact on the members of Plaintiff the American Geophysical Union, who rely on research by and funding from, and often collaborate with, the NSF.  It will also harm Plaintiff Western Watersheds Project, which regularly uses NSF-funded research for protection and restoration of wildlife and native ecosystems,

COMPLAINT, No.                                                                                              88

**Add.92**

- **Small Business Administration**

335.    The implementation of the Executive Order and ARRP to impose an imminent 43 percent reduction in SBA staff, which will eliminate thousands of positions, will cause a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

336.    This reduction will also cause harm to Plaintiffs AFGE, AFSCME, and SEIU members who carry student loan debt, many of whom have benefited from the Public Service Loan Forgiveness program and income-driven repayment options that attach to the federal student loans of those employed in the public sector.  Because the Administration intends to transfer the processing of student loans from the (now eliminated) Department of Education to the SBA, understaffing in the SBA will cause delays in processing loan forgiveness or requests to adjust income-based repayment, causing significant financial harm to AFSCME, SEIU, and AFGE members.

337.    The reductions will also have a severely detrimental impact on the small businesses across the United States, including the members of Plaintiff Main Street Alliance, who rely on SBA services, which include loans, loan guarantees, grants, disaster relief, assistance connecting with government contracting opportunities, a mentoring program, and a national network of Small Business Development Centers that provide counseling and training to help entrepreneurs start their own businesses.

338.    In particular, Main Street Alliance members and other small businesses that have suffered substantial injuries in national disasters rely on the SBA's Emergency Injury Disaster Loan ("EIDL") program.  But without adequate staff, EIDL loan processing will be delayed and loan recipients facing repayment difficulty will be unable to reach EIDL to renegotiate payments, causing them to end up in default and be sent to collection.  Reductions in staffing will also slow the processing of loan guarantees, which will have detrimental effects not only on small business loan recipients but also on contractors and suppliers, and their employees.  Many of these effects have already begun to occur.  The SBA office that funds an important mentoring program has been effectively eliminated.  At least one Small Business Development Center has already closed, with

COMPLAINT, No.                                                                                                          89

**Add.93**

1    more to come.  As the RIFs continue to unfold, they will have extremely detrimental effects on small

2    businesses throughout the nation including many members of Main Street Alliance.

3    339.    In addition, the implementation of the Executive Order and SBA ARRP will cause a

4    direct and seriously detrimental injury to local governments that interact directly with this agency and

5    rely on its services every day, specifically including but not limited to Plaintiffs the City and County

6    of San Francisco and King County.  The elimination of positions at the SBA threatens the Plaintiff

7    local governments' ability to support communities that are recovering after major disasters, by

8    slowing critical financial assistance.  They will cause delays in, among other things, damage

9    assessments, establishment of Disaster Loan Outreach Centers, and servicing of disaster loans, which

10    are currently fully managed by SBA employees.  In addition, residents and businesses that depend on

11    timely access to disaster loans will face financial harm.  Without sufficient SBA staff to travel to

12    disaster locations to perform assessments and provide loan application technical assistance, residents

13    in disaster areas will face difficulty obtaining low-interest federal disaster loans, therefore hindering

14    their ability to rebuild and recover from disasters

15    • **Social Security Administration**

16    340.    The implementation of the Executive Order and ARRP to imminently eliminate the

17    jobs of 7,000 of the 57,000 SSA employees—at a time when the SSA was already at a 50-year

18    staffing low just as the peak of the Baby Boomer generation become eligible for SSA retirement

19    benefits—will have a direct and severely detrimental impact on the federal employees who are

20    terminated, those who remain, and their labor representatives including Plaintiff AFGE.

21    341.    These layoffs will also affect Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and

22    their non-federal employee members who work for state agencies that determine eligibility for Old

23    Age, Survivors and Disability Insurance and depend on SSA-administered technology to make their

24    assessments, for local or state determination entities, and/or for medical providers that make those

25    determinations, which also depend on SSA staff.  SEIU Local 1000 members are employed by the

26    California state agencies that rely on the provision of social security numbers when issuing driver's

27    licenses and processing unemployment benefits applications, and will likely face long delays in

28    COMPLAINT, No.                                                                              90

**Add.94**

speaking with SSA staff and resolving problems with social security numbers, which, in turn, will delay the provision of state service, including driver's licenses and unemployment/disability insurance.

342.   In addition, these actions will also have a direct and severely detrimental impact on Plaintiff Alliance for Retired Americans and its members, who are already experiencing long wait times for appointments in person and long wait times (already up to 90 minutes) on the 800-number to apply for benefits or to correct benefit problems by phone.  Employees processing benefits applications will no longer have the necessary information technology support, causing problems including website disruptions that prevent ARA members and others from applying for benefits or calculating benefits to make retirement decisions.  And adding the caseload of employees who are terminated to SSA employees' already overwhelming caseload will mean the current problem of almost one-fifth of benefit applications not being timely processed will expand and people who are entitled to receive Social Security benefits, including ARA members, will not timely receive them. These same issues will also affect Plaintiff AFSCME's significant number of retired members and their families.

- **State Department**

343.   The implementation of the Executive Order and ARRP imminently to impose sweeping cuts at the State Department—including staff reductions in domestic offices of 15%, on top of the elimination of entire offices—will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.  SEIU also represents members employed by service contractors who provide cleaning services at State Department offices, and risk losing their jobs due to the significant reduction in staff.

344.   These reductions will also cause immediate, substantial, and irreparable harm to the vital diplomatic work the Department performs.  For example, the planned reorganization eliminates numerous Special Envoys, Representatives, and Coordinators, positions that provide high-level, specialized attention to pressing issues such as climate change, global criminal justice, hostage affairs, nuclear nonproliferation and particularly geopolitically sensitive States like Iran, Sudan, and

COMPLAINT, No.                                                                                                           91

North Korea.  The scale of the Reorganization Plan announced on April 22 will also make it extremely hard for the employees who remain to keep the work of their offices going without severe disruptions.

- **Department of the Treasury**

345.     The implementation of the Executive Order and ARRP to impose the planned and ongoing 40 percent reduction to the IRS workforce will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives.

346.     The IRS plans to reduce its workforce from 102,000 employees to roughly 60,000 to 70,000, with especially high staffing cuts in taxpayer services and compliance, and to close more than 110 offices with taxpayer assistance centers.  These staffing cuts will reduce the IRS's ability to accomplish its core functions and will directly and severely harm Plaintiff the Center for Taxpayer Rights, the members of its LITC Connect program, the clients of its own Low Income Tax Clinic, and taxpayers across the country.  The planned IRS staffing shortfalls will cause simple, quick cases to snowball into labor-intensive, years-long matters for the Center's advocates, requiring more technical assistance from the Center and leaving low-incoming taxpayers unassisted.  The Center's members will be required to expend more resources per case and be less able to accomplish their missions. Clients will suffer financially through delayed or denied tax refunds, the inability to reach the IRS to stop automatic assessments, and—for some prospective clients— the inability to be served by overwhelmed LITCs that are forced to impose client caps.

347.     These actions will also have a direct and severely detrimental impact on local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiff Santa Clara.  Federal law entitles local governments to reimbursement from the IRS for certain interest payments they make on "Qualified Energy Conservation Bonds."  For example, Plaintiff Santa Clara issued such bonds to provide low-interest financing to promote alternative energy usage, and is therefore entitled to monthly reimbursement payments from the IRS.  Because these reimbursements depend on staff for processing, reorganization will likely cause slowdowns in the issuance of these reimbursement payments.

COMPLAINT, No.                                                                                      92

**Add.96**

348.     The Department of Treasury is also responsible for processing federal payments and disbursing them to state and local governments, including money for block grants, formula grants, and direct payments for specified use by those state and local governments.  The predicted across the board staffing cuts at the Department pose a significant threat to a functional Treasury.  With a lower-staffed Treasury Department, these payments could be delayed or stop altogether, severely harming members of AFSCME and SEIU who work in state and local government, and jeopardizing their jobs.

- **Department of Veterans Affairs**

349.     The implementation of the Executive Order and ARRP to imminently roll out the elimination of approximately 80,000 positions at the VA will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE, AFSCME, and SEIU.

350.     This massive reorganization will also harm Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and their non-federal employee members, who are employed by facilities that provide care to veterans and are operated by state government but depend on the VA to timely process government funding.

351.     These actions will also cause immediate and irreparable injuries to veterans who rely on VA services including members of Plaintiffs Common Defense and VoteVets, and to the organizational mission of those organizations.  For example, cuts to support medical and healthcare support staff, IT support, and clerical and data entry positions make it significantly more difficult for VA health care providers to do their jobs and for veterans to make medical appointments and be connected with services.  The RIFs will exacerbate staffing shortages that already exist at many VA facilities and make it harder for veterans to access health care, including mental health care, and other veterans' services including crisis support.  Cuts to research staff will also disrupt important work that benefits veterans and the public generally.  The reductions will stress understaffed veterans' hospitals and other services to the breaking point.

COMPLAINT, No.                                                                                              93

**Add.97**

352.     In addition, the implementation of the Executive Order and VA ARRP will have substantial and deleterious effects on the veterans living in Plaintiff cities and counties and will also impose costs and burdens on the local governments themselves, specifically including but not limited to the County of Santa Clara.

353.     For example, the delays, closures, and loss of staff at the VA—both at VA hospitals and in offices that perform centralized functions like call centers and benefits processing—will also prevent or hinder Plaintiff Santa Clara's Office of Veterans Services from doing its primary, core function of connecting veterans to the healthcare and benefits-processing staff at the VA.  Reduction in force at the VA will also impose additional burdens on hospitals, like those operated by Plaintiff Santa Clara, that operate emergency departments because delays and/or elimination of care options for veterans will make them more reliant on services provided by Plaintiff Satna Clara and other local governments such as housing support and behavioral and medical health care.  And reduced VA staff will impact Plaintiff King County's ability to serve veterans experiencing homelessness or housing instability, weakening a nationally recognized, award-winning program that had been advancing veteran support services.

## **CLAIMS FOR RELIEF**

### **Claim I:**
### **Separation of Powers/*Ultra Vires***
### **Against Defendant President Donald J. Trump**

354.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

355.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

356.     The Constitution vests the legislative power in Congress.  U.S. Const., art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).  Congress exercised that Article I legislative authority to create the agencies of the federal government.  Congress has not delegated to the President the authority to employ and discharge the subordinate employees of the agencies or to spend appropriated funds on those positions; rather, it delegated those functions exclusively to the heads of federal agencies.

357.     From time to time in this nation's history, Congress has delegated to the President the authority to fast-track legislation proposing the reorganization of federal agencies.  But Congress has given President Trump no such authority.  While Congress has also delegated certain authorities to President Trump to enact regulations with respect to the management and conduct of the federal civil service, none of those delegations authorize the sweeping authority President Trump has claimed for himself to order agencies to engage in large-scale RIFs, eliminate programs and offices at his direction, reduce staffing to 2019 or government shutdown levels, and otherwise reorganize the federal government.

358.     The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  The President cannot usurp Congress's legislative authority on his own mandate; any legislative authority wielded by the President must have been delegated within the confines of the Constitutional limitations protecting the respective spheres.  The President has no constitutional power to enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).   The President lacks the constitutional or statutory authority to order large-scale terminations of federal employees, to require agencies to eliminate offices and functions, to require agencies to consider their own elimination, to move agency functions as between agencies, or otherwise to engage in large-scale government reorganization.  The President likewise has no constitutional or statutory authority to impose parameters and requirements for such RIFs and reorganizations that require agencies to defy and ignore their authorizing statutes.

359.     Executive Order 14210 exceeds the President's lawful authority, at a minimum, by ordering agencies, including but not limited to Federal Agency Defendants, to:

    a.     Implement large-scale RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions, needs, and appropriations);

    b.     Prioritize in RIFs any functions that "my Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

COMPLAINT, No.                                                                                                   95

**Add.99**

c.     Prioritize in RIFs 2019 and/or government emergency shutdown levels of staffing (aka, Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.     Consider their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies); and

e.     Reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

360.     Therefore, the President's Executive Order 14210 ordering agencies to engage in large-scale RIFs and reorganization plans, and impose hiring freezes, limits, and controls, is not authorized by Article II and usurps Congress's Article I authority, and is thus *ultra vires*.

<div align="center">

**Claim II:**
**Separation of Powers/*Ultra Vires***
**Against Defendants OMB, OPM, DOGE and their Directors**

</div>

361.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

362.     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

363.     Congress exercised its Article I legislative authority to create the agencies of the federal government.  *See generally* United States Code, Title 5 (Government Organization and Employees).  To the agency heads, Congress has also expressly delegated the power to manage the functions of the agencies, including the right to employ and discharge subordinate employees of the agencies and to spend appropriated funds on those positions.

364.     In addition to agency-specific authorizing statutes, Congress has also generally authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

365.     Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-making authority of the federal agencies with respect to federal agency employment or organization;

COMPLAINT, No.                                                                                            96

<div align="center">

**Add.100**

</div>

to require agencies to take general or specific action with respect to employment or organization; or to impose substantive requirements that effectively demand agencies to disregard statutory and regulatory requirements.

366. The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds statutory authority and usurps the authority delegated by Congress to the agencies, not to OMB or OPM, by, at a minimum, requiring agencies, including but not limited to Federal Agency Defendants, to:

a. Submit ARRPs for OMB and OPM approval;

b. Include in those ARRPs large-scale RIFS (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

c. Prioritize in those large-scale RIFs any functions that "[the President's] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

d. Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of staffing (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

e. Include in their ARRPs consideration of their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

f. Include in their ARRPs a plan to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions; and

g. Submit these plans for approval on timeframes that do not permit agencies to actually consider and assess their own needs or the staffing needed to meet their statutory responsibilities.

367. DOGE has no statutory authority. DOGE exceeds any authority it may have to implement the President's orders by usurping the authority delegated by Congress to the agencies, not to the President or DOGE. DOGE has no authority at all to dictate to the agencies created and

COMPLAINT, No.                                                                                               97

**Add.101**

1  governed by Congress any level of staffing cut or spending reduction.  DOGE therefore exceeds any

2  authority by ordering agencies, including but not limited to Federal Agency Defendants, to impose

3  cuts to functions and staffing according to "targets" and "goals" imposed by DOGE.

4      368.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the

5  President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025

6  Memorandum to all agencies, as well as any direction, approval, or requirement imposed with respect

7  to any ARRPs that result from that Executive Order, exceed OMB, OPM, and DOGE's authority and

8  are contrary to statute and thus *ultra vires*.

9   
10  **Claim III:**
   **Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
   **Against Defendants OMB, OPM, DOGE and their Directors**
11  **(Action Not in Accordance With Law and Exceeding Statutory Authority)**

12      369.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

13      370.    The Plaintiff unions' federal employee members are subject to the requirements of

14  OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons

15  who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the

16  actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal

17  Directors, for purposes of 5 U.S.C. § 702.

18      371.    Congress exercised its Article I legislative authority to create the agencies of the

19  federal government.  *See generally* United States Code, Title 5 (Government Organization and

20  Employees).  To the agency heads, Congress has also expressly delegated the power to manage the

21  functions of the agencies, including the right to employ and discharge subordinate employees of the

22  agencies and to spend appropriated funds on those positions.

23      372.    In addition to specific authorizing statutes, Congress has also generally authorized the

24  heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the

25  employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management

26  decisions, including the hiring and firing of employees (5 U.S.C. § 302).

27      373.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-

28  making authority of the federal agencies with respect to federal agency employment.

COMPLAINT, No.                                  98

374.    The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds statutory authority and usurps the authority delegated by Congress to the agencies (including but not limited to Federal Agency Defendants), and not to OMB or OPM, by: requiring agencies to submit Agency RIF and Reorganization Plans to OMB and OPM for approval; requiring agencies to include in those plans large-scale RIFs; and imposing an assortment of other parameters and requirements, including considering Funding Lapse Plan Staffing Levels as a baseline.

375.    DOGE has no statutory authority.  DOGE exceeds any authority it may have to implement the President's orders by usurping the authority delegated by Congress to the agencies (including but not limited to Federal Agency Defendants), not to the President or DOGE.  DOGE has no authority at all to dictate to the agencies created and governed by Congress any level of staffing cut or spending reduction.

376.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025 Memorandum to all agencies, and any direction, approval, or requirement imposed with respect to any ARRPs that result from that Executive Order, exceed authority and are contrary to statute.

377.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025 Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

378.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

379.    The actions of OMB, OPM, and DOGE therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory authority in violation of 5 U.S.C. § 706(2)(C), and for those reasons are also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

COMPLAINT, No.                                                                                                  99

**Add.103**

**Claim IV:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Arbitrary and Capricious Agency Action)**

380.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

381.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, for purposes of 5 U.S.C. § 702.

382.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025 Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

383.    The actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), including because they: 1) order federal agencies to cede decision-making authority to OMB OPM, and/or DOGE, regardless of the requirements of any applicable statute or regulation; 2) require agencies to disregard their authorizing statutes and regulations and follow the President's unconstitutional directions and directions of OMB,OPM, and/or DOGE;  3) categorically impose requirements to engage in large-scale RIFs that are necessarily contrary to agency function and authorizing statutes and regulations; 4) categorically impose requirements to RIF employees at the President's direction, according to the offices, programs and functions the President and his Administration eliminate regardless of statute or regulation; 5) categorically require agencies to engage in RIFs that will align the agency with Funding Lapse Plan Staffing Levels, which necessarily and by definition cannot adequately staff agencies; 6) require agencies to abandoned reasoned decision-making considering all relevant factors, in service of the President's orders; 7) require agencies to act under unrealistic timeframes that necessarily will result in plans that are not supported

COMPLAINT, No.                                                                                          100

by rational reasoning or the agency's considered judgment; and 8) require the process for the creation and approval of plans to radically transform the entire federal government to proceed in secret.

**Claim V:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(D)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Notice and Comment)**

384.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

385.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, for purposes of 5 U.S.C. § 702.

386.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701.

387.    Under the APA, a court shall "hold unlawful and set aside agency action …found to be …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

388.    OMB and OPM's February 26, 2025 Memorandum, and any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

389.    Neither OMB, nor OPM, nor DOGE, has published and provided opportunity for notice and comment on its actions pursuant to Executive Order 14210, including but not limited to the February 26, 2025 Memorandum, any decision "approving" an ARRP, or DOGE's directives ordering agencies to make staffing or spending cuts.

390.    Neither OMB nor its Director, OPM nor its Acting Director, nor DOGE and its actual and nominal Directors complied with the rule-making provisions set forth in 5 U.S.C. § 553 before issuing OMB and OPM's February 26, 2025 Memorandum.  That memorandum, as well as any decision "approving" an ARRP and DOGE's directives ordering agencies to make staffing or spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

COMPLAINT, No.                                                                                              101

391.   OMB, OPM, and DOGE's actions therefore also violate 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

<div align="center">

**Claim VI:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
**Against Federal Agency Defendants**
**(Action Not in Accordance With Law)**

</div>

392.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

393.   The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants, for purposes of 5 U.S.C. § 702.

394.   Each Federal Agency Defendant is an agency that Congress has made subject to the APA. 5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA. 5 U.S.C. § 704.

395.   On information and belief, each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

396.   None of the Federal Agency Defendants have the statutory authority to cede their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE. None of the Federal Agency Defendants have the statutory authority to implement the President's unconstitutional direction to engage in large-scale RIFs, including with respect to functions, programs, or offices that *the President and those acting on his* authority have decided to cut; or to impose staffing cuts that take an agency, irrespective of duty or need, back to government-shutdown lapse levels. The Federal Agency Defendants have exceeded their authority by implementing the President's unconstitutional plans.

397.   Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C.

COMPLAINT, No.                                                                                           102

<div align="center">

**Add.106**

</div>

§ 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

398.    The actions of Federal Agency Defendants therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory authority in violation of 5 U.S.C. § 706(2)(C), and are for those reasons also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

**Claim VII:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Federal Agency Defendants**
**(Arbitrary and Capricious Agency Action)**

399.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

400.    The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants for purposes of 5 U.S.C. § 702.

401.    Congress made each Federal Agency Defendant subject to the APA.  5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA.  5 U.S.C. § 704.

402.    Each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

403.    The actions of the Federal Agency Defendants, including but not limited to implementing the President's unconstitutional orders to reorganize and RIF employees, pursuant to the terms dictated by the President, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), for reasons that include the following: they 1) cede decision-making authority to OMB and OPM, regardless of the requirements of any applicable statute; 2) disregard their authorizing statutes and follow the President's unconstitutional directions and directions of OMB and OPM;  3) engage in large-scale RIFs that are necessarily contrary to agency's ability to maintain required function and authorizing statute; 4) RIF employees at the President's

COMPLAINT, No.                                                                                    103

(111 of 726), Page 111 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 111 of 726
Case 3:25-cv-03698   Document 1   Filed 04/28/25   Page 108 of 115

direction, according to the offices, programs and functions the President and his Administration
eliminate regardless of statute; 5) RIF according to Funding Lapse Plan Staffing Levels, which
necessarily and by definition cannot staff agencies at the level necessary to adequately perform; 6)
abandon reasoned decision-making considering all relevant factors, in service of the President's
orders; 7) act under unrealistic timeframes that necessarily will result in plans that are not supported
by rational reasoning or agencies' considered judgment; and 8) conduct the process for the creation
and approval of plans to radically transform the entire federal government in secret.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

1. Declare that President Donald J. Trump has violated the United States Constitution by engaging in wholesale transformation of the federal government without any Congressional authorization by and through the Workforce Executive Order;

2. Declare that OMB, OPM, and DOGE have exceeded statutory authority and acted in an arbitrary and capricious manner and therefore acted unlawfully by ordering federal agencies to act in accordance with the President's unconstitutional mandate by and through the Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum;

3. Declare that Federal Agency Defendants have acted contrary to statutory authority and in an arbitrary and capricious manner and therefore acted unlawfully by implementing the President's unconstitutional Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum to reorganize the federal government and RIF large numbers of federal employees, without Congressional authorization;

4. Vacate the February 11, 2025 Workforce Executive Order, the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs; and issue all necessary and appropriate

COMPLAINT, No.                                                                                              104

**Add.108**

1    process to preserve status or rights pending conclusion of the review proceedings under 5

2    U.S.C. § 705;

3    5.   Temporarily restrain and enjoin the Defendants from implementing or enforcing the

4    February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM

5    Memorandum implementing that order; any and all approvals or exemptions awarded by

6    OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to

7    federal agency ARRPs; and the ARRPs, pending further orders from this Court;

8    6.   Pursuant to 5 U.S.C. § 706, vacate, hold unlawful and set aside the February 11, 2025

9    Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum

10   implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or

11   DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency

12   ARRPS; and the ARRPs;

13   7.   Enter preliminary and/ permanent injunctive relief;

14   8.   Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as

15   appropriate; and

16   9.   Grant such other relief as this Court may deem proper.

17   DATED: April 28, 2025                    Stacey M. Leyton
18                                            Barbara J. Chisholm
19                                            Danielle E. Leonard
                                              Corinne Johnson
20                                            Alice X. Wang
                                              Robin S. Tholin
21                                            ALTSHULER BERZON LLP
                                              177 Post St., Suite 300
22                                            San Francisco, CA 94108
                                              Tel: (415) 421-7151
23                                            sleyton@altshulerberzon.com
                                              bchisholm@altshulerberzon.com
24                                            dleonard@altshulerberzon.com
25
                                        By: */s/ Danielle Leonard*
26
27                                           *Attorneys for All Union and Non-Profit Organization*
                                             *Plaintiffs*
28

COMPLAINT, No.                                                                              105

**Add.109**

Elena Goldstein (pro hac vice app. forthcoming)
Skye Perryman (pro hac vice app. forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC) and for Plaintiffs City of
Chicago, IL; Martin Luther King, Jr. County, WA;
Harris County, TX; and City of Baltimore, MD*

Jules Torti (pro hac vice app. forthcoming)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice app. forthcoming)
Jacek Pruski (pro hac vice app. forthcoming)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice app. forthcoming)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org

COMPLAINT, No.

106

Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice app. forthcoming)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

COMPLAINT, No.                                                                                      107

1

2    By: /s/ Steven K. Ury

3        Attorneys for Plaintiff Service Employees International
         Union, AFL-CIO (SEIU)

4

5        David Chiu (SBN 189542)
         City Attorney
6        Yvonne R. Meré (SBN 175394)
         Chief Deputy City Attorney
7        Mollie M. Lee (SBN 251404)
         Chief of Strategic Advocacy
8        Sara J. Eisenberg (SBN 269303)
9        Chief of Complex and Affirmative Litigation
         Molly J. Alarcon (SBN 315244)
10       Alexander J. Holtzman (SBN 311813)
         Deputy City Attorneys
11       OFFICE OF THE CITY ATTORNEY FOR THE CITY
12       AND COUNTY OF SAN FRANCISCO
         1390 Market Street, 7th Floor
13       San Francisco, CA 94102
         molly.alarcon@sfcityatty.org
14       alexander.holtzman@sfcityatty.org

15   By:  /s/ David Chiu
16       David Chiu
         City Attorney
17
18       Attorneys for Plaintiff City and County of San Francisco

19
         Tony LoPresti (SBN 289269)
20       COUNTY COUNSEL
         Kavita Narayan (SBN 264191)
21       Meredith A. Johnson (SBN 291018)
         Raphael N. Rajendra (SBN 255096)
22       Hannah M. Godbey (SBN 334475)
23       OFFICE OF THE COUNTY COUNSEL
         COUNTY OF SANTA CLARA
24       70 West Hedding Street, East Wing, 9th Floor
         San José, CA 95110
25       Tel: (408) 299-5900

26       By:  /s/ Tony LoPresti
27
         Attorneys for Plaintiff County of Santa Clara, Calif.
28

COMPLAINT, No.                                                                108

**Add.112**

1

2          David J. Hackett (pro hac vice  app. forthcoming)

3          General Counsel to King County Executive & Special
Deputy Prosecutor

4          Alison Holcomb (pro hac vice app. forthcoming)
Deputy General Counsel to King County Executive &

5          Special Deputy Prosecutor
Erin King-Clancy (pro hac vice app. forthcoming)

6          Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING

7          ATTORNEY LEESA MANION
401 5th Avenue, Suite 800

8          Seattle, WA 98104
(206) 477-9483

9          David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

10         aclancy@kingcounty.gov

11         By: /s/ David J. Hackett

12         David J. Hackett

13         *Attorneys for Plaintiff Martin Luther King, Jr. County*

14

15         Jill Habig (SBN 268770)
PUBLIC RIGHTS PROJECT

16         490 43rd Street, Unit #115
Oakland, CA 94609

17         Tel: (510) 738-6788
jill@publicrightsproject.org

18

19         By: */s/ Jill Habig*

20         *Attorneys for Plaintiffs Baltimore, MD, Chicago, IL,
Harris County, TX, and King County, WA*

21

22         Christian D. Menefee
Harris County Attorney

23

24         Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant

25         Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel

26         Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division

27         Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division

28

COMPLAINT, No.                          109

1   R. Chan Tysor (pro hac vice app. forthcoming)
    Senior Assistant County Attorney
2   Alexandra "Alex" Keiser (pro hac vice app. forthcoming)
    Assistant County Attorney
3   1019 Congress, 15th Floor
    Houston, Texas 77002
4   Tel: (713) 274-5102
    Fax: (713) 437-4211
5

6   jonathan.fombonne@harriscountytx.gov
    tiffany.bingham@harriscountytx.gov
7   sarah.utley@harriscountytx.gov
    bethany.dwyer@harriscountytx.gov
8   chan.tysor@harriscountytx.gov
    alex.keiser@harriscountytx.gov
9

10  By: */s/ Jonathan G.C. Fombonne*
    Jonathan G.C. Fombonne
11

12  *Attorneys for Plaintiff Harris County, Texas*

13

14  Mary B. Richardson-Lowry,
    Corporation Counsel of the City of Chicago
15
    Stephen J. Kane (IL ARDC 6272490) (pro hac vice app.
16  forthcoming)
    Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice
17  app. forthcoming)
    Lucy Prather (IL ARDC 6337780) (pro hac vice app.
18  forthcoming)
    City of Chicago Department of Law,
19  Affirmative Litigation Division
    121 N LaSalle Street, Suite 600
20  Chicago, Illinois 60602
    Tel: (312) 744-6934
21  Stephen.kane@cityofchicago.org
    Rebecca.Hirsch2@cityofchicago.org
22  Lucy.Prather@cityofchicago.org
23

24  By:    */s/Stephen J. Kane*
           Stephen J. Kane
25

26  *Attorneys for Plaintiff City of Chicago*

27

28

COMPLAINT, No.                                                          110

**Add.114**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming)
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By: _/s/ Sara Gross_____

*Attorneys for Plaintiff City of Baltimore*

COMPLAINT, No.

111

**Add.115**

# Exhibit A

**9669**

Federal Register

Vol. 90, No. 30

Friday, February 14, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14210 of February 11, 2025

## Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.

**Sec. 2**. *Definitions.* (a) "Agency" has the meaning given to it in section 3502 of title 44, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States Code, and includes individuals who serve in the executive branch and who qualify as employees under that section for any purpose.

(e) "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f) "Law enforcement" means:

(i) engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii) the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g) "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h) "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

**Sec. 3**. *Reforming the Federal Workforce to Maximize Efficiency and Productivity.* (a) *Hiring Ratio.* Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan). The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan. This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service. This ratio shall not apply to functions related to public safety, immigration

enforcement, or law enforcement. Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b) *Hiring Approval.* Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i) This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii) The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

(iii) Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

(c) *Reductions in Force.* Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

(d) *Rulemaking.* Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

(i) failure to comply with generally applicable legal obligations, including timely filing of tax returns;

(ii) failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

(iii) refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

(iv) theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

(e) *Developing Agency Reorganization Plans.* Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

(f) Within 240 days of the date of this order, the USDS Administrator shall submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

**Sec. 4.** *Exclusions.* (a) This order does not apply to military personnel.

(b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

(c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

**Add.118**

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2025.*

[FR Doc. 2025–02762
Filed 2–13–25; 11:15 am]
Billing code 3395–F4–P

# Exhibit B



**U.S. Office of
Management and Budget**

**U.S. Office of
Personnel Management**



# MEMORANDUM

**TO:**     Heads of Executive Departments and Agencies

**FROM:**   Russell T. Vought, Director, Office of Management and Budget;
           Charles Ezell, Acting Director, Office of Personnel Management.

**DATE**:   February 26, 2025

**RE**:     Guidance on Agency RIF and Reorganization Plans Requested by
           *Implementing The President's "Department of Government
           Efficiency" Workforce Optimization Initiative*

---

### I.     Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

### II.    Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1. Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

### III.    Available Tools

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each.  Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

**Add.122**

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

## IV.    Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

## V.    Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

4

**Add.124**

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

5

**Add.125**

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

## VI.  Exclusions

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("*CHCOs*"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

### Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook.** RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

**Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)**

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

**Step 2: Planning, Preparation & Analysis (up to 30 days)**

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

**Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)**

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

**Step 4: RIF Implementation & Separation (Final Step)**

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

7

**Add.127**

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

*[Additional counsel and affiliations identified on signature page]*

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

#### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br>             Plaintiffs, <br><br>       v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br>             Defendants. | Case No. 3:25-cv-03698-SI <br><br> **MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |

1  **MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

2  TO ALL DEFENDANTS: PLEASE TAKE NOTICE that as soon as counsel may be heard in

3  Courtroom 1, 17th Floor, United States District Court, Northern District of California, located at 450

4  Golden Gate Avenue, San Francisco, CA, Plaintiffs[1] will move the Court pursuant to Rule 65 of the

5  Federal Rules of Civil Procedure and Rule 65-1 of the Civil Local Rules and this Court's authority to

6  "issue all necessary and appropriate process to postpone the effective date of an agency action or to

7  preserve status or rights," 5 U.S.C. §705, for a temporary restraining order follows:

8  1.   Enjoin and/or stay Defendants Office of Management and Budget ("OMB"), Office of

9  Personnel Management ("OPM"), Department of Government Efficiency ("DOGE"), AmeriCorps,

10  Department of Agriculture, Department of Commerce, Department of Energy, Environmental

11  Protection Agency, General Services Agency, Department of Health and Human Services,

12  Department of Housing and Urban Development, Department of Interior, Department of Labor,

13  National Labor Relations Board, National Science Foundation, Small Business Association, Social

14  Security Administration, Department of State, Department of Treasury, and Department of Veteran

15  Affairs and their agency heads named in their official capacities as Defendants in this lawsuit, their

16  officers, agents, servants, employees, and attorneys, and all persons acting by, through, under, or in

17  concert with these Defendants, from taking any action to implement or enforce Executive Order

18  14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) or the OMB/OPM Memorandum re: Guidance on Agency

19  RIF and Reorganization Plans Requested by Implementing The Presidents "Department of

20  Government Efficiency" Workforce Optimization Initiative (Feb. 26, 2025), including but not limited

21  to:

22

23  _____

[1] Moving plaintiffs are: American Federation of Government Employees, AFL-CIO; American
24  Federation of State County and Municipal Employees, AFL-CIO; Service Employees International
Union, AFL-CIO; AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU
25  Local 1000; Alliance For Retired Americans; American Geophysical Union; American Public Health
Association; Center For Taxpayer Rights; Coalition To Protect America's National Parks; Common
26  Defense Civic Engagement; Main Street Alliance; Northeast Organic Farming Association, Inc.;
VoteVets Action Fund Inc.; Western Watersheds Project; County of Santa Clara, California; City of
27  Chicago, Illinois; Martin Luther King, Jr. County, Washington; Harris County, Texas; City of Baltimore,
Maryland; and City and County of San Francisco, California.
28

Motion for TRO and OSC; Case No. 3:25-cv-03698-SI                                    1
**Add.129**

1      (1) any further approval of Agency RIF and Reorganization Plans ("ARRPs") by OMB and

2  OPM;

3      (2) any further orders by DOGE to agencies to cut programs or staff in conjunction with

4  implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs;

5      (3) any further implementation of the Executive Order, the OMB/OPM Memorandum, or

6  ARRPs by Federal Agency Defendants, including but not limited to execution of any existing

7  reduction in force ("RIF") notices, issuance of any further RIF notices, and placement of employees

8  on administrative leave; and

9      (4) any further transfer of functions or programs between any Federal Agency Defendants in

10  conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs.

11      2.    Order Defendants OPM and OMB to provide to the Court and to Plaintiffs the current

12  versions of the ARRPs of the Federal Defendant Agencies identified above.

13      3.    Order Defendants to serve and file a declaration(s) verifying that they have complied

14  with this Order and detailing what steps, if any, they have taken to do so.

15      The Motion is made on the grounds that (1) Plaintiffs are likely to prevail on their claims that

16  President Trump's Workforce Executive Order No. 14210 is *ultra vires* and unconstitutional; that the

17  actions of OMB, OPM, and DOGE to implement the Executive Order are *ultra vires* and violate the

18  Administrative Procedure Act ("APA"), 5 U.S.C. §706(2)(A), (C), and that OMB and OPM failed to

19  engage in notice-and-comment rulemaking as required under 5 U.S.C. §706(2)(D); and that the

20  actions of the other Federal Agency Defendants named above to implement the Executive Order, the

21  OMB/OPM Memorandum, and the ARRPs violate the Administrative Procedure Act, *id.* §706(2)(A),

22  (C); (2) that Plaintiffs will suffer irreparable injury unless the relief requested is granted; and (3) that

23  the balance of equities and public interest favor injunctive relief.

24      This Motion is supported by the accompanying Plaintiffs' Memorandum in Support of Motion

25  for Temporary Restraining Order and Appendices; the Declarations listed in the accompanying Index

26  of Evidence; the Complaint; and the entire record in this case.  Plaintiffs have provided notice of this

27  Motion and are serving it through the Court's electronic filing service, as set forth in the

28  accompanying Declaration of Plaintiffs' counsel Barbara J. Chisholm.

DATED: May 1, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne F. Johnson
Alice X. Wang
Robin S. Tholin
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006

Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice app. forthcoming)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice app. forthcoming)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900

1
TPaterson@afscme.org
MBlumin@afscme.org

2

3    By: */s/Teague Paterson*

4    *Attorneys for Plaintiff American Federation of State*
*County and Municipal Employees, AFL-CIO (AFSCME)*

5

6    Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,
7    AFL-CIO
1800 Massachusetts Ave., N.W.
8    Washington, D.C. 20036
Tel: (202) 730-7428
9    steven.ury@seiu.org

10

11    By: */s/ Steven K. Ury*

12    *Attorneys for Plaintiff Service Employees International*
*Union, AFL-CIO (SEIU)*

13

14    David Chiu (SBN 189542)
City Attorney
15    Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
16    Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
17    Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
18    Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
19    Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE CITY
20    AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
21    San Francisco, CA 94102
molly.alarcon@sfcityatty.org
22    alexander.holtzman@sfcityatty.org

23

24    By:  */s/ David Chiu*
David Chiu
25    City Attorney

26

27    *Attorneys for Plaintiff City and County of San Francisco*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

By:  */s/ Tony LoPresti*

*Attorneys for Plaintiff County of Santa Clara, Calif.*


David J. Hackett (pro hac vice  app. forthcoming)
General Counsel to King County Executive & Special
Deputy Prosecutor
Alison Holcomb (pro hac vice app. forthcoming)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor
Erin King-Clancy (pro hac vice app. forthcoming)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
aclancy@kingcounty.gov

By: */s/ David J. Hackett*

David J. Hackett

*Attorneys for Plaintiff Martin Luther King, Jr. County*


Jill Habig (SBN 268770)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
jill@publicrightsproject.org

By: */s/ Jill Habig*

*Attorneys for Plaintiffs Baltimore, MD, Chicago, IL,*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Harris County, TX, and King County, WA*

Christian D. Menefee
Harris County Attorney

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice app. forthcoming)
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice app. forthcoming)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice app. forthcoming)
Lucy Prather (IL ARDC 6337780) (pro hac vice app. forthcoming)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By:    */s/Stephen J. Kane*
          Stephen J. Kane

*Attorneys for Plaintiff City of Chicago*


Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming*)*
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By*: /s/  Sara Gross*

*Attorneys for Plaintiff City of Baltimore*

(140 of 726), Page 140 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 140 of 726
Case 3:25-cv-03698-SI    Document 37-1    Filed 05/01/25    Page 1 of 83

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle E. Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[*Additional counsel and affiliations identified on signature page*]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ............................................................................................... 6

I.    Congressional Authorization Before Government Reorganization ..................... 6

    A.    History of Presidential Reorganization ............................................. 6
    B.    Last Operative Authorization of "Reorganization" Authority ................. 8
    C.    President Trump's Unsuccessful First-Term Reorganization ................... 8

II.   Defendants Are Reorganizing the Federal Government Without
    Congressional Authorization ................................................................ 9

    A.    President Trump Has Ordered a Massive "Transformation" of
        Agencies ....................................................................... 9
    B.    OMB, OPM, and DOGE Are Executing the President's
        Reorganization Orders ................................................... 10
    C.    The Trump Administration is Hiding its Reorganization Plans from
        the Public .................................................................. 11

III.  Restructuring and RIFs at Agencies Are Causing Widespread Irreparable
    Harm .......................................................................................... 12

    1.    AmeriCorps ................................................................. 14
    2.    Agriculture ................................................................ 14
    3.    Commerce ................................................................. 15
    4.    Energy ...................................................................... 16
    5.    Environmental Protection Agency (EPA) ........................... 17
    6.    General Services Administration (GSA) ............................. 18
    7.    Health and Human Services (HHS) .................................. 18
    8.    Housing and Urban Development (HUD) ........................... 21
    9.    Interior .................................................................... 21
    10.   Labor ...................................................................... 23
    11.   National Labor Relations Board (NLRB) ........................... 23
    12.   National Science Foundation (NSF) ................................. 24
    13.   Small Business Administration (SBA) ............................... 24
    14.   Social Security Administration (SSA) ............................... 25
    15.   State ....................................................................... 26
    16.   Treasury ................................................................... 27
    17.   Veterans Administration (VA) ........................................ 28

ARGUMENT ............................................................................................................ 29

I.    This Court Should Enjoin Defendants' Implementation of Executive Order
      14210 and the Resulting Agency RIF and Reorganization Plans ...................... 29

      A.    Plaintiffs Are Likely to Succeed on Merits of Their Claims that the
            Executive Order and Agency Implementation are Unlawful ................. 29

            1.    Executive Order 14210 Violates Separation of Powers and is
                  *Ultra Vires* ............................................................................ 29
                  a.    The President Has No Article II Authority to Reorganize
                        Agencies ....................................................................... 29
                  b.    The President Has No Statutory Authority to Restructure
                        Agencies ....................................................................... 32
            2.    OPM's, OMB's, and DOGE's Actions Implementing Executive
                  Order 14210 Exceed Statutory Authority and Are *Ultra Vires* ........ 35
                  a.    OMB ............................................................................. 35
                  b.    OPM ............................................................................. 36
                  c.    DOGE ........................................................................... 36
            3.    OPM's, OMB's, and DOGE's Actions Implementing Executive
                  Order 14210 Also Violate the APA .......................................... 37
                  a.    The OPM, OMB and DOGE actions exceed statutory
                        authority ....................................................................... 38
                  b.    The OPM, OMB, and DOGE actions are arbitrary and
                        capricious ..................................................................... 38
                  c.    OPM and OMB failed to comply with notice-and-comment
                        rulemaking .................................................................... 41
            4.    Federal Agency Defendants Also Violate the APA .......................... 42
            5.    This Court Has Jurisdiction to Hear These Claims ......................... 44
                  a.    All Plaintiffs Have Article III Standing ........................... 44
                  b.    No Plaintiff is Required to Channel These Claims ................. 46

      B.    Defendants Are Causing, and Will Continue to Cause, Irreparable
            Harm ........................................................................................ 48

      C.    The Balance of Equities and Public Interest Weigh in Plaintiffs'
            Favor ........................................................................................ 50

II.   Scope of the Order: Require an Immediate Halt to Approvals and the
      ARRPs ............................................................................................... 50

CONCLUSION .................................................................................................... 50

Add.139

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*AFGE v. OPM.,*
  2025 WL 914823 (9th Cir. Mar. 26, 2025) .......................................................... 48

5

*AFGE v. OPM,*
  N.D. Cal. Case No. 3:25-cv-01780-WHA (N.D. Cal.) ...................................*passim*

6

7

*AFL-CIO v. Dep't of Labor,*
  2025 WL 1129227 (D.D.C. Apr. 16, 2025)......................................................*passim*

8

9

*AFSCME v. Soc. Sec. Admin.,*
  2025 WL 868953 (D. Md. Mar. 20, 2025) ............................................... 11, 37, 41

10

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
  2025 WL 485324 (D.D.C. Feb. 13, 2025).......................................................... 35

11

*Aids Vaccine Advoc. Coal. v. United States Dep't of State,*
  2025 WL 752378 (D.D.C. Mar. 10, 2025) .......................................................... 34

12

13

*Axon Enters., Inc. v. FTC,*
  598 U.S. 175 (2023) ..................................................................................... 47, 48

14

15

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................................... 38

16

17

*Biden v. Texas,*
  597 U.S. 785 (2022) ....................................................................................... 38

18

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ......................................................................................... 2

19

20

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996).......................................................................... 35

21

*Chief Prob. Officers of Cal. v. Shalala,*
  118 F.3d 1327 (9th Cir. 1997) .......................................................................... 42

22

23

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) .......................................................................... 39

24

25

*City of Sausalito v. O'Neill,*
  386 F.3d 1186 (9th Cir. 2004) .......................................................................... 46

26

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ....................................................................................... 46

27

28

*Clarke v. Office of Fed. Hous. Enter. Oversight*,
   355 F.Supp.2d 56 (D.D.C. 2004)...........................................................................50

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ................................................................................... 30, 33

*Cnty. of Santa Clara v. Trump*,
   250 F.Supp.3d 497 (N.D. Cal. 2017).....................................................................49

*Colwell v. Dep't of Health & Hum. Servs.*,
   558 F.3d 1112 (9th Cir. 2009).............................................................................41

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)...............................................................38, 39, 42, 43

*Elgin v. Dep't of the Treasury*,
   567 U.S. 1 (2012) ...............................................................................................47

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ...........................................................................................43

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022)...............................................................................38

*Eurofins Elec. & Elec. Testing NA, LLC v. SGS N. Am. Inc.*,
   2024 WL 4453315 (N.D. Cal. Oct. 8, 2024) .......................................................50

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ....................................................................................38, 39

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir.) (en banc), *judgment vac'd on other grounds*, 144 S. Ct. 480
   (2023) ................................................................................................................48

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023)........................................................44, 45, 50

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ...........................................................................................45

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ....................................................................................29, 31

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008).............................................................................49

*Goto.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000).............................................................................50

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
    333 F.3d 1082 (9th Cir. 2003) .................................................................. 41

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ................................................................................ 31

*INS v. Chadha*,
    462 U.S. 919 (1983) ....................................................................... 2, 7, 29

*Kaweah Delta Health Care Dist. v. Becerra*,
    123 F.4th 939 (9th Cir. 2024) ................................................................. 38

*League of California Cities v. FCC*,
    118 F.4th 995 (9th Cir. 2024) ........................................................... 40, 43

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) .................................................................. 49

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ............................................................................... 47

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) ................................................................ 49

*Marbury v. Madison*,
    5 U.S. 137 (1803) ................................................................................... 30

*Maryland v. USDA*,
    2025 WL 973159 (D. Md. Apr. 1, 2025) ................................................ 48

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .................................................................. 49

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012) ............................................................................... 47

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 39

*Mt. Diablo Hosp. v. Shalala*,
    3 F.3d 1226 (9th Cir. 1993) ................................................................... 39

*Murphy Co. v. Biden*,
    65 F.4th 1122 (2023) .............................................................................. 35

*Myers v. United States*,
    272 U.S. 52 (1926) ....................................................................... 2, 29, 30

*Nat'l Ass'n of Mfrs. v. United States Dep't of Homeland Sec.*,
491 F.Supp.3d 549 (N.D. Cal. 2020) .................................................................. 32

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
2025 WL 597959 (D.D.C. Feb. 25, 2025) ....................................................*passim*

*Nat'l Council of Nonprofits v. OMB*,
2025 WL 368852 (D.D.C. Feb. 3, 2025) ....................................................... 34, 44

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
595 U.S. 109 (2022) ...................................................................................... 2, 29

*Nat'l Urb. League v. Ross*,
977 F.3d 770 (9th Cir. 2020). But the Order ................................................ 42, 43

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025) ......................................................................... 37, 1

*New York v. Trump*,
2025 WL 1098966 (D.R.I. Jan. 28, 2025) ........................................................ 35

*New York v. Trump*,
2025 WL 357368 (D.R.I. Jan. 31, 2025) .......................................................... 34

*Northwest Env't Advocates v. E.P.A.*,
537 F.3d 1006 (9th Cir. 2008) ........................................................................ 38

*NTEU and Dep't of Treasury, IRS*,
60 F.L.R.A. 783 (2005) .................................................................................. 47

*NTEU v. Helfer*,
53 F.3d 1289 (D.C. Cir. 1995) (OPM) ............................................................. 37

*NTEU v. Newman*,
768 F.Supp. 8 (D.D.C. 1991) .......................................................................... 50

*NTEU v. Trump.*,
2025 WL 561080 (D.D.C. Feb. 20, 2025) ......................................................... 48

*NTEU v. U.S. Dep't of Treasury*,
838 F. Supp. 631 (D.D.C. 1993) ...................................................................... 50

*NTEU v. Vought*,
2025 WL 942772 (D.D.C. Mar. 28, 2025) ...................................................... 9, 31

*NTEU v. Vought*,
D.C. Cir. Case No. 25-5091 (Apr. 28, 2025) ...................................................... 1

*OPM v. AFGE*,
2025 WL 1035208 (U.S. Apr. 8, 2025) ............................................................. 48

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ........................................................................ 38

*Pacito v. Trump*,
   2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ........................................... 35

*Pangea Legal Servs. v. U.S. Dep't of Homeland Security*,
   512 F.Supp.3d 966 (N.D. Cal. 2021) .......................................................... 49

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ...................................................................................... 41

*PFLAG, Inc. v. Trump*,
   2025 WL 685124 (D. Md. Mar. 4, 2025) ..................................................... 34

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*,
   128 F.4th 1089 (9th Cir. 2025) ............................................................. 37, 38

*Robins v. Spokeo*,
   867 F.3d 1108 (9th Cir. 2017) .................................................................... 46

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .................................................................... 49

*San Diego Cnty. Credit Union v. Citizens Equity-First Credit Union*,
   65 F.4th 1012 (9th Cir. 2023) ..................................................................... 46

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) .............................................................................. 30, 31

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ...................................................................... 35

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden
   v. Sierra Club*, 142 S.Ct. 46 (2021) ........................................................... 35

*State v. Su*,
   121 F.4th 1 (9th Cir. 2024) .................................................................... 37, 43

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .................................................................................... 46

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) .................................................................................... 47

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) .................................................................... 44

*United States v. Perkins*,
116 U.S. 483 (1886) ................................................................................. 31

*Veit v. Heckler*,
746 F.2d 508 (9th Cir. 1984) .................................................................... 48

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) .................................................................. 49

*Widakuswara v. Lake*,
2025 WL 1166400 (D.D.C. Apr. 22, 2025)............................... 34, 44, 48

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................................................... 29

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024)................................................................... 50

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ....................................................................... 2, 29, 30

**U.S. Constitution**

U.S. Const. Article I, §1 ................................................................................ 29

U.S. Const. Article I, §8 ................................................................................ 29

U.S. Const. Article II §1 ............................................................................... 30

U.S. Const. Article II, §2 .............................................................................. 31

U.S. Const. Article II, §3 .............................................................................. 30

**Federal Statutes**

5 U.S.C. §101 ............................................................................................... 30

5 U.S.C. §104 ............................................................................................... 30

5 U.S.C. §105 ............................................................................................... 30

5 U.S.C. §551(4) .......................................................................................... 41

5 U.S.C. §553 ............................................................................................... 41

5 U.S.C. §701(b)(1) ..................................................................................... 37

5 U.S.C. §704 ............................................................................................... 37

5 U.S.C. §706(2) ................................................................................. 4, 38, 42

5 U.S.C. §§901-912 .................................................................................... *passim*

5 U.S.C. §§1101-1105 ...................................................................... 33, 36, 41

5 U.S.C. §2301 ........................................................................................... 32

5 U.S.C. §3101 ........................................................................................... 32

5 U.S.C. §3502 ..................................................................................... 33, 36

5 U.S.C. §7117(a)(1) .................................................................................. 47

5 U.S.C. §7701 ........................................................................................... 47

6 U.S.C. §542 ............................................................................................. 34

10 U.S.C. §111 .......................................................................................... 30

10 U.S.C. §113 .......................................................................................... 30

26 U.S.C. §7802(d)(3)(C) ........................................................................ 33

28 U.S.C. §1331 ........................................................................................ 47

31 U.S.C. §501-507 .................................................................................. 35

31 U.S.C. §503 ..................................................................................... 35, 36

31 U.S.C. §1512 ........................................................................................ 36

38 U.S.C. §301 .......................................................................................... 30

38 U.S.C. §303 .......................................................................................... 30

38 U.S.C. §510 .......................................................................................... 34

42 U.S.C. §202 .......................................................................................... 30

42 U.S.C. §203 .......................................................................................... 30

42 U.S.C. §281 .......................................................................................... 33

42 U.S.C §282 ........................................................................................... 30

42 U.S.C. §7131 ........................................................................................ 30

42 U.S.C. §8819 ........................................................................................ 34

**Federal Regulations**

1 C.F.R. §19.2.................................................................................................35

**Federal Rules**

Fed. R. Civ. P. 26(d).................................................................................50, 51

Fed. R. Civ. P. 65 ........................................................................................29

**Executive Orders and Other Admin Materials**

Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 13, 2017) ........................8

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ..........................9

Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ..........................9

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).................*passim*

Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025)...................1, 9

Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025).......................1

Exec. Order No. 14238, 90 Fed. Reg 13043 (Mar. 14, 2025) ........................9

Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) ........................9

*Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive &*
*Administer Funds Under Foreign Aid Legis.*,
9 Op. O.L.C. 76 (O.L.C. 1985)...............................................................31

*President's Authority To Promulgate a Reorganization Plan Involving the Equal*
*Employment Opportunity*
*Commission*, Op. O.L.C. 248, 250 (1977)...............................................31

1

**INTRODUCTION**

2
3
4
5
6
7
8
9

In the first three months of his second term, President Donald J. Trump has engaged in an unprecedented campaign to radically restructure and dismantle the federal government, in disregard of constitutional limits on executive power.  The President calls this "large scale structural reform" the "Manhattan Project of our time."[1]  As part of this plan, the President issued Executive Order 14210, which exceeds his lawful authority by directing the restructuring of entire agencies, the elimination of programs and functions, and the drastic reduction of the number of employees within every agency, all without *any* Congressional authorization.[2]  This TRO motion seeks to preserve the status quo by enjoining the currently ongoing implementation of that Executive Order.

10
11
12

President Trump has neither constitutional authority nor Congressional authorization to effectuate a government-wide reorganization and direct massive federal employee layoffs in service of that reorganization, either across or within agencies, and any attempt to implement such radical

13

14
15
16

[1] Statement by President-elect Donald J. Trump announcing Department of Government Efficiency,  The American Presidency Project (Nov. 12, 2024), available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-that-elon-musk-and-vivek-ramaswamy.  *See also*:

17
18

- "**It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state**."  Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative);

19
20

- "**It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people**."  Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy); and

21
22
23

- "**I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid**."  Remarks by President after Executive Order Signing, The White House (Feb. 18, 2025).

24
25
26
27
28

[2] Other actions taken as part of this "policy" of radical transformation of the government have included an attempt to halt *all* spending, the elimination of entire agencies, termination of government property leases and sale of government property, as well as cancellation of government contracts and grants.  The Executive Order enlisting the Office of Management and Budget to halt federal spending has been enjoined as unlawful by two courts.  *New York v. Trump*, 133 F.4th 51, 70 (1st Cir. 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, -- F.Supp.3d --, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025).  Efforts to dismantle certain specific agencies have also been enjoined.  *E.g.*, *NTEU v. Vought,* D.C. Cir. Case No. 25-5091 (Apr. 28, 2025) (reversing partial stay of preliminary injunction against further RIFs and terminations of CFPB employees so that court can "carefully consider the separation-of-powers and other arguments raised by the parties").

MEM. SUPP. MOT. FOR TEMPORARY RESTRAINING ORDER, NO. 3:25-cv-03698-SI          1

**Add.148**

1 restructuring is entirely *ultra vires*. "The President's power, if any, to issue [an] order must stem

2 either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v.*

3 *Sawyer*, 343 U.S. 579, 585 (1952). Since the founding of this nation, federal courts have recognized

4 that the Constitution gives the legislative power to create, regulate, and restructure federal agencies to

5 Congress—*not* to the President: "To Congress under its legislative power is given the establishment

6 of offices … [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272

7 U.S. 52, 129 (1926); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022)

8 (federal agencies are "creatures of statute").

9        While Congress may choose at times to delegate to the President some of its statutory power

10 with respect to agencies, it has not done so here. The President exceeds his constitutional authority

11 when he unilaterally assumes and exercises the authority to recreate federal agencies in the manner *he*

12 sees fit, without that legislative authorization. *Youngstown,* 343 U.S. at 587 ("In the framework of

13 our Constitution, the President's power to see that the laws are faithfully executed refutes the idea

14 that he is to be a lawmaker. … And the Constitution is neither silent nor equivocal about who shall

15 make laws which the President is to execute."). And when the President does so across *every federal*

16 *agency*, he threatens the nation's constitutional foundations: "There can be no liberty where the

17 legislative and executive powers are united in the same person." *Bowsher v. Synar*, 478 U.S. 714,

18 721-22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).[3] Thus,

19 for at least 100 years, when Presidents have sought to restructure the government by reorganizing

20 both between and within federal agencies, they have universally obtained Congressional

21 authorization to do so. *See* Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch in the*

22 *20th Century: Landmark Commissions* (2002); Heritage Foundation Legal Mem. No. 210, *infra* n.3.

23

24 _____

25        [3] *See also* Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*,
   Heritage Foundation Legal Memorandum No. 210, at 1, 3 (July 12, 2017) ("The President may
26 create, reorganize, or abolish an office that he established, but he cannot fundamentally reorganize
   the executive branch in direct violation of an act of Congress. *… [T]he President does not have*
27 *constitutional authority to reorganize the executive branch on his own*." (emphasis added)); *accord*
   John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Foundation Legal
28 Memorandum No. 4782, at 1-2 (Nov. 3, 2017) (recognizing that "[s]ince [*INS v.*] *Chadha*, [462 U.S.
   919 (1983)], sweeping reorganization of the federal bureaucracy requires the active participation of
   Congress."), both available at: www.heritage.org.

1        Despite these limits on Presidential authority, Executive Order No. 14210 was issued on

2    February 11, 2025, to "*commence a critical transformation of the Federal bureaucracy*."  Exec.

3    Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (*Implementing the President's "Department of*

4    *Government Efficiency" Workforce Optimization Initiative*, hereinafter "Workforce Executive Order"

5    (emphasis added)*,* attached as App. A.  It directs all federal agencies to "eliminat[e] waste, bloat, and

6    insularity" by immediately engaging in "large-scale reductions-in-force (RIFs)" in furtherance of

7    government "reorganization."  *Id*.  While superficially ordering agencies to act "consistent with

8    applicable law," *id.*, the President orders agencies to immediately take actions that the President has

9    no authority to direct—and which are necessarily inconsistent with the obligation of federal agencies

10   faithfully to adhere to their authorizing statutes and appropriations, and to engage in considered and

11   rational decision-making consistent with those statutes and the needs of the agencies.  This Executive

12   Order is plainly ultra vires.

13       Further, the President has enlisted three agencies, the Office of Management and Budget

14   ("OMB"), Office of Personnel Management ("OPM"), and newly created Department of Government

15   Efficiency ("DOGE"), to implement this unlawful Executive Order.  OMB, OPM, and DOGE have

16   assumed decision-making power with respect to the Order's implementation.  OMB and OPM swiftly

17   required all federal agencies to submit "Agency RIF and Reorganization Plans" ("ARRPs") designed

18   to implement the Executive Order *for OMB and OPM approval* by two deadlines: March 13 and

19   April 14, 2025.  *See* Feb. 26, 2025 OMB and OPM Memorandum (attached hereto as App. B).

20   Cabinet-level departments and other federal agencies were thus given mere *weeks* to address how to

21   enact the President's "large-scale" RIFs (including, per the Executive Order, cutting any programs or

22   functions "my Administration" decides to eliminate) and to propose a reorganization of whatever

23   agency functions remain (including "[w]hether the agency or any of its subcomponents should be

24   *eliminated or consolidated*").  *Id.* at 4 (implementing App. A, Sec. 3(c) and (e)) (emphasis added)*.*

25       By conditioning ARRPs on OMB and OPM approval, OMB and OPM have usurped the

26   agencies' ultimate decision-making power.  DOGE, for its part, is imposing and enforcing directives

27   for agencies to cut spending on staff and programs and eliminate offices deemed contrary to the

28   President's policy vision.  OMB, OPM, and DOGE have taken these actions largely in secret,

1    refusing to reveal the ARRPs to employees, their labor representatives, the public, or Congress.

2    OMB, OPM, and DOGE's actions are in excess of any authority, arbitrary and capricious, and flaunt

3    rule-making requirements, and violate the Administrative Procedure Act ("APA"), 5 U.S.C.

4    §706(2)(A), (C), (D).  Plaintiffs seek to enjoin OMB, OPM, and DOGE from further unlawful action.

5         What information has become public makes clear that implementation of those ARRPs,

6    including through large-scale RIFs and reorganizations ordered by the President and approved by

7    OMB and OPM, and with cuts directed by DOGE, is now ongoing or imminent across the federal

8    government.  The evidence collected by Plaintiffs eliminates any doubt that the agencies are acting

9    according to the President's unlawful directive as executed by OMB, OPM, and DOGE, not based on

10   their own independent analysis or reasoned decision-making with respect to their myriad and

11   complex statutory obligations and agency functions.

12        The radical restructuring of agencies and the attendant harms are addressed below, agency-by-

13   agency.  Just by way of example, on March 27, 2025, the Department of Health and Human Services

14   ("HHS") announced a "transformation" of the department that includes a "reduction in workforce of

15   about 10,000 full-time employees" (with more to come), across agencies performing important

16   medical, public health, and scientific work (the Center for Disease Control ("CDC"); the Food and

17   Drug Administration ("FDA"); National Institutes of Health ("NIH"); Community Health Service

18   ("CHS")).[4]  As HHS explained, *The restructuring of HHS is proceeding in accordance with*

19   *President Trump's Executive Order… .*"[5]  Secretary Kennedy further admitted that the restructuring

20   was directed not only by the President's Executive Order but also by DOGE, and did not take into

21   account the proper function and requirements of the agency:

22        "Personnel that should not have been cut, were cut," Kennedy told reporters on
          Thursday. "We're reinstating them. *And that was always the plan. Part of the Doge,*
23        *we talked about this from the beginning, is we're going to do 80% cuts, but 20% of*

24

25

26        [4] Press Release, U.S. Dep't of Health & Hum. Servs., *HHS announces transformation to make*
          *America healthy again* (Mar. 27, 2025).  The Department's chosen url says it all:
          https://www.hhs.gov/press-room/**hhs-restructuring-doge**.html (emphasis added).

27        [5] U.S. Dep't of Health & Hum. Servs., *Fact Sheet: HHS' transformation to make America healthy*
28        *again* (Mar. 27, 2025) (emphasis added), available at:  https://www.hhs.gov/press-room/hhs-
          restructuring-doge-fact-sheet.html.

*those are going to have to be reinstated, because we'll make mistakes*."[6]
As Secretary Kennedy further revealed, these Administration-ordered cuts terminated, among other functions, the *entire office* at the CDC that monitors lead exposure in children (the Lead Poisoning Prevention and Surveillance Branch).[7]

Other Departments and agencies are marching in line to implement the President's unconstitutional orders:   The Small Business Administration ("SBA") announced that pursuant to the Executive Order it "will reduce its workforce by 43 including by "eliminating non-essential roles."[8] The Department of Veterans Affairs ("VA") revealed in an internal memorandum that it would implement the President's Executive Order by returning to 2019 staffing levels and cutting 80,000 jobs.[9]   When asked about this, VA Secretary Doug Collins confirmed he too was following orders:

> "So, the 80,000 number that has come out, is that number already done? Have you already decided who to let go?" Fox's Brian Kilmeade questioned.
>  *"No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across government*," Collins replied. "*And that is a goal, that is our target.*" (*Id.*)

Plaintiffs set forth below, and extensively catalogued (Compl. ¶¶189-261) the currently available information regarding implementation of these ARRPs.  These agency actions pursuant to this Executive Order are also arbitrary and capricious in violation of the APA, 5 U.S.C. §706(2)(A),(C).

The size and scale of the destruction and harm caused by the Workforce Executive Order cannot be overstated.  The ill-considered actions at HHS alone have disrupted tens of thousands of lives and irreplaceable scientific research, and threatened the health, safety, and well-being of Plaintiffs and their members and the communities they serve.  The estimates of federal employees actually or imminently affected by this Executive Order, by losing their jobs and their benefits, are in

---

[6] The Guardian, *RFK Jr says 20% of Doge's health agency job cuts were mistakes* (April 4, 2025) (emphasis added), available at:  https://www.theguardian.com/us-news/2025/apr/04/rfk-jr-doge-cuts.

[7] CBS News, *RFK Jr. says 20% of health agency layoffs could be mistakes* (April 3, 2025), available at:  https://www.cbsnews.com/amp/news/rfk-jr-hhs-job-cuts-doge-mistakes/.

[8] U.S. Small Business Administration, *Small Business Administration announces agency-wide reorganization*, available at:  https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization.

[9] The Hill, *VA secretary: Cutting 80,000 jobs 'is our target'* (Mar. 10, 2025), available at: https://thehill.com/homenews/state-watch/5186097-va-seek-cuts-80000-jobs/

MEM. SUPP. MOT. FOR TEMPORARY RESTRAINING ORDER, NO. 3:25-cv-03698-SI          5

the hundreds of thousands. The federal labor unions are being decimated by these efforts to gut the civil service. And local governments, unions representing state and local government employees, and nonprofits—all of whom depend on the services of federal agencies—are facing overwhelming harms, as detailed in the more than 50 declarations submitted along with this Motion. All factors weigh heavily in favor of injunctive relief.

Plaintiffs have sued and move for relief now because sufficient information has finally been made public to discern some of the significant actions and impact of the President's Order, notwithstanding the efforts to keep these plans from the public eye. While this Executive Order applies to hundreds of agencies, Plaintiffs' TRO focuses on the government dismantlement that is already or poised to be underway, at the agencies engaged in ongoing and imminent plans to implement the Executive Order by engaging in large-scale RIFs and reorganizations.[10]

To maintain the status quo pending consideration of a preliminary injunction, Plaintiffs seek a TRO ordering an immediate halt to the following: (1) any further "approval" of ARRPs by OMB and OPM; (2) any further orders by DOGE to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs; (3) any further implementation of the Executive Order, the OMB/OPM Memorandum, or ARRPs by Federal Agency Defendants, including but not limited to execution of any existing RIF notices, issuance of any further RIF notices, and placement of employees on administrative leave; and (4) any further transfer of functions of any component of the Federal Agency Defendants between agencies. In furtherance of this Court's ability to consider and resolve the challenge to these illegal actions, Plaintiffs also ask this Court to shine a light on these plans by requiring Defendants to reveal their ARRPs.

Plaintiffs have served counsel for the United States, and ask that this Court set this motion for hearing as soon as possible next week, with Defendants' response due Tuesday, May 6 (for which Plaintiffs attempted to reach agreement, but Defendants opposed this schedule), followed by full consideration of Plaintiffs' request for a preliminary injunction as soon as possible thereafter.

**BACKGROUND**

---

[10] These include: AmeriCorps; USDA; Commerce; Energy; EPA; GSA; HHS; HUD; Interior; Labor; NLRB; NSF; SBA; SSA; State; Treasury; and the VA.

1    **I.**      **Congressional Authorization Before Government Reorganization**

2       **A.**      **History of Presidential Reorganization**

3       Congress first delegated to the President the authority to reorganize federal agencies in 1932.

4 Economy Act of 1932, Pub. L. 72-212, tit. VI, §§401-08, 47 Stat. 413. From 1932 through 1984,

5 Congress "amended, extended, narrowed, or reactivated" this government reorganization authority 16

6 times to grant Presidents limited authority to develop plans to reorganize the executive branch. S.

7 REP. 115-381 (2018); *see also* Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch*

8 *Reorganization* at 6 (2017). The most recent authority (the Reorganization Act Amendments of

9 1984) expired on December 31, 1984. Pub. L. No. 98-614, 98 Stat. 3192; *see* 5 U.S.C. §905(b).[11]

10       Presidents have used such statutory authorities to accomplish reorganizations of government,

11 large and small, with Congressional approval. *See* Cong. Rsch. Serv., R44909, at *6 (reorganizations

12 have included "relatively minor reorganizations within individual agencies" and "the creation of large

13 new organizations" – such as the predecessor to HHS in 1953, EPA in 1970, and FEMA in 1979).

14 Congress has also rejected various presidential reorganization plans—for example, proposals to

15 eliminate the Department of Education, *see, e.g.*, H.R. 714, 98th Cong. (1983); H.R. 1510, 115th

16 Cong. (2017), to merge the Department of Labor, Department of Commerce, and SBA, *see, e.g.*, S.

17 1116, 112th Cong. (2011), and to consolidate agencies into a new Food Safety Administration, *see*

18 H.R. 609, 114th Cong. (2015), among others. Congress has also denied requests for reorganization

19 authority, as with Presidents Reagan in 1981, Bush in 2003, and Obama in 2012. *See* Cong. Rsch.

20 Serv., R42852, at 29, 32-34; S. 2129, 112th Cong. (2012); H.R. 4409, 112th Cong. (2012). At other

21 times, Congress has reorganized the government through the regular legislative process. *See, e.g.*,

22 Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135. Congress has also sometimes

23 delegated to the President limited reorganization authority with respect to specific agencies. *See, e.g.*,

24 Pub. L. 105-277, div. G, subdiv. A, §1601, 112 Stat. 2681-795 (1998) (authorizing reorganization of

25

26       [11] The 1984 amendments "altered the method by which a plan could take effect," replacing prior procedures involving a one-house legislative veto with a requirement of a joint resolution of

27 Congress approved by the President. This change responded to *INS v. Chadha*, 462 U.S. 919 (1983), which invalidated on separation of powers grounds a one-house legislative veto provision in another

28 statute. Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* 30-31 (2012).

1    USAID). Such laws typically set expiration dates for the delegated authority. *E.g.*, *id.* §6601(e)

2    (prohibiting presidential reorganization of USAID after 1998).

3         President Trump has been given no such authorization by Congress.

4    **B.      Last Operative Authorization of "Reorganization" Authority**

5         The reorganization authority that expired in 1984 remains codified at 5 U.S.C. §§901-912 and

6    is instructive:  Congress defined "reorganization" as including changes to the structure of federal

7    agencies both *between* and *within* agencies, including "the abolition of all or a part of the functions of

8    an agency, except that no enforcement function or statutory program shall be abolished by the plan,"

9    and "the consolidation or coordination of part of an agency or the functions thereof with another part

10   of the same agency or the functions thereof." *Id.* §903(a).  Congress authorized the President to

11   reorganize agencies only for purposes determined *by Congress*. *Id.* §901.  And Congress required the

12   President to explain how any changes would comport with the agencies' statutory requirements and

13   funding levels, to facilitate Congress's consideration of the President's changes. *Id.* §903(b).[12]

14   **C.      President Trump's Unsuccessful First-Term Reorganization**

15        President Trump sought to reorganize the government during his first term and was never

16   authorized by Congress to do so.  First, on March 17, 2017, President Trump issued Executive Order

17   13781, which required OMB "to propose a plan to reorganize governmental functions and eliminate

18   unnecessary agencies …, components of agencies, and agency programs."  Exec. Order No. 13781,

19   82 Fed. Reg. 13959 (2017).[13]  On June 21, 2018, the Administration released *Delivering Government*

20   *Solutions in the 21st Century*, which listed over 30 government-wide reorganization proposals and

21

22

23   _____

    [12] Congress required a *detailed* explanation:

24         In his message transmitting a reorganization plan, the President shall specify with
      respect to each abolition of a function included in the plan the statutory authority for
      the exercise of the function.  The message shall also estimate any reduction or increase

25         in expenditures (itemized so far as practicable), and describe any improvements in
      management, delivery of Federal services, execution of the laws, and increases in

26         efficiency of Government operations, which it is expected will be realized as a result
      of the reorganizations included in the plan.

27   5 U.S.C. §903(b) (also requiring detailed implementation plan).

    [13] Notably, in that plan the President required and OMB implemented a notice and public

28   comment process.  Apr. 12, 2017 OMB Memorandum M-17-22, at 2.

conceded those "significant changes will require legislative action." *Id.* at 4;[14] *see also id.* at 21 (emphasizing need for "support of the Congress"); *id.* at 6 ("OMB would begin a "dialogue with Congress to prioritize and refine proposals"); *id.* at 55 (plan "would necessarily require a partnership with the Congress, including the granting of statutory authorities as necessary.").

Members of the House and Senate introduced bills in 2018 to give President Trump the reorganization authority needed for his plan, under 5 U.S.C. chapter 9, but neither bill passed. H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018). Congress also considered the Trump administration's first-term reorganization proposals by convening numerous hearings before and after OMB publicly released the 2018 Plan. ECF 1 ¶135 (listing hearings); Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals*, at 1 (July 25, 2018). Congress chose not to engage in any large-scale reorganization.[15]

## II.     Defendants Are Reorganizing the Government Without Congressional Authorization

### A.     President Trump Has Ordered a Massive "Transformation" of Agencies

President Trump has been unequivocal about his intent to radically transform the size and organization of the government via "large scale structural reform." *Supra* n.1. To carry out his reorganization agenda (an "18-month DOGE agenda," never made public), he created DOGE and embedded "DOGE Teams" in every federal agency. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). And he ordered OMB, OPM, and DOGE to create "a plan to reduce the size of the Federal Government's workforce." The White House, *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[16]

---

[14] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf

[15] *See, e.g.*, Gov't Exec., *Omnibus puts kibosh on White House efforts to unilaterally reorganize agencies*, *shed workers* (Mar. 22, 2018), available at: https://www.govexec.com/management/2018/03/omnibus-puts-kibosh-white-house-efforts-unilaterally-reorganize-agencies-shed-workers/146894/; Gov't Exec., *Congress begins formally blocking Trump's government reorganization plan* (Sep. 12, 2018), available at: https://www.govexec.com/management/2018/09/congress-begins-formally-blocking-trumps-government-reorganization-plan/151218/.

[16] The President separately dismantled several government agencies, either eliminating their functions or transferring and subsuming them within other agencies. Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Education); Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) (seven agencies); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (four agencies); *see also* Exec. Order No. 14169, 90 Fed. Reg. 8619 (Foreign Aid); Press Release, U.S. Dep't of State, *Prioritizing America's national interests one dollar at a time* (Jan. 29, 2025) (USAID); *NTEU v. Vought*, -- F.Supp.3d --, 2025 WL 942772 (D.D.C. Mar. 28, 2025) (CFPB).

On February 11, 2025, President Trump issued the Workforce Executive Order, commencing his "transformation" of the government without waiting for Congressional authorization.  *See* App. A.  The Order applies to almost all federal agencies, including 15 cabinet-level departments and hundreds of lower agencies and commissions.  *Id.* §2(a) (excluding only Executive Office of the President).  It requires hundreds of agencies to reorganize themselves through "large-scale" RIFs.  *Id.* §§3(c), (e).  In those RIFs, agencies must "prioritize[]" "agency initiatives, components, or operations that *my Administration* suspends or closes," and, remarkably, "all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id.*[17]  The President also required agencies, within 30 days, to submit reorganization plans reflecting these required RIFs, and to assess their own eradication: "whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* §3(e).  The Order excluded from the RIF requirements only "functions related to public safety, immigration enforcement, or law enforcement," and authorized OPM to grant agencies exemptions from the Order's requirements as "necessary [to] assist in promoting workforce reduction." *Id.* §§3, 4(c).

### B.    OMB, OPM, and DOGE Are Executing the President's Reorganization Orders

On February 26, 2025, OMB and OPM issued a Memorandum to all federal agencies directing compliance with the President's Workforce Order.  App. B.  OMB and OPM combined the various requirements of the Executive Order into one "Agency RIF and Reorganization Plan," due initially in *two weeks*.  *Id.* at 3.  They assumed decision-making "approval" for the content of these ARRPs. *Id.* at 3, 4 ("Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**."; "Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**.") (emphasis in original).

---

[17] The referenced Contingency Plans, known as "Lapse Plans," set forth the minimal staffing needed when agencies are not appropriated at all (to protect, for example, against the destruction of property or loss of life).  Agencies *by law cannot* perform their normal Congressional-intended functions during such circumstances:  "The Antideficiency Act restricts the conduct of business by agencies during a lapse of appropriations."  Dep't of Commerce, *Plan for Orderly Shutdown Due to Lapse of Congressional Appropriations* (September 27, 2023), available at: https://www.commerce.gov/sites/default/files/2023-09/DOC-Lapse-Plan-2023.pdf.

OMB and OPM then provided extensive direction to agencies regarding the mandatory content of these ARRPs, consistent with and amplifying the President's Executive Order.  *Id.* at 3, 4 ("Phase 1 ARRPs shall focus on initial agency cuts and reductions. … Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward.").  The Memorandum instructed that "[p]ursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated."  *Id.* at 2; *see also id.* at 1-2 ("Principles to Inform ARRPs" that included "significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required").  OMB and OPM also ordered that agency heads must "collaborate with their … DOGE … team leads within the agency" in developing RIFs. *Id.*  They further clarified that the agencies and their DOGE leads should not just use Lapse Plan levels as a "starting point" for RIFs, but (without explanation) *2019* Lapse Plan levels.  *Id.*

OMB has subsequently confirmed in court pleadings that it has final decision-making authority with respect to the ARRPs, withholding them as "pre-decisional" pending OMB review. *Democracy Forward Found. v. Off. of Mgmt. & Budget*, No. 1:25-cv-00858 (D.D.C.), ECF No. 9 (Defendants' Apr. 2, 2025 Motion to Dismiss: "[A]gency reduction-in-force plans are still under development by the Executive Branch[,] and OMB is currently actively reviewing these plans").

DOGE is also implementing the Workforce Executive Order, by giving agencies mandatory reduction targets for the ARRPs, including cuts to specific programs and functions, as publicly confirmed by at least HHS Secretary Kennedy and VA Secretary Rollins (*supra*, at 4-5).[18]

### C.    The Trump Administration is Hiding its Reorganization Plans from the Public

The Trump Administration has refused requests from the press, employees, their labor representatives and the public for the ARRPs.  *See Democracy Forward Foundation v. OMB*, No.

---

[18] Courts have recognized that DOGE is imposing mandates on federal agencies.  *See AFSCME v. Soc. Sec. Admin.*, 2025 WL 868953, at *68 (D. Md. Mar. 20, 2025); *AFL-CIO v. Dep't of Lab.*, 2025 WL 1129227, at *45 (D.D.C. Apr. 16, 2025) (allegations that "USDS has been directing operations and personnel decisions at Congressionally-created agencies that Congress has imbued with the authority to exercise specific responsibilities.").  *See also* Anna Bower, *On DOGE, Directives, and DOJ*, Lawfare (Apr. 27, 2025) ("Recent litigation is also increasingly producing documentary evidence proving that DOGE has taken control of some agency functions, such as terminating contracts, despite the government's representations that DOGE merely 'consults.'"), available at: https://www.lawfaremedia.org/article/on-doge--directives--and-doj.

1    1:25-cv-00858 (D.D.C.), ECF 9-1 ¶23 (denying FOIA request for ARRPs).[19]  Recent reports indicate

2    that individuals involved in discussions of the ARRPs at the VA had to sign Non-Disclosure

3    Agreements ("NDAs").[20]  The White House has stated that the plans will be revealed only "*once ...*

4    *enacted.*"[21]

5    **III.    Restructuring and RIFs at Agencies Are Causing Widespread Irreparable Harm**

6            The ARRPs were due to OMB/OPM on April 14, 2025.  App. B.  Some agencies' ARRPs

7    (such as NLRB and NSF, which proposed few or no RIFs) were rejected by OMB and required to be

8    resubmitted.  Chisholm Decl. Ex. 1; Soriano Decl. ¶¶8-11 (AFGE).  Although ARRPs are not public,

9    agency statements and employee RIF notices show that other agencies have begun implementation.

10           RIFs:  As of today (May 1, 2025), the agencies known to have begun RIFs include at least:

11   AmeriCorps, EPA, GSA, HHS, HUD, Labor, and SBA.  The agencies for which Plaintiffs have

12   collected evidence of imminent RIFs include:  Agriculture, Commerce, Energy, Interior, NLRB,

13   NSF, SSA, State, Treasury, and VA.  Breaking news reveals more agency RIFs every day.[22]

14           Programs/offices:  Nearly agencies or programs are being eliminated through these ARRPs an

15   RIFs.  At least one agency Congress created to provide important public services nationwide—

16   AmeriCorps—has been decimated, with 85% of staff given RIF notices and immediately put on

17   leave, all to "comply[]" with the Executive Order.  Daly Decl. ¶25 & Ex. A (AFSCME).  Other

18   known ongoing or imminent RIFs impacting entire programs and offices include:  Labor—OFCCP,

19

20           [19] Bachelder Decl. ¶¶12-13; Bailey Decl. ¶¶14-15, 17; Bobbitt Decl. ¶¶19-23; Couture Decl.
     ¶¶10-11; Daly Decl. ¶21; Gamble Decl. ¶¶7, 9-10; Gustafsson Decl. ¶7; Howell Decl. ¶¶9-11; Hunter
21   Decl. ¶11; Jacobs Decl. ¶¶15, 17; Kelley Decl. ¶¶12-14; Levin Decl. ¶¶17, 19-20; Niemeier-Walsh
     Decl. ¶¶16-17; Soldner Decl. ¶12.

22           [20] *E.g.*, Gov't Exec., *VA forces staff in workforce reduction discussions to sign non-disclosure
     agreements* (Apr. 24, 2025) ("Senior leaders are contemplating which jobs to keep and which to slash
23   in meetings, but telling staff they cannot discuss those topics."),available at:
     https://www.govexec.com/workforce/2025/04/va-forces-staff-workforce-reduction-discussions-sign-
24   non-disclosure-agreements/404808/.

25           [21] Wash. Post, *White House expects 'mass reduction' of federal workforce as deadline looms*
     (Mar. 13, 2025), available at:  https://www.washingtonpost.com/politics/2025/03/13/government-
26   agency-reorganization-rif-federal-workers/; *see also* Wash. Post, *Internal White House document
     details layoff plans across U.S. agencies* (Mar. 27, 2025).

27           [22] For example, after Plaintiffs' complaint was filed on April 28, 2025, the press reported that
     DOGE is imposing cuts on the Peace Corps, which is not a named defendant.  *See* N.Y. Times, *Peace
28   Corps, under review by DOGE, is said to plan 'significant' staff cuts*
     https://www.nytimes.com/2025/04/28/us/politics/peace-corps-cuts-doge.html.

1    Neuman Decl. ¶29 & Ex. F (SEIU) (cutting 90% of AFSCME-represented staff); EPA—OEJ and

2    External Civil Rights, and ORD, Dreyfus Decl. ¶13 (AFGE); Howell Decl. ¶¶16-18 (AFGE); HHS—

3    NIOSH, Niemeier-Walsh Decl. ¶21 (AFGE) (cutting 93% of staff), including its Coal Workers'

4    Health Surveillance Program, National Firefighter Registry for Cancer, and Health Hazard Evaluation

5    Program, *id.* ¶¶24-29; Benjamin Decl. ¶25 (APHA); Substance Abuse and Mental Health Services

6    Administration, Prendiville Decl. (SEIU Local 1021) ¶¶12-14; National Center for Injury Prevention

7    and Control, Benjamin Decl. ¶¶16, 18 (APHA); Low-Income Home Energy Assistance Program, *id.*

8    ¶23; HUD—OFPM, Bobbitt Decl. ¶13 (terminating nearly all positions).

9        Intra-agency transfers:  Agencies already reduced due to the illegal reorganization are

10   simultaneously having the functions of *other* agencies transferred to them.  In particular, the

11   functions of the Department of Education (targeted for elimination by a different Executive Order so

12   not a defendant here) are to be moved to agencies including the SBA.  *Infra.* at 24.  USAID (also a

13   different Executive Order) is being merged into the State Department.  *Infra* at 26.

14       These actions have caused and continue to cause Plaintiffs irreparable harm, including:

15       Harm to Unions and Others Representing Federal Employees.  Plaintiffs AFGE, AFSCME,

16   SEIU, and their locals are labor unions representing federal employees at agencies subject to the

17   President and OMB, OPM, and DOGE's orders, and are implementing ARRPs.  *See* App C.[23]  These

18   Plaintiffs' hundreds of thousands of federal employee members are directly impacted by Defendants'

19   unlawful acts.  Employees subject to RIFs by each Federal Agency Defendant will imminently lose

20   compensation, health benefits, and important work and careers as dedicated public servants; those

21   who remain will face "worse and harmful" working conditions.  Daly Decl. ¶30 (AFSCME).[24]

22

23       [23] Appendix C to this Motion is a chart identifying the agencies for which each Plaintiff asserts
     harm.  The chart identifies the agencies at which each of these unions represents federal employees.

24       [24] *AmeriCorps*: Blake ¶¶38-39 (AFSCME); Daly Decl. ¶¶30, 32, 36 (AFSCME); *USDA*: Blake
     ¶¶25-37 (AFSCME); Bachelder Decl. ¶17 (AFSCME); Kelley Decl. ¶3 (AFGE); Soldner Decl. ¶26

25   (AFGE); *Commerce*: Kelley Decl. ¶3 (AFGE); *Energy*: *id.* ¶3; *EPA*: *id.* ¶3; Dreyfus Decl. ¶15
     (AFGE); Neuman Decl. ¶8 (SEIU); *GSA*: Kelley Decl. ¶3 (AFGE); Fabris Decl. ¶33 (AFGE); *HHS*:

26   Kelley Decl. ¶3 (AFGE); Niemeier-Walsh Decl. ¶32 (AFGE); Neuman Decl. ¶8 (SEIU); *HUD*:
     Kelley Decl. ¶3 (AFGE); Bobbitt Decl. ¶37 (AFGE); *Interior*: Kelley Decl. ¶3 (AFGE); Cochran

27   Decl. ¶¶19-21 (AFGE); Neuman Decl. ¶8 (SEIU); *Labor*: Kelley Decl. ¶3 (AFGE); Gamble Decl.
     ¶15 (AFGE); *SBA*: Kelley Decl. ¶3 (AFGE); Gustafsson Decl. ¶16 (AFGE); *SSA*: Kelley Decl. ¶3

28   (AFGE); Wilson Decl. ¶¶6-9 (AFGE); Couture Decl. ¶4 (AFGE); *State*: Kelley Decl. ¶3 (AFGE);

1    Plaintiff AGU's members likewise include thousands of federal employee scientists.[25]  *See also* Shah

2    Decl. ¶11 (Common Defense; mass terminations disproportionately affect veteran members).[26]

3        *Harm to Other Unions and Their Members, Non-Profit Organizations, and Local*

4    *Governments*.  Plaintiffs summarize some of the harms they and their members will face from cuts to

5    agencies on which they and their members rely, arranged by Federal Agency Defendant:

6    **1.    AmeriCorps**

7        As explained above, in April, AmeriCorps sent RIF notices and placed immediately on leave

8    approximately 90% of its staff, locking them out of their computer systems.  Daly Decl. ¶¶14, 20-22

9    & Ex. A (AFSCME).  As the New York Times reported, the agency "has placed on administrative

10    leave almost all of its federal staff *at the direction of Elon Musk's cost-cutting team,* according to

11    people familiar with developments at the agency."[27]

12        These severe staffing cuts left the gutted agency "unable to complete the day-to-day work

13    required to keep the Agency running."  Id. ¶¶18, 26, 36.  As a result, educational funds to former

14    AmeriCorps participants are endangered, grantees will be left without assistance, and grants will not

15    be timely processed or renewed.  *Id.* ¶¶26, 28-29, 31.  Local governments and non-profits rely on

16    AmeriCorps to provide disaster relief, public health services and training, wildfire mitigation,

17    emergency management, and other programs, and will be left without assistance.  Dively Decl. ¶¶18-

18    20 (King County); Benjamin Decl. ¶39 (APHA).

19    **2.    Agriculture (USDA)**

20        In April, USDA Secretary Brooke Rollins warned employees that "USDA is pursuing an

21    aggressive plan to optimize its workforce by eliminating positions that are no longer necessary," that

22    RIFs were imminent, and that regional offices would be eliminated/consolidated, and headquarters

23    employees would be moved to rural communities.  Soldner Decl. ¶¶13-14 & Ex. B (AFGE);

---

Hunter Decl. ¶¶36-37 (AFGE); *Treasury*: Kelley Decl. ¶3 (AFGE); *VA*: Blake Decl. ¶45 (AFSCME);
Kelley Decl. ¶3 (AFGE); Burke Decl. ¶21 (AFGE); Bailey Decl. ¶¶20, 22 (SEIU).

[25] Shultz Decl. ¶¶5-6, 8-27 (USDA, Commerce, EPA, Energy, Interior, NSF).

[27] N.Y. Times, DOGE guts agency that organizes community service programs (April 17, 2025), available at:  https://www.nytimes.com/2025/04/17/us/politics/doge-cost-americorps-community-service.html.

1     Bachelder Decl. ¶11 & Ex. A (AFSCME).  "[S]ome employees have been told to expect the

2     department to cut back to fiscal 2019 staffing levels—which would lead to USDA slashing around

3     9,000 of its 98,000 employees—while others have been told there is an overall federal workforce

4     reduction number the administration has developed and the department will do its part proportionally

5     to meet that target."  Soldner Decl. Ex. B.  A USDA "executive" confirmed that DOGE, not USDA,

6     "was making the decisions on where cuts will take place."  *Id.*

7          Local governments will be directly impacted.  Counties that operate ports and airports or

8     otherwise receive imports rely on USDA to screen and seize prohibited or dangerous agricultural and

9     food products and to test animals for disease, inspect food for safety, conduct safety studies,

10    quarantine invasive pests, and disseminate critical information.  Barton Decl. ¶¶10-12 (Harris

11    County); Williams Decl. ¶¶25-28 (Santa Clara).  With reduced ability to rely on those services,

12    counties will face risks such as the spread of food-borne disease and avian flu and other public health

13    threats.  Barton Decl. ¶¶10-11 (Harris County); Williams Decl. ¶25 (Santa Clara); Dively Decl. ¶¶15-

14    17 (King County relies on USDA to reduce risk of bird impacts to airplanes and for food assistance).

15         Cuts to Forest Service staff will reduce park services and oversight of livestock grazing,

16    causing damage to habitats, the survival of sensitive species, and Plaintiffs' members' recreational

17    experience.  Molvar Decl. ¶¶28-33 (including on WWP-leased land); *see also* Williams Decl. ¶24

18    (Forest Service reductions will shift wildfire response burden to Santa Clara firefighting agencies);

19    Crispen Decl. ¶¶2-4 (San Francisco; same).  Reductions in USDA staffing will cause many other

20    serious harms to Plaintiffs.  *See* Davis Decl. ¶¶9-19, 21, 23-24 (NOFA; cuts will undermine organic

21    certification and standards, leading to unfair competition, and interfere with access to loans and other

22    programs, financially harming member farmers); O'Brien Decl. ¶¶17-19 (AFSCME members in K-

23    12 food service and child and adult care programs depend on effective processing of USDA funds);

24    Shultz Decl. ¶¶21-25 (AGU member scientists rely on USDA research, data, and expertise);

25    Bachelder Decl. ¶¶14-16, 19-20 (AFSCME) (cuts harm farmers, market participants, and public, who

26    rely on USDA information, including in relation to the beef trade and mad cow disease); Soldner

27    Decl. ¶¶19-21 (AFGE; cuts will compromise slaughterhouse and processing facility inspections, with

28    "serious implications for the safety and quality of meat, poultry, and eggs that Americans consume").

### 3.    Commerce

In March, the press began reporting that the Department of Commerce's National Oceanic and Atmospheric Administration ("NOAA") was planning to cut over 1000 positions or 20% of its staff, "as part of the Trump administration's mandate for agencies to prepare 'reductions in force,' according to multiple sources familiar with the matter."[28]  PBS also reported on the planned cuts, and that DOGE had listed "19 NOAA facilities for lease termination" including the Radar Operations Center, where the nation's Doppler radar network, which provides real-time weather data and operates 24 hours a day, is staffed.[29]

These cuts will be devastating to, and compromise public safety in, cities and counties that rely on NOAA's National Weather Service for detailed and real-time weather information, data, and expertise, and on the agency's assistance, including on-site, to support localities handling emergency weather events.  Williams Decl. ¶¶29-30 (Santa Clara); Velez Decl. ¶¶6-7, 11 (Chicago) Bechelli Decl. ¶4c (San Francisco).  Localities lack the capacity to make up for this loss and will be forced to rely on less-accurate private weather services, which could have "catastrophic life-safety ramifications."  Pena Decl. ¶¶7-9 (Harris County); *see* Velez Decl. ¶¶8, 10; Jue Decl. ¶3; Dively Decl. ¶22 (King County); Leach Decl. ¶¶20-21, 24. Plaintiff organizations' conservation, recovery, and environmental protection efforts will also be harmed, Molvar Decl. ¶¶23-27 (WWP); Neubacher Decl. ¶13 (CPANP), as will their members' scientific research, Shultz Decl. ¶¶5, 21-27 (AGU).

### 4.    Energy

The Department of Energy's March 13 ARRP, which was leaked, identified 43% of its staff as "non-essential."[30]  Braden Decl. ¶13 & Ex. C.  U.S. Senate Democrats released a fact sheet:

---

[28] ABC News, *NOAA braces for mass layoffs, fueling concerns about lifesaving weather services* (March 12, 2025), available at:  https://abcnews.go.com/Politics/noaa-braces-mass-layoffs-fueling-concerns-lifesaving-weather/story?id=119730398.

[29] PBS News, *As NOAA braces for more cuts, scientists say public safety is at risk* (March 14, 2025) available at: https://www.pbs.org/newshour/nation/as-noaa-braces-for-more-cuts-scientists-say-public-safety-is-at-risk; *see also* PBS News, *As NOAA shrinks under Trump's cuts, employees speak out* (April 16, 2025), available at:  https://www.pbs.org/newshour/politics/fired-rehired-and-fired-again-noaa-employees-are-caught-in-a-liminal-state.

[30] Federal News Network, *Energy Department extends hiring freeze, deems 43% workforce non-'essential' in reorganization plan* (Apr. 4, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/energy-department-extends-hiring-freeze-deems-43-workforce-non-essential-in-reorganization-plan/.

DOGE is reportedly proposing staffing cuts of up to 50% of the workforce at the Department of Energy (DOE), with new reductions in force (RIFs) hitting key priorities such as clean energy, grid resilience, and state and community programs the hardest while even targeting national security programs.

*Id.* ¶11 & Ex. A.  The cuts included 54% (1,800+ positions) to science and innovation programs; 61% (990+ positions) to energy infrastructure and deployment programs; 71% (3,000+ positions) to the Deputy Secretary's Office, environmental management programs, and other policy programs; 18% (540+ positions) to the Nuclear National Security Administration (NNSA); and 10% (520+ positions) to the Power Marketing Administrations (PMAs).  *Id.*

These planned cuts will undermine cities' building and vehicle electrification goals, leading to continued pollutant exposure in the community, and harm cities that depend on the Department's support for energy policy implementation.  Jue Decl. ¶¶5-6 (San Francisco); Leach Decl. ¶¶32-36 (Baltimore); *see also* Gabel Decl. ¶¶7, 12-13 (AFSCME; cuts will harm efforts to make homes energy efficient).  They will increase the risk of large-scale power outages throughout the country.  Braden Decl. ¶¶17, 19-20 (AFGE), and harm scientists including Plaintiff organizations' members who rely on the Department's research, data, and expertise.  Shultz Decl. ¶¶5, 21-27 (AGU).

**5.** <u>**Environmental Protection Agency (EPA)**</u>

On April 21, 2025, EPA began sending RIF notices to employees across its headquarters and regional offices, including the Office of Environmental Justice.  Dreyfus Decl.  ¶¶12-14, Exs. A-C (AFGE).  Both the President and EPA Administrator have stated that up to 65% of EPA's workforce could be cut, and the press reported that the Office of Research and Development, with 1,155 chemists, biologists, toxicologists and other scientists, will be dismantled.  Howell Decl. ¶¶8, 17, Exs. A, E (AFGE).  The New York Times reported:  "The strategy is part of large-scale layoffs, known as a 'reduction in force,' being planned by the Trump administration, which is intent on shrinking the federal work force."  *Id.*, Ex. E (AFGE).

These ongoing and planned cuts will render Plaintiff localities unable to depend on the expertise and support of EPA's scientists and engineers to remediate hazardous environmental conditions, Ige Decl. ¶¶25-28 (Chicago); to register pesticides and approve off-label uses for new invasive species, to protect farmers' crops, Williams Decl. ¶32 (Santa Clara).  *See also id.* ¶¶33-34

1    (Santa Clara depends on EPA tracking of hazardous waste shipments to ensure facilities manage

2    waste properly and to prepare for emergency response); Dively Decl. ¶¶29-32 (King County relies on

3    EPA staff to process and support grants and environmental initiatives, and for data and tools to reach

4    decarbonization targets and support climate planning; EPA reductions will impede implementation of

5    energy efficiency and conservation grant); Worthington Decl. ¶¶4, 6-8 (Chicago relies on EPA staff

6    for advice on brownfield inspections and remediation, toxic site clean-up, and complying with federal

7    requirements); Jue Decl. ¶4 (San Francisco relies on EPA research to electrify vehicles and

8    buildings); Leach Decl. ¶¶27-31 (Baltimore relies on EPA data and technical assistance for

9    environmental exposures and climate strategies); Dreyfus Decl. ¶16 (AFGE; RIFs will limit EPA's

10    work with tribal governments to ensure environmental regulations are observed across state borders);

11    Howell Decl. ¶¶18, 22 (AFGE; RIFs will hamstring mitigation of environmental hazards following

12    natural disasters like floods and wildfires, and cause loss of years of work in ongoing research and

13    likely need to euthanize lab animals); *id.* ¶¶17, 21 (AFGE; RIFs will harm states that rely on EPA for

14    management of Clean Water Act permits and guidance and oversight of state-managed programs and

15    undermine environmental justice efforts).

16    **6.** **General Services Administration (GSA)**

17         GSA has announced plans for a nearly 50% cut in staff and issued RIF notices throughout the

18    agency, including to more than 600 employees in the Public Buildings Service.  Fabris Decl. ¶¶23-25,

19    Exs. J-L (AFGE).[31] The RIFs to GSA's public buildings staff threaten the health and safety of federal

20    employees federal contractors, and all visitors to federal courthouses and other buildings throughout

21    the country.  *Id.* ¶¶28-32.  No employees remain to maintain fire protection systems, oversee water

22    testing for hazards, manage indoor air quality, supervise asbestos inspections, or address other health

23    or safety concerns.  *Id.*  In addition, SEIU represents hundreds of federally contracted janitors at GSA

24    locations as well as federal buildings at numerous other agencies who face layoffs if GSA staff are

25    laid off or locations are closed.  Adler Decl. ¶9 (SEIU); *see also id.* ¶7 (members laid off after U.S.

26

27

28         [31] *See, e.g.*, Gov't Exec., *GSA seeks 50% spending cuts, nonvoluntary RIF after OPM's resignation offer* (Feb. 4, 2025), available at:  https://federalnewsnetwork.com/hiring-retention/2025/02/gsa-seeks-50-spending-cuts-nonvoluntary-rif-after-opms-resignation-offer/.

1    Institute of Peace shuttered); *id.* ¶8 (contracted janitor layoffs imminent at DOL sites).

2    **7.    Health and Human Services (HHS)**

3    On March 27, 2025 HHS announced "a dramatic restructuring in accordance with President

4    Trump's Executive Order."  *Supra* at 4; *see also* Fact Sheet: HHS' Transformation (Mar. 27, 2025)

5    ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order");

6    Jacobs Decl. ¶14, Ex. B (AFGE).  HHS immediately noticed "a reduction in workforce of about

7    10,000 full-time employees who are part of this most recent transformation" with a total goal of

8    cutting 20,000 staff, including 3500 at the FDA, 2400 at the CDC, 1200 at NIH, and 300 at CMS; and

9    consolidating divisions and closing regional offices.  *Id.*  Secretary Kennedy attributed the cuts to the

10    President's Executive Order and DOGE.  *Supra* at 4.

11    Cities and counties depend on CDC laboratories that have been or will be weakened by RIFs,

12    including CDC's now-eliminated sexually transmitted disease ("STD") lab branch, without which

13    public health agencies will lose important information about antimicrobial resistant organisms and

14    STDs generally and may face difficulty in ensuring effective treatment and stopping further disease

15    transmission.  Philip Decl. ¶¶4-5, 7-8 (San Francisco).  Santa Clara relies on several CDC labs that

16    are the only ones capable of testing for certain infectious diseases; delays or disruptions in the CDC's

17    ability to test specimens or report results would produce information gaps and delays resulting in the

18    avoidable spread of infectious diseases.  Williams Decl. ¶¶38-39 (Santa Clara).

19    Municipalities depend on the CDC to help them control outbreaks of contagious diseases such

20    as measles.  Ige Decl. ¶¶7-11, 13-17 (Chicago); Philip Decl. ¶15 (San Francisco); Barton Decl. ¶¶20-

21    22 (Harris County), Williams Decl. ¶¶35-37, 39 (Santa Clara).  Yet the CDC staff responding to the

22    current measles outbreak in Texas were put on administrative leave.  Jacobs Decl. ¶27 (AFGE).

23    Localities also depend on the CDC to help serve certain rare and high-risk patients, Philip Decl. ¶14

24    (San Francisco); to train city staff to prevent the spread of diseases like HIV and syphilis, *id.* ¶6; to

25    provide personnel supporting an HIV treatment clinic, Dively Decl. ¶33(b) (King County); and for

26    maternal and infant health data, Ige Decl. ¶¶18-19 (Chicago).  *See also* Benjamin Decl. ¶¶16, 18-20

27    (APHA) (RIFs effectively shuttered CDC offices on injury control, birth defects, and smoking and

28    health; disrupted research on women's reproductive health and drug-resistant STDs; closed reference

1    laboratories critical to nationwide public health measures); O'Brien Decl. ¶¶12-13 (AFSCME).

2          Many of these effects are already being felt.  RIFs have caused CDC to cancel plans to

3    support Milwaukee public schools with lead exposure; severely hindered monitoring, testing, and

4    prevention efforts for communicable diseases; and endangered disease testing for first responders and

5    firefighters.  Benjamin Decl. ¶¶17, 25, 29-34 (APHA); *see* Ige Decl. ¶¶12-15 (Chicago: lost access to

6    HIV resources).  Decimation of the Center for Injury Prevention and Control halted updates to

7    guidance on diagnosing traumatic brain injury, Jacobs Decl. ¶24 (AFGE), and shut down critical data

8    systems, publications, and grants on drownings, opioid overdoses, and suicides, *id.* ¶¶24-25; *see also*

9    Barton Decl. ¶18 (Harris County; cessation of public health emergency preparedness calls); Leach

10    Decl. ¶¶37-38 (Baltimore; delayed response when seeking CDC guidance and feedback); Dively

11    Decl. ¶33(a) (King County; unable to reach HHS personnel that support public health grants,

12    requiring county to divert funds); Philip Decl. ¶12 (San Francisco; difficulty with grant reporting).

13          Nor is CDC the only HHS agency where RIFs have caused or will cause irreparable harm.

14    The Administration for Children and Families terminated every employee administering a program to

15    cover heating and cooling bills for millions of low-income households and eliminated the division

16    overseeing a case management system tracking child abuse and neglect.  Benjamin Decl. ¶¶22-23

17    (APHA); *see also* Neuman Decl. ¶21 (lack of approval for a Head Start grant will force layoffs of up

18    to 144 SEIU members and result in 1,200 children in Santa Clara losing childcare on July 1, 2025);

19    O'Brien Decl. ¶7 (delay in HHS grants will harm AFSCME members at Head Start Programs and

20    limit development services to children and families).  Layoffs at NIOSH shuttered a federal screening

21    program for black lung disease, Benjamin Decl. ¶25 (APHA); stopped routine mine safety

22    inspections, Jacobs Decl. ¶23 (AFGE); shut down the program that investigates and recommends

23    ways to reduce exposure to health hazards in workplaces, Niemeier-Walsh Decl. ¶¶24-27 (AFGE);

24    O'Brien Decl. ¶16; and left no one to continue research to reduce cancer risk among firefighters or

25    the risk of black lung disease among coal miners, Niemeier-Walsh Decl. ¶¶28-29 (AFGE); *see also*

26    Pena Decl. ¶¶21-22 (Harris County;  NIOSH information on causes of certain industrial fires can

27    inform future life-saving practices); O'Brien Decl. ¶15 (AFSCME members in medical fields rely on

28    NIOSH to certify respirators).  Closure of the Substance Abuse and Mental Health Services

1    Administration impairs resources on which therapists and substance abuse counselors rely.

2    Prendiville Decl. ¶¶12-14 (SEIU).  Layoffs of FDA administrative staff forced the postponement or

3    cancellation of site visits to inspect facilities.  Garthwaite Decl. ¶¶12-14 (AFGE).

4    **8.    <u>Housing and Urban Development (HUD)</u>**

5         In April, HUD commenced a RIF of positions in the Office of Field Policy and Management

6    ("FPM") throughout the country.  Bobbitt Decl. ¶¶13-14 (AFGE).  The FPM serves as the first point

7    of contact for HUD and housing-related questions and concerns within a community.  *Id.* ¶¶24-28.

8    Press reports staffing cuts of up to 50% and closed field offices.[32]  *Id.* ¶¶9-12 & Exs. A-B (AFGE).

9         These FPM cuts will drastically limit access to HUD services, in particular among vulnerable

10   populations like homeless veterans, seniors, and people with disabilities, and prevent effective

11   coordination of important community development efforts.  *Id.* ¶¶26-27.  Further RIFs will harm

12   states, cities, and counties that depend on HUD staff for technical assistance, grant administration,

13   and timely processing of housing assistance program applications and payments and authorizations

14   necessary for large-scale development projects; without those resources, housing instability will rise.

15   Williams Decl. ¶43 (Santa Clara); Leach Decl. ¶¶49-53 (Baltimore); Dively Decl. ¶38 (King

16   County); Wander Decl. ¶¶10-11 (SEIU); Neuman Decl. ¶51 (SEIU); O'Brien Decl. ¶¶39-40

17   (AFSCME).  Local governments receive from HUD millions of dollars in federal contracts, loans,

18   and grants that support community capital projects, affordable housing development, and disaster

19   recovery, any delay of which would divert local resources and increase housing instability.  Dively

20   Decl. ¶¶37-39 (King County); Leach ¶¶49-53 (Baltimore); *see also* Bobbitt Decl. ¶¶9, 11-12, 28

21   (AFGE; forthcoming RIFs will reduce support for disaster relief and homelessness, limit rental

22   assistance and support for public housing, and reduce housing discrimination investigations).

23   **9.    <u>Interior</u>**

24

25

---

26   [32] Associated Press, *Trump Administration looks to slash HUD workers tackling the housing crisis* (Feb. 15, 2025), available at:  https://apnews.com/article/doge-hud-trump-turner-affordable-housing-musk-0176c8539fa9b5959198c351c97b8652; Bloomberg News, *Trump Administration Plans to Eliminate Dozens of Housing Offices* (Mar. 5, 2025), available at:

27

28   https://www.bloomberg.com/news/articles/2025-03-05/hud-plans-to-eliminate-dozens-of-state-and-local-field-offices.

1    In April, sources leaked a "major reorganization" being led by DOGE.[33]  The Department

2    responded:  "under President Trump's leadership, we are implementing necessary reforms to ensure

3    fiscal responsibility, operational efficiency, and government accountability," and refused to

4    "comment on personnel matters." *Id*.  Shortly thereafter, the Secretary transferred authority for

5    complying with Executive Order 14210 and for the "consolidation, unification and optimization

6    efforts within the Department" to the DOGE Team.[34]  Soon after, additional reports broke regarding

7    upcoming RIFs.[35]  Neubacher Decl. ¶8 & Ex. B (CPANP).

8    Like other Department components, the National Park Service ("NPS") is already suffering

9    from reduced staffing.  *Id*. ¶¶5, 6 (CPANP).  Further cuts will force NPS employees who lose their

10   positions, and live in park housing, to relocate.  *Id*. ¶16.  Cuts will also undermine the agency's work

11   of protecting and preserving national parks, including by impacting threatened and endangered

12   species and sensitive ecological areas; harm the visitor experience, including leading to the closure of

13   areas, miles-long waits to enter parks, traffic problems, limitations on ranger tours and other

14   educational programs, and reduction of park hours; and threaten visitors' safety, including due to

15   trails and trees that are not properly maintained and longer emergency response times.  *Id*. ¶¶9-12, 14.

16   RIFs to the Interior Department will also harm WWP by impeding timely access to public

17   records necessary to accomplish its conservation mission; diminishing the Bureau of Land

18   Management's prevention of ecologically destructive grazing on federal lands; hindering WWP's

19   ability to research and obtain information for its conservation efforts; impacting the Fish and Wildlife

20   Service's ability to protect endangered species such as the Wyoming toad and Arctic grayling; and

21   causing other adverse effects that will decimate National Wildlife Refuges, harm WWP's ability to

22

23   [33] Politico Pro, *Major reorganization looms for Interior* (Apr. 10, 2025), available at:
     https://subscriber.politicopro.com/article/eenews/2025/04/10/major-reorganization-looms-for-
     interior-00283745.

24   [34] Dep't of Interior Order No. 3429, *Consolidation, Unification and Optimization of
     Administrative Functions* (Apr. 25, 2025), available at:  https://www.doi.gov/document-
25   library/secretary-order/so-3429-consolidation-unification-and-optimization-administrative; Gov't
     Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23, 2025),
26   available at: https://www.govexec.com/workforce/2025/04/interior-solicits-employees-resumes-
     preparation-widespread-layoffs/404786/.

27   [35] Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr.
     23, 2025), available at https://www.govexec.com/workforce/2025/04/interior-solicits-employees-
28   resumes-preparation-widespread-layoffs/404786/.

Add.169

1   protect native wildlife, and impede the enjoyment of land by WWP's staff and members.  Molvar

2   Decl. ¶¶6-8, 10-22, 39.  AGU members also depend on access to research, data, expertise, and grants

3   that will be impaired by Interior's layoffs.  Shultz Decl. ¶¶5, 21-27.

4         The cuts will also harm Plaintiff localities.  *See* Bechelli Decl. ¶4(d) (San Francisco relies on

5   U.S. Park Police to assist during emergencies and for incidents on federal property); Williams Decl.

6   ¶44 (Santa Clara relies on U.S. Geological Survey resources and guidance on earthquake hazards).

7   **10.    Labor**

8         In April, Labor sent RIF notices to the "vast majority" of the staff of the Office of Federal

9   Contract Compliance Programs ("OFCCP"), placing those staff immediately on administrative leave,

10  and telling employees they were being terminated "due to the agency's 'significantly reduced scope

11  of mission.'"[36]  The Department announced that more RIFs "should be expected" in the coming

12  weeks.[37] Gamble Decl. ¶14 & Ex. E (AFGE).

13        Cuts will make it impossible for the Department to continue to conduct OSHA workplace

14  safety inspections and mine inspections, increasing the likelihood of preventable workplace deaths

15  and injuries.  *Id*. ¶16 (AFGE); *see* Neuman Decl. ¶34 (SEIU) (OSHA likely will be unable to provide

16  crucial services and investigations, particularly to workers in dangerous jobs, including SEIU

17  members); O'Brien Decl. ¶¶21-28 (AFSCME.  The shutdown of the OFCCP has already harmed

18  employment prospects for veteran and disabled workers and left them vulnerable to

19  discrimination.  Levin Decl. ¶18 (AFGE); Gamble Decl. ¶16 (AFGE); Neuman Decl. ¶31 (SEIU).

20  Chicago's labor enforcement office also relies on the Department for coordination on training,

21  education and outreach, investigation, and enforcement.  Campos Decl. ¶¶3, 5-11.

22  **11.    National Labor Relations Board (NLRB)**

23        When the NLRB first submitted its ARRP, it told OMB it had determined it would not engage

24  in any RIF, because the employees' work was too essential to the agency's mission.  Chisholm Decl.,

25

26        [36] Bloomberg Law, *DOL puts contractor watchdog employees on leave as layoffs loom* (Apr. 16, 2025), available at:  https://news.bloomberglaw.com/daily-labor-report/dol-puts-contractor-watchdog-employees-on-leave-as-layoffs-loom; *see also*, *e.g.*, Neuman Decl. ¶¶29, 31 (SEIU).

27        [37] Bloomberg Law, *Lawmakers, workers push Chavez-DeRemer to stop labor DOGE cuts* (Apr. 14, 2025), available at:  https://news.bloomberglaw.com/daily-labor-report/lawmakers-workers-push-chavez-deremer-to-stop-labor-doge-cuts.

28

1    Ex. 1. But OMB reportedly rejected the NLRB's first ARRP and required the agency to submit a

2    new one proposing staff reductions including layoffs, which OMB is currently reviewing. *Id.*

3         Cuts will increase delays in enforcing labor laws and harm unions and workers who rely on

4    the NLRB. The average time between filing a charge and issuance of a complaint was already 120

5    days in 2023, and from complaint to decision was 330 days. Neuman Decl. ¶¶40-41 (SEIU). These

6    delays will get worse. *Id.*; O'Brien Decl. ¶48 (AFSCME members already experiencing delays).

7    When employers violate workers' rights without recourse or timely response, it chills union

8    organizing campaigns and bargaining. Neuman Decl. ¶38 (SEIU); O'Brien Decl. ¶48 (AFSCME).

9    **12.**     **National Science Foundation (NSF)**

10         NSF submitted an initial ARRP that did not include large-scale RIFs and instead relied on

11    voluntary separation offers to satisfy the Executive Order and OMB/OPM Memorandum. Soriano

12    Decl. ¶8 (AFGE). But OMB, OPM, and DOGE rejected that plan and instructed NSF to lay off half

13    of the agency's employees under "orders from the White House."[38] *Id.* ¶¶9-11.

14         Cutting NSF staff by half will have devasting effects on the development of scientific

15    research and technology. NSF provides funding to almost all scientific disciplines, and NSF-funded

16    projects have led to discoveries that form the basis of many important technologies, including the

17    Internet, artificial intelligence, electric batteries, and Magnetic Resonance Imaging ("MRI"). *Id.* ¶16.

18    RIFs will drastically limit the agency's ability to review proposals and provide funding for critical

19    research projects. *Id.* ¶¶17-19. They will harm WWP by interrupting or canceling studies on certain

20    species that WWP needs for its conservation efforts. Molvar Decl. ¶¶34-37. AGU's member

21    scientists also rely on NSF for research, data, funding, and expertise. Shultz Decl. ¶¶5, 21-26.

22    **13.**     **Small Business Administration (SBA)**

23         In March and April, SBA sent RIF notices to employees at the COVID-19 Economic Injury

24    Disaster Loan Serving Center, Office of Entrepreneurial Development, Office of Entrepreneurial

---

[38] Science, *Exclusive: NSF director to resign amid grant terminations, job cuts, and controversy* (Apr. 24, 2025), available at: https://www.science.org/content/article/nsf-director-to-resign-amid-grant-terminations-job-cuts-and-controversy.

1   Education, procurement office, and field, district, and branch offices.[39]  Gustafsson Decl. ¶¶8-9, 13

2   (AFGE).  The SBA then announced that as required by the President's Executive Order, "the agency

3   will reduce its workforce by 43%," cutting over 2700 jobs as a "strategic reorganization."[40]  The SBA

4   Administrator explained that the RIF plan "will be actioned in the coming weeks."[41]

5       The anticipated 43% reduction will cause significant delays to loans, disaster loan guarantees,

6   and other services.  Gustafsson Decl. ¶¶14, 17 (AFGE).  MSA members depend on low-interest loans

7   to rebuild after disasters like hurricanes or fires, and any delays compound financial harm to those

8   small businesses.  Phetteplace Decl. ¶10.  The cuts will harm localities as well: SBA provides disaster

9   assistance for San Francisco businesses, homeowners, and renters and without sufficient SBA staff

10  residents will be unable to access these funds, hindering rebuilding and recovery from disasters.

11  Bechelli Decl. ¶4(b); *see also* Dively Decl. ¶44 (King County similarly relies on SBA disaster loans).

12      Reduced SBA staff will also likely prevent small businesses from reaching SBA to modify

13  loans when facing repayment difficulty, causing defaults; make it harder to secure loan guarantees,

14  with ripple effects on contractors, suppliers, and employees; and harm small businesses that rely on

15  the SBA for government contracting opportunities, education, and affordable business consulting.

16  Phetteplace Decl. ¶¶11-16 (MSA); Gustafsson Decl. ¶17 (AFGE).  These harms will be compounded

17  by the reported transfer of student loan processing from the Department of Education to SBA, further

18  straining the dramatically reduced staff.  Neuman Decl. ¶43 (SEIU); O'Brien Decl. ¶41 (AFSCME).

19  This will inevitably cause billing issues and delays in processing Public Service Loan Forgiveness

20  applications and forbearance and loan repayment requests.  Neuman Decl. ¶¶43-46 (SEIU).

21  **14.    Social Security Administration (SSA)**

22      In April, the SSA confirmed it is "proceeding with plans that may include abolishment of

23  organizations and positions, directed reassignments, and reductions in force (RIF)."  Couture Decl.

24  ¶12.  The SSA had previously stated plans to implement the Executive Order via RIFs that "could

25  _____

26  [39] Gov't Exec., *SBA hit with more layoffs* (Apr. 18, 2025), available at:
https://www.govexec.com/workforce/2025/04/sba-hit-with-more-layoffs/404682/.

27  [40] SBA, *Small Business Administration Announces Agency-Wide Reorganization* (Mar. 21, 2025),
available at:  https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization.

28  [41] *Id.*

include abolishment of organizations and positions" and would "soon implement agency-wide organizational restructuring."[42]  *Id.*  DOGE posted 47 SSA field offices for sale, and the SSA ARRP was reported to include "field office consolidation" and cuts of approximately 5 to 7,000 employees.[43]  The Acting Commissioner discussed consolidation of regional offices and credited the reorganization as "support[ing] President Trump's priorities to streamline functions."  *Id.* ¶10 & Ex. D.  On April 4, the Washington Post reported SSA leaders were *directed* to provide OMB with a "more extensive RIF proposal."  *Id.* ¶13 & Ex. E.

Even before any RIFs, SSA was at a 50-year staffing low, with high average call wait times; only 84% of retirement, survivor, and Medicare claims timely processed; and only 43% of people receiving appointments within 28 days (down from 85% in 2020).  *Id.* ¶¶16-17.  During the past two months, benefits recipients or applicants have experienced longer wait times, difficulty accessing the SSA website to apply for benefits, and delays in making appointments.  Fiesta Decl. ¶¶7, 9-10 (ARA); *see also id.* ¶¶12, 16-18; Nelson Decl. ¶¶7-13 (AFSCME; appointment request denied after 11 calls and hours-long waits).  Only 39% of callers in March 2025 reached a representative, compared to 70% last year.  Fiesta Decl. ¶17 (ARA).  And the SSA website has crashed repeatedly.  *Id.* ¶¶13-15; Nelson Decl. ¶10 (AFSCME).

RIFs to SSA will worsen these issues.  Couture Decl. ¶¶20, 22, 25-26 (AFGE); Norman Decl. ¶¶16, 22 (AFGE); Fiesta Decl. ¶¶8, 13, 20, 21 (ARA); Nelson Decl. ¶18 (AFSCME); O'Brien Decl. ¶¶35-38 (AFSCME); Wells Decl. ¶¶20-28, 45 (former SSA official).  This will threaten access to benefits, with particularly detrimental effects on individuals with disabilities or beneficiaries who are defrauded, or scammed.  Wilson Decl. ¶15 (AFGE); Couture Decl. ¶22 (AFGE); Fiesta Decl. ¶¶8, 19, 21-23 (ARA); O'Brien Decl. ¶38 (AFSCME); Jefferies Decl. ¶¶12-14 (SEIU Local 1000).

**15.  State**

On April 22, 2025, the State Department announced a reorganization plan for domestic

---

[42] Press Release, Soc. Sec. Admin (Feb. 28, 2025), available at:  https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

[43] Gov't Exec., *SSA reorg plan contemplates field office closures, contradicting public statements* (Apr. 7, 2025), available at:  https://www.govexec.com/management/2025/04/ssa-reorg-plan-contemplates-field-office-closures-contradicting-public-statements/404369/.

operations, including significant consolidation and reorganization of bureaus and offices and

"reducing staff in domestic offices by 15 percent, consistent with the President's Workforce

Optimization Initiative." Hunter Decl. ¶¶21-25, Ex. I (AFGE).

       The proposed consolidation and elimination of staff will stop crucial diplomatic work, day-to-day operations assisting American citizens abroad who lose passports or face criminal prosecution, and promotion of American business interests abroad. *Id.* ¶33; McKeon Decl. ¶¶42, 45 (former State Department official). Cuts to the Department's programs focusing on democracy, human rights, refugees, and conflict stabilization operations "will inevitably be paid for in lives." Hunter Decl. ¶31 (AFGE). The proposed terminations of Special Envoys, Representatives, and Coordinators will hamper the Department's ability to respond to pressing issues like climate change, global criminal justice, hostage affairs, nuclear nonproliferation and geopolitically sensitive states like Iran, Sudan, and North Korea; and the dismantlement of the Counter Foreign Information Manipulation and Interference office eliminated a key tool to counter the sophisticated disinformation campaigns from foreign governments, such as Russia, Iran, and China. *Id.* ¶¶30, 32. The proposed reductions will also harm localities that depend on the State Department to ensure the security of events like the 2026 FIFA World Cup. Dively Decl. ¶13 (King County); *see also* Williams Decl. ¶¶18, 40.

### 16. <u>Treasury</u>

       In April, an internal IRS memorandum was leaked to the press detailing planned cuts of up to 40% of the IRS workforce, including approximately 60,000 to 70,000 positions, through bi-weekly RIF notices starting "this week."[44] The leaked ARRP included plans to cut up to 50% of IRS tax enforcement staff, and 20% across the board for other components of Treasury.[45]

       Reduction of IRS staff will harm taxpayers served by Plaintiff Center for Taxpayer Rights, including delaying tax refunds. Olson Decl. ¶29 (CTR). The staffing reduction and office closures

---

[44] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends* (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends; *see also* CNBC, *Tax attorneys say IRS has become a 'zombie' as agency cuts staff and halts audits of the wealthy* (Apr. 17, 2025), available at: https://www.cnbc.com/2025/04/17/irs-staff-cuts-fewer-audits-of-wealthy.html.

[45] Fed. News Network, *Treasury plans to cut up to 50% of IRS enforcement staff, 20% of other components* (Apr. 9, 2025), available at: https://federalnewsnetwork.com/reorganization/2025/04/treasury-plans-to-cut-up-to-50-of-irs-enforcement-staff-20-of-other-components/.

1    will injure taxpayers who rely on those services and prevent them from resolving account issues and

2    avoiding fines and/or levies. *Id.* ¶¶11-19, 34. For example, if a taxpayer can't reach an IRS

3    employee, or if their correspondence is not opened or processed, the IRS's automated collection

4    system will issue levies on bank accounts, or offset the next year's tax refund, automatically. *Id.*

5    ¶¶22-25. Other taxpayers will face severe risks as well. *See id.* ¶34; O'Brien Decl. ¶49 (AFSCME).

6    **17.**    <u>**Veterans Administration (VA)**</u>

7    In March, the VA issued a Memorandum that implements the President's Executive Order

8    and explains: "For planning purposes, the Department's initial objective is to return to our 2019 end-

9    strength numbers of 399,957 employees," which reflects an approximate cut of 80,000 jobs. Burke

10    Decl. ¶¶7-9, Ex. A (AFGE). VA Secretary Doug Collins confirmed this goal was "put out" by

11    President Trump and OPM. *Supra* at 5. The planned cuts will be implemented in stages including

12    "administrative and support roles"; "medical and healthcare support staff"; "regional and central

13    office staff"; and "field office and call center reductions." Burke Decl. ¶13, Ex. C (AFGE)

14    "Cutting 80,000 VA employees will cause immediate chaos across every aspect of VA,

15    including providing health care, helping veterans access other benefits, and processing claims." *Id.*

16    ¶16; *see also* Shah Decl. ¶¶14-22 (cuts will cause "mass disruption" to medical care); Bailey Decl.

17    ¶19. Staff threatened by RIFs manage patient information, take calls from veterans in crisis, clean

18    patient rooms, install and maintain fire suppression systems, conduct research studies, prevent

19    dangerous workplace conditions, and perform other critical work. Burke Decl. ¶¶18, 20 (AFGE); *see*

20    *also* Bailey Decl. ¶19. VA facilities are already short-staffed and further cuts will have catastrophic

21    consequences for veterans' health care access. *Id.* ¶¶19-20; Turner-Nichols Decl. ¶¶14, 16 (AFGE);

22    O'Brien Decl. ¶¶32-34 (AFSCME). Cuts to procurement staff will disrupt access to medical devices,

23    supplies, and mobility aids for VA medical centers and veterans. Burke Decl. ¶17 (AFGE).

24    Members of Plaintiffs Common Defense and VoteVets will be harmed by delaying or

25    curtailing VA services, cancellation of appointments, increasing wait times, raising barriers to

26    communication and scheduling of appointments, and reducing the quality of services. Shah Decl.

27    ¶¶12, 14-22 (CD); Eaton Decl. ¶¶2, 9 (VV). It will also harm Plaintiff localities, which depend on

28    VA hospitals to provide high-quality care, including mental health services, tailored to veterans, such

that disruptions to services will impose additional burdens on county hospitals and support services. Williams Decl. ¶46 (Santa Clara); *see also* Dively Decl. ¶42 (King County).

<div align="center">

**ARGUMENT**

</div>

**I.    This Court Should Enjoin Defendants' Implementation of Executive Order 14210 and the Resulting Agency RIF and Reorganization Plans**

A TRO is warranted when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65 (b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  All of these factors strongly favor Plaintiffs.

**A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the Executive Order and Agency Implementation are Unlawful**

**1.    Executive Order 14210 Violates Separation of Powers and is *Ultra Vires***

The President's actions must be authorized by the Constitution or an act of Congress. *Youngstown,* 343 U.S. at 585.  As in *Youngstown*, the President has bypassed and usurped the role of Congress:  "The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."  *Id.*  Because, as explained in detail below, sections 3(c), (e), (f) and 4 of the Workforce Executive Order are not authorized by the Constitution or any statute, the President's orders to dismantle federal agencies, including by "large-scale reductions in force," are unlawful. Notably, the President cited no specific statutory authority for this Order.  App. A at 1.

**a.    The President Has No Article II Authority to Reorganize Agencies**

The Constitution vests in Congress the legislative power to create the departments, agencies, and offices within the executive branch; to define their duties; and to fund their activities.  U.S. Const. art. I, §1 (legislative power); *INS v. Chadha*, 462 U.S. 919 (1983); *Myers*, 272 U.S. at 129; U.S. Const. art I, §8, cl. 18 (Necessary and Proper Clause).  By this legislative power Congress thus "control[s]" the very "existence of executive offices."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  Indeed, among Congress's very first acts were "establishing executive departments and staffs."  Gary Lawson, *Necessary and Proper Clause*, *The Heritage Guide to the Constitution*,

1  The Heritage Foundation.[46]  When the First Congress created the Treasury Department, for example,

2  it established therein "distinct offices—Secretary, Comptroller, Auditor, Treasurer and Register—and

3  their duties."  Harvey C. Mansfield, *Reorganizing the Federal Executive Branch: The Limits of*

4  *Institutionalization*, 35 L. & Contemp. Probs. 462, 463 (1970).

5  Those executive agencies of the federal government are defined by various statutes, including

6  5 U.S.C. §§101, 104, 105 (defining "agency" to include departments and agencies).  Each agency has

7  its own authorizing statutes that govern its administration and create the office of the agency head.

8  *See e.g.*, 10 U.S.C. §§111, 113 (Defense); 38 U.S.C. §§301, 303 (VA); 42 U.S.C. §§202, 203 (HHS);

9  42 U.S.C §§281, 282 (NIH); 42 U.S.C. §7131 (Energy).

10  The President's constitutional authority, by contrast, is set forth in Article II.  U.S. Const. art.

11  II §1, cl. 1.  The President has no constitutional legislative authority.  *Chadha*, 462 U.S. at 951, 956-

12  59; *Youngstown*, 343 U.S. at 635.  Thus, the President has no constitutional power to unilaterally

13  enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417,

14  438-39 (1998).  Rather than allowing the President to write or re-write statutes, the Constitution

15  instead requires that "[the President] shall take Care that the Laws be faithfully executed."  U.S.

16  Const. art. II, §3.  The Take Care Clause "refutes the idea that [the President] is to be a lawmaker.

17  The Constitution limits his functions in the lawmaking process to the recommending of laws he

18  thinks wise and the vetoing of laws he thinks bad."  *Youngstown*, 343 U.S. at 587.

19  And yet, the President does not execute the laws alone:  "He must execute them by the

20  assistance of subordinates."  *Myers,* 272 U.S. at 117.  "To aid him in the performance of these duties,

21  he is authorized to appoint certain officers, who act by his authority and in conformity with his

22  orders."  *Marbury v. Madison*, 5 U.S. 137, 166 (1803); *see also Seila L. LLC v. Consumer Fin. Prot.*

23  *Bureau*, 591 U.S. 197, 203-04 (2020) ("Because no single person could fulfill that responsibility

24  alone, the Framers expected that the President would rely on subordinate officers for assistance.").

25  The President's constitutional authority with respect to those who assist him in taking care

26  that the law is faithfully executed is established in the Appointments Clause which reads, "[t]he

27

28  ───────────────────
[46] Available at:  http://www.heritage.org/constitution/#!/articles/1/essays/59/necessary-and-proper-clause.

President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … [the] Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. art. II, §2, cl. 2. Even the removal of Senate-confirmed officers is subject to recognized constitutionally permissible constraints. *See Seila Law*, 591 U.S. at 204 (recognizing boundaries of Article II authority to remove appointed officers).

Article II authority has *never* been extended to the power to order the removal of rank-and-file federal employees, let alone order the wide-scale layoff of hundreds of thousands of positions authorized by Congress. *Id.* (reaffirming limits of Article II removal authority under *Morrison v. Olson*, 487 U.S. 654 (1988); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935); and *United States v. Perkins*, 116 U.S. 483, (1886)).[47] As the Supreme Court explained in *Free Enterprise Fund*:

> *Humphrey's Executor* did not address the removal of inferior officers, whose appointment Congress may vest in heads of departments. *If Congress does so, it is ordinarily the department head, rather than the President, who enjoys the power of removal*. This Court has upheld for-cause limitations on that power as well.

561 U.S. at 493 (emphasis added and citations omitted).

Article II does not give the President carte blanche authority over the structure or functions of the federal agencies created by Congress, either. Article II does not authorize the President to fundamentally reorganize the executive branch or restrict or abolish the congressionally authorized work of even a single agency that he did not establish. *See, e.g.*, *NTEU v. Vought*, 2025 WL 942772 (D.D.C. Mar. 28, 2025); 2025 WL 1144646, at *4 (D.D.C. Apr. 18, 2025) (affirming that the President lacks authority to dismantle agencies created by Congress). Congress has long understood the power to authorize reorganization both between and within agencies to be a legislative, not executive power. *Supra* at 8; *e.g.*, 5 U.S.C. §§901-905; *see also Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76, 78 (O.L.C. 1985) (recognizing "Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies within the Executive

---

[47] *See also Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16, 2025 Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Immediate Administrative Stay), at *27 (U.S. Solicitor General conceding *"Agency heads… control hiring and firing decisions for subordinates.*" (emphasis added)).

1    Branch"); *President's Authority To Promulgate a Reorganization Plan Involving the Equal*

2    *Employment Opportunity Commission*, Op. O.L.C. 248, 250 (1977) ("reorganization plan may not

3    transgress the limitations set forth in 5 U.S.C. §905").

4           President Trump is trying to accomplish by executive fiat the exact type of reorganization that

5    has long been understood to be solely within Congress's power to exercise or delegate.  The last

6    version of the (now-lapsed) reorganization authority enacted by Congress defined "reorganization

7    plan" to include the types of actions ordered by President Trump in the Workforce Executive Order

8    14210, including, in particular, the "abolition of all or a part of the functions of an agency" *other than*

9    *statutorily mandated programs, id.* §903(a)(2) ("except that no enforcement function or statutory

10   program shall be abolished by the plan").  There can be no real dispute that the orders contained in

11   the Workforce Executive Order are legislative, not executive in nature, and have not been delegated

12   to President Trump by the power Congress has not reactivated.

13          **b.**       **The President Has No Statutory Authority to Restructure Agencies**

14          The President does not employ the millions of federal employees; the agencies do.  5 U.S.C.

15   §3101 (employment authority for all agencies).  Congress has delegated authority to determine *which*

16   employees to employ and *how many* (consistent with appropriations) to the heads of the federal

17   agencies, not to the President, in agencies' various authorizing statutes.  *Id.*; AFGE v. OPM, N.D. Cal.

18   Case No. 3:25-cv-01780-WHA (ECF 132 at *9).

19          Congress has never delegated to the President the authority to make the decision to remove

20   federal employees, whether by way of a RIF or for any other reason.  Instead, Congress has delegated

21   to the President only *rule-making authority* to issue government-wide regulations consistent with

22   merit-systems principles required by Congress.  *E.g.*, 5 U.S.C. §2301 (delegating to President rule-

23   making authority "necessary to ensure that personnel management is based on and embodies the

24   merit system principles."); *id.* §3301 (regulations for efficiency of hiring); *id.* §3302 (authority to

25   create excepted service from usual competitive requirements); *id.* §7301 (regulations for "conduct" of

26   employees within federal executive branch).  The plain language of the authority to create rules for

27   the "conduct" of the people who are employed by the government does not extend to the authority *to*

28   *make them no longer employed*, and therefore no longer subject to such rules.  *Cf.  Nat'l Ass'n of*

MEM. SUPP. MOT. FOR TEMPORARY RESTRAINING ORDER, NO. 3:25-cv-03698-SI          32

1     *Mfrs. v. United States Dep't of Homeland Sec.*, 491 F.Supp.3d 549, 564 (N.D. Cal. 2020) (finding

2     "that Congress did not delegate authority to eviscerate portions of the statute in which the

3     Congressional delegation of power was made. Logic would so dictate.").

4           There is a statute within the Civil Service Reform Act ("CSRA") that imposes constraints on

5     how an agency can conduct a RIF, but it does not grant any authority to the President. That provision

6     delegates authority only to OPM, and only to make government-wide rules for the "order of

7     retention" that applies if agencies engage in such a reduction. 5 U.S.C. §3502. And, to the extent

8     that Congress designated OPM as the agency responsible for *procedural* implementation of the

9     President's rules (5 U.S.C. §1103), that statute nowhere provides the President (or OPM, *see infra*),

10     with authority to order agencies to implement wide-scale terminations of federal employees.

11           Nor has Congress delegated to the President the authority to transfer or excise specific

12     programs, functions, or offices that Congress established and placed within a specific agency's

13     statutory authority or discretion. Such a delegation would come dangerously close to the line-item

14     veto struck down as unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998). Many of

15     President Trump's recent actions effectively assume that line-item veto power, namely the power to

16     excise programs that do not fall within the President's desired vision (i.e., AmeriCorps).

17           Nor has Congress delegated to the President the authority to decide to remove agency

18     functions, offices or programs that are *not* statutorily authorized but were established by the agencies

19     in an exercise of the authority given *to them* by Congress. As discussed above, the 1977

20     Reorganization Act specifically defined the elimination of agency functions *other than statutorily*

21     *mandated programs* to require Congressional approval, as a *legislative* act. 5 U.S.C. §903(a)(2). The

22     President crosses a line defined by Congress, and enters into the legislative arena, when he orders all

23     federal agencies, across the board, to eliminate programs they created and budgeted for, and to

24     wholesale eliminate personnel and cut services, *regardless* of the agencies' respective needs, all in

25     service of the President's desire to reconfigure and shrink the government. No statute comes close to

26     authorizing that.[48] And to the extent Congress has previously ever delegated any authority to the

27

28

---

[48] Congress at times has imposed significant constraints even on the agencies' ability to reorganize themselves. *See, e.g.*, 26 U.S.C. §7802(d)(3)(C) (IRS: requiring approval by oversight

1    President to review and be involved in agency reorganizations in the past, as either general matter or

2    in any agency-specific way, those authorizations have long since expired.[49]

3          Finally, to the extent that programs, offices, and positions that the President is ordering federal

4    agencies to eliminate via these "large-scale" reductions and reorganizations are authorized by

5    Congress and funded through current appropriations, no statute delegates to the President the power

6    to direct the agencies to eliminate those functions or to cut spending.  To the extent the President's

7    order is directed at, in his words, "waste" and "bloat," the President lacks the authority to replace

8    Congress's "considered policy judgment" in appropriating funds for the agencies' approved budgets

9    for this workforce with his own.  *E.g.*, *Widakuswara v. Lake*, 2025 WL 1166400, at *15 (D.D.C. Apr.

10   22, 2025) ("defendants' unwillingness to expend funds in accordance with the congressional

11   appropriations laws is a direct affront to the power of the legislative branch"); *Aids Vaccine Advoc.*

12   *Coal. v. United States Dep't of State*, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (President

13   lacks authority "to rescind or defer the funds Congress has appropriated); *PFLAG, Inc. v. Trump*,

14   2025 WL 685124, at *19 (D. Md. Mar. 4, 2025) (President may not direct agencies to withhold

15   congressionally appropriated funds "in order to further an administrative policy"); *Nat'l Council of*

16   *Nonprofits v. OMB*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (OMB may not "interfer[e] with

17   Congress's appropriation of federal funds"); *New York v. Trump*, 2025 WL 357368, at *2 (D.R.I. Jan.

18   31, 2025) ("The Executive Branch has a duty to align federal spending and action with the will of the

19   people as expressed through congressional appropriations, not through 'Presidential priorities.'").

20         Thus, President Trump is now simply bypassing the Congressional authorization that his first-

21   term Administration admitted was necessary for the reorganization plan but which he has not

22   obtained, *supra* at 8.  The President lacks either constitutional or statutory authority to order agencies

23

24   _____
     board prior to any agency reorganization); 42 U.S.C. §281 (HHS: requiring Congressional notice

25   prior to reorganizing NIH); 38 U.S.C. §510 (VA: requiring Congressional approval before
     restructuring or downsizing personnel by more than 15% within any particular office).

26   [49] *See, e.g.,* 5 U.S.C. §901-905, discussed *supra* at 8; *see also* 6 U.S.C. §542 (authorizing
     President to reorganize for purposes of creating the Department of Homeland Security,

27   notwithstanding the requirements of 5 U.S.C. §905(b), now expired); 42 U.S.C. §8819 (authorizing
     President to "review periodically the progress of the Secretary of Agriculture and the Secretary of

28   Energy in carrying out the purposes [of the particular program]" and *apply to Congress to reorganize*
     pursuant to the now-expired "provisions of chapter 9 of title 5").

MEM. SUPP. MOT. FOR TEMPORARY RESTRAINING ORDER, NO. 3:25-cv-03698-SI          34

to act in the manner his Executive Order directs, and that Order is therefore ultra vires.  And where the government, including the President, takes ultra vires action, it is the proper constitutional role of this Court to declare that action unlawful.  *E.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (2023); *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden v. Sierra Club*, 142 S.Ct. 46 (2021); *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

This Court should thus hold this Administration's actions unlawful and ultra vires.  *See, e.g.*, *Pacito v. Trump*, 2025 WL 655075, at *11 (W.D. Wash. Feb. 28, 2025) (President Executive Order likely ultra vires); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, -- F.Supp.3d --, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025) (foreign aid executive order); *New York v. Trump*, 2025 WL 1098966 (D.R.I. Jan. 28, 2025) (executive order suspending federal financial assistance); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) (same).

### 2. OPM's, OMB's, and DOGE's Actions Implementing Executive Order 14210 Exceed Statutory Authority and Are *Ultra Vires*

Neither OMB, OPM, nor DOGE possesses authority to order agencies to reorganize, to engage in "large-scale" RIFs, or to usurp the decision-making authority delegated by Congress.

**a. OMB.**  Although OMB is housed within the Executive Office of the President, it was created by Congress.  *See* 31 U.S.C. §§501-507.[50]  OMB carries out statutorily mandated roles with respect to a variety of centralized functions, including budgeting, regulatory review, financial management, the promulgation of Executive Orders, and general management.  The OMB role with respect to Executive Orders is generally a procedural one (1 C.F.R. §19.2), unless the President includes a directive to OMB in an Executive Order, as he has done here.  OMB's authority with respect to financial and other management is generally limited to proposing policies, giving "advice" and making "recommendations" to agencies, along with long-range management planning.  31 U.S.C. §503.  To the extent that OMB assumes a role that goes beyond advising, making recommendations,

---

[50] As this Congressional Research Service Report explains, the roles played by OMB in faithfully implementing statutory authority and effectuating the President's policy can result in tension.  Cong. Rsch. Serv., RS21665, *Office of Management and Budget (OMB): An Overview* (2023).  Most of the roles played by OMB do not remotely authorize the actions here, including "budget formulation and execution;" "legislative coordination and clearance;" "information and regulatory affairs."  *Id*. at *2.

1    or gathering reports from agencies, but instead purports to direct and approve (or reject) agency

2    action, OMB crosses the line from clearinghouse or advisor to decision-maker—which Congress did

3    not authorize. *E.g.*, *Nat'l Council of Nonprofits v. OMB*, 1:25-cv-00239, 2025 WL 597959, at *15-16

4    (D.D.C. Feb. 25, 2025) (rejecting argument that OMB management role set forth in §503 authorizes

5    action implementing Executive Order freezing government spending).  And §503 does not give OMB

6    the authority to make significant decisions *for agencies* in the realm of agency organization, agency

7    functions or programs, or the size and scope of programs or staffing, particularly in light of the many

8    statutes delegating those functions to the agencies themselves.[51]

9          The Administration has already confirmed that OMB is acting as the final decision-maker

10    with respect to the content of the ARRPs.  First, the February 26, 2025 Memorandum unambiguously

11    provides "instruction" to submit the ARRPs for "approval."  App. B at 1, 3-4; *supra* at 12 (FOIA

12    request for ARRPs rejected as pre-decisional because "*none have been approved by OMB*."). Because

13    OMB lacks the authority to order federal agencies to downsize or reorganize, or to assume final

14    decision-making power by requiring agencies to submit such plans for OMB approval, its actions to

15    implement the President's Executive Order are ultra vires.

16         **b.**    **OPM.**  OPM similarly has no statutory authority to approve agency plans to

17    reorganize between or within agencies.  5 U.S.C. §§1101-1105.  Nor does it have authority to require

18    agencies to terminate workers, as this Court recently held.  *AFGE v. OPM*, No. 3:25-cv-01780-WHA

19    (N.D. Cal.), ECF No. 45 (Feb. 28, 2025 Order); ECF No. 132 (Mar. 14, 2025 Order); ECF No. 202

20    (Apr. 18, 2025 Order).  OPM's statutory authority with respect to RIFs consists of setting

21    government-wide order of retention rules for the release of employees in a RIF, *not making the*

22    *decision whether or how many employees to RIF*.  5 U.S.C. §3502.  OPM cannot order federal

23    agencies to downsize or reorganize, or assume final decision-making power.  OPM's actions in

24    implementing the President's Executive Order thus exceed any OPM authority and are ultra vires.

25

26

27

28

---

[51] OMB's authority to apportion congressional appropriations to federal agencies gives OMB reach across the executive branch, but that apportionment authority is narrowly limited to "prevent[ing] obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period," 31 U.S.C. §1512.

**c.** **DOGE.** DOGE was created by Executive Order and has no statutory authority at all. *See AFL-CIO v. Dep't of Labor*, Case No. 25-cv-00339-JDB (D.D.C. April 16, 2025 Order), ECF No. 78 ("defendants' motion to dismiss points to *no legal source* that grants USDS the authority to take these actions"); Exec. Order 14158 (Jan. 20, 2025). DOGE cannot cloak itself in authority the President lacks either. DOGE lacks any authority to order federal agencies to anything and its actions to implement the Executive Order therefore exceed any authority and are ultra vires.

**3.** **OPM's, OMB's, and DOGE's Actions Implementing Executive Order 14210 Also Violate the APA**

OPM, OMB, and DOGE are all agencies subject to the APA. *See* 5 U.S.C. §701(b)(1); *AFGE v. OPM*, N.D. Cal. Case No. 3:25-cv-01780-WHA (N.D. Cal.) (OPM); *NTEU v. Helfer*, 53 F.3d 1289, 1292-93 (D.C. Cir. 1995) (OPM)); *New York v. Trump*, 133 F.4th 51, 70 (1st Cir. 2025) (OMB); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *12-13 (OMB); *see also AFL-CIO v. Dep't of Lab.,* 2025 WL 1129227, at *45 n.19 (D.D.C. Apr. 16, 2025) ("Defendants do not contest that USDS is an agency—either for purposes of judicial review or APA review"); *AFSCME*, 2025 WL 868953, at *56 (analyzing whether USDS is "agency" including by reference to APA definition).

OPM and OMB's Memorandum requiring agencies to submit ARRPs, and OPM and OMB's "approvals" of ARRPs, are final agency actions that are reviewable under the APA. *See* 5 U.S.C. §704; *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("[F]inal agency actions, even if implementing an executive order, are subject to judicial review under the APA."). So are DOGE's directives ordering agencies to make staffing and spending cuts. Final agency action (1) marks the "consummation of the agency's decisionmaking process" and (2) is action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). The finality requirement is "interpreted in a pragmatic and flexible manner" that "focus[es] on the practical … effects of the agency action." *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (citation omitted).

Each action challenged here qualifies. OPM and OMB's Memorandum is final agency action because it is a "definitive statement of [OPM and OMB's] position" on the steps federal agencies must take to comply with Executive Order 14210, and it imposes obligations on federal agencies,

including to submit and implement ARRPs, with which "immediate compliance … is expected." *See id.*[52]  OPM and OMB's approvals of specific agencies' ARRPs are also independently final agency actions, because they are neither "tentative [n]or interlocutory," *Bennett*, 520 U.S. at 178, but rather final decisions approving the individual ARRPs pursuant to which each agency will conduct RIFs and restructuring.  *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *New York v. Trump*, 133 F.4th at 67-68.  DOGE's directives to specific agencies requiring cuts to programs and staffing are similarly final agency actions because they are the "consummation" of DOGE's decision-making process, with which "immediate compliance … is expected." *Id.* (citation omitted); *see supra* at 4, 11.

### a.    The OPM, OMB and DOGE actions exceed statutory authority

The APA prohibits agency action that exceeds statutory or constitutional authority or is otherwise not in accordance with law.  *See* 5 U.S.C. §706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra,* 123 F.4th 939, 944 (9th Cir. 2024) (under APA, vacating agency action that exceeded statutory authority); *Northwest Env't Advocates v. E.P.A.*, 537 F.3d 1006, 1025-27 (9th Cir. 2008) (same).  For the reasons discussed *supra* at 35-37, the OMB, OPM and DOGE actions issuing the Memorandum, exercising approval authority over ARRPs, and dictating cuts to agency staffing and functions exceed any authority those agencies possess and violate 5 U.S.C. §706(2)(A) and (C).

### b.    The OPM, OMB, and DOGE actions are arbitrary and capricious

OPM's, OMB's, and DOGE's actions are also arbitrary and capricious, in violation of 5 U.S.C. §706(2)(A).  The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency action must be both "reasonable and reasonably explained," *FCC v. Prometheus Radio*

---

[52] This Memorandum is final agency action even though "reviewing and approving individual" agency-specific ARRPs remains.  *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) (agencies' programmatic environmental assessment of offshore well treatments was final agency action even though agencies "will still have to approve permits from private entities .. before the treatments will … be used" and plaintiffs harmed); *Prutehi Litekyan: Save Ritidian*, 128 F.4th at 1108 ("a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party"); *Biden v. Texas*, 597 U.S. 785, 807-10 (2022) (DHS memo was final agency action).

1    *Project*, 592 U.S. 414, 423 (2021). An agency must "adequately consider[] all relevant factors," *Mt.*

2    *Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (citation omitted), and "articulate a

3    satisfactory explanation for its action including a rational connection between the facts found and the

4    choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

5    It is arbitrary and capricious for an agency to "entirely fail[] to consider [an] important aspect of the

6    problem." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (citation omitted). "It is a foundational

7    principle of administrative law that judicial review of agency action is limited to the grounds that the

8    agency invoked when it took the action." *Id.* at 20 (quotation omitted).

9         *OMB and OPM Memorandum and ARRP Approvals.* OMB and OPM's Memorandum and

10    approvals of ARRPs are the epitome of arbitrary and capricious action, for several reasons.

11         1. The time period provided by OMB and OPM to submit plans for massive layoffs and

12    restructuring (a mere *two weeks* for the initial plan that must identify agency-wide cuts) is absurdly

13    short and necessarily means that agencies could not engage in rational decision-making, as opposed

14    to simply following the desires of the President and his agents. *See, e.g.*, McKeon Decl. ¶¶7-45;

15    Hugler Decl. ¶¶7-21; Wells Decl. ¶¶39-47 (collectively, former government officials describing

16    complex agency deliberations and process required to plan RIFs).

17         2. OMB and OPM's mandate that all agencies engage in "large-scale RIFs" to achieve a

18    "significant reduction" in personnel and the "maximum elimination of functions" (in the name of

19    eliminating "bloat" and "waste"), is per se unreasonable and necessarily disregards important aspects

20    of the decision at issue, including the impacts on the agencies' ability to effectively perform their

21    statutory functions and requirements and the resulting consequences to the public, the economy, the

22    environment, or anything else.[53] App. B at 3-4; *see also infra* at 14-29.

---

23    [53] Although the Executive Order and Memorandum briefly acknowledge agencies are subject to

24    statutory authority, those caveats are "nothing more than window dressing." *New York v. Trump*, 133
      F.4th at 69; App. A §3(c); App. B at 2. The boilerplate references to statutory authority are

25    inherently incompatible with the directive to adhere to the Executive Order's and Memorandum's
      categorical RIF requirements. "Savings clauses are read in their context, and they cannot be given

26    effect when the Court, by rescuing the [legality] of a measure, would override clear and specific
      language." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (rejecting

27    Executive Order's caveat that agency actions be performed "consistent with law" because it
      conflicted with the order's unambiguous requirements). Additionally, Federal Agency Defendants'

28    extensive functions and obligations are governed by myriad statutes. The deadlines imposed do not

---

MEM. SUPP. MOT. FOR TEMPORARY RESTRAINING ORDER, NO. 3:25-cv-03698-SI    39

**Add.186**

3. OMB and OPM's categorical requirements that agencies engage in large-scale RIFs, in compliance with instructions to cut all programs the President (or his agents) has targeted, App. B at 4; *see also* App. A §3(c), and using 2019 Lapse Plan staffing levels as a baseline, App. B. at 2, are irrational and unmoored from any reasonable consideration of the relevant factors.  Requiring agencies to abolish all offices, programs, and operations identified by the President (or via his agents) necessarily requires agencies to ignore their complex array of statutory authority and obligations and effectively permits the President to wield power that he does not have.  Lapse Plan levels are an arbitrary starting point: *by definition*, they do not reflect staff levels for fully functioning agencies, *see supra* n. 17.  And using 2019 levels (the last year of the prior Trump Administration) is even more arbitrary.  Those levels have nothing to do with agencies' current needs and obligations.

These actions by OMB and OPM are neither "reasonable [nor] reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.  Indeed, they are patently *un*reasonable, given the harm and chaos they are causing.  *See supra* at 14-29.  The APA does not permit a "break it now, fix it later" method of governance.  Even if the Memorandum's stated goal were within OMB/OPM's authority (which it is not), OMB and OPM have provided no explanation, let alone a rational one, for their choice to accomplish that goal through a whirlwind, clandestine process that replaces considered agency decision-making with unqualified mandates and ignores countervailing considerations, including the repercussions that will necessarily result from abruptly abolishing vast swaths of government service and functions.  *See id.; League of California Cities v. FCC*, 118 F.4th 995, 1014 (9th Cir. 2024) (agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").  And OMB and OPM's categorical requirements necessarily preclude the federal agencies that are carrying out RIFs from engaging in reasoned decision-making that considers all important aspects of the decision as required by the APA.  *See infra* at 42-45.

*DOGE directives.*  The evidence (including the President's orders, public statements from

---

provide them anywhere near sufficient time to assess what staffing and programs are necessary to adequately provide statutorily required functions.  *See New York v. Trump*, 133 F.4th at 69.

agency officials, and statements from DOGE itself) establishes that DOGE is directing agencies to cut programs and personnel by imposing mandatory targets and using DOGE teams embedded at agencies to enforce those targets. DOGE's actions are neither reasonable nor reasonably explained. The public explanation provided by representatives of DOGE for its actions is "waste and fraud."[54] But none of the cuts to agency personnel and functions demanded by DOGE have any identified connection to "waste" or "fraud." As in other cases:

> [DOGE] has not even attempted to explain why a more tailored, measured, titrated approach is not suitable to the task. Instead, the government simply repeats its incantation of a need to modernize the system and uncover fraud. Its method of doing so is tantamount to hitting a fly with a sledgehammer.

*AFSCME v. Soc. Sec. Admin.*, 2025 WL 868953, at *68 (D. Md. Mar. 20, 2025). Again, even assuming for the sake of argument that DOGE has any authority here (which it does not), what DOGE's statements make clear is that DOGE has utterly failed to grapple with numerous important relevant aspects of the decision at hand, including the consequences that its directed cuts have for agencies' abilities to perform proper functions and obligations, the financial implications of these ham-handed decisions, and the resulting harms to the constituents the agencies serve and the public.

### c.     OPM and OMB failed to comply with notice-and-comment rulemaking

The APA requires OPM rules to go through a "notice-and-comment" process before enactment, so that the public can weigh in and the agency can consider the public's views. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); 5 U.S.C. §553; 5 U.S.C. §1103(b)(1), 1105 (OPM rules subject to APA). "Rule" is "defined broadly to include any 'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *Perez*, 575 U.S. at 95-96 (quoting 5 U.S.C. §551(4)). OPM and OMB's Memorandum and their decisions "approving" ARRPs are all "rules," because they "create[] new rights and impose[] new obligations" that federal agencies are required to follow. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1088 (9th Cir. 2003); *see Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009). Yet OMB and OPM indisputably failed to proceed through the

---

[54] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.

notice-and-comment rulemaking process before issuing the Memorandum and approvals. Those actions were therefore "without observance of procedure required by law" and invalid. 5 U.S.C §706(2)(D); *Chief Prob. Officers of Cal. v. Shalala*, 118 F.3d 1327, 1329 (9th Cir. 1997).

### 4.    Federal Agency Defendants Also Violate the APA

The Federal Agency Defendants named in this TRO Motion are currently or imminently implementing the ARRPs, including by terminating federal employees on a massive scale, shuttering entire agency programs, offices, and functions, and reorganizing and restructuring the remaining agency positions and functions. *See* Section **, *supra*.  Those actions to implement the ARRPs are all also final agency action under the APA, because they are the "consummation of [each] agency's decisionmaking process" to comply with the Executive Order, Memorandum, and/or DOGE directives and they determine the legal rights and obligations of, and have legal consequences for, thousands of federal employees. *See New York v. Trump*, 133 F.4th at 62-63, 67-68 (OMB memorandum *and* agency implementing action were both "final agency action" under APA).

Federal Agency Defendants' actions implementing the Workforce Executive Order are arbitrary and capricious for several reasons.

1. Agencies have ceded their decision-making authority to the President and his agents at OMB, OPM, and DOGE, and thereby have defied and ignored any applicable Congressional policy and intent. *See supra* at 9-29.

2. Adhering to the categorical objectives in the President's and his agents' orders necessarily precludes agencies from considering or relying on important relevant factors – including their own statutory, programmatic, and other functions and obligations; their own appropriated funds authorized by Congress; the negative impact on the federal civil servants they employ; and myriad harmful effects that the decimation of government services and functions will have on public health, national security, scientific and medical research, the economy, and the environment. *See supra,* 14-29.  An agency's desire to meet one goal "does not excuse the failure to address" the agency's other relevant requirements or obligations. *Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020).  But the Order prevents considering or prioritizing agency functions and public impacts, and agencies therefore "entirely fail[] to consider … important aspect[s] of the problem." *Regents of the Univ. of*

1    *Cal.*, 591 U.S. at 30 (citation omitted).

2    3.  Targeting 2019 Lapse Plan staffing levels and mandatory program reductions are

3    necessarily arbitrary and capricious.  "An agency's obligation to consider alternatives is well

4    settled[.]"  *Su*, 121 F.4th at 16-17 *see also Nat'l Urb. League*, 977 F.3d at 779.  But the pre-ordained

5    parameters prevent any reasoned assessment or pursuit of alternatives.

6    4.  Federal Agency Defendants' actions in abolishing fully funded agency offices, programs,

7    and functions (and their corresponding workforces) that the agencies previously implemented and

8    deemed necessary and important to performing the agencies' purposes are an abrupt reversal in

9    position.  Agencies that reverse established policies are required to "take[] into account" the "serious

10   reliance interests" in such policies and "weigh any such interests against competing policy concerns"

11   before acting.  *Regents of the Univ. of Cal.*, 591 U.S. at 30, 32 (quoting *Encino Motorcars, LLC v.*

12   *Navarro,* 579 U.S. 211, 221-22 (2016)).  "It would be arbitrary and capricious to ignore such

13   matters." *Id.* (quotation omitted).  Here, the directives of the President and his agents prevent any

14   consideration of or accommodation for reliance interests.

15   5. Federal Agency Defendants' elimination of longstanding programs and the workforces

16   needed to carry out those programs is also insufficiently explained.  An agency that reverses its

17   position is required to "display awareness that it is changing position" and "show that there are good

18   reasons for the new policy." *Encino Motorc*ars, 579 U.S. at 221 (citation omitted); *League of*

19   *California Cities*, 118 F.4th at 1014.  But Federal Agency Defendants have provided no "good

20   reasons" for their new position that programs and workforces that have existed for decades are no

21   longer important to performing the agencies' functions.  Indeed, by refusing to make ARRPs public,

22   these agencies have failed to provide *any* reasoned explanation for their actions.  They are not entitled

23   to any presumption of regularity for their irrational and unexplained about-face.

24   6. The short deadlines in which Federal Agency Defendants were required to make RIF

25   determinations prevented any meaningful consideration of relevant factors, and the oversight

26   authority exercised by OPM and OMB would override attempts to depart from the categorical

27   requirements based on other relevant considerations.  *See Nat'l Council of Nonprofits*, 2025 WL

28   597959, at *7 (rejecting contention that "countless federal agencies ... suddenly began exercising

their own discretion to suspend funding across the board at the exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record"); *New York v. Trump*, 133 F.4th at 68 (affirming conclusion that "any suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions was 'disingenuous'").[55] "A court is not required to exhibit a naiveté from which ordinary citizens are free." *New York*, 133 F.4th at 68.

For all of those reasons, Federal Agency Defendants' actions carrying out the President and his agents' orders are neither reasonable nor reasonably explained. Courts have enjoined similar arbitrary and capricious conduct by agencies blindly following the President's unlawful orders.[56]

### 5. This Court Has Jurisdiction to Hear These Claims

#### a. All Plaintiffs Have Article III Standing

While all Plaintiffs have standing, this Court can proceed upon finding that even a single plaintiff does. *See Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013).

The union Plaintiffs have standing on behalf of their members. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681 (9th Cir. 2023) (associational standing standard). Union Plaintiffs' members include many federal employees who have suffered, or imminently will suffer, termination due to the RIFs, and so have lost or will lose salaries, health insurance, and other benefits, and will face moving expenses, new job searches, and in some cases

---

[55] Courts have rejected this Administration's attempts to blame agencies for action the Administration required them to take. *See AFGE v. OPM*, N.D. Cal. Case No. 25-cv-01780-WHA, ECF Nos. 44, 45, 120, 132 (OPM, not federal agencies, ordered terminations of probationary employees); *Supra at **.*

[56] *See Widakuswara v. Lake*, 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025) ("[D]efendants had no method or approach … that this Court can discern. They took immediate and drastic action to slash USAGM, without considering its statutorily or constitutionally required functions … and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world. It is hard to fathom a more straightforward display of arbitrary and capricious actions[.]"); *New York*, 2025 WL 715621, at *8-9 (agencies' funding freezes pursuant to executive order arbitrary and capricious because the record "does not suggest that agencies made individualized assessments … before making the determination to blanketly pause … funds"); *New York*, 133 F.4th at 70 ("categorical" funding freezes likely arbitrary and capricious:"given their breadth and immediacy, [they] were likely not supported by rational reasons and [the agencies] failed to consider meaningfully important aspects of the problem"); *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 ("Plaintiffs allege that OMB's funding freeze … failed to consider the disastrous effects it would have. Defendants … insist that … it is done "to ensure compliance with the President's priorities.' But furthering the President's wishes cannot be a blank check for OMB to do as it pleases. The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision.").

severe emotional distress.[57]  The members who remain employed will face overwork and worsened

conditions.[58]  And AFSCME and SEIU also represent state, county, city, and private sector

employees who will suffer direct injuries from implementation of the ARRPs.  *Supra* at 13.  The

union Plaintiffs also have standing to sue in their own right because the government's "behavior has

frustrated [their] mission and caused [them] to divert resources in response to that frustration of

purpose." *Fellowship of Christian Athletes*, 82 F.4th at 681 (citation omitted).  The RIFs "directly

affect[] and interfere[] with [the unions'] core business activities," which include representing and

providing counseling and assistance to all federal employees in the unions' bargaining units. *Food &*

*Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 395 (2024).[59]

The non-profit organization Plaintiffs similarly have standing to sue on behalf of their

members and in their own right.  The accompanying declarations demonstrate that their members

have been and will be harmed by the loss of government services resulting from Defendants'

elimination of agency staff, functions, and programs.[60]  That harm includes, for example, public

health official members of APHA who are left without critical CDC support; AGU scientist members

who face the loss of access to critical data and research from numerous federal agencies; retiree

members of ARA facing barriers getting through to the SSA; small business members of MSA who

face delays in obtaining loans and loan guarantees and the loss of support; and members of veterans

groups facing delays and detriment to services.  Benjamin Decl. ¶¶27-31 (APHA); Shultz Decl. ¶¶5,

21-27 (AGU); Fiesta Decl. ¶¶5-9, 20-23 (ARA); Phetteplace Decl. ¶¶2-3, 6, 9-15 (MSA); Eaton Decl.

---

[57]  *See* App. C; Kelley Decl. (AFGE) ¶¶2-3, 22, 24, 25; Blake Decl ¶¶9-45 (AFSCME); Cochran Decl. ¶21; Norman Decl. ¶15 (AFGE); Howell Decl. ¶¶15, 23 (AFGE); Wilson Decl. ¶¶13, 16 (AFGE); Turner-Nichols Decl. ¶¶10, 12 (AFGE).

[58]  *See, e.g.*, Fabris Decl. ¶¶28-33 (AFGE); Wilson Decl. ¶¶12-14 (AFGE); Hunter Decl. ¶37 (AFGE); Bailey Decl. ¶¶20, 22 (SEIU).

[59]  Kelley Decl. ¶¶10-15, 16-21; Levin Decl. ¶20; Dreyfus Decl. ¶17; Gustafsson Decl. ¶16; Fabris Decl. ¶33; Niemeier-Walsh Decl. ¶32; Soldner Decl. ¶25; Bobbitt Decl. ¶37; Braden Decl. ¶21; Bachelder Decl. ¶21; Norman Decl. ¶18; Wilson Decl. ¶17; Daly Decl. ¶32. Union Plaintiffs are also harmed because they will lose members and funding from lack of dues. Kelley Decl. ¶¶16-21; Gamble Decl. ¶17; Dreyfus Decl. ¶¶18-20; Gustafsson Decl. ¶19; Levin Decl. ¶23; Fabris Decl. ¶34; Niemeier-Walsh Decl. ¶33; Soldner Decl. ¶¶23-24; Bobbitt Decl. ¶38; Braden Decl. ¶22; Bachelder Decl. ¶24; Daly Decl. ¶34; Norman Decl. ¶¶20-21; Turner-Nichols Decl. ¶13; Bailey Decl. ¶¶22, 24.

[60]  *See, e.g.*, Olson Decl. ¶¶16, 26, 28-29, 36-39 (CTR); Shah Decl. ¶¶14-22 (Common Defense); Molvar Decl. ¶¶39, 40 (WWP); Davis Decl. ¶¶30, 32-41 (NOFA); Neubacher Decl. ¶10 (CPANP).

¶¶2, 9 (VV).  The organizations are also suffering organizational injury from the RIFs and

reorganization.[61]  AGU also has federal employee members at risk of job loss and increased workload

burdens due to RIFs.  Shultz Decl. ¶¶5-6, 12, 13-20.  These declarations show actual harm as well as

a "substantial risk" of additional harm, either of which is sufficient.  *See Robins v. Spokeo*, 867 F.3d

1108, 1117-18 (9th Cir. 2017); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (future

injury suffices "if … there is a substantial risk that the harm will occur"); *San Diego Cnty. Credit

Union v. Citizens Equity-First Credit Union*, 65 F.4th 1012, 1025 (9th Cir. 2023) (same).[62]

     The local government Plaintiffs have standing to "protect [their] own proprietary interests…

as varied as a municipality's responsibilities, powers, and assets."  *City of Sausalito v. O'Neill*, 386

F.3d 1186, 1197-98 (9th Cir. 2004).  These Plaintiffs are incurring current and imminent harm cuts to

the federal staff services that they rely on, including, for example, USDA screening of dangerous

products at ports of entry, safety-essential weather forecasts from NOAA, irreplaceable CDC

laboratory resources and support for controlling disease outbreaks, and HUD resources to support

housing assistance and prevent instability—any one of which could present life-threatening and other

serious risks to residents, and many of which will impose serious additional costs.  *See supra,* 14-29.

     Finally, Plaintiffs have standing for their procedural claims, because they would have

submitted comments had Defendants properly engaged in notice-and-comment rulemaking.[63]

### b.    No Plaintiff is Required to Channel These Claims

     This Court has subject matter jurisdiction to hear these federal claims pursuant to 28 U.S.C.

---

[61] *See* Shultz Decl. ¶¶9, 26, 28-29 (AGU; lost revenue and advancement of science that is AGU's mission, due to cuts at USDA, NOAA, DOE, EPA, NSF), ¶30 (resource diversion, pivoting away from priorities); Benjamin ¶33 (APHA: loss of data collection tools, scientific research), 37-38 (diversion of resources to fill gaps in public health advice and information), 41 (revenue loss); Olson Decl. ¶¶40-43 (CTR; resource diversion, overburdened staff); Shah Decl. ¶23 (Common Defense; resource diversion, harming ability to provide services); Davis Decl. ¶43 (same); Eaton Decl. ¶11 (VoteVets; same, plus increased operating costs); Molvar Decl. ¶¶6-8, 10-22 (WWP; lost data and research it relies on for its conservation mission); Neubacher Decl. ¶17 (CPANP); Fiesta Decl. ¶10 (ARA).

[62] This case is nothing like *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), in which the plaintiffs' theory of future injury and causation relied on a "highly attenuated chain of possibilities" that required five separate and "speculative" events by independent actors to occur before the challenged statute would even affect the plaintiffs.

[63] *See, e.g.*, Howell Decl. ¶25 (AFGE); Schelling Soldner Decl. ¶27 (AFGE); Jacobs Decl. ¶37 (AFGE); Hunter Decl. ¶40 (AFGE); Soriano Decl. ¶24 (AFGE); Couture Decl. ¶25 (AFGE); Shah Decl. ¶27 (Common Defense); Fiesta Decl. ¶24 (ARA); Neubacher Decl. ¶18 (CPANP); Leach Decl. ¶54 (Baltimore); Williams Decl. ¶47 (Santa Clara).

1   §1331. Defendants may argue, as the Administration has elsewhere, that this Court lacks jurisdiction

2   on the theory that Congress impliedly "channeled" these claims into an administrative adjudicatory

3   scheme under the CSRA (via the Merit Systems Protection Board, "MSPB") or the Federal Service

4   Labor-Management Relations Statute ("FSLMRS") (via the Federal Labor Relations Authority,

5   "FLRA"), *before* they may be heard in federal court, under the doctrine established by *Thunder Basin*

6   *Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994). Plaintiffs are likely to succeed, because Congress

7   that created the civil service protections set forth in the CSRA and FSLMRS did not silently foreclose

8   judicial review when the Administration engages in a wholesale dismantling of federal agencies.

9        i. As a threshold matter, the administrative agencies at issue were never designed to handle

10  claims involving (1) the President, (2) OPM, (3) OMB, or (4) DOGE, *or* (5) agency action

11  effectuating government-wide Presidential orders, whether under the APA or ultra vires doctrine.

12  The MSPB hears employee appeals from specific adverse personnel actions by employing agencies. 5

13  U.S.C. §7701; *id.* §7703. The FLRA hears bargaining unit-specific matters that *expressly exclude*

14  government-wide action.  *NTEU and Dep't of Treasury, IRS*, 60 F.L.R.A. 783, 783 (2005) (FLRA

15  lacks jurisdiction to consider challenges to government-wide rules); *see also* 5 U.S.C. §7117(a)(1)

16  (duty to bargain excludes "Government-wide rule or regulation"). Implied doctrines must, of course,

17  remain grounded in and faithful to text.  *E.g., Loper Bright Enterprises v. Raimondo*, 603 U.S. 369,

18  391-92 (2024); *see also Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction

19  conferred by 28 U.S.C. §1331 should hold firm against 'mere implication flowing from subsequent

20  legislation.'").[64]  There is no basis anywhere in text to conclude that the types of claims Plaintiffs

21  assert were ever intended for these agencies.  *See, e.g.*, *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10

22  (2012) (noting that Congress created an administrative scheme for some claims by "*covered*

23  *employees* appealing *covered agency actions*" (emphasis added)).  Thus, recent decisions have agreed

24  that government-wide action, or agency dismantling, are not channeled.  *E.g., AFGE,* 2025 WL

25  900057, at *2; *see also Widakuswara v. Lake*, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025).

26        ii. *Union Plaintiffs*.  As in the recent *AFGE v. OPM* case, and other union cases challenging

---

[64]  *See also Axon Enters., Inc.  v.  FTC*, 598  U.S.  175,  217  (2023). (Gorsuch, J., concurring) ("Respectfully, this Court should be done with the *Thunder Basin* project.  I hope it will be soon.").

the dismantling of agencies, these are not the type of claims that are properly sent to the MSPB or the

FLRA. *OPM*, *supra*; *Widakuswara, supra*. An early challenge to a variety of actions by the

President (including the Workforce Executive Order) brought by other unions that asserted limited

claims based on impact on bargaining rights and their own financial harm was held to raise labor

disputes that should be heard by the FLRA in the first instance. *NTEU v. Trump*., 2025 WL 561080,

at *1 (D.D.C. Feb. 20, 2025).[65] Plaintiffs bring entirely different claims here. And the Ninth Circuit

has *never* channeled any case other than an employee's individual claim against their employing

agency.[66] It certainly has never channeled an ultra vires or APA claim challenging government-wide

orders of any sort, nor any claim against the President, OPM, OMB, or DOGE. *See also Feds for*

*Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir.) (en banc), *judgment vac'd on other grounds*, 144 S.

Ct. 480 (2023) (rejecting channeling of challenge to Presidential mandate).

   iii. *Non-Union Organizations and Local Government Plaintiffs*. Organizations and

government entities are not silently barred from bringing systemic challenges to unlawful

government acts in federal court. *See AFGE v. OPM*., 2025 WL 914823, at *1 (9th Cir. Mar. 26,

2025) ("Nor have appellants demonstrated—under existing authority—that they are likely to establish

that Congress has channeled the organizational plaintiffs' claims to administrative agencies.");[67]

*Maryland v. USDA*, 2025 WL 973159, at *15 (D. Md. Apr. 1, 2025) (states' claims not channeled).

   For purposes of this TRO motion, under governing Ninth Circuit law, Plaintiffs have more

than a likely chance of success of defeating any argument that these claims are "channeled."

**B.**  **Defendants Are Causing, and Will Continue to Cause, Irreparable Harm**

   First, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"

*Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *Rodriguez v. Robbins*,

---

[65] That case contended that agencies were going to violate RIF regulations regarding employee retention requirements, which that court believed could be heard by the FLRA. *Id.*

[66] *E.g.*, *Veit v. Heckler*, 746 F.2d 508, 510-11 (9th Cir. 1984) (federal employee's claims against his employing agency challenging a personnel action).

[67] The Supreme Court's stay in the probationary employees case did not endorse the Administration's channeling arguments. *OPM v. AFGE*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025). Alsup ultimately rejected these argument, with respect to unions, non-profits, and the State of Washington. *AFGE v. OPM*, Case 2025 WL 900057, at *2 (N.D. Cal. Mar. 24, 2025); 2025 WL 660053, at *8 (N.D. Cal. Feb. 28, 2025); (ECF No. 88, Order Granting Leave to Amend).

715 F.3d 1127, 1144-45 (9th Cir. 2013).  Where executive action causes constitutional injuries, injunctive relief is appropriate.  *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017). These principles apply to structural separation of powers violations.  *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537-38 (N.D. Cal. 2017).  Second, the union and other Plaintiffs' federal employee members who have been or will be terminated face irreparable injury from losing their wages and health benefits for themselves and their families and in many cases needing to relocate. *See supra* at 14; *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health coverage).  Damages are not available in APA cases, making this monetary harm irreparable.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020).[68]

Third, the non-profit organization Plaintiffs' members, and SEIU and AFSCME's non-federal members, face irreparable injury from the disruption of critical government services, including high risks of environmental degradation, impairment of scientific research, risks to public health, nonenforcement of safety and labor standards, and lack of timely access to government benefits.  *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("[E]nvironmental injury, by its nature, … is … irreparable.") (citation omitted); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (loss of government benefits); *supra*, 14-29. Fourth, the local government Plaintiffs face irreparable harm from the loss of federal services, information, and support, without which they cannot effectively provide government services and protect their populations, and which will require substantial resource diversion and threaten the welfare of their citizens.  *See supra* at 14-29.  Fifth, the union and other non-profit organization Plaintiffs are suffering irreparable organizational injury, because Defendants' actions are interfering with their organizational missions and forcing unexpected and immediate diversion of substantial resources.  *See supra* at 14-29.   Finally, the lack of public rulemaking injured Plaintiffs who would have participated.  *See supra* at n.63; *NTEU v. Newman*, 768 F.Supp. 8, 10 (D.D.C. 1991)

---

[68] Those who remain employed will have more work, *see supra* at 13, in federal buildings that no longer can guarantee healthful and safe conditions, *see* Fabris Decl. ¶¶28-33 (GSA).

### C. The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor

The equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor Plaintiffs. Preserving constitutional and statutory rights "is always in the public interest." *Melendres*, 695 F.3d at 1002; *see also NTEU v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F.Supp.2d 56, 66 (D.D.C. 2004). The severe threats to the public presented by Defendants' actions necessitate a temporary pause to protect the status quo. *Supra* at 14-29. By contrast, the government will suffer no harm from halting employee terminations and reorganizing, and will function (indeed function better) if the status quo is maintained.

## II. Scope of the Order: Require an Immediate Halt to Approvals and the ARRPs

Plaintiffs request that the Court temporarily restrain and enjoin OMB, OPM, DOGE, and the Federal Agency Defendants from any further implementation or enforcement of Executive Order 14210 or the OMB and OPM Memorandum, including any further approvals of ARRPs, as set forth in the accompanying Proposed Order. This temporary relief is appropriate to maintain the status quo. *See Fellowship of Christian Athletes*, 82 F.4th at 684-85; *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Pausing enforcement and implementation of the challenged Administration orders will halt further RIFs and reorganizations, and thus will help maintain the last "uncontested status" between the parties that preceded this case. *Goto.com, Inc.*, 202 F.3d at 1210. The scope of the relief is appropriate because Plaintiffs have demonstrated that they are suffering irreparable injury from the actions of each of the Federal Agency Defendants named in this motion. Plaintiffs further request that the Court order that OMB and OPM immediately provide to the Court and to Plaintiffs the Federal Defendant Agency ARRPs, which Defendants have to date kept secret. There is good cause for this narrow, expedited discovery to assist the Court in evaluating the illegality of these plans. *See* Fed. R. Civ. P. 26(d); *Eurofins Elec. & Elec. Testing NA, LLC v. SGS N. Am. Inc.*, No. 5:24-CV-06340-EJD, 2024 WL 4453315, at *1 (N.D. Cal. Oct. 8, 2024) (good cause for expedited discovery to assist court evaluating preliminary injunction).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and

1    enter the accompanying proposed temporary restraining order and/or an order to show cause.

2

3    DATED: May 1, 2025                          Stacey M. Leyton
                                                 Barbara J. Chisholm
4                                                Danielle E. Leonard
                                                 Corinne Johnson
5                                                Alice X. Wang
                                                 Robin S. Tholin
6                                                ALTSHULER BERZON LLP
                                                 177 Post St., Suite 300
7                                                San Francisco, CA 94108
                                                 Tel: (415) 421-7151
8                                                sleyton@altshulerberzon.com
                                                 bchisholm@altshulerberzon.com
9                                                dleonard@altshulerberzon.com

10

11                                       By: */s/ Danielle Leonard*

12                                           *Attorneys for All Union and Non-Profit Organization*
                                             *Plaintiffs*
13

14                                           Elena Goldstein (pro hac vice)
                                             Skye Perryman (pro hac vice)
15                                           DEMOCRACY FORWARD FOUNDATION
                                             P.O. Box 34553
16                                           Washington, D.C. 20043
                                             Tel: (202) 448-9090
17                                           Fax: (202) 796-4426
                                             egoldstein@democracyforward.org
18                                           sperryman@democracyforward.org
19

20                                       By: */s/ Elena Goldstein*

21                                           *Attorneys for All Union and Non-Profit Organization*
                                             *Plaintiffs (except NRDC) and for Plaintiffs City of*
22                                           *Chicago, IL; Martin Luther King, Jr. County, WA;*
                                             *Harris County, TX; and City of Baltimore, MD*
23

24

25                                           Jules Torti (pro hac vice)
                                             PROTECT DEMOCRACY PROJECT
26                                           82 Nassau St., #601
                                             New York, NY 10038

27

28                                           Erica J. Newland (pro hac vice)
                                             Jacek Pruski (pro hac vice)
                                             PROTECT DEMOCRACY PROJECT

2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice app. forthcoming)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and AFGE
locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice app. forthcoming)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.

1    Washington, D.C.  20036
     Tel: (202) 775-5900
2    TPaterson@afscme.org
     MBlumin@afscme.org
3

4    By: */s/Teague Paterson*

5    *Attorneys for Plaintiff American Federation of State*
     *County and Municipal Employees, AFL-CIO (AFSCME)*
6

7    Steven K. Ury (SBN 199499)
8    SERVICE EMPLOYEES INTERNATIONAL UNION,
     AFL-CIO
9    1800 Massachusetts Ave., N.W.
     Washington, D.C. 20036
10   Tel: (202) 730-7428
     steven.ury@seiu.org
11

12   By: */s/ Steven K. Ury*

13   *Attorneys for Plaintiff Service Employees International*
     *Union, AFL-CIO (SEIU)*
14

15   David Chiu (SBN 189542)
16   City Attorney
     Yvonne R. Meré (SBN 175394)
17   Chief Deputy City Attorney
     Mollie M. Lee (SBN 251404)
18   Chief of Strategic Advocacy
     Sara J. Eisenberg (SBN 269303)
19   Chief of Complex and Affirmative Litigation
     Molly J. Alarcon (SBN 315244)
20   Alexander J. Holtzman (SBN 311813)
     Deputy City Attorneys
21   OFFICE OF THE CITY ATTORNEY FOR THE CITY
22   AND COUNTY OF SAN FRANCISCO
     1390 Market Street, 7th Floor
23   San Francisco, CA 94102
     molly.alarcon@sfcityatty.org
24   alexander.holtzman@sfcityatty.org

25

26   By:  */s/ David Chiu*
     David Chiu
27   City Attorney

28   *Attorneys for Plaintiff City and County of San Francisco*

**Add.200**

1

2          Tony LoPresti (SBN 289269)
           COUNTY COUNSEL
3          Kavita Narayan (SBN 264191)
4          Meredith A. Johnson (SBN 291018)
           Raphael N. Rajendra (SBN 255096)
5          Hannah M. Godbey (SBN 334475)
           OFFICE OF THE COUNTY COUNSEL
6          COUNTY OF SANTA CLARA
7          70 West Hedding Street, East Wing, 9th Floor
           San José, CA 95110
8          Tel: (408) 299-5900

9          By:  */s/ Tony LoPresti*

10         *Attorneys for Plaintiff County of Santa Clara, Calif.*

11

12         David J. Hackett (pro hac vice  app. forthcoming)
           General Counsel to King County Executive & Special
13         Deputy Prosecutor
           Alison Holcomb (pro hac vice app. forthcoming)
14         Deputy General Counsel to King County Executive &
           Special Deputy Prosecutor
15         Erin King-Clancy (pro hac vice app. forthcoming)
           Senior Deputy Prosecuting Attorney
16         OFFICE OF KING COUNTY PROSECUTING
           ATTORNEY LEESA MANION
17         401 5th Avenue, Suite 800
           Seattle, WA 98104
18         (206) 477-9483
           David.Hackett@kingcounty.gov
19         aholcomb@kingcounty.gov
           aclancy@kingcounty.gov
20
           By: */s/ David J. Hackett*
21
           David J. Hackett
22
           *Attorneys for Plaintiff Martin Luther King, Jr. County*
23

24         Jill Habig (SBN 268770)
           PUBLIC RIGHTS PROJECT
25         490 43rd Street, Unit #115
           Oakland, CA 94609
26         Tel: (510) 738-6788
           jill@publicrightsproject.org
27

28

MEM. SUPP. MOT. FOR TEMPORARY RESTRAINING ORDER, NO. 3:25-cv-03698-SI        54
**Add.201**

1

2    By: */s/ Jill Habig* _____

3    *Attorneys for Plaintiffs Baltimore, MD, Chicago, IL,*
     *Harris County, TX, and King County, WA*

4

5    Christian D. Menefee
     Harris County Attorney

6

7    Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
     Deputy County Attorney and First Assistant

8    Tiffany Bingham (pro hac vice app. forthcoming)
     Managing Counsel

9    Sarah Utley (pro hac vice app. forthcoming)
     Division Director – Environmental Division

10   Bethany Dwyer (pro hac vice app. forthcoming)
     Deputy Division Director - Environmental Division

11   R. Chan Tysor (pro hac vice app. forthcoming)
     Senior Assistant County Attorney

12   Alexandra "Alex" Keiser (pro hac vice app. forthcoming)
     Assistant County Attorney

13   1019 Congress, 15th Floor
     Houston, Texas 77002

14   Tel: (713) 274-5102
     Fax: (713) 437-4211

15

16   jonathan.fombonne@harriscountytx.gov
     tiffany.bingham@harriscountytx.gov

17   sarah.utley@harriscountytx.gov
     bethany.dwyer@harriscountytx.gov

18   chan.tysor@harriscountytx.gov
     alex.keiser@harriscountytx.gov

19

20   By: */s/ Jonathan G.C. Fombonne*
     Jonathan G.C. Fombonne

21

22   *Attorneys for Plaintiff Harris County, Texas*

23

24   Mary B. Richardson-Lowry,
     Corporation Counsel of the City of Chicago

25

26   Stephen J. Kane (IL ARDC 6272490) (pro hac vice app.
     forthcoming)

27   Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice
     app. forthcoming)

28

Lucy Prather (IL ARDC 6337780) (pro hac vice app.
forthcoming)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By:     */s/Stephen J. Kane*
        Stephen J. Kane

*Attorneys for Plaintiff City of Chicago*


Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming*)*
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By*: /s/ Sara Gross*

*Attorneys for Plaintiff City of Baltimore*

# Appendix A

(208 of 726), Page 208 of 726 Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 208 of 726
Case 3:25-cv-03698-SI    Document 37-1    Filed 05/01/25    Page 69 of 83

9669

Federal Register

Vol. 90, No. 30

Friday, February 14, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14210 of February 11, 2025

## Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. *Purpose.* To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.

Sec. 2. *Definitions.* (a) "Agency" has the meaning given to it in section 3502 of title 44, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States Code, and includes individuals who serve in the executive branch and who qualify as employees under that section for any purpose.

(e) "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f) "Law enforcement" means:

(i) engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii) the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g) "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h) "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

Sec. 3. *Reforming the Federal Workforce to Maximize Efficiency and Productivity.* (a) *Hiring Ratio.* Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan). The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan. This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service. This ratio shall not apply to functions related to public safety, immigration

enforcement, or law enforcement. Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b) *Hiring Approval.* Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i) This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii) The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

(iii) Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

(c) *Reductions in Force.* Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

(d) *Rulemaking.* Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

(i) failure to comply with generally applicable legal obligations, including timely filing of tax returns;

(ii) failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

(iii) refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

(iv) theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

(e) *Developing Agency Reorganization Plans.* Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

(f) Within 240 days of the date of this order, the USDS Administrator shall submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

**Sec. 4.** *Exclusions.* (a) This order does not apply to military personnel.

(b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

(c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2025.*

[FR Doc. 2025–02762
Filed 2–13–25; 11:15 am]
Billing code 3395–F4–P

# Appendix B



U.S. Office of
Management and Budget

U.S. Office of
Personnel Management



# MEMORANDUM

**TO:**           Heads of Executive Departments and Agencies

**FROM:**      Russell T. Vought, Director, Office of Management and Budget;
                Charles Ezell, Acting Director, Office of Personnel Management.

**DATE**:       February 26, 2025

**RE**:         Guidance on Agency RIF and Reorganization Plans Requested by
                *Implementing The President's "Department of Government
                Efficiency" Workforce Optimization Initiative*

---

## I.     Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

## II.     Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1.  Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

## III.    Available Tools

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each. Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

## IV.    Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

3

**Add.211**

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

## V.    Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

**Add.213**

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

## VI.    Exclusions

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("*CHCOs*"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

## Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook.** RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

**Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)**

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

**Step 2: Planning, Preparation & Analysis (up to 30 days)**

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

**Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)**

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

**Step 4: RIF Implementation & Separation (Final Step)**

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

# Appendix C

Appendix C:  Plaintiff Declarations By Federal Defendant Agency

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| AmeriCorps | Blake (AFSCME)<br>Daly (AFSCME) | Benjamin (APHA) | Dively (King County) |
| Department of Agriculture | Kelley (AFGE)<br>Soldner (AFGE)<br>Bachelder (AFSCME)<br>Blake (AFSCME)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Neuman (SEIU) | Shultz (AGU)<br>Davis (NOFA)<br>Molvar (WWP) | Barton (Harris County)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Crispen (San Francisco) |
| Department of Commerce | Kelley (AFGE) | Shultz (AGU)<br>Neubacher (CPANP)<br>Molvar (WWP) | Leach (Baltimore)<br>Velez (Chicago)<br>Pena (Harris County)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Bechelli (San Francisco)<br>Jue (San Francisco) |
| Department of Energy | Braden (AFGE)<br>Kelley (AFGE)<br>Gabel (AFSCME) | Shultz (AGU) | Leach (Baltimore)<br>Dively (King County)<br>Jue (San Francisco) |
| Environmental Protection Agency | Howell (AFGE)<br>Kelley (AFGE)<br>Dreyfus (AFGE Local 1236)<br>Bailey (SEIU)<br>Neuman (SEIU) | Shultz (AGU)<br>Molvar (WWP) | Leach (Baltimore)<br>Ige (Chicago)<br>Worthington (Chicago)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Jue (San Francisco) |
| General Services Administration | Fabris (AFGE)<br>Kelley (AFGE)<br>Adler (SEIU)<br>Neuman (SEIU) | | |

| | | | |
|---|---|---|---|
| Department of Health and Human Services | Garthwaite (AFGE) Jacobs (AFGE) Kelley (AFGE) Niemeier-Walsh (AFGE) Gabel (AFSCME) O'Brien (AFSCME) Adler (SEIU) Neuman (SEIU) Prendiville (SEIU) | Benjamin (APHA) | Leach (Baltimore) Ige (Chicago) Barton (Harris County) Pena (Harris County) Dively (King County) Williams (Santa Clara County) Philip (San Francisco) |
| Department of Housing and Urban Development | Bobbitt (AFGE) Kelley (AFGE) O'Brien (AFSCME) Adler (SEIU) Neuman (SEIU) Wander (SEIU Local 1000) | | Leach (Baltimore) Dively (King County) Williams (Santa Clara County) |
| Department of the Interior | Cochran (AFGE) Kelley (AFGE) Adler (SEIU) Neuman (SEIU) | Shultz (AGU) Neubacher (CPANP) Molvar (WWP) | Dively (King County) Williams (Santa Clara County) Bechelli (San Francisco) |
| Department of Labor | Gamble (AFGE) Levin (AFGE) Kelley (AFGE) O'Brien (AFSCME) Adler (SEIU) Neuman (SEIU) | | Campos (Chicago) |
| National Labor Relations Board | O'Brien (AFSCME) Neuman (SEIU) | | |
| National Science Foundation | Kelley (AFGE) Soriano (AFGE) Adler (SEIU) Neuman (SEIU) | Shultz (AGU) Molvar (WWP) | |

Add.218

| | | | |
|---|---|---|---|
| Small Business Administration | Gustafsson (AFGE)<br>Kelley (AFGE)<br>O'Brien (AFSCME)<br>Neuman (SEIU) | Phetteplace (MSA) | Dively (King County)<br>Bechelli (San Francisco) |
| Social Security Administration | Couture (AFGE)<br>Kelley (AFGE)<br>Wilson (AFGE Local 1122)<br>Norman (AFGE Local 3172)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Prendiville (SEIU)<br>Jefferies (SEIU Local 1000) | Fiesta (ARA) | |
| Department of State | Hunter (AFGE)<br>Kelley (AFGE)<br>Adler (SEIU)<br>Neuman (SEIU) | | Dively (King County)<br>Williams (Santa Clara County) |
| Department of Treasury | Kelley (AFGE)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Neuman (SEIU) | Olson (CTR) | |
| Department of Veterans Affairs | Burke (AFGE)<br>Kelley (AFGE)<br>Turner-Nichols (AFGE Local 2110)<br>Blake (AFSCME)<br>O'Brien (AFSCME)<br>Neuman (SEIU)<br>Bailey (SEIU) | Shah (Common Defense)<br>Eaton (Vote Vets) | Dively (King County)<br>Williams (Santa Clara County) |

3

**Add.219**

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

    450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

    1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br>     Plaintiffs, <br><br>       v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>     Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Hearing Date: May 9, 2025 <br> Time: 10:30 am <br> Judge: Hon. Susan Illston <br> Place: San Francisco Courthouse <br>           Courtroom 1 |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 5

I.  Statutory and Regulatory Background................................................................. 5

    A.  Agency Authority to Engage in RIFs.......................................................... 5

    B.  Modern RIFs ............................................................................................... 9

    C.  Exclusive Scheme for Administrative and Judicial Review of Labor and
        Personnel Disputes Involving Federal Civil Servants ........................... 12

II.  Factual Background .......................................................................................... 13

    A.  Executive Order 14210 ............................................................................. 13

    B.  February 26, 2025 Memorandum ............................................................. 14

III.  Procedural History ........................................................................................... 17

STANDARD OF REVIEW ...................................................................................... 19

ARGUMENT ............................................................................................................ 19

I.  Plaintiffs' Delay Alone Warrants Denial of the TRO Motion .......................... 19

II.  Plaintiffs Satisfy None of the *Winter* Requirements........................................ 22

    A.  Plaintiffs Are Unlikely to Succeed on the Merits of their Claims ....................... 22

        1.  The Workforce Executive Order and Workforce Memorandum are
            Not Subject to Review ........................................................................... 22

            a.  The FSLMRS and CSRA Preclude District-Court
                Jurisdiction Over Plaintiffs' Challenge to the Workforce
                Executive Order and Workforce Memorandum. ........................ 23

            b.  Plaintiffs Fail to Show Standing ................................................. 31

            c.  Independent of the FSLMRS and CSRA, the Workforce
                Executive Order Is Not Reviewable Here.................................... 34

            d.  The Workforce Memorandum is Not a Reviewable Final
                Agency Action ............................................................................ 35

2. The Workforce Executive Order and Workforce Memorandum are
Lawful .......................................................................................... 38
a. The Workforce Executive Order is Lawful .................................. 39
b. The Workforce Memorandum is Lawful ...................................... 44
3. To the Extent Plaintiffs Purport to Challenge Particular RIFs, Any
Such Challenge is Likewise Precluded and In Any Event Lacks
any Legal or Factual Basis ....................................................................... 45
B. Plaintiffs Have Not Demonstrated Irreparable Harm Warranting the Broad
TRO They Seek ........................................................................................ 46
C. The Balance of the Equities and Public Interest Do Not Favor a TRO ............... 48
III. Plaintiffs Are Not Entitled to Release of the ARRPs ....................................... 48
IV. Plaintiffs Are Not Entitled to any Relief Against USDS or "DOGE" ............................ 49
V. Any Relief Should be Limited ........................................................................ 49
VI. Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief ............... 50
CONCLUSION .................................................................................................... 50

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*AFGE v. OPM*,
    No. 25-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) .................................................. 30

*AFGE v. Sec'y of the Air Force*,
    716 F.3d 633 (D.C. Cir. 2013) ............................................................................................... 27

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
    No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ......................................... 23, 24

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ................................................................................... *passim*

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ............................................................................................... 33

*Arnett v. Kennedy*,
    416 U.S. 134 (1974) ......................................................................................................... 19

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*,
    713 F.3d 1187 (9th Cir. 2013) ............................................................................................. 32

*Atomic Oil Co. of Okl. v. Bardahl Oil Co.*,
    419 F.2d 1097 (10th Cir. 1969) ........................................................................................... 50

*Axon Enters., Inc. v. FTC*,
    598 U.S. 175 (2023) ................................................................................................... *passim*

*Bennett v. Spear*,
    520 U.S. 154 (1997) ......................................................................................................... 36

*Bldg. & Const. Trades Dep't v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ....................................................................... 4, 39, 40, 42

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................................................................... 50

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................................................... 34

*City and County of San Francisco v. Trump*,
 897 F.3d 1225 (9th Cir. 2018) ........................................................................... 40

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ........................................................................................... 31

*Common Cause v. Trump*,
 506 F. Supp. 3d 39 (D.D.C. Nov. 25, 2020) ...................................................... 39

*Ctr. for Biological Diversity v. Trump*,
 453 F. Supp. 3d 11 (D.D.C. 2020) ..................................................................... 34

*Curlott v. Campbell*,
 598 F.2d 1175 (9th Cir. 1979) ........................................................................... 48

*Dalton v. Specter*,
 511 U.S. 462 (1994)...................................................................................... 34, 35

*Dep't of Educ. v. California*,
 145 S. Ct. 966 (2025) ......................................................................................... 25

*Devasahayam v. DMB Cap. Grp.*,
 No. 3:17-cv-02095-BEN-WVG, 2017 WL 6547897 (S.D. Cal. Dec. 20, 2017)...................... 20

*Disney Enters., Inc. v. VidAngel, Inc.*,
 869 F.3d 848 (9th Cir. 2017) ............................................................................. 46

*Duenas v. Garland*,
 78 F.4th 1069 (9th Cir. 2023) ............................................................................ 43

*E. Bay Sanctuary Covenant v. Barr*,
 934 F.3d 1026 (9th Cir. 2019) ........................................................................... 50

*Eagle Tr. Fund v. USPS*,
 365 F. Supp. 3d 57 (D.D.C. 2019) ..................................................................... 43

*Elgin v. Dep't of the Treasury*,
 567 U.S. 1 (2012)........................................................................................ *passim*

*Env't Prot. Info. Ctr. v. Carlson*,
 968 F.3d 985 (9th Cir. 2020) ............................................................................. 22

*Fed. L. Enf't Offs. Ass'n v. Ahuja*,
  62 F.4th 551 (D.C. Cir. 2023) ........................................................................ 28

*Feds for Med. Freedom v. Biden*,
  63 F.4th 366 (5th Cir. 2023) ........................................................................ 30

*Filebark v. U.S. Dep't of Transp.*,
  555 F.3d 1009 (D.C. Cir. 2009) ............................................................. 24-25

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................ 31, 33

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................... 34

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ................................................................................... 42

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ..................................................................... 35

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ..................................................................... 47

*Granny Goose Foods, Inc. v. Bhd. of Teamsters Loc. No. 70*,
  415 U.S. 423 (1974) ................................................................................... 20

*Hanson v. District of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) ................................................................. 32

*HIAS, Inc. v. Trump*,
  985 F.3d 309 (4th Cir. 2021) ..................................................................... 40

*Hilton v. Sullivan*,
  334 U.S. 323 (1948) ................................................................................ 5, 6

*Hindes v. FDIC*,
  137 F.3d 148 (3d Cir. 1998) ....................................................................... 43

*Int'l Tech. Univ. Found. v. WASC Senior Coll. & Univ. Comm'n*,
  No. 22-cv-4576, 2023 WL 2621344 (N.D. Cal. Mar. 23, 2023) ................ 20

*Jarkesy v. SEC,*
803 F.3d 9 (D.C. Cir. 2015) ............................................................................ 23

*Jones v. U.S. Secret Serv.,*
701 F. Supp. 3d 4 (D.D.C. 2023) ..................................................................... 35

*Kalispel Tribe of Indians v. U.S. DOI,*
999 F.3d 683 (9th Cir. 2021) ........................................................................... 44

*Keim v. United States,*
177 U.S. 290 (1900) ........................................................................................... 5

*Kerr v. Jewell,*
836 F.3d 1048 (9th Cir. 2016) ......................................................................... 23

*Kirby Corp. v. Pena,*
109 F.3d 258 (5th Cir. 1997) ........................................................................... 44

*Lampon-Paz v. OPM,*
732 F. App'x 158 (3d Cir. 2018) ..................................................................... 26

*Larson v. Domestic & Foreign Com. Corp.,*
337 U.S. 682 (1949) ......................................................................................... 44

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ......................................................................................... 31

*Lujan v. Nat'l Wildlife Fed.,*
497 U.S. 871 (1990) ............................................................................... 1, 25, 35

*Lundeen v. Mineta,*
291 F.3d 300 (5th Cir. 2002) ..................................................................... 43, 44

*Lyons v. Dep't of Veteran's Affs.,*
273 F. App'x 929 (Fed. Cir. 2008) .................................................................. 27

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ......................................................................................... 50

*Markland v. OPM,*
140 F.3d 1031 (Fed. Cir. 1998) ......................................................................... 9

*Marshall v. HHS,*
   587 F.3d 1310 (Fed. Cir. 2009)................................................................. 27

*Maryland v. U.S. Dep't of Agriculture,*
   No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025).................................. 23, 24

*Medkirk v. United States,*
   45 Ct. Cl. 395 (Ct. Cl. 1910)..................................................................... 5

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) .................................................................. 48

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.,*
   991 F.2d 536 (9th Cir. 1993) .................................................................. 19

*Myers v. United States,*
   272 U.S. 52 (1926)........................................................................... 4, 42

*N.Y. Republican State Comm. v. SEC,*
   799 F.3d 1126 (D.C. Cir. 2015) .............................................................. 23

*NARA v. Favish,*
   541 U.S. 157 (2004)........................................................................... 39

*Nat'l Min. Ass'n v. McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) .............................................................. 36

*Nat'l Treasury Emps. Union v. Trump,*
   No. 25-CV-420 (CRC), 2025 WL 561080 (D.D.C. Feb. 20, 2025) ................................ *passim*

*Nken v. Holder,*
   556 U.S. 418 (2009)........................................................................... 48

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004)............................................................................ 35

*NTEU and Dep't of Treasury, IRS,*
   60 F.L.R.A. 783 (2005)........................................................................ 27

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) .............................................................. 44

*Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*,

306 F.2d 840 (2d Cir. 1962)................................................................................. 20

*Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89 (1984)............................................................................................... 44

*Perez v. City of Petaluma*,

No. 21-CV-06190-JST, 2021 WL 3934327 (N.D. Cal. Aug. 13, 2021).................. 20

*Pom Wonderful LLC v. Hubbard*,

775 F.3d 1118 (9th Cir. 2014) ............................................................................. 47

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,

128 F.4th 1089 (9th Cir. 2025) ............................................................................ 37

*Sampson v. Murray*,

415 U.S. 61 (1974)................................................................................. 21, 47, 48

*Seila Law LLC v. CFPB*,

591 U.S. 197 (2020)............................................................................... 4, 42, 43

*Sherley v. Sebelius*,

689 F.3d 776 (D.C. Cir. 2012) ............................................................................... 4

*Singh v. Berger*,

56 F.4th 88 (D.C. Cir. 2022) ............................................................................... 32

*Special Counsel ex rel. John Doe v. Department of Agriculture*,

No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), (Order on Stay Request)

https://perma.cc/3F45-PKG5 .............................................................................. 28

*Spokeo, Inc. v. Robins*,

578 U.S. 330 (2016)............................................................................................ 31

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

240 F.3d 832 (9th Cir. 2001) .............................................................................. 19

*Summers v. Earth Island Institute*,

555 U.S. 488 (2009)............................................................................................ 32

*Thunder Basin Coal Co. v. Reich*,

   510 U.S. 200 (1994) ............................................................................................ 23

*TransUnion LLC v. Ramirez*,

   594 U.S. 413 (2021) ............................................................................................ 33

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*,

   578 U.S. 590 (2016) ............................................................................................ 36

*United States v. Arthrex, Inc.*,

   594 U.S. 1 (2021) ................................................................................................ 42

*United States v. Fausto*,

   484 U.S. 439 (1988) ...................................................................................... 25, 27

*United States v. Texas*,

   599 U.S. 670 (2023) ............................................................................................ 33

*Veit v. Heckler*,

   746 F.2d 508 (9th Cir. 1984) ............................................................................. 26

*Washington v. Trump*,

   847 F.3d 1151 (9th Cir. 2017) ........................................................................... 19

*Weinberger v. Romero-Barcelo*,

   456 U.S. 305 (1982) ............................................................................................ 19

*West v. PBC Mgmt. LLC*,

   No. 23-cv-3283, 2023 WL 4477296 (N.D. Cal. July 10, 2023) ......................... 20

*Whitmore v. Arkansas*,

   495 U.S. 149 (1990) ............................................................................................ 31

*Widakuswara v. Lake*,

   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ......................... *passim*

*Widakuswara v. Lake*,

   No. 25-cv-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ............................. 25

*Winter v. Nat. Res. Def. Council, Inc.*,

   555 U.S. 7 (2008) .......................................................................................... 19, 46

*Youngstown Sheet & Tube Co. v. Sawyer*,

    343 U.S. 579 (1952) ............................................................................... 35

**Constitution**

U.S. CONST. art. II, § 1, cl. 1 ............................................................. 42, 43

U.S. CONST. art. II, § 3 ........................................................................... 42

**Statutes**

5 U.S.C. § 551(13) ............................................................................. 35, 36

5 U.S.C. § 553(a)(2) ................................................................................. 48

5 U.S.C. § 702 ......................................................................................... 25

5 U.S.C. § 704 ............................................................................ 35, 36, 38

5 U.S.C. § 1204 ................................................................................. 12, 47

5 U.S.C. § 2302(a)(2)(A) ................................................................... 12-13

5 U.S.C. § 3328 ....................................................................................... 30

5 U.S.C. § 3502 ................................................................................ *passim*

5 U.S.C. § 7105 ................................................................................. 12, 26

5 U.S.C. § 7116(a) ................................................................................... 12

5 U.S.C. § 7118 ....................................................................................... 12

5 U.S.C. § 7123(a) ............................................................................ 12, 26

5 U.S.C. § 7511(a)(1) .............................................................................. 12

5 U.S.C. § 7512 ....................................................................................... 12

5 U.S.C. § 7513(d) .................................................................................. 12

5 U.S.C. § 7701(g) ............................................................................ 12, 47

5 U.S.C. § 7703(b) .................................................................................. 26

5 U.S.C. §§ 7101-35 ................................................................................ 12

28 U.S.C. § 1295(a)(9) ............................................................................ 12

19 Stat. 169 (Aug. 15, 1876) .................................................................... 5

37 Stat. 413 (Aug. 23, 1912) .................................................................... 5

Federal Service Labor-Management Relations Statute,

 Pub. L. No. 95-454, tit. VII, § 701, 92 Stat. 1111, 1191-1216 ................................ 12

Pub. L. No. 89-554, 80 Stat. 428 (1966) ................................................................ 7

Veterans' Preference Act of 1944,

 Pub. L. 78-359, 58 Stat. 387 .............................................................................. 6

**Rules**

Fed. R. Civ. P. 65(b) ............................................................................................ 19

Fed. R. Civ. P. 65(c) ............................................................................................ 50

**Legislative Materials**

H.R. Rep. No. 78-1289 (1944) ............................................................................. 6

S. Rep. No. 79-265 (1945) ................................................................................... 7

**Administrative & Executive Materials**

5 C.F.R. § 301.806 ............................................................................................. 12

5 C.F.R. § 315.801 ............................................................................................. 12

5 C.F.R. pt. 351 ............................................................................................... 7, 8

5 C.F.R. § 351.201 ...................................................................................... 7, 8, 41

5 C.F.R. § 351.203 ............................................................................................. 7

5 C.F.R. § 351.204 ............................................................................................. 8

5 C.F.R. § 351.205 ...................................................................................... 38, 44

5 C.F.R. § 351.402 ............................................................................................. 8

5 C.F.R. § 351.403(a)(1) ...................................................................................... 8

5 C.F.R. § 351.505(b)(1) .................................................................................... 22

5 C.F.R. § 351.701 ............................................................................................. 8

5 C.F.R. § 351.703 ............................................................................................. 8

5 C.F.R. § 351.801(b) ..................................................................................... 9, 46

5 C.F.R. § 351.802 ............................................................................................. 9

5 C.F.R. § 351.901 ............................................................................................. 9

5 C.F.R. § 1201.3(a)(6) ...................................................................................... 9

5 C.F.R. § 1201.22 ................................................................................................ 9

9 Fed. Reg. 9575 (Aug. 8, 1944) ............................................................................. 7

90 Fed. Reg. 13043 (Mar. 14, 2025) .................................................................... 24

Exec. Order 12498,

    50 Fed. Reg. 1036 (Jan. 4, 1985) ..................................................................... 10

Exec. Order 12839,

    58 Fed. Reg. 8515 (Feb. 10, 1993) ............................................................ 10, 11, 44

Exec. Order 14158,

    90 Fed. Reg. 8441 (Jan. 20, 2025) ................................................................. 2, 49

Exec. Order 14210,

    90 Fed. Reg. 9669 (Feb. 11, 2025) ................................................................. *passim*

**<u>Other Authorities</u>**

11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. Apr. 2025 update) ..... 20

64 Ann. Rep. U.S. Civil Service Comm'n (1946-1947) ............................................. 9

Chris Cameron, *Judge Refuses to Immediately Reinstate Inspectors General Fired by Trump*,

    N.Y. Times (Feb. 14, 2025),

    https://www.nytimes.com/2025/02/14/us/politics/trump-inspectors-general-ruling.html ........ 20

Elena Kagan, *Presidential Administration*,

    114 Harv. L. Rev. 2245 (2001) ........................................................................ 45

Harry S Truman, Statement by the President on Federal Employees Displaced by the Reduction-

    in-Force (Sept. 3, 1949),

    https://www.trumanlibrary.gov/library/public-papers/201/statement-president-federal-

    employees-displaced-reduction-force ............................................................... 9

Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7,

    2025),

    https://www.reuters.com/world/us/trump-tells-cabinet-secretaries-they-not-musk-are-charge-

    staff-cuts-2025-03-06/ .................................................................................. 14

Ronald Reagan, Radio Address to the Nation on Federal Civilian Employment (Aug. 20, 1983),
    https://www.reaganlibrary.gov/archives/speech/radio-address-nation-federal-civilian-
    employment........................................................................................................................ 10

Saikrishna Bangalore Prakash, *Imperial from the Beginning: The Constitution of the Original
    Executive* (2015) .......................................................................................... 42, 43

The Federalist No. 72 (Alexander Hamilton) (George W. Carey & James McClellan eds.,  2001)
    ............................................................................................................................ 42

The Hill, *VA secretary: Cutting 80,000 jobs 'is our target'* (Mar. 10, 2025),
    https://thehill.com/homenews/state-watch/5186097-va-seek-cuts-80000-jobs/ ...................... 49

United States Civil Service Commission, *Civil Service Act and Rules, Statutes, Executive Orders
    and Regulations* (amended to November 15, 1925) .................................................. 6

United States Civil Service Commission, Departmental Circular No. 372 (Sept. 4, 1942) ........... 6

United States Office of Personnel Management, Workforce Reshaping Operations Handbook
    (2017),
    https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-
    rif/workforce_reshaping.pdf .......................................................................................... 8

William J. Clinton, Memorandum on Career Transition Assistance for Federal Employees, (Sept.
    12, 1995),
    https://www.presidency.ucsb.edu/documents/memorandum-career-transition-assistance-for-
    federal-employees ...................................................................................................... 11

William J. Clinton, Memorandum on Implementing Management Reform in the Executive
    Branch (Oct. 1, 1993),
    https://www.presidency.ucsb.edu/node/327737 .................................................... 11

William J. Clinton, Memorandum on Streamlining the Bureaucracy (Sept. 11, 1993),
    https://www.presidency.ucsb.edu/node/327725 .................................................... 11

**INTRODUCTION**

The Administrative Procedure Act (APA) allows a plaintiff to challenge a specific final agency action for which there is no other adequate remedy in a court, but plaintiffs cannot seek "systemic improvement" to agency-wide policy. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 894 (1990). Yet in this lawsuit of staggering breadth, Plaintiffs do not challenge any discrete final agency action or even any agency-specific policy. They instead seek to enjoin implementation virtually government-wide of an Executive Order that is not subject to review and is in any event unquestionably lawful on its face. Plaintiffs also challenge a memorandum from the Office of Personnel Management (OPM) and Office of Management and Budget (OMB), but that document is also not a final agency action, does not affect Plaintiffs, and is entirely lawful.

Plaintiffs' request for government-wide relief is not the only respect in which their motion is extraordinary. Plaintiffs seek to prevent reductions in force (RIFs) for which affected individuals have or would have administrative remedies and judicial review directly in a court of appeals. That fact deprives this Court of jurisdiction. And Plaintiffs seek to forestall implementation of the Executive Order based on a legal theory—that a statutory authorization to *federal agencies* deprives the *President* of any role in directing or shaping how agencies exercise that authority—that upends the very structure of Article II. They seek in their motion to prevent 20 government components (including 12 cabinet-level departments) from implementing the Executive Order and memorandum—based on broad and novel structural constitutional theories, in a brief that is more than twice the presumptive limit under the local rules while claiming support in nearly 1,300 pages of declarations and exhibits—in the context of moving for a *temporary restraining order* (TRO). All this even though the Executive Order and memorandum they challenge were issued more than 11 and 9 weeks before they sought emergency relief from this Court. Because the TRO motion is procedurally improper and lacks any legal basis, the Court should deny the motion.

As no one disputes, Congress has expressly authorized federal agencies to engage in RIFs and has done so for nearly 150 years. Congress has further directed OPM to "prescribe regulations for the release of competing employees in a [RIF] which give due effect to" four statutorily prescribed factors. 5 U.S.C. § 3502. OPM implements the RIF statute through regulations

published in part 351 of title 5 of the Code of Federal Regulations. Consistent with these authorities, on February 11, 2025, President Trump issued Executive Order 14210, which aims to "restore accountability to the American public" by "eliminating waste, bloat and insularity." Exec. Order. 14210, § 1, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Workforce Executive Order). The Workforce Executive Order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." *Id.* § 3(c). On February 26, 2025, OPM and OMB issued a memorandum (Workforce Memorandum) to agencies providing certain guidance for complying with the Executive Order, stating that the agencies should submit Agency RIF and Reorganization Plans (ARRPs) in two phases on March 13, 2025, and April 14, 2025, delineating certain categories of information the ARRPs should include, and further stating that the Phase 2 plans should be planned for implementation by September 30, 2025.

The Workforce Executive Order and Workforce Memorandum thus include general principles agencies should follow in preparing and submitting ARRPs, including a focus on statutorily provided functions as well as subcomponents and offices that provide direct services to citizens. But both sources make clear that RIFs must be carried out consistent with all applicable legal requirements. And neither the Workforce Executive Order nor the Workforce Memorandum directs RIFs of particular employees or otherwise dictates the results of agencies' decisionmaking processes. Nor, contrary to Plaintiffs' briefing, are RIFs being carried out "in secret." TRO Brief at 3. The Workforce Memorandum suggests a notice period of at least 30 days before RIFs are effectuated (and in many cases significantly longer than that).

On April 28, 2025, Plaintiffs nonetheless filed a 115-page complaint seeking broad relief against virtually every cabinet-level department, as well as OPM, OMB, and the United States DOGE Service (USDS)[1], in addition to the President himself. On May 1, 2025, Plaintiffs filed the

---

[1] It is unclear whether Plaintiffs are referring to USDS, which is a nonstatutory component located within the Executive Office of the President, as to which Amy Gleason serves as the Acting Administrator. Though Plaintiffs use the term Department of Government Efficiency, the Department of Government Efficiency and USDS are not the same thing. The Department of Government Efficiency or "DOGE" is the umbrella term for the government-wide initiative to implement the President's DOGE Agenda. It consists of USDS, the USDS Temporary Organization, and Agency DOGE Teams. Exec. Order 14158, § 3(a)–(c), 90 Fed. Reg. 8441 (Jan. 20, 2025). Consistent with Executive Order 14158 and as the government has repeatedly explained

instant motion for a TRO, seeking to enjoin OPM, OMB, USDS, as well as seventeen departments or agencies and their heads from implementing the Workforce Executive Order or Workforce Memorandum, in addition to other relief. For multiple reasons, the motion should be denied.

First, Plaintiffs cannot establish the immediacy required for a TRO. The Motion seeks to enjoin implementation of the Workforce Executive Order and Workforce Memorandum on the legal ground that they are ultra vires and exceed the President's authority (as to the Workforce Executive Order) and the authority of OPM and OMB (as to the Workforce Memorandum). Nothing would have prevented Plaintiffs from filing their May motion in February immediately after the Executive Order and Memorandum were issued. Indeed, in the intervening time, multiple similar suits have been filed challenging, inter alia, the Workforce Executive Order and personnel actions across numerous federal agencies. This includes a February challenge to the Workforce Executive Order filed the day after that Order was issued (the district court in that case denied a preliminary injunction on jurisdictional grounds that equally bar this lawsuit). Consistent with extensive case law in this District, that delay alone warrants rejection of Plaintiffs' plea for emergency relief now on a highly expedited timetable.

Second, Plaintiffs cannot challenge the Workforce Executive Order or the Workforce Memorandum here. The comprehensive, reticulated administrative-judicial review scheme set forth in the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act foreclose that. Plaintiffs have not established standing. And putting aside these jurisdictional defects, the Workforce Executive Order and Workforce Memorandum would still not be reviewable. The Workforce Executive Order is not subject to review under the APA or on an ultra vires theory. The Workforce Memorandum is not reviewable because it is not a final agency action.

Even if the Court could review the legality of the Workforce Executive Order and Workforce Memorandum on the merits, that merits analysis would be exceptionally easy. The

---

in other litigation, Agency DOGE Teams (which consist of employees from the relevant agency and detailees, who take actions within their agency, and who report to agency leadership) are distinct from USDS and the USDS Temporary Organization (which are nonstatutory components with limited and advisory responsibilities). We use the term USDS in this brief but, regardless, this distinction is not relevant to the TRO motion, which must be denied in any event.

Executive Order makes clear that any RIFs or other action must be "consistent with applicable law." And there is no question that the Executive Order *can be* applied lawfully because, again, no one disputes that agencies have authority to conduct RIFs. Plaintiffs' "*ultra vires*" argument thus rests on a contention that "Congress has delegated authority to determine *which* employees to employ and *how many* (consistent with appropriations) to the heads of the federal agencies, not to the President." TRO Brief at 32 (emphases in original). But putting aside that the Workforce Executive Order neither orders specific RIFs nor divests agency heads of their discretion in this area, this is precisely backwards. The President has inherent authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)) (citation omitted); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020) (authority exercised by federal officers "remains subject to the ongoing supervision and control of the elected President"). Agencies thus "*must* implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). There is no colorable argument that President Trump acted unlawfully in providing direction for agencies to follow, consistent with applicable law, in exercising the authority Congress expressly provided them. The Workforce Memorandum—which provides broad guidance (concerning information agencies should provide about the actions the *agencies* decide to take), and emphasizes to agencies that they should only undertake actions that are consistent with their statutory authority—is also plainly lawful.

Plaintiffs also cannot demonstrate any irreparable harm that would justify the broad injunction they seek here. The Workforce Memorandum makes clear that any specific RIFs must be preceded by a 60-day formal notice period (which OPM can shorten to 30 days), which provides ample opportunity for any individual affected employees to attempt to seek relief, including emergency relief. More broadly, the Supreme Court has made clear that loss of government employment generally does not constitute irreparable injury. And in the exclusive remedial scheme Congress provided, prevailing employees may obtain reinstatement, backpay, and attorney's fees.

Likewise, the balance of equities and the public interest favor Defendants, as Plaintiffs'

1   requested TRO would interfere with the President's ability to manage the federal workforce to
2   more closely reflect policy preferences and the needs of the American public.

3   Finally, if the Court does enter injunctive relief (which, respectfully, it should not), any
4   injunction should be limited to only members of Plaintiff unions who themselves have Article III
5   standing (specifically individual members, if any, who face a certainly impending RIF). And if the
6   Court enjoins implementation of the Workforce Executive Order and Workforce Memorandum, it
7   should make clear that its injunction does not prevent agencies from conducting RIFs and acting
8   on other personnel and organizational matters independent of the Workforce Executive Order.

9   **BACKGROUND**

10  **I.   Statutory and Regulatory Background**

11  **A.   Agency Authority to Engage in RIFs**

12  For approximately 150 years, Congress has recognized federal agencies' authority to
13  engage in RIFs. The first such statute, enacted in 1876, required that veterans receive a preference
14  over other employees when such reductions were undertaken. 19 Stat. 169 (Aug. 15, 1876); *see*
15  *also Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948) (summarizing history of veterans' preferences
16  in reductions in force). A subsequent enactment precluded agencies from discharging or reducing
17  the rank or salary of honorably discharged veterans. 37 Stat. 413 (Aug. 23, 1912). Interpreting this
18  statutory framework, courts repeatedly rejected challenges to RIFs, recognizing that such
19  reductions were a matter of executive discretion. *See Medkirk v. United States*, 45 Ct. Cl. 395, 401
20  (Ct. Cl. 1910) ("The matter of qualification as between the persons then employed in the service
21  was an administrative function which the courts could neither supervise nor inquire into after the
22  exercise of the discretion of the proper official in dispensing with the services of those adjudged
23  to be least qualified under the law which required a reduction in the force."); *Keim v. United States*,
24  177 U.S. 290, 295 (1900) (provision authorizing reductions in force "do[es] not contemplate the
25  retention in office of a clerk who is inefficient, nor attempt to transfer the power of determining
26  the question of efficiency from the heads of departments to the courts").

27  Later, the Executive Branch implemented a system whereby employees were placed into
28  classes for purposes of determining which positions would be eliminated in a RIF. In 1921,

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

President Harding issued an executive order directing demotions and dismissals of employees with the lowest ratings in each class, with a preference provided to veterans. United States Civil Service Commission, *Civil Service Act and Rules, Statutes, Executive Orders and Regulations* (amended to November 15, 1925), at 104. A subsequent executive order issued by President Coolidge detailed how to categorize employees during a RIF. *Id.* The Civil Service Commission then issued regulations that codified the various requirements governing RIFs. United States Civil Service Commission, Departmental Circular No. 372 (Sept. 4, 1942). These regulations recognized that a RIF may be "necessary because of insufficient appropriations, consolidation of functions, diminution of work, or other reason, whereby one or more employees serving in other than temporary appointments will be required to be dropped from the rolls[.]" *Id.* ¶ 1.

As World War II concluded, a widespread understanding emerged that the federal government would need to shrink dramatically as the nation shifted from a war-time footing to a peace-time posture. President Roosevelt recognized that agencies may need to undertake reductions in personnel: "Veterans should be accorded special consideration in connection with any reductions in total personnel which it may be necessary for Federal agencies to work out from time to time." H.R. Rep. No. 78-1289 (1944). Congress then enacted the Veterans' Preference Act of 1944. The intent of the statute was to "give legislative sanction to existing veterans' preference, to the rules and regulations in the executive branch of the Government. . . ." *Hilton*, 334 U.S. 323 at 338 (quotation marks omitted). The statute provided, inter alia, that "[i]n any reduction in personnel in any civilian service of any Federal agency, competing employees shall be released in accordance with Civil Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings." Veterans' Preference Act of 1944, § 12, Pub. L. 78-359, 58 Stat. 387, 390.

Similarly, in enacting the Federal Employee Pay Act of 1945, Congress recognized the Executive Branch's authority to reduce the size of the Government. A Senate Committee Report preceding enactment of the Act stated: "It was the feeling of the committee that the interests of efficiency and economy could best be served a policy of reduction of force in many Government agencies. By this proposal, authority of the Director of the Bureau of the Budget to fix personnel

ceilings for agencies within the executive branch is extended to all employees of executive agencies, including the Postal Service, Wage Board employees as well as employees subject to the Classification Act." S. Rep. No. 79-265, at 6 (1945).

In the 1966 recodification of Title 5, Congress amended the Veterans' Preference Act of 1944. Pub. L. No. 89-554, 80 Stat. 428 (1966). The amended statute provided: "[t]he Civil Service Commission shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to" four specified factors. *Id.* The current version of the statute is substantively the same, with OPM substituted. 5 U.S.C. § 3502. It provides that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to--(1) tenure of employment; (2) military preference, subject to section 3501(a)(3) of this title; (3) length of service; and (4) efficiency or performance ratings." *Id.* § 3502(a)(1)-(4).

In 1944, the Civil Service Commission exercised the authority delegated by the Veterans' Preference Act of 1944 to enact regulations governing reductions in force. *See* 9 Fed. Reg. 9575, 9575-82 (Aug. 8, 1944). The regulations encouraged agencies to proactively manage the size of their workforce. "Looking ahead for changes in workloads, available funds and employee turnover, and restricting appointments in certain lines of work may prevent a surplus in workers which would otherwise occur." *Id.* "It is better practice to keep a working staff down to the number required than to cut down an oversize staff of employees." *Id.* at 9576-77. Since the regulations were promulgated in 1944, they have been periodically amended, and are codified at 5 C.F.R. part 351.

Under current regulations, agencies may invoke RIF authority "when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties." *Id.* § 351.201. A "reorganization" is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization." *Id.* § 351.203.

The regulations acknowledge agencies' discretion when deciding that a RIF is necessary. "Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated." *Id.* § 351.201(a)(1). "This includes determining when there is a surplus of employees at a particular

location in a particular line of work." *Id.* The regulations further emphasize that "[e]ach agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction [in] force is necessary." *Id.* § 351.204.

Statutory RIFs generally involve seven steps. First, agencies must establish competitive areas in which employees compete for retention. *Id.* § 351.402. Employees potentially subject to a RIF compete for retention with other employees also within their competitive areas. Second, after establishing competitive areas, agencies must establish competitive levels. A competitive level consists of "all positions in a competitive area which are in the same grade (or occupational level) and classification series, and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption." *Id.* § 351.403(a)(1). Third, after establishing competitive levels, the agency establishes a retention register for each competitive level that classifies employees based upon their retention standing. The agency applies the four retention factors required by statute. *See* 5 U.S.C. § 3502. Fourth, the agencies must decide which employees to release from the competitive level based upon the ranking in the retention register.[2] Fifth, agencies must assess whether employees have "bump and retreat" rights. 5 C.F.R. Part 351 Subpart G.[3] In addition, released employees may be reassigned to vacant positions following the same retention procedures that apply to an employee's bump and retreat rights. *Id.* § 351.703. Sixth, agencies must provide notice to affected employees. Agencies are generally required to provide written notice to employees affected by a RIF 60 full days in advance of the date of release. 5 U.S.C. § 3502; 5 C.F.R. Part 351 Subpart H. When a RIF is caused by

---

[2] Before an agency releases any employee from a competitive level, it must first release any noncompeting employee. *See* United States Office of Personnel Management, Workforce Reshaping Operations Handbook, 52-53 (2017), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

[3] "Bumping" is the assignment of an employee to a position in a different competitive level that "[i]s held by another employee in a lower tenure group or in a lower subgroup within the same tenure group." 5 C.F.R. § 351.701(b). "Retreating" is the assignment of an employee to a position in a different competitive level that "[i]s held by another employee with lower retention standing in the same tenure group and subgroup." *Id.* § 351.701(c).

"circumstances not reasonably foreseeable," the head of an agency or designee may request approval from OPM to provide notice less than 60 days in advance, provided that the notice is issued at least 30 days in advance of the release. 5 C.F.R. § 351.801(b). The regulations detail the information that RIF notices must include, such as the reasons for the action, its effective date, and information about the judicial review available to the employee. *Id.* § 351.802. Seventh, the regulations authorize judicial review for affected employees. Generally, employees may challenge RIFs at the MSPB. *Id.* § 351.901 ("An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board"); *Id.* § 1201.3(a)(6).[4] Appeals must generally be brought within 30 days of the effective date of the RIF. *Id.* § 1201.22. The MSPB's decision can be appealed to the Federal Circuit. *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998).

## B. Modern RIFs

On numerous occasions since the Veterans' Preference Act of 1944 was enacted, the federal government has exercised its authority to conduct RIFs. As noted, widespread reductions in the federal workforce were necessary after World War II ended. *See* 64 Ann. Rep. U.S. Civil Service Comm'n 10 (1946-1947). President Truman acknowledged the widespread reductions in force, and expressed hope that separated employees would be able to compete for other federal positions. Harry S Truman, Statement by the President on Federal Employees Displaced by the Reduction-in-Force (Sept. 3, 1949), https://www.trumanlibrary.gov/library/public-papers/201/statement-president-federal-employees-displaced-reduction-force. President Truman also noted that "[i]t is unrealistic to expect . . . that all these employees can be placed in current vacancies in the Federal service, which very properly is contracting in size." *Id.*

The 1980s also featured Executive Branch-led efforts to reduce the federal workforce, including through RIFs. These efforts were undertaken under the Reagan Administration's policy

---

[4] Employees covered by collective bargaining agreements may have mandatory agency grievance procedures they must use in lieu of an MSPB appeal (unless there is an allegation of discrimination, in which case they either go through the agency grievance procedure or the MSPB).

of reducing the size of Government. As President Reagan explained in a radio address, "[f]ifteen departments, agencies, and commissions have been able to reduce their payroll numbers by 20 percent or more." Ronald Reagan, Radio Address to the Nation on Federal Civilian Employment (Aug. 20, 1983), *available at* https://www.reaganlibrary.gov/archives/speech/radio-address-nation-federal-civilian-employment.

The Reagan administration combined its emphasis on reducing the Federal workforce with increased oversight of federal agencies through OMB. *See* Executive Order 12498, 50 Fed. Reg. 1036 (Jan. 4, 1985). Executive Order 12498 set out the following goals: "to create a coordinated process for developing on an annual basis the Administration's Regulatory Program, establish Administration regulatory priorities, increase the accountability of agency heads for the regulatory actions of their agencies, provide for Presidential oversight of the regulatory process, reduce the burdens of existing and future regulations, minimize duplication and conflict of regulations, and enhance public and Congressional understanding of the Administration's regulatory objectives." *Id.* It required executive agencies to "submit to the Director of the Office of Management and Budget (OMB) each year, starting in 1985, a statement of its regulatory policies, goals, and objectives for the coming year and information concerning all significant regulatory actions underway or planned." *Id.* Further, the Executive Order required that "[t]he head of each Executive agency subject to this Order shall ensure that all regulatory actions are consistent with the goals of the agency and of the Administration, and will be appropriately implemented." *Id.*

In the 1990s, the Clinton Administration maintained the policies of the Reagan Administration, both in terms of reducing the number of federal employees and in exercising control over agencies to ensure that they were responsive to the President's policy goals. To promote the goal of reducing the size of the Federal Government, President Clinton issued Executive Order 12839 the month after he took office. Executive Order 12839, 58 Fed. Reg. 8515 (Feb. 10, 1993). The order outlined a plan to reduce 100,000 Federal positions.

Executive Order 12839 relied upon "the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, section 3301 of title 5, United States Code, and section 1111 of title 31, United States

1    Code." *Id.* The Order required that "[e]ach executive department or agency with over 100

2    employees shall eliminate not less than 4 percent of its civilian personnel positions (measured on

3    a full-time equivalent (FTE) basis) over the next 3 fiscal years." *Id.* It further instructed that "[t]he

4    positions shall be vacated through attrition or early out programs established at the discretion of

5    the department and agency heads." *Id.* The Executive Order also required that "[a]t least 10 percent

6    of the reductions shall come from the Senior Executive Service, GS-15 and GS-14 levels or

7    equivalent." *Id.* The Executive Order set "target dates" for these reductions: "Each department and

8    agency shall achieve 25 percent of its total reductions by the end of fiscal year 1993, 62.5 percent

9    by the end of fiscal year 1994, and 100 percent by the end of fiscal year 1995." *Id.* Finally, the

10   Executive Order created a role for OMB, instructing the Director of OMB to "issue detailed

11   instructions regarding the implementation of this order, including exemptions necessary for the

12   delivery of essential services and compliance with applicable law." *Id.*

13        Later in 1993, President Clinton signed a presidential memorandum entitled "Streamlining

14   the Bureaucracy" in which he "direct[ed] each head of an executive department or agency to

15   prepare . . . a streamlining plan to be submitted to the Director of the Office of Management and

16   Budget as part of a goal "to reduce the executive branch civilian work force by 252,000."[5] Also in

17   1993, President Clinton signed a presidential memorandum directing departments and agencies to

18   appoint officials responsible for, among other things, "overseeing agency-specific application of

19   . . . personnel reduction."[6] Ultimately, during the Clinton Administration, there was a substantial

20   reduction in the number of federal employees, due in part to the implementation of RIFs.[7]

21

22

23

24   [5]  William J. Clinton, Memorandum on Streamlining the Bureaucracy (Sept. 11, 1993), https://www.presidency.ucsb.edu/node/327725 (last accessed May 6, 2025).

25   [6]  William J. Clinton, Memorandum on Implementing Management Reform in the Executive

26   Branch (Oct. 1, 1993), https://www.presidency.ucsb.edu/node/327737.

27   [7]  William J. Clinton, Memorandum on Career Transition Assistance for Federal Employees, (Sept. 12, 1995), https://www.presidency.ucsb.edu/documents/memorandum-career-transition-

28   assistance-for-federal-employees (transition services to federal employees who "either have been or are likely to be separated from Federal service due to a reduction in force").

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

## C. Exclusive Scheme for Administrative and Judicial Review of Labor and Personnel Disputes Involving Federal Civil Servants

The Federal Service Labor-Management Relations Statute (FSLMRS), set forth in Title VII of the Civil Service Reform Act of 1978 (CSRA), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (codified at 5 U.S.C. §§ 7101-35), governs labor relations between the Executive Branch and its employees. The statute further "establishes a scheme of administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"). Under that scheme, the Federal Labor Relations Authority (FLRA) reviews matters including negotiability and "unfair labor practice[]" disputes or claims. *See* 5 U.S.C. § 7105(a). When reviewing unfair labor practice complaints, it is "the FLRA [that] resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *AFGE v. Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118)). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. 5 U.S.C. § 7123(a).

The CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted). If an agency takes a final adverse action against an employee no longer in his or her probationary period—including removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less, 5 U.S.C. § 7512—the employee may appeal to the MSPB. *Id.* § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Non-probationary employees may appeal final MSPB decisions to the Federal Circuit, which generally has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.[8]

---

[8] Federal employees serving in their probationary periods (for the Competitive Service) or trial periods (for the Excepted Service) generally do not enjoy a right to appeal to the MSPB, as they are not considered "employee[s]" for purposes of the CSRA's Chapter 75, 5 U.S.C. § 7511(a)(1), but remain properly considered as "applicants" for employment under an extended hiring and evaluation period. *See* 5 U.S.C. § 7511(a)(1)(A)-(B) (one-year trial period), (C) (two-year trial period); 5 C.F.R. §§ 315.801, 301.806. However, many of the protections of the CSRA's Chapter 23 extend to both "applicants and employees." *See*, *e.g.*, 5 U.S.C. § 2302(a)(2)(A)(i)–(xii)

## II. Factual Background

### A. Executive Order 14210

On February 11, 2025, President Trump issued the Workforce Executive Order, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). As relevant to this motion, subpart c of Section 3—"*Reductions in Force*"—directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id.* Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id.*

The Workforce Executive Order further provides that, within 30 days of its issuance (i.e., by March 13, 2025), "Agency Heads shall submit to" OMB and OPM "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id.* § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* The Executive Order further provides that agency heads "may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id.* § 4(b). The Director of OPM is also authorized to "grant exemptions from [the] order." *Id.* § 4(c). Finally, the order states that it "shall be implemented consistent with applicable law and subject to the availability of appropriations," *id.*

---

(identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in an agency").

§ 5(b), and shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof," *id.* § 5(a)(i).

The Workforce Executive Order does not direct specific RIFs and contains no specific requirements related to RIFs except for the guidance set forth above. Consistent with the Order's language, the President has confirmed that agencies have ultimate responsibility for planning and implementing RIFs. *See* Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7, 2025), *available at* https://www.reuters.com/world/us/trump-tells-cabinet-secretaries-they-not-musk-are-charge-staff-cuts-2025-03-06/.

### B. February 26, 2025 Memorandum

On February 26, 2025, OPM and OMB jointly issued the Workforce Memorandum (Memorandum or Workforce Memorandum). ECF No. 37-1 App. 2. We describe the guidance provided by that Memorandum here.

**Agency Plans:** The Memorandum noted that the Workforce Executive Order required agencies to submit reports by March 13 and the Memorandum "submit[s] guidance on these Agency RIF and Reorganization Plans ('ARRP'), along with the instruction that such plans be submitted to OMB and OPM." *Id.* AARPs should seek to achieve five principles: (1) "Better service for the American people; (2) "Increased productivity"; (3) "A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required"; (4) "A reduced real property footprint"; and (5) "Reduced budget topline." *Id.* at 1-2. "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions." *Id.* at 2. The Memorandum identifies in broad terms "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2. The Memorandum cautions that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

**Formulation of Plans:** The Memorandum provides a list of "available tools" agencies should consider employing in crafting their ARRPs to effectuate the President's directive. This includes the hiring freeze President Trump set forth in a January 20, 2025 Presidential Memorandum, processes to ensure that agency heads have visibility and sign off onto potential job offers, eliminating non-statutorily mandated functions through RIFs, reviewing underperforming employees as well as employees engaged in misconduct and probationary employees, reducing headcount through attrition and allowing term or temporary positions to expire without renewal, separating reemployed annuitants in areas likely subject to RIFs, and renegotiating collective bargaining agreements that inhibit government efficiency and employee accountability. *Id.* at 3. The Memorandum also notes that agencies should consider changes to regulations and agency policies that would reduce or eliminate agency subcomponents and otherwise hasten implementation of ARRPs, while cautioning that some such changes "must be pursued through notice-and-comment rulemaking[.]" *Id.*

**Submission of Plans**: The Memorandum states that agencies should submit ARRPs in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, which "shall focus on initial agency cuts and reductions, *id.* at 3; and Phase 2 ARRPs, to be submitted by April 14, 2025, which "shall outline a positive vision for more productive, efficient agency operations going forward," *id.* at 4.

**Phase 1:** Phase 1 ARRPs should provide a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities[,]" tools the agency intends to use to increase efficiencies, "[a] list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs," "[t]he agency's suggested plan for congressional engagement to gather input and

1  agreement on major restructuring efforts and the movement of fundings between accounts," and

2  the agency's timetable for implementation of each part of the Phase 1 AARP. *Id.*

3  **Phase 2:** Phase 2 ARRPs should provide, among other things: confirmation that the agency

4  has reviewed all its personnel data, plans to ensure that employees are grouped based on like duties

5  and functions to the maximum extent possible, any proposed relocations from Washington, D.C.

6  to less expensive areas of the country, "[t]he competitive areas for subsequent large-scale RIFs[,]"

7  all reductions (of FTE positions and otherwise), the agency's plan to ensure new career

8  appointment hires are in highest-need areas, any collective bargaining agreement provisions that

9  inhibit efficiency and cost-savings (and the agency's plan to renegotiate any such provisions), an

10  explanation how the ARRP will improve services for Americans and advance the President's

11  priorities, "[f]or agencies that provide direct services to citizens (such as Social Security,

12  Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs

13  will have a positive effect on the delivery of such services" (a certification that "should include a

14  written explanation from the Agency Head"), plans to improve efficiency and reduce costs through

15  improved technology, "[a]ny changes to regulations and agency policies, including changes that

16  must be pursued through notice-and-comment rulemaking," as well as the agency's timetable and

17  plan for implementing the ARRP. *Id.* at 5-6. The Memorandum further states that agencies should

18  continue sending monthly progress reports on May 14, 2025, June 16, 2025, and July 16, 2025. *Id.*

19  at 6. Phase 2 Plans should be planned for implementation by September 30, 2025. *Id.* at 4.

20  **Exclusions:** The Memorandum contains several exclusions, including the Postal Service,

21  positions "necessary to meet law enforcement, border security, national security, immigration

22  enforcement, or public safety responsibilities[,]" the Executive Office of the President, military

23  personnel in the armed forces and Federal uniformed personnel. *Id.* at 6. Agencies providing direct

24  services to citizens may "not implement any proposed ARRPs until OMB and OPM certify that

25  the plans will have a positive effect on the delivery of such services." *Id.*

26  **Relation to RIFs:** ARRPs are distinct from RIFs. The Workforce Memorandum states

27  that, before a RIF is implemented and an employee separated from service, there must be a formal

28  RIF notice period of 60 days (or 30 days if the agency obtains an OPM waiver), in which affected

employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options. ECF No. 37-1 App. 2 at 7. As noted above, OPM's regulations independently codify these notice requirements.

### III. Procedural History

More than two months after OPM and OMB issued the Memorandum, Plaintiffs—employee unions, organizations, cities, and counties—sued on April 28, 2025. *See* ECF No. 1 (Complaint). They filed the TRO motion three days later. *See* ECF No. 37 (TRO Motion); ECF No. 37-1 (TRO Brief). The Complaint names President Trump, OPM, OMB, USDS, and 23 other components as well as their heads as defendants (including virtually every Cabinet-level Department). Complaint ¶¶ 55-106.[9]

The Complaint contains seven claims for relief. Claim I, styled as a "Separation of Powers/*Ultra Vires*" claim that is asserted against President Trump, asserts that "Executive Order 14210 exceeds the President's lawful authority" by, in Plaintiffs' characterization of the Order, directing the Federal Agency Defendants to implement large-scale RIFs, and prioritize certain items and functions in those RIFs, among other things. *Id.* ¶ 359. According to Plaintiffs, "Congress has not delegated to the President the authority to employ and discharge the subordinate employees of the agencies or to spend appropriated funds on those positions; rather, it delegated those functions exclusively to the heads of federal agencies." *Id.* ¶ 356.

Claims II-V consist of claims against OPM, OMB, and USDS.[10] Claim II asserts a Separation of Powers/*Ultra Vires* claim against OPM, OMB, and USDS as well as their directors,

---

[9] Plaintiffs refer to the 23 other defendants as "Federal Agency Defendants." Complaint ¶ 63. We do not concede that all of these entities are agencies for the purposes of the Freedom of Information Act, Federal Records Act, APA, or any other purpose (it is well-established that the President is not an agency; the government's position is also that USDS is not an agency). But since the TRO must be denied regardless of whether any or all the Defendants are agencies, we do not address that issue further (except to note below that the President is not an agency who can be sued under the APA). And for ease of reference, we also use the "agency" terminology in this brief.

[10] Again, Plaintiffs characterize this claim as being brought against "DOGE" but we assume that the intended defendant is USDS, since the DOGE structure—consisting of USDS, the USDS Temporary Organization, and every DOGE Team housed within agencies—is not even an entity that can be sued. In any event, the claim fails and is not the basis for a TRO regardless of who Plaintiffs purport to bring it against.

---

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

**Add.250**

and contends that the Workforce Memorandum exceeds these entities' authority by supposedly "supplant[ing] the decision-making authority of the federal agencies with respect to federal agency employment or organization." *Id.* ¶ 365. Claim III, an APA claim, asserts that the same Memorandum is not in accordance with law and exceeds the authority of OPM, OMB, and USDS on similar grounds. *Id.* ¶¶ 369-379. Claim IV, also an APA claim, asserts that OPM, OMB, and USDS acted arbitrarily and capriciously by issuing the Workforce Memorandum, and issuing any decision approving an ARRP (and that USDS's supposed directives ordering agencies to make staffing and spending cuts are likewise arbitrary and capricious) because they supposedly "order federal agencies to cede decision-making authority to" those entities and direct large-scale RIFs regardless of agency's statutory requirements, regulations, and necessary functions. *Id.* ¶¶ 380-83. Claim V asserts that the Workforce Memorandum is a "rule" under the APA that was subject to notice-and-comment requirements. *Id.* ¶¶ 384-91.

Claims VI and VII are advanced against Federal Agency Defendants. Claim VI, an APA claim for action not in accordance with law, contends that that the Federal Agency defendants have unlawfully "cede[d] their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE." *Id.* ¶ 396. Claim VII, an APA claim for arbitrary and capricious agency action, asserts (again, without discussion of any specific RIFs) that the agencies' implementation of the Workforce Executive Order is arbitrary and capricious. *Id.* ¶ 403.

On May 1, 2025, Plaintiffs filed the TRO Motion against OPM, OMB, USDS, and 17 of the agency defendants, seeking to enjoin implementation of the Workforce Executive Order and Workforce Memorandum, including approvals of ARRPs, execution of any RIF notices, issuance of further RIF notices, placement of employees on administrative leave, "any further transfer of functions or programs between any Federal Agency Defendants in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs" and "any further orders by DOGE to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs[.]" TRO Motion at 1-2.[11]

---

[11] In citing to filings, unless otherwise indicated, we use the page numbers corresponding to the pages in the underlying document rather than on the ECF stamp.

## STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure empowers district courts to issue TROs. *See* Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (standards applicable to TROs and preliminary injunctions "substantially identical" (quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). A court should not "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

## ARGUMENT

Plaintiffs seek the extraordinary remedy of a temporary restraining order, and not just any restraining order. They ask this Court to enjoin implementation of an Executive Order on a virtually government-wide basis, in an area of core Executive Branch responsibility. *See Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) ("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs."). But Plaintiffs are not entitled to any TRO because they waited far too long to bring this motion and any "emergency" is thus entirely of their own making. And even putting that aside, Plaintiffs satisfy none of the four *Winter* requirements, let alone all of them.

## I. Plaintiffs' Delay Alone Warrants Denial of the TRO Motion

The Court should deny the TRO on the threshold ground that Plaintiffs waited too long to seek this "emergency" relief. Plaintiffs filed their motion for a TRO on May 1, *more than eleven weeks* after the President signed the Workforce Executive Order (on February 11, 2025), and *more than nine weeks* after OPM and OMB issued the Workforce Memorandum. Plaintiffs' delay forecloses preliminary injunctive relief—let alone a temporary restraining order. A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (citation omitted). "Delays of

one month or more are common grounds for denying motions for temporary restraining orders, and some courts deny temporary relief based on delays of as little as ten days." *Int'l Tech. Univ. Found. v. WASC Senior Coll. & Univ. Comm'n*, No. 22-cv-4576, 2023 WL 2621344, at *3 (N.D. Cal. Mar. 23, 2023).

This Court and other federal district courts in California have denied motions for TROs by plaintiffs who delayed much less than Plaintiffs' 11-week delay. *See, e.g.*, *Perez v. City of Petaluma*, No. 21-CV-06190-JST, 2021 WL 3934327, at *1 (N.D. Cal. Aug. 13, 2021) (one-month delay); *West v. PBC Mgmt. LLC*, No. 23-cv-3283, 2023 WL 4477296, at *2 (N.D. Cal. July 10, 2023) (eight-week delay); *Devasahayam v. DMB Cap. Grp.*, No. 3:17-cv-02095-BEN-WVG, 2017 WL 6547897, at *4 (S.D. Cal. Dec. 20, 2017) (one-month delay was "reason enough to deny a TRO"). In February, a federal judge in Washington, D.C., criticized attorneys who waited 21 days before filing a motion for a TRO challenging the removal of inspectors general. Chris Cameron, *Judge Refuses to Immediately Reinstate Inspectors General Fired by Trump*, N.Y. Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-inspectors-general-ruling.html.

At bottom, preliminary relief exists to give a court enough time to engage in the ordinary adjudicative process. *See* 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. Apr. 2025 update) ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."). Thus, to obtain a temporary restraining order, Plaintiffs must show that they will suffer irreparable harm in the time before the Court can hold a hearing on a preliminary injunction; if they cannot meet that burden, they are not entitled to a TRO. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842–43 (2d Cir. 1962); *cf. Granny Goose Foods, Inc. v. Bhd. of Teamsters Loc. No. 70*, 415 U.S. 423, 439 (1974) (ex parte TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."). Here, where plaintiffs have produced a 50-page motion and 1,300 pages of declarations, where the government has been provided notice, and where the Court will hold a live hearing before resolving the motion, plaintiffs cannot show irreparable harm in the time before a preliminary injunction could be issued because this Court

could just as easily have considered this motion as one for a preliminary injunction. Plaintiffs'
weeks-long delay in filing suit and in seeking a TRO underscores that they do not need immediate
relief to preserve the Court's ability to grant them effectual relief should they prevail on the merits.
That they have titled their motion one for a TRO does not make it so. *See Sampson v. Murray*, 415
U.S. 61, 86-87 (1974) (TRO label does shield a coercive order from appellate review).

It is no answer to contend, as Plaintiffs have, that RIFs are only now occurring or are
occurring soon. ECF No. 43 at 2. The TRO Motion does not make freestanding challenges to
particular RIFs, and Plaintiffs do not seek to enjoin particular RIFs on fact-specific grounds. Again,
Plaintiffs' challenges involve legal grounds that were fully available to them beginning February
11 and February 26. Although Plaintiffs also assert two claims against the Federal Agency
Defendants, *see supra* p. 18, those claims also are not based on any fact-bound attack on particular
RIFs. Rather, Plaintiffs complain that these agencies have supposedly ceded decisionmaking
authority to the President, OPM, OMB, and USDS, that they are, inter alia, being compelled to act
on unrealistic timetables, and that the RIFs they will supposedly engage in are necessarily contrary
to statute. *Id.* As discussed further below, these contentions are entirely speculative and have no
basis in either the Workforce Executive Order or the Workforce Memorandum. *See infra* pp. 45-
46. But for present purposes, it suffices to note that Plaintiffs could have made all of these
arguments months ago—beginning February 11 or (at the latest) by February 26.

Plaintiffs also contend that "neither the White House, OMB, OPM, nor any of the
implementing agencies made [the ARRPs] public" and "Plaintiffs have been required to uncover
the evidence to support this TRO request by relying on leaks and unfolding events." ECF No. 37
at 2. But as the Workforce Memorandum and the description above make clear, the ARRPs are
deliberative agency planning documents that discuss a number of steps the agency plans to take
to, inter alia, improve the agency's efficiency, as well as to focus on statutorily required functions
activities that directly serve the public. *See supra* pp. 15-16. RIFs follow a separate process,
including a formal RIF notice period of 60 days (or 30 days if the agency obtains an OPM waiver),
in which affected employees are issued formal RIF notices, as well as provided appeal rights,
career transition assistance, and priority placement options. ECF No. 37-1 App. 2 at 7. Employees

1  who receive a RIF notice also have an opportunity to inspect the retention register/related records

2  before the RIF. 5 CFR § 351.505(b)(1). If pre-RIF challenges are judicially cognizable, the

3  appropriate time for such litigation would be during the 60-day (or 30-day) notice period.

4  And in any event, again, Plaintiffs' legal claims are based on the content of the February

5  11 Workforce Executive Order, and the February 26 Workforce Memorandum. Had Plaintiffs filed

6  suit in February, these questions could have been litigated long ago—indeed, it is quite possible

7  that this Court could have by now decided modestly expedited *motions for summary judgment*

8  raising the legal issues Plaintiffs raise in this TRO motion. This Court should reject out of hand

9  the notion that Plaintiffs' sprawling current challenge to an Executive Order issued nearly three

10  months ago constitutes an emergency that requires the nearly government-wide TRO that Plaintiffs

11  now request. Because this motion comes far too late, the Court should deny it.

12  **II. Plaintiffs Satisfy None of the *Winter* Requirements**

13  Given the timing considerations set forth above, this Court should deny the TRO motion

14  without further consideration of the relevant requirements. But even if the Court considers the four

15  *Winter* requirements, Plaintiffs satisfy none of them.

16  **A. Plaintiffs Are Unlikely to Succeed on the Merits of their Claims**

17  The likelihood-of-success factor "is a threshold inquiry and is the most important factor."

18  *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). And it is dispositive here.

19  Plaintiffs can show no likelihood of success in their challenge to the Workforce Executive Order

20  and the Workforce Memorandum. They cannot challenge either and, even if they could, both are

21  lawful. To the extent Plaintiffs purport to challenge particular RIFs, this Court lacks jurisdiction

22  to consider those challenges, and any such challenge would be utterly conclusory.

23  **1. The Workforce Executive Order and Workforce Memorandum are Not Subject to Review**

24  

25  Plaintiffs are unlikely to succeed in challenging the Workforce Executive Order and the

26  Workforce Memorandum because this Court lacks jurisdiction to consider those challenges.

27  Congress's comprehensive remedial scheme for adjudicating employment disputes with the

28  federal government precludes Plaintiffs' suit. They have not established standing to pursue their

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI
**Add.255**

claims and to seek the relief sought in the TRO motion. And even putting these threshold obstacles aside, neither the Workforce Executive Order nor the Workforce Memorandum is reviewable in this context. We address each point in turn.

### a. The FSLMRS and CSRA Preclude District-Court Jurisdiction Over Plaintiffs' Challenge to the Workforce Executive Order and Workforce Memorandum.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015). Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)); *accord Kerr v. Jewell*, 836 F.3d 1048, 1057-58 (9th Cir. 2016). Applying that framework here, neither the union Plaintiffs nor the non-union Plaintiffs can show that their challenge to any RIFs agencies may undertake in implementing the Workforce Executive Order can be heard in federal district court.

**Union Plaintiffs:** First, the union Plaintiffs cannot show that district courts have jurisdiction over their claims. *See AFGE v. Trump*, 929 F.3d at 752; *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025); *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080 (D.D.C. Feb. 20, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025).

In *AFGE v. Trump*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three executive orders issued by President Trump during his first administration that would have enacted substantial changes to the way federal unions operated. On the government's appeal from a district court decision largely in the unions' favor, the D.C. Circuit reversed the underlying decision on jurisdictional grounds, holding that the FSLMRS's

comprehensive administrative-judicial review scheme channeled jurisdiction entirely away from the federal district courts. Federal labor disputes must be heard through the FLRA review scheme, with judicial review in a federal court of appeals following the conclusion of administrative proceedings before the FLRA. *See AFGE v. Trump*, 929 F.3d at 754-61. Applying the logic of that holding, a federal district court in Washington, D.C. recently held—in denying a preliminary injunction that also challenged Executive Order 14210, in the context of alleged firing of 70 CFPB employees—that the FSLMRS channeled jurisdiction away from federal district courts and instead required the unions to pursue their claims before the FLRA. *See Nat'l Treasury Emps. Union*, 2025 WL 561080, at *4. A district court in Massachusetts reached the same conclusion in a lawsuit by labor unions representing federal employees challenging the closing of the deferred resignation offer known as the "Fork in the Road." *Am. Fed'n of Gov' Emps.*, 2025 WL 470459, at *1-*3.

The Fourth and D.C. Circuits reached similar conclusions in decisions from the last month concerning the Administration's workforce policies. The Fourth Circuit stayed a preliminary injunction to "refrain" from certain types of "reductions in force." *Maryland*, 2025 WL 1073657, at *1. "[T]he Government argue[d] . . . that the district court lacked subject-matter jurisdiction because the Civil Service Reform Act . . . provides the exclusive means for review of personnel actions taken against federal employees." *Id.* The Court agreed, recognizing "the Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." *Id.* So too in the D.C. Circuit. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025). In response to an Executive Order directing the United States Agency for Global Media (USAGM) leadership to reduce the agency to the minimum level of operations required by statute, *see* 90 Fed. Reg. 13043 (Mar. 14, 2025), USAGM placed over 1,000 employees on administrative leave, and terminated nearly 600 personal-service contractors. The D.C. Circuit stayed a district court order preliminarily enjoining those actions, finding that "[t]he district court likely lacked jurisdiction over USAGM's personnel actions." *Widakuswara*, 2025 WL 1288817 at *2. The Court noted that "'[w]e have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions.'" *Id.* (quoting *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009)). "Congress has instead established

comprehensive statutory schemes for adjudicating employment disputes with the federal government" and "[t]hese remedial schemes provide[] the exclusive procedures by which federal employees may pursue employment- and contractor-related claims." *Id.*

In so concluding, the panel majority also rejected the district court's conclusion that an injunction was warranted because "this case is not simply a collection of employment disputes" since the "facts on the record and on the ground" suggest USAGM is being "dismantl[ed]." *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025). The panel majority did not quibble with the district court's characterization but instead held that it was irrelevant to the channeling question. As the Court explained, "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'" *Widakuswara*, 2025 WL 1288817, at *3 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 893). Rather, any individual personnel actions "must be pursued through other remedial channels." *Id.*

The same result is required here. "The claims here are brought by a union representing federal employees against their federal employers—thus, they are federal labor-management relations claims." *Nat'l Treasury Emps. Union*, 2025 WL 561080, at *5 (quotation marks omitted). "And the Statute's scheme is 'exclusive' with respect to such claims." *Id.* Indeed, the Supreme Court recognized this exclusivity principle just last month in staying a district court's temporary restraining order under the APA in the funding context: "The APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (quoting 5 U.S.C. § 702). Citing *California*, the Fourth Circuit last month stayed a preliminary injunction

**Non-Union Plaintiffs:** The non-union Plaintiffs also fail to show that their claims can be heard in federal district court. The CSRA provides the exclusive means of redressing employment disputes involving federal employees, *see United States v. Fausto*, 484 U.S. 439, 455 (1988)), even when those disputes involve constitutional claims. *See Elgin*, 567 U.S. at 10-15. Such claims must be pursued before the MSPB (if at all). The CSRA thus imposes an "implied preclusion of district

1  court jurisdiction," *id.* at 12, and "precludes courts from providing supplemental remedies,"

2  *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018).

3     This is the exact conclusion the Ninth Circuit reached in *Veit v. Heckler*, 746 F.2d 508,

4  510-11 (9th Cir. 1984), over four decades ago. In that case, a career employee of the Social

5  Security Administration sued the Secretary of Health and Human Services in federal district court

6  to challenge the agency's appraisal of his job performance. *Id.* at 510. The district court rejected

7  the employee's claim, holding that it was not subject to federal court review, and the Ninth Circuit

8  affirmed. The court noted that "[t]he CSRA provides a comprehensive scheme for administrative

9  and judicial review of federal personnel actions and practices." *Id.* It observed that "other circuits

10  have held that the comprehensive nature of the procedures and remedies provided by the CSRA

11  indicates a clear congressional intent to permit federal court review as provided in the CSRA *or*

12  *not at all*." *Id.* at 511 (emphasis added). And the Ninth Circuit agreed with those courts that "the

13  federal courts have no power to review federal personnel decisions and procedures unless such

14  review is *expressly* authorized by Congress in the CSRA or elsewhere." *Id.* (emphasis added).

15     **Plaintiffs' claims are precluded:** Given that well-established precedent demonstrating

16  that Plaintiffs' claims are precluded, specific consideration of the *Thunder Basin* factors is

17  unnecessary here. In any event, analysis of those factors confirms this conclusion.

18     The first step under *Thunder Basin*—Congress's intent to preclude—is satisfied here:

19  Congress established a detailed scheme for adjudicating federal labor disputes. The FSLMRS

20  provides for "administrative and judicial review" regarding disputes between employees and their

21  federal employers and disputes between unions representing those employees and the government.

22  *AFGE*, 929 F.3d at 752. Congress decided, through the FSLMRS, that federal labor disputes must

23  first be administratively exhausted before the FLRA. Judicial review, if any, is available only in a

24  court of appeals. *See id.* (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *see also* 5 U.S.C. § 7703(b)

25  (judicial review in Federal Circuit or other court of appeals). "Congress typically chooses . . .

26  review in a court of appeals following the agency's own review process" when designing an

27  implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is what this scheme includes. Accordingly,

28  as the D.C. Circuit has recognized, the FSLMRS precludes jurisdiction in the district courts over

1    federal union disputes. *See AFGE v. Trump*, 929 F.3d at 754. This "enormously complicated and

2    subtle scheme to govern employee relations in the federal sector" does not permit a district court

3    runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir.

4    2013)). The same is true for the CSRA. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455.

5    Turning to the second *Thunder Basin* step—whether particular claims are of the type

6    Congress intended to be reviewed in this scheme—the Court must consider "three considerations

7    designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Axon*, 598

8    U.S. at 186. The factors are: (i) "could precluding district court jurisdiction foreclose all

9    meaningful judicial review of the claim"; (ii) "is the claim wholly collateral to the statute's review

10   provisions"; and (iii) "is the claim outside the agency's expertise?" *Id.* (internal quotation marks,

11   citation, and alteration omitted). These "considerations" are ultimately merely guideposts to "best

12   [] understand what Congress has done—whether the statutory review scheme, though exclusive

13   where it applies, reaches the claim in question." *Id.*

14   All three factors are satisfied here. First, both statutory schemes provide meaningful

15   judicial review over Plaintiffs' claims. Plaintiffs do not substantially argue otherwise. Plaintiffs

16   briefly contend that "[t]he FLRA hears bargaining unit-specific matters that *expressly exclude*

17   government-wide action." TRO Brief at 47 (citing *NTEU and Dep't of Treasury*, IRS, 60 F.L.R.A.

18   783, 783 (2005). But even if this assessment of the FLRA's authority is accurate, the assertion is

19   irrelevant. As Judge Cooper observed in *National Treasury Employees Union*, "even if the FLRA

20   cannot decide [Plaintiffs'] constitutional claims, 'it is of no dispositive significance whether the

21   agency has the authority to rule on constitutional claims so long as the claims can eventually reach

22   an Article III court fully competent to adjudicate them.'" 2025 WL 561080 at *7 (quoting *AFGE

23   v. Trump*, 929 F.3d at 758 (some quotation marks omitted)). Here, as in *AFGE v. Trump*, parties

24   can bring certain claims through the administrative process "in the context of concrete . . .

25   disputes." *Id.* at 757. Similarly, if any Plaintiff thinks particular RIFs conflict with any federal rule,

26   guidance, or statute, it may assert such a claim within one of the review schemes. *See, e.g.*,

27   *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory

28   interpretation); *Lyons v. Dep't of Veteran's Affs.*, 273 F. App'x 929, 931 (Fed. Cir. 2008)

(considering whether regulation was violated); *Fed. L. Enf't Offs. Ass'n v. Ahuja*, 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system).[12]

Plaintiffs' claims are also not wholly collateral. As the Supreme Court explained in *Elgin*, what matters for purposes of this inquiry is whether *the subject* of Plaintiffs' challenge is a matter covered by the CSRA and FSLMRS schemes. Thus, in *Elgin*, Plaintiffs' "constitutional claims [were] the vehicle by which they seek to reverse the removal decisions, to return to federal employment[.]" 567 U.S. at 22. And "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Id.* Similarly here, the ultimate subject of Plaintiffs' challenge is agency removals in the form of RIFs; their APA and ultra vires claims are simply the vehicles by which they seek to prevent such RIFs.[13]

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. As noted, Plaintiffs contend that the Workforce Executive Order and Workforce Memorandum effectively compel agencies to engage in large-scale RIFs that are necessarily contrary to statute, and force them to act under unrealistic timeframes. *See supra* p. 18. That assertion is incorrect but, in any event, is a question expert administrative agencies should assess in the context of challenges to particular RIFs, not a question a federal district court should address

---

[12] The FLRA and MSPB are also both capable of adjudicating claims of multiple employees raising common issues on a consolidated basis. *See Nat'l Treasury Emps. Union*, 2025 WL 561080, at *7 ("NTEU provides no reason why it could not seek relief from the FLRA on behalf of a class of plaintiffs and admits that it would ask other agencies to follow an administrative judge's ruling in its favor."); Order on Stay Request, *Special Counsel ex rel. John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5 (single MSPB order staying termination of nearly 6,000 employees); *see also Widakuswara*, 2025 WL 1288817, at *2 n.2 (D.C. Circuit noting this MSPB ruling and stating that "administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters").

[13] This case is thus unlike *Axon*, where the Supreme Court held that the claims at issue did not need to be channeled. In that case, plaintiffs challenged pending FTC and SEC enforcement actions on the ground that the ALJs could not "constitutionally exercise governmental authority because of their dual-layer protection from removal." 598 U.S. at 183. The core of each plaintiffs' claim was that they were subject to "an illegitimate proceeding, led by an illegitimate decisionmaker," which qualified as a "here-and-now injury" that could not be remedied after the fact, because "[a] proceeding that has already happened cannot be undone." *Id.* at 191 (citation omitted). Here, Plaintiffs' claims are not based on a claim that the administrative schemes are unconstitutionally structured or otherwise invalid.

in a government-wide challenge to an Executive Order that provides agencies with significant discretion in implementation. Indeed, even in *Elgin* (where the question at issue was the constitutionality of a federal statute), the Court noted that the need for agency expertise supported a channeling requirement, since "preliminary questions unique to the employment context" include fact questions about a "resignation" (there whether it "amounted to a constructive discharge") as well as "statutory or constitutional claims that the MSPB routinely considers." 567 U.S. at 22-23. Even if some of the claims could move beyond the administrative expertise of the FLRA or the MSPB, these "threshold questions" may "alleviate [the other] concerns." *Id.*

Against all of this, Plaintiffs address channeling only briefly and unpersuasively. Plaintiffs do not specifically address the *Thunder Basin* factors[14] but insist that the channeling requirement does not apply because "the administrative agencies at issue were never designed to handle claims involving (1) the President, (2) OPM, (3) OMB, or (4) DOGE, *or* (5) agency action effectuating government-wide Presidential orders, whether under the APA or ultra vires doctrine." TRO Brief at 47. But initially, it is not even clear what this means. The personnel actions Plaintiffs seek to prevent—namely, RIFs—will be carried out by individual agency defendants, and there is no basis for Plaintiffs' claim that the President, OPM, OMB, and USDS are dictating specific RIFs.

But in any event, it makes no difference whether labor relations claims covered by the FSLMRS or personnel actions covered by the CSRA are ultimately traceable to the President (or OMB, OPM, or USDS). In *AFGE v. Trump*, an Executive Order was also involved and that did not change the fact that the labor statutes applied. *AFGE v. Trump*, 929 F.3d at 753. Nor is there any exception to channeling requirements for covered personnel actions purportedly taken pursuant to "government-wide" policies. The employees in *Elgin*, to take just one example, were discharged pursuant to a "government-wide" rule: they failed to register for the draft and a federal statute barred from Executive agency employment anyone who has knowingly and willfully failed

---

[14] Plaintiffs cite Justice Gorsuch's concurrence in *Axon* criticizing *Thunder Basin*. *See Axon*, 598 U.S. at 205 (Gorsuch, J., concurring). Justice Thomas also expressed criticism of *Thunder Basin*. *Id.* at 196 (Thomas, J., concurring). But as Judge Cooper pointed out in *National Treasury Employees Union*, 2025 WL 561080 at *5 n.3, the seven other Justices applied the *Thunder Basin* factors, and there is no question this framework remains good law that is binding here.

to register for the Selective Service as required by the Military Selective Service Act, 5 U.S.C. § 3328. *See Elgin*, 567 U.S. at 7. Plaintiffs also cite the Fifth Circuit's decision in *Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) (en banc) (since vacated as moot) as a case "rejecting channeling of challenge to Presidential mandate." TRO Brief at 48. But the Fifth Circuit there rejected channeling arguments because it concluded that the subject of the challenge—a vaccine mandate—was not a personnel action covered by the CSRA. 63 F.4th at 375. That holding has nothing to do with this case. The FSLMRS and CSRA bar Plaintiffs' claims.

Finally on this point, Defendants recognize that, as Plaintiffs note, Judge Alsup recently concluded that public-sector unions were not subject to statutory channeling in a case challenging the termination of probationary employees. *AFGE v. OPM*, No. 25-01780, 2025 WL 900057, at *2 (N.D. Cal. Mar. 24, 2025). Defendants respectfully submit that this decision was incorrect and have appealed it but, in any event, it is clearly distinguishable from this one in several respects.

For one, Judge Alsup concluded there that "[t]he public-sector unions' ultra vires and other claims will not be subject to judicial review if not litigated here" because probationary employees do not have appeal rights to the MSPB (whose decision could then be subject to judicial review). *Id.* at *4. That consideration is irrelevant here because this action does not involve a challenge to matters concerning probationary employees in particular.

And in applying the *Thunder Basin* factors, Judge Alsup concluded that the case involved OPM directing "all federal agencies to terminate their probationers *en masse*." *Id.* at *3. Based on that characterization[15]—that the case involved whether OPM had the authority to issue a clear directive that agencies purportedly then obeyed—Judge Alsup concluded that the case raised "only a standard issue of administrative and constitutional law, relating not at all to considerations of agency policy," *id.* at *2 (citation omitted), and that the claim was wholly collateral because it involved no challenge to any decision about a particular agency's workforce but, rather, about "a prior controlling event: Did the OPM exceed its authority when it directed all federal agencies to terminate their probationers en masse[,]" *id.* at *3. Here, by contrast, the Workforce Executive Order and Memorandum plainly do not contain the sort of simple directive like the "terminate all

---

[15] Which, to be clear, the government asserts was and is incorrect.

probationary employees" directive that Judge Alsup ascribed to OPM in that case. Neither source directs RIFs of particular employees or classes of employees, and both provide ample discretion for agencies to conduct RIFs consistent with their own workforce needs, and statutorily required functions. Any challenges to RIFs in this context thus necessarily involve consideration of agency policy issues—including agency-specific questions regarding each agency's particular statutory authorities and responsibilities, and the particular RIF action that the agency chose or is planning to carry out—of the sort that must be channeled through the exclusive remedial schemes that Congress has established. Because this Court lacks jurisdiction over Plaintiffs' claims, Plaintiffs are not likely to succeed on the merits of those claims.

### b. Plaintiffs Fail to Show Standing

To establish standing, a plaintiff must show: (i) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (ii) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (iii) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up) (omission in original). Plaintiffs "bear[] the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up) (omission in original). Because Plaintiffs seek a 14-day TRO and bear the burden of showing standing for each remedy they request, they must demonstrate a redressable injury for that time period.

To establish injury in fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, rather than being a "generalized grievance," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted). "[A]llegations of *possible* future injury are not sufficient" to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted).

The union Plaintiffs have not established their standing. Because they rely on their members' injuries, the union Plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009). Plaintiffs assert that "[u]nion Plaintiffs' members include many federal employees who have suffered, or imminently will suffer, termination due to the RIFs," TRO Brief at 44. But the examples in the footnote accompanying that assertion do not adequately substantiate this claim. Specifically, the Kelley, Blake, Cochran, Norman, Howell, Wilson, and Turner-Nichols declarations do not appear to allege any imminent RIFs of any named Plaintiff union members. *See* ECF Nos. 37-6 (no specific allegations about pending or specific imminent RIFs), 37-10 ¶ 9 ("To date, I have not heard of any formal plans for a RIF at the Department of the Interior or, specifically at NPS."), 37-19 ¶ 14 (noting that formal RIF notices have not been sent but will be 30 days in advance of June 30), 37-23 ¶ 16 (noting that bargaining unit employees have received RIFs but not specifying whether any are members and not naming them), 37-25 (no specific allegations about pending or specific imminent RIFs), 37-28 (same), 37-33 (same), 37-35 (same).[16] Nor can plaintiffs rely (TRO Brief at 44-45) on the speculative possibility that some member may be harmed as a result of a future RIF. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009). Rather, they must identify specific members by name who will suffer harm. *See Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.,* 713 F.3d 1187, 1194 (9th Cir. 2013). "This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498-99 (2009). Plaintiffs do not meet that standard here.

---

[16] The TRO motion does not seek relief as to any employee as to whom a RIF has already been effectuated. TRO Motion at 2. And any such request would be without merit given that the purpose of a preliminary injunction (and certainly a TRO) is to preserve the status quo, and "courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo.'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)).

1     Plaintiffs' other standing allegations are unavailing. Although Plaintiffs assert that "[t]he

2  members who remain employed will face overwork and worsened conditions," TRO Brief at 45,

3  this contention is entirely conclusory, particularly since—as discussed above—the Executive

4  Order directs agencies to consider RIFs as part of a broader effort to focus agencies on, among

5  other things, the performance of statutorily required functions (not to reduce headcount for its own

6  sake). Nor have Plaintiffs shown that being asked to perform more duties at work is a concrete

7  harm for purposes of Article III. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)

8  (plaintiff must show harm of the type cognizable at common law). Plaintiffs also claim standing

9  based on the supposedly impending loss of critical government services. TRO Brief at 45. But this

10  too is speculative, particularly given the discretion afforded to agencies by the Workforce

11  Executive Order, and the Workforce Memorandum's repeated instructions that agencies should

12  not undertake any action that would impair service delivery functions. *See infra* p. 37. Even if it

13  were not speculative, Plaintiffs would *still* lack standing as mere potential end-users of government

14  services. *United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023); *Arizona v. Biden*, 40 F.4th

15  375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs

16  on a State creates a cognizable Article III injury for the State to vindicate in federal court").

17  Plaintiffs also contend that the prospect of RIFs require them to divert their own resources. TRO

18  Brief at 45. That theory of organizational standing was expressly rejected in the Supreme Court's

19  recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The Court

20  rejected the proposition that "standing exists when an organization diverts its resources in response

21  to a defendant's actions," stating "[t]hat is incorrect." *Id.* at 395. And, in any event, this assertion

22  too is entirely conclusory. Finally, Plaintiffs contend that they "have standing for their procedural

23  claims, because they would have submitted comments had Defendants properly engaged in notice-

24  and-comment rulemaking." TRO Brief at 46. But Plaintiffs' notice and comment claim concerns

25  only the February 26, 2025 Workforce Memorandum, which has no direct effect on any of

26  Plaintiffs. *See infra* p. 36-38.

27

28

c. **Independent of the FSLMRS and CSRA, the Workforce Executive Order Is Not Reviewable Here**

Even if statutory preclusion did not apply, the Workforce Executive Order still would not be reviewable in this Court. The President is not an agency, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and therefore "actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994). To be sure, final agency actions implementing the Workforce Executive Order may be subject to judicial review (though not in federal district court for personnel and labor actions, *see supra* pp. 23-31), *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996), but the Executive Order itself is not. As noted above, Plaintiffs do not challenge any specific RIF. Thus, APA review of the Workforce Executive Order is plainly unavailable here.

Although the "President's actions may still be reviewed for constitutionality" through a cause of action in equity, *Franklin*, 505 U.S. at 801, that cause of action is unavailable here because this exception applies only to constitutional claims. "Claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the exception recognized in *Franklin*." *Dalton*, 511 U.S. at 473-74.

In *Dalton*, for example, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Rather, the Court explained that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. In reaching this conclusion, the Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). It explained that the Constitution is implicated only if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51-54 (D.D.C. 2020) (rejecting separation-of-powers claim based on Appropriations Clause under *Dalton* because "[a]t bottom, this is just an allegation that [executive officials] exceeded their statutory authority"). That forecloses Plaintiffs' *ultra vires* claim here because it is a claim for statutory violations, not freestanding constitutional claims. *See* TRO Brief at 29-35

(Plaintiffs arguing at length that neither Article II nor a specific statute authorizes the Workforce Executive Order but making no freestanding constitutional arguments).

To be sure, the Supreme Court suggested in *Dalton* that nonstatutory review of the President's actions for constitutionality could be available in a case "involv[ing] the conceded *absence of any* statutory authority." 511 U.S. at 473; *see also id.* (discussing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) as an example of this scenario because the Government in that case had made no argument about statutory authorization and thus "[t]he only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces"). But that narrow exception is plainly inapplicable here because federal law expressly permits RIFs, the governing statute expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century. *See supra* pp. 5-11.

### d.  The Workforce Memorandum is Not a Reviewable Final Agency Action

Also independent of the jurisdictional barriers identified above, the Workforce Memorandum is not reviewable because only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. That requirement has two distinct parts. First, what is challenged must be "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" *Id.* § 551(13). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), against programs for which they are seeking "*wholesale* improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan*, 497 U.S. at 891. As the *Lujan* Court explained, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations." *Id.* at 899; *see also Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.") (alteration in original) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)), *appeal filed*, No. 23-5288 (D.C. Cir argued Nov. 22, 2024).

1    Second, agency action must be "final." The Supreme Court has laid out a two-part test for

2    finality, including that (1) "the action must mark the consummation of the agency's

3    decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and

4    (2) "the action must be one by which "rights or obligations have been determined,' or from which

5    'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations

6    omitted). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s]

7    or ruling[s]." 5 U.S.C. § 704.

8    Here, the Workforce Memorandum does not qualify as "agency action." As noted above,

9    the Workforce Memorandum is inter-agency correspondence which states that agencies should

10    submit Phase 1 ARRPs by March 13 (reports that were already required under the Workforce

11    Executive Order), and Phase 2 ARRPs by April 14, and sets forth guidance on what those ARRPs

12    should contain. The APA provides a list of five actions which it considers agency action: rules,

13    orders, licenses, sanctions, and relief. 5 U.S.C. § 551(13). The Act further defines each of these

14    terms. *Id.* § 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief"). Even

15    construed expansively, none of these terms encompasses the Workforce Memorandum.

16    But even if the Workforce Memorandum qualifies as an agency action, it is not a *final*

17    agency action. Plaintiffs do not explain how the Memorandum "consummat[es]" any agency's

18    decisionmaking process in such a way that legal consequences flow to Plaintiffs. *U.S. Army Corps.*

19    *of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (citation omitted). As the D.C. Circuit has

20    explained, this prong of the *Bennet* test is measured by the "actual legal effect (or lack thereof) of

21    the agency action in question on regulated entities." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243,

22    252 (D.C. Cir. 2014).

23    The Workforce Memorandum has no such effect. It begins an iterative process between

24    agencies and OPM and OMB, while explaining in broad terms what the agency ARRPs should

25    include. Although Plaintiffs contend that the Memorandum provides "extensive direction to

26    agencies," the examples they cite underscore that it provides broad guidance, some of which just

27    replicates the Workforce Executive Order. TRO Brief at 10-11; *see id.* (quoting portions of

28    Memorandum stating that "Phase 1 ARRPs shall focus on initial agency cuts and reductions," that

1  "Phase 2 plans shall outline a positive vision for more productive, efficient agency operations

2  going forward.").

3  More fundamentally, as Plaintiffs note, the finality requirement is "interpreted in a

4  pragmatic and flexible manner" that "focus[es] on the practical . . .effects of the agency action."

5  *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025)

6  (citation omitted). The Memorandum is multiple steps removed from any agency action that has

7  an actual effect on Plaintiffs (i.e., any RIFs undertaken pursuant to the Workforce Executive Order

8  and an ARRP), which include: (1) the relevant agency's preparation of a Phase 1 ARRP; (2) that

9  agency's preparation of a Phase 2 ARRP; and (3) any RIFs that are noticed and effectuated.

10  Contrary to Plaintiffs, the statement in the Workforce Memorandum that agencies should

11  submit ARRPs to OMB and OPM for "review and approval" does not change this analysis. That

12  language cannot possibly bear the weight that Plaintiffs assign to it and does not alter the

13  fundamental point that individual agencies (not OPM and OMB) are in charge of crafting and

14  implementing ARRPs as well as making decisions on RIFs. This is clear for at least nine reasons.

15  First, the Executive Order simply provides agencies with broad guidance and does not dictate

16  specific RIFs. Second, the Executive Order directly states that it shall not "be construed to impair

17  or otherwise affect the authority granted by law to an executive department, agency, or the head

18  thereof." Exec. Order 14210, § 5(a)(i). Third, President Trump has publicly stated that agencies

19  are responsible for developing and implementing RIFs. *See supra* p. 14. Fourth, the Workforce

20  Memorandum also contains very broad guidelines, not specific dictates. Fifth, even the Workforce

21  Memorandum's very broad guidance concerning the contents of ARRPs relates only to the

22  *information* to be included in the ARRPs, not what agencies *should do* (to take just one example,

23  Phase 2 ARRPs should include "all reductions (of FTE positions and otherwise)" but a requirement

24  that the agency list all reductions it has chosen to make does not mean that the agency has to *make*

25  any specific reductions in the first place). Sixth, the Workforce Memorandum states at least five

26  times that agencies should only undertake actions that are consistent with their statutory

27

28

1   authority.[17] Seventh, the Memorandum repeatedly makes clear that agencies should not undertake

2   any action that would impair service delivery functions.[18] Eighth, the ARRPs even once finalized

3   by the agency are simply agency planning documents that are distinct from any RIFs themselves.

4   *See supra* pp. 16-17. And ninth, this argument ignores the roles OMB and OPM play in this

5   context. "OPM may examine an agency's preparations for reduction in force at any stage." 5 C.F.R.

6   § 351.205. "When OPM finds that an agency's preparations are contrary to the express provisions

7   or to the spirit and intent of these regulations or that they would result in violation of employee

8   rights or equities, OPM may require appropriate corrective action." And the President's executive

9   order directed agency heads to submit their reorganization plans to OMB.

10      The Workforce Memorandum is thus *far* removed from any action with an actual effect on

11  Plaintiffs. Even if Plaintiffs could challenge federal employment decisions under the APA (as

12  discussed above, they cannot), employment termination decisions would be the relevant final

13  agency action—even if the Memorandum and ARRPs were "agency action," they would be

14  "preliminary, procedural, or intermediate agency action" that "is subject to review on the review

15  of the final agency action." 5 U.S.C. § 704. The Memorandum is not *itself* a final agency action.

16      **2.  The Workforce Executive Order and Workforce Memorandum are Lawful**

17      Even if the Court could review the Workforce Executive Order and Workforce

18  Memorandum, both are plainly lawful. We address each in turn.

19

20  [17] Specifically that: (1) any changes made by agencies should seek to "driv[e] the highest-quality,
21  most efficient delivery of their statutorily-required functions," ECF No. 37-1 App. 2 at 2; (2)
    agencies should only seek to eliminate "functions that not statutorily mandated," *id.*; (3)
22  "[a]gencies should review their statutory authority and ensure that their plans and actions are
    consistent with such authority," *id.*; (4) agencies should only seek to "[e]liminat[e] non-statutorily
23  mandated functions through RIFs," *id.* at 3; and (5) in their initial reports, agencies must provide
24  "[a]ny statutes that establish the agency, or subcomponents of the agency, as statutorily required
    entities," *id.*

25  [18] Specifically, "(1) Agency field offices should only be closed or consolidated "to the extent
26  consistent with efficient service delivery," ECF No. 37-1 App. 2 at 2; (2) ARRPs must include
    "[a]n explanation of how the ARRPs will improve services for Americans and advance the
27  President's policy priorities," *id.* at 5; (3) ARRPs must include "[t]he framework and criteria the
    agency has used to define and determine efficient use of existing personnel and funds to improve
28  services and the delivery of these services," *id.*

### a.  The Workforce Executive Order is Lawful

The Workforce Executive Order makes clear that any RIFs may be conducted only where "consistent with applicable law." Exec. Order 14210, § 3(c). The Order also states it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof." *Id.* § 5(a)(i). In the context of this case—where Plaintiffs effectively make a facial challenge to the Order and seek an injunction prohibiting its implementation virtually across the government—that is dispositive. Courts "cannot ignore . . . unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing" presidential directives, such as the Workforce Executive Order at issue here. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. Nov. 25, 2020) (majority opinion for three-judge district court). A court that disregards such qualifications fails to give effect to the presidential directive as drafted, and also acts contrary to the presumption of regularity under which courts assume that co-equal branches of government will follow the law. *See NARA v. Favish*, 541 U.S. 157, 174 (2004) (stating that "in the absence of clear evidence to the contrary, courts presume that [public officials] have properly discharged their official duties" (citation omitted)). Rather, an Executive Order with a lawfulness constraint almost uniformly cannot be unlawful because, if the agency "may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Construction Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

This type of directive is a straightforward way for a President to exercise his undoubted authority to require a subordinate agency to determine what the law allows and then take whatever action is legally available to promote the President's priorities. This Executive Order fits that mold. It does not mandate any RIFs, but directs agencies to prioritize certain areas in RIFs that do take place—e.g., "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives" as well as "all agency initiatives, components, or operations that my Administration suspends or closes." And again, it does so only to the extent the law allows such prioritization. Exec. Order 14210, § 3(c).

A consistent-with-law proviso does not categorically immunize an Executive Order or similar directive from review. But in rare instances where courts have held that such consistent-with-law qualifications are not dispositive, they have done so in only narrow circumstances, where a directive *could not* be implemented lawfully. In *Allbaugh*, for example, the D.C. Circuit suggested that despite such a clause the plaintiffs there could facially challenge the Executive Order at issue if it lacked "any valid application." 295 F.3d at 33. And other courts have reached similar conclusions where a directive "unambiguously commands action" incompatible with the law. *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018); *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) (similar).

The Ninth Circuit's decision in *San Francisco* is particularly instructive on the narrowness of this exception. There, the Ninth Circuit concluded that giving effect to the savings clause would mean the Executive Order itself would do nothing, and the court refused to accept the assertion that the Order there was meaningless. 897 F.3d at 1238 (declining to credit argument "that the Executive Order is all bluster and no bite"). Similarly, in *HIAS* the Fourth Circuit considered an Executive Order it found essentially "supplant[ed]" the statutory criteria. 985 F.3d at 322.

By contrast, the Workforce Executive Order does not come close to commanding actions that are incompatible with law. Congress has expressly recognized agencies' authority to implement RIFs since shortly after the Civil War. They are expressly authorized by 5 U.S.C. § 3502. OPM has promulgated an extensive set of regulations governing use of RIFs (regulations Congress has also authorized and directed OPM to promulgate). Agencies have repeatedly engaged in RIFs since the nineteenth century, including Presidentially-directed RIFs during the Truman, Reagan, and Clinton Administrations. *See supra* pp. 9-11. There is no colorable argument that the Workforce Executive Order is unlawful on its face.

Plaintiffs thus spend little time actually engaging with the operative terms of the Executive Order. Plaintiffs note (TRO Brief at 3) language in the Order that it is intended to "commence[] a critical transformation of the Federal bureaucracy." Exec. Order 14210, § 1. Plaintiffs repeat this rhetoric of "transformation" throughout their brief. TRO Brief at 1, 3, 9, 10. But this language—located in the Executive Order's "purpose" section—merely explains *why* President Trump issued

the Order and what he hopes will be accomplished by it. This language does not itself *do* anything. And Plaintiffs never explain why the Order's operative provisions (e.g., "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law," Exec. Order 14210, § 3(c)) constitute a direction to violate the law—presumably because there is no such colorable argument.

Plaintiffs instead argue that the Order exceeds the President's authority because the President purportedly has no Article II or statutory authority to "reorganize" agencies. TRO Brief at 29-35. But this entire line of discussion is irrelevant. Executive Order 14210 contains one sub-section—"Developing Agency Reorganization Plans"—dealing with organizational matters. Exec. Order 14210, § 3(e). And that section simply directs agencies to prepare a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," and states that the report should "discuss *whether* the agency or any of its subcomponents should be eliminated or consolidated." *Id.* (emphasis added). This is not a mandate to conduct any reorganizations at all, let alone a directive to take any illegal action. Nor have plaintiffs pointed to any statutorily mandated agency structures for any of the agencies they have sued, much less established that the government intends to violate those statutory requirements. Thus, Plaintiffs' discussion of this issue is beside the point. If any agency in the future conducts any "reorganization" that Plaintiffs believe is unlawful, they may attempt to challenge any such action.

Plaintiffs' discussion of Reorganization Acts, TRO Brief at 7, 33, is similarly an irrelevant distraction. Although Congress has on occasion enacted Reorganization Acts that authorized the President to propose reorganization plans to Congress, these enactments do not purport to limit the authority to conduct RIFs. As noted, such RIFs are specifically authorized by 5 U.S.C. § 3502. And in OPM's regulations, OPM sets out when agencies can permissibly undertake them. 5 C.F.R. §§ 351.201(a)(1), 351.204. Congress also specifically directed OPM to promulgate such regulations. Plaintiffs thus do not and cannot dispute that federal law expressly allows RIFs.

At bottom, even on Plaintiffs' telling, this is not a *separation-of-powers dispute* in the sense of a dispute about the powers of the Executive Branch vis-à-vis Congress—rather, Plaintiffs make arguments concerning the exercise of authority *within* the Executive Branch. According to them,

"Congress has never delegated to the President the authority to make the decision to remove federal employees, whether by way of a RIF or for any other reason." TRO Brief at 32. Instead, they say, "Congress has delegated authority to determine *which* employees to employ and *how many* (consistent with appropriations) to the heads of the federal agencies, not to the President." *Id.*

This argument is contrary to the basic structure of Article II. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. CONST. art. II, § 1, cl. 1; id., § 3). To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)) (citation omitted). Indeed, "[b]ecause no single person could fulfill" the responsibilities of faithfully executing all the laws, "the Framers expected that the President would rely on subordinate officers for assistance." *Seila Law*, 591 U.S. at 203-04. In recognition of this reality, the U.S. Code is necessarily replete with delegations and authorizations to agencies and other components. Yet there is obviously no legal principle that federal agencies wield their statutory authorities in siloes upon which *the President* cannot intrude. President Trump acted well within his authority in providing broad direction to agencies on how they should exercise the authority Congress has concededly given them.

By asserting that the President violates the separation of powers by directing agency heads to exercise their statutory powers over agency personnel matters and over the structure and priorities of their agencies, Plaintiffs invert a basic underpinning of our constitutional order. Federal agencies depend for their "legitimacy and accountability to the public through a 'clear and effective chain of command' down from the President, on whom all the people vote." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010)). Our constitutional structure presumes that federal officers and agencies will be "subject to [the President's] superintendence." The Federalist No. 72, at 374 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001); *see also* Saikrishna Bangalore Prakash, *Imperial from the Beginning: The Constitution of the Original*

*Executive* 184-89 (2015) (collecting Founding Era sources). The President's "'ongoing supervision and control' of executive officials legitimizes the power that they exert in his or her name." *Duenas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023) (quoting *Selia Law LLC v. CFPB*, 591 U.S. 197, 224 (2020)). Plaintiffs' theory is anathema to notions of self-governance under the Constitution. To accept plaintiffs' argument that the President may not set the policy direction for executive agencies is to untether those agencies from any form of political accountability. The Constitution, of course, demands the opposite conclusion. *See* U.S. Const., art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States.").

Finally, even if there were limits on the President's authority to direct an agency in the exercise of the agency's statutory authority, the Workforce Executive Order would not implicate any such limits. The Order provides direction only in very broad terms. And President Trump has made clear that agencies are responsible for developing and implementing their own plans to engage in reduction-in-force actions. *See supra* p. 14. Indeed, if anything, the Workforce Executive Order provides *less* extensive direction than the direction President Clinton provided in Executive Order 12839—which directed reductions in the form of specific percentage requirements; directed that at least ten percent of cuts come from the Senior Executive Service, GS-15 and GS-14 levels; and provided agencies with a required timeline to complete the cuts. *See supra* pp. 10-11.

Finally, to the extent the lawfulness question concerning the Executive Order presented a close case in this context (which it does not), the very high standards for *ultra vires* claims would preclude Plaintiffs from succeeding in any challenge to the Executive Order's legality. To prevail on an *ultra vires* claim, a plaintiff must establish that a government official "acted in a blatantly lawless manner or contrary to a clear statutory prohibition." *Hindes v. FDIC*, 137 F.3d 148, 164 (3d Cir. 1998); *accord Lundeen v. Mineta*, 291 F.3d 300, 312 (5th Cir. 2002) (noting that ultra vires action must involve "a plain violation of an unambiguous and mandatory provision of the statute" that "is of a *summa* or *magna* quality")(emphasis omitted)(citations omitted)). Allegations of constitutional error do not establish ultra vires action. *See Eagle Tr. Fund v. USPS*, 365 F. Supp. 3d 57, 68 n.6 (D.D.C. 2019) (Jackson, J.), *aff'd*, 811 F. App'x 669, 670 (D.C. Cir. 2020) ("[A] constitutional claim is separate from an ultra vires claim."). Neither do claims that "simply involve

1   a dispute over statutory interpretation." *Lundeen*, 291 F.3d at 312 (quoting *Kirby Corp. v. Pena*,

2   109 F.3d 258, 269 (5th Cir. 1997)). Rather, an officer may be said to act *ultra vires* "only when he

3   acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

4   101-02 n.11 (1984) (citation omitted); *see also Larson v. Domestic & Foreign Com. Corp.*, 337

5   U.S. 682, 689 (1949) (suit must allege that official is "not doing the business which the sovereign

6   has empowered him to do"); *Kalispel Tribe of Indians v. U.S. DOI*, 999 F.3d 683, 691 (9th Cir.

7   2021). This is a "very stringent standard," rendering ultra vires claims "essentially a Hail Mary

8   pass" that "in court as in football, . . . rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of

9   Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.). It does not succeed here.

### b. The Workforce Memorandum is Lawful

11     Even if the Court could consider the lawfulness of the Workforce Memorandum, it too is

12   lawful. As we have discussed, the Memorandum merely provides broad guidance on what ARRPs

13   should contain, guidance which itself only concerns what information the ARRPs should provide.

14   The Memorandum makes clear to agencies that they should only take actions that are consistent

15   with their statutory authority. *See supra* pp. 37-38. Likewise, it makes clear that agencies should

16   not undertake any action that would impair service delivery functions. *See supra* p. 38.

17     In addition, it is logical (and lawful) to rely on OPM and OMB in this manner. As noted

18   above, Congress expressly empowered OMB to promulgate regulations governing RIFs, and OPM

19   has done just that. The regulations make clear, among other things, that "OPM may examine an

20   agency's preparations for reduction in force at any stage" and that "[w]hen OPM finds that an

21   agency's preparations are contrary to the express provisions or to the spirit and intent of these

22   regulations or that they would result in violation of employee rights or equities, OPM may require

23   appropriate corrective action." 5 C.F.R. § 351.205. As to OMB, just as President Trump relied

24   upon OMB to set out the details of his policy governing reduction of federal personnel, President

25   Clinton relied upon OMB to prescribe similar guidance on the same issue. Exec. Order 12839, 58

26   Fed. Reg. 8515 (Feb. 10, 1993). More generally, the Workforce Memorandum is consistent with

27   the practice of previous administrations that have relied upon OMB to ensure that agency policy

28   was responsive to the President's policy goals. As now-Justice Kagan explained, President Clinton

1  exercised "presidential directive authority to initiate agency action[,]" thus "accelerat[ing] the shift
2  toward[s] early White House involvement by establishing an instrument for centralized control
3  that functioned before the agencies had adopted a proposal (or perhaps even taken up an issue in
4  the first instance)." *See* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2316
5  (2001). In this way, now-Justice Kagan explained, President's Clinton's efforts correspond to
6  President Reagan's efforts to "attain[] an ever greater capacity to oversee, supervise, and even to
7  direct administrative action." *Id.* at 2317. Such efforts are not unlawful; rather, they "promote[]
8  accountability" by "enhanc[ing] transparency" and "establish[ing] an electoral link between the
9  public and the bureaucracy, increasing the latter's responsiveness to the former." *Id.* at 2332. The
10 Workforce Memorandum is more of the same, and is straightforwardly lawful.

11  ### 3. To the Extent Plaintiffs Purport to Challenge Particular RIFs, Any Such
12  Challenge is Likewise Precluded and In Any Event Lacks any Legal or Factual
    Basis

13  The Complaint also asserts two claims directed at Federal Agency Defendants. But to the
14  extent Plaintiffs seek to challenge particular RIFs as unlawful, any such claim necessarily fails.

15  Count VI contends that that the Federal Agency defendants have unlawfully "cede[d] their
16  decision-making authority with respect to the employees of that agency to the President, OMB,
17  OPM, or DOGE." Complaint ¶ 396. For the reasons discussed above, this is incorrect but, in any
18  event, just repackages Plaintiffs' complaints about the Workforce Executive Order and
19  Workforce Memorandum. Claim VII asserts that the agencies' implementation of the Workforce
20  Executive Order is arbitrary and capricious. *Id.* ¶ 403. But this contention too is based on systemic
21  complaints that Federal Agency Defendants have, inter alia, ceded decisionmaking authority to
22  OPM and OMB regardless of statutory requirements, are engaging in large-scale RIFs that are
23  necessarily contrary to statute, and have acted under unrealistic timeframes. *Id.* Neither claim
24  identifies any specific RIFs, let alone establishes that any specific RIF violates the relevant
25  agency's organic statutes or otherwise does not comply with the law applicable to that agency.

26  But to the extent Plaintiffs do purport to challenge individual RIFs, any such challenge
27  fails. Any such challenges also must be channeled through the congressionally required
28  administrative processes, as discussed above. Plaintiffs provide no facts suggesting that any

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

particular RIF that is currently in progress or that will take place is unlawful, but instead merely state in conclusory fashion that agencies are engaging in large-scale RIFs that are necessarily contrary to statute, and have acted under unrealistic timeframes. If Plaintiffs believe they have a basis for challenging specific RIFs based on facts particular to those RIFs, they may attempt to challenge those RIFs through the review scheme Congress provided. But they are not entitled to a virtually government-wide injunction based on speculation that agencies will implement the Workforce Executive Order in an unlawful fashion.

## B. Plaintiffs Have Not Demonstrated Irreparable Harm Warranting the Broad TRO They Seek

A "court need not consider the other factors" if a movant fails to show a likelihood of success on the merits. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). The Court accordingly need not and should not consider the irreparable-harm requirement.

But if it does, Plaintiffs also cannot demonstrate irreparable harm justifying the TRO they seek. To meet the irreparable harm requirement, the mere "possibility" of irreparable harm is insufficient; instead, the moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs do not meet that standard here.

Plaintiffs most prominently claim irreparable harm in the form of loss of employment for employees subject to RIFs. TRO Brief at 13, 49. But most narrowly, any such potential employment actions cannot justify the government-wide TRO Plaintiffs seek because employees who are the subject of a RIF will receive written notice 60 days before any RIF is implemented (or 30 days with an OPM waiver). *See supra* pp. 16-17. OPM regulations require such notice. 5 C.F.R. § 351.801(b). Thus, Plaintiffs may attempt to seek emergency relief[19] from any specific RIFs during that notice period, which itself is sufficient reason to deny the broad TRO they seek here.

More broadly, as the D.C. Circuit recently noted, "[a]lthough we appreciate the gravity of these harms . . . [l]oss of government employment generally does not constitute irreparable injury, especially since employees seeking to challenge their termination or placement on administrative

---

[19] We of course do not mean that Plaintiffs would be entitled to such relief, or even that any tribunal could grant it. We just note that they could seek emergency relief while a RIF notice is pending.

1    leave may seek emergency stays from the Office of Special Counsel and MSPB." *Widakuswara*,

2    2025 WL 1288817, at *5 (citation omitted). Plaintiffs assert that "[d]amages are not available in

3    APA cases, making this monetary harm irreparable." TRO Brief at 49. But the MSPB may order

4    reinstatement, backpay, and attorney's fees. 5 U.S.C. §§ 1204(a)(2), 7701(g). *See Sampson v.*

5    *Murray*, 415 U.S. 61, 90 (1974) (finding lack of irreparable harm from loss of government

6    employment and explaining that "[t]he possibility that adequate compensatory or other corrective

7    relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a

8    claim of irreparable harm," a conclusion that "is fortified by the Back Pay Act" (quotation marks

9    omitted)); *see also Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal*., 739 F.2d 466, 471 (9th

10   Cir. 1984) ( "[m]ere financial injury . . . will not constitute irreparable harm if adequate

11   compensatory relief will be available in the course of litigation"). The same is true for Plaintiffs'

12   concerns that terminated employees "face irreparable injury from losing their wages and health

13   benefits for themselves and their families and in many cases needing to relocate," TRO Brief at

14   49. *See Sampson*, 415 U.S. at 92 n.68 ("insufficiency of savings or difficulties in immediately

15   obtaining other employment—external factors common to most discharged employees and not

16   attributable to any unusual actions relating to the discharge itself—will not support a finding of

17   irreparable injury").

18        Plaintiffs also claim irreparable harm based on the supposedly impending loss of critical

19   government services. TRO Brief at 49. We dealt with this claim in our standing discussion but,

20   even if such allegations were (barely) sufficient to establish Article III standing, they are too

21   speculative to meet Plaintiffs' much higher burden of demonstrating irreparable harm. *See Pom*

22   *Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014) (plaintiff "must establish a

23   likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative

24   allegations of harm."). And allegations certainly do not establish irreparable harm justifying a TRO

25   preventing implementation of the Executive Order *virtually government-wide*.

26        Plaintiffs also claim that "the lack of public rulemaking injured Plaintiffs who would have

27   participated." TRO Brief at 49. But the Workforce Memorandum is not a "rule" at all. And even

28   if it were, a rule involving "a matter relating to agency management or personnel" is exempt from

---

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

Add.280

1  notice-and-comment requirements. 5 U.S.C. § 553(a)(2); *see Curlott v. Campbell*, 598 F.2d 1175,

2  1180 n.8 (9th Cir. 1979) ("The APA … is inapplicable because the Commission decision

3  [regarding procedures for adjusting employee pay] involves a management/personnel matter.").

4  Nor did the Memorandum or the Executive Order dictate any specific RIFs, and any RIFs will be

5  preceded by at least a 30-day notice period. This is not irreparable harm warranting a TRO.

6  **C. The Balance of the Equities and Public Interest Do Not Favor a TRO**

7  When the nonmovant is the government, the last two *Winter* factors "merge." *Nken v.*

8  *Holder*, 556 U.S. 418, 435 (2009). Although there is no need to consider the remaining two TRO

9  requirements, they too favor the government. Initially, granting the near government-wide TRO

10 Plaintiffs seek conflicts with "the well-established rule that the Government has traditionally been

11 granted the widest latitude in the dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83

12 (citation omitted). As to the public interest, although Plaintiffs assert that, "[p]reserving

13 constitutional and statutory rights 'is always in the public interest,'" *Melendres v. Arpaio*, 695 F.3d

14 990, 1002 (9th Cir. 2012), that principle does not help them here, because the Workforce Executive

15 Order and the Memorandum are lawful. *See supra* pp. 38-45. In addition, as the D.C. Circuit has

16 noted, "the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries

17 laid down by Congress." *Widakuswara*, 2025 WL 1288817, at *6. "Because personnel and grant

18 disputes directly concern the public fisc, Congress has limited the resolution of these potentially

19 costly claims to specialized tribunals such as the MSPB and the" Court of Federal Claims. *Id.* The

20 public interest is served when courts "respect those boundaries," *id.*—particularly in this context,

21 where Plaintiffs seek a near government-wide injunction against implementation of an Executive

22 Order that directs agencies to follow the law, and provides them with substantial discretion.

23 **III. Plaintiffs Are Not Entitled to Release of the ARRPs**

24 Plaintiffs also request that the Court order "OPM and OMB to provide to the Court and to

25 Plaintiffs the current versions of the ARRPs of the Federal Defendant Agencies identified above."

26 TRO Motion at 2. Plaintiffs provides no basis for this request other than the fact that Defendants

27 have not disclosed them. TRO Brief at 50. If Plaintiffs believe that these documents are subject to

28 disclosure, they may seek them under FOIA, and litigate any withholdings. And although this

motion does not challenge any specific RIFs, Plaintiffs do not need the ARRPs to challenge RIFs in the future since, as previously noted, RIF notices are provided to affected employees.

**IV. Plaintiffs Are Not Entitled to any Relief Against USDS or "DOGE"**

Although Plaintiffs' motion and brief are focused on the Workforce Executive Order and Memorandum, Plaintiffs also seek an injunction against "any further orders by DOGE to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs." TRO Motion at 2; *see also id.* (contending "that the actions of OMB, OPM, and *DOGE* to implement the Executive Order are" unlawful (emphasis added).

For one, again, it is unclear whether Plaintiffs are referring to USDS or the broader DOGE structure more generally. If Plaintiffs are referring to USDS, USDS lacks the power to issue any directives to federal agencies and Plaintiffs do not identify any such directives. If they are referring to the broader DOGE structure—which consists of USDS, the USDS Temporary Organization, and Agency DOGE Teams—that is not a distinct entity that can be sued. In any event, Agency DOGE Teams consist of employees of the relevant agency who answer to agency leadership. Exec. Order 14,158, § 3(c) (agency heads required to "establish *within their respective Agencies* a DOGE Team of at least four employees" (emphasis added)). An agency does not act *ultra vires* to the extent it exercises statutory authority the agency possesses, through agency employees. In any event, Plaintiffs identify no such "orders." They cite a statement by HHS Secretary Kennedy, but that statement does not suggest any sort of order directed to HHS. *See* TRO Brief at 4. Plaintiffs also note a quote from VA Secretary Collins, in which the Secretary noted that the President and OPM "have said let's look at a reduction in force across government" in the context of noting that *the agency's own goal* to cut 80,000 positions. *See* The Hill, *VA secretary: Cutting 80,000 jobs 'is our target'* (Mar. 10, 2025), *available at* https://thehill.com/homenews/state-watch/5186097-va-seek-cuts-80000-jobs/. Because Plaintiffs' allegation that USDS or "DOGE" are issuing unconstitutional directives to agencies lacks any legal or factual basis, the Court should deny this aspect of the motion for this reason in addition to all the other reasons set forth in this brief.

**V.  Any Relief Should be Limited**

The Court should deny Plaintiffs' motion in its entirety. But even if the Court determines

that a TRO is appropriate, it should limit its scope in at least two respects. Nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The Ninth Circuit has repeatedly vacated or stayed nationwide injunctions. *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). The Court should thus limit any relief to any party before it that is able to establish its entitlement to preliminary injunctive relief— which would, at most, be any individual members of the Plaintiff unions who establish that they will imminently be subject to a RIF. Second, the court should make clear that any TRO enjoining implementation of the Workforce Executive Order and/or Workforce Memorandum does not deprive any enjoined components of their preexisting authority to conduct RIFs and otherwise manage their workforce independent of the Executive Order and Memorandum. The TRO motion is clear that it seeks only to prevent the listed components "from taking any action to implement or enforce" the Executive Order and Memorandum. TRO Motion at 1. And Plaintiffs do not dispute that agencies have authority to conduct RIFs. Thus, although such a clarification is arguably unnecessary, the Court should make this limitation clear if it issues a TRO.

## VI.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief

Should the Court order any injunctive relief, the Court should order security. The Court may issue an injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). That language is mandatory. *See Atomic Oil Co. of Okl. v. Bardahl Oil Co.*, 419 F.2d 1097, 1100–01 (10th Cir. 1969). If the Court issues an injunction, the Court must require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. Here, an appropriate bond would be commensurate to the salaries and benefits the government must pay for any employees it would prefer to separate from federal service but is unable to for the duration of any preliminary relief.

## CONCLUSION

The Court should deny the motion for a temporary restraining order and order to show cause.

1   Dated: May 7, 2025                    Respectfully submitted,

2                                         PATRICK D. ROBBINS (CABN 152288)
                                          Acting United States Attorney
3                                         U.S. ATTORNEY'S OFFICE
                                          450 Golden Gate Avenue, Box 36055
4                                         San Francisco, California 94102-3495

5                                         ERIC J. HAMILTON (CABN 296283)
                                          Deputy Assistant Attorney General
6
                                          DIANE KELLEHER
7                                         Branch Director

8                                         CHRISTOPHER HALL
                                          Assistant Branch Director
9
                                          s/ Andrew M. Bernie
10                                        1100 L Street, NW
                                          Washington, DC 20005
11                                        Telephone: (202) 353-7203
                                          andrew.m.bernie@usdoj.gov
12
                                          *Counsel for Defendants*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[*Additional counsel and affiliations identified on signature page*]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................II

I.      Defendants Are Implementing the President's Orders to Reorganize Through RIFs ............1

II.     There is No Constitutional or Statutory Authority for the EO or Memo ................................3

III.    Plaintiffs are likely to succeed on their APA Claims against OMB, OPM, and DOGE 7

IV.     Plaintiffs Are Likely to Succeed on Their APA Claims against Agency Defendants.............8

V.      Congress Did Not Send These Constitutional and APA Claims to Adjudicative Agencies for Employee Personnel Actions and Labor Disputes ............................................9

VI.     Plaintiffs Establish Standing and Irreparable Injury ............................................................12

VII.    The Equities Otherwise Favor a TRO ..................................................................................14

VIII.   The Scope of the Requested Injunction Is Appropriate........................................................14

IX.     Plaintiffs Did Not Delay Seeking a TRO .............................................................................15

X.      No Bond Should Be Required ...............................................................................................15

CONCLUSION ........................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AFGE v. OPM.*,
   2025 WL 914823 (9th Cir. Mar. 26, 2025) ........................................................................ 10

*AFGE v. OPM*,
   2025 WL 900057 (N.D.Cal. Mar.24, 2025) ...................................................................... 11

*AFL-CIO v. Dep't of Lab.*,
   2025 WL 1129227 (D.D.C. Apr. 16, 2025).................................................................... 7,

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) ............................................................................................ 16

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ............................................................................................ 13

*Biden v. Texas*,
   597 U.S. 785 (2022) ........................................................................................................... 8

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987) ......................................................................................... 14

*Cal. v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ........................................................................................... 14

*Chen v. I.N.S.*,
   95 F.3d 801 (9th Cir. 1996) ............................................................................................... 6

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) .................................................................................. 5, 6, 9

*City & Cnty. of San Francisco v. USCIS*,
   981 F.3d 742 (9th Cir. 2020) ........................................................................................... 14

*Cnty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017).............................................................................. 7

*Cuviello v. City of Vallejo*,
   944 F.3d 816 (9th Cir. 2019) ........................................................................................... 16

*Dalton v. Spencer*,
   511 U.S. 462 (1994) ........................................................................................................... 7

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ......................................................................................................... 11

*Doe v. Horne*,
  115 F.4th 1083 (9th Cir. 2024) ........................................................................ 16

*E. Bay Sanctuary Cov. v. Trump*,
  349 F.Supp.3d 838 (N.D. Cal. 2018) ............................................................... 16

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ........................................................................... 15

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ........................................................................... 15

*Elgin v. Dep't of the Treasury*,
  567 U.S. 1 (2012) ...................................................................................... 10, 11

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ........................................................................................ 11

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ........................................................................................ 14

*Freelancer Int'l Pty Ltd. v. Upwork Global, Inc.*,
  2020 WL 6929088 (N.D. Cal. Sep. 9, 2020) ................................................... 15

*Harris v. Bd. of Supervisors*,
  366 F.3d 754 (9th Cir. 2004) ........................................................................... 13

*Kerr v. Jewell*,
  836 F.3d 1048 (9th Cir. 2016) ......................................................................... 11

*Kingdomware Techs., Inc. v. U.S.*,
  579 U.S. 162 (2016) .......................................................................................... 2

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .............................................................................. 10, 11, 12

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .......................................................................................... 7

*Markland v. OPM*,
  140 F.3d 1031 (Fed. Cir. 1998) ........................................................................ 6

*Medellín v. Texas*,
  552 U.S. 491 (2008) .......................................................................................... 3

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) .......................................................................... 13

*Mims v. Arrow Fin. Servs., LLC*,
  565 U.S. 368 (2012) ........................................................................................ 10

*Murphy Company v. Biden*,
   65 F.4th 1122 (2023) ............................................................................7

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 597959 (D.D.C. Feb. 25, 2025) ...................................5, 8, 16

*Natl. Treas. Employees Union v. Vought*,
   2025 WL 942772 (D.D.C. Mar. 28, 2025) ................................... 7, 9

*Navajo Nation v. U.S. Dep't of Interior*,
   819 F.3d 1084 (9th Cir. 2016) .............................................................8

*New York v. McMahon*,
   No. 1:25-cv-10601 (D. Mass.) ......................................................... 15

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) ...................................................*passim*

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ...............................................................................7

*NTEU v. Trump*,
   No. 1:25-cv-00420 (D.D.C.) ............................................................ 15

*Pacito v. Trump*,
   2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ................................. 16

*Pangea Legal Servs. v. DHS*,
   501 F.Supp.3d 792 (N.D. Cal. 2020) ........................................... 14, 15

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ...............................................................................8

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
   128 F.4th 1089 (9th Cir. 2025) ............................................................8

*Regents of Univ. of Cal. v. DHS Sec'y*,
   908 F.3d 476 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) ............. 15

*Rhode Island v. Trump*,
   2025 WL 1303868 (D.R.I. May 6, 2025) ........................................ 8, 9

*San Francisco v. Trump*,
   2025 WL 1282637 (N.D. Cal. May 3, 2025) .................................... 16

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
   508 F. Supp. 3d 521 (N.D. Cal. 2020) ...............................................7

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) .............................................................................4

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012)........................................................................4

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden
    v. Sierra Club*, 142 S.Ct. 46 (2021) .......................................................7, 11

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ......................................................................5, 6

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) .......................................................................10, 11, 12

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ...............................................................................11, 12

*United States v. Texas*,
    599 U.S. 670 (2023) .....................................................................................13

*Veit v. Heckler*,
    746 F.2d 508 (1984) .....................................................................................10

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ......................................................................7

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) .........................................................................................11

*Woonasquatucket River Watershed Council v. USDA*,
    2025 WL 1116157 (D.R.I. Apr. 15, 2025) ....................................................9

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .......................................................................................6

**Federal Statutes**

5 U.S.C.
    § 551 ..............................................................................................................8
    § 702 ............................................................................................................11
    § 903 ..........................................................................................................3, 4
    § 1103 ........................................................................................................9, 10
    § 1105 ........................................................................................................9, 10
    § 7134 ..........................................................................................................10
    § 2301 ............................................................................................................4
    § 3502 ........................................................................................................6, 8
7 U.S.C.
    § 5921 ............................................................................................................3

15 U.S.C.
    § 8962 ............................................................................................................3

28 U.S.C.
   § 1331 .................................................................................................... 10, 11

**Other Authorities**

5 C.F.R. § 351.201 ............................................................................................ 8

5 C.F.R. § 351.806 ........................................................................................... 14

President Trump's Workforce Executive Order ("EO") requires agencies across the federal government to restructure and radically downsize themselves, including by conducting *mandatory* "large-scale" reductions-in-force ("RIFs"), for the sole purpose of achieving the "transformation" of the federal government, without any Congressional authorization. OMB and OPM are implementing this EO through a Memorandum ("Memo") mandating that each agency submit *for approval* its Agency RIF and Reorganization Plan ("ARRP"). A TRO is needed to freeze implementation of these unlawful and unprecedented directives, which agencies are currently implementing.

Defendants attempt to portray this EO as business as usual, as similar in kind or scale to previous Presidential actions; it is not. Never in the history of this country has a President attempted to reorganize the government without Congressional authorization, including through large-scale RIFs. Indeed, President Trump acknowledged during his first term that, like other Presidents over the past century, he could not reorganize the federal government without Congressional approval.

Nor can Defendants defend these ultra vires orders based on the fiction that the President, OMB, and OPM have merely provided "broad guidance" to federal agencies, which are exercising their independent discretion to consider whether and how to engage in RIFs. Defendants submit no evidence to support their portrayal. They cite a single article, but omit the rest of what the President said: "…if they don't cut, then Elon will do the cutting." Mammel Decl. Ex. M. Plaintiffs' record proves that agencies have been *ordered* to downsize and restructure the government, and are following that order, using RIFs to achieve the parameters and timeframes required by the President.

## I.    Defendants Are Implementing the President's Orders to Reorganize Through RIFs

Defendants rely on a central factual contention that defies the language of the EO, Memo, and evidentiary record: that agencies are exercising their own discretion to conduct RIFs after being given only "broad guidance" by the President. This counterfactual narrative relies on no evidence.

1. The EO's plain language categorically requires that all Agency Heads "*shall promptly undertake preparations to initiate large-scale reductions in force.*" ECF 37-1, App. A. It orders that agencies "*shall*" "prioritize" in these RIFs "all offices that perform functions not mandated by statute or other law" including "all agency diversity, equity, and inclusion initiatives;" "all agency initiatives, components, or operations that my Administration suspends or closes;" and government

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI                     1

1    shutdown level staffing. The EO permits (using "may") Agency Heads to exempt only certain

2    security positions; and authorizes OPM (not agencies) to grant further exemptions only that

3    "promot[e] workforce reduction." These orders are *not* equivocal, or *guidance*: "it is generally clear

4    that 'shall' imposes a mandatory duty." *Kingdomware Techs., Inc. v. U.S.*, 579 U.S. 162, 172 (2016).

5    Defendants themselves argue that agencies must follow the President's orders. Opp. 4, 42.

6    　　　2. The OMB/OPM Memo implementing the EO is equally mandatory: "Each agency *will*

7    submit a Phase 1 ARRP to OMB and OPM for review and approval … Phase 1 ARRPs *shall focus on*

8    *initial agency cuts and reductions*. ... Phase 2 plans *shall* outline a positive vision" for agency

9    operations. ECF 37-1, Ex. B. Defendants' "nine reasons" notwithstanding (Opp. 37), there is nothing

10    equivocal or permissive about the Memo, which removes agency discretion and decision-making.

11    And Defendants *do not deny* Plaintiffs' showing that OMB and OPM have *rejected* certain agencies'

12    ARRP submissions for failing to eliminate a sufficient number of positions. ECF 37-1 at 12.

13    　　　3. Defendants contend that "ARRPs are distinct from RIFs" (to pretend the RIFs are not in

14    service of a reorganization). Opp. 16. But the EO and Memo order the RIFs as the centerpiece of the

15    plan to reorganize—OMB and OPM directed each agency to create *a single combined ARRP* because

16    reorganization is the sole purpose of these RIFs. *See* Opp. 7 (citing RIF regs on "reorganization").

17    　　　4. The uncontroverted record establishes that Federal Agency Defendants are currently

18    implementing President Trump's orders to conduct RIFs in service of reorganizing the government.

19    *See*, *e.g.*, Gamble Reply Decl. Exs. A, B, C (Labor Dept. communications and RIF notice stating

20    abolition of entire program office based on Presidential order, and RIF therefore "due to the impact of

21    the [EO]," specifically §3(c)'s large-scale reductions order).[1] The record further shows that agencies

22    are eliminating functions on demand;[2] that the President is asserting that his Executive Orders

23

24    　　[1] ECF 37-1 at 14 (*AmeriCorps*: nearly all staff RIF'd per EO); Mammel Decl. Exs. C-D (*EPA*:
      scientific research office cut per EO); ECF 37-14 at ¶¶9-12, Exs. A-D (*GSA*: RIFs and offices cut

25    "[i]n support of the [EO]"); ECF 37-1 at 4-5 (*HHS*: cuts "proceeding in accordance with [EO]"
      including entire programs and offices); ECF 41-1 at ¶15, Ex. C (*HUD*: large-scale RIFs in

26    "[c]ompliance with [EO]"); ECF 37-1 at 24 (*NSF*: cutting half of staff under "orders from the White
      House"); *id.* at 24-25 (*SBA*: 43% reduction per EO); *id.* at 25-26 (*SSA*: plans per EO include

27    "abolishment of organizations and positions" and RIFs); *id.* at 27 (*State*: consolidation, 15%
      reduction per EO); *id.* (*Treasury*: 40% IRS cut per EO); *id.* at 28 (*VA*: cuts to 2019 levels per EO).

28    　　[2] *See*, *e.g.*, ECF 37-1 at 4-5 (HHS); *id.* at 14 (AmeriCorps); Mammel Decl. ¶¶6-7 (EPA Office of
      Research and Development, *see* 7 U.S.C. §5921(f); 15 U.S.C. §8962).

**Add.293**
REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI        2

abolishing offices *make law* and therefore eliminate the "statutory and regulatory foundation" for the offices, *e.g.*, Gamble Reply Decl., ¶¶4, 7, Exs. C, D; and that the reorganization being implemented transfers functions and offices *between* agencies.[3]

USDA Secretary Rollins admitted the reason this is happening, revealing the plan all along (hatched between Trump terms): "The four years in between term one and term two allowed a lot of work to be done to really be much more intentional on how we do just that, *how we right-size the federal government, across every single agency*." Mammel Decl. Ex. A (emphasis added).

5. Defendants also distort the history: President Clinton did *not* order agencies to conduct RIFs and he secured congressional authorization for his buyout plans. *See* Exec. Order 12839, 58 Fed. Reg. 8515 (Feb. 10, 1993); Federal Workforce Restructuring Act of 1994, Pub. L. 103-226, 108 Stat. 111 (1994). Defendants' suggestion that Presidents Reagan or Truman ordered RIFs is unsupported and Plaintiffs can find no record of this. As far as Plaintiffs are aware, no prior President has assumed the authority, without express congressional authorization, to require agencies to engage in RIFs, in service of a reorganization or otherwise. (And even if any prior president had ordered a RIF, "past practice does not, by itself, create power." *Medellín v. Texas*, 552 U.S. 491, 532 (2008).)

## II.    There is No Constitutional or Statutory Authority for the EO or Memo

1.    *The President's EO is Unconstitutional*. Defendants concede that the President was not specifically authorized by Congress to reorganize the federal government, Opp. 41, defying 100 years of presidential and congressional precedent. *See* ECF 37-1 at 29-32. The plain language of the EO and record evidence establish that President Trump has ordered a reorganization. *Supra* at 1-2. Congress's definition of "reorganization plan" plainly encompasses the types of actions the President has ordered federal agencies to take, including transfers of functions between agencies, elimination of functions (*including non-statutory functions*, 5 U.S.C. §903(a)(2)), and the consolidation of programs and functions within agencies. *Id*. §903; ECF 37-1 at 14-29. Regardless of whether agencies generally have authority to implement some form of RIFs, the President's order to conduct RIFs to effectuate a government-wide reorganization lacks Congressional authorization.

---

[3] *See, e.g.*, Mammel Decl. ¶¶3-4 & Ex. A (USDA plans potentially include consolidating functions with up to seven other agencies across government, including housing and firefighting); ECF 37-26 ¶¶42-43 (DOE student aid office planned to move to SBA).

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI          3

1    Nor do Defendants attempt to respond to Plaintiffs' showing that neither Article II nor

2  Congress has *ever* provided the President the authority to lay off rank-and-file federal employees

3  (ECF 37-1 at 31). The assumption of such authority would defy the purpose of civil service

4  protections from political influence (5 U.S.C. §2301) and Supreme Court precedent, *Seila Law LLC*

5  *v. CFPB*, 591 U.S. 197, 217 (2020) (reaffirming Article II restrictions on President's removal powers,

6  even of officers). Thus, Defendants rely *only* on the President's general Article II supervision

7  authority. Defendants' argument rests on two faulty premises: first, that agencies are the real actors;

8  and second, that the President's orders do not direct agencies to violate the law by acting in a manner

9  that is entirely arbitrary and capricious and ignores relevant considerations. Opp. 38-45.[4]

10    First, the argument that the President is simply giving agencies general guidance defies the

11  language of the EO, Memo, and record. *Supra* at 1-2. Defendants rely on (and misleadingly cite) a

12  single Presidential press comment that the agencies are making the decisions (after public outcry over

13  DOGE's directions to agencies). Opp. 14; *supra* at 1. Defendants submitted *no* evidence from any

14  Federal Agency Defendant to show either that 1) they are in fact making these decisions, or 2) that

15  they are engaging in reasoned decision-making. Defendants have *conceded* the factual record, which

16  is filled with admissions by agencies that they are acting pursuant to the President's instructions and

17  consistent with the arbitrary EO parameters. *Supra* n.1.

18    Next, as a matter of law, no one disputes the President has general supervision powers—that

19  is a strawman.[5] The question is whether the President's powers of supervision extend to ordering

20  agencies to take the action the President has *categorically* required, including giving up their

21  _____

22  [4] In Defendants' view, 100 years of Congressional and Presidential action are "irrelevant" and
apparently misguided, because the Constitution already permits the President to exercise decision-

23  making authority over agencies. This is plainly wrong. No court has interpreted Article II's general
supervision power so broadly as to authorize the President to order agencies across the government to
dismantle themselves though "large-scale" RIFs for the purpose of reorganization.

24  [5] Defendants also overreach by citing without attribution the concurrence in *Arnett v. Kennedy*,
416, 134, 168 (1974), for the proposition that "the Government" has discretion and control, when the

25  Court was discussing *Congressional* control over agencies and their employees via legislation. *Id.*
Defendants also argue that agencies must implement a President's orders, citing *Sherley v. Sebelius*,

26  689 F.3d 776, 784 (D.C. Cir. 2012). The issue in *Sherley* was whether HHS regulations regarding
stem cell research violated an act of Congress, and whether HHS acted in an arbitrary and capricious

27  manner by rejecting comments made during rule-making that wanted to eliminate all such research,
contrary to an Executive Order interpreting the statutory authority. President Trump's Executive

28  Order makes no attempt *at all* to interpret statutory authority before imposing his categorical
requirements.

1    decision-making power to OMB, OPM and DOGE; eliminating offices and functions *the President*

2    dictates; planning RIFs that prioritize shutdown levels of staffing regardless of agency function; and

3    otherwise acting in an arbitrary and capricious manner that abuses any discretion. No case holds that

4    Article II gives the President the authority to do all that. And supervision authority does not include

5    ordering agencies to violate the APA. *New York v. Trump*, 133 F.4th 51, 70-71 (1st Cir. 2025); *State*

6    *v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (agency implementing Exec. Order must comply with APA).

7       In service of this argument, Defendants rely heavily on the savings clause. Opp. 39-40. This is

8    a familiar and misleading playbook. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242

9    (9th Cir. 2018) (rejecting same argument); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, *7

10    (D.D.C. Feb. 25, 2025) (rejecting contention that "countless federal agencies ... suddenly began

11    exercising their own discretion to suspend funding across the board at the exact same time" because it

12    requires "unfathomable" "coincidental assumptions" and "contradicts the record"); *accord New York*

13    *v. Trump*, 133 F.4th at 69. Generically telling agencies to comply with the law while imposing

14    categorical requirements that make that instruction impossible cannot save the EO: "Because the

15    Executive Order unambiguously commands action, here there is more than a 'mere possibility that

16    some agency might make a legally suspect decision.' The Executive Order's savings clause does not

17    and cannot override its meaning." *City & Cnty of San Francisco*, 897 F.3d at 1240.[6]

18       Even if the President had the authority to order agencies to exercise their own discretion to

19    RIF and reorganize themselves, he cannot order them to replace reasoned and rational decision-

20    making with Presidential fiat (to eliminate offices and functions "My Administration's" orders

21    eliminated); improper considerations (to prioritize using government shutdown levels of employment

22    that by definition cannot support agency functions); and predetermined outcomes (large-scale RIFs).

23    Even within the scope of discretion the CSRA affords agencies, no agency has the authority to rush

24    into "large-scale" RIFs that serve the sole purpose of effectuating the President's goal of downsizing

25    and reorganizing government and eliminating programs, offices, and functions that he chooses to

---

[6] Defendants rely on inapplicable out of circuit precedent to argue that an EO cannot be unlawful if it has any lawful application when it contains a savings clause. Opp. at 39-40; s*ee City & Cnty. of San Francisco*, 897 F.3d at 1240.

Add.296

1    eliminate (divorced from any proper consideration of agency needs and functions).[7] As in *New York*

2    *v. Trump*, even if some of the ARRP elements fell within agency discretion, and even if the agencies

3    were making considered decisions themselves, that would not save this EO and its breakneck

4    implementation from falling outside the President's authority. 133 F.4th at 69-70. Defendants spend

5    many pages discussing the history of the RIF authority, but whatever general authority exists does not

6    answer whether the President can order *these* RIFs, with *these* parameters, which are being compelled

7    in service of the President's unconstitutional reorganization of government. Defendants' primary

8    response is simply to claim that agencies are making the decisions. Opp. 43.

9        Where, as here, Congress has repeatedly declined to reauthorize the power to reorganize that

10   the President needs to take such action, his power is "at its lowest ebb." *Youngstown Sheet & Tube*

11   *Co. v. Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring); *accord City & Cnty. of San*

12   *Francisco*, 897 F.3d at 1234. The President's orders to agencies to implement a reorganization on his

13   terms, including by way of RIFs for the purpose of reorganization, are not grounded in any

14   Constitutional or statutory authorization, usurp legislative authority, and are unconstitutional and

15   ultra vires. *Id.* at 585; *Chen v. I.N.S.*, 95 F.3d 801, 805 (9th Cir. 1996) ("the Executive Order lacked

16   the force and effect of law because it was never grounded in a statutory mandate or congressional

17   delegation of authority"); *State v. Su*, 121 F.4th at 13 ("In sum, the President cannot issue an

18   executive order instructing agencies to carry out [his] mandate" without Constitutional or statutory

19   authority); *see also City & Cnty. of San Francisco*, 897 F.3d at 1235 (enjoining implementation of

20   unconstitutional Executive Order). This conclusion does not upend the Constitution, as Defendants

21   claim; it respects it. The agency action implementing the President's unlawful directives therefore

22   should be enjoined. *Id.*[8] The Ninth Circuit has conclusively resolved the availability of ultra vires

---

[7] The sole RIF statute (5 U.S.C. §3502) does not provide *unfettered* agency discretion and is of course subject to review for "abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like," *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998). By following President Trump's orders, agencies abuse statutory discretion. *Infra*, at 7-9.

[8] *See also Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017) (denying stay of injunction of Executive Order); *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds*, *sub nom. Biden v. Sierra Club*, 142 S.Ct. 46 (2021); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 547 (N.D. Cal. 2020) (enjoining Exec. Order); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017) (same).

1    claims and relief to enjoin unlawful Executive Orders; Defendants' argument that review is

2    foreclosed by *Dalton v. Spencer*, 511 U.S. 462 (1994) is another oft-rejected refrain (Opp. 34);[9] and

3    Defendants' out-of-circuit case law does not apply. Opp. at 43-44.

4        2.    *Defendants Concede OMB, OPM and DOGE Lack Authority*. Defendants concede this

5    point, by identifying no statutory authority for OMB, OPM, or DOGE actions. Opp. 44-45.[10]

6    **III.    Plaintiffs are likely to succeed on their APA Claims against OMB, OPM, and DOGE**

7        *1. Discrete agency action.* Plaintiffs' claims challenging the OMB/OPM Memo and ARRP

8    approvals are not an impermissible "wholesale" or "programmatic attack" seeking "general judicial

9    review of [agencies'] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891, 899

10   (1990) (no APA claim where plaintiffs sought court oversight of all "continuing (and thus constantly

11   changing) operations of the BLM" to manage federal public lands). Plaintiffs properly challenge only

12   specific and "circumscribed, discrete agency actions" by OMB and OPM. *Norton v. S. Utah*

13   *Wilderness All.*, 542 U.S. 55, 62 (2004). The fact that those actions may have widespread impacts

14   does not convert Plaintiffs' challenge into a "programmatic" challenge. *See New York*, 133 F.4th at

15   67 (APA challenge to OMB directive to freeze *all* federal financial assistance across all agencies). As

16   the Supreme Court recognized, an agency's "specific order or regulation, applying some particular

17   measure across the board to all individual [agency decisions], … can of course be challenged under

18   the APA"—even if the challenge will have widespread effects. *Lujan*, 497 U.S. at 890 n.2.

19       *2. Final agency action.* Defendants do not dispute that the Memo sets forth OMB/OPM's final

20   position; instead they argue it is too far removed from any legal consequences to Plaintiffs.[11] Opp.

21

22   ―――――――――――
        [9] *Dalton* made clear that constitutional challenges are justiciable where the President's action lacks
23   both "'statutory authority' and 'background constitutional authority.'" *Murphy Company v. Biden*, 65
     F.4th 1122, 1130 (2023). Plaintiffs assert such a separation of powers claim here. *Cf. Natl. Treas.*
24   *Employees Union v. Vought*, 2025 WL 942772, *8-9 (D.D.C. Mar. 28, 2025).
        [10] Defendants are correct that Plaintiffs seek relief against U.S. DOGE Services (USDS), which is
25   often referred to as DOGE and is an agency for the purposes of the APA. *AFL-CIO v. Dep't of Lab.*,
     2025 WL 1129227, at *22 n.19 (D.D.C. Apr. 16, 2025). But Defendants cannot rely on the opaque
26   structure and operations of DOGE to dodge accountability. *See AFL-CIO*, 2025 WL 1129227, at *17
     (explaining that DOGE Teams are tasked with "executing the agenda laid out in the DOGE E.O. and
27   other relevant Executive Orders—as interpreted by the USDS Administrator").
        [11] The Memo is an APA "rule." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (opinion
28   letter was a rule; "rule" is "defined broadly to include any 'statement[s] of general or particular
     applicability and future effect' … to 'implement, interpret, or prescribe law or policy'") (quoting 5
     U.S.C. §551(4)).

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI         7

36-37. But "[a] federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, … a decision by another administrative agency ..." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025). Final agency action includes action that binds or directs government officials to act in ways that impact plaintiffs. *See New York*, 133 F.4th at 68 (OMB directive to agencies to freeze federal funds was final agency action ); *Nat'l Council of Nonprofits*, 2025 WL 597959, *13 (same).[12] The Memo is final agency action because it mandates that agencies perform large-scale RIFs on a particular timeline according to specific terms and subject to OMB/OPM approval, ECF 37-1 at 10-11, and those RIFs have legal consequences for Plaintiffs, *id.* at 44-49. The record refutes Defendants' contention that agencies do not need to comply with the Memo. *Id.* at 12-28.[13] Defendants do not dispute that ARRP approvals and DOGE's directives are final action.

3. *Unlawful action.* Defendants do not even attempt to justify these agencies' failure to provide any reasoned explanation for the requirements imposed in their Memo or directives; their disregard for important aspects of the decision (including harm to employees, governments, and the public); or their unreasonable timelines and demands, including to abolish programs as directed by the President/his agents and start from a baseline of *government shutdown staffing*, which by definition is insufficient to perform basic agency functions. ECF 37-1 at 38-40; *Rhode Island v. Trump*, 2025 WL 1303868, at *11-12 (D.R.I. May 6, 2025). Defendants also do not deny that OMB and OPM did not perform notice-and-comment rulemaking, ECF 37-1 at 41, or provide any statutory authority for their challenged actions,[14] *supra* at 7. Plaintiffs are likely to succeed on these claims.

## IV.    Plaintiffs Are Likely to Succeed on Their APA Claims against Agency Defendants

1. *Discrete, final agency action.* Plaintiffs challenge Federal Agency Defendants' implementation of ARRPs through RIFs and reorganizations. Defendants concede terminations through RIFs are final agency action, Opp. 38; reorganizations by eliminating programs and functions

---

[12] *See also Biden v. Texas*, 597 U.S. 785, 807-10 (2022) (DHS memo).

[13] The Memo's determination that OMB/OPM are the final decisionmakers about each agency's ARRP is inconsistent with the RIF statute and OPM regulations, under which *agencies* are the decision-maker. 5 U.S.C. §3502; 5 C.F.R. § 351.201. The Memo thus alters the status quo of who the final decisionmakers will be, and reflects the "consummation of agency decisionmaking regarding that issue." *Navajo Nation v. U.S. Dep't of Interior*, 819 F.3d 1084, 1091 (9th Cir. 2016).

[14] OPM rules are not subject to the APA "personnel" exception. 5 U.S.C. §§1103(b)(1), 1105.

are as well. These claims are not improper "programmatic" challenges. Each agency is taking action

pursuant to a unified document (ARRP) that implements the categorical mandates of a single EO.

Courts have upheld many similar challenges. *See New York*, 133 F.4th at 67 (APA applied to all of

agencies' actions to "implement broad, categorical freezes on obligated funds" pursuant to OMB

directive: "we are not aware of any supporting authority for the proposition that the APA bars a

plaintiff from challenging a number of discrete final agency actions all at once").[15]

> *2. Arbitrary and capricious.* Defendants do not even attempt to rebut Plaintiffs' showing that

Federal Agency Defendants, by complying with the categorical mandates and impossible deadlines

imposed by the President, OMB, OPM, and DOGE when creating their ARRPs, *necessarily* fail to

meet fundamental requirements to: consider all relevant factors; address reliance interests; consider

alternatives; explain reversals in position; and provide a reasoned explanation for the sudden

elimination of longstanding programs and corresponding workforces. ECF 37-1 at 42-44. An

arbitrary and capricious claim exists regardless of statutory authority—Defendants' response that

agencies have authority to conduct RIFs is a non sequitur. Defendants also contend, without citation,

that Plaintiffs can only challenge specific future RIFs, after the fact. Opp. 45-46. But Plaintiffs

challenge the ARRPs that are being created and approved pursuant to the EO *now*. Plaintiffs provided

voluminous evidence, despite Defendants' refusal to make ARRPs public, establishing the arbitrary

and capricious way in which the 17 agencies against which they seek a TRO are implementing

ARRPs and conducting RIFs. ECF 37-1 at 12-29. That is more than sufficient to support this claim.

**V.    Congress Did Not Send These Constitutional and APA Claims to Adjudicative Agencies
for Employee Personnel Actions and Labor Disputes**

> Defendants' channeling argument singularly focuses on a challenge to "RIFs." Opp. 23-31.

But as Defendants recognize, Plaintiffs challenge the legality of the EO and Memo (*id.* at 22),

approval of ARRPs by OMB/OPM, and implementation of ARRPs as ultra vires and unlawful under

the APA. ECF 1 at 99-105. Defendants make no argument regarding jurisdiction over *those claims*,

---

[15] *See City & Cnty. of San Francisco*, 897 F.3d 1225; *NTEU v. Vought*, 2025 WL 942772, at *13 (D.D.C. Mar. 28, 2025) (CFPB dismantling); *Rhode Island*, 2025 WL 1303868, at *8 (D.R.I. May 6, 2025) (IMLS, MBDA, FMCS dismantling); *Woonasquatucket River Watershed Council v. USDA*, 2025 WL 1116157, at *10 (D.R.I. Apr. 15, 2025) (IIJA, IRA funding freeze).

1    and so waived the issue. Regarding their other arguments, federal courts do not lightly remove

2    subject matter jurisdiction from federal claims based on implied congressional intent. *Mims v. Arrow*

3    *Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("jurisdiction conferred by 28 U.S.C. § 1331 should hold

4    firm against 'mere implication flowing from subsequent legislation.'"). Defendants' arguments

5    should be rejected because Congress did not preclude federal courts from hearing Plaintiffs' claims.

6           1. *Local Governments, Non-Federal Employee Unions and Non-Profits*. Defendants ignore

7    the Ninth Circuit's recent decision. *See AFGE v. OPM*, 2025 WL 914823, at *1 (9th Cir. Mar. 26,

8    2025) ("Nor have appellants demonstrated—under existing authority—that they are likely to establish

9    that Congress has channeled the organizational plaintiffs' claims to administrative agencies.").

10          Defendants' argument would also require a novel and dramatic expansion of *Thunder Basin*

11   *Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994), which has been applied to channel only "covered

12   employees appealing covered agency actions." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10 (2012).

13   But these Plaintiffs are not "covered employees." No controlling authority has ever sent such

14   plaintiffs to agencies designed to hear claims brought by federal employees or their unions against

15   employing agencies—or foreclosed all judicial review—simply because the case involves federal

16   employment. Defendants also seriously misconstrue *Veit v. Heckler*, 746 F.2d 508 (9th Cir. 1984),

17   contending that case's "exact conclusion" would channel these third parties. Opp. 26. But *Veit*

18   involved a single employee, challenging a covered action by his employing agency. *Id.* at 509-11.

19          To the extent that Defendants contend that Congress impliedly foreclosed *any* claims by these

20   Plaintiffs, implied doctrines cannot be so divorced from statutory text, which evidences no intent to

21   foreclose jurisdiction. *E.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024). The

22   Congress that enacted the CSRA and FSLMRS referenced the APA at least three times (5 U.S.C.

23   §§1103, 1105, 7134) and cannot be said to have silently intended to eliminate the bedrock principle

24   of APA review. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that

25   two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of

26   showing a clearly expressed congressional intention that such a result should follow."); *Loper Bright*,

27   603 U.S. at 393 ("The text of the APA means what it says."). The APA's judicial review provisions

28   are a "command," and the Supreme Court has warned against impliedly expanding exceptions. *E.g.*,

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI          10

1   *Dep't of Commerce v. N.Y.*, 588 U.S. 752, 771-72 (2019); *see also U.S. Army Corps of Eng'rs v.*

2   *Hawkes Co., Inc.*, 578 U.S. 590, 601-02 (2016); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586

3   U.S. 9, 22-23 (2018). Defendants' implied foreclosure argument conflicts with this APA precedent.

4       2. *Unions and Other Plaintiffs Representing Federal Employees*. The federal sector union

5   Plaintiffs bring the same claims as the above Plaintiffs, under an express grant of federal jurisdiction.

6   28 U.S.C. §1331; 5 U.S.C. §702; *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated as*

7   *moot, Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (confirming equitable jurisdiction to hear ultra vires

8   claim). The fact that *some types of claims* brought by federal employees and their unions may be

9   heard by the MSPB and FLRA does not mean that *all* claims must go there. *Axon*, 598 U.S. at 185 ("a

10  statutory review scheme [that precludes district court jurisdiction] does not necessarily extend to

11  every claim concerning agency action"); *Kerr v. Jewell*, 836 F.3d 1048, 1052-53 (9th Cir. 2016).[16]

12      Defendants invoke out-of-circuit decisions that treat this administrative channeling doctrine

13  like field preemption touching on anything employment related—but, as this Court recently held, that

14  is incorrect. *AFGE v. OPM,* 2025 WL 900057, at *6.[17] Defendants try to cabin the *OPM* case to the

15  probationary employee context, but the rationale applies equally here to 1) the government-wide

16  challenges that can never be heard by the MSPB or FLRA (against the President, OMB, OPM and

17  DOGE, particularly as this Administration works to destroy those channels), and 2) APA claims

18  against Federal Agency Defendants for arbitrary and capricious actions, including for the reasons

19  explained above regarding the command of APA review. The ARRPs are also not covered "personnel

20  actions"—Defendants attempt to distinguish *Feds For Medical Freedom v. Biden* as involving a

21  policy, not a "personnel action"—but so too does this case challenge actions and documents that are

22  not themselves personnel actions, even if they will ultimately result in personnel actions. 63 F.4th

23  366, 375 (5th Cir. 2023) (*en banc*), *judgment vac'd on other grounds*, 144 S.Ct. 480 (2023). Finally,

24

25      [16] In applying *Thunder Basin*, the Supreme Court has generally found that individual "run of the

26  mine" statutory claims belong in administrative fora, *see Elgin*, 567 U.S. at 22; *Thunder Basin*, 510
    U.S. at 205, while broader challenges to agencies or their policies (including constitutional

27  challenges) should be heard by an Article III district court, *see Free Enter. Fund*, 561 U.S. at 489;
    *Axon*, 598 U.S. at 189.This trajectory is also consistent with, rather than contrary to, the APA.

28      [17] Defendants' out-of-circuit cases also fail to persuade because they do not involve the types of
    claims at issue here, or do not consider or reach arguments that Plaintiffs have here pressed,
    particularly with respect to statutory text and the command of judicial review in the APA.

1    no controlling authority has ever channeled a procedural APA claim because it involves employment.

2         In short, this Court can and should conclude that Union Plaintiffs' claims are not the "type"

3    that Congress intended to be channeled. But even if the Court were to apply the three-part *Thunder*

4    *Basin* analysis, it would reach the same result. As to the first factor, *meaningful* judicial review of

5    these claims, by these parties, would be foreclosed for the reasons explained. *Thunder Basin*, 510

6    U.S. at 207. Meaningful review must account for the type of claim and relief *Congress* intended,

7    particularly for APA claims (for which the Supreme Court has said judicial review years after agency

8    adjudication *is not meaningful*, *Hawkes*, 578 U.S. at 601-02). As to the second factor, Plaintiffs'

9    claims are "*wholly* collateral" to the CSRA's scheme because they do not challenge individual

10   adverse personnel actions or employer action under a contract; they concern separation of powers

11   issues and challenge the substantive and procedural lawfulness of the EO and its implementation

12   through the ARRPs. *Id.* at 211. And as to the third factor, the labor agencies have no particular

13   expertise in resolving constitutional and administrative law questions. *Loper Bright*, 603 U.S. at 399.

14   **VI.    Plaintiffs Establish Standing and Irreparable Injury**

15        Substantial evidence shows such Defendants' RIFs have injured and will injure Plaintiff

16   federal sector unions,[18] causing members to lose salaries and health insurance if terminated,[19] and

17   worsening workplace conditions if they remain. *See* ECF 37-1 at 44-45 & nn. 57-58.[20] RIFs will also

18   injure members Plaintiff organizations and non-federal unions; as many declarants explain, cuts of

19   this magnitude cannot be made without causing extensive and irreparable harm. ECF 37-1 at 12-29.[21]

---

[18] Defendants wrongly assert that Plaintiffs fail to allege imminent RIFs of Plaintiff unions' members. *E.g.* ECF 37-14 ¶¶12, 23-25 (AFGE; GSA plans 50% cut, RIF notice with June 6 date); ECF 41-1 ¶¶13, 38, Ex. D (AFGE; HUD RIF of 146 members on May 18); ECF 37-18 ¶¶9-14, Exs. D-F, H (AFGE; SBA RIFs of bargaining unit announced in April with dates in June); ECF 37-12 ¶¶20, 22, 25 (AFSCME; RIFs to 90% of AmeriCorps unit; some effective June 24); Gamble Reply Decl. ¶3-5, Exs. A-B (AFGE; DOL RIF of members effective June 6); ECF 37-32 ¶¶10-13 (AFGE; White House ordered 50% staff cut at NSF; voluntary early retirement window ends May 8); ECF 41-4 ¶¶15, 22, Ex. E (AFGE; HHS RIF of all but six unit members, likely effective June 30); ECF 37-9 ¶¶7-9, 13 (AFGE; VA to cut roughly 80,000 jobs, RIF notices anticipated in June).

[19] Defendants ignore this loss of health insurance. *See* ECF 37-1 at 49. Plaintiff unions need not name specific members, Opp. 32, because it is "clear and not speculative" their members will be injured. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025).

[20] These allegations are not "conclusory," Opp. 33, but rely on declarants' prior and current experiences with reduced staffing and give specific factual explanations. *E.g.* ECF 37-20 ¶37; ECF 37-21 ¶32; ECF 37-35 ¶¶12-13.

[21] *See*, *e.g.*, ECF 37-39 ¶¶7-8, 11 (ARA; SSA wait times); ECF 37-37 ¶¶18-21 (NOFA; USDA

These injuries are fully "grounded in evidence," not "conclusory or speculative." Opp. 47. Similarly, city and county Plaintiffs showed direct injury, including delayed public health grants and staff cuts from HHS;[22] loss of EPA support to remediate hazardous environmental conditions;[23] and increased burdens on local firefighting.[24] These are not the types of "indirect" consequences or "peripheral costs" that Defendants' authorities warn are insufficient for standing.[25] Given this evidence, and Plaintiffs' showing that RIFs have *already* harmed services,[26] Defendants cannot defeat Plaintiffs' evidence of injury by pointing to boilerplate "instructions that agencies should not undertake any action that would impair service delivery functions." Opp. 33.

Nor does the *potential* advance notice to employees obviate these injuries. In fact, Defendants have been providing *no* notice before placing employees on immediate administrative leave. *See, e.g.*, ECF 37-12 ¶20 (AmeriCorps).[27] Many RIFs have already occurred.[28] And Defendants offer no reason why Plaintiffs should be required to make seriatim requests for emergency injunctive relief each time an agency notices a new RIF, when all stem from the same challenged unlawful acts.

---

Farm Service Agency); *cf. Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) ("Given … existing shortages and delays, it is not speculative to anticipate that reducing the resources available will further impede the County's ability to deliver medical treatment to plaintiffs").

[22] *E.g.* ECF 37-46 ¶23 (80% of Harris County Public Health Preparedness and Response team depends on funding from CDC, which has been unresponsive to grant questions); ECF 41-6 ¶33(a)-(b) (King County is unable to reach grant specialist and is relying on stop-gap funding; CDC Public Health Associate at county Sexual Health Clinic was terminated).

[23] *E.g.* ECF 37-58 ¶¶31-34 (Santa Clara relies on "EPA's capacity to deploy the on-scene coordinators…during its emergency response to releases of hazardous materials and other harmful chemicals"); ECF 37-52 ¶¶25-28 (EPA aided Chicago following an industrial structure collapse); ECF 37-19 ¶¶8, 22 (effects of EPA cuts on emergency response).

[24] ECF 37-58 ¶24 (Forest Service cuts will shift wildfire response burden to Santa Clara); ECF 37-49 ¶¶2-4 (San Francisco; same); ECF 37-1 at 25-40 (listing additional harms).

[25] *See* Opp. 33 (citing *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022)). Those cases also both involved challenges to the Executive's decision *not* to arrest or prosecute, a type of lawsuit that is historically disfavored. *Texas*, 599 U.S. at 678. In contrast, challenges to agency actions reducing services are familiar territory for courts, including from localities that will experience "an increased demand for aid supplied by the state and local entities" as a result. *City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 754 (9th Cir. 2020).

[26] For example, RIFs at HHS caused CDC to cancel support for Milwaukee public schools with lead exposure; severely hindered monitoring, testing, and prevention efforts for communicable diseases; and endangered disease testing for first responders and firefighters. ECF 37-36 ¶¶17, 25, 29-34 (APHA). NIOSH shuttered a federal screening program for black lung disease, *id.* ¶25; and stopped routine mine safety inspections, ECF 37-21 ¶23.

[27] *See also* ECF 37-14 ¶11 (GSA); ECF 37-21 ¶18 (HHS); ECF 37-16 ¶10 (DOL). This violates 5 C.F.R. §351.806, which requires, "When possible, the agency shall retain the employee on active duty status during the notice period." The only exception is if "in an emergency the agency lacks work or funds for all or part of the notice period."

[28] *See* ECF 37-13 ¶¶12-14 (EPA); ECF 41-1 ¶¶13-18 (HUD); ECF 37-18 ¶¶8-14 (SBA).

**Add.304**

Finally, *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not foreclose standing when, as here, a defendant's actions "perceptibly impaired" the plaintiff's "core business activities." *Id.* at 395; *see, e.g.*, ECF 37-23 ¶¶10-19 (AFGE); ECF 37-1 at 45 n.59.

## VII.   The Equities Otherwise Favor a TRO

Defendants' argument depends on their contention that their actions were lawful. Opp. 48; *cf. Pangea Legal Servs. v. DHS*, 501 F.Supp.3d 792, 826-27 (N.D. Cal. 2020). They provide no evidence and assert no harm from short-term preservation of the status quo to allow full consideration of a preliminary injunction. "The public interest is served by compliance with the APA," as is "ensuring that the statutes enacted by representatives are not imperiled by executive fiat." *Id.* at 825-26.

## VIII.   The Scope of the Requested Injunction Is Appropriate

Plaintiffs have shown injury to Plaintiffs and their members across the country. *Supra* at 12-13. An injunction must be as broad as necessary to give parties relief, as when "a showing of nationwide impact" is made. *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *see Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987); *see also Pangea Legal Servs.*, 501 F.Supp.3d at 826-27.[29] Moreover, the APA's directive to "hold unlawful and set aside agency action," is not limited by "geographic boundaries." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020) ("*E. Bay I*").[30] Thus, the "ordinary result [in an APA case] is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Regents of Univ. of Cal. v. DHS Sec'y*, 908 F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) (cleaned up).

Defendants object to disclosure of the ARRPs as unnecessary, arguing that Plaintiffs can challenge RIFs after RIF notices issue. Opp. 48-49. But Defendants should reveal to the Court which further actions implementing the ARRPs are imminent, so this Court can properly evaluate the record for a preliminary injunction.[31] Moreover, good cause exists to expedite this discovery. *See Freelancer*

---

[29] Plaintiff unions and nonprofit organizations are not geographically limited. *See, e.g.*, ECF 37-23 ¶2 (AFGE); ECF 37-26 ¶4 (SEIU); ECF 37-36 ¶2 (APHA); ECF 37-39 ¶2 (ARA). Plaintiff cities and counties injuries derive not only (or even mainly) from termination of federal employees employed therein. *See, e.g.*, ECF 37-46 ¶¶12-26; ECF 37-47 ¶4(c); ECF 41-6 ¶22(e), 29-31.

[30] Defendants cite an earlier motions panel decision in *E. Bay Sanctuary*, which the Ninth Circuit deemed non-binding in affirming preliminary injunctive relief in all four border states. *See E. Bay I*, 994 F.3d at 985-88; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660-62 (9th Cir. 2021).

[31] Defendants' suggestion that any TRO should permit them to conduct RIFs that are independent

1    *Int'l Pty Ltd. v. Upwork Global, Inc.*, 2020 WL 6929088, *2 (N.D. Cal. Sep. 9, 2020) (expedited

2    discovery factors include pending preliminary injunction request, purpose, and breadth of request).

3    **IX.    Plaintiffs Did Not Delay Seeking a TRO**

4          Plaintiffs sought a TRO as soon as reasonably practicable after information became public

5    regarding agencies' implementation of the EO and Memo, in conjunction with the March 13 and

6    April 14 ARRP deadlines. *See* ECF 37-1 at 14-23. The grounds for Plaintiffs' legal challenge were

7    not "fully available" in February. Opp. 21-22. Defendants would have challenged standing without

8    information regarding the agencies' RIF plans. In fact, in another case, the government argued that

9    claims challenging this EO were unripe in February because implementation via RIFs had not yet

10   occurred.[32] Plaintiffs also could not show that agencies were following the EO and the Memo—or, in

11   the case of the NLRB and NSF, that agencies not sufficiently following it were forced to modify their

12   plans (ECF 37-1 at 12, 23-24)—until the agencies took actions and their plans emerged.[33]

13   **X.    No Bond Should Be Required**

14         This Court "retains discretion as to the amount of security required, *if any*." *E. Bay Sanctuary*

15   *Cov. v. Trump*, 349 F.Supp.3d 838, 868 (N.D. Cal. 2018) (quotation omitted); *see also San Francisco*

16   *v. Trump*, 2025 WL 1282637, *38 (N.D. Cal. May 3, 2025); *Nat'l Council of Nonprofits*, 2025 WL

17   597959, *19. A TRO would simply require Defendants to continue the work that these agencies have

18   performed for decades. *See Pacito v. Trump*, 2025 WL 893530, at *15 (W.D. Wash. Mar. 24, 2025).

19                               **CONCLUSION**

20         The Court should issue the proposed temporary restraining order.

21

---

22   of the EO and Memo, Opp. 50, could not be effectuated without knowing what is in the ARRPs. *See*

23   *also Urgent Need for Transparency and Oversight Regarding Agency Reduction-in-Force and Reorganization Plans Affecting Scientific and Health Priorities* (May 2025), http://united sciencealliance.org/united-call-for-transparency (75 science groups call for ARRP transparency)

24   [32] *NTEU v. Trump*, No. 1:25-cv-00420 (D.D.C.), Dkt. 14 at 17; *see also NY v. McMahon*, No. 1:25-cv-10601 (D. Mass.), Dkt. 95 at 9-10 (arguing plaintiffs "lack[ed] understanding of the [Education

25   Dept's] ongoing reorganization," were speculating about harms, and had no standing to stop RIFs).

26   [33] Regardless, "[d]elay by itself is not a determinative factor." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (17-month delay); *see also Doe v. Horne*, 115 F.4th 1083, 1111 (9th Cir.

27   2024) (7 months); *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (3 months). And timing arguments are "not particularly probative in the context of ongoing, worsening injuries," *Arc of Cal.*,

28   757 F.3d at 990, which Plaintiffs show. *See, e.g.*, Mammel Decl. ¶8 (May 2: EPA RIFs "in the coming weeks"); ¶11 (Interior May 2: coming RIFs). In Defendants' cited cases, either the plaintiffs did not explain the delay or did not show worsening and irreparable harm.

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI     15

DATED: May 8, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne Johnson
Alice X. Wang
Robin S. Tholin
Aaron Schaffer-Neitz
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice app. forthcoming)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorney for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and AFGE
locals*

Teague Paterson (SBN 226659)

1  Matthew Blumin (pro hac vice)
   AMERICAN FEDERATION OF STATE, COUNTY,
2  AND MUNICIPAL EMPLOYEES, AFL-CIO
   1625 L Street, N.W.
3  Washington, D.C. 20036
   Tel: (202) 775-5900
4  TPaterson@afscme.org
   MBlumin@afscme.org
5

6  By: */s/ Teague Paterson*

7  *Attorneys for Plaintiff American Federation of State*
8  *County and Municipal Employees, AFL-CIO (AFSCME)*

9

10  Steven K. Ury (SBN 199499)
    SERVICE EMPLOYEES INTERNATIONAL UNION,
11  AFL-CIO
    1800 Massachusetts Ave., N.W.
12  Washington, D.C. 20036
    Tel: (202) 730-7428
13  steven.ury@seiu.org

14  By: */s/ Steven K. Ury*

15  *Attorney for Plaintiff Service Employees International*
16  *Union, AFL-CIO (SEIU)*

17

18  David Chiu (SBN 189542)
    City Attorney
19  Yvonne R. Meré (SBN 175394)
    Chief Deputy City Attorney
20  Mollie M. Lee (SBN 251404)
    Chief of Strategic Advocacy
21  Sara J. Eisenberg (SBN 269303)
    Chief of Complex and Affirmative Litigation
22  Molly J. Alarcon (SBN 315244)
    Alexander J. Holtzman (SBN 311813)
23  Deputy City Attorneys
    OFFICE OF THE CITY ATTORNEY FOR THE CITY
24  AND COUNTY OF SAN FRANCISCO
    1390 Market Street, 7th Floor
25  San Francisco, CA 94102
    molly.alarcon@sfcityatty.org
26  alexander.holtzman@sfcityatty.org
27

28  By: */s/ David Chiu*

*Attorneys for Plaintiff City and County of San Francisco*

Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

By: */s/ Tony LoPresti*

*Attorneys for Plaintiff County of Santa Clara, Calif.*

David J. Hackett (pro hac vice)
General Counsel to King County Executive & Special
Deputy Prosecutor
Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor
Erin King-Clancy (pro hac vice app. forthcoming)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
aclancy@kingcounty.gov

By: */s/ David J. Hackett*

*Attorneys for Plaintiff Martin Luther King, Jr. County*

Sharanya Mohan (SBN 350675)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org

By: */s/ Sharanya Mohan*

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI          19

1

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,*
*Harris County, TX, and King County, WA*

2

3

Christian D. Menefee

4

Harris County Attorney

5

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)

6

Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)

7

Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)

8

Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)

9

Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice)

10

Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice)

11

Assistant County Attorney
1019 Congress, 15th Floor

12

Houston, Texas 77002
Tel.: (713) 274-5102

13

Fax: (713) 437-4211

14

15

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov

16

sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov

17

chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

18

19

By: */s/ Jonathan G.C. Fombonne*

20

*Attorneys for Plaintiff Harris County, Texas*

21

22

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

23

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app.

24

forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice

25

app. forthcoming)
Lucy Prather (IL ARDC 6337780) (pro hac vice)

26

City of Chicago Department of Law,
Affirmative Litigation Division

27

121 N LaSalle Street, Suite 600

28

Chicago, Illinois 60602

REPLY ISO MOT. FOR TEMPORARY RESTRAINING ORDER, No: 3:25-cv-03698-SI          20

Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By: */s/ Stephen J. Kane*

    *Attorneys for Plaintiff City of Chicago*


Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming*)*
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By: */s/ Sara Gross*

    *Attorneys for Plaintiff City of Baltimore*

Pages 1 - 54

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

```
AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, AFL-CIO,  )
et al.,                         )
                                )
            Plaintiffs,         )
                                )
   VS.                          )   NO. 3:25-cv-03698-SI
                                )
PRESIDENT DONALD J. TRUMP, in   )
his official capacity as        )
President of the United States, )
et al.,                         )
                                )
            Defendants.         )
_____)
```

San Francisco, California
Friday, May 9, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
BY: **DANIELLE E. LEONARD, ATTORNEY AT LAW**
**STACEY M. LEYTON, ATTORNEY AT LAW**
**CORINNE F. JOHNSON, ATTORNEY AT LAW**
**BARBARA J. CHISHOLM, ATTORNEY AT LAW**

DEMOCRACY FORWARD FOUNDATION
PO Box 34553
Washington, D.C. 20043
BY: **ELENA GOLDSTEIN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

Add.313

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:

 3                          OFFICE OF THE CITY ATTORNEY
                            Sixth Floor - Fox Plaza
 4                          1390 Market Street
                            San Francisco, California  94102
 5                   BY:    YVONNE R. MERE, ATTORNEY AT LAW

 6                          OFFICE OF THE COUNTY COUNSEL
                            70 West Hedding Street
 7                          East Wing - Ninth Floor
                            San Jose, California 95110
 8                   BY:    RAPHAEL N. RAJENDRA, ATTORNEY AT LAW

 9                          KING COUNTY EXECUTIVE
                            401 5th Avenue - Suite 800
10                          Seattle, Washington 98104
                     BY:    ALISON C. HOLCOMB, ATTORNEY AT LAW
11
     For Defendants:
12                          DEPARTMENT OF JUSTICE
                            Civil Division
13                          950 Pennsylvania Avenue NW
                            Washington, D.C. 20530
14                   BY:    ERIC J. HAMILTON
                            DEPUTY ASSISTANT ATTORNEY GENERAL
15
                            DEPARTMENT OF JUSTICE
16                          20 Massachusetts Avenue NW
                            Washington, D.C. 20530
17                   BY:    ANDREW M. BERNIE
                            DEPUTY ASSISTANT ATTORNEY GENERAL
18

19

20

21

22

23

24

25
```

Add.314

```
 1   Friday - May 9, 2025                          10:30 a.m.

 2                       P R O C E E D I N G S

 3                            ---o0o---

 4        THE CLERK:  All rise.  Court is now in session, the

 5   Honorable Susan Illston presiding.

 6        THE COURT:  Good morning.

 7        ALL:  Good morning.

 8        THE COURT:  You may all be seated.

 9        THE CLERK:  Now calling Civil Matter 25-CV-3698,

10   American Federation of Government Employees, AFL-CIO, et al.

11   versus Trump, et al.

12        Counsel, please approach the podiums and state your

13   names for the record.

14        MS. LEONARD:  Good morning, Your Honor.  Danielle

15   Leonard from Altshuler Berzon.  With me at counsel table,

16   appearing on behalf of the plaintiff coalition, are Stacey

17   Leyton from Altshuler Berzon, Corinne Johnson from Altshuler

18   Berzon, Elena Goldstein from Democracy Forward, Ravi Rajendra

19   from Santa Clara County, and Yvonne Mere from San Francisco.

20        THE COURT:  Good morning.

21        MR. HAMILTON:  Good morning, Your Honor.  Eric

22   Hamilton from the U.S. Department of Justice for defendants.

23   With me is Andrew Bernie from the U.S. Department of Justice,

24   also for defendants.

25        THE COURT:  Good morning.
```

```
 1          Good morning.  This is the hearing on plaintiffs'
 2   motion for a temporary restraining order.  I've read and
 3   reviewed the papers submitted by the plaintiffs, by defendants,
 4   and by various amicus briefs which have come in over the last
 5   few days.  On -- and the amicus briefs are on either side of
 6   the issue.
 7          I thought I would give you my preliminary view of how
 8   to approach this first, and then I'll be happy to hear what you
 9   want to add to the papers that you've already submitted.
10          I've taken a hard look at the law that applies in this
11   case, and I think it is clear from Supreme Court precedent that
12   the President has the authority to seek changes in the
13   executive branch agencies, but he must do so in lawful ways.
14   And in the case of large-scale reorganizations or critical
15   transformations, he must do so with the cooperation of
16   Congress.  The Constitution is structured that way.
17          It doesn't require the cooperation of the courts;
18   we're not part of that.  But it requires the approval and
19   cooperation of the Congress because the agencies were created
20   by statute by the Congress.
21          I'm therefore inclined to issue a temporary
22   restraining order at this stage to protect the power of the
23   legislative branch, which is what's being affected by these
24   activities.
25          Defendants have raised a lot of questions about why we
```

1 ought not get to the merits in the first instance, including

2 timeliness, standing, and jurisdiction.  I haven't found those

3 arguments persuasive, but I'll be happy to hear anything you

4 want to add today.

5          On the merits, the case involves challenges to three

6 levels of executive action.  At the top, the President's

7 executive order 14210; in the middle, the February 26, 2025,

8 memorandum from the Office of Management and Budget and the

9 Office of Personnel Management, which was issued in response to

10 the executive order; and then, at the bottom, the various

11 agency, RIF, and reorganization plans that were submitted to

12 OMB and OPM in response to the memo.  And then there are DOGE

13 actions happening as well.

14          With respect to the executive order, I think

15 plaintiffs are likely to succeed on their claim that the

16 executive -- that the directive to initiate large-scale

17 reductions in force in Executive Order 14210 is *ultra vires*, as

18 the President has neither constitutional nor, at this moment

19 anyway, statutory authority to reorganize the executive branch

20 in this way.

21          The administrative agencies are creatures of statute.

22 Many past presidents, including President Trump in his first

23 term, have recognized that they need Congress to initiate major

24 agency reorganizations.  Nothing has changed since the first

25 term to alter that law.

1          And for similar reasons, the memo requiring that the

2    agencies submit their plans to OMB and OPM for review and

3    approval is *ultra vires* and violates, I believe, the APA.

4          So that's where I'm starting, which is that -- which

5    would suggest then that I grant the TRO at this time, but we're

6    having this hearing so we can flesh out any issues that need to

7    be fleshed out.

8          It might be well for the Government to start.

9          Tell me your name again, sir.

10         **MR. HAMILTON:**  Thank you, Your Honor.  Eric Hamilton.

11         **THE COURT:**  Good.

12         **MR. HAMILTON:**  Your Honor, this Court should deny

13    plaintiffs' motion for a temporary restraining order.  As

14    Your Honor identified, there are a number of arguments we have

15    raised that are threshold arguments, CSRA channeling, standing,

16    APA reviewability, the lawfulness of the executive order and

17    memorandum, and there are others.  To succeed, plaintiffs would

18    have to persuade the Court on each of those issues and still

19    others.

20         But, Your Honor, we think this is the rare motion for

21    a temporary restraining order where the Court doesn't even have

22    to get to that.

23         Your Honor, the motion begins and ends with Rule 65.

24    Plaintiffs' 51-page brief and 1,300 pages of declarations don't

25    look anything like a motion for a temporary restraining order;

they look like a motion for summary judgment.  And their months-long delay in filing the motion is enough for the Court to deny the request.

The first page of plaintiffs' brief calls their case a challenge to an executive order.  It's an executive order that was signed on February 11th, months ago, and yet, plaintiffs did not get their motion on file until May.

There's case law in the Ninth Circuit, as well as federal district courts in the State of California, that have recognized that delays of much less are, by itself, enough for a court to deny a motion for a temporary restraining order.

I want to highlight a case we cite in our brief:  NTEU against Trump.  It's a case from the DC District Court that was a challenge to the exact same executive order at issue here brought by a different union.  The plaintiffs there filed a motion for a temporary restraining order just three days after the executive order was signed.

And the delay in this case is even more stark when compared against the timing of other temporary restraining order motions filed by plaintiff AFGE during the Trump administration.

A different case in the Northern District of California called AFGE against OPM with Judge Alsup was -- had a TRO motion filed ten days after OPM issued probationary employee guidance.

1         Another AFGE case in this district court, AFGE against

2 Trump, which is with Judge Donato, a TRO motion was filed

3 ten days after the President signed the collective bargaining

4 agreement executive order that the union is challenging.

5         And looking to Boston, AFGE against Ezell, motion for

6 a TRO was filed eight days after the plaintiff filed -- excuse

7 me -- after the OPM began the "Fork in the Road" deferred

8 resignation program.

9         And, Your Honor, nothing has happened since

10 February 11th to justify that sort of delay.  All have known

11 since at least the February 26th memorandum of OPM and OMB that

12 there would be ARRPs submitted in mid-March and mid-April.

13         And when I look through plaintiffs' motion talking

14 about happenings at different agencies, we see multiple

15 agencies where nothing can possibly explain the delay in

16 seeking the extraordinary emergency relief of a temporary

17 restraining order.

18         Take, for example, the Department of Energy.  There,

19 plaintiffs say that the ARRP was leaked on April 4th.  Nothing

20 can explain their month-long delay there.  And as to HHS,

21 plaintiffs say that a RIF was announced there back on

22 March 27th; but, again, they can't explain their delay in

23 seeking emergency relief from a federal court during the

24 intervening weeks since then.

25         So, Your Honor, we think the case ends with Rule 65,

1   but if the Court turns to the four *Winter* factors, the

2   plaintiffs have failed to make the required showing on each.

3          I'll start with likelihood of success on the merits.

4   There is no likelihood of success on the merits for plaintiffs.

5          Your Honor noted the argument that we've made that the

6   Civil Service Reform Act as well as the FSLMRS preclude subject

7   matter jurisdiction.

8          Congress anticipated the problem of there being

9   disputes over federal employment action, and that's why it

10  created a specific remedial scheme for litigation over that,

11  which goes to the Merit System Protection Board or the FLA.

12         And --

13         **THE COURT:**  So it's your argument that Congress

14  anticipated that the President would issue an order effectively

15  radically transforming all these federal agencies and that that

16  should go to the administrative agencies for review?

17         **MR. HAMILTON:**  It is, Your Honor.  And other courts

18  have recognized that the fact that there's an executive order

19  or constitutional claims or statutory claims -- that isn't

20  enough to take a case outside of the Merit System Protection

21  Board.

22         We cite, for example, the AFGE against Trump case from

23  the DC circuit in 2019.  That case involved a challenge to

24  implementation of three executive orders.  And during the

25  second Trump administration, we've seen courts repeatedly

1    recognize that the CSRA and FSLMRS preclude challenges to the

2    Trump administration's workforce policies.

3            For example, quite recently, the Fourth Circuit stayed

4    a preliminary injunction in Maryland against USDA in a

5    challenge to the -- to an OPM guidance document on probationary

6    employees.

7            More recently, the DC circuit stayed a preliminary

8    injunction in the Widakuswara case which is a challenge to an

9    executive order that directed changes at the USAGM and resulted

10   in reductions in force.

11           Both of those cases, appellate courts recognized that

12   district court litigation was precluded by --

13           THE COURT:  I read those cases because you cited them

14   and relied on them extensively in your briefs.  And, of course,

15   each of them is two to one, and the two, the majority opinions

16   discussions were brief.  Very.

17           And the dissents, I found very persuasive.  They were

18   articulate and explained at length why -- why, in the opinion

19   of those judges, these issues are totally unsuited for the

20   administrative review.

21           MR. HAMILTON:  Sure.

22           THE COURT:  So I just want you to know that I found

23   persuasive the arguments made in the dissents.

24           MR. HAMILTON:  Sure.  And those cases proceeded on

25   appellate emergency dockets.

1    We also cite cases that have more extensive treatment

2  of the issues, including the 2019 DC Circuit case I mentioned,

3  and we also cite some recent district court --

4    **THE COURT:**  Of course, in 2019, the President didn't

5  even claim to be able to make the sweeping changes that he's

6  trying to order here.  Back then he recognized he needed to get

7  the Congress' permission, and he sought it, which is what the

8  Heritage Foundation said he had to do and what he could have

9  done here, but he didn't.

10    **MR. HAMILTON:**  Certainly true that the executive order

11  issued in February was not under review there.

12    But *AFGE against Trump* from 2019 still involved the

13  implementation of multiple executive orders.  And as I said, we

14  also cite the *AFGE against Ezell* case from the District of

15  Massachusetts and *NTEU against Trump* from DDC, a challenge to

16  the very executive order at issue here, where the Court held

17  that CSRA FSLMRS precluded federal district court litigation.

18    And in the end, plaintiffs' theory of district court

19  litigation would make no sense of Congress' statutes because

20  Congress anticipated litigation over separations of federal

21  employees and it created a specific forum for those cases.  But

22  under plaintiffs' theory, a plaintiff with even less of a stake

23  in federal employment than the employee himself or herself

24  doesn't have to go through that scheme and instead can go to

25  any judicial district of their choosing to bring litigation

1    outside of that scheme.

2          Even if the Court had subject matter jurisdiction over

3    such a case, plaintiffs still haven't carried their burden to

4    establish standing to sue.

5          There are two categories of plaintiffs here.  One

6    category is the union plaintiffs.  They're relying on a theory

7    of standing where they're asserting the rights and interests of

8    their members.  But the U.S. Supreme Court recognized in

9    Summers against Earth Island Institute in 2009 that, for that

10   theory of standing to succeed, a plaintiff has to make specific

11   allegations establishing that at least one identified member

12   has suffered or would suffer harm.

13         Plaintiffs respond to this argument in a footnote, and

14   they don't dispute that their declarations do not identify

15   named members, which under our reading of *Summers* is a

16   requirement for standing.

17         The organizational plaintiffs' standing is on even

18   weaker ground.  They are relying on downstream injuries from

19   reductions in force in the Federal Government.  Cases from

20   the -- like United States against Texas from the U.S. Supreme

21   Court recognized that that's not a viable theory of standing.

22   And we also cite circuit precedent like Arizona against Biden,

23   that is also dismissive of that sort of theory of standing.

24         But in the end, if the organizational plaintiffs are

25   concerned about disruption in the services that they feel they

1   are entitled to from the Federal Government, the right way to

2   litigate that isn't to bring a lawsuit enjoining any sort of

3   personnel changes in the agency with which they might work.

4   Instead, they should bring a claim against the agency, seeking

5   a court order, compelling whatever it is they think they've

6   been denied.

7          But the fact that one plaintiff might receive funding

8   from an agency doesn't allow them to cut off any sort of

9   personnel action that an agency might engage in within that

10  agency.

11         Still another threshold barrier to plaintiffs' claim

12  is the fact that the executive order at issue here is not

13  reviewable.  The Administrative Procedure Act does not apply to

14  acts of the President.  The Franklin against Massachusetts case

15  interpreted the APA and the word "agency" in that statute to

16  exclude acts of the President, and so that is not a viable

17  claim for review of the executive order --

18         **THE COURT:**  Well, the plaintiffs didn't say it was.

19  They didn't bring that claim.

20         **MR. HAMILTON:**  Their complaint at least is seeking,

21  I believe, vacatur of an executive order.

22         **THE COURT:**  Not under the APA.

23         **MR. HAMILTON:**  Well, but there are still problems with

24  the constitutional and statutory theories that they are

25  seeking.  Dalton against Specter, for example, rejects the idea

```
1    that any time that a president is allegedly exceeding statutory

2    authority that that would automatically become a constitutional

3    claim.

4          And there are also reviewability problems with the OMB

5    and OPM memorandum.  Again, plaintiffs are litigating an APA

6    claim.  Requirements for the APA are that an agency action has

7    to be both discrete and final.  The February memorandum of OMB

8    and OPM is neither.

9          The memorandum is kicking off an interagency

10   collaborative process.  It is seeking planning documents from

11   agencies so that there can be discussion and coordination

12   across the executive branch on workforce policy.

13         That is not final agency action, which is something

14   that marks the consummation of the agency's decision-making

15   process instead of being interlocutory and also is something

16   from which legal consequences flow.  That does not describe the

17   OMB and OPM memorandum.

18         THE COURT:  So then the action is premature?

19         MR. HAMILTON:  It is premature.

20         THE COURT:  But I thought you said it was three months

21   too late.

22         MR. HAMILTON:  Well, it is -- there are multiple

23   problems with the way that the lawsuit is structured.

24   Plaintiffs are using reductions in force as a hook and as their

25   injury, and for that sort of theory, they are much too soon
```

```
 1   because they haven't structured any of their claims around an

 2   actual reduction in force at the agency level.

 3          Instead, they structure their claims around an

 4   executive order and a memorandum, both of which were issued in

 5   February, and because of that choice, under Rule 65, their

 6   delay in seeking such relief disqualifies them from any sort of

 7   emergency relief and especially a temporary restraining order.

 8          Turning, though, to the merits of plaintiffs' claims.

 9   Again, they argue that the executive order and memorandum both

10   issued in February are unlawful.

11          I want to start with the statutory landscape here,

12   because it's undisputed by the parties that there is a

13   reduction in force statute on the books, and that statute is

14   5 U.S.C. 3502.

15          And there's no reason that the President cannot issue

16   an executive order against the backdrop of that statutory

17   authority --

18          THE COURT:  He didn't do it the way the statute says

19   to do it.  That's all.

20          MR. HAMILTON:  Well, the executive order is obligating

21   agencies to begin preparations for a reduction in force and to

22   engage in a planning process through which information flows to

23   the Office of Management and Budget.

24          And, Your Honor, our brief compares this executive

25   order to other executive orders issued during past
```

```
 1   administrations, and I want to highlight in particular an

 2   executive order issued during the Clinton administration.

 3          That executive order, like this one, was issued in

 4   February after a new president took office.  And the

 5   February 1993 Clinton executive order -- it actually goes

 6   farther than the executive order under review here.

 7          Plaintiffs say -- that executive order didn't direct

 8   any reduction in force, but I struggle to square that

 9   interpretation with the EO's text.  Section 1 of President

10   Clinton's executive order says (as read):

11          "Each executive department or agency with over

12      100 employees shall eliminate not less than 4 percent

13      of its civilian personnel positions over the next

14      three fiscal years."

15          And plaintiffs respond that legislation was enacted

16   during the Clinton administration in connection with the

17   President's workforce policies.  But that legislation postdated

18   the executive order at issue here.  That is no --

19          THE COURT:  Probably so did the reductions in force.

20          MR. HAMILTON:  Well, the executive order sets

21   different timings.  It even sets -- says, I think, something

22   like 25 percent of personnel cuts have to happen within the

23   first year.  And so the President -- President Clinton laid out

24   that policy before Congress acted.

25          THE COURT:  But then Congress acted.
```

1    **MR. HAMILTON:** Right.  And here, President Trump is --

2    is requiring agencies to begin preparations for reductions in

3    force, and --

4    **THE COURT:** The order requires execution of reductions

5    in force.

6    **MR. HAMILTON:** Well, it's -- it's -- I believe that

7    the language in Section 3 is -- is requiring preparation for a

8    reduction in force, and -- and the -- the -- Section 3 also

9    says that the reductions in force have to be consistent with

10   law.

11   That is a reference to statutory limitations on agency

12   authority, and it would also include implicitly the authority

13   that agencies have under 5 U.S.C. 3502 to carry out reductions

14   in force.

15   And, Your Honor, we also -- there's an additional

16   clause in the executive order on this point.  Right.  So it's

17   Section 3C, consistent with applicable law in that reduction in

18   force subsection.  But then later, in Section 5(a)(1), the

19   executive order says that it shall not be construed to impair

20   agencies' statutory authority.  And that belies plaintiffs'

21   theory of the executive order, which reads it to -- to create

22   statutory conflicts that do not exist.

23   And we cite cases like *Building and Construction* from

24   the DC circuit, and *Common Cause* that note that savings clauses

25   like this that limit applications of executive orders to

consistency with statutes are meaningful, and -- and that
plaintiffs cannot hold that an executive order is violative of
a statute where that is disavowed.

The exception would be if an executive order perhaps
has no conceivable application of lawfulness.  But that can't
possibly describe the executive order at issue here, which is
obligating agencies to understand their statutory authorities
and make preparations for workforce improvements consistent
with those authorities.

Plaintiffs focus less so on Section 3's declarative
language and anchor their claims in the purpose language, which
cites a transformation.  But that is -- is just the purpose
section of the executive order, and it explains that this is
the beginning of the Trump administration's implementation of
its workforce agenda.

Also want to note reorganization.  The plaintiffs are
claiming that the President has no authority to reorganize, and
this is a reference to Section 3E of the executive order, but
that section, by its terms, is simply requiring agencies to
prepare a report that's identifying statutes and making
proposals for consolidation and cutting of offices; and it
would be entirely consistent with that section for an agency to
make proposals for legislative changes.

In fact, when we look at the OMB/OPM memorandum that
requires agencies to submit information by mid-March in an

1  ARRP, it expressly invites comments and proposals for

2  legislative engagement as part of policies that those agencies

3  wish to implement.

4       So turning to that memorandum, the February 26th

5  memorandum issued by OMB and OPM, it is setting out guidance

6  for implementation of the President's executive order.  It says

7  that agencies should focus on eliminating nonstatutory

8  functions and protecting the services that they are providing.

9       Footnote 17 of our brief identifies the five different

10  times that agencies are advised in that memorandum to not do

11  anything in derogation of their statutory requirements.  I

12  think it's page 2 of the memorandum which tells agencies to

13  examine their statutory authority for reductions in force and

14  to act consistent with their statutory authorities in any sort

15  of workforce policy that they might carry out.

16       The organizational plaintiffs rely heavily on the

17  notion that implementation of the executive order would lead to

18  changes in the services that they receive inconsistent with

19  statutes.  Footnote 18 of our brief rebuts that, identifying

20  the three different times that this memorandum tells agencies

21  to be mindful of the quality of services that they are

22  obligated to provide customers, the American people.

23       Separate and apart from the executive order and the

24  memorandum at issue, plaintiffs appear to try to challenge

25  reductions in forces in different agencies; but as I noted

```
 1   earlier in my presentation, the plaintiffs aren't actually
 2   structuring any of their claims around particular reductions in
 3   forces in agencies, which reveals a serious mismatch between
 4   the injury that they're claiming and the types of claims that
 5   they're trying to litigate --
 6        THE COURT:  I wonder if you could just start that
 7   sentence over again.  I didn't follow you.
 8        MR. HAMILTON:  Yes.
 9        So the plaintiffs, especially in trying to explain
10   their lengthy delay in filing the motion --
11        THE COURT:  Three months.
12        MR. HAMILTON:  Yes.
13        They talk about reductions in force happening at
14   different agencies.  Their brief ticks through a number of the
15   defendants explaining what they have heard about as far as
16   reductions in force.
17        But reviewing the complaint and the claims, they don't
18   actually structure their claims around specific reduction in
19   force --
20        THE COURT:  Well, let me ask you this question:
21        The Senate sent a letter to, I guess, OMB and OPM,
22   maybe to the President, saying could we see your ARRPs, please,
23   which is what you're talking about, the various proposed
24   reductions in force.
25        Was there a response to that?
```

1          **MR. HAMILTON:**  I do not know, Your Honor.

2          And plaintiffs have requested the same document.  We

3   think that the right way for that to be litigated is --

4          **THE COURT:**  Is through FOIA.

5          **MR. HAMILTON:**  Is through Freedom of Information --

6          **THE COURT:**  There's no need to speed up FOIA, so we

7   can go through the normal 18- to 24-month time frame on getting

8   a response to FOIA requests.  I know there's another lawsuit

9   pending on that.

10         But my question to you is:  You're about to say, well,

11  they haven't tailored their complaint to the specific RIFs.

12  Well, they haven't been told what they are.  The Senate asked

13  for that and didn't get it.

14         So how are challenges supposed to be tailored if you

15  won't tell them what's happening?

16         **MR. HAMILTON:**  Well, actually, the February memorandum

17  specifies a notice process through which agencies will notify

18  individuals affected by reductions in force as a default

19  60 days before it takes effect, and there's a minimum of

20  30 days.

21         So plaintiffs' argument that defendants are acting in

22  secrecy is belied by the February memorandum --

23         **THE COURT:**  Why don't -- why won't you, counsel for

24  the defendants in this case, give counsel for plaintiffs a copy

25  of the ARRPS -- ARRPs?

1        **MR. HAMILTON:**  Those documents are deliberative

2   documents.  They're planning documents.  They're the sort of --

3   you know, deliberative documents that are typically held

4   confidential.  And as our brief explains, they aren't -- they

5   aren't final agency actions.  And, you know, the fact that OMB

6   and OPM will review them highlights that.

7        And there's multiple stages to them.  There's the

8   initial document that the memo makes due in mid-March and then

9   additional documents due in mid-April.

10       And as I --

11       **THE COURT:**  We're now in May, so because they've

12  waited three months, we are now to the point where those things

13  should be available.

14       **MR. HAMILTON:**  Well, so -- so -- I think the bottom

15  line point, though, here is to the extent that plaintiffs want

16  to challenge specific RIFs, it should be in the context of

17  specific RIFs that have gone out and that employees have

18  received notice of.  And we've seen litigation like that.  I

19  cited the *USAGM* case in the DDC District Court that went up to

20  the DC circuit.  That was based on specific reduction in force

21  actions.

22       And, you know, we made the argument there, which the

23  DC circuit accepted, that that still was not the right forum.

24  But what we've identified here is an additional problem on top

25  of that problem of this fundamental mismatch with the way that

```
 1   plaintiffs have structured their case.

 2            Separate and apart from likelihood of success on the

 3   merits is irreparable harm.  Plaintiffs can't show an

 4   irreparable harm that would merit a temporary restraining

 5   order.

 6            Your Honor, again, they brought a facial challenge to

 7   this executive order and memorandum seeking virtual executive

 8   branch-wide implementation of the order, and that is

 9   inconsistent with their attempt to make this case about

10   specific reductions in force.

11            We cite the Sampson case, which explains that the loss

12   of government employment is not an irreparable harm.  That's a

13   case of the U.S. Supreme Court, and plaintiffs don't have an

14   effective response to that case.

15            In addition, the way that plaintiffs have structured

16   their temporary restraining order belies their irreparable harm

17   claims, because they're seeking a forward-looking order that

18   would prevent future implementation of the executive order.

19            And so that wouldn't even apply to the specific harms

20   that they claim to have identified with RIF announcements that

21   they say have taken place in different agencies --

22            THE COURT:  Well, it would be a very different matter

23   to -- and perhaps it will.  I don't know.  But it would be a

24   different matter to request undoing things that have been done

25   previously as opposed to simply preserve the status quo by
```

1    preventing further -- further change going forward.

2          MR. HAMILTON:  But the remedy at stake today is a

3    motion for a temporary restraining order, and under Rule 65,

4    that is a 14-day order until there is a later showing by the

5    plaintiffs.  And given --

6          THE COURT:  And we'll set -- we'll do that today.

7    We'll set a further hearing.

8          MR. HAMILTON:  But my point is for that 14-day period,

9    because the memorandum that OMB and OPM issued note the notice

10   that individuals affected by any reduction in force will

11   receive, it's greater than that 14-day period; and so

12   plaintiffs can't establish an irreparable harm that would be

13   addressed by -- during the time period of the temporary

14   restraining order that they are requesting.

15          The other factors for a temporary restraining order

16   are the balance of the equities and the public interest.  Both

17   of those disfavor the temporary restraining order that the

18   plaintiffs are seeking.

19          The order that they are requesting would be enormously

20   intrusive on the Federal Government's management of the

21   workforce.  The President is the head of the executive branch.

22   The Constitution vests the executive power of our government in

23   him.  And it -- you know, the plaintiffs are seeking judicial

24   superintendents of the executive branch management of the

25   federal workforce.

1    **THE COURT:** That's not really right.  The plaintiffs

2   are seeking involvement of the Congress, the legislature, which

3   created by statute the agencies that the President is directing

4   to -- to take action.  That's what they want is they want to

5   test -- they want to bring into balance the separation of

6   powers that the Constitution sets out, which is that the

7   Congress legislates and it makes statutes and it creates

8   agencies, and then the President takes care that the laws be

9   faithfully executed.

10    **MR. HAMILTON:**  Yes, but the executive order and memo

11  are entirely consistent with that backdrop structure of our

12  government.  They are beginning this deliberative policy-making

13  process within the branch of agencies carrying out the

14  workforce agenda consistent with their statutes.

15    And I'd add, too, that the plaintiffs' conception of

16  Article II, where the President cannot direct agencies to

17  review and understand and plan policies consistent with their

18  statutory authorities, those agencies' statutory authorities,

19  is anti-democratic.  They are attempting to sever the

20  democratically accountable president from the agency heads who

21  have been accorded statutory authorities, including the RIF

22  statute that everyone agrees remains on the books in the U.S.

23  code at 5 U.S.C. 3502.

24    **THE COURT:**  But it's not being followed, that statute.

25    **MR. HAMILTON:**  Well, the OPM and OMB memorandum sets

```
1   out processes that are consistent with that statute, and the

2   statute directs OPM to put out regulations for reductions in

3   force.

4           OPM --

5           THE COURT:  It didn't.

6           MR. HAMILTON:  It did that under previous

7   administrations, and those regulations remain on the books.

8           Those regulations even give OPM a role in reviewing

9   and understanding agencies' carrying out of reductions in

10  force.  They give OPM the authority to take corrective actions

11  where there is noncompliance with those regulations.

12          So in the end, plaintiffs satisfy none of the four

13  Winter factors to obtain a temporary restraining order.

14          But, again, we don't think that the analysis even gets

15  off the ground because of the extraordinary delay that

16  plaintiffs took to get their motion on file, which is a

17  challenge to a February temporary restraining order.

18          If, however, the Court were to enter a temporary

19  restraining order, we'd ask that the Court not enter nationwide

20  relief.  Any sort of relief should be limited to the specific

21  plaintiffs, specific members in plaintiffs, where plaintiffs

22  are relying on organizational, associational standing.

23          And in addition, any order of the Court we would

24  suggest would make clear that the temporary restraining order

25  would not affect agencies' authorities under their own statutes
```

```
1    to engage in activities authorized by law.

2            In addition, if a temporary restraining order is

3    issued, a bond should be required.  Rule 65 makes a security a

4    requirement for any emergency injunctive relief in the form of

5    a TRO or a preliminary injunction, and the amount of that bond

6    should be consistent with whatever scope of a temporary

7    restraining order that the Court may issue.

8            And finally, if the Court does enter a temporary

9    restraining order, we would ask that the Court could issue a

10   stay pending any appeal authorized by the Solicitor General.

11           THE COURT:  All right.  Thank you.

12           MR. HAMILTON:  Thank you, Your Honor.

13           THE COURT:  You're welcome.

14           Tell me your name again.

15           MS. LEONARD:  Danielle Leonard.  And good morning,

16   Your Honor.

17           THE COURT:  Good morning.

18           MS. LEONARD:  I will endeavor to keep it brief,

19   because I think much of what defense counsel has raised in the

20   arguments that the Court just heard has been fully responded to

21   in plaintiffs' briefs to the Court and in the Court's initial

22   remarks.

23           But picking up on something Your Honor just said a

24   moment ago, plaintiffs absolutely endeavor with this case to

25   restore the proper balance that is set by the Constitution
```

```
 1   between the legislative branch, Congress, and the President,
 2   where the President seeks to usurp and intrude on that branch.
 3   And it is, of course, the role of the Article III courts to
 4   help maintain that balance when called upon to do so.
 5           And the idea that plaintiffs are asking for an
 6   undemocratic result is contrary to the -- the entire structure
 7   of what I just described.
 8           Congress, democratically elected, has been given the
 9   legislative authority that the President seeks to assume for
10   himself here.
11           I'm going to start -- there's a lot to address, but
12   I'm going to start with the language of the executive order,
13   because what the Court just heard from counsel is not what the
14   executive order says.
15           Defendants would have this Court believe that the
16   executive order just sets forth a planning process, just tells
17   the agencies to comply with their statutes:  Go exercise your
18   discretion.  Come back.  Make a plan.  Maybe we'll talk about
19   it.
20           That is not what this order does.  This is a mandatory
21   order instructing agencies to begin RIFs now and -- and to do
22   so in the manner that the President is directing and to do so
23   in furtherance of the President's transformation of the
24   government.
25           The RIFs and the reorganization are part and parcel of
```

```
 1   the same thing.  They are the centerpiece of the plan to
 2   reorganize the government.  And the reason we know this is the
 3   OMB and OPM memorandum that put them into the same planning
 4   document, the ARRP.
 5          What counsel refuses to acknowledge is also that the
 6   President and OMB and OPM have assumed the discretion that the
 7   agencies have and the decision-making authority that the
 8   agencies have been given by Congress for themselves.  And they
 9   cannot do that consistent with the Constitution, because there
10   is no authority in the Constitution or statute that allows the
11   President or OMB/OPM to do that.
12          They are not waiting for these planning documents to
13   go through some sort of long -- I believe the word was
14   "dialogue" before they are taking effect.  They are not waiting
15   for congressional approval.
16          They are --
17          THE COURT:  They're not asking for approval.
18          MS. LEONARD:  They're not asking for approval and
19   they're not waiting for it, Your Honor, absolutely.  They are
20   implementing these now.
21          The exhibits that we gave you, just one example from
22   the Department of Labor with the reply brief and the Gamble
23   Declaration -- it's a perfect example of what's happening.  The
24   President eliminated the Office of Contract Compliance.
25   Eliminated it.  Crossed it out.  Gone.
```

1    Then told all the employees of that, You're being

2  RIF'd because your office is gone because the President has

3  eliminated it, and that eliminated the statutory and regulatory

4  authority for that office.

5    The President is making the law, and then the agencies

6  are executing his orders by firing everyone for the offices

7  that he has eliminated.  He said in the executive order, the

8  offices and functions that "my administration" eliminates.

9    That is incredibly telling, Your Honor.  That's one of

10 the ways in which the President is ordering agencies to ignore

11 and defy their requirements.

12    He also said "prioritize government-shutdown levels of

13 staffing."  That is necessarily in direct contradiction with a

14 fully functioning agency.  Government shutdown levels of

15 staffing have nothing to do with proper agency functions.

16 They're to prevent loss of life and property.  They cannot

17 support agency function.

18    You cannot say to the agencies:  Start there.  Go talk

19 to DOGE and start there as the basis.  Eliminate the offices

20 that I tell you to eliminate and also to eliminate anything

21 that is not mandated by statute, and I will decide what is

22 mandated by statute.

23    OMB and OPM, in their memorandum, assume that

24 authority for themselves.  Maximally eliminate, engage in RIFs

25 now.  Maximally eliminate nonstatutory functions.

1    Congress, when it defined the reorganization power,

2  included nonstatutory functions in the last go-round as the

3  thing that the President had to bring to them to talk about how

4  to implement.

5    This is absolutely a reorganization.  It is

6  unconstitutional for the President to assume that authority.

7    They tellingly do not cite anything other than the

8  President's general supervisory role over the agency as in

9  defense of the constitutionality of all of this.  They didn't

10  have a specific congressional authorization to cite because

11  there is none.  They don't have a specific constitutional

12  provision to cite because there is none.  It's just the general

13  authority.

14    So they say the agencies can do something like this,

15  in their way, if they were to be actually doing that.  So the

16  President can order them to do it in any way that he wants, as

17  he has here.

18    It is -- it is -- it is an ouroboros.  I believe,

19  the --

20    **THE COURT:**  What?

21    **MS. LEONARD:**  An ouroborus; the snake eating its tail,

22  Your Honor.

23    A similar argument was made in the Ninth Circuit

24  decision that counsel did not discuss, The City and County of

25  San Francisco -- I believe the Ninth Circuit called it "an

1    intellectual cul-de-sac" -- one of my favorite lines.

2            Notably, in counsel's argument, I was keeping track.

3    I don't believe that counsel cited a single Ninth Circuit case

4    to Your Honor, discussing a lot of out-of-circuit precedent on

5    all of this -- all of these issue and jurisdictional roadblocks

6    that they are trying to throw up, but notably avoiding the

7    directly on-point many, many cases out of the Ninth Circuit in

8    which courts have enjoined executive orders as *ultra vires* and

9    the implementation of those orders as affecting -- as *ultra*

10   *vires* pursuant to the equitable power of the court and as well

11   as using the APA to enjoin the implementation of

12   unconstitutional executive orders and other otherwise arbitrary

13   and capricious agency acts.

14           I'm just going to tick a few of the arguments that --

15   that counsel made.

16           Your Honor was spot on in saying that they are trying

17   to have it both ways by saying that plaintiffs are both too

18   late and too early to file this lawsuit.  I just want to

19   briefly say there has been no delay.  The attempt by defendants

20   to hide the ball with respect to how the executive order is

21   being implemented by not making it public is central to what's

22   going on here.  They're trying to insulate from judicial review

23   what is a pretty profoundly unlawful set of instructions by

24   saying -- by not making them public how they're being

25   implemented and then saying but plaintiffs should either have

1  challenged the executive order from the outset -- to which they

2  would have responded that plaintiffs have no standing because

3  there's no injury, actual or concrete -- sorry -- actual or

4  imminent, concrete and particularized.  We all understand what

5  that means.

6          They did make those arguments in response to early

7  cases challenging executive orders.  And so we have come here

8  to the Court as they have begun to implement what we believe

9  are approved or being approved, whether they formally approve

10 them or not, OMB and OPM have the decision-making authority

11 here.

12         And then the agencies are RIF'ing people now.  They're

13 reorganizing now.  They're eliminating offices now to great

14 effect all over the country.  We saw what happened with HHS.

15 We saw what happened when they implemented with respect to HHS.

16 Decimating the CDC.  Decimating, incredibly, NIOSH.  Decimating

17 office after office.

18         This is being replicated at every federal agency.

19 That is the extent of -- the President's order reaches that

20 far.  And so Your Honor's relief should reach that far as well.

21         **THE COURT:**  I understood from the declarations that

22 were submitted in support of the motion -- and tell me if I'm

23 wrong -- the earliest RIF termination date is May 18, 2025, at

24 which point some HUD employees will be terminated.

25         I got that from the Bobbitt AFGE declaration.  Is that

1    correct?

2            **MS. LEONARD:**  That sounds right, Your Honor.  There

3    are a number of actual RIFs that have happened at a number of

4    different agencies, so I don't want to say I know for certain.

5    I believe the earliest --

6            There are two thing there are going on.  For some of

7    the RIF notices, they are putting people on administrative

8    leave immediately, so shutting down services immediately,

9    ending -- closing offices immediately, and they're doing that

10   by way of OPM's authorization and OMB's authorization.  So the

11   services are actually not waiting for the RIF dates to come to

12   pass, but people are being paid still.  The employees are being

13   paid.

14           Then I believe that the RIF date -- the earliest time

15   frames for some of these are in May.  I think that is -- that

16   is correct.

17           **THE COURT:**  That's like next week is what it is.

18           **MS. LEONARD:**  I can't believe we're here already, but

19   that is correct.

20           And there are a whole lot of them in June as well.  I

21   know that to be true.

22           And we keep hearing daily of the imminence -- you

23   know, at the Department of the Interior, EPA -- the imminence

24   of -- there are RIF's being announced every day.

25           To briefly touch on some of the jurisdictional

roadblocks, counsel, in discussing channeling, didn't talk about the Ninth Circuit and the stay of the probationary case at all.  And I think -- you know, we've got two different sets of plaintiffs and their relationship to these channeling arguments.

With respect to the -- I'll call them nonfederal sector plaintiffs, I think the Ninth Circuit was quite clear that the governing law doesn't support the idea that those plaintiffs should be foreclosed from being able to use the command of judicial review in the APA or bringing any other type of claim.

That argument is really out there and is incorrect and is certainly not what Congress intended.

There's no attempt by the Government to reconcile two pretty important things:  One, the statute and what CSRA means when it sets up those administrative agencies, and the APA and what it means for these types of claims, as well as for claims against these type of defendants.

That is also true of the union, the federal sector union defendants.

Of course, there are unions in this case who also represent nonfederal sector employees, who stand very similarly as the others receiving services.

**THE COURT:**  Do you know whether the Merit Systems Protection Board and the Federal Labor Relations Authority

```
 1    currently have quorums to operate?
 2           MS. LEONARD:  I do.  That is a question about the
 3    status of the stays with respect to the President's attempt to
 4    remove members of -- of those boards.
 5           And I believe -- but I will have to confirm -- that
 6    they've gone back and forth a few times.
 7           And that is the --
 8           THE COURT:  Do you know?
 9           MR. HAMILTON:  I do not, Your Honor.
10           THE COURT:  Okay.  You don't know if there's a reply
11    to the Senate's request to make -- give them copies of the
12    ARRPs?  You don't know --
13           MR. HAMILTON:  Correct.
14           THE COURT:  -- either way?
15           Okay.  And you don't know if either of these boards
16    has a quorum so as to be able to function?
17           MR. HAMILTON:  Your Honor, we could attempt to
18    provide, you know, perhaps information supplementally in a
19    brief, yeah.
20           THE COURT:  Thank you.
21           MS. LEONARD:  I think we are going to get the answer
22    for you in a minute.
23           THE COURT:  Because that's another reason that it
24    would be inefficient.
25           MS. LEONARD:  It -- the channel being destroyed
```

1  argument is something that I think is quite important here,

2  that the administration has attempted to destroy the very

3  channels that it then tries to shuttle all of these plaintiffs'

4  claims to.

5          I don't think it's the only reason at all.

6          Thank you.

7          FSLRA has a quorum and MSPB has one member is the

8  answer, Your Honor.

9          And those decisions to remove obviously have been

10  challenged and are yet another example of, in our view, this

11  administration's overreach with respect to the Constitution;

12  but that's a separate set of issues for another day.

13          But -- but I think that there is a reckoning that is

14  going to happen at some point in the courts, and the tide is

15  shifting on these channeling arguments.

16          It is not field preemption, Your Honor.  It depends on

17  the claim.  It depends on the defendants.  And it -- there

18  is -- there is very good argument that these types of

19  government-wide actions by the President, by OMB, by OPM, as

20  Judge Alsup held -- simply, Congress never intended for those

21  to be heard by those agencies.

22          And then the reckoning is the direct conflict with the

23  law under the APA, and what the Supreme Court has been very

24  clearly saying about narrowly, narrowly, narrowly construing

25  the exceptions to judicial review under that statute, including

1    the *Hawkes* case, which directly addresses the issue of an

2    administrative scheme for review and says it's not meaningful.

3    It's not meaningful if you have to wait until the end.

4            There will be a reckoning between these lines of

5    cases.  There is very good reasons to think that the Congress

6    that enacted these statutes did not ever intend to remove

7    judicial review under the APA, including the fact that the APA

8    is mentioned in these statutes three times.

9            So unless the Court has any further questions about

10   channeling, I'm happy to move on.

11           I think one of the issues I really wanted to be sure

12   to address is the savings clause argument, because I think

13   there is great emphasis and weight put on that, and I think

14   that the *City and County -- City and County of San Francisco*

15   case from the Ninth Circuit that I mentioned, with the

16   cul-de-sac comment, that really addresses this.

17           You look at the specific requirements of an executive

18   order and you interpret that as you would any other enactment,

19   and does -- do the specific requirements of the executive order

20   tell the agencies to do something that's inconsistent with this

21   catch-all papering-over:  Just go comply with the law.

22           And that is absolutely what's going on here, both with

23   respect to the executive order and the OMB/OPM memorandum.  You

24   cannot say on the one hand:  Cut now.  Cut the amount that we

25   are telling you to cut.  Cut your agency in half.  Eliminate

1  the offices that I tell you to eliminate.  But just go comply

2  with the law.

3       They cannot say:  Eliminate to the maximum degree

4  possible anything that is not mandated by statute, and we get

5  to say what is mandated by statute.  But just go comply with

6  the law.

7       They cannot say effectively:  Abuse your discretion,

8  and in a rushed time frame, act in a completely arbitrary and

9  capricious manner to eliminate things that yesterday the agency

10 believed were necessary, were fully operational, were providing

11 really important government services, and comply with the law.

12      The APA's arbitrary and capricious requirement for

13 agencies applies even when they are acting in accordance with

14 the President's direction in an executive order.

15      The Ninth Circuit has said that repeatedly.  The *Su*

16 case and other cases, the Ninth Circuit has said that

17 repeatedly.

18      They still cannot act in a way that is arbitrary and

19 capricious.  And if the President is piggybacking here,

20 piggybacking on agency authority to have his own authority

21 under the Constitution to do any of this, he is saying:  I'm

22 only telling them to do what they otherwise can do.

23      Part of what they have to do is comply with the APA.

24 It is not within the President's authority at all to order

25 agencies to violate the Administrative Procedure Act.

1    And telling them, "Comply with the law when you follow

2  my orders," is not sufficient.  The Court does not need to

3  relieve itself of common sense when it is interpreting these

4  executive orders.  And that's exactly what the Ninth Circuit

5  has said time and again in the cases that opposing counsel has

6  not addressed.

7    The savings clause argument simply cannot be squared

8  with an executive order that says Trump -- President Trump and

9  OMB and no one else gets to say what the law is.

10    That is legislating, Your Honor, and that is what the

11  President cannot do.

12    There was a lot that was covered, and I want to make

13  sure I cover them all.

14    The APA.  These are final agency action.  The OMB

15  memoranda gives orders to -- to the -- all of the agencies of

16  the Federal Government in a very clear way.  It sets forth

17  standards that they must comply with and timelines and time

18  frames.  This is classic final agency action in the decisions

19  that went into making that memorandum.

20    And then the approvals, whether they're happening

21  formally or not, OMB and OPM are approving the plans, the ARRPs

22  that the agencies are implementing, and those approvals are

23  final decisions as well.

24    And it matters not, as we addressed in our briefs,

25  that the effectuation of those decisions happens through

1    government actors that then touch on the plaintiffs.  That's

2    absolutely -- that doesn't defeat final agency action that is

3    reviewable for the APA.

4            So the OMB and OPM action here, which is what the

5    injunction of the TRO is aimed at, along with the implementing

6    agencies -- absolutely final agency action.

7            And then the final -- the agencies themselves are also

8    now taking action to effectuate those instructions, and that

9    should be enjoined, whether it's by way of -- because they're

10   Rule 19 defendants effectuating the unlawful OMB and OPM

11   actions or stand-alone, arbitrary and capricious claims against

12   them for their further unlawful actions -- we address both of

13   those in our briefs -- the Court has absolutely the authority

14   to do it under the APA as well as top-down, all the way *ultra*

15   *vires* within the equitable power of the Court.

16           **THE COURT:**  What about the publication of the ARRPs?

17           **MS. LEONARD:**  So counsel's argument that the only way

18   to do that is through FOIA is wrong.  This Court absolutely has

19   the authority to order the defendants to turn those over to the

20   plaintiffs and the Court and -- so that the Court can review

21   and understand the facts of what is happening related to this

22   challenge, both under the *ultra vires* and the APA in the

23   preliminary injunction context.

24           So that the Court can understand the facts and assess

25   a preliminary injunction in that context, we would

1  absolutely ask the Court for expedited immediate discovery to

2  allow us to have those documents.

3      And that discovery order is a separate -- as we have

4  asked for, can be separate and apart from the stay that is

5  issued as part of any temporary restraining order.

6      **THE COURT:** Okay.

7      **MS. LEONARD:** I think that's an answer to Your Honor's

8  question. The Court absolutely has the authority to issue

9  that.

10     There's another thing that's been happening which I

11  also wanted to raise because it came in the reply documents.

12     In the attachment to the Gamble Declaration, we also

13  give the Court two documents that are quite significant.

14  They're dated April 14th and April 16th, and it's the

15  Department of Labor's request to OPM to waive the RIF statutory

16  notice requirement -- to cut it down.

17     There are two different interrelated notice

18  requirements:  One is 90 days and one is 60 days, and they are

19  cutting those down.

20     And OPM granted it like that, and the only basis for

21  the request to shorten the RIF notice time to employees was the

22  argument that the office has been eliminated by the President

23  in an executive order. So the statutory and regulatory basis

24  for the office is gone, and now you're RIF'd, and now we

25  shorten the time, and now we put everyone on administrative

```
 1   leave.
 2            That is what they are doing, Your Honor.
 3            And so to the extent that OPM is -- I know this is not
 4   in our papers, but to the extent that OPM is receiving and
 5   granting waivers, we would ask that they be required to turn
 6   those documents over as well.
 7            The Court should decide this case on the facts, not on
 8   the Government's contentions, which are divorced from an actual
 9   record.
10            And it's notable here, as I'm sure Your Honor is
11   aware, that they have not put in a single piece of evidence in
12   response to this request.
13            So with respect to the very end of that exchange with
14   counsel when they asked for a stay pending appeal, as we all
15   know, TROs are not appealable, and the stay is particularly
16   inappropriate where they've made no showing at all and they
17   have not even made an attempt to show the factors that they
18   would need to show of harm to the government.
19            There will be no harm to the government of maintaining
20   the status quo, Your Honor, of keeping in place the important
21   functions, offices, programs, and people who do the work in
22   this government that we all rely on.  Keeping them in place and
23   maintaining the status quo for now is not going to harm our
24   Federal Government.  I want to make that very, very clear.
25            So I think the final question to address with
```

```
 1    Your Honor, unless Your Honor has any questions about all the

 2    legal arguments or other roadblocks, is the scope of relief.

 3            And if there are questions with respect to -- I'm

 4    sorry.  I'm just looking at my notes with respect to opposing

 5    counsel's arguments to make sure I'm covering everything.

 6            If there are questions with respect to standing and

 7    harm in particular, we've obviously given the Court a mountain

 8    of evidence.  My colleague, Stacey Leyton, is ready to answer

 9    any of those.  But we will happily follow Your Honor's lead

10    with respect to whether you have any questions with respect to

11    that.

12            But scope of relief and what does it take to maintain

13    the status quo here, Your Honor.

14            So I think the lay of the land as we know it,

15    notwithstanding the defendants' refusal to inform this Court as

16    to what is actually happening with respect to approvals, we

17    certainly are asking the Court to maintain the status quo by

18    saying:

19            Stop implementation of this executive order.

20            Stop OMB/OPM approval of ARRPs.

21            Stop, I would add, granting of waivers with respect to

22    the RIF timeline.

23            Stop agencies issuing RIFs under the ARRPs.

24            And stop any enforcement of those RIFs.

25            Stop any reorganization and elimination of offices as
```

1  part of the reorganization.

2       It's hard not knowing exactly what's in the ARRP, but

3  I think an order to stop the implementation of them is

4  perfectly appropriate.

5       And we have brought to Your Honor not a request, not a

6  request to enjoin the entire Federal Government from doing

7  this, although I think we could have.  I think we could have.

8  This executive order is that unlawful.

9       We have brought to Your Honor the agencies for which

10  we had the concrete and real, the best information we possibly

11  could find, about actual or imminent action to implement.

12  There are more agencies that are taking action.  They just

13  eviscerated the Peace Corps.  There are actions that are

14  happening every day.

15       We expect as we go forward into the preliminary

16  injunction context to raise additional questions.

17       But what is -- what is before Your Honor -- before

18  the Court are the federal agency defendants that we have

19  identified as taking actual or imminent action now, and we ask

20  that Your Honor enjoin them for further -- from further

21  implementation.

22       Counsel said any TRO should allow the agencies to

23  exercise their statutory powers.  In a normal context, we take

24  no issue with that.  However, just as with the spending freeze

25  case, *New York v. Trump* out of the First Circuit, it would be

1   entirely inappropriate for this Court to enjoin the

2   implementation of the ARRP that they haven't made public, and

3   for the agencies to turn around and just say "But now we're

4   doing it on our own."

5          If the agencies had moved forward in the spending

6   freeze case the next day, by just freezing all of the spending

7   after that was enjoined, I think the Court would have had some

8   serious questions as to the truth of the assertion that that

9   was happening according to agency discretion.

10          So I think defendants are going to have do a bit more

11   to demonstrate -- or should have to do a bit more to

12   demonstrate to the Court that actually agencies are somehow

13   exercising discretion and reasoned decision-making and all the

14   things that -- we have declarations in the record, Your Honor,

15   from former agency officials that talk about what it takes to

16   engage in a proper RIF.

17          **THE COURT:**  Right.  And aren't there rules and

18   regulations about what needs to be done?

19          **MS. LEONARD:**  They are incredibly lengthy and

20   complicated, Your Honor.

21          **THE COURT:**  And I think that is probably why the

22   executive order said what it said, because there's some

23   impatience with how slow that process can be.

24          But if the statutes provide for that process, then the

25   process needs to be followed, it would seem to me.

1          **MS. LEONARD:**  I take no issue with that -- with that

2     at all.

3          But all I'm saying is that I -- there's a presumption

4     of regularity that used to exist with respect to the

5     Government's actions that I think they need to reearn, Your

6     Honor, given what has happened here.

7          If I may, if I could take a moment to check with my

8     team and just make sure that I've covered everything.

9          **THE COURT:**  And I want to ask all of you about what

10    date we should set for the next hearing.

11               (Plaintiffs' counsel conferring.)

12         **MS. LEONARD:**  I'm getting nods, so they think I've

13    talked enough, that I've covered it all, Your Honor.

14         **THE COURT:**  Come on up, then.  Why don't we talk about

15    next steps.

16         Assume for a moment that I do grant the TRO.  It could

17    only -- it would be in effect, then, for 14 days; right?

18         **MR. HAMILTON:**  That is correct, for a temporary

19    restraining order.

20         But, Your Honor, we'd ask that if the Court does enter

21    an emergency injunctive order that it would convert it to a

22    preliminary injunction.

23         **THE COURT:**  That request is denied.

24         **MR. HAMILTON:**  Okay.  In that event, any hearing

25    should -- you know, I think we should have an opportunity to

1  submit briefs on the good cause that would be needed for the

2  Court to extend beyond 14 days.  And after that point, if a

3  hearing is --

4          **THE COURT:**  We can just set a hearing within 14 days

5  if you want.

6          **MS. LEONARD:**  I think that our preference would be --

7  I mean, I think we're ready to move very quickly to a

8  preliminary injunction hearing, and I think that what we would

9  propose is that we have some very -- the plaintiffs would file

10  a supplemental brief with any additional things that have

11  transpired to inform the Court of the current status of -- of

12  what we understand is happening in the world.

13          In very short order, maybe two days after any --

14  assuming -- trying not to be presumptuous, but assuming Your

15  Honor is going to write a written opinion, if Your Honor is

16  issuing the opinion, we would be prepared to file something

17  very quickly supplementing our existing legal briefing, which

18  is, as Your Honor knows, quite extensive.

19          Then defendants could have the -- converting our

20  existing TRO, plus that supplement into the motion for a PI,

21  and then defendants could have some -- some amount of time

22  before the hearing, but we'd be ready to go.

23          **THE COURT:**  Right.  And I'm not sure I understood what

24  you were getting at when you were talking about extending the

25  14 days.

1    **MR. HAMILTON:**  Oh, a temporary restraining order under

2    Rule 65, by default, expires after 14 days.

3        **THE COURT:**  Right.

4        **MR. HAMILTON:**  There is, I believe, a good cause --

5        **THE COURT:**  To extend it?

6        **MR. HAMILTON:**  -- to extend.

7        **THE COURT:**  If you guys want to extend it because of

8    the need for briefing, that's -- that's your choice.  But I'm

9    saying I can do it within the 14 days if I have to.

10       **MR. HAMILTON:**  No, Your Honor.  We would oppose

11   extending any temporary restraining order --

12       **THE COURT:**  Okay.

13       **MR. HAMILTON:**  -- but instead would suggest that

14   motion be converted to a preliminary injunction.  We don't

15   think there's any need for additional briefing.  Plaintiffs

16   have submitted 51 pages.  We've submitted 50 pages.  And we

17   think a preliminary injunction should be entered if the Court

18   is inclined to enter any sort of emergency relief.

19       **THE COURT:**  Okay.  Well, you can say that in 14 days

20   for sure.

21       **MR. HAMILTON:**  Could I address a couple other

22   housekeeping matters?

23       **THE COURT:**  Sure.

24       **MR. HAMILTON:**  One is if the Court does enter an

25   order, I noted earlier our request for a stay pending any

1   appeal authorized by the Solicitor General.  We'd ask that any

2   order issued by the Court would note our request for a stay

3   pending appeal and rule on that request in the order's text.

4           Finally, earlier in the hearing, you know, we

5   discussed possible supplemental submission.  I understand

6   plaintiffs made a representation on the quorum at two entities,

7   so we won't plan to provide anything further on that.

8           **THE COURT:**  You're not going to give me any

9   information on that?

10          **MR. HAMILTON:**  I believe plaintiffs -- plaintiffs

11  provided information about --

12          **THE COURT:**  They said one of them has one person --

13  which is probably not a quorum -- and one of them has a quorum.

14          **MR. HAMILTON:**  We don't think those issues are

15  relevant --

16          **THE COURT:**  Doesn't matter, because the alternative

17  forum that you say we should send this case to rather than this

18  Court is no forum at all if it doesn't have a quorum.

19          **MR. HAMILTON:**  Well, Congress could have structured

20  the statute in a way that altered the, you know, litigation if

21  there were issues with the quorum at any particular --

22          **THE COURT:**  So that's Congress' fault?

23          **MR. HAMILTON:**  I beg your pardon?

24          **THE COURT:**  That's Congress' fault?

25          **MR. HAMILTON:**  Congress could have structured the

```
 1   statute differently.  Our argument flows from the Civil Service
 2   Reform Act and the FLSMRS as Congress wrote it.
 3            THE COURT:  All right.  And what about -- you will get
 4   back to me, though, on whether there's been a response to the
 5   Senate request?
 6            MR. HAMILTON:  Well, we don't think it's appropriate
 7   for commentary on interbranch discussions between Congress and
 8   the executive branch.  And we also don't think that any of the
 9   claims turn on that issue.
10            THE COURT:  So you don't want to tell me, is what
11   you're saying?
12            MR. HAMILTON:  We don't think it's relevant to the
13   litigation, respectfully, Your Honor.
14            THE COURT:  Okay.
15            MR. HAMILTON:  Thank you.
16            THE COURT:  All right.
17            MS. LEONARD:  One point I just wanted to note, that in
18   our proposed temporary restraining order, we did ask that
19   the Court order defendants to verify and file within
20   two days --
21            THE COURT:  I know.
22            MS. LEONARD:  Okay.  And I want to raise this point
23   because of what counsel is saying here about not wanting any
24   further briefing, wanting the Court to put in its ruling that
25   the stay has been denied.
```

```
 1          They are quite clearly intending do take this TRO up

 2    on appeal when it is not an appealable order.  And

 3    foreshadowing what is coming next, they need to move forward

 4    with respect to Your Honor's order if you do, in fact, enter

 5    this TRO, by informing all of the agencies that they represent

 6    and that the agencies are actually taking action to stop the

 7    implementation of this executive order unless and until some

 8    other court tells them not to.

 9          THE COURT:  Okay.

10          So back to my housekeeping, which is -- I know that

11    the statute provides this 14-day limit absent other -- other

12    consents.

13          Okay.  My ace courtroom deputy is giving me

14    information that I don't quite get.

15          Tell me what you're saying.

16          THE CLERK:  14 days if it were to be entered today

17    would be May 23rd.  May 26th is a holiday, so I was suggesting

18    the 27th or the 29th, a Tuesday or Thursday.

19          THE COURT:  No, it only goes till the 23rd.  It has to

20    be before.

21          THE CLERK:  Okay.  20th we have a pretrial.

22          THE COURT:  Hang on.  Let's see.  Today is the 9th.

23    What about the 22nd?

24          THE CLERK:  22nd is available.

25          THE COURT:  How about we set a further hearing for
```

1    May 22nd?

2         MR. HAMILTON:  Sorry.  May 22nd?

3         THE COURT:  That would be a Thursday.  We could do it

4    at 10:30.

5         MS. LEONARD:  That works for plaintiffs, Your Honor.

6         MR. BERNIE:  For a hearing, Your Honor?

7         THE COURT:  Yes.

8         MR. HAMILTON:  That's fine, Your Honor.

9         THE COURT:  So set a further hearing for 10:30 on

10   Thursday, May 22nd.

11        If the plaintiffs want to file anything further, they

12   should do so by the 14th of May at 4 -- by 4:00.  And if the

13   Government wants to file anything further, it should do so by

14   the 19th of May by 4:00.  Then we'll have the hearing on

15   May 22nd at 10:30.  Okay?

16        MS. LEONARD:  Thank you, Your Honor.

17        THE COURT:  Thank you.  And the matter will be

18   submitted, but you'll hear from me today.  Thank you.

19        THE CLERK:  That concludes our hearings for today.

20             (Proceedings adjourned at 11:50 a.m.)

21                     ---o0o---

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3            I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6      DATE:   Friday, May 9, 2025

7

8

9

10
       _____
11         Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                  Official Reporter, U.S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 25-cv-03698-SI |
| Plaintiffs, | **ORDER GRANTING TEMPORARY RESTRAINING ORDER AND COMPELLING CERTAIN DISCOVERY PRODUCTION** |
| v. | |
| DONALD J. TRUMP, et al., | Re: Dkt. No. 37 |
| Defendants. | |

The new presidential administration has made clear that it intends to change the way the federal government operates. An Executive Order issued on February 11, 2025 seeks to "commence[] a critical transformation of the Federal bureaucracy" by "eliminating waste, bloat, and insularity[.]" Exec. Order No. 14210, 90 Fed. Reg. 9,669 (Feb. 11, 2025). It is the prerogative of presidents to pursue new policy priorities and to imprint their stamp on the federal government. But to make large-scale overhauls of federal agencies, any president must enlist the help of his co-equal branch and partner, the Congress. Federal courts should not micromanage the vast federal workforce, but courts must sometimes act to preserve the proper checks and balances between the three branches of government. As a group of conservative former government officials and advisors have written to the Court, "Unchecked presidential power is not what the Framers had in mind." Dkt. No. 69-1 at 1.

The plaintiffs in this case—a collection of unions, non-profit organizations, and local governments—contend that the executive branch cannot lawfully implement large-scale reductions in the federal workforce without the participation of Congress. They bring this suit against President Trump, numerous federal agencies, and their respective agency heads. Specifically, plaintiffs

contest several layers of actions within the executive branch.  First, they argue President Trump exceeded his authority when issuing Executive Order 14210, which directs agency heads "to initiate large-scale reductions in force (RIFs)," focusing on "all agency initiatives, components, or operations that my Administration suspends or closes."  *See* Exec. Order No. 14210 § 3(c).  Second, they argue that a subsequent memo from the Office of Management and Budget and the Office of Personnel Management implementing the executive order exceeded those agencies' authority and violated the Administrative Procedure Act (APA).  And third, they argue that the "Agency RIF and Reorganization Plans" submitted by various agencies across the government likewise violate the Administrative Procedure Act.  With layoffs pending across multiple federal agencies, plaintiffs seek a temporary restraining order to pause any reductions in force and preserve the status quo as this lawsuit moves forward.

The Court GRANTS a temporary restraining order as described below.[1]  The Court finds that plaintiffs are likely to succeed on the merits of at least some of their claims.  The irreparable harm that plaintiffs will suffer in the absence of injunctive relief outweighs any burden placed on the government by this two-week pause.  In the context of a dynamic situation, the Court's temporary order seeks to preserve the status quo and protect the power of the legislative branch.

Plaintiffs have submitted sixty-two sworn declarations to the Court, constituting more than 1,000 pages of evidentiary material.  Before proceeding through technical legal arguments, the Court finds it appropriate to highlight several of these declarations to illustrate what is at stake in this lawsuit and some of the ways in which executive and legislative powers intersect.

The National Institute for Occupational Safety and Health (NIOSH) is part of the Centers for Disease Control in the Department of Health and Human Services.  Dkt. No. 41-1 ("Decl. Niemeier-Walsh AFGE") ¶ 5.  There are (or were) 222 NIOSH employees in the agency's Pittsburgh office that research health hazards faced by mineworkers.  *Id.* ¶ 28.  According to the union that represents many of these employees, the department's reduction-in-force will terminate 221 of 222

United States District Court
Northern District of California

---

[1] At the hearing, the Court denied defendants' request to convert plaintiffs' motion for a temporary restraining order into a motion for a preliminary injunction.

1    of these positions. *Id.* Congress established NIOSH in the Occupational Safety and Health Act of

2    1970. Pub. L. 91-596 § 22, 84 Stat. 1590, 1612 (1970).

3       The Department of Labor houses the Office of Federal Contract Compliance Programs,

4    which ensures that federal contractors do not discriminate on the basis of race, color, religion, sex,

5    national origin, veteran status, or disability. Dkt. No. 37-24 ("Decl. Levin AFGE") ¶ 7. In late

6    January of this year, department leadership directed the employees in this office to stop their

7    enforcement efforts. *Id.* ¶ 9. On April 16, 2025, after giving employees an opportunity to accept a

8    deferred resignation, the department placed remaining employees in the office on administrative

9    leave, effective almost immediately. *Id.* ¶ 14. On May 6, 2025, employee union representatives

10   were informed that a RIF had been approved and that all positions in the Washington, D.C.

11   Enforcement Division of the office were being abolished. Dkt. No. 70-2 ("Decl. Gamble AFGE

12   ISO Reply") ¶ 4, Ex. A. Congress has directed by statute that the Department of Labor "shall

13   promptly investigate" complaints of discrimination against disabled workers or veterans by federal

14   contractors. 29 U.S.C. § 793(b); 38 U.S.C. § 4212.

15      The federal Office of Head Start resides in the Department of Health and Human Services.

16   Plaintiff Santa Clara County, California runs a childcare and early learning program for 1,200

17   infants and preschoolers with funding from federal Head Start, but that funding expires June 30,

18   2025. Dkt. No. 37-26 ("Decl. Neuman SEIU") ¶ 21. County staff worked with Office of Head Start

19   employees to apply for a grant renewal, but those federal employees have now all been laid off and

20   their San Francisco office closed. *Id.* Facing uncertainty about whether its grant will be approved

21   before funding expires, the county has notified more than one hundred early learning program

22   workers that they might lose their jobs on July 1, 2025. *Id.* Congress reauthorized the national Head

23   Start program and provided details for its administration through the Improving Head Start for

24   School Readiness Act of 2007. Pub. L. 110-134, 121 Stat. 1363 (2007).

25      The Farm Service Agency in the U.S. Department of Agriculture provides specialized, low-

26   interest loans to small farmers not available from the private sector. Dkt. No. 37-37 ("Decl. Davis

27   NOFA") ¶¶ 20-21. After unprecedented flooding in 2024, one Vermont farmer asked the Farm

28   Service Agency for disaster assistance to plant a new crop, but the agency first had to inspect the

United States District Court
Northern District of California

3

fields. *Id.* ¶ 28. Due to low staffing levels, the farmer had to wait three to four weeks for an inspection and consequently missed the planting window that season. *Id.* The department now reportedly intends to further reduce staff at the agency. *Id.* ¶ 18. Other farmers have reported their contacts at the department have been laid off and the remaining staff are not familiar with their farms or their projects. *Id.* ¶¶ 40-41. Congress granted the Secretary of Agriculture the authority to establish the Farm Service Agency in 1994. Pub. L. 103-354 § 226, 108 Stat. 3178, 3214 (1994) (codified at 7 U.S.C. § 6932).

The Social Security Administration seeks to reduce its workforce by 7,000 employees. Dkt. No. 37-11 ("Decl. Couture AFGE") ¶ 9, Ex. C. Since staff reductions began, retirees have reported long wait times to reach an agency representative on the phone, problems with the agency's website, and difficulty making in-person appointments. Dkt. No. 37-39 ("Decl. Fiesta ARA") ¶ 7. One individual got through to a representative only after eleven attempts to call, each involving hours on hold. Dkt. No. 41-2 ("Decl. Nelson AFSCME") ¶ 12. Congress first established the Social Security Administration in the Social Security Act of 1935, known at that time as the Social Security Board. Pub. L. 74-271, § 701 et seq., 49 Stat. 620, 635 (1935) (now codified at 42 U.S.C. § 901 et seq.).

These examples illustrate there are various ways in which Congress is lawfully involved in the activity of administrative agencies. With this basic point in mind, the Court now turns to the facts of this case.

## BACKGROUND

### I. Executive Order 14210 and the Challenged Memorandum

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." 90 Fed. Reg. 9,669 (Feb. 11, 2025). The order "commences a critical transformation of the Federal bureaucracy[.]" *Id.* § 1. Section 3(c) of the order states,

> Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute

United States District Court
Northern District of California

United States District Court
Northern District of California

or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

*Id.* § 3(c). The order also directs agencies to submit a report within thirty days to the Office of Management and Budget that "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* § 3(e).

In response to Executive Order 14210, the directors of the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) sent a memo to heads of executive departments and agencies on February 26, 2025. Dkt. No. 37-1, Ex. B ("OMB/OPM Memo"). The memo states that "tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens. [¶] The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government." *Id.* at 1. The memo instructed agency heads to submit Agency RIF and Reorganization Plans (ARRPs) to OMB and OPM for review and approval. Agencies were directed to submit a "Phase 1" ARRP by March 13, 2025 that included, among other information, any Congressional statutes that established the agency, whether parts of the agency should be eliminated, a list of essential positions, how the agency intends to reduce positions, a "suggested plan for congressional engagement to gather input and agreement on major restructuring efforts," and the agency's timeline for implementation. *Id.* at 3-4. The memo directs agencies to submit "Phase 2" ARRPs by April 14, 2025 that include, among other information, all reductions that will occur through RIFs, proposed relocations of offices from the Washington, D.C. area to "less-costly parts of the country," "[a]n explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities," a certification that the ARRPs will improve the delivery of direct services, and a timetable for implementation. *Id.* at 4-6. The memo also instructs agencies to send monthly progress reports to OMB and OPM on May 14, June 16, and July 16, 2025. *Id.* at

6. The memo excludes law enforcement, border security, national security, immigration enforcement, public safety, military personnel, the Executive Office of the President, and the U.S. Postal Service. *Id.*

## II. The Agency Defendants and Their Locations within the Federal Bureaucracy

### A. The Central Agencies: OMB, OPM, and DOGE

In 1970, Congress transferred OMB to the president's authority. Reorganization Plan No. 2 of 1970, 84 Stat. 2085 (1970) (located at 5 U.S.C. Appendix, page 213). In 1982, Congress codified OMB's current location in the Executive Office of the President[2] at 5 U.S.C §§ 501-507. Congress established OPM as an "independent establishment in the executive branch" and the agency resides outside of the Executive Office of the President. 5 U.S.C. § 1101. In 2025, President Trump refashioned the U.S. Digital Service—an office that President Obama created within OMB[3]—into the U.S. DOGE Service via Executive Order 14158. 90 Fed. Reg. 8,441 (Jan. 20, 2025). DOGE is known colloquially as the Department of Government Efficiency, but it derives no authority from statutes.

### B. The Other Federal Agency Defendants

The defendants include twenty-one other federal departments or agencies that are arguably more public facing. For ease of reference, this order refers to these defendants collectively as the "federal agency defendants." That term does not include OMB, OPM, or DOGE. Fourteen of the federal agency defendants are considered "executive departments" under 5 U.S.C. § 101 and have been established by Congressional statute.[4] *See*, *e.g.*, 7 U.S.C. § 2201 (USDA); 22 U.S.C. § 2651

---

[2] "Established in 1939, the Executive Office of the President (EOP) consists of a group of federal agencies immediately serving the President." Harold C. Relyea, Cong. Rsch. Serv., 98-606, *The Executive Office of the President: An Historical Overview* (2008).

[3] *See* Clinton T. Brass and Dominick A. Fiorentino, Cong. Rsch. Serv., IN12493, *Department of Government Efficiency (DOGE) Executive Order: Early Implementation* (2025).

[4] These include the departments of Agriculture (USDA), Commerce, Defense, Energy, Health and Human Services (HHS), Homeland Security (DHS), Housing and Urban Development (HUD), Justice (DOJ), Interior, Labor, State, Treasury, Transportation, and Veterans Affairs (VA). The only executive department not named in this suit is the Department of Education. Plaintiffs'

United States District Court
Northern District of California

1    (State); 38 U.S.C. § 301 (VA); 42 U.S.C. § 3532 (HUD).

2         Six additional defendant agencies have a statutory basis elsewhere in the United States Code

3    and one was created by President Nixon under reorganization authority granted by Congress, as

4    follows:

5         Defendant AmeriCorps, known formally as the Corporation for National and Community

6    Service, received its current statutory formulation through the National and Community Service

7    Trust Act of 1993.  Pub. L. 103-82, title II, §§ 202-03, 107 Stat. 785, 873 (1993) (codified at 42

8    U.S.C. § 12651 et seq.).  AmeriCorps is a "government corporation."  42 U.S.C. § 12651 (referring

9    to 5 U.S.C. § 103).

10        Defendant General Services Administration (GSA) was established by Congress in the

11   Federal Property and Administrative Services Act of 1949.  Pub. L. 81-152, 63 Stat. 277 (1949).

12   The structure of the agency is now codified at 42 U.S.C. § 301 et seq.

13        Defendant National Labor Relations Board (NLRB) was created by the National Labor

14   Relations Act of 1935.  Pub. L. 74-198, ch. 372, 49 Stat. 449 (1935).  The structure of the agency is

15   codified at 29 U.S.C. § 153.

16        Defendant National Science Foundation (NSF) was established by the National Science

17   Foundation Act of 1950.  Pub. L. 81-507, ch. 171, 64 Stat. 149 (1950).  The structure of the agency

18   is codified at 42 U.S.C. § 1861 et seq.

19        Defendant Small Business Administration (SBA) was established by the Small Business Act

20   of 1953 as amended in 1958.  Pub. L. 85-536, 72 Stat. 384 (1958).  The structure of the agency is

21   now codified at 15 U.S.C. § 633 et seq.

22        Defendant Social Security Administration (SSA) was first established by Congress in the

23   Social Security Act of 1935, known at that time as the Social Security Board.  Pub. L. 74-271, § 701

24   et seq., 49 Stat. 620, 635 (1935) (now codified at 42 U.S.C. § 901 et seq.).

25        Defendant Environmental Protection Agency (EPA) was created by the Reorganization Plan

26

27   _____

28   TRO motion does not implicate the departments of Defense, Justice, or Homeland Security.  *See*
     Dkt. No. 37 at 1.

United States District Court
Northern District of California

1    No. 3 of 1970 under statutory reorganization authority granted to the president by Congress at that

2    time.  35 Fed. Reg. 15,623, 84 Stat. 2086 (1970) (located at 5 U.S.C. Appendix, page 216).

3

4    **III.    Agency RIF and Reorganization Plans (ARRPs)**

5           Pursuant to the terms of the OMB/OPM February 26, 2025 memo, federal agencies were

6    directed to submit Phase 1 ARRPs by March 13, 2025 and Phase 2 ARRPs by April 14, 2025.

7    OMB/OPM Memo at 3-4.  Defendants have not publicly released these plans despite requests from

8    the public, employees, and members of Congress.  An agency's action steps would include the

9    following: (1) submitting its ARRP to OMB and OPM; (2) receiving approval of the ARRP by OMB

10   and OPM; (3) sending of RIF notices; (4) placing employees on administrative leave; and

11   (5) terminating employees.

12          As described in sworn declarations submitted by plaintiffs, the defendant agencies appear to

13   be at different points along this continuum of action.  RIFs have started at multiple agencies,

14   including HHS, HUD, Labor, State, AmeriCorps, GSA, and SBA.  After sending RIF notices to

15   employees, agencies have sometimes placed these employees on immediate administrative leave

16   until the termination date set by the RIF, usually sixty days after the notice.  *See*, *e.g.*, Dkt. No. 37-

17   14 ("Decl. Fabris AFGE") ¶¶ 11-15.  The earliest RIF termination date that the Court can discern

18   from the declarations is May 18, 2025, at which point some HUD employees will be terminated.

19   Dkt. No. 41-1 ("Decl. Bobbitt AFGE") ¶¶ 13, 14, Exs. C, D.

20          As directed by Executive Order 14210, the scale of the RIFs is large.  Here are some

21   examples.  HHS is issuing RIF notices to 8,000-10,000 employees.  Dkt. No. 37-17 ("Decl.

22   Garthwaite AFGE") ¶ 7, Ex. A.  Reports indicate the Department of Energy has identified 8,500

23   positions as eligible for cuts, nearly half of its workforce.  Dkt. No. 37-8 ("Decl. Braden AFGE")

24   ¶ 12, Ex. A.  The National Oceanic and Atmospheric Administration is reportedly preparing a RIF

25   to reduce its workforce by more than half.  Dkt. No. 37-40 ("Decl. Molvar WWP") ¶ 23.  Reports

26   also suggest that HUD is preparing to cut half of its staff and close many field offices.  Decl. Bobbitt

27   AFGE ¶¶ 9, 11, Exs. A, B.  Department of Labor management have said internally that they intend

28   to cut the agency's headquarters staff by 70%.  Dkt. No. 37-16 ("Decl. Gamble AFGE") ¶ 12.

United States District Court
Northern District of California

1    Reports suggest the Internal Revenue Service in the Department of the Treasury plans to cut 40%

2    of its staff.  Dkt. No. 37-42 ("Decl. Olson CTR") ¶ 10.  The VA is planning to cut 83,000 positions.

3    Dkt. No. 37-5 ("Decl. Bailey SEIU") ¶ 12.  AmeriCorps sent an email to employees announcing a

4    reorganization that will cut more than half of its workers.  Dkt. No. 37-12 ("Decl. Daly AFSCME")

5    ¶ 14, Ex. A.  NSF has been directed to cut about half of its 1,700 staff.  Dkt. No. 37-32 ("Decl.

6    Soriano AGFE") ¶¶ 9-10, Ex. A.  The SBA announced it planned to cut its workforce by more than

7    40%.  Dkt. No. 37-18 ("Decl. Gustafsson AFGE") ¶ 6, Ex. A.

8

9    **IV.    Plaintiffs**

10         The union plaintiffs in this case consist of the American Federation of Government

11   Employees (AFGE) and four of its locals (Local 1122, Local 1236, Local 2110, and Local 3172),

12   the American Federation of State County and Municipal Employees (AFSCME), and the Service

13   Employees International Union (SEIU) and one of its locals (Local 1000).  Eleven membership-

14   based non-profit organizations have joined the unions as co-plaintiffs: Alliance for Retired

15   Americans, American Geophysical Union, American Public Health Association, Center for

16   Taxpayer Rights, Coalition to Protect America's National Parks, Common Defense Civic

17   Engagement, Main Street Alliance, Natural Resources Defense Council, Northeast Organic Farming

18   Association, VoteVets Action Fund, and Western Watersheds Project.  Six local governments have

19   also joined the suit: Santa Clara County, CA; King County, WA; Baltimore, MD; Harris County,

20   TX; Chicago, IL; and San Francisco, CA.

21         The plaintiffs in this action are discussed more fully in the Court's consideration of standing

22   below.

23

24   **V.    Procedural History**

25         Plaintiffs filed their complaint on Monday, April 28, 2025.  Dkt. No. 1.  The complaint

26   alleges that President Trump's Executive Order 14210 is *ultra vires* and usurps Congressional

27   authority, in violation of the Constitution's separation of powers (Claim One); that OMB, OPM, and

28   DOGE also acted *ultra vires* or beyond their authority in directing agencies to submit ARRPs and

United States District Court
Northern District of California

Add.375  9

1 engage in RIFs (Claim Two); that the February 26, 2025 memo violated the Administrative

2 Procedure Act in several ways (Claims Three through Five); and that the federal agency defendants'

3 ARRPs also violate the Administrative Procedure Act (Claims Six and Seven).

4   On Thursday, May 1, 2025, plaintiffs filed a motion for a temporary restraining order.  Dkt.

5 No. 37 ("Mot.").  Per the Court's schedule, defendants filed an opposition on Wednesday, May 7,

6 2025, and plaintiffs filed a reply the following day.  Dkt. Nos. 60 ("Opp'n"), 70 ("Reply").  The

7 Court has received several briefs from *amici curiae*.  Dkt. Nos. 51, 69, 71, 75.  The Court heard oral

8 arguments on the motion on Friday, May 9, 2025.

9

10          **LEGAL STANDARD**

11   A party may seek a temporary restraining order (TRO) to preserve the status quo and prevent

12 irreparable harm until a preliminary injunction hearing may be held.  *Reno Air Racing Ass'n, Inc. v.*

13 *McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415

14 U.S. 423, 438-39 (1974)); Fed. R. Civ. P. 65(b).  The standard for evaluating a TRO is "substantially

15 identical" to the standard for evaluating injunctive relief.  *Babaria v. Blinken,* 87 F.4th 963, 976 (9th

16 Cir. 2023), *cert. denied sub nom. Babaria v. Jaddou*, 145 S. Ct. 160 (2024) (internal quotation marks

17 and citations omitted).

18   "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear

19 showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7,

20 22 (2008).  In order to obtain a preliminary injunction, the plaintiff "must establish that he is likely

21 to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

22 relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

23 *Id.* at 20 (citations omitted).  When the nonmoving party is the government, the final two factors

24 merge.  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418,

25 435 (2009)).

26   Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious

27 questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's

28 favor," so long as the other two *Winter* factors are also met.  *All. for the Wild Rockies v. Cottrell*,

United States District Court
Northern District of California

632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks and citation omitted).  This formulation recognizes a sliding scale approach, where "a stronger showing of one element may offset a weaker showing of another."  *Id.* at 1131, 1134-35.

## DISCUSSION

### I.    Timing

To start, the Court addresses defendants' argument that plaintiffs' motion for a temporary restraining order should be denied because it was brought too late after the Executive Order was filed and the OMB/OPM Memorandum issued. Opp'n at 19-22.  Defendants' argument is not well-taken.  The details of the ARRPs have only trickled into public view due to defendants' ongoing decision not to release the plans publicly.  Moreover, in a case where other plaintiffs challenged Executive Order 14210 shortly after it was issued, as defendants suggests plaintiffs here should have done, the government's attorneys argued that plaintiffs' harm was too "speculative" to establish injury.  *See Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025).  Defendants cannot have it both ways.  The Court finds that plaintiffs reasonably waited to gather what information they could about the harm they may suffer from the Executive Order, the OMB/OPM Memorandum, and the ARRPs.

### II.    Standing

Federal courts may only hear a case if plaintiffs can show they have standing to sue.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016, revised May 24, 2016).  "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."  *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

To establish standing to sue, plaintiffs must show an injury, trace that injury to the defendants' conduct, and prove that courts can provide adequate redress for the injury.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury "must be concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation

United States District Court
Northern District of California

1    marks and citation omitted). To be imminent, a threatened injury must be "*certainly impending*"—

2    "allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks, brackets, and

3    citations omitted). Plaintiffs cannot base standing on a theory of harm that "relies on a highly

4    attenuated chain of possibilities." *Id.* at 410. The standing inquiry must be "rigorous" where the

5    court faces claims that Congress or the executive branch has acted unconstitutionally. *Id.* at 408.

6    Organizational plaintiffs such as trade unions or membership-based non-profit organizations

7    have two paths to establishing standing. "[A]n association has standing to bring suit on behalf of

8    its members when: (a) its members would otherwise have standing to sue in their own right; (b) the

9    interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

10   asserted nor the relief requested requires the participation of individual members in the lawsuit."

11   *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Organizations without

12   formal members may achieve associational standing if they are "the functional equivalent of a

13   membership organization." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002)

14   (citing *Hunt*, 432 U.S. at 342-45).

15   Injury may come in many forms. The threat of a pending job loss constitutes a concrete

16   economic injury. *Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1014 (N.D. Cal. 2007). The

17   possible loss of federal funding is also sufficient to establish injury. *Nat'l Urb. League v. Ross*, 508

18   F. Supp. 3d 663, 688 (N.D. Cal. 2020). A failure to provide relevant information can constitute

19   injury where one might be entitled to such information. *Fed. Election Comm'n v. Akins*, 524 U.S.

20   11, 20 (1998). While the Ninth Circuit has held an organization can meet the injury requirement by

21   showing it had to divert resources to fight a problem affecting the organization, *La Asociacion de*

22   *Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010), the

23   Supreme Court recently rejected organizations seeking standing "simply by expending money to

24   gather information and advocate against the defendant's action," *Food & Drug Admin. v. All. for*

25   *Hippocratic Med.*, 602 U.S. 367, 394 (2024).

26   With this framework in mind, the Court now turns to the question of standing as applied to

27   plaintiffs in this case. Since the Court need not address the standing of each plaintiff to proceed as

28   long as it finds standing for at least one plaintiff, it limits its discussion below.

United States District Court
Northern District of California

United States District Court
Northern District of California

### A.    Injury

The numerous plaintiffs in this case can be divided into three general groups, each with its own set of alleged injuries.

#### 1.    Union Plaintiffs

In the declarations filed in support of their motion for a temporary restraining order, the union plaintiffs assert the following categories of harm.

First, and perhaps most obviously, they assert injury on behalf of their federal employee members who have received RIF notices or suffer under the looming threat of such notices. Second, they contend that their federal employees who are not let go will be injured by significantly increased workloads. Third, they assert injury to the unions themselves, in the form of "thousands of hours" of diverted staff resources and the loss in dues revenue that will result from the loss of employee members. *See*, *e.g.*, Dkt. No. 37-23 ("Decl. Kelley AFGE") ¶¶ 12-13, 15, 20.

The unions also assert injury on behalf of their non-federal employee members who stand to lose their jobs as a result of federal workforce reductions. For example, SEIU represents 6,000 federal contract workers at facilities that may face closure in the wake of staff reductions. Dkt. No. 37-3 ("Decl. Adler SEIU") ¶¶ 4, 9. These workers have lost their jobs during government shutdowns, or in the recent contested closure of the U.S. Institute of Peace facility. *Id.* ¶¶ 5, 7. Similarly, if staff reductions lead to the delay in processing of Medicare enrollment or other federal fund sources like grant payments, union members that work in sectors that depend on these revenue streams face layoffs. As just two provided examples, AFSCME members work in local housing authorities and local transit agencies that rely on a steady stream of federal funding. Dkt. No. 41-5 ("Decl. O'Brien AFSCME") ¶¶ 39-40, 45-46.

In response, defendants first argue that the unions do not show that a specific federal employee has been harmed or will imminently be harmed. Opp'n at 32 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Defendants are factually mistaken and overstate their legal case. Factually, multiple declarants have asserted personal harm. *See*, *e.g.*, Decl. Fabris AFGE ¶ 10

1    (declarant received RIF notice); Dkt. No. 37-24 ("Decl. Levin AFGE") ¶¶ 14-15 (declarant placed

2    on same-day administrative leave); Decl. Bobbit AFGE, Ex. D (declarant received and provided

3    redacted list of employees in RIF notice). As to the doctrine, the Court in *Summers* wanted to ensure

4    that injury had been specifically established by sworn affidavits. The Ninth Circuit has later

5    clarified that naming individuals is not necessary "when it is clear and not speculative that a member

6    of a group will be adversely affected by a challenged action and a defendant does not need to know

7    the identity of a particular member to defend against an organization's claims." *Mi Familia Vota v.*

8    *Fontes*, 129 F.4th 691, 708 (9th Cir. 2025). It is not speculative here that the union's members are

9    being harmed by defendants' challenged actions.

10         The unions also establish standing as organizations representing federal employees based on

11   impending direct financial harm to their organizations in the form of lower membership numbers

12   and lower dues.

13         SEIU has also established standing based on the federal contract workers that it represents.

14   These workers have lost their jobs when federal facilities close. Decl. Adler SEIU ¶¶ 5, 7. The

15   ARRPs are likely to result in the closure of more federal facilities,[5] and when that happens SEIU's

16   contract workers will lose their jobs. This is not like the attenuated five-link chain of cascading

17   events in *Clapper*—given the breadth of the RIFs that have been announced, these injuries are

18   "certainly impending." *See Clapper*, 568 U.S. at 410. AFSCME also represents non-federal

19   employee workers who rely on the federal workforce to process grants to support their work. In the

20   Department of Energy's Weatherization Assistance Program, reports indicate the number of federal

21   staff will decrease by 75%. Dkt. No. 37-15 ("Decl. Gabel AFSCME") ¶ 11. If or when these cuts

22   are implemented, AFSCME workers at a non-profit supported by this program will find it

23   "extremely challenging to get the necessary grant money to operate, and layoffs . . . are almost

24   certain." *Id.* ¶ 12. While slightly more attenuated than the contract workers' basis for standing, the

25   Court finds that these facts support an independent basis for standing as well.

26

27

28         [5] One of the principles to inform the ARRPs, per the OMB/OPM Memorandum, is "[a]
     reduced real property footprint." OMB/OPM Memo at 2.

1    Defendants also challenge whether the employees who will be saddled with more work will

2    have experienced a concrete harm. Opp'n at 33. The Court need not decide at this stage whether

3    this type of injury is sufficient for standing.

4

5          **2.      Non-Profit Plaintiffs**

6    All of these non-profit organizations except for the Natural Resources Defense Council have

7    submitted declarations that detail the harms that significant federal workforce reductions impose

8    upon their members or the organizations themselves. Two consistent themes emerge from these

9    declarations. First, the organizations' members benefit from services provided by federal

10    employees, but significant staffing reductions across various agencies impact their ability to

11    continue to benefit. Second, many of the organizations assert that they have had to divert resources

12    away from their primary mission to respond to the impact of federal staffing cuts on their members.

13    As defendants note, the diversion of resources theory rests on shakier ground after *Food &*

14    *Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024).[6] But at least

15    some of the organization plaintiffs establish injury on other bases. For example, the American

16    Geophysical Union attests that implementation of ARRPs will cause the organization to lose

17    membership, publication authors, and conference attendees, resulting in a loss of revenue to the

18    organization. Dkt. No. 37-45 ("Decl. Shultz AGU") ¶¶ 9, 28-29. Based on its past experience, the

19    Center for Taxpayer Rights suggests that its low-income members will see delays to the processing

20    of refunds that they rely on for day-to-day expenses. Dkt. No. 37-42 ("Decl. Olson CTR") ¶¶ 35-

21    37. The Executive Director of the Western Watersheds Project finds personal enjoyment from

22    visiting the Arctic grayling in its natural habitat, an enjoyment threatened by further cuts to the

23    agency currently working on Endangered Species Act findings for that species. Dkt. No. 37-40

24    ("Decl. Molvar WWP") ¶¶ 15-18. Harm that "affects the recreational or even the mere esthetic

25

26

27    [6] The Supreme Court there denied standing when plaintiff organizations incurred costs opposing the government's actions but explained that organizations have standing when a defendant's acts "directly affected and interfered with [plaintiff's] core business activities." *Food*

28    *& Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. at 395.

1    interests of the plaintiff . . . will suffice" for standing.  *Summers*, 555 U.S. at 494 (citing *Sierra Club*

2    *v. Morton*, 405 U.S. 727, 734-736 (1972).

3        The Court finds these types of harm sufficient to establish injury.  None are as attenuated as

4    the causal chain of events leading to potential injury in *Clapper*.  The Court reserves a full discussion

5    of standing for each plaintiff for a later stage.

6

7                    **3.        Local Government Plaintiffs**

8        To establish standing, a local government must assert a harm to its own "proprietary

9    interests," which "are as varied as a municipality's responsibilities, powers, and assets."  *City of*

10   *Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).  Proprietary interests include a local

11   government's ability to enforce regulations, its ability to collect revenue, and its ability to protect

12   its natural resources.  *Id.* at 1198.

13       The local government plaintiffs assert that large-scale reductions in the federal workforce

14   will jeopardize the timely delivery of many different federal funding streams that their budgets rely

15   on.  Baltimore also asserts a more direct financial injury in the form of lost municipal tax revenues,

16   given that 12,400 city residents are (or were) federal employees.  Dkt. No. 37-54 ("Decl. Leach—

17   Baltimore") ¶¶ 5-8.  The local governments also contend that they will be forced to expend more

18   resources in the absence of federal support, in areas like fighting wildfires or the provision of shelter

19   to the unhoused.

20       The Court finds the local governments have standing on the basis of impending financial

21   harm.  For example, King County has a budget that includes more than $200 million in federal

22   revenue for its operating budgets, and $500 million in federal funds in its capital budget for 2025.

23   Dkt. No. 41-6 ("Decl. Dively—King County") ¶¶ 6, 8.  The county communicates with staff across

24   multiple federal agencies to process grants and permits for capital projects; any delay in these

25   communications delays projects and increases costs.  *Id.* ¶¶ 22, 26, 31, 33, 38.  With large-scale

26   RIFs happening across agencies, such delay is likely.[7]  As another example, Harris County Public

27   _____

28       [7] As one example, the County believes the closure of HUD's regional office in Seattle will
     result in delays in disbursement of the County's $47 million in federal grant funds.  Decl. Dively—

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Health receives grants from the CDC, but has begun to experience a delay in communication after

2  HHS initiated its RIF.  Dkt. No. 37-46 ("Decl. Barton—Harris County") ¶¶ 23, 26.

3       Finding the above sufficient to establish standing for at least some of the local governments,

4  the Court reserves a fuller analysis for another day.

6            **4.**      **Procedural Injury**

7       Lastly, plaintiffs across all of the above categories assert a procedural injury for their notice-

8  and-comment claims, because they contend they would have submitted comments had they been

9  given a chance.  *See*, *e.g.*, Dkt. No. 37-31 ("Decl. Soldner AFGE") ¶ 27.  Some explained that they

10  provided comments in response to notices about similar proposals during President Trump's first

11  administration.  *See*, *e.g.*, *id.*

12       A procedural injury must be related to a plaintiff's concrete interests.  *Summers*, 555 U.S. at

13  496.  As a collection of plaintiffs have established standing based on harm to their concrete interests,

14  the plaintiffs also have standing to challenge a lack of notice and comment procedures.

16       **B.**      **Causation and Redressability[8]**

17       The plaintiffs challenge three layers of action: the president's executive order, the

18  OMB/OPM Memorandum issued pursuant to the executive order, and the agency ARRPs submitted

19  pursuant to the memorandum.  The harm experienced by plaintiffs or imminently threatening them

20  comes from the reorganizations and RIFs established by the ARRPs.  As many declarants have

21  offered, the agencies had not talked about large-scale RIFs or reorganizations prior to President

22  Trump's executive order.  *See, e.g.*, Decl. Bailey SEIU ¶ 10; Decl. Garthwaite AFGE ¶ 6.  These

23  harms are fairly traceable to defendants' actions at all three levels; beyond the defendants, there are

24  no intervening actors causing these harms.  *See Lujan*, 504 U.S. at 560.

25       Finally, the Court can redress the harms by vacating the unlawful actions as allowed by the

---

King County ¶¶ 37-38.

    [8] Defendants do not specifically challenge causation or redressability in their opposition, but the Court must complete the standing inquiry regardless.

APA and Supreme Court precedent.

### C. Conclusion as to Standing

At this stage, the Court finds at least some collection of the plaintiffs have sufficient standing to bring their claims.

## III. Subject Matter Jurisdiction—*Thunder Basin* Preclusion

Courts generally have jurisdiction under 28 U.S.C. § 1331 to review federal government actions. *Califano v. Sanders*, 430 U.S. 99, 105 (1977). But Congress sometimes precludes district court review "by specifying a different method to resolve claims about agency action," *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023), often through channeling review to an adjudicative body within an agency. In determining whether Congress has removed district court jurisdiction, courts ask two questions: whether "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction" and whether "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).

When examining the second question—whether the particular claims should be channeled to agency review—courts consider three factors from *Thunder Basin*: "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise?" *Axon*, 598 U.S. at 186 (internal quotation marks, brackets, and citations omitted). Affirmative answers to these questions suggest that Congress did not intend to limit jurisdiction, "[b]ut the same conclusion might follow if the factors point in different directions." *Id.* Together, these factors recognize that agency action should rarely evade effective judicial review, but channeling from a district court to an agency adjudication may be appropriate "in the matters [an agency] customarily handles, and can apply distinctive knowledge to." *Id.*

Defendants argue that the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act of 1978 preclude district court jurisdiction over plaintiffs' claims. Opp'n



United States District Court
Northern District of California

United States District Court
Northern District of California

1    at 23-31.  The Federal Service Labor-Management Relations Statute established a Federal Labor

2    Relations Authority to resolve issues related to collective bargaining between federal employee

3    unions and their employers, including "issues relating to the granting of national consultation

4    rights," "issues relating to determining compelling need for agency rules or regulations," "issues

5    relating to the duty to bargain in good faith," and "complaints of unfair labor practices."  5 U.S.C.

6    § 7105(a)(2).  In passing the statute, Congress specified that its provisions "should be interpreted in

7    a manner consistent with the requirement of an effective and efficient Government."  *Id.* § 7101(b).

8    The Civil Service Reform Act provides a mechanism for employees who have suffered an adverse

9    action to appeal to the Merit Systems Protection Board.  5 U.S.C. §§ 7512, 7513(d); *see also* 5

10   U.S.C. § 1204 (delineating functions of the Board).  The Civil Service Reform Act of 1978 excluded

11   reductions in force from the definition of "adverse action" appealable to the Board.  5 U.S.C.

12   § 7512(B); 5 C.F.R. § 752.401(b)(3).  However, per federal regulations issued by OPM, employees

13   who have been furloughed, separated or demoted by a reduction in force can appeal to the Board.  5

14   C.F.R. § 351.901.[9]  Judicial review of final orders of both the Authority and the Board is available

15   at circuit courts.  5 U.S.C. §§ 7703, 7123(a).

16        Defendants' opposition cites to courts across the country that have begun to address this

17   question in the context of similar claims.  On February 12, 2025, a District of Massachusetts court

18   declined to enjoin enforcement of the deadline for opting into a deferred resignation program.  *Am.*

19   *Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *1-3 (D.

20   Mass. Feb. 12, 2025).  The court determined the plaintiff unions lacked standing and that the claims

21   were precluded by the Federal Service Labor-Management Relations Statute and the Civil Service

22   Reform Act of 1978, which establish "exclusive procedures for disputes involving employees and

23   their federal employers and disputes between unions representing federal employees and the federal

24   government."  *Id.*

25        In a February 20, 2025 ruling, a D.C. district court denied a temporary restraining order and

26

27 ──────────────────

28        [9] As defendants' opposition notes, some employees may be precluded from appealing to the
     Board under the terms of their collective bargaining agreements.  Opp'n at 9 n.4.

1    preliminary injunction because it found that the union plaintiffs were precluded by the Federal

2    Service Labor-Management Relations Statute under *Thunder Basin*. *Nat'l Treasury Emps. Union*

3    *v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025). There, the

4    plaintiffs sought to prevent the termination of probationary employees, anticipated large-scale RIFs,

5    and any renewal of deferred resignation programs. *Id.* at *1. The court determined that the unions'

6    claimed injuries—financial harm and loss of bargaining power—could be meaningfully reviewed

7    through the Federal Labor Relations Authority, even though that body could not resolve the unions'

8    constitutional claims. *Id.* at *6-7. The constitutional question could be revived in an appeal of the

9    FLRA's decision. *Id.* at * 7.

10       The next day, February 21, 2025, another D.C. district court rejected the injunctive relief

11   requested by two employee unions that sought to pause the administration's attempt to dismantle

12   the U.S. Agency for International Development. *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-

13   352 (CJN), 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025). The court held that while "at a high

14   level of generality and in the long run, plaintiffs' assertions of harm could flow from their

15   constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," the court

16   noted that "the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking

17   injunctive relief flow essentially from their members' existing employment relationships with

18   USAID." *Id.* at *7. The court held that the Federal Service Labor-Management Relations Statute,

19   the Civil Service Reform Act, and the Foreign Service Act of 1980 indicated that Congress intended

20   for these types of claims to be channeled first to the administrative review offered by those statutory

21   schemes. *Id.* at *8-10. The court noted that the Foreign Service Act's scheme was "even broader"

22   than the other two and reasoned that "plaintiffs have presented no irreparable harm they or their

23   members are *imminently* likely to suffer from the hypothetical future dissolution of USAID" absent

24   immediate judicial review. *Id.* The court concluded that it likely lacked jurisdiction, so plaintiffs

25   were unlikely to succeed on the merits of their claims. *Id.* at *11.

26       All three of the above opinions relied on *American Federation of Government Employees,*

27   *AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). In that case, federal employee unions challenged

28   executive orders regarding federal labor-management relations from President Trump's first term.

United States District Court
Northern District of California

1    *Id.* at 753.  The orders directed federal agencies to remove certain subjects from labor negotiations,

2    limit the time employees could spend on union affairs during their workday, and exclude disputes

3    over for-cause terminations from grievance proceedings.  *Id.*  The appellate court determined that

4    the unions' claims—some of which asserted that the Executive Orders violated the Federal Service

5    Labor-Management Relations Statute itself—must be channeled first to the Federal Labor Relations

6    Authority.  *Id.* at 753-54, 761.

7        More recently, on April 22, 2025, in a case involving the administration's attempt to

8    dismantle the U.S. Agency for Global Media, the district court held that a conclusion that the claims

9    at issue "boiled down to a quotidian employment dispute . . . would ignore the facts on the record

10    and on the ground."  *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *11

11    (D.D.C. Apr. 22, 2025).  The district court determined that the administrative tribunals "have no

12    jurisdiction to review the cancelation of congressional appropriations" and that the case involved

13    administrative and constitutional law issues, separate from federal employment questions.  *Id.* at

14    *11 n.22.  On appeal, however, a majority opinion from the D.C. Circuit determined that "[t]he

15    'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be

16    packaged together and 'laid before the courts for wholesale correction under the APA.'"

17    *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (citation

18    omitted).

19        Finally, Judge Alsup of this district found that federal employee unions' challenge to the

20    OPM directive to agencies to terminate probationary employees should not be precluded based on

21    the *Thunder Basin* analysis.  *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 3:25-cv-01780-

22    WHA, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025).[10]  First, the court decided that the *ultra vires*

23    and APA claims in that case would not benefit from the administrative expertise of the Federal

24    Labor Relations Authority or the Merit Systems Protection Board.  *Id.* at 3-4.  It also found the

25    claims collateral to the review authority of those agencies, because the claims challenged executive

26

27

28    [10] The district court reversed its earlier decision finding preclusion under *Thunder Basin*, upon further briefing.

United States District Court
Northern District of California

1    power, not a specific personnel action. *Id.* at 5. Lastly, it determined that the district court offered

2    the only opportunity for meaningful judicial review. *Id.* at 6. The court noted that probationary

3    employees could not appeal a decision to the Merit Systems Protection Board and distinguished the

4    claims in this case from the bargaining-related issues sent to the Federal Labor Relations Authority

5    in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir.

6    2019). *Id.* at 7-8.[11]

### A.    Federal Employee Union Plaintiffs

9    The Court starts its analysis with the union plaintiffs. The Court agrees with Judge Alsup in

10    this district that the D.C. Circuit's 2019 decision in *AFGE v. Trump* is not particularly helpful to

11    resolving the claims channeling question here. In that case, the claims involved executive orders

12    that touched directly on matters related to collective bargaining, which are central to the purpose of

13    the Federal Labor Relations Authority. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929

14    F.3d at 753-54, 761. To the extent that other recent orders rely on the 2019 opinion, the Court

15    disagrees with their reasoning. Here, the claims are far afield from the central concerns of the

16    Federal Labor Relations Authority, *see* 5 U.S.C. § 7105(a)(2), instead touching on fundamental

17    questions of executive authority and separation of powers.

18    Defendants' opposition also cites two fresh opinions from the Fourth Circuit and the D.C.

19    Circuit that found it likely that plaintiffs with similar claims to those here would ultimately be

20    channeled to administrative review schemes. Opp'n at 24-25 (citing *Widakuswara v. Lake*, No. 25-

21    5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025); *Maryland v. U.S. Dep't of Agriculture*, No. 25-

22    1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025)). When considering out-of-circuit authority, the

23    Court looks to its persuasive value. *See Jones v. PGA TOUR, Inc.*, 668 F. Supp. 3d 907, 917 (N.D.

---

[11] The preliminary injunction in Judge Alsup's case is currently on appeal. On April 8, 2025, the Supreme Court granted the government's application for an emergency stay of the injunction pending appeal, stating that the non-profit organization plaintiffs on whose claims the original injunction was based had not sufficiently shown standing. *OPM v. AFGE*, --- S. Ct. ----, No. 24A904, 2025 WL 1035208, at *1 (S. Ct. Apr. 8, 2025) (citing *Clapper*). On return to the district court, the case proceeded and the court granted relief as to the claims of the plaintiff unions and the State of Washington.

United States District Court
Northern District of California

1   Cal. 2023).  Tthe Fourth Circuit offers no reasoning for its conclusion that the district court lacked

2   jurisdiction, and this Court finds the dissenting opinion in that case more robust and more

3   persuasive.     The D.C. Circuit provides slightly more (two paragraphs) on the question of

4   jurisdiction, but again the dissenting judge in that case centered the claims in the appropriate

5   context—the comprehensive dismantling of an entire agency—far more concretely and persuasively

6   than the panel majority.

7          The Court now moves to its own application of *Thunder Basin*.  Recognizing, as other courts

8   have, that the Federal Service Labor-Management Relations Statute and the Civil Service Reform

9   Act indicate an intent to limit jurisdiction in some instances, the Court turns to the second inquiry:

10  "whether the claims at issue are of the type Congress intended to be reviewed within the statutory

11  structure."  *Free Enter. Fund*, 561 U.S. at 489 (internal quotation marks, brackets, and citation

12  omitted).  The Court concludes the answer is no.  To explain, the Court examines each of the three

13  *Thunder Basin* factors in turn, all three of which favor a finding of subject matter jurisdiction in this

14  Court.

15         First, precluding district court jurisdiction for the union plaintiffs at this time would foreclose

16  meaningful judicial review.  Plaintiffs seek an opportunity to challenge "large-scale reductions in

17  force" happening rapidly across multiple agencies in the federal government.  In some offices or

18  agencies, nearly all employees are receiving RIF notices.  Defendants contend that plaintiffs must

19  take their concerns to what can be a prolonged administrative process and *then* appeal to present

20  their constitutional claim in federal court.  By that point, if they prevailed, they "would return to an

21  empty agency with no infrastructure" to support a resumption of their work.  *See Widakuswara*,

22  2025 WL 1166400, at *11 n.22.

23         Second, the claims at issue here are wholly collateral to the review authority of the Federal

24  Labor Relations Authority and the Merit Systems Protection Board.  As noted above, this lawsuit

25  involves questions of constitutional and statutory authority and the separation of powers.  Federal

26  employees are simply the ones to suffer most immediately the collateral damage of allegedly

27  unlawful actions.  In other words, "[t]he plaintiffs in this lawsuit challenge the evisceration of their

28  jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work

of [their offices or agencies] and shutting [them] down." *See Widakuswara*, 2025 WL 1288817, at *8 (Pillard, J., dissenting). Moreover, employees' rights to appeal a RIF to the Merit Systems Protection Board comes not directly from statute but from regulation. *See* 5 C.F.R. § 351.901;[12] *see also* 5 U.S.C. § 7512(B) (excluding reductions in force from the review provisions for "adverse actions").[13] When Congress did not directly specify Board review for reductions-in-force claims, it seems unlikely that Congress intended the Merit Systems Protection Board to be the *exclusive* avenue for such claims, let alone claims that involve broader questions about constitutional and administrative law. The same holds true for the Federal Labor Relations Authority—Congress desired that body's enabling statute to be interpreted "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b). There is nothing efficient about sending constitutional claims to a body that cannot decide them, only to wait for an opportunity to appeal.[14]

Third, the claims here involve issues related to the appropriate distribution of authority to and within the executive branch, not the individual employee or labor disputes these two administrative bodies customarily handle. As the Supreme Court has repeated, "agency adjudications are generally ill suited to address structural constitutional challenges." *Axon,* 598 U.S. at 195. Neither the Merit Systems Protection Board nor the Federal Labor Relations Authority have

---

[12] 5 U.S.C. § 7701 arguably provides *indirect* statutory authority with its rather circular proposition: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation."

[13] Defendants' opposition cites the adverse actions sections without noting that reductions in force are explicitly excluded from those provisions. Opp'n at 12.

[14] In *Elgin v. Department of Treasury*, the Supreme Court decided that there was no exception to Civil Service Reform Act exclusivity for constitutional challenges to federal statutes, in that case a statute that bars those who fail to register for the draft from federal employment. 567 U.S. 1, 12 (2012). The Court held that plaintiffs were obliged to wait to present their constitutional claim to the Federal Circuit after proceeding through the Merit Systems Protection Board. *Id.* at 21. However, the *Elgin* plaintiffs sought to vindicate their own personal rights to employment. Here, the plaintiffs confront an issue much larger in scope: how to interpret the constitutional structure of the federal government. And while the *Elgin* plaintiffs were likely to have a job and an agency to return to in the event they eventually won their case after winding through two layers of administrative and judicial review, the same cannot be said in this case. *See id.* at 25 (Alito, J., dissenting) ("I doubt that Congress intended to channel petitioners' constitutional claims into an administrative tribunal that is powerless to decide them[.]").

United States District Court
Northern District of California

1    special expertise to bear on the questions in this suit.

2

3        **B.**     **Other Plaintiffs**

4       The rest of the plaintiffs in this case, including the non-profit organizations, the local

5 governments, and the unions in their capacity representing non-federal employees, do not have

6 access to the Federal Labor Relations Authority or the Civil Service Reform Act. Even if the union

7 plaintiffs should be channeled out of court—and this Court thinks they should not—the *Thunder*

8 *Basin* factors weigh against claims channeling even more strongly when applied to these other

9 plaintiffs. Defendants fail to show how the cases they cite—involving challenges by federal

10 employees—support the channeling of constitutional and APA claims by non-federal employees,

11 including federal contract workers, non-profit organizations on behalf of their members, or local

12 governments. In *U.S. v. Fausto*, cited by both defendants and the *amici* states who filed a brief in

13 support of defendants, the Supreme Court held that a type of employee that received lesser privileges

14 in the Civil Service Reform Act was not entitled to district court review that was denied to

15 employees who had more privileges under the Act, because holding otherwise would have flipped

16 the structural logic of the Act. 484 U.S. 439, 448-49 (1988). But the Civil Service Reform Act says

17 nothing at all about non-federal employee unions, non-profit organizations, or local governments.

18 The Court is not persuaded that, when Congress created the Merit Systems Protection Board or the

19 Federal Labor Relations Authority, it intended for constitutional and APA claims by these sorts of

20 plaintiffs to be precluded from federal court. *See Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No.

21 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (in denying an application for an

22 emergency stay, finding the government had not shown they are likely to establish that Congress

23 intended to channel claims by non-profit organizations to the same administrative agencies).

24

25 **IV.**     **Analysis of the *Winter* Factors**

26       The Court now proceeds to the *Winter* factors, examining whether plaintiffs have established

27 they are likely to succeed on the merits, whether they are likely to suffer irreparable harm in the

28 absence of preliminary relief, if the balance of equities tips in their favor, and whether an injunction

United States District Court
Northern District of California

1    is in the public interest.  *See Winter*, 555 U.S. at 22.

2

3        **A.    Likelihood of Success on the Merits**

4            **1.    *Ultra Vires***

5        Plaintiffs' first and second claims for relief allege that Executive Order 14210, and the

6    actions and orders of OMB, OPM, and DOGE to implement the Executive Order, violate the

7    separation of powers and are therefore *ultra vires*.

8        "When an executive acts *ultra vires*, courts are normally available to reestablish the limits

9    on his authority."  *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated and remanded*

10   *on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (quoting *Dart v. United States*,

11   848 F.2d 217, 223 (D.C. Cir. 1988)).  The ability to enjoin unconstitutional action by government

12   officials dates back to the courts of equity, "reflect[ing] a long history of judicial review of illegal

13   executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320,

14   327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72

15   L.Q. Rev. 345 (1956)).  Where the President exceeds his authority, the district court may declare the

16   action unlawful and an injunction may issue.  *Sierra Club*, 963 F.3d at 891 (explaining that, in

17   *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), "The [Supreme] Court never

18   questioned that it had the authority to provide the requested relief").

19

20        **a.    Actions by President Trump**

21       Plaintiffs are likely to succeed on their claim that the President's Executive Order 14210 is

22   *ultra vires*, as the President has neither constitutional nor, at this time, statutory authority to

23   reorganize the executive branch.

24       "In the framework of our Constitution, the President's power to see that the laws are

25   faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions

26   in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he

27   thinks bad.  And the Constitution is neither silent nor equivocal about who shall make laws which

28   the President is to execute."  *Youngstown*, 343 U.S. at 587.

United States District Court
Northern District of California

1    Article I of the U.S. Constitution vests in Congress the legislative power.  U.S. Const. art. I,

2    § 1.  "To Congress under its legislative power is given the establishment of offices, [and] the

3    determination of their functions and jurisdiction . . . ."  *Myers v. United States*, 272 U.S. 52, 129

4    (1926).  "Congress has plenary power over the salary, duties, *and even existence* of executive

5    offices."  *Free Enter. Fund*, 561 U.S. at 500 (emphasis added).  While "[t]he President may create,

6    reorganize, or abolish an office that *he* established," the Constitution does not authorize him "to

7    enact, to amend, or to repeal statutes."  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)

8    (emphasis added); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety &

9    Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

10   In 1952, the Supreme Court considered the validity of an Executive Order by President

11   Truman, who ordered the Secretary of Commerce to seize most of the nation's steel mills to prevent

12   strikes from halting steel production during the Korean War.  *Youngstown,* 343 U.S. at 582.

13   Although various statutes authorized the President to seize property under certain circumstances,

14   none of the statutory conditions had been met, and so the President claimed the seizures were lawful

15   pursuant to his constitutional authority.  In reviewing whether the district court's preliminary

16   injunction to stop enforcement of the order was proper, the Supreme Court explained, "The

17   President's power, if any, to issue the order must stem either from an act of Congress or from the

18   Constitution itself."  *Id.* at 585.  Where President Truman lacked both constitutional and statutory

19   authority to seize the steel mills, the Supreme Court affirmed the district court injunction.

20   *Youngstown* applies here.  Defendants do not claim that Executive Order 14210 issued under

21   the President's constitutional powers.  Rather, they attempt to fit the President's actions into existing

22   statutory authority.  Such statutory authority, however, is plainly lacking.  The Ninth Circuit has

23   explained,

24       Justice Jackson's *Youngstown* concurrence provides the operative test in this context:

25           When the President takes measures incompatible with the expressed
             or implied will of Congress, his power is at its lowest ebb, for then he
26           can rely only upon his own constitutional powers minus any
             constitutional powers of Congress over the matter. Courts can sustain
27           exclusive presidential control in such a case only by disabling the
             Congress from acting upon the subject. Presidential claim to a power
28           at once so conclusive and preclusive must be scrutinized with caution,

United States District Court
Northern District of California

> for what is at stake is the equilibrium established by our constitutional
> system

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)).

As history demonstrates, the President may broadly restructure federal agencies only when authorized by Congress. "Although the U.S. Constitution vests in Congress the authority to organize the Executive Branch,[] former presidential administrations have asked Congress to grant expedited government reorganization authority to execute cross-agency government reorganizations more efficiently." S. Rep. No. 115-381, at 4 (2018). Since 1932, when President Hoover was the first President to request and receive such reorganization authority, Congress has granted this authority "16 times under both Republican and Democratic administrations[,]" to nine different Presidents. *Id.*; John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Found. Legal Memorandum No. 4782, at 3 (Nov. 3, 2017), available at: https://www.heritage.org/sites/default/files/2017-11/IB4782.pdf [https://perma.cc/59KD-JVU5] (hereinafter, "Heritage Found. Legal Memorandum No. 4782"). According to a Senate Report issued during President Trump's first term in office, "[b]etween 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." S. Rep. No. 115-381, at 4 (2018). The most recent statutory authorization for a president to conduct a governmental reorganization expired December 31, 1984. Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch Reorganization* 6-7 & n.23 (2017) (hereinafter, "CRS R44909").

The brief of *amicus curiae* Constitutional Accountability Center recounts the long history of Congress exercising its "power to restructure and abolish federal agencies as it finds necessary . . . ." Dkt. No. 51-1 at 6-9. Defendants' opposition brief also recounts this long history, which supports the proposition that large-scale reorganization of the federal agencies stems from a long-standing partnership between the executive and legislative branches. *See* Opp'n at 5-6 (citing, *inter alia*, 19 Stat. 169; 37 Stat. 413; the Veterans' Preference Act of 1944; the Federal Employee Pay Act of 1945; the 1966 recodification and amendment of the Veterans' Preference Act of 1944).

United States District Court
Northern District of California

1    In recent history, this congressional check on executive reach has stopped Democratic and

2    Republican presidents alike from restructuring federal agencies. Presidents George W. Bush, Barack

3    Obama, and Donald Trump (in his first term) all sought but did not receive Congressional approval

4    to reorganize the executive branch. CRS R44909 at 7; H.R. 6787, 115th Congress (2017-2018); S.

5    3137, 115th Congress (2018). Indeed, during the first months of his first term in office, President

6    Trump attempted a large-scale reorganization of federal agencies when he issued Executive Order

7    13781, entitled, "Comprehensive Plan for Reorganizing the Executive Branch." *See* 82 Fed. Reg.

8    13,959 (Mar. 16, 2017). That order called for agency heads to submit plans within 180 days "to

9    reorganize the agency, if appropriate, in order to improve the efficiency, effectiveness, and

10   accountability of that agency." *Id.* The accompanying legislation, however, died in Congress. *See*

11   H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018).

12   The simple proposition that the President may not, *without Congress*, fundamentally

13   reorganize the federal agencies is not controversial: constitutional commentators and politicians

14   across party lines agree that "sweeping reorganization of the federal bureaucracy requires the active

15   participation of Congress." *See* Heritage Found. Legal Memorandum No. 4782 at 1-2; *see also* Paul

16   J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Found.

17   Legal Memorandum No. 210, at 1 (July 12, 2017), available at: https://www.heritage.org/political-

18   process/report/the-presidents-reorganization-authority [https://perma.cc/2T7K-H6EY] (". . . to

19   accomplish major reorganization objectives, [the President] will need explicit statutory authority

20   from Congress . . ."); Ronald C. Moe, Cong. Rsch. Serv., RL30876, *The President's Reorganization*

21   *Authority: Review and Analysis* 2 (2001) ("It is Congress, through law, that determines the mission

22   of agencies, personnel systems, confirmation of executive officials, and funding, *and ultimately*

23   *evaluates whether the agency shall continue in existence*.") (emphasis added). As former

24   government officials note in their *amicus* brief, House Representative James Comer (R-Kentucky)

25   has introduced the Reorganizing Government Act of 2025. *See* H.R. 1295, 119th Cong. (2025). The

26   bill would allow "Congress to fast-track President Trump's government reorganization plans by

27   renewing a key tool to approve them swiftly in Congress." Press Release, House Committee on

28   Oversight and Government Reform, Chairman Comer and Senator Lee Introduce Bill to Fast-Track

29

1  President Trump's Government Reorganization Plans (Feb. 13, 2025),

2  https://oversight.house.gov/release/chairman-comer-and-senator-lee-introduce-bill-to-fast-track-

3  president-trumps-government-reorganization-plans/ [https://perma.cc/3XSV-TKWL].    The bill

4  contemplates that the President must partner with Congress on a government reorganization effort,

5  acknowledging that presidential "reorganization authority . . . was last in effect in 1984[.]"  *Id.*

6       In their brief, defendants assert that judicial review of the Executive Order is unavailable,

7  citing *Dalton v. Specter*, 511 U.S. 462, 470 (1994).[15]  Opp'n at 34.  The facts of *Dalton* could not be

8  more different from the scenario here.  In *Dalton*, the Supreme Court held that judicial review of the

9  President's decision is unavailable "[w]here a statute . . . commits decisionmaking to the discretion

10  of the President."  511 U.S. at 476-77.  At issue in *Dalton* was a decision by the President to close

11  the Philadelphia Naval Shipyard, pursuant to the Defense Base Closure and Realignment Act of

12  1990.    The Act provided for the Secretary of Defense, following notice and public comment, to

13  prepare closure recommendations, which then went to Congress and to an independent commission,

14  which then held public hearings and prepared a report, which then went to the President for approval,

15  following which Congress then could enact a joint resolution of disapproval.  *Id.* at 464-65.  As

16  discussed further below regarding the APA claims, nothing close to this level of procedure has

17  occurred here, at least as far as the record shows.  More importantly, *Dalton* challenged Presidential

18  action taken pursuant to statutory authority that Congress delegated to the President.    Thus,

19  defendants misread plaintiffs' *ultra vires* theory against President Trump.  Plaintiffs' claim is not

20  that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed.  Instead, Claim

21  One is about the President acting without *any* authority, constitutional or statutory.  As defendants

22  themselves state in their brief, "[A]n officer may be said to act *ultra vires* 'only when he acts without

23  any authority whatever.'"  Opp'n at 44 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465

24  U.S. 89, 101-02 n.11 (1984) (internal quotation marks omitted)).  This is precisely what plaintiffs

25

26       [15] Defendants appear to conflate the *ultra vires* and APA claims, arguing that President
    Trump is not subject to the APA and that his Executive Order is not reviewable under APA
27  standards.  *See* Opp'n at 34.  However, plaintiffs do not sue President Trump under the APA, and
    their APA claims challenge the carrying out of the Executive Order by OPM, OMB, DOGE, and
28  the federal agency defendants but do not challenge the Executive Order itself as violating the APA.

1    here have alleged.

2         Defendants also argue that "federal law expressly permits RIFs, the governing statute

3    expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently

4    recognized agencies' authority to engage in RIFs since the nineteenth century." Opp'n at 35.  Maybe

5    so.  However, what plaintiffs allege—and what defendants fail to refute—is that Executive Order

6    14210 reaches so broadly as to exceed what the President can do without Congress.  The Executive

7    Order mandates that "Agency Heads *shall* promptly undertake preparations *to initiate large-scale*

8    *reductions-in-force* (RIFs), consistent with applicable law," including submitting plans that "shall

9    discuss whether the agency or any of its subcomponents should be eliminated . . . ."[16]  Exec. Order

10   14210 § 3(c), (e) (emphasis added).  This is not an instance of the President using his "inherent

11   authority to exercise 'general administrative control of those executing the laws,'" *see* Opp'n at 4,

12   because Congress has passed no agency reorganization law for the President to execute.  Congress

13   may choose to do so.  But as of today, Congress has not.[17]

14        In defendants' interpretation, there is no unlawful action here because the President did not

15   order the agencies to take any specific actions, and OMB and OPM were merely providing guidance

16   about how agencies should conduct RIFs.  The evidence plaintiffs have presented paints a very

17   different picture: that the agencies are acting at the direction of the President and his team.

18   Defendants submitted no evidence of their own in response.  As noted above regarding causation

19   for standing, agencies were not discussing a need for large-scale RIFs prior to the President's

20   order.  In their reply brief, plaintiffs present a declaration that a recently-issued RIF notice at the

21   ─────────────────────

22        [16] The most recent, now lapsed, Congressional authorization for the President to reorganize
     the federal agencies covered precisely these actions, including "the transfer of the whole or a part
23   of an agency" and "the abolition of all or a part of the functions of an agency, except that no
     enforcement function or statutory program shall be abolished by the plan . . . ."  *See* 9 U.S.C.
24   § 903(a)(1), (2).

          [17] *Amici* the State of Montana et al. filed a brief in support of defendants.  Dkt. No. 71-1.
25   They argue, among other things, that "Article II provides the President with broad authority to
     manage the federal workforce. . . , and the courts have recognized it for more than two centuries
26   except in limited circumstances not relevant here." *Id.* at 3 (citing *Trump v. United States*, 603 U.S.
     593, 609 (2024)).  However, a closer read of the cited decision shows that the removal power
27   defendants cite applies "with respect to executive officers of the United States *whom he has*
     *appointed*." *See Trump*, 603 U.S. at 609 (emphasis added).  The removal of Presidentially-appointed
28   officers is simply not at issue in this case.

1   Department of Labor attributes the RIF to Executive Order 14210, citing section 3(c) of that order

2   specifically. Decl. Gamble AFGE ISO Reply ¶ 6, Ex. B. The Executive Order itself directs agencies

3   to prioritize RIFs of "all agency initiatives, components, or operations that *my* Administration

4   suspends or closes." Exec. Order 14210 § 3(c) (emphasis added). In other words, the President will

5   suspend or close agency operations, and that agency must then be prioritized for a RIF, which is

6   what appears on the present record to be happening. *See id.* ¶¶ 4-6, Ex. B. The Court reads the

7   mandatory language in the Executive Order as providing specific direction to the agencies.

8       The government also says there are no problems here because the Executive Order and the

9   OMB/OPM Memorandum direct agencies to comply with the law and not to reduce services to the

10   public. Opp'n at 39-40; Exec. Order 14210 §§ 3(c) ("Agency Heads shall promptly undertake

11   preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law"),

12   5(a)(i). As defendants note in their papers, "[a] consistent-with-law provision does not categorically

13   immunize an Executive Order or similar directive from review." Opp'n at 40. The Ninth Circuit,

14   in considering "whether, in the absence of congressional authorization, the Executive Branch may

15   withhold all federal grants from so-called 'sanctuary' cities and counties[,]" rejected the

16   government's argument that the words "consistent with law" saved the otherwise unlawful

17   Executive Order. *San Francisco*, 897 F.3d at 1231, 1239-40. As the court explained, "'It is a

18   commonplace of statutory construction that the specific governs the general[,]' . . . [and t]he

19   Executive Order's savings clause does not and cannot override its meaning." *Id.* at 1239 (quoting

20   *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

21       The Court finds plaintiffs have shown a likelihood of success on the merits of Claim One,

22   which alleges that Executive Order 14210 usurps Congress's Article I powers and exceeds the

23   President's lawful authority.

24

25                b.    **Actions by OPM, OMB, and DOGE**

26       Plaintiffs also assert that the actions by OPM, OMB, and DOGE in implementing the

27   executive order are *ultra vires* and therefore unlawful. They argue that none of these defendants

28   "possesses authority to order agencies to reorganize, to engage in 'large-scale' RIFs, or to usurp the

United States District Court
Northern District of California

1    decision-making authority delegated by Congress." Mot. at 35.

2

3    **OPM:** The question of whether the President, acting without Congress, may engage in *en*

4    *masse* termination of rank-and-file employees was recently litigated in a case involving the

5    termination of probationary employees at numerous federal agencies. In issuing a temporary

6    restraining order, Judge Alsup of this district found plaintiffs likely to succeed on their *ultra vires*

7    claim, explaining, "No statute — anywhere, ever — has granted OPM the authority to direct the

8    termination of employees in other agencies." *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-

9    cv-1780-WHA, 2025 WL 660053, at *4 (N.D. Cal. Feb. 28, 2025).[18] Rather, as laid out in statute,

10   "Each Executive agency . . . may employ such number of employees of the various classes

11   recognized by chapter 51 of this title [regarding classification] as Congress may appropriate for

12   from year to year." 5 U.S.C. § 3101. With regard to OPM in particular, Congress vested the Director

13   of OPM with a number of functions, none of which include the termination of employees from, or

14   the restructuring of, other federal agencies outside of OPM. *See* 5 U.S.C. § 1103(a). In the

15   probationary employee case, "OPM concede[d] that it lacks the authority to direct firings outside of

16   its own walls . . . ." *Am. Fed'n of Gov't Emps.,* 2025 WL 660053, at *5.

17

18   **OMB:** Housed within the Executive Office of the President, OMB, like OPM, has its

19   functions laid out in statute. *See* 31 U.S.C. §§ 501-507. None of the statutes authorize OMB to

20   terminate employees outside of OMB or to order other agencies to downsize, nor do defendants

21   point to any such authority in their brief. *See also Nat'l Council of Nonprofits v. Off. of Mgmt. &*

22   *Budget*, --- F. Supp. 3d ----, No. CV 25-239 (LLA), 2025 WL 597959, at *15 (D.D.C. Feb. 25, 2025)

23   ("the structure and provisions of Section 503 strongly suggest that OMB occupies an oversight role"

24   and 31 U.S.C. § 503(a)(5) "further indicates that OMB's role is mainly supervisory, rather than

25   directly active").

26

27

28

United States District Court
Northern District of California

---

[18] As noted above, the preliminary injunction in Judge Alsup's case is currently on appeal.

1    **DOGE:** As plaintiffs rightly note, DOGE "has no statutory authority at all." Mot. at 37.

2    DOGE was created by Executive Order out of the United States Digital Service, and is housed in

3    the Executive Office of the President. *See* Exec. Order No. 14158. DOGE therefore could not have

4    been acting pursuant to statutory authority in ordering large-scale RIFs of the workforces at the

5    defendant federal agencies.

6                                        * * *

7            In sum, no statute gives OPM, OMB, or DOGE the authority to direct other federal agencies

8    to engage in large-scale terminations, restructuring, or elimination of itself. Such action is far

9    outside the bounds of any authority that Congress vested in OPM or OMB, and, as noted, DOGE

10   has no statutory authority whatsoever. "[A]n agency literally has no power to act . . . unless and

11   until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

12           Plaintiffs are likely to succeed on the merits of their *ultra vires* claims (Claim Two) against

13   OPM, OMB, DOGE, and their Directors.

14

15           **2.    APA Claims**

16           Plaintiffs also challenge, as violative of the APA: the OMB/OPM Memo; OPM and OMB's

17   approvals of specific agencies' ARRPs; and "DOGE's directives to specific agencies requiring cuts

18   to programs and staffing[.]" Mot. at 37-38. Plaintiffs' Third through Seventh Claims assert

19   violations of the Administrative Procedure Act against OMB, OPM, DOGE, and their directors,

20   under 5 U.S.C. § 706(2)(A), (C), and (D), and against the federal agency defendants, under 5 U.S.C.

21   § 706(2)(A) and (C).

22           The APA provides, in relevant part, that

23           The reviewing court shall--
24           **. . . (2)** hold unlawful and set aside agency action, findings, and conclusions found to
             be--
25           **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
             law;
26           **. . .**
27           **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory
             right;
28           **(D)** without observance of procedure required by law; . . . .

*United States District Court*
*Northern District of California*

34

1    5 U.S.C. § 706(2).

2

3                              a.    **Final Agency Action**

4              The APA provides that "[a]gency action made reviewable by statute and final agency

5    action for which there is no other adequate remedy in a court are subject to judicial review."  5

6    U.S.C. § 704.  Because plaintiffs do not allege that any action here was made reviewable by statute,

7    the threshold question is whether the challenged actions constitute "final agency action."  If not, this

8    Court is without subject matter jurisdiction to decide the APA claim.  *See San Francisco Herring*

9    *Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 580 (9th Cir. 2017).

10             The Supreme Court has explained that "two conditions must be satisfied for agency action

11   to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process

12   . . . —it must not be of a merely tentative or interlocutory nature.  And second, the action must be

13   one by which 'rights or obligations have been determined,' or from which 'legal consequences will

14   flow[.]'"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).    The Supreme Court

15   has "long taken" a "pragmatic approach" to the question what constitutes final agency action.  *San*

16   *Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S.*

17   *Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

18             The record presently before the Court indicates that the challenged actions are final agency

19   actions under the APA.  While the ultimate impacts of the RIFs may yet be unknown (in part due to

20   defendants' refusal to publicize the ARRPs), and while certain ARRPs are still awaiting OMB/OPM

21   approval, nowhere do defendants assert that the OMB/OPM Memo itself is subject to change or is

22   in draft form.  Nor do any defendants claim that the ARRPs, once approved, may be modified or

23   rescinded.  These actions—the issuance of the OMB/OPM Memo and the approvals of the ARRPs—

24   are done and final.  *See San Francisco Herring Ass'n*, 946 F.3d at 578 ("The Park Service does not

25   suggest it is still in the middle of trying to figure out its position on whether it has jurisdiction over

26   the waters [at issue] . . .").   An agency engages in "final" action, for instance, when it "state[s] a

27   definitive position in formal notices, confirm[s] that position orally, and then send[s] officers out

28   into the field to execute on the directive."  *Id.* at 579.

United States District Court
Northern District of California

1    So have OMB, OPM, DOGE, and their directors done here.  The OMB/OPM Memo required

2    agencies to submit Phase 1 ARRPs by March 13 and Phase 2 ARRPs by April 14.  As alleged, the

3    ARRPs "are only effectuated by OMB and OPM (and DOGE) approval."  Compl. ¶ 14.  The little

4    evidence presented on how the ARRP approval process has actually played out shows that at least

5    one agency (the National Science Foundation) initially submitted an ARRP that "did not include

6    plans for large-scale RIFs" and that OMB, OPM, and DOGE rejected this plan "and directed the

7    agency to implement large-scale RIFs instead."  Decl. Soriano AFGE ¶¶ 8-9.  According to a

8    Program Director at the National Science Foundation, "NSF is now following the orders of the

9    DOGE team embedded within the agency and plans to cut its staff of approximately 1,700

10   employees by half."  *Id.* ¶ 9.[19]  "It is the imposition of an obligation or the fixing of a legal

11   relationship that is the indicium of finality of the administrative process."  *Getty Oil Co. v. Andrus*,

12   607 F.2d 253, 256 (9th Cir. 1979).  Based on the record to date, the Court finds the OMB/OPM

13   Memo and OMB/OPM approval of the ARRPs constitute final agency action under the APA.

14       At this time, the Court will refrain from opining on whether DOGE's actions are subject to

15   review under the APA.  The record is less developed as to DOGE's actions and would benefit from

16   further factual development.  Nevertheless, having found above that any actions by DOGE in

17   directing other federal agencies to engage in large-scale RIFs is *ultra vires*, the Court need not reach

18   the APA question specifically in order for injunctive relief to cover DOGE.  *See League of*

19   *Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 &

20   n.3; *Cmty. Legal Servs. in East Palo Alto v. United States Dep't of Health & Human Servs.*, --- F.

21   Supp. 3d ----, No. 25-cv-2847-AMO, 2025 WL 1233674, at *8 (N.D. Cal. Apr. 29, 2025) (plaintiffs

22   "need only show a likelihood of success on one claim to demonstrate likelihood of success in support

23   of a preliminary injunction").

---

[19] Of course, defendants may offer countervailing evidence at the preliminary injunction stage.  At this stage, defendants submitted no evidence in support of their opposition brief.  The Court emphasizes that releasing the ARRPs will be critical to a full understanding of the facts as this case proceeds.

United States District Court
Northern District of California

### b.  Merits

The Court likewise reserves ruling on the merits of the APA claim asserting arbitrary and capricious action by OPM, OMB, and DOGE (Claim Four) and the APA claims asserted against the federal agency defendants (Claims Six and Seven).  As discussed at the hearing, the release of the ARRPs will significantly aid the Court's review of the merits of these APA claims.

Plaintiffs' Third Claim—that OMB, OPM, DOGE, and their directors violated the APA by taking action not in accordance with law and exceeding statutory authority—overlaps with the analysis of the *ultra vires* claim.  For the same reasons already stated above, plaintiffs have shown a likelihood of success on their claim that at least OPM and OMB are acting outside their statutory authority by directing large-scale layoffs at other federal agencies.

Plaintiffs' Fifth Claim alleges that OMB, OPM, DOGE, and their directors violated the APA by engaging in "rule-making" without publication and opportunity for notice and comment.  In their brief, defendants assert, incorrectly, that OPM has simply promulgated regulations as they are statutorily authorized to do.  *See* Opp'n at 44 ("Congress expressly empowered OMB [sic] to promulgate regulations governing RIFs, and OPM has done just that."); *see also id.* at 35 ("the governing statute expressly directs OPM to promulgate regulations governing RIFs . . ."); *id.* at 1, 7-8, 40-41 (citing 5 U.S.C. § 3502).[20]  OPM did not promulgate regulations here.  Promulgating a regulation would have required a public process, including notice and comment under the APA.  *See* 5 U.S.C. § 553.  This did not occur.  Plaintiffs have shown a likelihood of succeeding on their claim that OPM and OMB engaged in rule-making without notice and comment required by the APA, in issuing the February memorandum and in approving the ARRPs.

### B.  Irreparable Harm

The Court discussed plaintiffs' injuries in the standing section above, but in the context of

---

[20] 5 U.S.C. § 3502 states, in part, that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to-- (1) tenure of employment; (2) military preference . . .; (3) length of service; and (4) efficiency or performance ratings."  5 U.S.C. § 3502(a).

United States District Court
Northern District of California

the *Winter* analysis the Court must also consider whether this injury is irreparable. Plaintiffs assert that constitutional violations constitute irreparable injury, including violations of the separation of powers. Mot. at 48-49. Plaintiffs assert that union members will face irreparable harm when they lose their wages and health benefits and, in some cases, may need to relocate. *Id.* The Court agrees that these losses constitute irreparable harm and notes that RIF terminations are beginning in less than two weeks at some agencies. As the Ninth Circuit has noted, "[l]ack of timely access to health care poses serious health risks," especially for individuals with chronic health conditions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008). Further, facing the potential loss of federal funding, the local government plaintiffs experience irreparable harm when they are forced to plan how to mitigate that loss. *See Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537-38 (N.D. Cal. 2017). These plaintiffs cannot recover damages via an APA claim, making their monetary loss irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Defendants and their supportive *amici* states argue from *Sampson v. Murray* that plaintiffs have not made a sufficient showing of irreparable harm. In *Sampson*, the Supreme Court considered whether to enjoin the dismissal of a single employee and determined the plaintiff had not made a sufficient showing of irreparable harm "in this type of case," even though the plaintiff would suffer at least a temporary loss of income. *Sampson v. Murray*, 415 U.S. 61, 63, 89-90, 92 (1974). But the Court also recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. The present case, simply put, is not the same "type of case" as *Sampson*. The Court here is not considering the potential loss of income of one individual employee, but the widespread termination of salaries and benefits for individuals, families, and communities.

## C.    Balance of Interests

The last two factors—assessing the harm to the opposing party and weighing the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. In this

United States District Court
Northern District of California

1     context, these factors require the Court to ask whether pausing the government's large-scale RIFs

2     and reorganizations harms the government more than it benefits the plaintiffs.  Defendants argue,

3     primarily, that there is no public interest in injunctive relief because its actions are lawful.  Opp'n

4     at 48.  This argument fails, as the Court has found it likely that defendants' actions are not lawful.

5     Notably, defendants do not argue that the government would suffer by a temporary preservation of

6     the status quo, although their *amici* states take up the banner.  *Id.*; Dkt. No. 71-1 ("The President

7     suffers harm when he is unable to exercise his Article II powers.").  The Court notes again that its

8     order does not prevent the President from exercising his Article II powers, it prevents him from

9     exercising Congress' Article I powers.

10          The Court finds that temporary relief as ordered below would serve the public interest,

11     because "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the

12     contrary, there is a substantial public interest in having governmental agencies abide by the federal

13     laws that govern their existence and operations."  *See League of Women Voters of United States v.*

14     *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations omitted).

15

16     **V.     Scope of Remedy and Order**

17          Providing relief beyond the named parties is appropriate where necessary to provide relief

18     to the named parties.  *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987).  The Court has

19     found that plaintiffs are likely to succeed on the merits of their challenges to Executive Order 14210,

20     the OMB/OPM Memorandum, and OMB/OPM's approval of the ARRPs.  The Court acknowledges

21     that its temporary restraining order as detailed below will provide relief beyond the named parties,

22     but to do otherwise is impracticable and unworkable, particularly where the agencies' RIF plans

23     largely remain secret.  To be clear, the Court has not ruled on whether plaintiffs are likely to succeed

24     on their APA claims regarding individual agency ARRPs, but finds it necessary to temporarily

25     enjoin further implementation of those plans because they flow from likely illegal directives.

26     Moreover, since the Court requires more information to evaluate the individual ARRPs and what

27     roles OMB, OPM, and DOGE have played in shaping them, it will order their disclosure under the

28     Court's inherent powers to manage discovery.   The Court finds it appropriate to order this

United States District Court
Northern District of California

1    production on an expedited discovery basis.  The timelines required to be in the ARRPs will be

2    particularly useful to the Court as it determines whether further prompt action is necessary.

3         Holding that the President, OMB, OPM, and DOGE have exceeded their authority naturally

4    raises the question of precisely where the line should be drawn between executive and legislative

5    authority over agency reorganization.  But as Chief Justice Roberts once wrote, in certain cases

6    "[w]e have no need to fix a line . . . . It is enough for today that wherever that line may be, this

7    [action] is surely beyond it."  *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 585.

8         For the foregoing reasons and for good cause shown, the Court therefore ORDERS as

9    follows:

10        IT IS HEREBY ORDERED that, pending consideration of a preliminary injunction, the agency defendants (as delineated below) and their officers or employees or any other individuals acting under their authority or the authority of the President  are hereby enjoined and/or stayed from taking any actions to implement or enforce sections 3(c) and 3(e) of Executive Order 14210 or the February 26, 2025 OMB/OPM Memorandum, including but not limited to:

14        (1) any further approval of ARRPs or waivers of statutorily-mandated RIF notice periods by OMB and OPM;

15        (2) any further orders by DOGE to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs;

17        (3) any further implementation of the Executive Order, the OMB/OPM Memorandum, or ARRPs by Federal Agency Defendants, including but not limited to: execution of any existing RIF notices (including final separation of employees), issuance of any further RIF notices, placement of employees on administrative leave, and transfer of functions or programs between the agency defendants.

20        This restraining order shall last fourteen days, through Friday, May 23, 2025, unless the Court finds good cause to extend it.  *See* Fed. R. Civ. P. 65(b)(2).  The restraining order shall apply to the following defendant agencies: OMB, OPM, DOGE, USDA, Commerce, Energy, HHS, HUD, Interior, Labor, State, Treasury, Transportation, VA, AmeriCorps, EPA, GSA, NLRB, NSF, SBA, and SSA.

23        IT IS FURTHER ORDERED that, good cause having been shown pursuant to Federal Rule of Civil Procedure 26(d), OMB and OPM must provide to the Court and to Plaintiffs (1) the versions of all defendant agency ARRPs submitted to OMB and OPM, (2) the versions of all defendant agency ARRPs approved by OMB and OPM, (3) any agency applications for waivers of statutorily-mandated RIF notice periods, and (4) any responses by OMB or OPM to such waiver requests, **by 4:00 p.m. (PDT) on Tuesday, May 13, 2025.**

27        IT IS FURTHER ORDERED that, **by 3:00 p.m. (PDT) on Tuesday, May 13, 2025,** defendants shall serve and file a declaration(s)

verifying that they have complied with this Order, including serving a copy of this order on every defendant agency head, and detailing what additional steps, if any, they have taken to comply.

## VI.    Rule 65(c) Security

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The district court retains discretion "as to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted).

The government has requested that the Court require plaintiffs give security in an amount "commensurate to the salaries and benefits the government must pay for any employees it would prefer to separate from federal service but is unable to for the duration of any preliminary relief."  Opp'n at 50.[21]  The Court notes, first, that defendants have not provided support for security in any fixed amount, and the Court cannot establish such an amount without the ARRPs or some other evidence showing the comprehensive RIF plans.[22]  Second, the Court finds there is significant public interest underlying this action, particularly in light of the constitutional claims raised.  *See Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015) (citing *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005)).  Although defendants allege they will incur costs for retaining federal employees that they would prefer to separate, Opp'n at 50, so too will the government incur costs if the RIFs are implemented hastily and unlawfully.  *See, e.g.*, Compl., Ex.

---

[21] On March 11, 2025, President Trump issued a memorandum for the heads of executive departments and agencies, stating that the policy of the United States is to demand the posting of a bond when a plaintiff seeks an injunction against the federal government.  Donald J. Trump, *Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)*, The White House (Mar. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/ [https://perma.cc/GF6W-9MPE].

[22] On April 10, 2025, a group of United States Senators sent a letter to the heads of OPM and OMB requesting, among other things, copies of the Phase 1 and Phase 2 ARRPs submitted to OPM and OMB, the impact of the RIFs relating to costs or savings to agency budgets, and the number of people placed on administrative leave.  *See* Dkt. No. 1-3, Compl., Ex. C.  Although the Senators requested a response by April 21, at the hearing in this case government counsel could not confirm whether a response has issued.

C at 2 (defendant Kennedy stating, with regard to April terminations of HHS employees: "[p]ersonnel that should not have been cut were cut . . . that was always the plan . . . we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."). At this time, the Court waives the requirement that plaintiffs post a bond.

## CONCLUSION

The Court concludes where it began. The President has the authority to seek changes to executive branch agencies, but he must do so in lawful ways and, in the case of large-scale reorganizations, with the cooperation of the legislative branch. Many presidents have sought this cooperation before; many iterations of Congress have provided it. Nothing prevents the President from requesting this cooperation—as he did in his prior term of office. Indeed, the Court holds the President likely *must* request Congressional cooperation to order the changes he seeks, and thus issues a temporary restraining order to pause large-scale reductions in force in the meantime.

A temporary restraining order is, by definition, temporary. The Court will not consider defendants' request for a stay of execution of the temporary restraining order, as doing so would render the exercise pointless. The Court must promptly proceed to consideration of a preliminary injunction.

Plaintiffs' motion for a preliminary injunction shall be filed no later than Wednesday, May 14, 2025 at 4:00 p.m. (PDT) and shall not exceed 25 pages; defendants' opposition is due by Monday, May 19, 2025 at 4:00 p.m. (PDT) and shall not exceed 25 pages. The Court shall hold a preliminary injunction hearing in person on Thursday, May 22, 2025 at 10:30 a.m.

**IT IS SO ORDERED**.

Dated: May 9, 2025

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, *et al.*

       Plaintiffs,

              v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

       Defendants.

Case No. 3:25-cv-03698-SI

**DEFENDANTS' MOTION FOR A
PROTECTIVE ORDER OR IN THE
ALTERNATIVE FOR
RECONSIDERATION AND REQUEST
FOR AN IMMEDIATE
ADMINISTRATIVE STAY;
MEMORANDUM OF POINTS AND
AUTHORITIES**

Defendants respectfully move, pursuant to Federal Rules of Civil Procedure 26(c)(1) and

59(e), for either a protective order relating to or reconsideration of the Court's order that Agency

RIF and Reorganization Plans (ARRPs) submitted to the Office of Management and Budget (OMB) and Office of Personnel Management (OPM) be disclosed by Tuesday, May 13 at 4:00 p.m. Pacific Time (Disclosure Order). Defendants respectfully request that the Court rescind the requirement that Defendants produce these documents, either by issuing a protective order or reconsidering the Disclosure Order. At the very least (and although Defendants would still seek relief from the Court of Appeals from any such modified order), Defendants respectfully ask the Court to enter a protective order restricting any produced ARRPs to Plaintiffs' counsel and prohibiting Plaintiffs' counsel from further disclosing the ARRPs (including to their clients). Further, Defendants also request an immediate administrative stay of the Disclosure Order while the Court considers this motion and, if the Court denies this motion, a seven-day administrative stay to allow for orderly briefing in the Court of Appeals. Given the imminence of the deadline, Defendants also intend to seek mandamus relief from the Disclosure Order in the Ninth Circuit tomorrow morning, as well as an immediate administrative stay from that Court. Defendants do not through this motion seek a stay of the Court's order granting a temporary restraining order (TRO).[1] Defendants are seeking a stay of that order from the Ninth Circuit. But this Court already denied a motion to stay its injunctive order, and Defendants have appealed that order.[2]

      Defendants emailed counsel for Plaintiffs at 1:26 pm Pacific Time today to obtain their position on this motion but, as of the filing of this motion, Defendants have not received a response. Due to the urgency of this motion, Defendants are filing this motion now.[3]

---

[1] To be clear, Defendants do not accept that this order is properly characterized as a TRO, *see Sampson v. Murray*, 415 U.S. 61, 86-87 (1974), but for ease of reference, Defendants will refer to it as a TRO here..

[2] The Court has jurisdiction to enter the relief requested. The Court issued two orders in one document (the TRO and the Disclosure Order), and Defendants are appealing only the former. And even if the Disclosure Order were before the Court of Appeals, at most, this Court would be divested of jurisdiction to quash that Order; it would not be divested of the authority to impose a protective order, in the same way a district court can still grant a full or partial stay of a preliminary injunction that has been appealed.

[3] Defendants acknowledge that this Court's Local Rules provide that party must obtain leave of Court prior to filing a reconsideration motion. Defendants are filing this motion now given the exigent circumstances and to give the Court a reasonable opportunity to rule on the motion before the Tuesday deadline.

## ARGUMENT

Upon a party's showing of "good cause," courts may issue protective orders to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). A district court has "broad discretion" to decide "when a protective order is appropriate and what degree of protection is required," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). A court may also grant a motion for reconsideration "(1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). "A court considering a Rule 59(e) motion is not limited merely to these four situations." *Id.*

The Court should either grant Defendants a protective order from the obligation to disclose the ARRPs or reconsider the Disclosure Order because the ARRPs are privileged pre-decisional and deliberative agency planning documents. They also contain significant, highly sensitive information the disclosure of which will irreparably harm OPM, OMB, and the Defendant Agencies, harm that cannot be undone once the documents are disclosed. Defendants submit that the Court's grant of this extraordinary relief was both substantively and procedurally erroneous. And although the Court need not consider this separate question to grant the relief requested, the ARRPs are also simply irrelevant to future proceedings in this Court, and at the very least no one will be irreparably harmed by granting relief from disclosure (let alone by a brief administrative stay).

### I.       The ARRPs are Privileged

"Federal law recognizes a privilege for pre-decisional, non-factual, non-public communications occurring within federal agencies." *United States v. Irvin,* 127 F.R.D. 169, 172 (C.D. Cal.1989). This deliberative process privilege protects confidential exchanges of opinions and advice within the executive branch of government. *Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, No. CIVS 03-2591 FCD EFB, 2007 WL 4557104, at *4 (E.D. Cal. Dec. 21, 2007). Its purpose "is to prevent injury to the quality of agency decisions by ensuring that the frank

1   discussion of legal or policy matters in writing, within the agency, is not inhibited by public

2   disclosure." *Maricopa Audubon Soc'y v. U.S. Forest Service,* 108 F.3d 1089, 1092 (9th Cir. 1997)

3   (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148 (1975)) (internal quotations omitted).

4   "The deliberative process privilege is designed to allow agencies to freely explore possibilities,

5   engage in internal debates, or play devil's advocate without fear of public scrutiny." *Thomas v.*

6   *Cate*, 715 F. Supp. 2d 1012, 1019 (E.D. Cal. 2010). "To fall within the deliberative process

7   privilege, a document must be both 'predecisional' and 'deliberative.'" *Carter v. U.S. Department*

8   *of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002). The ARRPs satisfy both requirements.[4]

9          The ARRPs are predecisional. "A predecisional document is one prepared in order to assist

10  an agency decisionmaker in arriving at his decision." *Assembly of State of Cal. v. U.S. Dep't of*

11  *Com.*, 968 F.2d 916, 920 (9th Cir. 1992) (quotation marks omitted). That is satisfied here. For one,

12  as explained in the attached declaration, ARRPs are "subject to change at any moment as the

13  agency's needs, missions, and staffing evolve or as new leadership joins an agency." Declaration

14  of Stephen M. Billy ¶ 5 (Decl.). An ARRP is never final and may change drastically as the agency's

15  priorities and thinking changes. *Id.* ¶ 6. "Indeed, the non-final and frequently changing nature of

16  ARRPs is one of the reasons OMB and OPM requested that the agencies submit monthly progress

17  reports in May, June, and July." *Id.* Nothing in an ARRP irrevocably commits an agency to taking

18  any specific step. *Id.* ¶ 5. But in addition, the ARRPs have *many* recommendations distinct from

19  specific RIFs. *Id.* ¶ 3; *see also* TRO Opposition at 15-16 (summarizing information to be included

20  in Phase 1 and Phase 2 ARRPs). They typically include plans for changes that would take place

21  many years in the future, if at all. Decl. ¶ 3.

22  _____

23  [4] The privilege is qualified and may be overcome if a litigant's "need for the materials and the
    need for accurate fact-finding override the government's interest in non-disclosure." *FTC v.*

24  *Warner Communc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (per curiam). In assessing a claim
    under the privilege, a court must consider "1) the relevance of the evidence; 2) the availability of

25  other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure
    would hinder frank and independent discussion regarding contemplated policies and decisions."

26  *Id.* The Court conducted no such analysis here before ordering disclosure. And Defendants would
    prevail in any such analysis since the ARRPs contain significant highly sensitive information,

27  while, on the other hand, they bear no relevance to this action globally challenging implementation

28  of the Executive Order and Workforce Memorandum.

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate
Administrative Stay
3:25-cv-3698-SI

1    They are also deliberative. "A predecisional document is a part of the deliberative process,

2    if the disclosure of the materials would expose an agency's decisionmaking process in such a way

3    as to discourage candid discussion within the agency and thereby undermine the agency's ability

4    to perform its functions." *Carter*, 307 F.3d at 1089. The foregoing discussion demonstrates why

5    that requirement is clearly satisfied here. As the Workforce Memorandum and Declaration both

6    make clear, Phase 1 and Phase 2 ARRPs contain a significant amount of information concerning

7    the agencies' future plans and strategies, not all of which will actually be acted upon, at least not

8    right away. And as discussed further in the next section, that information is highly sensitive,

9    concerning plans and strategies in a number of core areas. *See infra* p. 6.

10    The Court's opinion appears to reflect fundamental misconceptions about ARRPs. First,

11    the Court suggested that ARRPs are set in stone following a single discrete event (their "approval"

12    by OPM/OMB). *See* TRO Opinion at 35. As explained above, that is incorrect. *See supra* p. 4; *see*

13    *also* Decl. ¶ 5 ("Nothing in an ARRP, or its review or approval by OPM or OMB, binds the agency

14    to any particular course of action."). As a formal matter, ARRPs are always subject to change

15    based on, among other things, intervening events and changes in the agency's thinking. The

16    Court's opinion, relatedly, appears to rest on a mistaken understanding that the only content in

17    ARRPs concerns upcoming RIFs and other related subjects directly tied to the TRO decision,

18    essentially analogizing the ARRPs to an administrative record for imminent RIFs. *See* TRO

19    Opinion at 35 ("While the ultimate impacts of the RIFs may yet be unknown (in part due to

20    defendants' refusal to publicize the ARRPs)…"). Again, as discussed above, that is mistaken. The

21    ARRPs are extensive long- and intermediate-term agency planning documents containing the

22    agencies' detailed analysis, plans, and strategies on a range of regulatory, legislative, and

23    organizational subjects. *See supra* p. 4; *infra* p. 6.

24    **II.    Disclosure of the ARRPs would Irreparably Harm the Government**

25    Publication of confidential documents is irreversible. "[O]nce a secret is revealed, there is

26    nothing for [a court order] to protect." *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x

27    727, 732 (3d Cir. 2009). A party erroneously required to disclose privileged materials or

28    communications" is likely to suffer irreparable harm. *See Admiral Ins. Co. v. U.S. Dist. Ct.*, 881

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate
Administrative Stay
3:25-cv-3698-SI

F.2d 1486, 1491 (9th Cir. 1989) (collecting cases). "[A]n order that information be produced that brushes aside a litigant's claim of a privilege not to disclose, leaves only an appeal after judgment as a remedy. Such a remedy is inadequate at best. Compliance with the order destroys the right sought to be protected." *In re von Bulow*, 828 F.2d 94, 98 (2d Cir. 1987). If Defendants are required to disclose the ARRPs on Tuesday, there can be no putting that toothpaste back in the tube. That is quintessential irreparable harm.

The irreparable harm to the government would be particularly severe here given the contents of the ARRPs, which "include highly sensitive information that would seriously undermine agency operations if they were released." Decl. ¶ 4. This "information includes strategies for agency negotiations with unions; plans and strategies for personnel reorganization that may or may not materialize, but might seriously hurt agency recruitment and retention if released; plans and strategies regarding present and future regulatory changes; plans and strategies for present and future appropriations requests; plans and strategies for congressional engagement; and plans and strategies for agency IT management." *Id.*

### III.    The Disclosure Order is Substantively and Procedural Flawed and Highly Unfair to the Government

The Court should not require the Government to hand over this massive trove of information and suffer this grave and irreparable harm in this highly expedited context. Based on its opinion, however, the Court may be of the view that the Government did not adequately oppose Plaintiffs' supposed discovery request. *See* TRO Opinion at 35 ("Nor do any defendants claim that the ARRPs, once approved, may be modified or rescinded."). Respectfully, that is not the case, and there is no basis for the Court's grant of this extraordinary relief.

Initially, the Court did not even have before it a proper motion for discovery. The caption to Plaintiffs' motion did not indicate that Plaintiffs were seeking discovery. *Compare* TRO Motion ("Motion for Temporary Restraining Order and Order to Show Cause"), *with* TRO Decision ("Order Granting Temporary Restraining Order and Compelling Certain Discovery Production."). Plaintiffs also did not follow any of the local rule requirements for resolving discovery and disclosure disputes. *See* Local Rule 37-1. When counsel for Plaintiffs emailed counsel for Defendants to obtain a position on their emergency motion and proposed schedule, they did not

1    indicate that the motion would seek discovery.[5] Nor did Plaintiffs attempt to serve Defendants

2    with discovery requests, and Defendants never had a chance to make formal objections to any such

3    request.

4          Putting those procedural defects aside, Plaintiffs provided no meaningful *legal* basis for

5    these materials to be released. Indeed, the entire basis for Plaintiffs' demand that the ARRPs be

6    produced in their TRO Brief was a postcard conclusory statement at the bottom of page 50 of their

7    51-page brief, in which they made no attempt to establish that the ARRPs were non-privileged and

8    otherwise subject to disclosure. In that context—a TRO briefing posture, where the government

9    had only three business days to respond to Plaintiffs' 51-page brief backed by nearly 1,400 pages

10   of exhibits—Defendants were not required to treat this conclusory and procedurally improper

11   request as effectively requiring the type of response they would have provided in formal discovery

12   objections and responses. Rather, Defendants quite appropriately pointed out that Plaintiffs had

13   provided no legal basis for this request. TRO Opposition at 48.

14         Notwithstanding all of this, the government explained that "the ARRPs are deliberative

15   agency planning documents that discuss a number of steps the agency plans to take t[o] … improve

16   the agency's efficiency, as well as to focus on statutorily required functions activities that directly

17   serve the public." ECF No. 60 at 21. Such documents, "which reflect the agency's group thinking

18   in the process of working out its policy," are definitionally deliberative materials shielded from

19   disclosure. *See NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). And the Workforce

20   Memorandum itself and the Government's extensive discussion of it made clear that ARRPs

21   contain significant information about the agency's long term strategies and recommendations. *See*

22   *supra* p. 4; TRO Opposition at 15-16. But without addressing those concerns or purporting to

23   engage in balancing analysis, this Court concluded that Plaintiffs had shown "good cause" under

24

25   [5] The substantive text of that email is as follows: "We are writing to inform you that Plaintiffs in
     the above-referenced case will tomorrow be filing a motion for temporary restraining order and to
26   show cause why a preliminary injunction should not issue. We intend to ask the Court to set a
     deadline for the government's response of Monday, and will ask for a hearing as soon as possible
27   next week. Please let me know whether Defendants will consent to this schedule on the TRO. We
     will be asking the Court for additional pages on the memorandum in support of the TRO motion,
28   of up to 50 pages. Please let us know if Defendants will consent."

1    Federal Rule of Civil Procedure 26(d), and then ordered the government to produce the Plans and

2    other documents by 4:00 p.m. PDT on Tuesday, May 13.

3         That analysis is plainly inadequate to dispense with the privilege. In *Karnoski v. Trump*,

4    the Ninth Circuit issued a writ of mandamus vacating discovery orders because the district court

5    did not perform a sufficiently "granular" balancing analysis before holding that the plaintiffs in

6    that case had overcome the deliberative process privilege. 926 F.3d 1180, 1206 (9th Cir. 2019)

7    (*per curiam*) ("The district court appears to have conducted a single deliberative process privilege

8    analysis covering all withheld documents, rather than considering whether the analysis should

9    apply differently to certain categories."); *see also id.* at 1195 (order covered 15,000 documents).

10   Here, the problem is not that the Court's analysis was too vague, but that it conducted no analysis

11   at all.

12        Indeed, the scope of the disclosure the Court ordered exceeds even what Plaintiffs sought

13   in their motion. *See* ECF No. 37-3 (requesting only "current versions" of the Plans). Plaintiffs first

14   asked for "waivers" of the 60-day RIF notice period at the end of the live hearing, and they never

15   asked for "agency applications for waivers" at all. Tr. at 43.

16   **IV.    The ARRPs Are Not Relevant to Future Proceedings before this Court**

17        Given the foregoing, the Court should grant a protective order or reconsider the Disclosure

18   Order. To grant either form of relief, the Court need not decide whether disclosure of the ARRPs

19   could be required or should be required in the future. The Court could simply order briefing on

20   whether the ARRPs should be withheld and the applicability of privileges.

21        In any event, Defendants respectfully submit that the ARRPs are not relevant to the

22   preliminary injunction proceedings this Court intends to conduct in the coming weeks—and

23   certainly no party would be irreparably harmed by the relief the Government seeks here. The Court

24   enjoined *all* implementation of the Workforce Executive Order and Workforce Memorandum, as

25   to *all* the 21 components against which Plaintiffs sought a TRO. TRO Decision at 40. And the

26   Court clearly held that both the Workforce Executive Order and the Workforce Memorandum were

27   *ultra vires*. TRO Opinion at 26-34. It is unclear how the contents of the ARRPs could affect the

28

1    conclusions the Court reached in issuing the TRO—since the Court held that the Workforce

2    Executive Order and Workforce Memorandum *cannot* be lawfully implemented.

3    The Court also stated that "the release of the ARRPs will significantly aid the Court's

4    review of the merits of" the claims that individual ARRPs are arbitrary and capricious. TRO

5    Opinion at 37. But Plaintiffs' arbitrary-and-capricious claims were directly tied to the Workforce

6    Executive Order and Workforce Memorandum. Plaintiffs did not make freestanding claims that

7    particular ARRPs violated the APA for reasons *independent of* these sources—for example, that

8    particular elements of the ARRPs flunked the arbitrary-and-capricious standard. And any such

9    fact-bound claim directed at individual ARRPs would of course not provide any basis for enjoining

10   implementation of the Executive Order and Memorandum, let alone enjoining its implementation

11   virtually government-wide. In short, no matter how detailed or well-supported the ARRPs may be,

12   the Court's opinion indicates that the Court believes they are tainted by an unlawful Executive

13   Order and Memorandum. True, the Court framed all of its merits conclusions in terms of

14   "likelihood of success" and Defendants obviously hope that the Court reconsiders these legal

15   conclusions (which Defendants respectfully submit are mistaken) at a later stage of the case. But

16   if the Court adheres to its legal conclusion that the Executive Order and Memorandum are

17   themselves unlawful, an analysis of specific ARRPs would not appear to in any way change those

18   conclusions.

19   Even if this Court had conducted a balancing analysis, the deliberative privilege would not

20   be overcome. Plaintiffs allege that the President has called for "large scale" changes to agencies

21   and that the separation of powers forbids him from so reforming federal agencies absent express

22   statutory authorization. Plaintiffs' claim thus does not turn on the specific Plans agencies have

23   prepared. Indeed, Plaintiffs do not challenge any Plan at all. Rather, they challenge the President's

24   authority to ask agencies to prepare Plans and OPM and OMB's ability to offer guidance on what

25   those documents should contain. Because the content of the ARRPS is legally irrelevant to the

26   claims as pled, Plaintiffs are not entitled to these ARRPs, and the Court erred in concluding

27   otherwise.

28

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate
Administrative Stay
3:25-cv-3698-SI

## V.    At a minimum, the Court Should Grant a Protective Order Restricting Disclosure of the ARRPs to the Court and Plaintiffs' Counsel

At the very least, Defendants ask that its disclosure obligation be restricted to only Plaintiffs' counsel; this smaller disclosure would obviate some of the most significant harms to Defendants of having their deliberative work-product made public. The Court should accordingly direct any ARRPs to be filed under seal and should enter a protective order directing that Plaintiffs' counsel may not disclose the ARRPs to anyone else (including their clients). Such limited relief would not eliminate the chilling effect created by disclosures of deliberative materials, nor would it justify disregarding the government's interest in maintaining the documents' confidentiality. *Cf. Perry v. Schwarzenegger*, 591 F.3d 1147, 1163-64 (9th Cir. 2009) (granting defendants' mandamus petition and overruling a district court's order compelling the defendants to produce documents whose disclosure threatened to "inhibi[t] internal campaign communications that are essential to effective association and expression," while emphasizing that "[a] protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened harms"). And it would not cure the procedural and substantive flaws associated with the Court's Disclosure Order discussed in detail above. But it would temper some of the effects of the disclosure that are most likely to hinder agency operations.

## VI.    The Court Should Grant an Immediate Administrative Stay

Given the pending Tuesday, May 13 deadline, and the grave and irreversible injury to the government associated with the disclosure of the ARRPs, Defendants respectfully request that the Court rule on this motion as soon as possible and to grant an immediate administrative stay of the Disclosure Order. Given the imminence of the deadline, Defendants also intend to seek mandamus relief from the Disclosure Order in the Ninth Circuit tomorrow morning, as well as an immediate administrative stay from that Court. Defendants will promptly inform this Court of any relevant developments in the Ninth Circuit.

### CONCLUSION

For the foregoing reasons, the Court should relieve Defendants of the obligation to produce the ARRPs, and grant an immediate administrative stay while it considers this motion.

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate Administrative Stay
3:25-cv-3698-SI

Dated: May 11, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

s/ Andrew M. Bernie
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

*Counsel for Defendants*

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate Administrative Stay
3:25-cv-3698-SI

Add.419
11

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF STEPHEN M. BILLY** |

1    I, Stephen M. Billy, declare, pursuant to 28 U.S.C. § 1746, as follows:

2    1.    I currently serve as a Senior Advisor for the Office of Management and Budget

3 (OMB), Executive Office of the President.  I have occupied this position since January 24, 2025.

4    2.    The portion of the Court's Order requiring disclosure of all Defendant Agency

5 Reorganization and RIF Plans (ARRPs) will irreparably harm OMB, the U.S. Office of Personnel

6 Management (OPM), and Defendant Agencies if it is not quashed.

7    3.    ARRPs are distinct from actual RIFs. ARRPs have many recommendations distinct

8 from plans for specific RIFs. They typically include plans for changes that would take place many

9 years in the future, if those changes take place at all.

10    4.    ARRPs include highly sensitive information that would seriously undermine

11 agency operations if they were released. Such information includes strategies for agency

12 negotiations with unions; plans and strategies for personnel reorganization that may or may not

13 materialize, but might seriously hurt agency recruitment and retention if released; plans and

14 strategies regarding present and future regulatory changes; plans and strategies for present and

15 future appropriations requests; plans and strategies for congressional engagement; and plans and

16 strategies for agency IT management.

17    5.    In addition to containing significant amounts of sensitive information, ARRPs are

18 deliberative in nature, subject to change at any moment as the agency's needs, missions, and

19 staffing evolve or as new leadership joins an agency. Nothing in an ARRP, or its review or

20 approval by OPM or OMB, binds the agency to any particular course of action.

21    6.    No ARRP is ever "final." ARRPs are living documents that are always subject to

22 change as agency needs and circumstances may dictate, or simply due to an agency rethinking or

23 reconsidering an issue. They may change drastically as a result of new leadership joining an

24 agency, as agency officials are confirmed by the Senate to their posts. Indeed, the non-final and

25 frequently changing nature of ARRPs is one of the reasons OMB and OPM requested that the

26 agencies submit monthly progress reports in May, June, and July.

27    7.    ARRPs are internal agency planning documents that lack any immediate force or

28 effect. They were developed thoughtfully and carefully by agencies, and invariably include the

agency's close consideration of its own statutory functions and authorities and its own long-term workforce planning needs.

8.    In many cases, ARRPs include ideas for reforms aimed at improving agency efficiency in delivering services to the American taxpayer—but those reforms, again, frequently reflect the agency's current thinking involving potential changes that may or may not take place in the intermediate or distant future, and are always subject to change for any reason.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Dated: May 11, 2025


/s/ Stephen M. Billy
Stephen M. Billy

Declaration of Stephen M. Billy
3:25-cv-03698-SI

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

    450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

    1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al*. <br><br>     Plaintiffs, <br><br>        v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al*., <br><br>     Defendants. | Case No. 3:25-cv-03698-SI <br><br> **NOTICE** |

In Defendants' motion filed earlier this evening, Defendants stated that "Defendants emailed counsel for Plaintiffs at 1:26 pm Pacific Time today to obtain their position on this motion but, as of the filing of this motion, Defendants have not received a response. Due to the urgency of this motion, Defendants are filing this motion now." Undersigned counsel has since learned that

1    Plaintiffs did respond but that they responded to a Department of Justice email address for the

2    undersigned as to which undersigned counsel has temporarily lost access. Undersigned counsel

3    sincerely regrets this error. Undersigned counsel has since conferred with Plaintiffs. Plaintiffs state

4    that they intend to file an opposition Tuesday and do not oppose an order stating that Defendants

5    need not produce or file the ARRPs until the Court has ruled on Defendants' motion.

6    Dated: May 11, 2025                      Respectfully submitted,

7                                             PATRICK D. ROBBINS (CABN 152288)
                                             Acting United States Attorney
8                                            U.S. ATTORNEY'S OFFICE
                                             450 Golden Gate Avenue, Box 36055
9                                            San Francisco, California 94102-3495

10                                           ERIC J. HAMILTON (CABN 296283)
                                             Deputy Assistant Attorney General
11                                           DIANE KELLEHER
                                             Branch Director
12                                           CHRISTOPHER HALL
13                                           Assistant Branch Director

14                                           s/ Andrew M. Bernie
                                             1100 L Street, NW
15                                           Washington, DC 20005
                                             Telephone: (202) 353-7203
16                                           andrew.m.bernie@usdoj.gov

17                                           *Counsel for Defendants*

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
8
et al.,

9
Plaintiffs,

10
v.

11
DONALD J. TRUMP, et al.,

12
Defendants.

13

Case No.  25-cv-03698-SI

**ORDER SETTING BRIEFING
SCHEDULE FOR MOTION FOR
PROTECTIVE ORDER AND
POSTPONING DISCOVERY
DEADLINE**

Re: Dkt. No. 88

14       On Friday, May 9, 2025, the Court issued an order that compelled certain expedited

15 discovery from defendants, with a deadline for production of Tuesday, May 13, at 4:00 p.m. (PDT).

16 Dkt. No. 85.  On Sunday, May 11, 2025, defendants filed a Motion for Protective Order or in the

17 Alternative For Reconsideration on the basis of the deliberative process privilege, seeking a stay of

18 the production deadline.  Dkt. No. 88.  The parties have conferred and neither plaintiffs nor

19 defendants oppose a postponement of the May 13 discovery deadline while the motion is more fully

20 considered by the Court.  Accordingly, the deadline in the Court's expedited discovery order in

21 Docket Number 85 that requires defendants Office of Budget and Management and Office of

22 Personnel Management to produce certain materials by Tuesday, May 13, 2025 (*see* Dkt. No. 85 at

23 40), is stayed until the Court rules on defendants' motion.

24       The Court sets the following briefing schedule:

25       Plaintiffs' response to defendants' motion is due on Tuesday, May 13, 2025.

26       Defendants may file a reply on Wednesday, May 14, 2025.

27 ///

28 ///

The Court will determine whether to schedule a hearing on the motion after considering the parties' written submissions.

**IT IS SO ORDERED**.

Dated: May 12, 2025

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

(430 of 726), Page 430 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 430 of 726
Case 3:25-cv-03698-SI    Document 100    Filed 05/14/25    Page 1 of 122

1  Stacey M. Leyton (SBN 203827)
   Barbara J. Chisholm (SBN 224656)
2  Danielle Leonard (SBN 218201)
   ALTSHULER BERZON LLP
3  177 Post Street, Suite 300
   San Francisco, CA 94108
4  Tel.: (415) 421-7151
5  sleyton@altber.com
   bchisholm@altber.com
6  dleonard@altber.com

7  Elena Goldstein (pro hac vice)
8  Skye Perryman (pro hac vice)
   Tsuki Hoshijima (pro hac vice)
9  DEMOCRACY FORWARD FOUNDATION
   P.O. Box 34553
10 Washington, D.C. 20043
   Tel.: (202) 448-9090
11 Fax: (202) 796-4426
12 egoldstein@democracyforward.org
   sperryman@democracyforward.org
13 thoshijima@democracyforward.org

14 *Attorneys for Plaintiffs*
15 [Additional counsel and affiliations listed on signature page]

16                 UNITED STATES DISTRICT COURT

17          FOR THE NORTHERN DISTRICT OF CALIFORNIA

18                   SAN FRANCISCO DIVISION

19 | AMERICAN FEDERATION OF | Case No. 3:25-cv-03698-SI |
   | GOVERNMENT EMPLOYEES, AFL-CIO; | |
20 | AMERICAN FEDERATION OF STATE | **AMENDED COMPLAINT FOR** |
   | COUNTY AND MUNICIPAL EMPLOYEES, | **DECLARATORY AND INJUNCTIVE** |
21 | AFL-CIO; SERVICE EMPLOYEES | **RELIEF** |
   | INTERNATIONAL UNION, AFL-CIO; | |
22 | AFGE LOCAL 1122; AFGE LOCAL 1236; | |
   | AFGE LOCAL 2110; AFGE LOCAL 3172; | |
23 | SEIU LOCAL 521; SEIU LOCAL 1000; SEIU | |
   | LOCAL 1021; ALLIANCE FOR RETIRED | |
24 | AMERICANS; AMERICAN GEOPHYSICAL | |
   | UNION; AMERICAN PUBLIC HEALTH | |
25 | ASSOCIATION; CENTER FOR TAXPAYER | |
   | RIGHTS; COALITION TO PROTECT | |
26 | AMERICA'S NATIONAL PARKS; | |
   | COMMON DEFENSE CIVIC | |
27 | ENGAGEMENT; MAIN STREET | |
28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

ALLIANCE; NATURAL RESOURCES
DEFENSE COUNCIL, INC.; NORTHEAST
ORGANIC FARMING ASSOCIATION,
INC.; VOTEVETS ACTION FUND INC.;
WESTERN WATERSHEDS PROJECT;
COUNTY OF SANTA CLARA,
CALIFORNIA; CITY OF CHICAGO,
ILLINOIS; MARTIN LUTHER KING, JR.
COUNTY, WASHINGTON; HARRIS
COUNTY, TEXAS; CITY OF BALTIMORE,
MARYLAND; and CITY AND COUNTY OF
SAN FRANCISCO, CALIFORNIA

      Plaintiffs,

   v.

DONALD J. TRUMP, in his official capacity
as President of the United States;
UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official capacity
as Director of U.S. Office of Management and
Budget;
UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT;
CHARLES EZELL, in his official capacity as
Acting Director of the U.S. Office of Personnel
Management;
DEPARTMENT OF GOVERNMENT
EFFICIENCY;
ELON MUSK, in his official capacity as the
actual head of the Department of Government
Efficiency;
AMY GLEASON, in her official capacity as
the titular Acting Administrator of the
Department of Government Efficiency;
UNITED STATES DEPARTMENT OF
AGRICULTURE;
BROOKE ROLLINS, in her official capacity
as Secretary of the U.S. Department of
Agriculture;
UNITED STATES DEPARTMENT OF
COMMERCE;
HOWARD LUTNICK, in his official capacity
as Secretary of the U.S. Department of
Commerce;
UNITED STATES DEPARTMENT OF

DEFENSE;
PETE HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
ENERGY;
CHRIS WRIGHT, in his official capacity as
Secretary of the U.S. Department of Energy;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY JR., in his official
capacity as Secretary of the U.S. Department
of Health and Human Services;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security;
UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT;
SCOTT TURNER, in his official capacity as
Secretary of the U.S. Department of Housing
and Urban Development;
UNITED STATES DEPARTMENT OF
JUSTICE;
PAM BONDI, in her official capacity as
Attorney General of the U.S. Department of
Justice;
UNITED STATES DEPARTMENT OF THE
INTERIOR;
DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the
Interior;
UNITED STATES DEPARTMENT OF
LABOR;
LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of the U.S. Department
of Labor;
UNITED STATES DEPARTMENT OF
STATE;
MARCO RUBIO, in his official capacity as
Secretary of the U.S. Department of State;
UNITED STATES DEPARTMENT OF
TREASURY;
SCOTT BESSENT, in his official capacity as
Secretary of U.S. Department of Treasury;
UNITED STATES DEPARTMENT OF
TRANSPORTATION;
SEAN DUFFY, in his official capacity as

1    Secretary for the U.S. Department of
     Transportation;
2    UNITED STATES DEPARTMENT OF
     VETERANS AFFAIRS;
3    DOUG COLLINS, in his official capacity as
     Secretary of Veterans Affairs;
4    AMERICORPS (a.k.a. the CORPORATION
     FOR NATIONAL AND COMMUNITY
5    SERVICE);
     JENNIFER BASTRESS TAHMASEBI, in her
6    official capacity as Interim Agency Head of
     AmeriCorps;
7    UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY;
8    LEE ZELDIN, in his official capacity as
9    Administrator of U.S. Environmental
     Protection Agency;
10   UNITED STATES GENERAL SERVICES
     ADMINISTRATION;
11   STEPHEN EHIKIAN, in his official capacity
12   as Acting Administrator for U.S. General
     Services Administration;
13   NATIONAL LABOR RELATIONS BOARD;
     MARVIN KAPLAN, in his official capacity as
14   Chairman of the National Labor Relations
15   Board;
     WILLIAM COWEN, in his official capacity as
16   the Acting General Counsel of the National
17   Labor Relations Board;
     NATIONAL SCIENCE FOUNDATION;
18   BRIAN STONE, in his official capacity as
19   Acting Director of the National Science
     Foundation;
20   PEACE CORPS;
     ALLISON GREENE, in her official capacity
21   as Chief Executive Officer of the Peace Corps;
22   UNITED STATES SMALL BUSINESS
     ADMINISTRATION;
23   KELLY LOEFFLER, in her official capacity
     as Administrator of the U.S. Small Business
24   Administration;
     UNITED STATES SOCIAL SECURITY
25   ADMINISTRATION; and
     LELAND DUDEK, in his official capacity as
26   Acting Commissioner of the U.S. Social
27   Security Administration,

28          Defendants.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

**Add.430**

# INTRODUCTION

Plaintiffs are a coalition of labor organizations, non-profit groups, and local governments that file this amended complaint to hold unlawful and stop the unconstitutional dismantling of the federal government by the President of the United States on a scale unprecedented in this country's history and in clear excess of his authority.  Plaintiffs are the American Federation of Government Employees, AFL-CIO ("AFGE"); American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"); Service Employees International Union, AFL-CIO ("SEIU"); AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU Local 521; SEIU Local 1000; SEIU Local 1021; Alliance for Retired Americans; American Public Health Association; American Geophysical Union; Center for Taxpayer Rights; Coalition to Protect America's National Parks; Common Defense Civic Engagement; Main Street Alliance; Natural Resources Defense Council, Inc.; Northeast Organic Farming Association Inc.; VoteVets Action Fund Inc.; Western Watersheds Project; the County of Santa Clara, California; Martin Luther King, Jr. County, Washington; the City of Baltimore, Maryland; Harris County, Texas; the City of Chicago, Illinois; and the City and County of San Francisco, California (collectively, "Plaintiffs").

By way of Executive Order, President Donald J. Trump has ordered agencies across the entire federal government to engage in a "critical transformation of the Federal bureaucracy" for the purported purpose of "eliminating waste, bloat, and insularity," including by conducting "large-scale" Reductions in Force ("RIFs") to further the reorganization of the federal agencies—all without *any* Congressional authorization.  *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's ''Department of Government Efficiency'' Workforce Optimization Initiative).  Executive Order 14210, and the actions taken by the Administration to implement the President's order, usurp Congress's exclusive Article I legislative authority, exceed the President's Article II Executive or statutory authority, and therefore violate the Constitution's fundamental separation of powers principles.  Plaintiffs seek to declare these acts of the President unconstitutional, unlawful, and otherwise in excess of any constitutional or statutory authority; to hold unlawful and set aside the acts of agency defendants implementing his orders as unlawful and in violation of the

1    Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) and (D); and to enjoin this unconstitutional

2    reorganization of the federal government without legislative authority.  Plaintiffs therefore hereby

3    plead as follows:

4        1.        The President does not possess authority to reorganize, downsize, or otherwise

5    transform the agencies of the federal government, unless and until Congress authorizes such action.

6    Federal agencies are "creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595

7    U.S. 109, 117 (2022).  Since the founding of the nation, federal courts have recognized that the

8    federal agencies are not created by the President:  "To Congress under its legislative power is given

9    the establishment of offices … [and] the determination of their functions and jurisdiction." *Myers v.*

10    *United States*, 272 U.S. 52, 129 (1926).

11        2.        When the President takes for himself the legislative power of Congress to recreate

12    federal agencies in the manner *he* sees fit, he violates the Constitution.  *Youngstown Sheet & Tube Co.*

13    *v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to

14    see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.… And the

15    Constitution is neither silent nor equivocal about who shall make laws which the President is to

16    execute.").  And when the President does so across *every* federal agency, he threatens the very

17    constitutional foundation of this nation:  "There can be no liberty where the legislative and executive

18    powers are united in the same person." *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) (quoting

19    James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).  Thus, for nearly 100 years,

20    when Presidents have wanted to restructure the government by reorganizing both between and within

21    federal agencies, they have obtained Congressional authorization to do so.  *See* Cong. Rsch. Serv.,

22    RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (June 10,

23    2002).

24        3.        President Trump contends he was elected with a mandate to radically transform the

25    size and organization of the entire federal government.  Ignoring applicable constitutional law, he has

26    engaged in a campaign unprecedented in American history:  to eliminate entire federal agencies;

27    drastically reduce the number of employees, functions, programs, and offices at others; terminate

28

leases for government property; terminate government contracts; and sell off government property, all without Congressional authorization.  President Trump has called his plan to downsize and transform the federal government as he desires "The 'Manhattan Project' of our time."[1]

4.    As soon as President Trump took office, he immediately began his "large scale structural reform" project. *Id.*

5.    First, on January 20, 2025, he created the "Department of Government Efficiency" or "DOGE" out of a former information technology office and charged it with enacting an "18-month DOGE agenda" (which the Administration has never made public) and embedding a "DOGE Team" at every federal agency.  Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).  He also immediately ordered DOGE, along with the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM"), to create "a plan to reduce the size of the Federal Government's workforce."  The White House, *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).

6.    The President then proceeded to dismantle several government agencies, either eliminating their functions or transferring and subsuming them within other agencies.  Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Education); Exec. Order No. 14238, 90 Fed. Reg 13043 (Mar. 14, 2025) (seven agencies); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (four agencies); *see also* Exec. Order No. 14169, 90 Fed. Reg. 8619 (Foreign Aid) and Press Release, U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025) (USAID); *Nat'l Treasury Emps. Union v. Vought*, __ F. Supp. 3d __, No. 25-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) (CFPB).

7.    On February 11, 2025, President Trump issued the Executive Order 14210 that is the subject of this lawsuit.  Executive Order 14210 (hereinafter "Workforce Executive Order" or

---

[1] Statement by President-elect Donald J. Trump announcing Department of Government Efficiency, The American Presidency Project (Nov. 12, 2024):

> To drive this kind of drastic change, the Department of Government Efficiency ["DOGE"] will provide advice and guidance from outside of Government, and will partner with the White House and Office of Management & Budget to drive **large scale structural reform**, and create an entrepreneurial approach to Government never seen before.

Available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-that-elon-musk-and-vivek-ramaswamy (emphasis added).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          3

1    "Executive Order 14210") ordered all federal agencies to "commence[]" a **critical transformation**

2    **of the Federal bureaucracy**" for the purported purpose of "eliminating waste, bloat, and insularity."

3    Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (emphasis added), attached hereto as

4    Exhibit A.

5         8.    This Workforce Executive Order, in pertinent part, requires all federal agencies to

6    effectuate President Trump's vision for the radical transformation and downsizing of the federal

7    government by:  1) freezing agency hiring and allowing OMB and DOGE to control future hiring

8    government-wide; 2) commencing "large-scale reductions in force" ("RIFs") that serve the purpose

9    of stripping away agency functions, eliminating the offices and functions that the President chooses

10   to eliminate, and dramatically reducing staffing levels throughout the government; and 3) creating

11   corresponding "reorganization" plans reflecting these RIFs that also address whether the "agency or

12   any of its subcomponents should be eliminated or consolidated."  *Id*.

13        9.    The Workforce Executive Order does not simply suggest or encourage agencies to

14   exercise their own statutory authority to effectuate a government-wide reorganization: it orders them

15   to act according to the President's vision, *regardless* of that statutory authority.  The Workforce

16   Executive Order imposes the following requirements:

17        a.    Agencies are *required* to commence large-scale RIFs (irrespective of whether staffing
             reductions are necessary or even appropriate in light of agency functions, obligations,
18           and appropriations);

19        b.    Agencies are *required* to prioritize in RIFs any "agency initiatives, components, or
             operations that my Administration suspends or closes" (irrespective of statutory
20           requirements, obligations, or authority delegated to the agencies);
21

22        c.    Agencies are *required* to prioritize in RIFs levels of staffing equivalent to  government
             emergency shutdown levels (which have nothing to do with the staffing needed to
23           properly run fully appropriated agencies);

24        d.    Agencies are *required* to consider their own abolition, by addressing whether the
             agency or any subparts should be eliminated by the President (again, regardless of
25           statutory requirements, obligations, or authority delegated to the agencies);

26        e.    And finally, agencies are required to reorganize themselves by picking up and
             arranging the pieces that are left, following these large-scale reductions.
27

28   As the President made plain in the White House "Fact Sheet" that accompanied the Executive Order,

     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              4

1    the Executive Order furthers the President's goals of "reforming the federal workforce" and

2    "reducing the unnecessary footprint of government."[2]

3         10.    Again and again, the President has explained his plan to reorganize and reform the

4    *entire federal government*: "I got elected on the basis of making our government stronger and smaller,

5    because we have millions of people that — obviously, they're paying millions of people that

6    shouldn't be paid."  The White House, *Remarks by President Trump after Executive Order Signing*

7    (Feb. 18, 2025); *see also* The White House, *Remarks by President Donald J. Trump in Joint Address*

8    *to Congress* (Mar. 4, 2025) ("Americans have given us a mandate for bold and profound change.  For

9    nearly 100 years, the federal bureaucracy has grown until it has crushed our freedoms, ballooned our

10   deficits, and held back America's potential in every possible way.  The nation founded by pioneers

11   and risk-takers now drowns under millions and millions of pages of regulations and debt. … My

12   administration will reclaim power from this unaccountable bureaucracy, and we will restore true

13   democracy to America again."); The White House, *Fact Sheet: President Donald J. Trump Continues*

14   *the Reduction of the Federal Bureaucracy* (Mar. 14, 2025) ("President Trump has made reforming the

15   federal workforce a key priority for his second term.").

16        11.    At no point has Congress authorized President Trump's actions with respect to the

17   federal agencies that Congress created in an exercise of its Article I legislative authority, which the

18   Constitution grants to Congress, not to the President.  Unlike President Trump, nine Presidents on 16

19   occasions, across the political spectrum, have been granted authority by Congress to propose fast-

20   tracked legislation before reorganizing federal agencies:  Presidents Herbert Hoover, Franklin D.

21   Roosevelt, Harry S. Truman, Dwight D. Eisenhower, John F. Kennedy, Lyndon B. Johnson, Richard

22   Nixon, Jimmy Carter, and Ronald Reagan.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the*

23   *Executive Branch in the 20th Century: Landmark Commissions* (June 10, 2002); *see also* Paul Larkin,

24   Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Foundation Legal

25   Memorandum No. 210 (July 12, 2017).  Congress has given no such authority to President Trump.

26

27   _____

     [2] The White House, *Fact Sheet:  President Donald J. Trump Works to Remake America's Federal*
28   *Workforce* (Feb. 11, 2025).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    5

12.     President Trump should well understand the constitutional limits on his authority to reorganize the federal government, because he tried and failed to obtain that authorization during his first term in office.  *See* Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 13, 2017) (Comprehensive Plan for Reorganizing the Executive Branch) (ordering OMB to engage in public and agency processes to create a report with recommendations regarding reorganization); Off. of Mgmt. and Budget, *Delivering Government Solutions in the Twenty-First Century:  Reform Plan and Reorganization Recommendations* (June 2018).[3]  As the first-term OMB reorganization report expressly acknowledged, the plans "establish a vision for the Executive Branch that will require further exploration and partnership with the Congress."  *Id.* at 4.  Congress did not re-enact reorganization authority for this first-term plan.  President Trump determined that in his second term he would proceed without Congress.

13.     To serve his goals of radical transformation, the President has also enlisted three centralized agencies with government-wide reach.  OMB, OPM, and DOGE are implementing the President's unconstitutional and unlawful orders to federal agencies by way of requiring all those other agencies to present "Agency RIF and Reorganization Plans" ("ARRPs") for *approval*, according to parameters and requirements imposed on those agencies.  *See* Memorandum from Russel Vought, OMB Director, and Charles Ezell, OPM Acting Director, to Heads of Executive Departments and Agencies re: Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025) (attached hereto as Exhibit B).  DOGE, for its part, has been dictating to each agency the required cuts to staffing and programs, in the name of "fraud and waste":  "We are

---

[3] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.  In 2017, President Trump ordered notice and public comment on the creation of these reorganization recommendations:  "The Director shall publish a notice in the *Federal Register* inviting the public to suggest improvements in the organization and functioning of the executive branch and shall consider the suggestions when formulating the proposed plan described in subsection (c) of this section."  Exec. Order No. 13781, Sec. 2(b).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          6

1    cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste

2    and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[4]

3         14.    Through these agents, President Trump's orders, effectuated by OMB, OPM, and

4    DOGE, require federal agencies within weeks to create plans to reorganize themselves through

5    massive layoffs, for the purpose of President Trump's desire for "large scale structural reform" and

6    "reducing the size and scope of the federal government."  These orders require agencies to disregard

7    individual authorizing statutes, regulations, and terms that govern each agency, and the requirements

8    of reasoned decision-making.  To be clear, the agencies that are directed to submit ARRPs are *not* the

9    decision-makers here:  even if they are quickly creating and submitting these plans, they are required

10   to submit plans that follow the President's mandate, according to the President's designs, and that are

11   only effectuated by OMB and OPM (and DOGE) approval.

12        15.    Three months into this Administration, there can be no real doubt that impacted

13   federal agencies are acting according to the direction being given by President Trump through

14   DOGE, OMB, and OPM.  Courts throughout the country have rejected this Administration's attempts

15   to blame agencies for action that this Administration required them to take.  *See New York v. Trump*,

16   133 F.4th 51, 65 (1st Cir. 2025) (affirming District of Rhode Island's conclusion that "any

17   'suggest[ion] that the challenged federal funding freezes were purely the result of independent agency

18   decisions' was 'disingenuous.'"); *Am. Fed'n of Gov. Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 25-

19   cv-01780-WHA (N.D. Cal.), ECF Nos. 44, 45, 120, 132 (holding that OPM, not federal agencies,

20   unlawfully ordered the terminations of probationary employees government-wide); *Does v. Musk*, __

21   F. Supp. 3d __, No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025) (holding DOGE is directing

22   agency action); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-

23   239, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025) (rejecting contention that "countless federal

24   agencies ... suddenly began exercising their own discretion to suspend funding across the board at the

25

26   _____

27        [4] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle
     critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript
28   available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    7

exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").

16.      Moreover, President Trump himself has touted his ability to control agencies through DOGE, stating that, "after he signs an executive order, it gets 'passed on to [Musk] and his group' and 'they're all getting done.'" *Does v. Musk*, 2025 WL 840574 at *2 (quoting The White House, *Interview of President Trump and Elon Musk by Sean Hannity*, *"the Sean Hannity Show", (*Feb. 18, 2025)).[5]  The President explained further:

> [H]e would take that executive order that I'd signed, and he would have those people to whatever agency it was – "when are you doing it?  Get it done.  Get it done."  And some guy that maybe didn't want to do it, all of a sudden, he's signing – he just doesn't want to be bothered.

*Id.*; *see also* The White House, *Remarks by President Trump Before Cabinet Meeting*, (Feb. 26, 2025) (President Trump:  "We're cutting down government.  We're cutting down the size of government.  We have to.  We're bloated.  We're sloppy.  We have a lot of people that aren't doing their job").[6]

17.      Those who work for President Trump confirm that the President is controlling federal agencies according to his vision:

- The President's National Economic Council Director Kevin Hassett, White House Press Briefing (Feb. 20, 2025):
   I'm saying that *we're studying every agency and deciding who to let go and why*, and we're doing so very rationally with a lot of support from analysis. (Emphasis added.)[7]

- Elon Musk, who according to the President, is head of DOGE, told reporters on February 11, 2025 that "the people voted for major government reform and that's what

---

[5] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

[6] Available at: https://www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-before-cabinet-meeting/.

[7] The White House, *Press Briefing by Press Secretary Karoline Leavitt, Deputy Chief of Staff Stephen Miller, National Economic Council Director Kevin Hassett, and National Security Advisor Mike Waltz* (Feb. 20, 20250, available at: https://www.whitehouse.gov/remarks/2025/02/press-briefing-by-press-secretary-karoline-leavitt-deputy-chief-of-staff-stephen-miller-national-economic-council-director-kevin-hassett-and-national-security-advisor-mike-waltz/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                              8

people are going to get."[8]  Musk, again on March 27, 2025:  "Well, this is a revolution, and I think it might be the biggest revolution in government since the original revolution."[9]

18.    The Administration has largely not revealed the transformation and downsizing plans to the press, to the public (even in response to FOIA requests), in response to union information requests, or to Congress.  OMB and OPM required all federal agencies to submit the ARRPs in a two-stage approval process, by deadlines of March 13 and April 14, 2025.  The Administration has refused to make either the March 13 or April 14 version of the ARRPs public, claiming they are "pre-decisional" because they have not been approved by OMB, and that employees and the public will learn what these plans are only when the reorganization occurs and RIF notices come out:

> It's no secret the Trump Administration is dedicated to downsizing the federal bureaucracy and cutting waste, fraud, and abuse. This document is a pre-deliberative draft and does not accurately reflect final reduction in force plans…. When President Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will make those announcements to their respective workforces at the appropriate time.

Email from White House Principal Deputy Press Secretary Harrison Fields, as reported by the Washington Post.[10]

19.    What information Plaintiffs have painstakingly collected is gleaned from RIF notices that have been issued to date, press coverage of agency sources and leaked government documents, and statements by the President and agency heads describing general plans.  That information reveals that the Administration is actively implementing this unprecedented reorganization now.  The American people have a right to know what the President is doing to dismantle their federal government.

---

[8] Gov't Exec., *Trump orders agencies to plan for widespread layoffs and attrition-based hiring*, (Feb. 11, 2025), available at: https://www.govexec.com/workforce/2025/02/trump-orders-agencies-plan-widespread-layoffs-and-attrition-based-hiring/402938/.

[9] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics*  (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

[10] Washington Post, *Internal White House document details layoff plans across U.S. agencies* (March 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    9

20.     Details are emerging: in late March, pursuant to the mandate of Executive Order 14210, the Department of Health and Human Services ("HHS") began eliminating more than 10,000 positions throughout the Center for Disease Control ("CDC"), Food and Drug Administration ("FDA"), the National Institutes of Health ("NIH"), among other programs, throwing the medical, public health, and scientific community into utter chaos.[11] As of April 15, 2025, the IRS was slated to commence RIFs ultimately totaling 40% of its workforce, including over 50% of the tax enforcement staff (the very staff that *brings in revenue to the government*).[12] On April 22, 2025, the EPA began sending RIF notices to employees across its headquarters and regional offices.[13] Other agencies are right behind (*see infra* ¶¶189–256):

- The Department of Agriculture will eliminate at least 9,000 positions and entire regional offices and Research Stations within the Forest Service, taking staff down to at least 2019 levels;

- The Department of Energy will terminate 43% of its staff, eliminating offices and functions (including more than 500 positions at the Nuclear National Security Administration and eliminating the Office of Clean Energy Demonstrations entirely);

- The U.S. Environmental Protection Agency will reportedly lose 65% of its staff and effectively the entire Office of Research and Development (over 1,000 chemists, biologists, toxicologists and other scientists), among others;

- The Department of Housing and Urban Development is looking to cut approximately 51% of staff, eliminating and consolidating offices and functions;

- The Department of the Interior is going to engage in large-scale RIFs of positions and programs that are deemed not "critical to public safety" or not "linked to highest priority programs";

---

[11] *See* March 27, 2025 Press Release:  HHS Announces Transformation to Make America Healthy Again, available at: https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

[12] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends*, (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends/.  The IRS began RIFs with one office in March.  Gov't Exec., *IRS sends RIF notices as it begins widespread layoffs* (Apr. 4, 2025), available at: https://www.govexec.com/workforce/2025/04/irs-sends-rif-notices-it-begins-widespread-layoffs/404317/.  On April 23, 2025, the IRS confirmed the RIFs are ongoing.  Fed. News Network, *IRS layoff notices to employees delayed by 'glitches,'* (Apr. 23, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-layoff-notices-to-employees-delayed-by-glitches/.

[13] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          10

- The Department of Labor will eliminate the entire Office of Federal Contract Compliance Programs, among other cuts;

- The Small Business Administration will lay off 43% of staff;

- The Social Security Administration will engage in "agency-wide organizational restructuring that will include significant workforce reductions" that the agency describes as "massive reorganizations" eliminating over 5,000 positions and potentially closing up to 47 field offices; and

- The Department of Veterans' Affairs looks to roll back to at least 2019 staffing levels by cutting *over 83,000 jobs across the country*, in critical veterans' service roles.

The list goes on, because the President has directed nearly every agency to make massive cuts to its workforce in furtherance of a reorganization of the entire federal government. These are no minor reforms or policy judgments: this is an express attempt to "transform" the country's federal administrative structure.

21. By ordering and enacting the radical transformation President Trump contends he was elected to enact, President Trump has exceeded any constitutional authority granted to him in Article II or statutorily delegated by Congress and has thereby usurped Congress's Article I authority. President Trump's Executive Order 14210 requiring agencies to engage in these large-scale RIF and reorganization plans is therefore *ultra vires* and unconstitutional.

22. Moreover, neither OMB, OPM, nor DOGE have their own authority to order federal agencies to engage in large-scale RIFs or take any other action in service of government reorganization. The statutory authority defined by Congress does not give OMB or OPM any authority to *require* agencies to RIF employees, or to do so according to specific parameters, including because the President has decided to eliminate programs, functions, or positions, or take agencies down to shutdown levels of staff, or for either OMB or OPM to assert decision-making authority over the agencies. Nor does DOGE have any authority to require agencies to meet targets imposed by DOGE for reductions of staff and/or spending. By implementing the President's orders, OMB, OPM, and DOGE therefore are each exceeding their authority, engaging in arbitrary and capricious action, and ignoring proper procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                                    11

23.      Finally, the impacted agencies themselves do not have the authority to do the President's unconstitutional bidding, under the terms set by the President rather than by Congress. Over and over, newly appointed agency heads have explained that they are reorganizing, eliminating programs, and cutting thousands upon thousands of jobs, because the President directed them to and because DOGE told them how much and what to cut.  As Veterans Affairs Secretary Doug Collins stated on the "Fox & Friends" program in early March 2025, the VA's plan to cut 80,000 jobs pursuant to the President's Executive Order was not his idea:  "No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across government,…And that is a goal, that is our target."[14]  *See also, e.g.*, U.S. Dep't of Health & Hum. Servs., *Fact Sheet: HHS Transformation to Make America Healthy Again* (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order").[15]  By implementing the President's unconstitutional orders, effectuated by DOGE's, OMB's, and OPM's requirements, these agencies have acted and are acting not in accordance with law and are engaged in arbitrary and capricious action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

24.      The President's insistence on implementing this politically driven "mandate" comes at a nearly immeasurable cost to federal agencies, millions of public employees, state and local governments, and all those who depend on the services the agencies provide every day.  Plaintiffs stand together to name these harms at their source, pursue their right to judicial review, and stop actions that threaten the very foundations of our constitutional democracy.

25.      And so it falls upon this Court to play its Article III role in restraining the President's unconstitutional acts and the unlawful actions of the agencies that implement those directives. *Marbury v Madison*, 5 U.S. 137 (1803).  None of the actions at issue here are dedicated by the Constitution to the President and out of this Court's reach.  Plaintiffs call upon this Court to hold unlawful President Trump's unconstitutional reorganization and dismantling of the federal

---

[14] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.
[15] Available at: https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                12

1  government by and through Executive Order 14210, and to enjoin the actions of the agencies

2  implementing that unconstitutional presidential order.

3  **JURISDICTION AND VENUE**

4  26.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5  27.  Venue is appropriate in this district under 28 U.S.C. § 1391(e).  Plaintiffs AFGE,

6  AFGE Local 1122, AFGE Local 1236, AFGE Local 2110, AFGE Local 3172, AFSCME, SEIU, SEIU

7  Local 521, SEIU Local 1000, and SEIU Local 1021 represent federal, state, and/or local government

8  employees whose place of employment is within the Northern District of California, and Plaintiffs the

9  City and County of San Francisco and the County of Santa Clara are located within the Northern

10  District of California.

11  28.  Intradistrict assignment is appropriate in the San Francisco/Oakland division of this

12  Court.

13  **PARTIES**

14  29.  Plaintiff AFGE is a labor organization and unincorporated association headquartered at

15  80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents

16  approximately 800,000 federal civilian employees through its affiliated councils and locals at 192

17  Departments, agencies and sub-agencies of the federal government, and in every state in the United

18  States.

19  30.  Plaintiff AFSCME is a labor organization and unincorporated association

20  headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union

21  of public employees in the United States, with 1.4 million members organized into approximately

22  3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico.

23  AFSCME members include nurses, corrections officers, child care providers, emergency medical

24  technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with

25  one thing in common:  a dedication to making our communities stronger, healthier, and safer.

26  AFSCME represents federal civilian employees in numerous agencies and departments across the

27

28

1    federal government, and state and local government employees who rely on the services of the

2    federal government every day.

3        31.    Plaintiff SEIU is a labor organization of approximately two million working people

4    united by the belief in the dignity and worth of workers and the services they provide.  SEIU's

5    members work in healthcare, the public sector, and property services.  SEIU has more than 150

6    affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800

7    Massachusetts Ave., N.W., Washington, D.C. 20036.  SEIU members include physicians, technicians,

8    long-term care workers, janitors, security officers, airport workers, librarians, childcare workers,

9    educators, fast food workers, employees who work for city, county, and federal governments, and

10    many more.  SEIU, together with its local affiliates, represent approximately 80,000 federal sector

11    employees in the United States, including nurses, doctors, other healthcare workers, police officers,

12    firefighters, first responders, office workers, scientists, engineers, analysts, maintenance workers, and

13    more.  SEIU federal sector members provide a broad swath of services and bring a substantial amount

14    of expertise to numerous agencies across the federal government.  SEIU also represents about

15    785,000 care providers and over 700,000 non-federal public sector employees employed by states,

16    counties, cities, and school boards across the country, which rely on federal agencies in order to

17    continue providing essential services to their communities.  SEIU's members also include

18    approximately 6,000 workers employed by contractors to provide cleaning, security, maintenance,

19    and other services at federally owned and federally leased sites run by numerous federal agencies.

20        32.    Plaintiff AFGE Local 1122 is a labor organization and unincorporated association

21    headquartered in Richmond, California.  AFGE Local 1122 represents approximately 600 employees

22    at a Social Security Administration Western Program Service Center in Richmond, California, in

23    addition to other units within SSA's San Francisco region.  Those employees work in positions

24    including Claims Specialists, Benefits Authorizers, and other clerical staff.

25        33.    Plaintiff AFGE Local 1236 is a labor organization and unincorporated association

26    headquartered in San Francisco, California.  AFGE Local 1236 represents approximately 74 attorney-

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              14

advisors at Environmental Protection Agency Region 9 Headquarters in San Francisco, California, and EPA's National Center for Radiation Field Operations in Las Vegas, Nevada.

34.     Plaintiff AFGE Local 2110 is a labor organization and unincorporated association headquartered in Palo Alto, California.  AFGE Local 2110 represents approximately 4,000 employees at the Department of Veterans' Affairs Palo Alto Health Care System, including its Menlo Park and Livermore Divisions, and at several Community-Based Outpatient Clinics in Fremont, San José, Monterey, and Capitola.  Those employees work as doctors, nurses, emergency medical services personnel, food service workers, custodial staff, and administrative staff.

35.     Plaintiff AFGE Local 3172 is a labor organization and unincorporated association headquartered in Pacifica, California.  AFGE Local 3172 represents approximately 1,600 employees at SSA field offices in California and Nevada.  Those employees work in positions including Claims Services Representatives, Claims Specialists, Technical Experts, and other administrative and facilities staff.

36.     Plaintiff SEIU Local 521 is a labor organization and unincorporated association headquartered in San José, California.  SEIU Local 521 represents over 72,000 members who work for cities, counties, public schools, public offices of education, public hospital districts, transit authorities, federally qualified healthcare clinics, private non-profits, and Head Start child care agencies in the state of California, and who operate family childcare provider services.  SEIU Local 521's members live and work throughout the state, including in the counties of San Mateo, Santa Clara, Santa Cruz, Monterey, and San Benito.  The members represented by SEIU Local 521 work in nearly most classifications in county and public district hospitals, social services agencies, and in Head Start agencies and family provider childcare settings.

37.     Plaintiff SEIU Local 1000 is a labor organization and unincorporated association headquartered in Sacramento and has a Coastal & Central Representation office located at 436 14th Street, Suite 200, in Oakland, California.  SEIU Local 1000 represents approximately 96,000 employees who work in the California state government.  Those employees live and work throughout the State, including in San Francisco, Oakland, and Sacramento.  The employees represented by

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              15

**Add.445**

1    SEIU Local 1000 work in a wide range of positions across the state government, including as office

2    assistants, secretaries, data entry staff, technical assistants, information technology analysts,

3    accounting officers, auditors, and departmental analysts.

4         38.    Plaintiff SEIU Local 1021 is a labor organization and unincorporated association

5    headquartered in Oakland, California. SEIU Local 1021 represents approximately 70,000 members

6    who work for cities, counties, public schools, public hospital districts, transit authorities, federally

7    qualified healthcare clinics, private non-profits, private higher education institutions, and Head Start

8    child care agencies in the state of California. SEIU Local 1021's members live and work throughout

9    the state, including in the counties of Alameda, Contra Costa, Del Norte, Humboldt, Marin,

10   Mendocino, Napa, San Francisco, and Sonoma. The members represented by SEIU Local 1021 work

11   in most classifications in county and public district hospitals, social services agencies, and in Head

12   Start agencies.

13        39.    Plaintiff Alliance for Retired Americans ("ARA" or the "Alliance") is a grassroots

14   organization with 4.4 million retiree members. Founded by the AFL-CIO Executive Council in 2001,

15   the Alliance has 40 state alliances and members in every state, including 950,000 members—nearly

16   300,000 of whom are retirees—in California. The Alliance's retiree members are from all walks of

17   life. They are former teachers, industrial workers, state and federal government workers,

18   construction workers, and community leaders united in the belief that every American deserves a

19   secure and dignified retirement after a lifetime of hard work.

20        40.    Plaintiff American Geophysical Union ("AGU") is a 501(c)(3) membership

21   association for Earth and space scientists. The organization, founded in 1919, pursues a mission "to

22   support and inspire a global community of individuals and organizations interested in advancing

23   discovery in Earth and space sciences and its benefit for humanity and the environment." AGU has

24   more than 42,000 members worldwide, with 29,000 residing in the U.S., of whom more than 4,000

25   are in California; approximately 8,400 of those members work in the federal government, 28,000 are

26   university researchers, and 2,000 are scientists at nonprofit organizations. In addition to traditional

27   career support provided by an association, AGU publishes a portfolio of 24 high-impact scholarly

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    16

**Add.446**

1    journals and convenes regular scientific meetings, including its Annual Meeting, which had more

2    than 30,000 attendees in 2024.

3        41.    Plaintiff the American Public Health Association ("APHA") is a non-partisan, non-

4    profit organization that champions the health of all people and all communities; strengthens the

5    profession of public health; shares the latest research and information; promotes best practices; and

6    advocates for public health issues and policies grounded in scientific research.  APHA represents

7    more than 23,000 individual members who reside in all 50 states, including 2,100 individual

8    members in California, and also has 52 state and regional affiliates.  APHA's membership also

9    includes organizational members, including groups interested in health, state and local health

10   departments, and health-related businesses.  APHA is the only organization that combines a 150-year

11   perspective, a broad-based member community, and the ability to influence federal policy to improve

12   the public's health.  APHA's membership additionally includes more than 250 California students in

13   university public health schools or related programs, and over 50 California agency or organizational

14   members, including the California Department of Public Health, Contra Costa County Public Health,

15   Marin County Public Health, and the Los Angeles Trust for Children's Health.

16       42.    Plaintiff Center for Taxpayer Rights is a nonpartisan nonprofit organization dedicated

17   to furthering taxpayers' awareness of and access to taxpayer rights.  The Center accomplishes its

18   mission, in part, by educating the public and government officials about the role taxpayer rights play

19   in promoting compliance and trust in systems of taxation.  The Center provides technical support for

20   the establishment and expansion of taxpayer advocate and ombuds offices as independent voices of

21   taxpayer rights and systemic change.  The Center develops materials to educate the public about the

22   function of taxes and taxpayer rights in civil society.  The organization also develops training

23   programs for tax administration officials as a component of leadership training.  Through the Center's

24   Low Income Taxpayer Clinic ("LITC"), the organization provides free representation to low-income

25   taxpayers in disputes with the IRS and in the federal courts.  All of the clients of the Center's LITC

26   are low-income taxpayers.  The Center also operates LITC Connect, a nationwide network of Low-

27   Income Taxpayer Clinics and volunteer attorneys, certified public accountants, and enrolled

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    17

1    agents that matches LITCs with tax professionals who can provide pro bono representation to low-

2    income taxpayers and support for specific issues.  The Center, through LITC Connect, provides

3    training when needed to LITC staff and tax professionals supporting LITCs in serving low-income

4    taxpayers and hosts weekly calls with LITCs who are LITC Connect members.  In 2023, LITCs, most

5    of whom are members of LITC Connect and the weekly calls, represented nearly 20,000 taxpayers

6    nationwide, educated over 140,000 taxpayers and service providers about their rights and

7    responsibilities before the IRS, secured over $10 million in tax refunds, and decreased or corrected

8    over $41 million in tax liabilities.

9           43.    Plaintiff Coalition to Protect America's National Parks ("Parks Coalition") is a non-

10   profit organization made up of over 4,000 members, all of whom are current, former, and retired

11   employees and volunteers of the National Park Service.  Together, they have accumulated over

12   50,000 years of experience caring for America's most valuable natural and cultural resources.  The

13   Coalition's goal is to support the preservation and protection of the National Park System and the

14   mission-related programs of the National Park Service ("NPS") to ensure the survival of the park

15   system for generations to come.  The Coalition's members are regular and avid users of the National

16   Park System and NPS programs, as well as the national forests and other public lands, for recreation

17   and conservation activities.

18          44.    Plaintiff Common Defense Civic Engagement ("Common Defense") is a grassroots

19   membership organization of progressive veterans, military families, and civilian supporters standing

20   up for our communities against the rising tide of racism, hate, and violence.  Common Defense

21   invests in the leadership of its members through training and deployment in campaigns that connect

22   directly to their history of service, including voting rights, climate justice, and anti-militarism.

23   Approximately 33,187 of Common Defense's members live in California, including approximately

24   2,000 veterans.

25          45.    Plaintiff Main Street Alliance ("MSA") is a national network of small businesses, with

26   approximately 30,000 members throughout the United States.  MSA helps small business owners

27   realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      18

**Add.448**

1    through organizing, research, and policy advocacy.  MSA also seeks to amplify the voices of its small

2    business membership by sharing their experiences with the aim of creating an economy where all

3    small business owners have an equal opportunity to succeed.  MSA is nonpartisan and is a Section

4    501(c)(3) organization.  MSA has approximately 1,410 small business members in California,

5    including more than 70 small businesses in Alameda, Santa Clara, San Francisco, Sonoma, and

6    Contra Costa Counties.

7            46.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-profit

8    environmental and public health membership organization that works to ensure the rights of all

9    people to clean air, clean water, and healthy communities.  NRDC has many hundreds of thousands

10    of members throughout the United States.  NRDC engages in research, policy analysis, advocacy,

11    public education, and litigation to protect public health and the environment.  As part of its work,

12    NRDC petitions federal agencies for rulemaking and other actions to protect the environment and

13    human health, comments on proposed regulations issued by federal agencies, researches and informs

14    its members about important environmental and public health issues, and publishes scientific papers

15    and advocacy briefs to inform the scientific community, policymakers, and the public.

16            47.    Plaintiff Northeast Organic Farming Association Inc. ("NOFA") is a non-profit

17    organization of over 5,000 farmers, farmworkers, gardeners, landscape professionals, and consumers

18    working to promote healthy food, organic farming practices, and a cleaner environment.  NOFA is

19    comprised of seven state-chapters:  Connecticut, Massachusetts, New Hampshire, New Jersey, New

20    York, Rhode Island, and Vermont.  Each of these organizations offers educational conferences,

21    workshops, farm tours, and printed materials to educate farmers, gardeners, consumers, and land care

22    professionals on organic farming.  NOFA also publishes a quarterly newspaper, *The Natural Farmer*,

23    that provides features on organic farming techniques, certification issues, organic market conditions,

24    and environmental developments that may impact farmers and growers; administers the Organic

25    Land Care program, which trains landscape professionals and others on the principles and practices

26    of organic land care, as laid out by the *NOFA Standards for Organic Land Care*; runs a professional

27    accreditation program; provides advice, support and cross-credentialing to partner institutions

28    AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              19

1      engaged in sustainable landscape education; and educates the public about the importance of using

2      standards-based organic landscaping services.

3          48.    Plaintiff VoteVets Action Fund Inc. ("VoteVets") is a non-partisan, non-profit

4      organization incorporated under the laws of the District of Columbia.  Its purpose is to lift up the

5      voices of veterans on matters of national security, veterans' care, and everyday issues that affect the

6      lives of those who served as well as their families including foreign policy, veterans' unemployment,

7      robust investment in care for veterans, energy security, protecting the rights of those who serve, and

8      upholding the Constitution and democracy that every military member swore to uphold and protect.

9      VoteVets has nearly two million supporters across the country, in all fifty states, with whom it

10     regularly communicates about issues affecting veterans, including the operations, programs, and

11     services available through the VA.  Approximately 417,000 of VoteVets' supporters live in California,

12     including 131,000 in Northern California.

13         49.    Plaintiff Western Watersheds Project ("WWP") is a non-profit environmental

14     conservation group that works to influence and improve public lands management throughout the

15     western United States to protect native species and conserve and restore the habitats they depend

16     on.  WWP's primary focus is on the negative impacts of livestock grazing, including harm to

17     ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless

18     areas, Wilderness Study Areas, and designated Wilderness.  WWP was founded in 1993 and has more

19     than 14,000 members and supporters and field offices in Colorado, Utah, Idaho, Montana, Wyoming,

20     Arizona, Nevada, and Oregon.  WWP covers over 250 million acres of public land spanning all of the

21     western states.

22         50.    The Plaintiffs identified in the preceding paragraphs are all proceeding on their own

23     behalf as an organization, including based on injury to their mission and organizational activities, as

24     well as on a representative or associational basis, based on injury to their members.

25         51.    Plaintiff County of Santa Clara, California ("Santa Clara") is a charter county and

26     political subdivision of the State of California.

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          20

**Add.450**

52.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

53.     Plaintiff the Mayor and City Council of Baltimore ("Baltimore") is the corporate identity of the Plaintiff City of Baltimore, Maryland, a home-rule jurisdiction created by the Baltimore City Charter as an entity that may sue and be sued.

54.     Plaintiff Harris County, Texas ("Harris County") is a local government entity in the state of Texas.

55.     Plaintiff the City of Chicago, Illinois ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

56.     Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city and county.

57.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

58.     Defendant Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.  OMB is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

59.     Defendant Russell Vought is the Director of OMB and is sued in his official capacity.

60.     Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

61.     Defendant Charles Ezell has been the Acting Director of OPM since January 20, 2025. He is sued in his official capacity.

62.     Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C.  DOGE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

63.     Defendant Elon Musk is the actual head of DOGE and is sued in his official capacity.

64.     Defendant Amy Gleason is the titular Acting Administrator of DOGE and is sued in her official capacity.

65.     The following federal departments and agencies, including their agency heads, may be referred to collectively herein as "Federal Agency Defendants."  For purposes of this Amended Complaint, the Federal Agency Defendants do not include OMB, OPM, or DOGE, which will be specifically identified.  The Federal Agency Defendants are sued for their own unlawful conduct in Claims Six and Seven below, and also pursuant to Rule 19 for purposes of effectuating complete relief as to Claims One through Five against the President, OMB, OPM, DOGE and their agency heads.

66.     Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

67.     Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

68.     Defendant United States Department of Commerce ("Commerce") is a federal agency headquartered in Washington, D.C.  Commerce is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

69.     Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

70.     Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C.  Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

71.     Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity.

72.     Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C.  Energy is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

73.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

74.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C.  HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

75.     Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.

76.     Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

77.     Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity.

78.     Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C.  HUD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

79.     Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity.

80.     Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.  DOJ is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

81.     Defendant Pam Bondi is the Attorney General and is sued in her official capacity.

82.     Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C.  Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

83.     Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

84.     Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C.  DOL is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

85.     Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    23

**Add.453**

86.     Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

87.     Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.

88.     Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C.  Treasury is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

89.     Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.

90.     Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C.  DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

91.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.

92.     Defendant United States Department of Veterans Affairs ("the VA") is a federal agency headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

93.     Defendant Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity.

94.     Defendant AmeriCorps (a.k.a. the Corporation for National and Community Service) is a federal agency headquartered in Washington, D.C.  AmeriCorps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

95.     Defendant Jennifer Bastress Tahmasebi is the Interim Agency Head of AmeriCorps and is sued in her official capacity.

96.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    24

97.     Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity.

98.     Defendant United States General Services Administration ("GSA") is a federal agency headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

99.     Defendant Stephen Ehikian is the GSA Acting Administrator and is sued in his official capacity.

100.    Defendant National Labor Relations Board ("NLRB") is a federal agency headquartered in Washington, D.C.  NLRB is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

101.    Defendant Marvin Kaplan is the Chairman of the NLRB and is sued in his official capacity.

102.    Defendant William Cowen is the Acting General Counsel of the NLRB and is sued in his official capacity.

103.    Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia.  NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

104.    Defendant Brian Stone is the Acting Director of the NSF and is sued in his official capacity.

105.    Defendant Peace Corps is a federal agency headquartered in Washington, D.C.  Peace Corps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

106.    Defendant Allison Greene is the Chief Executive Officer of the Peace Corps and is sued in her official capacity.

107.    Defendant United States Small Business Administration ("SBA") is a federal agency headquartered in Washington, D.C.  SBA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

108.    Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official capacity.

109.    Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

110.    Defendant Leland Dudek is the Acting Commissioner of the SSA and is sued in his official capacity.

## FACTUAL ALLEGATIONS

I.    **The Constitution's Distribution of Legislative and Executive Authority With Respect to the Agencies of the Federal Government**

111.    Article I vests in Congress the legislative power to create the departments, agencies, and offices within the executive branch; to define their duties; and to fund their activities.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); *INS v. Chadha*, 462 U.S. 919 (1983).  Thus, "[t]o Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18 ("The Congress shall have Power To…make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.").  Congress thus "control[s]" the very "existence of executive offices."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

112.    Among Congress's very first acts were "establishing executive departments and staffs."  David Engdahl, Necessary and Proper Clause, *The Heritage Guide to the Constitution*, The Heritage Foundation.[16]  When the First Congress created the Treasury Department, for example, it established therein "distinct offices—Secretary, Comptroller, Auditor, Treasurer and Register—and their duties."  Harvey C. Mansfield, *Reorganizing the Federal Executive Branch: The Limits of Institutionalization*, 35 L. & Contemporary Problems 462, 463 (1970).

---

[16] Available at: http://www.heritage.org/constitution/#!/articles/1/essays/59/necessary-and-proper-clause.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                26

113.     Those executive agencies of the federal government are identified in various statutes, including 5 U.S.C. §§ 101 (listing Cabinet-level departments), 104 (independent establishments), and 105 (defining "agency" to include, inter alia, Cabinet departments and independent establishments). Each agency has its own authorizing statutes that govern its administration, including statutory provisions that authorize one or more individuals to act as the head of the agency. *See e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture/Forest Service); 38 U.S.C. §§ 301, 303 (VA); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C §§ 281, 282 (NIH); 42 U.S.C. § 7131 (Energy).

114.     The President's Constitutional authority is set forth in Article II.  U.S. Const. art. II § 1, cl. 1. ("The executive Power shall be vested in a President of the United States of America.").  The President has no constitutional legislative authority.  *INS v. Chadha*, 462 U.S. 919, 951, 956–59 (1983); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952).  Thus, the President has no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).  The declared purpose of separating and dividing the powers of government was to "diffuse[] power the better to secure liberty."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'...."  The Federalist No. 47, p. 325 (J. Cooke ed. 1961).").

115.     The Article II "Take Care Clause" requires that "[the President] shall take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Take Care Clause "refutes the idea that [the President] is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587 (1952).

116.     And yet, the President does not execute the laws alone:  "He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).  "To aid him in the

1    performance of these duties, he is authorized to appoint certain officers, who act by his authority and

2    in conformity with his orders." *Marbury v. Madison*, 5 U.S. 137, 166 (1803).

3        117.    The President's Constitutional authority with respect to those who assist him in taking

4    care that the law is faithfully executed is established in the Appointments Clause which reads, "The

5    President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint …

6    [the] Officers of the United States, whose Appointments are not herein otherwise provided for, and

7    which shall be established by Law."  U.S. Const. art. II, § 2, cl. 2.  That power extends to removal of

8    those appointed officers. *See Myers*, 272 U.S. at 135.

9        118.    This does not mean, however, that the President has carte blanche authority over

10   federal agencies.  The President may exercise Article II authority to create, reorganize, or abolish an

11   office that he established (such as the Executive Office of the President), but Article II does not

12   authorize the President to fundamentally reorganize the executive branch by, for example, ordering

13   government-wide terminations of federal employees, or restricting or abolishing the congressionally

14   authorized work of even a single agency that he did not establish. *Seila Law LLC v. Consumer Fin.*

15   *Prot. Bureau*, 591 U.S. 197, 217 (2020); *see also Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16,

16   2025 Application to Vacate the Order Issued by the U.S. District Court for the District of Columbia

17   and Request for an Immediate Administrative Stay), at *27 (U.S. Solicitor General conceding:

18   *"Agency heads…control hiring and firing decisions for subordinates*." (emphasis added)).

19       119.    "The President's power, if any, to issue [an] order must stem either from an act of

20   Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

21   585 (1952).  The President may, therefore, exercise only that legislative authority that Congress has

22   constitutionally delegated. *Id.* at 587.

23       120.    The President does not employ the millions of federal employees; the agencies do.  5

24   U.S.C. § 3101 ("General authority to employ":  "Each Executive agency, military department, and the

25   government of the District of Columbia may employ such number of employees of the various

26   classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.").

27   Thus, Congress has largely delegated authority, particularly for employment decisions, to the heads of

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    28

**Add.458**

the federal agencies, not to the President. *Id.*; *see also, e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS: "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.").

121.    Congress has never delegated corresponding authority to the President to make the employment decision to lay off federal employees. Instead, Congress has delegated to the President only rule-making authority to issue government-wide regulations consistent with merit-systems principles required by Congress. *E.g.*, 5 U.S.C. § 2301 (delegating to President rule-making authority "necessary to ensure that personnel management is based on and embodies the merit system principles."); *id.* § 3301 (regulations for the efficiency of hiring); *id.* § 3302 (authority to create excepted service from the usual competitive requirements). Likewise, to the extent that the authority to engage in reductions-in-force is grounded in statute, that statute only delegates the authority to OPM (not the President) and only to make government-wide rules for the "order of retention," not to make the decisions. 5 U.S.C. § 3502.

122.    Nor has Congress delegated to the President the authority to transfer or excise specific programs, functions, or offices that Congress established and placed within a specific agency's statutory authority or discretion. Such a delegation would come dangerously close to the line-item veto struck down as unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998). Many of President Trump's recent actions effectively assume that line-item veto power, namely the power to excise programs that do not fall within the President's desired vision.

123.    Finally, Congress has not delegated to President Trump the broader authority to impose his transformation on the federal government. When Congress has wanted to grant reorganization authority to a President, it has done so; but that grant of authority that has been used by Presidents over the last century has *not* been reactivated for President Trump.

**Add.459**

## II.  The 100-Year History of Congressionally Authorized Government Reorganization

124.  Congress first delegated to a President the legislative authority to propose reforms to federal agencies in 1932.  Economy Act of 1932, Pub. L. 72-212, tit. VI, §§ 401-408, 47 Stat. 413. Since then, from time to time, Congress has delegated to presidential administrations limited authority to propose reorganizations of the executive branch under specified conditions, usually within specified time limits.  *See, e.g.*, Economy Act of 1933, Pub. L. 73-2, tit. VI, §§ 401-408, 47 Stat. 1517; Reorganization Act of 1939, Pub. L. 76-19, 53 Stat. 561; Reorganization Act of 1945, Pub. L. 79-263, 59 Stat. 613; Reorganization Act of 1949, Pub. L. 81-109, 63 Stat. 203, as amended by 67 Stat. 4 (1953), 69 Stat. 14 (1955), 71 Stat. 611 (1957), 75 Stat. 41 (1961), 78 Stat. 240 (1964), 79 Stat. 135 (1965), 83 Stat. 6 (1969), and 85 Stat. 574 (1971); and the Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (1977) (codified at 5 U.S.C. §§ 901-913 (1982)), as amended by 94 Stat. 329 (1980) and 98 Stat. 3192 (1984).

125.  Nine different Presidents on 16 occasions have been granted this authority to fast-track reorganizations of government, large and small, through the legislative process.  *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority:  History, Recent Initiatives, and Options for Congress* (Dec. 11, 2012) ("Presidents used the authority for a variety of purposes, from relatively minor reorganizations within individual agencies to the creation of large new organizations, including the Department of Health, Education, and Welfare; the Environmental Protection Agency; and the Federal Emergency Management Agency.").  Presidents have submitted many other proposals that have not been accepted:  "Between 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." *Id.*

126.  A House of Representatives committee report for the Reorganization Act of 1977 explained the history of such laws:  "Reorganizations, of course, may be made in the executive branch by legislation proposed by the President or originating within the Congress.  This reorganization authority [in the Reorganization Act], however, is a cooperative effort by the President

1   and the Congress to expedite needed reorganizations and to respond readily to changed

2   requirements." H.R. Rep. 95-105, 2, 1977 U.S.C.C.A.N. 41, 42.

3       127.   The most recent authorization, the Reorganization Act of 1977, as amended, expired

4   on December 31, 1984, and has not been renewed. 5 U.S.C. § 905(b). The expired law remains

5   codified, however, and is instructive. The law defines reorganization as including changes to the

6   structure of federal agencies effectuated by consolidating and transferring functions *between*

7   agencies, and *within* agencies:

> (2) the abolition of all or a part of the functions of an agency, except that no
> enforcement function or statutory program shall be abolished by the plan;
> …
> (4) the consolidation or coordination of part of an agency or the functions thereof with
> another part of the same agency or the functions thereof;
> …
> (6) the abolition of the whole or a part of an agency which agency or part does not have,
> or on the taking effect of the reorganization plan will not have, any functions.

5 U.S.C. § 903(a).

14      128.   In that same law, Congress imposed requirements on the President, first requiring the

15  President to transmit any reorganization plan to Congress, and then that the President explain how

16  any changes to federal agencies would comport with statutory requirements and congressionally

17  authorized funding levels to facilitate Congress's consideration of the reforms reflected in such a

18  plan:

> In his message transmitting a reorganization plan, the President shall specify with
> respect to each abolition of a function included in the plan the statutory authority for
> the exercise of the function.
>
> The message shall also estimate any reduction or increase in expenditures (itemized so
> far as practicable), and describe any improvements in management, delivery of
> Federal services, execution of the laws, and increases in efficiency of Government
> operations, which it is expected will be realized as a result of the reorganizations
> included in the plan.
>
> In addition, the President's message shall include an implementation section which
> shall (1) describe in detail (A) the actions necessary or planned to complete the
> reorganization, (B) the anticipated nature and substance of any orders, directives, and
> other administrative and operational actions which are expected to be required for
> completing or implementing the reorganization, and (C) any preliminary actions which
> have been taken in the implementation process, and (2) contain a projected timetable

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                      31

**Add.461**

1          for completion of the implementation process.

2          The President shall also submit such further background or other information as the
3          Congress may require for its consideration of the plan.

4    5 U.S.C. § 503(b).

5          129.    On some occasions, Congress has denied presidential requests for reorganization

6    authority, as when President Barack Obama sought such authority in 2012. *See* S. 2129, 112th Cong.

7    (2012); H.R. 4409, 112th Cong. (2012). *See also Retooling Government for the 21st Century: The*

8    *President's Reorganization Plan and Reducing Duplication*: *Hearing Before the S. Comm. on*

9    *Homeland Sec. & Gov't Aff.*, 112th Cong. (2012) (S. Hrg. 112-531). In 2003, reorganization authority

10   for then-President Bush passed the House, but was defeated in the Senate. CRS Report R42852,

11   *supra*, at 32-33.

12         130.    Congress, exercising its Article I legislative authority, has also over the decades

13   rejected specific presidential reorganization plans presented through the regular legislative process.

14   These have included, for example, proposals to eliminate the Department of Education, *see, e.g.*, H.R.

15   714, 98th Cong. (1983) and H.R. 1510, 115th Cong. (2017); to merge the Department of Labor, the

16   Department of Commerce, and the Small Business Administration, *see, e.g.* S. 1116, 112th Cong.

17   (2011); and to consolidate parts of several agencies into a new Food Safety Administration. H.R.

18   609, 114th Cong. (2015); among others.

19         131.    At other times, Congress has authorized reorganizations via regular legislation, after

20   legislative debate and compromise by the people's representatives in Congress, such as when

21   Congress enacted the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135;

22   *Communication from the President of the United States: A Reorganization Plan for the Department of*

23   *Homeland Sec.*, 108th Cong. 16 (Jan. 7, 2003); Cong. Rsch. Serv., RL31493, *Homeland Security*

24   *Department of Organization and Management – Legislative Phase* (Feb. 25, 2003). Congress has

25   also sometimes delegated to the President limited reorganization authority with respect to specific

26   executive agencies, under specific conditions, and for specific periods of time. One such law, for

27   example, authorized a reorganization of the U.S. Agency for International Development ("USAID")

28   and related foreign affairs agencies in 1998. *See, e.g.,* Pub. L. 105-277, div. G, subdiv. A, § 1601,

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      32

Add.462

1    112 Stat. 2681-795 (1998) (codified at 22 U.S.C. § 6601).  Such laws typically set expiration dates

2    for the delegated authority:  that particular law, for example, prohibits presidential reorganization of

3    USAID after the effective date of the reorganization plan authorized in 1998.  22 U.S.C. § 6601(e).

4         132.    The long history of this reorganization authority legislation makes abundantly clear

5    that the power is legislative, rests with Congress, and is only delegated to the President when

6    Congress expressly decides to do that.

7    **III.    President Trump's First Unsuccessful Attempt at Government Reorganization**

8         133.    President Trump should be well aware that he does not possess the constitutional

9    authority to order reorganization of the government and that that is an authority that rests with

10   Congress, as evidenced by his experience during his first term.

11        134.    On March 13, 2017, during his first term, President Trump issued Executive Order

12   13781, which required the Director of OMB "to propose a plan to reorganize governmental functions

13   and eliminate unnecessary agencies ... , components of agencies, and agency programs."  Exec. Order

14   No. 13781, 82 Fed. Reg. 13959 (2017).  OMB's implementing memorandum created a process for

15   both agency and public input to contribute to a proposed plan.  Memorandum from Mick Mulvaney,

16   OMB Director, to Heads of Executive Departments and Agencies re: Comprehensive Plan for

17   Reforming the Federal Government and Reducing the Federal Civilian Workforce, M-17-22, at 2

18   (Apr. 12, 2017).[17]

19        135.    OMB released its comprehensive plan to the public on June 21, 2018.  OMB,

20   *Delivering Government Solutions in the Twenty-First Century:  Reform Plan and Reorganization*

21   *Recommendations* (June 2018) (hereinafter "2018 Reorganization Plan").[18]

22        136.    The 2018 Reorganization Plan listed 32 proposals and conceded that "significant

23   changes will require legislative action."  *Id.* at 4; *id.* at 21 (emphasizing the Administration's need for

24   "the support of the Congress,"); *id*. at 55 ("Fully and effectively achieving the end-state vision

25   _____

26   [17] Available at:
     https://web.archive.org/web/20170716192101/https://www.whitehouse.gov/sites/whitehouse.gov/
27   files/omb/memoranda/2017/M-17-22.pdf.
     [18] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-
28   Reorg-Plan.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    33

1    presented here would necessarily require a partnership with the Congress, including the granting of

2    statutory authorities as necessary."). The 2018 Plan committed that, in September 2018, OMB would

3    begin negotiations with Congress for legislative action. *Id*. at 6.

4         137.   In 2018, Rep. Jody Hice (R-GA) introduced a bill that would have resurrected 5

5    U.S.C. ch. 9 to give President Trump reorganization authority. *See* H.R.6787, 115th Congress (2017-

6    2018).[19] Senator Ron Johnson (R-WI) introduced a companion bill in the Senate. *See* S.3137,115th

7    Congress (2018).[20] The Senate bill cleared the committee following a hearing, but it was never

8    brought up for a vote in the Senate. The Senate's committee report does not appear to indicate (or

9    even suggest) that the Trump administration expressly requested authority, but OMB's deputy

10   director testified in support of Trump's reorganization plan at the committee hearing. *See Reforming*

11   *Government Act of 2018 Report of Comm. on Govt'l Aff. to Accompany S. 3137*, 115th Cong. 381

12   (2018).[21]

13        138.   In 2019, the Trump administration issued an update on the progress of the 2018 Plan.

14   Off. of Mgmt. & Budget, Exec. Off. of the President, *One Year [sic] Update: Reform Plan and*

15   *Reorganization Recommendations* (2019) (hereinafter "2019 Update").[22] The update noted that

16   "some proposals require action by Congress." *Id*. at 2. Along those lines, the update acknowledged

17   that "Congress has taken action to consider at least 10 of the proposals, via hearings, legislation, or

18   discussions with Members or staff." *Id*.

19        139.   Congress gave due consideration to the Trump administration's first-term

20   reorganization ambitions by convening numerous hearings before and after OMB publicly released

21   the 2018 Plan. *See, e.g.*, *FAA Reauthorization: Administration Perspectives: Hearing Before the S.*

22   *Comm. on Commerce, Science & Transp.*, 115th Cong. (June 7, 2017) (S. Hrg. 115-221);[23] *Agency*

23

---

24   [19] Available at: https://www.congress.gov/bill/115th-congress/house-bill/6787/subjects.

25   [20] Available at: https://www.congress.gov/bill/115th-congress/senate-bill/3137.

26   [21] Available at: https://www.congress.gov/115/crpt/srpt381/CRPT-115srpt381.pdf.

     [22] Available at:
27   https://web.archive.org/web/20200716100903/https://www.performance.gov/GovReform/Reform-
     and-Reorg-Plan-Update.pdf.

28   [23] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg29974/CHRG-115shrg29974.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                 34

1   *Approaches to Reorganization Examining OMB's Memorandum on the Federal Workforce: Hearing*

2   *Before S. Comm. on Homeland Sec. & Gov't Aff.*, 115th Cong. (June 15, 2017) (S. Hrg. 115-165);[24] *A*

3   *Review of the State Department Reauthorization Bill for Fiscal Year 2018 and the State Department*

4   *Reorganization Plans: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (July 17, 2017) (S.

5   Hrg. 115-704);[25] *Examining OMB's Memorandum on The Federal Workforce Part II: Expert Views*

6   *on OMB's Ongoing Government-Wide Reorganization: Hearing Before the S. Comm. on Homeland*

7   *Sec. & Gov't Aff.*, 115th Cong. (Sep. 13, 2017) (S. Hrg. 115-6177);[26] *Department of Energy:*

8   *Management and Priorities; Hearing Before the H. Comm. on Science, Space, & Tech.*, 115th Cong.

9   (Jan. 1, 2018) (Serial No. 115-45);[27] *Financing Overseas Development: The Administration's*

10   *Proposal: Hearing Before the H. Comm. on For. Rel.*, 115th Cong. (Apr. 11, 2018) (Serial No. 115-

11   119);[28] *Workforce for the 21st Century: Analyzing the President's Management Agenda: Hearing*

12   *Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. (May 16, 2018) (Serial No. 115-

13   96);[29] *USAID Resources and Redesign: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (June

14   20, 2018) (S. Hrg. 115-791);[30] *Examining the Administration's Government-Wide Reorganization*

15   *Plan: Hearing Before H. Comm. on Oversight & Gov't Reform*, 115th Cong. (June 27, 2018) (Serial

16   No. 115-88);[31] *Reviewing the Administration's Government Reorganization Proposal: Hearing Before*

17   *the S. Comm. on Homeland Sec. & Gov't Aff.,* 115th Cong. (July 18, 2018) (S. Hrg. 115-547);[32]

18   *Administration Reorganization and Modernization Proposals Related to the Department of Energy*

19

20

---

[24] Available at: https://www.govinfo.gov/content/pkg/CHRG-115shrg27394/pdf/CHRG-115shrg27394.pdf.

[25] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg38105/CHRG-115shrg38105.pdf.

[26] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg28405/CHRG-115shrg28405.pdf.

[27] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg28932/CHRG-115hhrg28932.pdf.

[28] Available at: https://www.congress.gov/115/meeting/house/108115/documents/HHRG-115-FA00-Transcript-20180411.pdf.

[29] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31422/CHRG-115hhrg31422.pdf.

[30] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg40341/CHRG-115shrg40341.pdf.

[31] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31276/CHRG-115hhrg31276.pdf.

[32] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg34573/CHRG-115shrg34573.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI      35

1   *and the Department of the Interior: Hearing Before S. Comm. on Energy and Nat'l Resources*, 115th

2   Cong. (July 19, 2018) (S. Hrg. 115-524);[33] *The Challenges and Opportunities of the Proposed*

3   *Government Reorganization on OPM and GSA: Hearing Before the S. Comm. on Homeland Sec. &*

4   *Gov't Aff.* (July 26, 2018) (S. Hrg. 115-451);[34] *Oversight Hearing on No Road Map, No Destination,*

5   *No Justification: The Implementation and Impacts of the Reorganization of the Department of the*

6   *Interior: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Apr. 30, 2019) (Serial No. 116-

7   13);[35] *The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on*

8   *Gov't Ops., H. Comm on Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26);[36]

9   *Document Production Status Update: OPM, FBI, and GSA: Hearing Before the Subcomm. on Gov't*

10  *Ops., H. Comm on Oversight & Reform*, 116th Cong. 42 (June 27, 2019);[37] *BLM Disorganization:*

11  *Examining the Proposed Reorganization and Relocation of the Bureau of Land Management*

12  *Headquarters to Grand Junction, Colorado: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong.

13  (Sep. 19, 2019) (Serial No. 116-21).[38]

14          140.    The Congressional Research Service aided Congress in its deliberations by preparing a

15  report, which discussed the 2018 Plan's 32 proposals and 3 significant subproposals.  Cong. Rsch.

16  Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide"*

17  *Proposals*, at 1 (July 25, 2018).[39]

18          141.    Congress largely did not support the proposed reforms.  *See The Administration's War*

19  *on a Merit Based Civil Service: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Gov't*

20

21  _____

    [33] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg30984/CHRG-115shrg30984.pdf.
22  [34] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg32987/CHRG-115shrg32987.pdf.
    [35] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg36257/CHRG-
23  116hhrg36257.pdf.
    [36] Available at: https://docs.house.gov/meetings/GO/GO24/20190521/109516/HMTG-116-GO24-
24  Transcript-20190521.pdf.
    [37] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37283/CHRG-
25  116hhrg37283.pdf.
    [38] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37679/CHRG-
26  116hhrg37679.pdf.
    [39]Available at:
27  https://www.everycrsreport.com/files/20180725_ZZZ82A53B606F807500_43464c0b3704bd6aa820
28  6aed6f1bc07c69cfcdfc.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                        36

1   *Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26); *see also* Fed. News Network,

2   *Congress not yet convinced of Trump administration's proposed OPM-GSA merger* (May 22, 2019)

3   ("Lawmakers on Tuesday afternoon expressed bipartisan concern and skepticism for the Trump

4   administration's proposed merger of the Office of Personnel Management with the General Services

5   Administration. And they weren't alone. The Government Accountability Office, OPM's inspector

6   general and a former agency director said the administration hasn't demonstrated enough evidence to

7   date to show the proposed OPM-GSA merger makes sense.");[40] Gov't Exec., *Omnibus Puts Kibosh*

8   *on White House Efforts to Unilaterally Reorganize Agencies, Shed Workers*. (Mar. 22, 2018);[41] Gov't

9   Exec., *Congress Begins Formally Blocking Trump's Government Reorganization Plan*. (Sep. 12,

10  2018).[42]

11  **IV.     President Trump's Second-Term Reorganization Without Congressional Authorization**

12       142.    Since Congress, as the representatives duly elected by the American people to the

13  legislative branch of government, may not support his reform proposals, President Trump has chosen

14  to proceed with his "Manhattan project of our time" without first obtaining Congressional

15  authorization—or even providing Congress with clear information about the unprecedented

16  reorganization he intends. And unlike during President Trump's first term, there has been absolutely

17  no public process by which the Administration's current proposals have been vetted. Instead, the

18  Administration is proceeding secretly, and by fiat.

19       143.    The President has acknowledged that he needs and does not have Congressional

20  authorization. The President responded "Yeah," when asked in a February 18, 2025 interview by TV

21  host Sean Hannity whether his Executive Order would "have to be codified into law" and "need the

22

23

24

25  [40] Available at: https://federalnewsnetwork.com/opm-reorganization/2019/05/congress-not-yet-
    convinced-of-trump-administrations-proposed-opm-gsa-merger/.
26  [41] Available at: https://www.govexec.com/management/2018/03/omnibus-puts-kibosh-white-house-
    efforts-unilaterally-reorganize-agencies-shed-workers/146894/.
27  [42] Available at: https://www.govexec.com/management/2018/09/congress-begins-formally-blocking-
    trumps-government-reorganization-plan/151218/.
28  AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    37

1    Republican Congress to follow up." The White House: *Interview of President Trump and Elon Musk*

2    *by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025).[43]

3          **A.**    **The Mandate to OMB, OPM, and DOGE to Reform and Downsize**

4          144.    On January 20, 2025, the President created DOGE to engage in his project of radically

5    transforming the size and scope of the federal government. Exec. Order No. 14158, 90 Fed. Reg.

6    8441 (Jan. 20, 2025) (Establishing and Implementing the President's "Department of Government

7    Efficiency"). That Order reorganized and renamed the U.S. Digital Service as DOGE and moved that

8    office from reporting to OMB within the Executive Office of the President to reporting directly to the

9    President's Chief of Staff. *Id.* The January 20 Order created two other structures: a "U.S. DOGE

10    Service Temporary Organization … headed by the [DOGE] Administrator and … dedicated to

11    advancing the President's 18-month DOGE agenda" and "DOGE Teams" embedded at each agency

12    and jointly appointed by DOGE and the agency head. *Id.* The Administration has never made public

13    the "18-month DOGE agenda" for the federal government. *Id.*

14          145.    On January 20, 2025, the President also issued a Presidential Memorandum imposing

15    a government-wide hiring freeze on all federal agencies, with limited exceptions. The White House:

16    *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[44] The President generally ordered: "this freeze

17    applies to all executive departments and agencies regardless of their sources of operational and

18    programmatic funding." *Id.* The President then ordered DOGE, OMB, and OPM to create a plan to

19    reduce the size of the federal government. *Id.* ("Within 90 days of the date of this memorandum, the

20    Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM

21    and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the

22    size of the Federal Government's workforce through efficiency improvements and attrition.").

23          146.    As other federal courts have found, individuals affiliated with DOGE, hired into the

24    federal government on a temporary basis, proceeded to embed within federal agencies and centralize

25    decision-making, with the part of DOGE based in the Executive Office of the President headed by

26

27    ―――――――――――――
[43] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

28    [44] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI          38

Elon Musk. *See, e.g.*, *Does v. Musk*, __ F. Supp. 3d __, No. 25-0462, 2025 WL 840574, at *1–4 (D. Md. Mar. 18, 2025); *New York v. Trump*, __ F. Supp. 3d __, No. 25-CV-01144, 2025 WL 573771, at *3–7 (S.D.N.Y. Feb. 21, 2025); *AFL-CIO v. Dep't of Lab.*, __F. Supp. 3d __, No. 25-339, 2025 WL 1129227, at *1–4 (D.D.C. Apr. 16, 2025).

147.    In a March 2025 interview, Elon Musk, on behalf of DOGE, explained the DOGE goals as follows:

> We want to reduce the spending by eliminating waste and fraud, reduce the spending by 15%, which seems really quite achievable.
> …
> We are cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding.[45]

148.    The President issued many other directives aimed at furthering the goals of transformation of the government and federal employment according to his vision, at each step enlisting the aid of OPM, OMB and/or DOGE to implement his directives, including:

- Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing) (OMB and OPM);

- Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 20, 2025) (Reforming the Federal Hiring Process and Restoring Merit to Government Service) (OMB, OPM, DOGE, working with "the Assistant to the President for Domestic Policy");

- Exec. Order No. 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025) (Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce) (OPM); and

- Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) (OMB).

In the President's own words:  "It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state."  Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's

---

[45] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      39

1    "Department of Government Efficiency" Deregulatory Initiative) (enlisting DOGE and OMB); *see*

2    *also* Exec. Order No. 14222, 90 Fed. Reg. 11095  (Feb. 26, 2025) (Implementing the President's

3    Department of Government Efficiency Cost Efficiency Initiative: enlisting DOGE in "a

4    transformation in Federal spending").

5            149.    The President also eliminated certain agencies with the following proclamation:

6            It is the policy of my Administration to dramatically reduce the size of the Federal
        Government, while increasing its accountability to the American people.  This order
7        commences a reduction in the elements of the Federal bureaucracy that the President
        has determined are unnecessary.  Reducing the size of the Federal Government will
8        minimize Government waste and abuse, reduce inflation, and promote American
        freedom and innovation.
9

10   Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the

11   Federal Bureaucracy) (enlisting OMB and OPM to eliminate the Presidio Trust; the Inter-American

12   Foundation; the United States African Development Foundation; and the United States Institute of

13   Peace).

14           150.    The President further enlisted OMB to "reduce the performance" of the following

15   agencies to "the minimum presence and function required by law":  the Federal Mediation and

16   Conciliation Service; the United States Agency for Global Media; the Woodrow Wilson International

17   Center for Scholars in the Smithsonian Institution; the Institute of Museum and Library Services; the

18   United States Interagency Council on Homelessness; the Community Development Financial

19   Institutions Fund; and the Minority Business Development Agency.  Exec. Order No. 14238, 90 Fed.

20   Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy).  The President

21   explained:  "This order continues the reduction in the elements of the Federal bureaucracy that the

22   President has determined are unnecessary." *Id*.

23           151.    The President also ordered the "closure" of the entire United States Department of

24   Education and transfer of certain functions to other agencies.  Exec. Order No. 14242, 90 Fed. Reg.

25   13679 (Mar. 20, 2025) (Improving Education Outcomes by Empowering Parents, States, and

26   Communities).  The President likewise closed the United States Agency for International

27

28

Development, firing nearly all of its staff, and subsumed what remained into the State Department,[46] as well as shuttered the Consumer Financial Protection Bureau, attempting to fire nearly all of its staff as well.[47]  Most recently, the President decimated AmeriCorps, ending core programs and placing nearly all staff on leave before later laying them off and cutting the bulk of grants to AmeriCorps grantees.[48]

152.    DOGE and/or OPM have taken a series of other actions since January 20, 2025 aimed at deconstructing and drastically reducing the size of the federal government, including:  the "Fork in the Road" Deferred Resignation Program, announced via e-mail to millions of federal employees; the unlawful termination of probationary employees nationwide; the mandated email reporting ("5 bullets") to all federal employees and corresponding threats for failure to respond; and the placement of employees throughout the federal government on administrative leave for a variety of reasons.

**B.  President's February 11, 2025 Executive Order to All Federal Agencies to Downsize and Reorganize Themselves Via Agency RIF and Reorganization Plans**

153.    The President's February 11, 2025 Workforce Executive Order is in the same vein as these other actions, furthering the President's express goal of "transforming" and "deconstruct[ing]" the agencies of the federal government.  Ex. A.

154.    The Executive Order applies to the executive departments and agencies, including but not limited to the Federal Agency Defendants.  *Id.* (citing 44 U.S.C. § 3502)  There are currently

---

[46] Carnegie Endowment for International Peace, *Trump's Move to Gut USAID Reveals the Crux of His Foreign Policy* (Feb. 4, 2025), available at: https://carnegieendowment.org/emissary/2025/02/usaid-trump-foreign-aid-policy-why.

[47] NBC News, *Trump administration and Musk's DOGE plan to fire nearly all CFPB staff and wind down agency, employees say* (Feb. 28, 2025), available at: https://www.nbcnews.com/business/business/trump-administration-musks-doge-plan-fire-cfpb-staff-close-agency-rcna194217.

[48] NY Times, *DOGE Guts Agency That Organizes Community Service Programs* (Apr. 17, 2025), available at: https://www.nytimes.com/2025/04/17/us/politics/doge-cost-americorps-community-service.html; *see also* MSN, *AmeriCorps Faces Major Blow As Elon Musk-Led DOGE Slashes $400 Million In Federal Grants* (Apr. 26, 2025), available at: https://www.msn.com/en-in/news/world/americorps-faces-major-blow-as-elon-musk-led-doge-slashes-400-million-in-federal-grants/ar-AA1DEjSo.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI      41

fifteen executive cabinet-level departments, 5 U.S.C. § 101, and hundreds of federal agencies and commissions.[49]

155.    The President ordered, in pertinent part:

a.    Reduction of the number of federal employees via hiring freezes, hiring/departure ratios, and OMB and DOGE control of agency hiring.  Ex. A, Sec. 3.  Specifically, the President required OMB to submit to him a "plan to reduce the size of the Federal Government's workforce" that will "require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan." *Id.*  The President allowed limited exceptions for "functions related to public safety, immigration enforcement, or law enforcement."  The President required all agency heads to submit *all career federal hiring* to DOGE for approval.  *Id.*

b.    All federal agencies "shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)."  *Id.*  In making these cuts, the President ordered that "[a]ll offices that perform functions not mandated by statute or other law *shall be prioritized* in the RIFs, including":

- "all agency diversity, equity, and inclusion initiatives";

- "all agency initiatives, components, or operations that my Administration suspends or closes"; and

- "all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website" ("Funding Lapse Plan Staffing Levels").

*Id.* (emphasis added).  The President allowed limited exceptions:  "This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement."  *Id.*

c.    All federal agencies shall submit to OMB a "reorganization plan" that "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

---

[49] Available at: https://www.usa.gov/agency-index.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                42

156.    The President's Executive Order removed agency discretion and authority, by ordering agencies to act.  The President's Executive Order necessarily orders agencies to disregard applicable statutory authorizations and appropriations, by implementing the following mandates:

a.    Agencies are *required* to implement "large-scale" RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

b.    Agencies are *required* to prioritize in RIFs "all agency initiatives, components, or operations that [the] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

c.    Agencies are *required* to prioritize in RIFs "all components and employees" not deemed "essential"—and therefore that do not continue working—during a government shutdown when annual appropriations have temporarily lapsed (aka Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.    Agencies are *required* to consider their own destruction, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

e.    And finally, agencies are *required* to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

157.    The President further granted OPM, rather than the agencies, the power to "grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction."  *Id.*, Sec. 4.

158.    The President gave agencies a mere 30 days, after commencing their planning for the massive RIFs, to submit reorganization reports describing how they would pick up and organize the pieces of what will be left.  *Id.*, Sec. 3.

**Add.473**

159.    Notwithstanding all of these requirements that order agencies to apply parameters that cannot be reconciled with agency statutory authority, the President then stated the Order should be implemented consistent with applicable law.  *Id.* Sec. 5.

**C.    OMB, OPM, and DOGE Implementation of the President's Orders: February 26 Directive, March 13 Deadline, and April 14 Deadline**

160.    On February 26, 2025, OMB and OPM issued a Memorandum to Heads of Executive Departments and Agencies, including but not limited to the Federal Agency Defendants, regarding "Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative."  Ex. B.

161.    OMB and OPM echoed the President's purposes in transforming the federal bureaucracy, explaining:

> The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public.  Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

> The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

*Id.*

162.    In this Memorandum, OMB and OPM directed federal agencies to comply with the President's Executive Order by submitting the "Agency RIF and Reorganization Plans" ("ARRPs") required by the Workforce Executive Order to OMB and OPM for "review and approval."  *Id.*

163.    The OMB and OPM February 26 Memorandum, by imposing onerous requirements under exceptionally unreasonable time frames, guarantees that agencies will not be able to comply with their statutory and regulatory mandates, will not exercise any existing discretion in a manner that is faithful to those mandates or results from considered, proper decision-making, and will instead do the President's unlawful bidding.  The OMB and OPM February 26 Memorandum, by endowing OMB and OPM with ultimate decision-making power as to the ARRPs, transfers decision-making to those without personal knowledge of or experience with the particular requirements and obligations

1  of these agencies, their component parts, or of the work performed by their employees—and the

2  impacts of eliminating that work.

3  164.  OMB and OPM set forth requirements for the ARRPs that included instructing that

4  ARRPs "should" include "[a] significant reduction in the number of full-time equivalent (FTE)

5  positions by eliminating positions that are not required."  OMB and OPM explained further:

6  "Pursuant to the President's direction, agencies should focus on the maximum elimination of

7  functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of

8  their statutorily required functions."  *Id.*  OMB and OPM further directed that agencies "should

9  also[,]" among other things:

10  • "seek to consolidate areas of the agency organization chart that are duplicative";

11  • "consolidate management layers where unnecessary layers exist"; and

12  • "seek reductions in components and positions that are non-critical[.]"

13  OMB and OPM further instructed:  "When taking these actions, agencies should align closures and/or

14  relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation

15  benefit costs for individual employees."  *Id.*

16  165.  OMB and OPM also directed agencies to work with DOGE in planning required RIFs

17  for non-essential positions, and to use 2019 Funding Lapse Plan Staffing Levels as the "starting

18  point" for identifying those positions that are "essential."  Ex. B.

19  166.  Among the "tools" OMB and OPM directed agencies could use:  "Eliminating non-

20  statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline)."  Then, OMB

21  and OPM directed that agencies must include the following in the plans submitted for approval:

22  ARRPs should also list the competitive areas for large-scale reductions in force, the
23  RIF effective dates (which may be a date prior to when the plan is submitted), the
    expected conclusion of the RIFs, the number of FTEs reduced, and additional impact
24  of RIFs such as cancellation of related contracts, leases or overhead.

25  *Id.*

26  167.  OMB and OPM required the ARRPs to be submitted for approval in two phases, the

27  first of which was due merely *two weeks* later on March 13, 2025, and the second on April 14, 2025,

28  and then gave specific requirements for each phase.  *Id.*

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    45

168.    The March 13 "Phase 1 ARRPs shall focus on initial agency cuts and reductions."  *Id.*  Agencies were required to identify, among other things, Funding Lapse Plan Staffing Levels:

> All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB *in 2019* referenced above.

*Id.* (emphasis added).  Agencies were also required to identify "[w]hether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

169.    The April 14 Phase 2 plans were required to contain further information regarding the reorganization in light of the required RIFs, including a new organization chart and, among other things:

- The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

- Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

- The competitive areas for subsequent large-scale RIFs.

- All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

- Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

*Id.*

170.    In the sample timeline provided in Appendix 1, OMB and OPM explained that "[a]gencies can accelerate [the] timelines" for conducting RIFs by "seek[ing] OPM waiver approval for a 30-day notification period," instead of the 60-day period generally required by the RIF statute and regulations.  The RIF statute and regulations provide that OPM may approve such a waiver, at the request of an agency, "[w]hen a reduction in force is caused by circumstances not reasonably foreseeable."  5 C.F.R. § 351.801; *see* 5 U.S.C. § 3502.  OMB and OPM stated that agencies can also

1   speed up the RIF process "through parallel processing . . . expediting process steps, and streamlining

2   stakeholder coordination."

3      171.   Finally, OMB and OPM instructed once again that "law enforcement, border security,

4   national security, immigration enforcement, or public safety responsibilities" as well as political

5   appointees were exempt from these "transformation" efforts and that agencies providing services to

6   the public were not permitted to implement any RIFs without OMB or OPM sign-off.  *Id.*

7      172.   On information and belief, it is not possible for any federal agency, let alone all federal

8   agencies, to create an ARRP that both accommodates the specific parameters required by the

9   President, OMB, and OPM *and* complies with all of the federal agency's statutory and regulatory

10  requirements in a mere two weeks, by the March 13 deadline, or even realistically by the April 14

11  deadline.  The OMB/OPM Memorandum did not provide agencies enough time to properly assess an

12  agency's statutory requirements, let alone assess how to comply with them *and* the President's

13  directives.

14     173.   The requirements for the ARRPs imposed by OMB and OPM on all federal agencies

15  effectively removed independent decision-making authority from the agencies and required agencies

16  to disregard the statutory authority governing the agency's organization, functions, personnel

17  requirements, and appropriations.  The language directing agencies to comply with applicable law in

18  creating these plans was disingenuous.

19     174.   The February 26, 2025 OMB and OPM memorandum contained new or modified rules

20  without engaging in notice and comment rule-making, and effectively required agencies (including

21  but not limited to Federal Agency Defendants) to comply with these new and modified rules

22  regardless of any prior existing regulations.

23     175.   On information and belief, DOGE, via individuals in the Executive Office of the

24  President and DOGE teams embedded at agencies (including but not limited to Federal Agency

25  Defendants), has enforced the requirements of the President's Executive Order and OMB/OPM

26  Memorandum, including by ordering federal agencies to make mandated cuts eliminating positions,

27  programs, offices, and functions.  On information and belief, DOGE has required federal agencies to

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI               47

1    comply with required targets imposed by DOGE for spending reductions by eliminating positions,

2    programs, offices, and functions to meet the DOGE stated goal of imposing spending cuts

3    government-wide.

4           176.    In sum, OMB, OPM, and DOGE have usurped agency authority, exceeded their own

5    authority, acted in an arbitrary and capricious manner, and ignored procedural requirements by

6    requiring federal agencies throughout the government, including but not limited to Federal Agency

7    Defendants, to:

8           a.      Submit ARRPs for OMB and OPM approval;

9           b.      Include in those ARRPs large-scale RIFs (irrespective of whether staffing reductions

10          are necessary or even appropriate in light of agency functions and appropriations);

11          c.       Prioritize in those large-scale RIFs any functions that "[the President's]

12          Administration suspends or closes" (irrespective of statutory requirements or authority

13          delegated to the agencies);

14          d.      Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of

15          staffing (which have nothing to do with the staffing needed to properly run fully appropriated

16          agencies);

17          e.      Include in their ARRPs consideration of their own destruction, by addressing whether

18          the agency or any subparts should be eliminated by the President (again, regardless of

19          statutory requirements or authority delegated to the agencies);

20          f.      Include in their ARRPs a plan to reorganize themselves by picking up and arranging

21          the pieces that are left, following these large-scale reductions;

22          g.      Submit these plans for approval on timeframes that do not permit agencies to actually

23          consider and assess their own needs or their statutory authority; and

24          h.      Impose cuts to functions and staffing according to "targets" and "goals" imposed by

25          DOGE.

26

27

28

**D.    OMB, OPM, and DOGE Lack of Statutory Authority to Order Agencies to Reorganize or Engage in a RIF**

177.    OMB must source its authority either directly from an act of Congress, or a delegation by Congress to the President that the President has in turn delegated to OMB.  OMB lacks the authority to order federal agencies to downsize or reorganize themselves, or to assume final decision-making power by requiring agencies to submit such plans for OMB approval.  31 U.S.C. §§ 501-507.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OMB cannot cloak itself in Presidential authority, either.

178.    OPM has no statutory authority to approve agency plans to reorganize or conduct RIFs in service of such a reorganization.  5 U.S.C. §§ 1101-1105.  OPM's statutory authority with respect to RIFs consists of setting government-wide order of retention rules for the release of employees in a RIF.  5 U.S.C. § 3502.  OPM cannot order federal agencies to downsize or reorganize themselves, or assume final decision-making power by requiring agencies to submit such plans for approval.  *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 3:25-cv-01780-WHA (N.D. Cal.), ECF No. 45 (Feb. 28, 2025 Order), ECF No. 132 (Mar. 14, 2025 Order), ECF No. 202 (Apr. 18, 2025 Order).  To the extent that Congress has generally authorized OPM to implement the President's rules for the federal workforce (5 U.S.C. § 1103), that authorization is coextensive with the President's authority and cannot exceed it.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OPM cannot cloak itself in Presidential authority, either.

179.    DOGE has no statutory authority at all.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, DOGE cannot cloak itself in Presidential authority, either.

**E.    The Administration's Lack of Transparency Regarding Reorganization Plans**

180.    The Trump Administration has never made public the "18-month DOGE agenda" referenced in Executive Order 14158.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          49

**Add.479**

181.    The Trump Administration has never made public any plan being created by DOGE in conjunction with OPM and OMB pursuant to the President's January 20, 2025 Memorandum requiring a "plan to reduce the size of the Federal Government's workforce."

182.    When asked by Fox News in March 2025 whether DOGE's actions would result in a report ("And the process is a report at some point?  At 100 days?"), Elon Musk responded on behalf of DOGE:  "Not really a report.  We are cutting the waste and fraud in real time.  Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week.  And so far, we are succeeding."[50]

183.    The Trump Administration has refused to make public the phase-one agency ARRPs that were to be submitted by March 13 to OMB and OPM for approval, including in response to requests from members of the public via the Freedom of Information Act ("FOIA"), federal employee unions, the press, and Congress.

184.    In lawsuits filed against the Trump Administration seeking disclosure under FOIA of the March 13 plans submitted to OMB and OPM, OMB and OPM refused to disclose those plans on the ground that they were "pre-decisional" and described them as pending OMB review and approval. *See, e.g.*, *Democracy Forward Foundation v. Off. of Mgmt. & Budget*, No. 1:25-cv-00858 (D.D.C.), ECF No. 9 (Defendants' Apr. 2, 2025 Motion to Dismiss:  "'[A]gency reduction-in-force plans are still under development by the Executive Branch[,] and OMB is currently actively reviewing these plans as part of Phase 1' … OMB explained, the plans Plaintiff requested 'are part of a longer two-phase process that has just been initiated.'").

185.    Executive Order 14210 did not, in ordering agencies to prepare and submit reorganization plans to OMB and OPM, create any process for notice and public comment, unlike the reorganization Executive Order issued in President Trump's first term.

186.    On March 13, 2025, the Washington Post reported: "Agencies across the federal government faced a Thursday deadline to submit plans for a large-scale firing of employees, but scant details were made public about what the White House said would be a 'mass reduction' of the federal

---

[50] *Supra*, n.9.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                         50

workforce.  The White House did not preview the plans, saying only that it would share their contents 'once the plans are enacted.'"  Wash. Post, *White House expects 'mass reduction' of federal workforce as deadline looms* (Mar. 13, 2025).[51]  White House press secretary Karoline Leavitt said: "The coming mass reduction will 'streamline our broken bureaucracy, save taxpayers millions of dollars and make the government more efficient for all.'"  *Id.*

187.  On March 27, 2025, the Washington Post published a report regarding "an internal White House document obtained by The Washington Post" that "contains closely held draft plans for reshaping the 2.3-million-person bureaucracy."  Wash. Post, *Internal White House document details layoff plans across U.S. agencies* (Mar. 27, 2025).[52]  The Post explained:  "The details are compiled from plans that President Donald Trump ordered agencies to submit, according to two people familiar with the document who spoke on the condition of anonymity because they were not authorized to talk about it."  *Id.*  The document shows that "[f]ederal officials are preparing for agencies to cut between 8 and 50 percent of their employees as part of a Trump administration push to shrink the federal government."  When confronted with questions regarding this document, the Post reports that White House Principal Deputy Press Secretary Harrison Fields responded by e-mail:

> "It's no secret the Trump Administration is dedicated to downsizing the federal bureaucracy and cutting waste, fraud, and abuse.  This document is a pre-deliberative draft and does not accurately reflect final reduction in force plans…  When President Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will make those announcements to their respective workforces at the appropriate time."

*Id.*

188.  When individuals at agencies have gone public with information regarding the wide-scale (and unlawful) scope of these plans, the Trump Administration has claimed they are "fraudulent."  For example:  On April 9, 2025, the Las Vegas ABC-news affiliate KTNV published a report titled, "As concerns among veterans rise, VA source shares details of workforce reduction

---

[51]Available at: https://www.washingtonpost.com/politics/2025/03/13/government-agency-reorganization-rif-federal-workers/.

[52]Available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      51

1    plan."[53]  The source described in detail the plans for cutting 80,000 jobs.  The VA responded by

2    calling the document "fraudulent" and an "intentionally false leaked document."  *Id.*

3         189.    The Trump Administration has largely refused to make the April 14 ARRPs publicly

4    available either, until it starts issuing RIF notices (and not even then).

5         190.    Members of Congress have submitted multiple requests for information to the Trump

6    Administration regarding these reorganization plans.

7         191.    For example, on April 7, the Ranking Member of the Senate Budget Committee sent a

8    demand letter requesting the OMB provide the Senate with documents including the March 13 plans

9    as well as any further plans, and expressing concern that "[t]hese sweeping workforce reductions will

10   not only strain agency operations and delay critical services for seniors and veterans, but they will

11   also harm the government's efforts to protect public health, conserve natural resources, and manage

12   federal lands."[54]

13        192.    On April 10, another group of Senators wrote to OPM and OMB, requesting

14   documents pertaining to the RIF and Reorganization plans; expressing concern regarding the

15   illegality, harm, and lack of transparency; and noting that the parameter to use government-shutdown

16   levels as a baseline could threaten the jobs of *700,000 federal employees.*  Letter from Senators to

17   Off. of Mgmt. and Budget and Off. of Pers. Mgmt. (Apr. 10, 2025), attached hereto as Exhibit C.  The

18   Senators continued:

19            Further, the size and scope of the reported RIF plans are clearly not about government
             efficiency.  The Department of Education has announced layoffs of 50% and the
20           Department of Veterans Affairs has proposed cuts of over 80,000 employees.  The
             Department of Defense is seeking to reduce its civilian workforce by 5-8%, or 61,000
21           employees, and the IRS reportedly plans to cut around 25% of its workforce, or 20,000
             employees.  On April 1, 2025, the Department of Health and Human Services began
22           the process of firing 10,000 employees, in addition to 10,000 employees who left their
             positions through the deferred resignation program and other downsizing efforts.  Two
23           days later, Secretary Kennedy suggested that 20% of these terminations could be
             mistakes.  The Secretary stated, "[p]ersonnel that should not have been cut were cut…
24

25   _____

26   [53] Available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-
     how-their-workforce-reduction-plan-will-affect-them.

27   [54] Letter from Jeffrey Merkley, Ranking Member of S. Comm. on the Budget, to Russell Vought,
     OMB Director (Apr. 7, 2025), available at:
28   https://www.budget.senate.gov/imo/media/doc/letter_to_omb_re_rif_plans.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          52

1    that was always the plan.  Part of the DOGE, we talked about this from the beginning,
2    is we're going to do 80% cuts, but 20% of those are going to have to be reinstated,
3    because we'll make mistakes."  The Social Security Administration (SSA) has already
     lost over 7,000 employees through terminations and resignations since February and
     closed 6 of 10 regional offices, leading to increased wait times and multiple website
4    crashes over the past month—yet SSA plans to cut thousands more.

5    *Id.*

6    193.    As a result of the Trump Administration's secrecy, federal employees throughout the

7    federal agencies, their labor representatives, state and local governments, organizations including

8    Plaintiffs, non-profits, and the public have been kept in the dark, intentionally, regarding this

9    Administration's plans.  As late as March 28, 2025, *after* the March 13 ARRPs with the required

10   "large-scale RIFs" had been submitted for approval, Elon Musk and his selected DOGE

11   representatives, sitting down for a lengthy interview with Fox News, minimized the terminations of

12   federal employees:

13       [DOGE lead at OPM] Anthony Armstrong:

14       And President Trump's been very clear: it's scalpel not hatchet.  And that's the way
15       it's getting done.

16       And then once those decisions are made, there's a very heavy focus on being
17       generous, being caring, being compassionate, and treating everyone with dignity and
         respect.  And if you look at how people have started to leave the government, it is
18       largely through voluntary means.  There's voluntary early retirement, there's
19       voluntary separation payments.  We put in place deferred resignation, the eight-month
         severance program.
20
21       So there's a very heavy bias towards programs that are long-dated, that are generous,
22       that allow people to exit and go and get a new job in the private sector.  And you've
         heard a lot of news about RIFs, about people getting fired.  At this moment in time,
23       less than .15, not 1. 5, less than .15 of the federal workforce has actually been given a
         RIF notice.
24
25       Elon Musk:

26       *Basically almost no one's gotten fired, is what we're saying.*[55]

27

28   [55] *Supra*, n.9.
     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          53

**Add.483**

1    **F.    Current and Impending Implementation of the President's Mandated ARRPs**

2        194.    Despite the Trump Administration's failure to provide the public, federal employees

3    and their labor representatives, the press, and Congress with detailed advance information regarding

4    these plans, information about the ARRPs that Plaintiffs have been able to obtain confirmation that

5    some agencies have already begun to implement the large-scale RIFs and reorganization plans

6    ordered by the President, and many other agencies are poised to do so imminently.  Plaintiffs set forth

7    their current information regarding actual and imminent implementation of President Trump's plans

8    to transform the federal government.

9        **1.    Ongoing RIFs and Reorganization**

10        195.    At least the following Federal Agency Defendants have begun to implement their

11    ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs:

12    • **Health and Human Services**

13        196.    On March 27, 2025, HHS announced:  "Today, the U.S. Department of Health and

14    Human Services (HHS) announced a dramatic restructuring in accordance with President Trump's

15    Executive Order, 'Implementing the President's 'Department of Government Efficiency' Initiative.'"

16    Press Release, U.S. Dep't of Health and Human Servs., *HHS Announces Transformation to Make*

17    *America Healthy Again* (Mar. 27, 2025).[56]  The restructuring involves "a reduction in workforce of

18    about 10,000 full-time employees who are part of this most recent transformation."  *Id*.

19        197.    HHS explained the restructuring and consolidation of functions that it was engaging in

20    as being pursuant to the President, DOGE, and OMB's orders.  *Id*.  Secretary Kennedy explained,

21    "We aren't just reducing bureaucratic sprawl.  We are realigning the organization…."  *Id*.; *see also*

22    *Fact Sheet: HHS' Transformation to Make America Healthy Again*, U.S. Dep't of Health and Human

23    Servs. (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President

24    Trump's Executive Order").[57]

25

26

27    _____

[56] https://www.hhs.gov/press-room/hhs-restructuring-doge.html

28    [57] https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                54

198.    HHS also revealed that the immediate 10,000-person reduction was just the beginning of a planned reduction:  "The current 82,000 full-time employees will be reduced to 62,000."  *Id.* The cuts will affect the following subagencies:

- FDA will decrease its workforce by approximately 3,500 full-time employees;

- The CDC will decrease its workforce by approximately 2,400 employees;

- The NIH will decrease its workforce by approximately 1,200 employees;

- CMS will decrease its workforce by approximately 300 employees;

- 28 divisions will be consolidated to 15;

- 10 regional offices will become 5; and

- Human Resources, Information Technology, Procurement, External Affairs, and Policy will be centralized.

*Id.*

199.    The CDC has eliminated the sexually transmitted disease ("STD") lab branch, put on leave CDC staff responding to a current measles outbreak in Texas, and has (because of RIFs) effectively shut its offices on injury control, birth defects, and smoking and health.  The Administration for Children and Families terminated employees administering programs that paid for the heating and cooling bills for low-income households, and eliminated a division that oversaw a case management system tracking child abuse and neglect.  And the National Institute for Occupational Safety and Health (NIOSH) shut down a federal screening program for black lung disease, halting routine mine safety inspections, eliminating a program that investigates and recommends ways to reduce exposure to health hazards in workplaces, and stopping its evaluation and approval of respirators (and potentially other forms of personal protective equipment) that are new to the market.  Reporting indicates that HHS' RIFs have affected programs that were mandated by Congress, and that "[s]ome congressionally mandated programs saw their entire staff dismissed."[58]

---

[58] Politico, *RFK Jr., DOGE gutted legally required offices. Courts may undo it all* (May 11, 2025), available at: https://www.politico.com/news/2025/05/11/trump-transforms-congressionally-mandated-health-offices-into-ghost-towns-00340176.

1    200.    Secretary Kennedy told the New York Times, "We're going to do more with less,"

2    even as he acknowledged that it would be "a painful period for H.H.S."[59]  Senator Patty Murray

3    "called Mr. Kennedy's comments about doing more with less an 'absurd suggestion' that 'defies

4    common sense.'  Her sentiments were echoed by several agency employees, who spoke on the

5    condition of anonymity to avoid retribution."  *Id.*

6    201.    HHS has never made public the ARRPs submitted to OMB and OPM for approval in

7    conjunction with the March 13 and April 14 deadlines.

8    • **Department of Labor**

9    202.    On April 15, 2025, the Department of Labor placed the "vast majority" of the staff of

10    the Office of Federal Contract Compliance Programs (OFCCP) on administrative leave.[60]  That office

11    is responsible for ensuring contractors across government agencies comply with a variety of federal

12    laws.  The email to employees stated they were being put on administrative leave "due to the

13    agency's 'significantly reduced scope of mission.'"  *Id.*  On May 6, DOL issued RIF notices to

14    OFCCP's employees, explaining the Department was conducting a RIF pursuant to the Workforce

15    Executive Order.  A "DOL memo indicated the department plans to ultimately cut 90% of the

16    OFCCP's workforce."  *Id.*

17    203.    For the RIFs at OFCCP, DOL requested from OPM a waiver of the 90-day notice

18    period for RIFs involving newly-established competitive areas and approval for a 30-day notice

19    period.  OPM granted the request.  The only justification given by OPM for its decision was:  "*In*

20    *accordance with the E.O. stated above, DOL must act quickly to conduct a RIF of employees in the*

21    *divisions, offices, and units, mentioned in your request.*"

22

23

24

25

26    [59] NY Times, *10,000 Federal Health Workers to Be Laid Off*  (Mar. 27, 2025), available at:
https://www.nytimes.com/2025/03/27/us/politics/health-department-job-layoffs-rfk-jr.html.

27    [60] Bloomberg Law, *DOL Puts Contractor Watchdog Employees on Leave as Layoffs Loom* (Apr. 16,
2025), available at: https://news.bloomberglaw.com/daily-labor-report/dol-puts-contractor-watchdog-
employees-on-leave-as-layoffs-loom.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    56

204.    Previously, on April 14, 2025, the Secretary of Labor had also warned publicly that more layoffs across the Department "should be expected" in the coming weeks.[61]  One protesting employee explained:  "This is no ordinary federal agency.  This is literally the firewall between workers and exploitation.  The people in this building are training people for jobs.  They're ensuring that they come home safe."  *Id.*

205.    DOL has never made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **AmeriCorps**

206.    On April 9, 2025, AmeriCorps announced to employees that the agency would be taking steps to "comply" with the Executive Order and ARRP, including by implementing a RIF of 50% or more of AmeriCorps staff.

207.    On April 16, 2025, AmeriCorps began sending boilerplate notices of administrative leave to AmeriCorps agency staff, both at headquarters in Washington, D.C. and in regional offices across the country, placing the vast majority of them on leave and locking them out of their computer systems shortly thereafter.

208.    AmeriCorps is a federal agency that staffs community service work around the country, including disaster relief.  As the New York Times reported:

> The independent federal agency that organizes community service work in the United States has placed on administrative leave almost all of its federal staff at the direction of Elon Musk's cost-cutting team, according to people familiar with developments at the agency.

NY Times, DOGE Guts Agency That Organizes Community Service Programs (April 17, 2025).

209.    On Thursday, April 24, 2025, the AmeriCorps employees began to receive RIF notices from the agency.

210.    AmeriCorps has not made public the ARRP submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[61] Bloomberg Law, *Lawmakers, Workers Push Chavez-DeRemer to Stop Labor DOGE Cuts* (Apr. 14, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/lawmakers-workers-push-chavez-deremer-to-stop-labor-doge-cuts.

- **Small Business Administration**

211.    On April 18, 2025, employees at the SBA throughout the COVID-19 Economic Injury Disaster Loan Serving Center were laid off, effective in dates through May 2025.[62]  "They are firing us just to fire us," one SBA employee was quoted as saying.  "We literally made money for the government by taking loan payment and recovering money in bankruptcy."  *Id.*

212.    Between March and April, employees throughout other offices at the SBA also received RIF notices, including the Office of Entrepreneurial Development and Office of Entrepreneurial Education, the procurement office, and positions in field, district, and branch offices.  For example, the entire Office of Entrepreneurial Education received RIF notices; that office is responsible for administering a $17 million grant that helps small businesses throughout the country.

213.    Previously, on March 21, 2025, the SBA issued a news release stating that, as required by President Trump's Workforce Executive Order, "the agency will reduce its workforce **by 43%** – ending the expansive social policy agenda of the prior Administration, eliminating non-essential roles, and returning to pre-pandemic staffing levels." [63]  The agency referred to this elimination of over 2,700 jobs as a "strategic reorganization."  *Id.*

214.    The SBA Administrator explained that SBA has "submitted" such a reorganization plan to OMB for approval.  *Id.*  The news release concluded:  "SBA's reorganization plan will provide for the preservation of public services through a strategic transfer of duties.  It will be actioned in the coming weeks."  *Id.*

215.    Notwithstanding the RIF notices going out by email on April 18, the SBA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[62] Gov't Exec., *SBA hit with more layoffs* (Apr. 18, 2025), available at: https://www.govexec.com/workforce/2025/04/sba-hit-more-layoffs/404682/.

[63] U.S. Small Bus. Admin*., Small Business Administration Announces Agency-Wide Reorganization* (Mar. 21, 2025), available at: https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization (emphasis added).

- **<u>Environmental Protection Agency</u>**

216.    On April 22, 2025, the EPA began sending RIF notices to some employees across its headquarters and regional offices.[64]

217.    Previously, both President Trump and EPA Administrator Lee Zeldin expressed that up to 65% of the EPA workforce will eventually be cut.

218.    The New York Times reported on March 17, 2025 that the Trump Administration intends to "dismantle" EPA's Office of Research and Development:

> The Environmental Protection Agency plans to eliminate its scientific research arm, firing as many as 1,155 chemists, biologists, toxicologists and other scientists, according to documents reviewed by Democrats on the House Committee on Science, Space and Technology. The strategy is part of large-scale layoffs, known as a "reduction in force," being planned by the Trump administration, which is intent on shrinking the federal work force.

NY Times, *Trump Administration Aims to Eliminate E.P.A.'s Scientific Research Arm* (Mar. 17, 2025).[65]

219.    In response to these public statements, 51 former EPA officials from both Democratic and Republican Administrations sent an "Open Letter" to Congress on March 18, 2025, that explained:

> We are former Senate-confirmed officials and Regional Administrators who served in the U.S. Environmental Protection Agency during Republican and Democratic administrations. We adhere to EPA's long-held core principles that the agency should be apolitical, professional, transparent, and dedicated to following the law and science.
>
> We are greatly alarmed by President Trump's recent comments that his administration is seeking to cut EPA by 65 percent. We share the concerns expressed by former EPA administrators who recently wrote that "such cuts would render the agency incapable of protecting Americans from grave threats in our air, water and land."
>
> We are writing to urge Congress to ensure that EPA has sufficient staff and funding to effectively implement the Clean Air Act, Clean Water Act, and other bedrock environmental laws for the good of all Americans.

---

[64] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

[65] Available at: https://www.nytimes.com/2025/03/17/climate/trump-eliminates-epa-science.html.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                      59

Deep cuts to EPA threaten more than 50 years of bipartisan progress under Republican and Democratic Congresses and presidents.  Actions that diminish EPA's capabilities will place at risk the quality of the air our children breathe, the water we all drink, and the waterways we swim, fish and play in.  They would jeopardize EPA's responses to toxic chemical spills and other disasters as well as basic compliance with America's environmental laws.

Policy changes are to be expected from one administration to the next, but not the dismantling of EPA. …

If the administration does not agree with the laws Congress has passed and the programs it has funded, it should work with Congress to seek changes, not unilaterally and recklessly freeze, delay, or eliminate funding.[66]

220.    On May 2, 2025, the EPA announced the next phase of its plans to significantly reorganize the agency and make major cuts to staffing.[67]  The EPA is planning to reduce its staff to Reagan-era levels, which involves cutting its workforce from about 15,000 to as few as 11,000 employees.[68]  Specifically, EPA will make major cuts to the Office of Research and Development and has encouraged the Office's 1,500 employees to apply for the approximately 500 new positions created in the reorganization.

221.    Notwithstanding the RIF notices that began going out on or about April 22, the EPA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Housing and Urban Development**

222.    HUD has commenced the RIF of positions in the Office of Field Policy and Management ("FPM") throughout the country, including management analysts, program analysts, customer service representatives, and labor standards specialists.  The FPM serves as the first point of contact for HUD and housing-related questions and concerns within a community

---

[66] Available at: https://www.environmentalprotectionnetwork.org/wp-content/uploads/2025/03/Senate-Confirmed-Officials-and-RA-Letter-to-Congress-Final.pdf.

[67] EPA, *EPA Announces Next Phase of Organizational Improvements to Better Integrate Science into Agency Offices, Deliver Clean Air, Land, and Water to All Americans* (May 2, 2025), available at: https://www.epa.gov/newsreleases/epa-announces-next-phase-organizational-improvements-better-integrate-science-agency.

[68] NPR, *The Trump administration says it will cut EPA staffing to Reagan-era levels* (May 2, 2025), available at:   https://www.npr.org/2025/05/02/nx-s1-5385272/epa-environmental-protection-agency-cuts-trump-zeldin.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          60

223.    Notwithstanding the RIF notices that have been sent at HUD, it has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **General Services Administration**

224.    GSA has announced plans for a nearly 50% cut in staff, and has issued RIF notices throughout the agency.[69]  The agency issued RIF notices to at least 600 employees in the Public Buildings Service.[70]

225.    Notwithstanding the RIF notices that have been sent at GSA, it has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **OPM**

226.    On April 18, 2025, OPM issued RIF notices to all employees in the Center for Leadership Development, which provides leadership development training to federal employees across the government.[71]  OPM has also eliminated its office for Human Capital Data Management and Modernization, Office of Communications, and Office of Procurement as part of its RIF.

227.    Notwithstanding the RIF notices that have been sent at OPM, it has not made public the ARRPs submitted in conjunction with the March 13 and April 14 deadlines.

  2.    **Imminent RIFs in Service of Government-wide Reorganization**

228.    At least the following federal agencies will begin to implement their ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs, imminently:

---

[69] Fed. News Network, *GSA seeks 50% spending cuts, nonvoluntary RIF after OPM's resignation offer* (Feb. 4, 2025), available at:  https://federalnewsnetwork.com/hiring-retention/2025/02/gsa-seeks-50-spending-cuts-nonvoluntary-rif-after-opms-resignation-offer/.

[70] Gov't Exec., *GSA continues slow drip of ROFs, nearly wiping out entire offices* (Mar. 7, 2025), available at:    https://www.govexec.com/workforce/2025/03/gsa-continues-slow-drip-rifs-nearly-wiping-out-entire-offices/403573/.

[71] Fed. News Network, *OPM shutters office that trained agency leaders, next generation of federal talent* (May 1, 2025), available at:    https://federalnewsnetwork.com/reorganization/2025/05/opm-shutters-office-that-trained-agency-leaders-next-generation-of-federal-talent/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                 61

- **USDA**

229.    As of filing, the USDA has not yet made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

230.    However, on April 7, 2025, Government Executive reported from USDA sources:

> Some employees have been told to expect the department to cut back to fiscal 2019 staffing levels—which would lead to USDA slashing around 9,000 of its 98,000 employees—while others have been told there is an overall federal workforce reduction number the administration has developed and the department will do its part proportionally to meet that target.

Gov't Exec., *USDA to slash headquarters, other staff and relocate some to new 'hubs' around the country* (Apr. 7, 2025).[72]

231.    In an email to USDA employees offering them another round of the Fork in the Road Deferred Retirement program, Secretary Rollins stated that RIFs were imminent. *Id.*

232.    On April 15, 2025, Government Executive reported further:

> The Trump administration is planning to severely scale back or outright eliminate funding for many programs across the Agriculture Department, according to White House documents obtained by Government Executive, as it slashes workers and closes offices at the local level…. The proposed cuts come as USDA is planning to gut its Washington headquarters, consolidate mission areas and administrative functions and relocate some staff to new "hubs" around the country.[73]

- **Department of Commerce**

233.    In March, the press began reporting that the Department of Commerce would seek to cut 20 percent of the National Oceanic and Atmospheric Administration ("NOAA") staff. Later in March, staff at NOAA were told they could take "voluntary" retirement offers rather than be laid off in the coming RIFs. DOGE has also listed 19 NOAA facilities for lease termination, including the Radar Operations Center, which houses staff for the nation's Doppler radar network.[74] RIFs have

---

[72] Available at: https://www.govexec.com/workforce/2025/04/usda-slash-headquarters-other-staff-and-relocate-some-new-hubs-around-country/404371/.

[73] Gov't Exec., *White House pitches layoffs, local office closures and program eliminations at USDA* (Apr. 15, 2025), available at: https://www.govexec.com/management/2025/04/white-house-pitches-layoffs-local-office-closures-and-program-eliminations-usda/404580/.

[74] PBS News, *As NOAA braces for more cuts, scientists say public safety is at risk (March 14, 2025)*, available at: https://www.pbs.org/newshour/nation/as-noaa-braces-for-more-cuts-scientists-say-public-safety-is-at-risk.

**Add.492**

also been announced for the National Centers for Environmental Information, which manages climate data critical to disaster preparation and response.[75]

234.    The Commerce Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Defense**

235.    In March, Military Times reported on Defense Secretary Hegseth's goal of cutting 5-8 percent of the total Department civilian workforce, which amounts to 50,000 to 70,000 jobs.[76]

236.    The Defense Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Energy**

237.    The Department of Energy's March 13 ARRP submitted to OMB and OPM for approval was, according to press reports, leaked to the press.[77]

238.    According to press reports, that ARRP identified 43 percent of its workforce as "non-essential" according to the provided parameters.  The report admitted:  "While the core group of essential personnel required to remain during a lapse are extremely minimal, such limited capabilities are neither intended nor capable of sustaining ongoing government operations."  *Id.*; *see also* Associated Press, *The Energy Department identifies thousands of nonessential positions at risk of DOGE cuts* (Apr. 4, 2025) ("The Energy Department has identified thousands of federal workers it deems "nonessential" and would not be protected if there is another round of large-scale firings, according to a document obtained by The Associated Press.").[78]

---

[75] Citizen Times, *NCEI, office critical to disaster prep and response, hit with more DOGE staffing cuts* (May 7, 2025), available at: https://www.citizen-times.com/story/news/local/2025/05/07/more-doge-staffing-cuts-at-ncei-as-reduction-in-force-looms/83477853007/.

[76] MilitaryTimes, *Almost 21,000 DOD employees approved to resign amid workforce cuts* (Mar. 18, 2025), available at: https://www.militarytimes.com/news/pentagon-congress/2025/03/18/almost-21000-dod-employees-approved-to-resign-amid-workforce-cuts/.

[77] Fed. News Network, *Energy Department extends hiring freeze, deems 43% workforce non-'essential' in reorganization plan* (Apr. 4, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/energy-department-extends-hiring-freeze-deems-43-workforce-non-essential-in-reorganization-plan/.

[78] Available at: https://apnews.com/article/energy-federal-employees-layoffs-rif-doge-db7b6446928095c26bfe79c608e1e8e7.

239.    Then, in early April 2025, U.S. Senate Democrats released a fact sheet detailing information in the possession of Senators that:

> DOGE is reportedly proposing staffing cuts of up to 50% of the workforce at the Department of Energy (DOE), with new reductions in force (RIFs) hitting key priorities such as clean energy, grid resilience, and state and community programs the hardest while even targeting national security programs.

The document summarizes:

> The staffing cuts the Department is reportedly contemplating break down as follows:
> 1. 54% cut (1,800+ positions) to science and innovation programs
> 2. 61% cut (990+ positions) to energy infrastructure and deployment programs
> 3. 71% cut (3,000+ positions) to the Deputy Secretary's Office, environmental management programs, and other policy programs
> 4. 18% cut (540+ positions) to the Nuclear National Security Administration (NNSA)
> 5. 10% cut (520+ positions) to the Power Marketing Administrations (PMAs)

240.    The Energy Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of the Interior**

241.    The press began reporting the week of April 7, 2025 that a "major reorganization" of the Department of Interior "looms."[79]  "DOGE is leading the reorganization plan," an Interior employee anonymously told the press.  *Id.*  When asked,

> Interior spokesperson Elizabeth Peace said that "under President Trump's leadership, we are implementing necessary reforms to ensure fiscal responsibility, operational efficiency, and government accountability."
> Peace added, "We do not comment on personnel matters."

*Id.*

242.    On April 17, 2025, the Secretary of the Interior issued a Secretary's Order: Consolidation, Unification and Optimization of Administrative Functions.  The Secretary explained:

> The Department is committed to supporting President Trump's Executive Order (EO) No. 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," issued on February 11, 2025.  As part of that commitment, the Department will be unifying and consolidating many of its functions within the Office of the Secretary.

---

[79] E&E News, *Major reorganization looms for Interior* (Apr. 10, 2025), available at: https://subscriber.politicopro.com/article/eenews/2025/04/10/major-reorganization-looms-for-interior-00283745.

**Add.494**

1    Dept. of the Interior, Order No. 3429.  The Secretary then delegated the authority to "lead and

2    coordinate the consolidation, unification and optimization efforts within the Department and its

3    Bureaus and Offices" to an individual who is the DOGE Team lead at the Department (Tyler

4    Hassen).  *Id.*[80]

5          243.    Then, on April 23, 2025, news broke that "Interior solicits employees' resumes in

6    preparation for widespread layoffs."[81]  The U.S. Geological Service emailed employees regarding

7    coming RIFs, collecting resumes to determine which employees were essential.  The NPS was

8    reportedly not far behind.  Alyse Sharpe, an Interior spokesperson, told Government Executive that

9    the department was "adhering to guidelines as laid out by the Office of Personnel Management but

10   had no further details on RIF plans at this time[,]" according to that publication.[82]

11         244.    Interior has yet to explain the number of employees impacted by this reorganization,

12   or to provide any further details regarding the ARRPs submitted to OMB for approval, including with

13   respect to any of its important subagencies (including the National Park Service, the Bureau of Land

14   Management, and the Bureau of Reclamation).  An earlier memo stated that the Department will

15   implement RIFs "to maximize workforce efficiency," exempting only positions "critical to public

16   safety" or "directly linked to the highest priority programs."

17         245.    On April 9, 2025, Interior Secretary Doug Blumin denied having a "specific

18   headcount" for coming RIFs.[83]  A document provided to the Washington Post previously showed 1 in

19   4 positions at Interior being considered for cuts.[84]

20

21

22   ─────────────────────
     [80] *See also* The Hill, *Interior Department gives broad powers to DOGE-tied official* (Apr. 21, 2025).

23   [81] Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23,
     2025), available at: https://www.govexec.com/workforce/2025/04/interior-solicits-employees-

24   resumes-preparation-widespread-layoffs/404786/.
     [82] *Id.*

25   [83] E&E News, *How many Interior jobs will be cut? Doug Burgum's not sure, yet* (Apr. 9, 2025),

26   available at: https://www.eenews.net/articles/how-many-interior-jobs-will-be-cut-doug-burgums-not-
     sure-yet/.

27   [84] Wash. Post, *Internal White House document details layoff plans across U.S. agencies* (Mar. 27,
     2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-

28   government-agencies/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    65

246.    On May 7, 2025, the press reported that Interior "is finalizing reduction-in-force plans expected to target thousands of employees, including 1,500 at the National Park Service, with notices going out to employees within 10 days."[85]  The U.S. Geological Survey is also expected to terminate 1,000 employees focused on its Ecosystems Mission Area, the Bureau of Reclamation is expected to terminate around 100 to 150 employees, and the Bureau of Land Management and Fish and Wildlife Service are expected to terminate employees as well.

247.    The Interior Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **National Labor Relations Board**

248.    The National Labor Relations Board submitted its ARRP for approval to OMB, telling OMB it had determined it would not engage in any RIF, because the employees' work was too essential to the agency's mission.  OMB rejected the NLRB ARRP and required the agency to submit a different one.[86]

249.    On information and belief, forced to do so, the NLRB now plans to RIF employees.

250.    The NLRB has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **National Science Foundation**

251.    On information and belief, NSF submitted an initial ARRP that did not include large-scale RIFs and instead relied on voluntary separation offers to satisfy the Workforce Executive Order.

---

[85] Gov't Exec., *Thousands of layoffs to hit Interior, National Parks imminently* (May 7, 2025), available at: https://www.govexec.com/workforce/2025/05/thousands-layoffs-hit-interior-national-parks-imminently/405145/.

[86] Bloomberg Law, *White House pushed job cuts at agency that's clashed with Musk (2)* (April 29, 2025), available at: https://news.bloomberglaw.com/product/blaw/bloomberglawnews/exp/eyJpZCI6IjAwMDAwMTk2LTgyOTAtZDg3Yi1hM2Y2LWRlYjQ1NTZhMDAwNCIsImN0eHQiOiJETE5XIiwidXVpZCI6IjRtVHNNJOURUOUpCSDN3U0o2dzZtStS1E9PURoNGFpbGdwTjNMZjh0WUNRRRXZBU1E9PSIsInRpbWUiOiIxNzQ1OTQ3NzQ3NzIwIiwic2lnIjoiVFpIbkdwbGwwYmRwaEVVOYkw1NEc1VG9xamtsNDZZZcURNPSIsInYiOiIxIn0=?source=newsletter&item=read-text&region=digest&channel=daily-labor-report.

1    But in late April, OMB, OPM, and DOGE rejected that plan, and according to the press, instructed

2    NSF to lay off half of the agency's employees under "orders from the White House."[87]

3            252.    The press has also reported that NSF's "37 divisions—across all eight NSF

4    directorates—are being abolished and the number of programs within those divisions will be

5    drastically reduced."[88]  Current directors will also lose their titles and may be reassigned to other

6    positions.  *Id.*  The press also reported that, as soon as May 9, 2025, NSF was expected to send layoff

7    notices.  *Id.*  On May 9, 2025, NSF sent RIF notices to all employees working in the Division of

8    Equity for Excellence in STEM.

9            253.    NSF has not made public the ARRPs submitted for OMB and OPM approval in

10   conjunction with the March 13 and April 14 deadlines.

11       • **Social Security Administration**

12           254.    On April 7, 2025, Government Executive reported that it had obtained a copy of the

13   SSA's ARRP.[89]  That plan "includes 'field office consolidation' as a goal for next year—even as the

14   agency maintains publicly that it isn't closing field offices."  *Id.*  This was after Elon Musk posted a

15   list of federal real estate for sale that included *47 Social Security Administration field offices*.[90]

16           255.    That same leaked document confirmed a planned cut of approximately 5,000 to 7,000

17   employees.  *Id.*

18           256.    Back in February, the SSA confirmed that it would implement President Trump's

19   executive order by implementing reductions in force that "could include abolishment of organizations

20   and positions" and would "soon implement agency-wide organizational restructuring."  Press

21

22   _____

23   [87] Science, *Exclusive: NSF director to resign amid grant terminations, job cuts, and controversy* (Apr. 24, 2025), available at:  https://www.science.org/content/article/nsf-director-resign-amid-grant-terminations-job-cuts-and-controversy.

24   [88] Science, *Exclusive: NSF faces radical shake-up as officials abolish its 37 divisions* (May 8, 2025), available at:

25   [89] Gov't Exec., *SSA reorg plan contemplates field office closures, contradicting public statements* (Apr. 7, 2025), available at: https://www.govexec.com/management/2025/04/ssa-reorg-plan-contemplates-field-office-closures-contradicting-public-statements/404369/.

26

27   [90] Associated Press, *A list of the Social Security offices across the US expected to close this year* (Mar. 19, 2025), available at: https://apnews.com/article/social-security-offices-closures-doge-trump-b2b1a5b2ba4fb968abc3379bf90715ff.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                               67

Release, Social Security Administration, *Social Security Announces Workforce and Organization Plans* (Feb. 28, 2025).[91]

257.    The SSA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **State Department**

258.    The State Department has put forward conflicting accounts of a massive reorganization plan.  Initially, on April 20, 2025, the New York Times reported on a draft reorganization plan that would require congressional approval and would take the form of another Executive Order.[92]  The State Department disclaimed responsibility and claimed that draft was "fake news." *Id.*

259.    On April 22, 2025, the Department officially announced a reorganization plan as follows:

> To deliver on President Trump's America First foreign policy, we must make the State Department Great Again.
> …
> In its current form, the Department is bloated, bureaucratic, and unable to perform its essential diplomatic mission in this new era of great power competition.  Over the past 15 years, the Department's footprint has had unprecedented growth and costs have soared. …
>
> That is why today I am announcing a comprehensive reorganization plan that will bring the Department into the 21 Century.  This approach will empower the Department from the ground up, from the bureaus to the embassies.  Region-specific functions will be consolidated to increase functionality, redundant offices will be removed, and non-statutory programs that are misaligned with America's core national interests will cease to exist.[93]

The announcement explained that "The Department will implement the changes methodically over the next several months." *Id.*

---

[91] Available at: https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

[92] New York Times, *Trump Administration Draft Order Calls for Drastic Overhaul of State Department* (April 20, 2025), available at https://www.nytimes.com/2025/04/20/us/politics/trump-state-department-overhaul.html.

[93] U.S. State Dept., Building an America First State Department, available at: https://www.state.gov/building-an-america-first-state-department/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          68

Add.498

260. The Department explained in a "Fact Sheet" that: "As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative."[94]

261. The Department also issued an "FAQ" that explained the RIFs are coming within the next 60 days. That FAQ included such questions as "Q: My office is being eliminated. What happens to me and my colleagues?" and "Q: My bureau is being moved to another office. What happens to me and my colleagues?"

262. The Department also explained the efforts to integrate the U.S. Agency for International Development (dismantled by prior Executive Order) into the State Department:

> While implemented separately, these two distinct reorganization efforts are highly complementary, and the Secretary and Department leadership continue to carefully consider the integration of former USAID programs and functions in developing and implementing the Department's reorganization plan.

263. Secretary of State Rubio explained further: "To transfer the remaining functions of USAID to such a monstrosity of bureaus would be to undo DOGE's work to build a more efficient and accountable government."[95]

264. Additional information regarding State Department RIFs have trickled out. The press has reported that the State Department is planning to terminate 3,400 employees beginning in early June,[96] and employees have begun to receive informal notifications that their roles will be cut. A cut of 3,400 employees amounts to more than 15 percent of Department staff.

265. The State Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[94] Available at: https://www.nbcnews.com/politics/trump-administration/marco-rubio-unveils-massive-overhaul-state-department-reduction-staff-rcna202458.

[95] Available at: https://statedept.substack.com/p/a-new-state-department-to-meet-the.

[96] Gov't Exec., *State Dept. cuts poised to be more severe than previously outlined, with 3,400 employees on the chopping block* (May 9, 2025), available at: https://www.govexec.com/management/2025/05/state-dept-cuts-poised-be-more-severe-previously-outlined-3400-employees-chopping-block/405171/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI    69

- **Department of Transportation**

266.     On May 2, 2025, the press reported that Transportation Secretary Sean Duffy announced at a town hall meeting that the Department of Transportation "will perform reductions in force at the end of May as part of the Trump's administration goal to reduce the federal employee headcount."[97]  Secretary Duffy stated that the number of employees subject to the RIF will depend on the number of employees who participate in the second round of the deferred resignation program.

267.     The Department of Transportation has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Peace Corps**

268.     On April 28, 2025, the press reported that the Peace Corps was "planning to reduce the number of full-time staff who support volunteers overseas" at the direction of DOGE.[98]  The agency warned staff of "significant restructuring efforts at the agency."  *Id.*

269.     On May 9, 2025, the press reported that the "Peace Corps may reduce its global staff by 25 percent, potentially closing some of its 60 international posts."[99]  Cuts at the Washington D.C. headquarters were anticipated to be even more severe – ranging from 50 to 80 percent of headquarter staff.  *Id.*

270.     It is also common knowledge among Peace Corps employees that RIFs are on the horizon.  Departments of the Peace Corps told staff in all-staff meetings that RIFs were a possibility, and some managers have told employees that their positions will be cut in a RIF.  Employees have also overheard conversations and seen documents that indicate that the Peace Corps will soon RIF its employees.

---

[97] Gov't Exec., *Initial layoffs at Transportation Department expected in late May* (May 2, 2025), available at:  https://www.govexec.com/workforce/2025/05/initial-layoffs-transportation-department-expected-late-may/405041/.

[98] N.Y. Times, *Peace Corps, under review by DOGE, is said to plan 'significant' staff cuts* (April 28, 2025), available at:  https://www.nytimes.com/2025/04/28/us/politics/peace-corps-cuts-doge.html.

[99] Independent, *JFK-created Peace Corps prep for 'significant restructuring efforts' as DOGE targets humanitarian group* (May 9, 2025), available at: https://www.independent.co.uk/news/world/americas/us-politics/peace-corps-restructuring-doge-review-b2748241.html.

- **Department of the Treasury**

271.    On April 15, 2025, an internal IRS memo was leaked to the press detailing planned cuts of up to 40% of its workforce, including approximately 60,000 to 70,000 positions, through bi-weekly RIF notices starting "this week."[100]

272.    Previously, on April 9, 2025, leaked ARRP plans indicated that Treasury plans to cut up to 50% of its tax enforcement staff, and 20% across the board for other components.[101]

273.    The Treasury Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Veterans Affairs**

274.    On March 4, 2025, the Chief of Staff of the Department of Veterans Affairs issued a *Memorandum – Department of Veterans Affairs Agency Reduction in Force (RIF) and Reorganization Plan (ARRP)*, Dep't of Veterans Affairs (Mar. 4, 2025).  That memo implements the President's Executive Order, and explains:  "For planning purposes, the Department's initial objective is to return to our 2019 end-strength numbers of 399,957 employees," which reflects an approximate cut of 80,000 jobs.[102]

275.    In early March, VA Secretary Doug Collins appeared on Fox & Friends and was asked about the plans to cut 80,000 jobs:

> "So, the 80,000 number that has come out, is that number already done? Have you already decided who to let go?" Fox's Brian Kilmeade questioned.
> *"No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across*

---

[100] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends* (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends; *see also* CNBC, *Tax attorneys say IRS has become a 'zombie' as agency cuts staff and halts audits of the wealthy* (Apr. 17, 2025), available at: https://www.cnbc.com/2025/04/17/irs-staff-cuts-fewer-audits-of-wealthy.html.

[101] Fed. News Network, *Treasury plans to cut up to 50% of IRS enforcement staff, 20% of other components* (Apr. 9, 2025), available at: https://federalnewsnetwork.com/reorganization/2025/04/treasury-plans-to-cut-up-to-50-of-irs-enforcement-staff-20-of-other-components/.

[102] Available at: https://www.afge.org/globalassets/documents/generalreports/2025/va-memo-3-4-25.pdf.

*government*," Collins replied. "*And that is a goal, that is our target.*"[103]

276.    In April 2025, as the deadline for the April 14 ARRP approached, a VA employee leaked the contents of the plans to the press.  The plan is to RIF the 80,000 employees in four categories, in phases including:

> 1.    Administrative and Support Roles:
>   - Policy and program analysts
>   - HR personnel
>   - IT support staff in non-critical functions
>   - Clerical and data entry positions
> 2.    Medical and Healthcare Support Staff
>   - Non-patient-facing administrative healthcare roles
>   - Some contract positions in VA medical centers
>   - Certain research positions with reduced funding
> 3.    Regional and Central Office Staff:
>   - Veterans Affairs Central Office (VACO) will see cuts in operational, administrative, and policy roles
>   - Reductions in public affairs, strategic planning, and some procurement functions
> 4.    Field Office and Call Center Reductions:
>   - VA call centers are expected to be streamlined with automation, reducing the need for live agents
>   - Some regional field office roles will be merged or reassigned[104]

The VA responded to this report claiming the document was "fraudulent."  *Id.*

277.    On April 10, 2025, at a press conference in Chesapeake, Virginia, VA Secretary Doug Collins was questioned about the VA's plan to cut 80,000 jobs:

> One reporter asked, "Did you end up doing this backwards? Talking about how many people you were going to cut before you actually had a plan to restructure the VA and to make it more efficient?"
> "*No, I think one of the things is, it was put across when Donald Trump was elected, he said 'We're going to make government smaller and more efficient,*'" Collins replied.[105]

---

[103] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.

[104] KTNV Las Vegas, *As concerns among veterans rise, VA source shares details of workforce reduction plan* (Apr. 11, 2025), available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-how-their-workforce-reduction-plan-will-affect-them.

[105] The American Homefront Project, *How much of the VA's budget savings will go to patient care? Collins says it's 'up to the President',* (April 17, 2025), available at: https://americanhomefront.wunc.org/news/2025-04-17/how-much-of-the-vas-budget-savings-will-go-to-patient-care-collins-says-its-up-to-the-president.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                72

1       278.    The VA has not made public the ARRPs submitted for OMB and OPM approval in

2 conjunction with the March 13 and April 14 deadlines.

3                                 \*\*\*

4       279.    The agency plans described above are being created and implemented pursuant to the

5 Workforce Executive Order.  Taken alone, as well as in conjunction with other government-wide

6 actions ordered by this Administration, each would have constituted a "reorganization" within the

7 meaning of the most recent, but now expired, statute authorizing the President to propose

8 reorganizations.  5 U.S.C. § 903.

9       280.    There are no public reports, anywhere, of any federal agency planning to engage in

10 "large-scale" RIFs of employees prior to President Trump's February 11, 2025 Executive Order.

11       281.    On information and belief, no agency had decided such reductions would be consistent

12 with agency mission, statutory obligations, or good policy prior to President Trump's order to plan

13 such reductions.

14       282.    On information and belief, as confirmed by the public statements of VA Secretary

15 Collins and OMB and OPM's rejection of the initial ARRPs of at least NLRB and NSF (which

16 proposed few or no RIFs), the "target" cuts in staff are being dictated to agencies by DOGE, in

17 service of the President's policy agenda of "transforming" the federal government.

18       283.    On information and belief, no agency has or would independently decide to cut the

19 entire offices, programs and functions that DOGE, acting the President's behalf, is ordering agencies

20 to cut.

21 **V.     Widespread Actual and Imminent Irreparable Harm**

22       284.    The above ongoing and imminent actions taken by the President, OMB and OPM,

23 DOGE, and the Federal Agency Defendants to implement Executive Order 14210 and the

24 OMB/OPM Memorandum and the resulting ARRPs, have and will cause harm, including irreparable

25 harm, to Plaintiffs, their members, and others, including but not limited to the following:

26

27

28

**Add.503**

1    285.    Plaintiffs were denied the opportunity for advance notice and to publicly comment on

2    the rules imposed by OMB and OPM in the February 26, 2025 Memorandum and thereby prevented

3    from exercising a right guaranteed by the Administrative Procedure Act.

4    286.    Plaintiffs AFGE, the AFGE locals, AFSCME, and SEIU each represent, and have as

5    members, federal employees who have been or will be laid off as a result of the ARRPs created

6    pursuant to the President's Executive Order No. 14210.  Those federal employees will lose their

7    income, their health benefits, and other incidents of employment, causing severe irreparable harm to

8    them, their families, and their communities.

9    287.    Plaintiffs AFGE, AFGE locals, AFSCME, and SEIU each represent, and have as

10   members, federal employees who, if they keep their job, will be subject to a reorganization resulting

11   from the large-scale RIFs that makes doing their job more difficult as result of the ARRPs created

12   pursuant to the President's Executive Order 14210.  Each federal employee who remains will be

13   required to do more to meet the agency's statutory mission and obligations, without the support of

14   colleagues who, until the implementation of the President's orders, the agency believed were needed

15   to perform the work of the agency.

16   288.    Each union Plaintiff has the core function of representing employees, including those

17   in federal bargaining units, in collective bargaining and providing counseling, advice, and

18   representation to employees in the event of adverse employment actions.  Each union Plaintiff has

19   and will be imminently prevented, by the mass terminations ordered by the President and directed by

20   DOGE, OMB, and OPM as part of the purported reorganization of the federal government, from

21   exercising those core functions as employee representatives.

22   289.    Each union Plaintiff has expended substantial time and resources as a result of the

23   President's Executive Order and OMB/OPM's implementing Memorandum, and the federal agencies'

24   implementing ARRPs, addressing member concerns and attempting to provide employees with

25   effective representation.  Each Plaintiff has been forced to divert resources that would be devoted to

26   representing employees who have or will experience adverse employment actions.

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              74

290.    Each union Plaintiff has been harmed in multiple other ways by the actual and imminent termination of its members, including by the loss of dues income and bargaining power. For example, Plaintiffs AFSCME, SEIU, SEIU Local 521, SEIU Local 1000, and SEIU Local 1021 have each been harmed because the well-being, job security, and working conditions of their members who work for state, local government, and private employers are significantly and adversely impacted by the reduction in federal government services occasioned by the President's Executive Order, the OMB/OPM implementing Memorandum and the resulting ARRPs.

291.    Each non-profit organization Plaintiff and its members have suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order 14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

292.    The Plaintiff non-profit organizations are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs across the country and the harms caused by the reductions in staff are and will not be limited to a defined and particular geographic area.

293.    Each local government Plaintiff has suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order 14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

294.    The Plaintiff local governments are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs that have and will result in reductions in staff and services both within and without their borders, and often involve staff performing work in locations across the country not within the geographic borders of the local government.

295.    Plaintiffs describe some of those harms to the Plaintiffs, by Federal Agency Defendant, as follows.  Plaintiffs would also face severe and irreparable injury to the extent that other Federal Agency Defendants that have not publicly announced their plans, or taken action that has been made public, move forward with reorganization and reductions-in-force, including at the Department of Defense, Department of Homeland Security, and Department of Transportation.

Add.505

- **USDA**

296.    Implementing the Executive Order and USDA ARRP to imminently terminate many thousands of USDA staff, to return staffing to 2019 levels, will irreparably and immediately harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFSCME and Plaintiff AFGE.  It will also irreparably and immediately harm the non-federal employee members of Plaintiffs AFSCME and SEIU who work in food service in K-12 schools that rely on USDA's school food programs for funding and for dietary guidelines or provide family childcare services that rely on USDA's childcare food program reimbursements.

297.    These actions will also have a direct and severely detrimental impact on Plaintiff NOFA, its members, and the farmers and other communities the USDA serves.  For example, NOFA's members rely financially on the services provided by the Farm Services Agency (FSA) and the Natural Resources Conservation Service (NRCS), including FSA loans to purchase and improve farms, farm equipment, and anything necessary to run the farms, and rely on their local FSA and NRCS officers to understand their specific farm's physical characteristics and business plans and to conduct in-person business because many lack reliable internet access or proficiency.

298.    These actions will also have a severely detrimental impact on the American Geophysical Union as well as its members, who rely on the USDA's funding, collaboration with its scientists, and use of its research, which is vital to, among other things, supporting the health of forests and rangelands in the face of climate change and other ecological stressors.  Western Watersheds Project will also face injury from the impairment of the Department's ability to control livestock grazing on Forest Service lands, causing damage to riparian habitats and spawning streams that are critical to the survival of certain species, including on WWP-owned land.

299.    In addition, the implementation of the Executive Order and USDA ARRP will cause a direct, immediate and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs King County, Harris County, County of Santa Clara, and the City and County of San Francisco.

**Add.506**

1    300.    For example, Plaintiffs King County and Harris County own and/or operate some of

2    the busiest airports and ports of entry in the nation.  The Department of Agriculture provides

3    personnel at these major transportation centers to manage prey animals that attract predatory birds

4    that create hazards to air traffic through risk of bird strikes to aircraft.  The Department also helps

5    Plaintiff Harris County protect the food supply at food manufacturing facilities processing meat and

6    dairy products.  Absent these critical food safety staff provided by the agency, Plaintiff Harris County

7    lacks the staff capacity, expertise, training, and authority to replace these critical food safety roles and

8    would struggle to prevent outbreaks of food borne illnesses and pathogens such as avian flu that

9    necessitate the destruction of food supply.

10    301.    Similarly, Plaintiff Santa Clara relies on the USDA Wildlife Services program to

11    depredate predators and other animals, including, for example, mountain lions, bears, and pigs, and

12    then tests them to determine if they have any infectious diseases or pose any other risks.  In a recent

13    example, USDA Wildlife Services staff depredated several feral swine in Santa Clara, and upon

14    testing them learned—and alerted Santa Clara staff—that those specific swine carried diseases

15    threatening residents, pets, agricultural producers, and the human food supply.  Reductions to the

16    USDA Wildlife Services program within and outside Santa Clara, will cause an information gap that

17    will  heighten the risks to Santa Clara, its agriculture industry, and its residents, and that Santa Clara

18    (and no other local government) could make up for.

19    302.    Local jurisdictions also rely on USDA to prepare for, respond to, and recover from

20    natural disasters and other emergencies.  For instance, in the aftermath of a major wildfire in Summer

21    2020, Santa Clara's Office of Emergency Management coordinated with USDA to facilitate USDA

22    employees coming to the affected area.  The USDA set up and staffed a field station to help ranchers

23    who lost grazing lands apply for low-interest loans, obtain machinery and tools, and even repair

24    damaged equipment.  Reducing and relocating staff will necessarily adversely impact Santa Clara's

25    ability to support its residents, including those who live in remote areas that are more difficult to

26    serve, in the aftermath of wildfires and other natural disasters, particularly those that affect the

27    substantial amount of agricultural production in the area.  The results could include a weakened

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    77

**Add.507**

1    economy, potential loss or relocation of agricultural businesses, diminished community resilience

2    after disasters, and additional costs to Santa Clara itself (in the form of staff time and funds) to

3    support recovery.

4          303.    Diminishment of the U.S. Forest Service staffing would force local and state

5    firefighting agencies to carry more of the burden of responding to wildfires and go without the

6    assistance on which they often rely. The U.S. Forest Service performs essential work to manage

7    federal wildland, to mitigate the risks of wildfire, and to fight wildfires when they occur.  It is a

8    critical component of the system of mutual aid used by firefighters across the United States.  Santa

9    Clara has experienced several very large wildfires in recent years, including several that were, at the

10    time, the largest in California history.

11          304.    Reduction of the USDA's already understaffed Food Safety Inspection Service, which

12    is responsible for ensuring that the nation's meat supply is free from disease and contamination, will

13    directly impact local governments by increase the risks of suffer foodborne illness and disease, which

14    will burden local governments' health and hospital systems and public health departments, including

15    those operated by Plaintiff Santa Clara.  Reductions to the USDA's Animal and Plant Health

16    Inspection Service will hamper local governments' efforts to monitor and respond to agricultural

17    pests (such as the Mediterranean fruit fly, which was detected in the Bay Area in August 2024, after

18    which Santa Clara worked with USDA officials to establish a quarantine area to prevent its spread)

19    and could hamper or altogether eliminate Santa Clara's practical ability and legal authority to issue

20    certifications necessary to export agricultural goods or collect fees for the inspection and issuance of

21    those certifications.  Similarly, Santa Clara's Division of Agriculture also relies on USDA's

22    Smuggling Interdiction and Trade Compliance Program and reductions there would hamper local

23    government's ability to detect and respond to  invasive pests arriving from overseas (such as the

24    invasive pests that Santa Clara staff biologists found living in camellias illicitly imported from China,

25    and then coordinated immediately with USDA staff to establish a federal quarantine).  Agriculture

26    Departments across California coordinate with USDA in the same way.

27

28

- **AmeriCorps**

305.     The implementation of the Executive Order and ARRP to virtually eliminate AmeriCorps programs has harmed and will irreparably and immediately harm the employees and members who are terminated, those who remain, and their labor representatives including Plaintiff AFSCME.

306.     These actions will also have a detrimental impact on organizations that rely on AmeriCorps programs.  For example, Plaintiff the American Public Health Association has a program working with the CDC on the education and training of Public Health AmeriCorps members, and its decimation will cause harm to the ability of APHA to build capacity to improve community health.

307.     In addition, the implementation of the Executive Order and AmeriCorps ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to AmeriCorps' work in schools; AmeriCorps' Disaster Response Team, which is often involved in disaster recovery work for months and years after disasters such as the recent California wildfires; and King County's work with AmeriCorps to expand capacity to deliver public health services, which will face increased costs and reduced program reach if King County's partnerships with AmeriCorps are lost or diminished.

- **Department of Commerce**

308.     The implementation of the Executive Order and ARRP to imminently reduce of staff in the Department of Commerce, including its announced plan to eliminate thousands of positions at NOAA and closure of the Minority Business Development Agency, will have direct and severely detrimental impacts on federal employees who are terminated, employees who remain, and their labor representatives including Plaintiff AFGE.

309.     Terminations of staff at NOAA, which media reports indicate could eliminate 20 percent or more of the agency's 13,000 employees, will prevent NOAA from effectively carrying out its critical work, ranging from research supporting the health of the ocean and aquatic species conducted by the National Marine Fisheries Service to the foundational research conducted and data

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                              79

**Add.509**

1    collected by the Office of Oceanic and Atmospheric Research to understand hurricanes, weather

2    forecasts, extreme storms, and natural disasters.

3         310.    These actions will have a severely detrimental impact on Plaintiff AGU and its

4    members, who collaborate with NOAA scientists and rely on funding from NOAA as well as on

5    NOAA's funding, science, and research to provide AGU members with the foundational research and

6    data to understand hurricanes, weather forecasts, extreme storms, climate change, the oceans, and

7    natural disasters, among many other services.  For example, AGU members will be harmed by the

8    loss of NOAA's provision of essential data services that they use to model coastal hazards and

9    research that tailors climate adaptation guidance to community organizations.  These actions will also

10   cause injury to the Plaintiff Western Watersheds Project, which relies on NOAA's climate data, data

11   collected by NOAA's National Weather Service, and conservation services by NOAA's National

12   Marine Fisheries Service, and Plaintiff NRDC, which relies on research from NOAA and the Census

13   Bureau, as well as NRDC members, who rely on NOAA support and services.

14        311.    In addition, the implementation of the Executive Order and Commerce ARRP will

15   cause a direct and seriously detrimental injury to local governments that interact directly with this

16   agency and rely on its services every day, specifically including but not limited to all Plaintiff local

17   governments.

18        312.    All local government Plaintiffs rely on data, staff, services, and expertise provided by

19   NOAA, including data they need to inform emergency preparations, planning, and response.  For

20   example, Plaintiffs Chicago, King County, Santa Clara, and San Francisco specifically rely on

21   forecasts, modeling, and real-time information for major public event safety planning and weather-

22   related operations at a granular level of detail with real-time updates, and Plaintiffs Harris County,

23   King County, Santa Clara County, and others use this same information for major weather events.

24   Plaintiff Chicago also relies on NWS personnel during large-scale outdoor City events, who are often

25   present on site to assist in real-time assessment and response to weather data as it comes in.  And

26   King County relies on interagency County and National Weather Service teams to coordinate and

27   conduct outreach to communities and provide education before major weather events like the

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    80

**Add.510**

1   November 2024 "bomb cyclone" windstorm that resulted in several fatalities. Plaintiff local

2   governments would lose valuable information and services that are essential to human safety and

3   resilience.

4          313.    King County also relies on NOAA Fisheries to assist in the development and

5   implementation of Puget Sound Salmon Recovery Plans that are critical to the recovery, management,

6   and protection of several species of salmon within King County—an essential component of the

7   region's economic, recreational, and cultural life. Also, NOAA Fisheries' consultation and review of

8   capital projects for Endangered Species Act and Essential Fish Habitat compliance is a critical step in

9   permitting projects. Delays would escalate construction costs, and elimination of review would

10  undermine progress toward salmon recovery and other marine life management and protection goals.

11         • **Department of Energy**

12         314.    The implementation of the Executive Order and ARRP to impose imminent reductions

13  of up to 50% of the staff at the Department of Energy will irreparably and immediately harm the

14  federal employees who are terminated, those who remain, and their labor representatives including

15  Plaintiff AFGE.

16         315.    These reductions, which are proposed to cut half of the science and innovation

17  programs, will also have a direct and substantially detrimental impact on the members of Plaintiff

18  American Geophysical Union who rely on research by and funding from the Department and

19  regularly collaborate with its scientists, and will directly impair the AGU's financial resources and

20  mission. They will also harm Plaintiff NRDC, which relies on publications and databases updated

21  and maintained by the Federal Energy Regulatory Commission, National Renewable Energy

22  Laboratory, and Energy Information Administration. By eliminating weatherization programs, they

23  will harm Plaintiff AFSCME, which has non-federal-employee members who perform weatherization

24  work funded, overseen, and assisted by the Department, which will be interrupted and injured. And

25  they will cause substantial harm to members of the public, who depend on the Department to keep

26  them safe including by maintaining the nation's nuclear stockpile and operating environmental

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              81

1   management programs that, among other things, clean up radioactive waste and prevent the material

2   from contaminating the soil and groundwater.

3       316.    In addition, the implementation of the Executive Order and Energy ARRP will cause a

4   direct and seriously detrimental injury to local governments that interact directly with this agency and

5   rely on its services every day.

6       317.    Crises stemming from understaffing of the programs of the Department of Energy will

7   enormously burden city and county governments, which will be left to handle environmental

8   disasters, specifically including but not limited to Plaintiffs City and County of San Francisco and the

9   City of Baltimore.

10      318.    For example, the Executive Order and AARP have already caused, and will continue

11  to cause, disruptions and harms to vital funding sources and supports.  For example, Plaintiff San

12  Francisco has received federal financial support from the Department of Energy to develop green

13  building standards, deploy EV charging infrastructure, and continue to transition city vehicles to Zero

14  Emission Vehicles.  Three 2024 Department of Energy grants awarded to San Francisco for these

15  purposes are in stasis awaiting information from San Francisco's last known federal program officers

16  on these grants—several of whom are no longer employed at the Department of Energy.  Similarly,

17  King County expects these actions to delay implementation of critical work funded by grants from

18  the Department of Energy.  As one example, Plaintiff King County is currently implementing a block

19  grant under the DOE's Energy Efficiency and Conservation Block Grant Program.  This grant will

20  allow King County to continue its efforts to reduce fossil fuel emissions and energy use, and improve

21  energy efficiency in various sectors.  On April 24, 2025, Plaintiff King County was advised that the

22  technical project officer for that particular grant was leaving the agency, and that it may reach out to

23  various email addresses unattached to specific people for issues and questions, and that a new

24  technical project officer has not yet been assigned to the grant.  King County expects that the

25  reductions at the Department of Energy have reduced or eliminated its ability to work on this grant.

26  Likewise, Plaintiff City of Baltimore also relies on the Department's data, models, training, and

27  support and funding for climate goals that affect it as a coastal city.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              82

**Add.512**

- **Environmental Protection Agency**

319.     The implementation of the Executive Order and ARRP to impose imminent substantial cuts at EPA—including the initial terminations of nearly 300 employees at environmental justice offices, planned elimination of the Office of Research and Development and layoffs of more than 1,000 employees working there, and targets to cut up to 65 percent of the budget, including employees—will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE and SEIU.

320.     The actions will also have a direct and severely detrimental impact on Plaintiff American Geophysical Union and its members, who collaborate with and rely on the EPA's research and funding, as well as the public.  They will stop the EPA's research, tracking, and responses to health hazards in the air, water, and land.  And they will harm non-profits that rely on data, analysis, and funding from the EPA for their work, including Plaintiffs American Geophysical Union and the NRDC.  In particular, the cuts to the EPA include large-scale staffing reductions at the EPA Office of Research and Development, which produces critical research on PFAS and lead contamination on which NRDC relies, as well as at the EPA Office of Environmental Justice and External Civil Rights, which ran EJScreen, an environmental justice screening and mapping tool on which NRDC relies.

321.     In addition, the implementation of the Executive Order and ARRP will cause a direct and seriously detrimental injury to local governments, specifically including but not limited to Plaintiffs the City of Baltimore, City of Chicago, County of Santa Clara, City and County of San Francisco, and King County.

322.     For example, Plaintiffs including King County and Chicago rely on the EPA in dealing with hazardous materials including Superfund sites, where EPA staffing and support is necessary to protect public health through remediation and technical assistance.  Similarly, local government plaintiffs including Santa Clara rely on the EPA for tracking, tracing, and managing hazardous materials while in transit to, from, or through their jurisdictions, for which they rely on the e-Manifest system and protocols developed and managed by EPA.   Plaintiffs Santa Clara and Chicago also rely on the EPA in the aftermath of disasters, including clearing hazardous waste and determining whether

1   and when it is safe for residents to return to disaster-affected areas.  If the EPA's ARRP diminishes

2   EPA's capacity to deploy staff on-site after fires and other natural disasters, that will make it more

3   difficult and more protracted for Plaintiff Santa Clara to fulfill its role of protecting its residents and

4   the environment from hazardous material leaks and exposures and to facilitate recovery from natural

5   disasters.

6       323.    Localities like Plaintiff King County rely on EPA staff expertise, collaboration, and

7   data sharing to support effective climate and environmental assessments and program

8   implementation.  Diminished access to EPA staff could hinder accurate greenhouse gas inventories

9   and mitigation planning and limit Plaintiff King County's ability to target mitigation efforts in areas

10  with high pollution burdens and vulnerable populations.

11      324.    Localities, including Plaintiffs King County and San Francisco, also rely on EPA staff

12  for funding and resources to support local environmental justice work. Without EPA staff to manage

13  and process grants, support mapping tools and other resources, and provide technical assistance,

14  localities like Plaintiffs will be seriously harmed.  Plaintiff San Francisco's Environment Department

15  will also be impaired in fulfilling its mission to promote environmental justice, and these cuts will

16  detrimentally impact communities in San Francisco that are already harder hit by environmental

17  issues.

18      325.    In addition, the implementation of the Executive Order and ARRP will cause serious

19  injury to local governments with respect to their agricultural work.  EPA's ongoing work is a linchpin

20  for the agricultural industry across the country, including, for example, in Santa Clara.  Plaintiff Santa

21  Clara's Division of Agriculture regulates and monitors the use of pesticides in this industry, including

22  by issuing use permits and receiving and reviewing reports from producers of when the pesticides are

23  used.  But EPA, not local governments, primarily manages and implements the Federal Insecticide,

24  Fungicide, and Rodenticide Act, which governs the registration, labeling, distribution, sale, and use of

25  pesticides in the United States, by determining whether a given manufacturer's product can be

26  registered as a pesticide, which in turn requires EPA to determine its safety for use in the food supply.

27  The EPA's involvement is essential not only for registering new pesticides, but also when Plaintiff

28

Santa Clara detects new invasive species or pests that require urgent response but for which there is not yet a registered pesticide. In those instances, the EPA must issue approvals for "off-label" use of registered pesticides. Execution of EPA's ARRP could diminish if not altogether destroy EPA's ability to register new pesticides and its ability to act promptly to permit famers to protect their crops from new and emerging threats. The risk is especially acute for Plaintiff Santa Clara: because the Bay Area is a site of significant international travel, there is an especially heightened chance that harmful pests will be detected first in or near Santa Clara.

326.    EPA's reorganization could also diminish or altogether block EPA's capacity to deploy the on-scene coordinators who assist local governments including Plaintiff Santa Clara during emergency response to releases of hazardous materials and other harmful chemicals. Plaintiff Santa Clara relies heavily and directly on EPA staff to provide interpretation, guidance, and training for EPA's Spill Prevention, Control, and Countermeasure regulations. Likewise, Plaintiff Santa Clara's Department of Environmental Health also relies on modeling software that EPA develops, maintains, and updates in order to assess potential offsite consequences of catastrophic releases of hazardous substances. If EPA does not maintain or continue to update this software, it would substantially diminish the ability of Plaintiff Santa Clara—and, on information and belief, other local and state agencies—to respond to these releases in ways that effectively protect residents.

- **General Services Administration**

327.    The implementation of the Executive Order and ARRP to impose imminent drastic cuts to GSA staff—including a 63 percent reduction in Public Buildings Service staff, which will eliminate more than 3,500 positions—will have direct and severely detrimental impacts on the federal employees who are terminated, employees who remain, their labor representatives including Plaintiff AFGE, and the public.

328.    Federal employees who work at and members of the public who visit federal office buildings, courthouses, and other federal facilities rely on Public Buildings Service staff to ensure their health and safety in the facilities by overseeing the testing of water in the buildings for the presence of bacteria, lead, and copper; maintaining fire prevention systems; managing indoor air

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    85

**Add.515**

1   quality, including during wildfires; and containing the spread of infectious diseases in the buildings.

2   The severe reduction in Public Buildings Service staff will threaten the health and safety of AFGE

3   members, as well as other federal employees and visitors, at federal buildings and facilities

4   throughout the country.  Cuts to other parts of GSA will similarly undermine the agency's ability to

5   provide real estate, facilities management, procurement, technology, and other services to the federal

6   government and the public.

7          329.    SEIU has hundreds of members who are employed by federal contractors to provide

8   cleaning services at GSA locations, who are at risk of losing their jobs due to the reduction in GSA

9   staff.

10        • **Department of Health and Human Services**

11        330.    The implementation of the Executive Order and ARRP has already included RIFs

12  carried out at HHS in late March 2025 that eliminated roughly 10,000 positions across the agency,

13  including 3,500 at the Food and Drug Administration (FDA), 2,400 at the Centers for Disease Control

14  and Prevention (one-fifth of all CDC employees), 1,200 at the National Institutes of Health (NIH),

15  and 300 at the Centers for Medicare & Medicaid Services (CMS).  Many offices and programs were

16  eliminated entirely or lost the vast majority of their employees, including the National Center for

17  Injury Prevention and Control, National Institute for Occupational Safety and Health, Office of

18  Health Equity, National Center on Birth Defects and Developmental Disabilities, certain programs

19  within the National Center for Environmental Health, and various CDC laboratories.  Five large HHS

20  offices were shuttered: in New York City, Boston, Chicago, Seattle, and San Francisco.

21        331.    These layoffs have caused immediate and severe harm to the federal employees who

22  were terminated, as well as those who remain, and to their labor representatives including Plaintiffs

23  AFGE.  They are also directly harming Plaintiffs AFSCME and SEIU, and their non-federal

24  employee members, some of whom are employed by Head Start programs that rely on HHS-

25  administered funding, training, technical support, and investigation and enforcement of rules; some of

26  whom are family childcare providers who depend upon HHS's Office of Child Care for the timely

27  receipt of grant funds, regulatory compliance guidance, and oversight; and many of whom work in

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          86

1    state administration of Medicaid and in public health positions who have been and will continue to be

2    injured by cuts to CMS and the CDC. SEIU also has members who are employed by federal

3    contractors to provide cleaning services at HHS locations, who are at risk of losing their jobs due to

4    the reduction in HHS staff.

5        332.    The actions will also have a direct and severely detrimental impact on Plaintiff

6    American Public Health Association and its members. Many APHA members are public health

7    officials who work in state and local health departments who have lost access to critical services. For

8    example, the CDC terminated employees who had been working on the ground responding to the

9    worsening measles outbreak in Texas that has already claimed the lives of two children and lead

10   experts who had been ready to provide essential on-the-ground support to Milwaukee public schools

11   that were closed due to the discovery of widespread presence of lead. State and local public health

12   officials and offices that relied on data, expertise, and support from HHS will have to expend

13   significant resources in response to these sweeping terminations and reorganization and run the risk

14   of new or worsening public health crises. The actions will also harm Plaintiff American Geophysical

15   Union and its members, who regularly collaborate with CDC and NIH researchers, as well as Plaintiff

16   NRDC, all of whom rely on CDC and NIH research including on lead contamination.

17       333.    The virtual elimination of NIOSH, which has seen 93% of the staff given RIF notices,

18   will harm non-federal employee members of Plaintiffs SEIU and AFSCME because it will halt

19   NIOSH's research, investigations, and guidance to prevent, mitigate, and address occupational

20   injuries and illnesses across all types of workplaces, including coal mines, fire departments, oil and

21   gas wells, healthcare facilities, and small businesses (including Plaintiff Main Street Alliance

22   members) and thereby increase health and safety risks to workers across the country. In particular,

23   cuts to a longstanding program offering coal miners free screenings for black lung, and an

24   opportunity for miners at risk of advancing their black lung to transfer to less dangerous positions,

25   has been eliminated. Firefighter safety programs, which address exposure to toxins and chemicals

26   and cancer risk, have also been shuttered or virtually eliminated.

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                            87

**Add.517**

334.    NIOSH is also essential to a wide range of activities undertaken by the local

government plaintiffs, so its demise is already harming, and will continue to harm, those plaintiffs.

For instance, Plaintiff Santa Clara relies on NIOSH's review, testing, evaluation, and/or certification

of stafety equipment, including Personal Protective Equipment (PPE) such as N95 respirators,

protective gowns, and equipment designed to protect against hearing loss, across its operations.  If

NIOSH remains shuttered, Santa Clara expects it will be forced to make impossible choices, such as

choosing between cancelling medical procedures that are clinically indicated for patients, or

procuring and using PPE that NIOSH has not reviewed or certified, and which may therefore fail to

comply with applicable regulations and inadequately protect workers and patients from harm.  And if

the decimation of NIOSH is not forestalled, Plaintiff Santa Clara and its residents—and likely

governments and residents across the country—will be left exposed to new and emerging hazards for

which there is not yet any NIOSH guidance or NIOSH-reviewed PPE.  That risk is especially

pronounced for Plaintiff Santa Clara for numerous reasons, including because it operates a large

health and hospital system, is a hub for international travel, is the home of numerous sites considered

to be targets for potential bioterrorist attacks, and has a location that leaves it susceptible to new and

emerging infections as well as respiratory and other atmospheric risks caused by wildfires and

exacerbated by climate change.

335.    In addition, the implementation of the Executive Order and HHS ARRP will cause a

direct and seriously detrimental injury to local governments that interact directly with the CDC and

rely on its services every day, specifically including but not limited to all local government Plaintiffs.

336.    For example, Plaintiff San Francisco operates an extensive public health system that

relies on CDC services in numerous ways.  The CDC supports San Francisco's public health efforts,

including through trainings, guidance, public health pipeline programs, transportation services for

rare but particularly infectious patients who cannot be treated at San Francisco's public hospital,

reference lab services, and surveillance support that is crucial for identifying and tracking the spread

of infections and diseases, including resistant strains.  Absent adequate CDC support, Plaintiff San

Francisco will have to divert and expend resources.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    88

**Add.518**

337.    The RIFs and reorganization at HHS are limiting or eliminating national data collection projects, and limiting access to staff with related subject-matter expertise, which will negatively affect the ability of local governments to respond to public health emergencies.  For example, Plaintiff Chicago's Department of Public Health relies upon CDC data and guidance to effectively surveil the spread of sexually transmitted diseases, control the spread of infectious diseases like measles and Mpox, and efficiently allocate resources to address chronic diseases like diabetes and opioid addiction.

338.    Local governments, including Plaintiff Santa Clara, also rely heavily on the CDC's Laboratory Response Network, as well as several CDC laboratories that are the only ones authorized or capable of testing for certain infectious diseases, including some sexually transmitted diseases. Delays or disruptions in CDC's ability to test specimens or report results to Plaintiff Santa Clara's Public Health Department will produce information gaps and delays that result in unnecessary spread of infectious diseases as well as inadequate directions or recommendations to affected patients. Indeed, Plaintiff Santa Clara's Public Health Department has protocols that often require its staff to contact and share specimens with the CDC very quickly and to monitor results that the CDC shares not only for its own specimens, but for tests of specimens from other parts of the country.  When the CDC operates the only laboratory that can conduct the testing, HHS's reorganization could mean the difference between life and death, between effective and ineffective treatment, between spread or containment of infectious disease, and whether residents suffer.

339.    Reductions to the CDC's extensive work developing information about emerging infectious-disease threats in other parts of the world, will directly impact Santa Clara and other local governments where there is frequent travel between Santa Clara and those areas.  When the CDC develops and shares information about outbreaks of Ebola, novel influenza, mpox, and other diseases—including not only COVID-19, but more recently Marburg virus disease (formerly known as Marburg haemorrhagic fever) and tuberculosis—localities including Plaintiff Santa Clara can be better prepared to handle potential cases that may emerge locally.  The CDC played a critical role in assisting Santa Clara in its response to these threats, including by sending experts with specific

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          89

**Add.519**

1    expertise in medicine, epidemiology, infection control, community mitigation, and communications

2    to Santa Clara to coordinate with Santa Clara's Emergency Operations Center, and to develop a

3    community mitigation plan.

4        340.    When there is a terrorist attack, disease outbreak, earthquake, or other emergency, and

5    local government health systems (including both public health departments and hospitals) require use

6    of medicines, including those that are not quickly or commercially available or in quantities that

7    would exhaust local supplies, those departments can access medicine from the Strategic National

8    Stockpile, which is administered and staffed by HHS's Administration for Strategic Preparedness and

9    Response (ASPR).  The time-sensitive availability of the Strategic National Stockpile is critical.  If

10    HHS's ARRP closes or reduces the capacity of ASPR to operate the Strategic National Stockpile,

11    CDC to operate the Drug Service, or FDA to operate the expanded access program, it would reduce if

12    not altogether block the ability of Plaintiff Santa Clara's Public Health Department and Health

13    System—and other local and state hospitals, clinics, and public health departments—to access these

14    vital, life-preserving resources in times of emergency.

15        341.    Additionally, NIOSH provides local governments with essential investigative support

16    in fire safety, particularly in the aftermath of industrial incidents.  Plaintiff Harris County contains

17    extensive petrochemical infrastructure, and has relied on NIOSH to identify causation in fires where

18    initial assessments were inconclusive.  Loss of NIOSH personnel and institutional knowledge will

19    compromise this function, leaving Plaintiff Harris County ill-equipped to respond to industrial

20    hazards and fire risks.

21    • **Department of Housing and Urban Development**

22        342.    The implementation of the Executive Order and ARRP to impose an imminent RIF of

23    up to 50 percent reduction in HUD staff, which will eliminate certain offices and more than 4,000

24    positions, will directly and significantly harm the federal employees who are terminated, those who

25    remain, their labor representatives including Plaintiff AFGE, and members of the public who depend

26    on HUD's services.  It will prevent individuals and communities across the country from being able

27    to access funding and support for disaster relief, community development, rental assistance,

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    90

**Add.520**

1    homeownership, homelessness, and housing discrimination complaints, and exacerbate the housing

2    crisis and housing-related issues throughout the country.

3         343.    These actions will also cause irreparable injury to Plaintiff AFSCME and SEIU, and

4    their non-federal employee members, who work at housing authorities across the country—including

5    in California—that depend on the regular and timely distribution of HUD funding and who will be

6    harmed by the closure of local HUD offices.  SEIU also represents hundreds of members employed

7    by service contractors who provide cleaning, security, and other services at housing authorities in

8    numerous states, and risk losing their jobs due to the significant reduction in HUD staff and closure

9    of offices.  SEIU Local 1000 members work at a California state agency that administers affordable

10   housing programs funded exclusively by HUD, and the cuts to HUD staff and dozens of office

11   closures will imperil the agency's critical functions and services, impede oversight and enforcement,

12   diminish critical technical assistance and support, and threaten affordable housing programs and

13   projects, harming SEIU Local 1000's members and the members of the public whom they serve.

14        344.    These actions will cause a direct and seriously detrimental injury to local governments

15   that interact directly with this agency and rely on its services every day, specifically including but not

16   limited to Plaintiffs City of Baltimore, County of Santa Clara and King County.

17        345.    For example, delays in receiving technical assistance and guidance from HUD staff on

18   topics critical to the governance of the Community Development Block Grant, HOME programs, and

19   Section 108 Loan Programs will impact localities like Plaintiff Baltimore.  These programs rely on

20   HUD staff to, *inter alia*, review and provide approvals necessary for processing the flow of funds

21   under these programs; reduced staff will hamper the ability of localities like Plaintiff Baltimore to use

22   these funds and to refinance loans through the 108 Loan program, causing financial and economic

23   harms.

24        346.    In addition, HUD's reorganization will cause delays in processing invoices and

25   payment to local governments and nonprofits in connection with nationwide housing assistance and

26   grant programs.  HUD's inability to timely process invoices and payments to grantees, provide

27   technical assistance, or manage future grant cycles will not only hamper the ability of local

28   

AMENDED COMPLAINT, No. 3:25-cv-03698-SI            91

1    governments to assist beneficiaries through housing support offices such as Plaintiff Santa Clara's

2    Office of Supportive Housing, but will also cause more residents to experience homelessness due to

3    lack of availability of shelters and services.

4    • **Department of Interior**

5        347.    The implementation of the Executive Order and ARRP to impose imminent mass

6    layoffs at the Department of the Interior will have an immediate and detrimental impact on the federal

7    employees who are terminated, those who remain, and their labor representatives including Plaintiffs

8    AFGE and SEIU.

9        348.    These actions will also inflict irreparable injury upon Plaintiff American Geophysical

10    Union and its members, who regularly collaborate with and depend on the agency—in particular, on

11    the U.S. Geological Survey (USGS), Bureau of Land Management, and Fish and Wildlife—for

12    funding and research.  The targeting of USGS will compromise vital public services, including

13    providing reliable science to resource managers, emergency response, other scientists who rely on it,

14    and the public.  For example, the planned reductions of 20 percent will eliminate regional centers that

15    partner with local natural resource managers and communities to help them deal with mounting

16    challenges of climate change, from wildfires to sea level rise.

17        349.    The reductions in staffing will also harm Plaintiff NRDC, which relies on publications

18    and databases updated and maintained by the Fish and Wildlife Service, U.S. Geological Survey, and

19    the Bureau of Land Management; and Plaintiff Coalition to Protect America's National Parks and its

20    members, because inadequate staffing will endanger animal and plant species and compromise park

21    functioning and operations, harming the recreational activities of members in national parks.  It will

22    harm Plaintiff Western Watersheds Project, by impeding timely access to public records necessary to

23    accomplish its conservation mission, adversely affecting the Bureau of Land Management's

24    prevention of ecologically destructive grazing on federal public lands, hindering WWP's ability to

25    research and obtain information related to conservation efforts, impacting the U.S. Fish and Wildlife

26    Service's ability to categorize and protect endangered species such as the Wyoming toad and Arctic

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                        92

1    grayling, and causing other adverse effects that will decimate the National Wildlife Refuge, harm

2    WWP's ability to protect native wildlife, and impede the enjoyment of land by WWP's members.

3            350.    In addition, the implementation of the Executive Order and the Interior ARRP will

4    cause a direct and seriously detrimental injury to local governments, specifically including but not

5    limited to Plaintiffs Santa Clara and King County.  It will harm Plaintiff Santa Clara's emergency-

6    planning efforts and capabilities, which rely on information about earthquake hazards developed by

7    USGS to plan for and respond to earthquakes.  Indeed, Plaintiff Santa Clara is a member of the

8    Association of Bay Area Governments, which partners closely with USGS to provide resources and

9    guidance related to earthquakes.  Similarly, implementation of the Executive Order and the Interior

10   ARRP would significantly slow Plaintiff King County's ability to complete infrastructure,

11   transportation, and environmental projects, increase costs, and reduce the effectiveness of efforts to

12   protect endangered species and historic resources.  It would result in Plaintiff King County

13   experiencing, among other things, increased uncertainty and project delays due to extended

14   consultation and permit review and issuance in ESA and EFH reviews conducted by U.S. Fish and

15   Wildlife Service along with NOAA Fisheries, which oversee species like Chinook Salmon and Bull

16   Trout.  It would also cause delays in compliance with federal laws requiring consultation with the

17   Bureau of Indian Affairs and other DOI agencies on the impacts of federally funded or permitted

18   projects on historic properties, potentially stalling project approvals.

19       • **<u>Department of Labor</u>**

20           351.    The implementation of the Executive Order and ARRP to impose imminent large-scale

21   layoffs at the Department of Labor will have a direct and severely detrimental impact on the federal

22   employees who are terminated, those who remain, and their labor representatives including Plaintiff

23   AFGE.  For example, the Department has eliminated the enforcement division of the Office of

24   Federal Contract Compliance Programs (OFCCP) and plans to cut OFCCP by 90 percent.

25           352.    These actions will also have a direct and severely detrimental impact on Plaintiffs

26   AFSCME and SEIU, whose non-federal employee members depends on many programs and

27   subagencies of the Department including the Occupational Health and Safety Administration

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          93

**Add.523**

("OSHA"), Wage and Hour Division, Bureau of Labor Statistics, and Employee Benefits Security Administration. SEIU also represents members employed by service contractors who provide cleaning services at DOL offices, and risk losing their jobs due to the significant reduction in staff. Plaintiff AFGE and its members will also be harmed by cuts to OSHA which, among many other vital roles, is responsible for ensuring effective occupational safety and health programs within federal agencies, and the Office of Workers' Compensation Programs, which administers Federal Employees' Compensation Act claims.

353. In addition, the implementation of the Executive Order and the Labor ARRP will cause a direct and seriously detrimental injury to local governments.

- **National Labor Relations Board**

354. The implementation of the Executive Order and ARRP to impose a large-scale reduction-in-force at the NLRB will have a direct and severely detrimental impact on the federal employees who are terminated, those that remain, and their labor representatives.

355. In addition, these actions will also have a direct and severely detrimental impact on Plaintiffs AFSCME and SEIU, both of whom represent private-sector members who depend on the NLRB and who regularly file unfair practice charges and representation petitions at the NLRB. Due to flat-line budgeting, case processing time has increased over the past decade from 100 days to 444 days. Decreasing staff will further extend the time it takes for the NLRB to prosecute violations of federal labor law, leaving workers and unions unprotected. Plaintiffs AFSCME and SEIU who regularly file unfair practice charges at the NLRB presently have significant pending petitions for representation and unfair labor practice charges that are not being timely processed due to current low staffing levels. The delay will mean that NLRA violations will effectively go unremedied and workers will be thwarted in having unions certified as their collective bargaining representatives because the NLRB will not be able to conduct timely elections.

1

- **National Science Foundation**

2     356.    The implementation of the Executive Order and ARRP to impose imminent layoffs of

3 up to half of NSF staff will have a direct and severely detrimental impact on the federal employees

4 who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

5     357.    They will also cause severe harm to science in the United States. NSF has already

6 abolished eleven of its thirteen advisory panels. It is a major funder of critical scientific research, and

7 the elimination of staff will cause serious disruptions in funding that created chaos and instability

8 among researchers. For these reasons, the reduction in NSF staff will have a direct and substantially

9 detrimental impact on the members of Plaintiff the American Geophysical Union, who rely on

10 research by and funding from, and often collaborate with, the NSF. It will also harm Plaintiff

11 Western Watersheds Project, which regularly uses NSF-funded research for protection and restoration

12 of wildlife and native ecosystems,

13

- **OPM**

14     358.    Planned RIFs at OPM will cause imminent harm to Plaintiff AFGE's members, who

15 will lose their jobs, and to Plaintiff AFGE itself by: impairing its mission, depriving it of membership

16 dues, and forcing it to allocate resources and attention to responding to RIFs instead of other

17 organizational goals.

18

- **Peace Corps**

19     359.    Planned RIFs at the Peace Corps will cause imminent harm to Plaintiff AFSCME's

20 members who will lose their jobs, and to Plaintiff AFSCME itself by: impairing its mission, depriving

21 it of membership dues, and forcing it to allocate resources and attention to responding to RIFs instead

22 of other organizational goals.

23

- **Small Business Administration**

24     360.    The implementation of the Executive Order and ARRP to impose an imminent 43

25 percent reduction in SBA staff, which will eliminate thousands of positions, will cause a direct and

26 severely detrimental impact on the federal employees who are terminated, those who remain, and

27 their labor representatives including Plaintiff AFGE.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI           95

361.     This reduction will also cause harm to Plaintiffs AFGE, AFSCME, and SEIU members who carry student loan debt, many of whom have benefited from the Public Service Loan Forgiveness program and income-driven repayment options that attach to the federal student loans of those employed in the public sector.  Because the Administration intends to transfer the processing of student loans from the (now eliminated) Department of Education to the SBA, understaffing in the SBA will cause delays in processing loan forgiveness or requests to adjust income-based repayment, causing significant financial harm to AFSCME, SEIU, and AFGE members.

362.     The reductions will also have a severely detrimental impact on the small businesses across the United States, including the members of Plaintiff Main Street Alliance, who rely on SBA services, which include loans, loan guarantees, grants, disaster relief, assistance connecting with government contracting opportunities, a mentoring program, and a national network of Small Business Development Centers that provide counseling and training to help entrepreneurs start their own businesses.

363.     In particular, Main Street Alliance members and other small businesses that have suffered substantial injuries in national disasters rely on the SBA's Emergency Injury Disaster Loan ("EIDL") program.  But without adequate staff, EIDL loan processing will be delayed and loan recipients facing repayment difficulty will be unable to reach EIDL to renegotiate payments, causing them to end up in default and be sent to collection.  Reductions in staffing will also slow the processing of loan guarantees, which will have detrimental effects not only on small business loan recipients but also on contractors and suppliers, and their employees.  Many of these effects have already begun to occur.  The SBA office that funds an important mentoring program has been effectively eliminated.  At least one Small Business Development Center has already closed, with more to come.  As the RIFs continue to unfold, they will have extremely detrimental effects on small businesses throughout the nation including many members of Main Street Alliance.

364.     In addition, the implementation of the Executive Order and SBA ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs the City and County

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                        96

**Add.526**

of San Francisco and King County.  The elimination of positions at the SBA threatens the Plaintiff local governments' ability to support communities that are recovering after major disasters, by slowing critical financial assistance.  They will cause delays in, among other things, damage assessments, establishment of Disaster Loan Outreach Centers, and servicing of disaster loans, which are currently fully managed by SBA employees.  In addition, residents and businesses that depend on timely access to disaster loans will face financial harm.  Without sufficient SBA staff to travel to disaster locations to perform assessments and provide loan application technical assistance, residents in disaster areas will face difficulty obtaining low-interest federal disaster loans, therefore hindering their ability to rebuild and recover from disasters

- **Social Security Administration**

365.    The implementation of the Executive Order and ARRP to imminently eliminate the jobs of 7,000 of the 57,000 SSA employees—at a time when the SSA was already at a 50-year staffing low just as the peak of the Baby Boomer generation become eligible for SSA retirement benefits—will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

366.    These layoffs will also affect Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and their non-federal employee members who work for state agencies that determine eligibility for Old Age, Survivors and Disability Insurance and depend on SSA-administered technology to make their assessments, for local or state determination entities, and/or for medical providers that make those determinations, which also depend on SSA staff.  SEIU Local 1000 members are employed by the California state agencies that rely on the provision of social security numbers when issuing driver's licenses and processing unemployment benefits applications, and will likely face long delays in speaking with SSA staff and resolving problems with social security numbers, which, in turn, will delay the provision of state service, including driver's licenses and unemployment/disability insurance.

367.    In addition, these actions will also have a direct and severely detrimental impact on Plaintiff Alliance for Retired Americans and its members, who are already experiencing long wait

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    97

times for appointments in person and long wait times (already up to 90 minutes) on the 800-number to apply for benefits or to correct benefit problems by phone. Employees processing benefits applications will no longer have the necessary information technology support, causing problems including website disruptions that prevent ARA members and others from applying for benefits or calculating benefits to make retirement decisions. And adding the caseload of employees who are terminated to SSA employees' already overwhelming caseload will mean the current problem of almost one-fifth of benefit applications not being timely processed will expand and people who are entitled to receive Social Security benefits, including ARA members, will not timely receive them. These same issues will also affect Plaintiffs AFSCME's and AFGE's significant number of retired members and their families.

- **State Department**

368.    The implementation of the Executive Order and ARRP imminently to impose sweeping cuts at the State Department—including staff reductions in domestic offices of 15%, on top of the elimination of entire offices—will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE. SEIU also represents members employed by service contractors who provide cleaning services at State Department offices, and risk losing their jobs due to the significant reduction in staff.

369.    These reductions will also cause immediate, substantial, and irreparable harm to the vital diplomatic work the Department performs. For example, the planned reorganization eliminates numerous Special Envoys, Representatives, and Coordinators, positions that provide high-level, specialized attention to pressing issues such as climate change, global criminal justice, hostage affairs, nuclear nonproliferation and particularly geopolitically sensitive States like Iran, Sudan, and North Korea. The scale of the Reorganization Plan announced on April 22 will also make it extremely hard for the employees who remain to keep the work of their offices going without severe disruptions.

- **Department of Transportation**

370.   The implementation of the Executive Order and ARRP to cut many positions at the Department of Transportation will have a negative impact on federal employees who are terminated, those that remain, and their labor representatives including SEIU, AFSCME, and AFGE.

371.   Planned reductions will harm plaintiff AFSCME, whose members work as, among other positions, highway maintenance workers that would be impacted if reduced DOT staff are unable to timely process grant applications.  Plaintiff AFSCME also employs members that work at transit agencies, which rely on the federal government to cover large portions of operations and maintenance costs.  Any disruption in federal grants, caused by staffing levels at DOT, would risk AFSCME members' livelihoods.

372.   Planned reductions will also cause immediate harm to city and county plaintiffs. Reductions will imperil the approval of DOT grants, environmental reviews, and airport certifications for plaintiff King County.  Plaintiff Baltimore will suffer from slower and lower quality responses to transportation disasters, including to its ports and bridges, and grant delays for infrastructure and traffic projects.

- **Department of the Treasury**

373.   The implementation of the Executive Order and ARRP to impose the planned and ongoing 40 percent reduction to the IRS workforce will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives.

374.   The IRS plans to reduce its workforce from 102,000 employees to roughly 60,000 to 70,000, with especially high staffing cuts in taxpayer services and compliance, and to close more than 110 offices with taxpayer assistance centers.  These staffing cuts will reduce the IRS's ability to accomplish its core functions and will directly and severely harm Plaintiff the Center for Taxpayer Rights, the members of its LITC Connect program, the clients of its own Low Income Tax Clinic, and taxpayers across the country.  The planned IRS staffing shortfalls will cause simple, quick cases to snowball into labor-intensive, years-long matters for the Center's advocates, requiring more technical assistance from the Center and leaving low-incoming taxpayers unassisted.  The Center's members

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              99

1    will be required to expend more resources per case and be less able to accomplish their missions.

2    Clients will suffer financially through delayed or denied tax refunds, the inability to reach the IRS to

3    stop automatic assessments, and—for some prospective clients— the inability to be served by

4    overwhelmed LITCs that are forced to impose client caps.

5         375.    These actions will also have a direct and severely detrimental impact on local

6    governments that interact directly with this agency and rely on its services every day, specifically

7    including but not limited to Plaintiff Santa Clara.  Federal law entitles local governments to

8    reimbursement from the IRS for certain interest payments they make on "Qualified Energy

9    Conservation Bonds."  For example, Plaintiff Santa Clara issued such bonds to provide low-interest

10   financing to promote alternative energy usage, and is therefore entitled to monthly reimbursement

11   payments from the IRS.  Because these reimbursements depend on staff for processing,

12   reorganization will likely cause slowdowns in the issuance of these reimbursement payments.

13        376.    The Department of Treasury is also responsible for processing federal payments and

14   disbursing them to state and local governments, including money for block grants, formula grants,

15   and direct payments for specified use by those state and local governments.  The predicted across the

16   board staffing cuts at the Department pose a significant threat to a functional Treasury.  With a lower-

17   staffed Treasury Department, these payments could be delayed or stop altogether, severely harming

18   members of AFSCME and SEIU who work in state and local government, and jeopardizing their

19   jobs.

20   • **Department of Veterans Affairs**

21        377.    The implementation of the Executive Order and ARRP to imminently roll out the

22   elimination of approximately 80,000 positions at the VA will directly and significantly harm the

23   federal employees who are terminated, those who remain, and their labor representatives including

24   Plaintiffs AFGE, AFSCME, and SEIU.

25        378.    This massive reorganization will also harm Plaintiffs AFSCME, SEIU, and SEIU

26   Local 1000 and their non-federal employee members, who are employed by facilities that provide

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                           100

**Add.530**

1    care to veterans and are operated by state government but depend on the VA to timely process

2    government funding.

3          379.    These actions will also cause immediate and irreparable injuries to veterans who rely

4    on VA services including members of Plaintiffs Common Defense and VoteVets, and to the

5    organizational mission of those organizations.  For example, cuts to support medical and healthcare

6    support staff, IT support, and clerical and data entry positions make it significantly more difficult for

7    VA health care providers to do their jobs and for veterans to make medical appointments and be

8    connected with services.  The RIFs will exacerbate staffing shortages that already exist at many VA

9    facilities and make it harder for veterans to access health care, including mental health care, and other

10   veterans' services including crisis support.  Cuts to research staff will also disrupt important work that

11   benefits veterans and the public generally.  The reductions will stress understaffed veterans' hospitals

12   and other services to the breaking point.  These same issues will also affect Plaintiff AFGE's

13   significant number of members who are veterans.

14         380.    In addition, the implementation of the Executive Order and VA ARRP will have

15   substantial and deleterious effects on the veterans living in Plaintiff cities and counties and will also

16   impose costs and burdens on the local governments themselves, specifically including but not limited

17   to the County of Santa Clara.

18         381.    For example, the delays, closures, and loss of staff at the VA—both at VA hospitals

19   and in offices that perform centralized functions like call centers and benefits processing—will also

20   prevent or hinder Plaintiff Santa Clara's Office of Veterans Services from doing its primary, core

21   function of connecting veterans to the healthcare and benefits-processing staff at the VA.  Reduction

22   in force at the VA will also impose additional burdens on hospitals, like those operated by Plaintiff

23   Santa Clara, that operate emergency departments because delays and/or elimination of care options

24   for veterans will make them more reliant on services provided by Plaintiff Satna Clara and other local

25   governments such as housing support and behavioral and medical health care.  And reduced VA staff

26   will impact Plaintiff King County's ability to serve veterans experiencing homelessness or housing

27

28
     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    101

instability, weakening a nationally recognized, award-winning program that had been advancing veteran support services.

### CLAIMS FOR RELIEF

#### Claim I:
#### Separation of Powers/*Ultra Vires*
#### Against Defendant President Donald J. Trump

382.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

383.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

384.    The Constitution vests the legislative power in Congress.  U.S. Const., art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).  Congress exercised that Article I legislative authority to create the agencies of the federal government.  Congress has not delegated to the President the authority to employ and discharge the subordinate employees of the agencies or to spend appropriated funds on those positions; rather, it delegated those functions exclusively to the heads of federal agencies.

385.    From time to time in this nation's history, Congress has delegated to the President the authority to fast-track legislation proposing the reorganization of federal agencies.  But Congress has given President Trump no such authority.  While Congress has also delegated certain authorities to President Trump to enact regulations with respect to the management and conduct of the federal civil service, none of those delegations authorize the sweeping authority President Trump has claimed for himself to order agencies to engage in large-scale RIFs, eliminate programs and offices at his direction, reduce staffing to 2019 or government shutdown levels, and otherwise reorganize the federal government.

386.    The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  The President cannot usurp Congress's legislative authority on his own mandate; any legislative authority wielded by the President must have been delegated within the confines of the Constitutional limitations protecting the respective spheres.  The President has no constitutional power to enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              102

**Add.532**

417, 438–39 (1998).   The President lacks the constitutional or statutory authority to order large-scale terminations of federal employees, to require agencies to eliminate offices and functions, to require agencies to consider their own elimination, to move agency functions as between agencies, or otherwise to engage in large-scale government reorganization.  The President likewise has no constitutional or statutory authority to impose parameters and requirements for such RIFs and reorganizations that require agencies to defy and ignore their authorizing statutes.

387.     Executive Order 14210 exceeds the President's lawful authority, at a minimum, by ordering agencies, including but not limited to Federal Agency Defendants, to:

    a.     Implement large-scale RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions, needs, and appropriations);

    b.     Prioritize in RIFs any functions that "my Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

    c.     Prioritize in RIFs 2019 and/or government emergency shutdown levels of staffing (aka, Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

    d.     Consider their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies); and

    e.     Reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

388.     Therefore, the President's Executive Order 14210 ordering agencies to engage in large-scale RIFs and reorganization plans, and impose hiring freezes, limits, and controls, is not authorized by Article II and usurps Congress's Article I authority, and is thus *ultra vires*.

### Claim II:
### Separation of Powers/*Ultra Vires*
### Against Defendants OMB, OPM, DOGE and their Directors

389.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                  103

**Add.533**

1    390.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official

2  action that is *ultra vires*.

3    391.    Congress exercised its Article I legislative authority to create the agencies of the

4  federal government.  *See generally* United States Code, Title 5 (Government Organization and

5  Employees).  To the agency heads, Congress has also expressly delegated the power to manage the

6  functions of the agencies, including the right to employ and discharge subordinate employees of the

7  agencies and to spend appropriated funds on those positions.

8    392.    In addition to agency-specific authorizing statutes, Congress has also generally

9  authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101),

10  manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the

11  management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

12    393.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-

13  making authority of the federal agencies with respect to federal agency employment or organization;

14  to require agencies to take general or specific action with respect to employment or organization; or

15  to impose substantive requirements that effectively demand agencies to disregard statutory and

16  regulatory requirements.

17    394.    The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds

18  statutory authority and usurps the authority delegated by Congress to the agencies, not to OMB or

19  OPM, by, at a minimum, requiring agencies, including but not limited to Federal Agency Defendants,

20  to:

21    a.    Submit ARRPs for OMB and OPM approval;

22    b.    Include in those ARRPs large-scale RIFS (irrespective of whether staffing reductions

23    are necessary or even appropriate in light of agency functions and appropriations);

24    c.    Prioritize in those large-scale RIFs any functions that "[the President's]

25    Administration suspends or closes" (irrespective of statutory requirements or authority

26    delegated to the agencies);

27

28

**Add.534**

d.      Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of staffing (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

e.      Include in their ARRPs consideration of their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

f.      Include in their ARRPs a plan to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions; and

g.      Submit these plans for approval on timeframes that do not permit agencies to actually consider and assess their own needs or the staffing needed to meet their statutory responsibilities.

395.    DOGE has no statutory authority.  DOGE exceeds any authority it may have to implement the President's orders by usurping the authority delegated by Congress to the agencies, not to the President or DOGE.  DOGE has no authority at all to dictate to the agencies created and governed by Congress any level of staffing cut or spending reduction.  DOGE therefore exceeds any authority by ordering agencies, including but not limited to Federal Agency Defendants, to impose cuts to functions and staffing according to "targets" and "goals" imposed by DOGE.

396.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025 Memorandum to all agencies, as well as any direction, approval, or requirement imposed with respect to any ARRPs that result from that Executive Order, exceed OMB, OPM, and DOGE's authority and are contrary to statute and thus *ultra vires*.

**Claim III:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Action Not in Accordance With Law and Exceeding Statutory Authority)**

397.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

398.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                      105

1    who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the

2    actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal

3    Directors, for purposes of 5 U.S.C. § 702.

4         399.    Congress exercised its Article I legislative authority to create the agencies of the

5    federal government. *See generally* United States Code, Title 5 (Government Organization and

6    Employees).  To the agency heads, Congress has also expressly delegated the power to manage the

7    functions of the agencies, including the right to employ and discharge subordinate employees of the

8    agencies and to spend appropriated funds on those positions.

9         400.    In addition to specific authorizing statutes, Congress has also generally authorized the

10   heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the

11   employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management

12   decisions, including the hiring and firing of employees (5 U.S.C. § 302).

13        401.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-

14   making authority of the federal agencies with respect to federal agency employment.

15        402.    The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds

16   statutory authority and usurps the authority delegated by Congress to the agencies (including but not

17   limited to Federal Agency Defendants), and not to OMB or OPM, by: requiring agencies to submit

18   Agency RIF and Reorganization Plans to OMB and OPM for approval; requiring agencies to include

19   in those plans large-scale RIFs; and imposing an assortment of other parameters and requirements,

20   including considering Funding Lapse Plan Staffing Levels as a baseline.

21        403.    DOGE has no statutory authority.  DOGE exceeds any authority it may have to

22   implement the President's orders by usurping the authority delegated by Congress to the agencies

23   (including but not limited to Federal Agency Defendants), not to the President or DOGE.  DOGE has

24   no authority at all to dictate to the agencies created and governed by Congress any level of staffing

25   cut or spending reduction.

26        404.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the

27   President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025

28

1     Memorandum to all agencies, and any direction, approval, or requirement imposed with respect to

2     any ARRPs that result from that Executive Order, exceed authority and are contrary to statute.

3         405.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA.

4     5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025

5     Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to

6     make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

7         406.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not

8     in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction,

9     authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

10        407.    The actions of OMB, OPM, and DOGE therefore violate the Administrative Procedure

11    Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory

12    authority in violation of 5 U.S.C. § 706(2)(C), and for those reasons are also arbitrary and capricious

13    in violation of 5 U.S.C. § 706(2)(A).

**Claim IV:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Arbitrary and Capricious Agency Action)**

16        408.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

17        409.    The Plaintiff unions' federal employee members are subject to the requirements of

18    OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons

19    who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the

20    actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal

21    Directors, for purposes of 5 U.S.C. § 702.

22        410.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA.

23    5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025

24    Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to

25    make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

26        411.    The actions of OMB and its Director, OPM and its Acting Director, and DOGE and its

27    actual and nominal Directors, violate the APA because they are arbitrary and capricious, in violation

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                    107

**Add.537**

of 5 U.S.C. § 706(2)(A), including because they: 1) order federal agencies to cede decision-making authority to OMB OPM, and/or DOGE, regardless of the requirements of any applicable statute or regulation; 2) require agencies to disregard their authorizing statutes and regulations and follow the President's unconstitutional directions and directions of OMB,OPM, and/or DOGE;  3) categorically impose requirements to engage in large-scale RIFs that are necessarily contrary to agency function and authorizing statutes and regulations; 4) categorically impose requirements to RIF employees at the President's direction, according to the offices, programs and functions the President and his Administration eliminate regardless of statute or regulation; 5) categorically require agencies to engage in RIFs that will align the agency with Funding Lapse Plan Staffing Levels, which necessarily and by definition cannot adequately staff agencies; 6) require agencies to abandoned reasoned decision-making considering all relevant factors, in service of the President's orders; 7) require agencies to act under unrealistic timeframes that necessarily will result in plans that are not supported by rational reasoning or the agency's considered judgment; and 8) require the process for the creation and approval of plans to radically transform the entire federal government to proceed in secret.

### Claim V:
### Administrative Procedure Act, 5 U.S.C § 706(2)(D)
### Against Defendants OMB, OPM, DOGE and their Directors
### (Notice and Comment)

412.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

413.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, for purposes of 5 U.S.C. § 702.

414.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701.

415.    Under the APA, a court shall "hold unlawful and set aside agency action …found to be …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    108

**Add.538**

416.    OMB and OPM's February 26, 2025 Memorandum, and any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

417.    Neither OMB, nor OPM, nor DOGE, has published and provided opportunity for notice and comment on its actions pursuant to Executive Order 14210, including but not limited to the February 26, 2025 Memorandum, any decision "approving" an ARRP, or DOGE's directives ordering agencies to make staffing or spending cuts.

418.    Neither OMB nor its Director, OPM nor its Acting Director, nor DOGE and its actual and nominal Directors complied with the rule-making provisions set forth in 5 U.S.C. § 553 before issuing OMB and OPM's February 26, 2025 Memorandum.  That memorandum, as well as any decision "approving" an ARRP and DOGE's directives ordering agencies to make staffing or spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

419.    OMB, OPM, and DOGE's actions therefore also violate 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

## Claim VI:
### Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)
### Against Federal Agency Defendants
### (Action Not in Accordance With Law)

420.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

421.    The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants, for purposes of 5 U.S.C. § 702.

422.    Each Federal Agency Defendant is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA.  5 U.S.C. § 704.

423.    On information and belief, each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

424.    None of the Federal Agency Defendants have the statutory authority to cede their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE.  None of the Federal Agency Defendants have the statutory authority to implement the President's unconstitutional direction to engage in large-scale RIFs, including with respect to functions, programs, or offices that *the President and those acting on his* authority have decided to cut; or to impose staffing cuts that take an agency, irrespective of duty or need, back to government-shutdown lapse levels.  The Federal Agency Defendants have exceeded their authority by implementing the President's unconstitutional plans.

425.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

426.    The actions of Federal Agency Defendants therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory authority in violation of 5 U.S.C. § 706(2)(C), and are for those reasons also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

**Claim VII:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Federal Agency Defendants**
**(Arbitrary and Capricious Agency Action)**

427.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

428.    The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants for purposes of 5 U.S.C. § 702.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      110

429.    Congress made each Federal Agency Defendant subject to the APA.  5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA.  5 U.S.C. § 704.

430.    Each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

431.    The actions of the Federal Agency Defendants, including but not limited to implementing the President's unconstitutional orders to reorganize and RIF employees, pursuant to the terms dictated by the President, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), for reasons that include the following: they 1) cede decision-making authority to OMB and OPM, regardless of the requirements of any applicable statute; 2) disregard their authorizing statutes and follow the President's unconstitutional directions and directions of OMB and OPM;  3) engage in large-scale RIFs that are necessarily contrary to agency's ability to maintain required function and authorizing statute; 4) RIF employees at the President's direction, according to the offices, programs and functions the President and his Administration eliminate regardless of statute; 5) RIF according to Funding Lapse Plan Staffing Levels, which necessarily and by definition cannot staff agencies at the level necessary to adequately perform; 6) abandon reasoned decision-making considering all relevant factors, in service of the President's orders; 7) act under unrealistic timeframes that necessarily will result in plans that are not supported by rational reasoning or agencies' considered judgment; and 8) conduct the process for the creation and approval of plans to radically transform the entire federal government in secret.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court:

1.  Declare that President Donald J. Trump has violated the United States Constitution by engaging in wholesale transformation of the federal government without any Congressional authorization by and through the Workforce Executive Order;

2. Declare that OMB, OPM, and DOGE have exceeded statutory authority and acted in an arbitrary and capricious manner and therefore acted unlawfully by ordering federal agencies to act in accordance with the President's unconstitutional mandate by and through the Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum;

3. Declare that Federal Agency Defendants have acted contrary to statutory authority and in an arbitrary and capricious manner and therefore acted unlawfully by implementing the President's unconstitutional Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum to reorganize the federal government and RIF large numbers of federal employees, without Congressional authorization;

4. Vacate the February 11, 2025 Workforce Executive Order, the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs; and issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings under 5 U.S.C. § 705;

5. Temporarily restrain and enjoin the Defendants from implementing or enforcing the February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs, pending further orders from this Court;

6. Pursuant to 5 U.S.C. § 706, vacate, hold unlawful and set aside the February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPS; and the ARRPs;

7. Enter preliminary and/ permanent injunctive relief;

8. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate; and

9. Grant such other relief as this Court may deem proper.

DATED: May 14, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne Johnson
Alice X. Wang
Robin S. Tholin
Aaron Schaffer-Neitz
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

113

Add.543

Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*


Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*


Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    114

**Add.544**

1    *Attorney for Plaintiffs American Federation of*
2    *Government Employees, AFL-CIO (AFGE) and AFGE*
     *locals*
3

4    Teague Paterson (SBN 226659)
     Matthew Blumin (pro hac vice)
5    AMERICAN FEDERATION OF STATE, COUNTY,
     AND MUNICIPAL EMPLOYEES, AFL-CIO
6    1625 L Street, N.W.
     Washington, D.C. 20036
7    Tel: (202) 775-5900
     TPaterson@afscme.org
8    MBlumin@afscme.org
9
     By: */s/ Teague Paterson*
10
11   *Attorneys for Plaintiff American Federation of State*
     *County and Municipal Employees, AFL-CIO (AFSCME)*
12

13   Steven K. Ury (SBN 199499)
     SERVICE EMPLOYEES INTERNATIONAL UNION,
14   AFL-CIO
     1800 Massachusetts Ave., N.W.
15   Washington, D.C. 20036
     Tel: (202) 730-7428
16   steven.ury@seiu.org
17
     By: */s/ Steven K. Ury*
18
19   *Attorney for Plaintiff Service Employees International*
     *Union, AFL-CIO (SEIU)*
20

21   David Chiu (SBN 189542)
     City Attorney
22   Yvonne R. Meré (SBN 175394)
     Chief Deputy City Attorney
23   Mollie M. Lee (SBN 251404)
     Chief of Strategic Advocacy
24   Sara J. Eisenberg (SBN 269303)
     Chief of Complex and Affirmative Litigation
25   Molly J. Alarcon (SBN 315244)
     Alexander J. Holtzman (SBN 311813)
26   Deputy City Attorneys
27   OFFICE OF THE CITY ATTORNEY FOR THE CITY
28
     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                          115

1

2
AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

3

4
By: */s/ David Chiu*

5

6
*Attorneys for Plaintiff City and County of San Francisco*

7

8
Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

9

10

11

12

13

14
By: */s/ Tony LoPresti*

15

16
*Attorneys for Plaintiff County of Santa Clara, Calif.*

17

18
David J. Hackett (pro hac vice)
General Counsel to King County Executive & Special
Deputy Prosecutor
Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor
Erin King-Clancy (pro hac vice app. forthcoming)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
aclancy@kingcounty.gov

19

20

21

22

23

24

25

26
By: */s/ David J. Hackett*

27
*Attorneys for Plaintiff Martin Luther King, Jr. County*

28
Sharanya Mohan (SBN 350675)

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

116

**Add.546**

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org

By: */s/ Sharanya Mohan*

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,
Harris County, TX, and King County, WA*

Christian D. Menefee
Harris County Attorney

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice)
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel.: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                117

**Add.547**

1    Stephen J. Kane (IL ARDC 6272490) (pro hac vice app.
     forthcoming)
2    Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice
     app. forthcoming)
3    Lucy Prather (IL ARDC 6337780) (pro hac vice)
     City of Chicago Department of Law,
4    Affirmative Litigation Division
     121 N LaSalle Street, Suite 600
5    Chicago, Illinois 60602
     Tel: (312) 744-6934
6    Stephen.kane@cityofchicago.org
     Rebecca.Hirsch2@cityofchicago.org
7    Lucy.Prather@cityofchicago.org
8
9    By: */s/ Stephen J. Kane* _____

10       *Attorneys for Plaintiff City of Chicago*

11

12    Ebony M. Thompson
      Baltimore City Solicitor
13
      Sara Gross (pro hac vice app. forthcoming)
14    Chief of Affirmative Litigation
      Baltimore City Department of Law
15    100 N. Holliday Street
      Baltimore, Maryland 21202
16    Tel: (410) 396-3947
      sara.gross@baltimorecity.gov
17
      By: */s/ Sara Gross* _____
18
         *Attorneys for Plaintiff City of Baltimore*
19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                              118

**Add.548**

1  Stacey M. Leyton (SBN 203827)
   Barbara J. Chisholm (SBN 224656)
2  Danielle Leonard (SBN 218201)
3  ALTSHULER BERZON LLP
   177 Post Street, Suite 300
4  San Francisco, CA 94108
   Tel. (415) 421-7151
5  Fax (415) 362-8064
   sleyton@altber.com
6  bchisholm@altber.com
7  dleonard@altber.com

8  Elena Goldstein (pro hac vice)
   Skye Perryman (pro hac vice)
9  Tsuki Hoshijima (pro hac vice)
   DEMOCRACY FORWARD FOUNDATION
10 P.O. Box 34553
   Washington, DC 20043
11 Tel: (202) 448-9090
   Fax: (202) 796-4426
12 egoldstein@democracyforward.org
13 sperryman@democracyforward.org
   thoshijima@democracyforward.org
14

15 *Attorneys for Plaintiffs*

16 *[Additional counsel and affiliations identified on signature page]*

17            UNITED STATES DISTRICT COURT

18       FOR THE NORTHERN DISTRICT OF CALIFORNIA

19            SAN FRANCISCO DIVISION

20

21 AMERICAN FEDERATION OF            Case No. 3:25-cv-03698-SI
   GOVERNMENT EMPLOYEES, AFL-CIO, et
22 al.,                              **PLAINTIFFS' MOTION FOR**
                                     **PRELIMINARY INJUNCTION**
23        Plaintiffs,

24     v.

25 DONALD J. TRUMP, in his official capacity
   as President of the United States, et al.,
26
27        Defendants.

28

## MOTION FOR PRELIMINARY INJUNCTION

TO ALL DEFENDANTS: PLEASE TAKE NOTICE that on May 22, 2025, at 10:30 a.m. in Courtroom 1, 17th Floor, United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, all Plaintiffs will move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 65-1 of the Civil Local Rules and this Court's authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights," 5 U.S.C. §705, for a preliminary injunction as follows:

1.     Enjoin and/or stay Defendants Office of Management and Budget ("OMB"), Office of Personnel Management ("OPM"), Department of Government Efficiency ("DOGE"), AmeriCorps, Department of Agriculture, Department of Commerce, Department of Energy, Environmental Protection Agency, General Services Agency, Department of Health and Human Services, Department of Housing and Urban Development, Department of Interior, Department of Labor, National Labor Relations Board, National Science Foundation, Peace Corps, Small Business Association, Social Security Administration, Department of State, Department of Transportation, Department of Treasury, and Department of Veteran Affairs and their agency heads named in their official capacities as Defendants in this lawsuit, their officers, agents, servants, employees, and attorneys, and all persons acting by, through, under, or in concert with these Defendants, from taking any action to implement or enforce Sections 3(c) and (e) of Executive Order 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) or the OMB/OPM Memorandum re: Guidance on Agency RIF and Reorganization Plans Requested by Implementing The Presidents "Department of Government Efficiency" Workforce Optimization Initiative (Feb. 26, 2025), including but not limited to:

(a) any further OMB or OPM action to implement Sections 3(c) and (e) of Executive Order 14210 or the February 26, 2025 OMB/OPM Memorandum, including but not limited to approval or disapproval of any federal agency Agency RIF and Reorganization Plans ("ARRPs"), whether express or implied, formal or informal;

(b) any further orders, directives, or commands by DOGE to any federal agency to eliminate programs, functions, or staff in conjunction with implementing Executive Order 14210, the OMB/OPM Memorandum, or ARRPs, whether express or implied, formal or informal;

1    (c) any further implementation of Executive Order 14120, the OMB/OPM Memorandum, or

2    ARRPs by Federal Agency Defendants, including but not limited to any of the following actions to

3    the extent taken to implement Executive Order 14210and/or the OMB/OPM Memorandum:

4        i.    the elimination or consolidation of programs or functions;

5        ii.    transfer of functions or programs between any Federal Agency Defendants or to/from

6        any other federal agency;

7        iii.    execution of any existing reduction in force ("RIF") notices including final separation

8        of employees,

9        iv.    issuance of any further RIF notices, and

10        v.    placement of employees on administrative leave.

11    2.    Further enjoin and/or stay Defendant DOGE by ordering DOGE to rescind and/or

12    take no further action to enforce any prior orders, directives, or commands to Federal Agency

13    Defendants regarding any aspect of ARRPs, including but not limited to RIFs or amounts of staff to

14    cut (whether communicated by way of target numbers of employees, positions, or amounts of

15    spending) or programs, functions, and offices to cut;

16    3.    Further enjoin and/or stay Federal Agency Defendants to rescind and/or take no

17    further action to enforce any prior action taken to implement Executive Order 14210 and/or the

18    OMB/OPM Memorandum and/or the ARRPs, including but not limited to rescinding any RIFs issued

19    to effectuate Executive Order 14210; restoring offices, programs, and functions previously eliminated

20    to effectuate Executive Order 14210; and transferring any federal employees previously moved into

21    administrative leave status to effectuate Executive Order 14210 back to the status they held prior to

22    implementation of the Executive Order;

23    4.    Further order that by no later than _____, 2025, Defendants shall provide to

24    Plaintiffs and the Court a proposed compliance plan that, at a minimum, identifies and describes all

25    actions previously taken to implement the EO at each covered agency and details the specific

26    proposed steps for implementation of this Court's orders.  Plaintiffs shall review and respond with

27    any objections or concerns.  By no later than _____, 2025, the parties shall jointly

28    submit an agreed upon plan for implementation of these orders, or, if agreement cannot be reached in

1    whole or part, Defendants shall submit their proposal as previously provided to Plaintiffs, and

2    Plaintiffs shall submit their objections thereto.

3         The Motion is made on the grounds that (1) Plaintiffs are likely to prevail on their claims that

4    President Trump's Workforce Executive Order No. 14210 is *ultra vires* and unconstitutional; that the

5    actions of OMB, OPM, and DOGE to implement the Executive Order are *ultra vires* and violate the

6    Administrative Procedure Act ("APA"), 5 U.S.C. §706(2)(A), (C), and that OMB and OPM failed to

7    engage in notice-and-comment rulemaking as required under 5 U.S.C. §706(2)(D); and that the

8    actions of the other Federal Agency Defendants named above to implement the Executive Order, the

9    OMB/OPM Memorandum, and the ARRPs violate the Administrative Procedure Act, *id.* §706(2)(A),

10   (C); (2) that Plaintiffs will suffer irreparable injury unless the relief requested is granted; and (3) that

11   the balance of equities and public interest favor injunctive relief.

12        This Motion is supported by the accompanying Plaintiffs' Memorandum in Support of Motion

13   for Preliminary Injunction; the Declarations listed in the accompanying Index of Evidence in Support

14   of Preliminary Injunction (including but not limited to the Supplemental Declaration of Jesus Soriano

15   (ECF 96-1)); Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and

16   Appendices, Reply Memorandum, Evidence, and Reply Evidence filed in support thereof; this

17   Court's May 9, 2025 Order Granting Temporary Restraining Order and Compelling Certain

18   Discovery Production; the Complaint; the Amended Complaint; and the entire record in this case.

19

20

21

22

23

24

25

26

27

28

1   DATED: May 14, 2025                          Stacey M. Leyton
                                                  Barbara J. Chisholm
2                                                 Danielle E. Leonard
                                                  Corinne F. Johnson
3                                                 Alice X. Wang
                                                  Robin S. Tholin
4                                                 ALTSHULER BERZON LLP
5                                                 177 Post St., Suite 300
                                                  San Francisco, CA 94108
6                                                 Tel: (415) 421-7151
                                                  sleyton@altshulerberzon.com
7                                                 bchisholm@altshulerberzon.com
                                                  dleonard@altshulerberzon.com
8

9                                          By: */s/ Danielle Leonard*_____

10                                               *Attorneys for All Union and Non-Profit Organization*
                                                 *Plaintiffs*
11

12                                               Elena Goldstein (pro hac vice)
13                                               Skye Perryman (pro hac vice)
                                                 Tsuki Hoshijima (pro hac vice)
14                                               DEMOCRACY FORWARD FOUNDATION
15                                               P.O. Box 34553
                                                 Washington, D.C. 20043
16                                               Tel: (202) 448-9090
                                                 Fax: (202) 796-4426
17                                               egoldstein@democracyforward.org
18                                               sperryman@democracyforward.org
                                                 thoshijima@democracyforward.org
19

20                                         By: */s/ Elena Goldstein*_____

21                                               *Attorneys for All Union and Non-Profit Organization*
                                                 *Plaintiffs (except NRDC) and for Plaintiffs City of*
22                                               *Chicago, IL; Martin Luther King, Jr. County, WA;*
                                                 *Harris County, TX; and City of Baltimore, MD*
23

24
                                                 Jules Torti (pro hac vice)
25                                               PROTECT DEMOCRACY PROJECT
                                                 82 Nassau St., #601
26                                               New York, NY 10038
27
                                                 Erica J. Newland (pro hac vice)
28                                               Jacek Pruski (pro hac vice)

PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and AFGE
locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice app. forthcoming)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO

1    1625 L Street, N.W.
     Washington, D.C.  20036
2    Tel: (202) 775-5900
     TPaterson@afscme.org
3    MBlumin@afscme.org

4    By: */s/Teague Paterson*

5

6    *Attorneys for Plaintiff American Federation of State*
     *County and Municipal Employees, AFL-CIO (AFSCME)*

7

8    Steven K. Ury (SBN 199499)
     SERVICE EMPLOYEES INTERNATIONAL UNION,
9    AFL-CIO
     1800 Massachusetts Ave., N.W.
10   Washington, D.C. 20036
     Tel: (202) 730-7428
11   steven.ury@seiu.org

12   By: */s/ Steven K. Ury*

13

14   *Attorneys for Plaintiff Service Employees International*
     *Union, AFL-CIO (SEIU)*

15

16   David Chiu (SBN 189542)
     City Attorney
17   Yvonne R. Meré (SBN 175394)
     Chief Deputy City Attorney
18   Mollie M. Lee (SBN 251404)
     Chief of Strategic Advocacy
19   Sara J. Eisenberg (SBN 269303)
     Chief of Complex and Affirmative Litigation
20   Molly J. Alarcon (SBN 315244)
     Alexander J. Holtzman (SBN 311813)
21   Deputy City Attorneys
     OFFICE OF THE CITY ATTORNEY FOR THE CITY
22   AND COUNTY OF SAN FRANCISCO
     1390 Market Street, 7th Floor
23   San Francisco, CA 94102
     molly.alarcon@sfcityatty.org
24   alexander.holtzman@sfcityatty.org

25

26   By:  */s/ David Chiu*
     David Chiu
27   City Attorney

28

1    *Attorneys for Plaintiff City and County of San Francisco*

2

3    Tony LoPresti (SBN 289269)
     COUNTY COUNSEL
4    Kavita Narayan (SBN 264191)
     Meredith A. Johnson (SBN 291018)
5    Raphael N. Rajendra (SBN 255096)
     Hannah M. Godbey (SBN 334475)
6    OFFICE OF THE COUNTY COUNSEL
     COUNTY OF SANTA CLARA
7    70 West Hedding Street, East Wing, 9th Floor
8    San José, CA 95110
     Tel: (408) 299-5900
9

10   By:  */s/ Tony LoPresti*

11   *Attorneys for Plaintiff County of Santa Clara, Calif.*

12

13   David J. Hackett (pro hac vice  app. forthcoming)
     General Counsel to King County Executive & Special
     Deputy Prosecutor
14   Alison Holcomb (pro hac vice app. forthcoming)
     Deputy General Counsel to King County Executive &
15   Special Deputy Prosecutor
     Erin King-Clancy (pro hac vice app. forthcoming)
16   Senior Deputy Prosecuting Attorney
     OFFICE OF KING COUNTY PROSECUTING
17   ATTORNEY LEESA MANION
     401 5th Avenue, Suite 800
18   Seattle, WA 98104
     (206) 477-9483
19   David.Hackett@kingcounty.gov
     aholcomb@kingcounty.gov
20   aclancy@kingcounty.gov

21   By: */s/ David J. Hackett*

22   David J. Hackett

23   *Attorneys for Plaintiff Martin Luther King, Jr. County*

24

25   Jill Habig (SBN 268770)
     PUBLIC RIGHTS PROJECT
26   490 43rd Street, Unit #115
     Oakland, CA 94609
27   Tel: (510) 738-6788
     jill@publicrightsproject.org

28

1

2

By: /s/ Jill Habig

3

*Attorneys for Plaintiffs Baltimore, MD, Chicago, IL, Harris County, TX, and King County, WA*

4

5

Christian D. Menefee
Harris County Attorney

6

7

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant

8

Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel

9

Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division

10

Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division

11

R. Chan Tysor (pro hac vice app. forthcoming)
Senior Assistant County Attorney

12

Alexandra "Alex" Keiser (pro hac vice app. forthcoming)
Assistant County Attorney

13

1019 Congress, 15th Floor

14

Houston, Texas 77002
Tel: (713) 274-5102

15

Fax: (713) 437-4211

16

jonathan.fombonne@harriscountytx.gov

17

tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov

18

bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov

19

alex.keiser@harriscountytx.gov

20

By: /s/ Jonathan G.C. Fombonne

21

Jonathan G.C. Fombonne

22

*Attorneys for Plaintiff Harris County, Texas*

23

24

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

25

26

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)

27

Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice app. forthcoming)

28

**Add.557**

Lucy Prather (IL ARDC 6337780) (pro hac vice app. forthcoming)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By:     */s/Stephen J. Kane*
        Stephen J. Kane

*Attorneys for Plaintiff City of Chicago*

Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming)
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By*:  /s/  Sara Gross*

*Attorneys for Plaintiff City of Baltimore*

(562 of 726), Page 562 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 562 of 726
Case 3:25-cv-03698-SI    Document 101-1    Filed 05/14/25    Page 1 of 56

1    Stacey M. Leyton (SBN 203827)
     Barbara J. Chisholm (SBN 224656)
2    Danielle E. Leonard (SBN 218201)
3    ALTSHULER BERZON LLP
     177 Post Street, Suite 300
4    San Francisco, CA 94108
     Tel.: (415) 421-7151
5    Fax: (415) 362-8064
     sleyton@altber.com
6    bchisholm@altber.com
7    dleonard@altber.com

8    Elena Goldstein (pro hac vice)
     Skye Perryman (pro hac vice)
9    Tsuki Hoshijima (pro hac vice)
     DEMOCRACY FORWARD FOUNDATION
10   P.O. Box 34553
     Washington, D.C. 20043
11   Telephone: (202) 448-9090
     Fax: (202) 796-4426
12   egoldstein@democracyforward.org
13   sperryman@democracyforward.org
     thoshijima@democracyforward.org
14

15   *Attorneys for Plaintiffs*

16   [*Additional counsel and affiliations identified on signature page*]

17                  UNITED STATES DISTRICT COURT

18            FOR THE NORTHERN DISTRICT OF CALIFORNIA

19                      SAN FRANCISCO DIVISION

20

21   AMERICAN FEDERATION OF              Case No. 3:25-cv-03698-SI
     GOVERNMENT EMPLOYEES, AFL-CIO,
22   et al.,                            **PLAINTIFFS' MEMORANDUM IN**
                                        **SUPPORT OF MOTION FOR**
23            Plaintiffs,               **PRELIMINARY INJUNCTION**

24        v.

25
     DONALD J. TRUMP, in his official capacity
26   as President of the United States, et al.,

27            Defendants.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page(s)

INTRODUCTION ......................................................................................... 1

BACKGROUND .......................................................................................... 3

I.      Additional Plaintiffs and Defendants ................................................ 3

II.     Restructuring and RIFs at Agencies Pursuant to the EO Are Causing
        Widespread Irreparable Harm ............................................................ 4

        A.     Ongoing Restructuring and RIFs Pursuant to the EO ............. 4

        B.     Ongoing and Imminent Harms from the Reorganization and RIFs ..................... 8

ARGUMENT ............................................................................................... 10

I.      This Court Should Enjoin Defendants' Implementation of Executive Order
        14210 and the Resulting Agency RIF and Reorganization Plans .................... 10

        A.     Defendants' Government-wide Order and Actions Are Causing
               Ongoing, Nationwide Irreparable Harm and the Balance of the
               Equities and Public Interest Weigh Heavily in Favor of a
               Preliminary Injunction ....................................................... 10

        B.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims that
               the Executive Order and Agency Implementation are Unlawful ................. 11

        C.     This Court Has Jurisdiction Over All Plaintiffs' Claims ..................... 16

               1.     Standing ........................................................... 16

               2.     Administrative Channeling .......................................... 17

II.     Plaintiffs' Proposed Relief Is Necessary to Maintain the Status Quo for the
        Duration of this Litigation and to Prevent Ongoing Nationwide Irreparable
        Harm .......................................................................... 21

        A.     Plaintiffs' Proposed Injunction .............................................. 21

        B.     The Injunction Protects the Status Quo ....................................... 22

        C.     The Scope of the Injunction Is Necessitated by the Scope of
               Defendants' Government-Wide Actions and Extent of the Harm to
               Plaintiffs ..................................................................... 23

        D.     The Proposed Injunction Does Not Exceed the Equitable Powers of
               this Court ..................................................................... 24

CONCLUSION ............................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AFGE v. OPM,*
   2025 WL 914823 (9th Cir. Mar. 26, 2025) ............................................................... 19

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ............................................................................................... 19

*American School of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) ................................................................................................. 24

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ............................................................................................... 24

*Axon Enters., Inc. v. FTC,*
   598 U.S. 175 (2023) ............................................................................................... 19

*Bowsher v. Synar,*
   478 U.S. 714 (1986) ............................................................................................... 14

*Bresgal v. Brock,*
   843 F.2d 1163 (9th Cir. 1987) ............................................................................... 22

*Building & Construction Trades Department v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) .......................................................................... 12, 13

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) .......................................................................... 10, 22

*Chen v. I.N.S.,*
   95 F.3d 801 (9th Cir. 1996) ................................................................................... 15

*City & Cnty. of San Francisco v. Barr,*
   965 F.3d 753 (9th Cir. 2020) ................................................................................. 23

*County of Santa Clara v. Trump,*
   250 F.Supp.3d 497 (N.D. Cal. 2017) ..................................................................... 24

*Dep't of Commerce v. New York,*
   588 U.S. 752 (2019) ............................................................................................... 18

*Driftless Area Land Conservancy v. Valcq,*
   16 F.4th 508 (7th Cir. 2021) .................................................................................. 25

*E. Bay Sanctuary Covenant v. Garland,*
   994 F.3d 962 (9th Cir. 2020) ................................................................................. 24

*Epic Sys. Corp. v. Lewis*,
 584 U.S. 497 (2018) ................................................................................. 19

*Feds for Med. Freedom v. Biden*,
 63 F.4th 366 (5th Cir.) (en banc) ............................................................ 19

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
 82 F.4th 664 (9th Cir. 2023) ..................................................................... 17

*Food & Drug Admin. v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) ................................................................................. 17

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
 512 F.3d 1112 (9th Cir. 2008) .................................................................. 10

*Griffin v. HM Florida-ORL, LLC*,
 144 S. Ct. 1 (2023) ................................................................................... 24

*Hecht Co. v. Bowles*,
 321 U.S. 321 (1944) ................................................................................. 24

*Kerr v. Jewell*,
 836 F.3d 1048 (9th Cir. 2016) .................................................................. 18

*Kingdomware Techs., Inc. v. U.S.*,
 579 U.S. 162 (2016) ................................................................................. 12

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
 752 F.3d 755 (9th Cir. 2014) .................................................................... 11

*League of Women Voters of N.C. v. North Carolina*,
 769 F.3d 224 (4th Cir. 2014) .................................................................... 22

*Longview Fibre Co. v. Rasmussen*,
 980 F.2d 1307 (9th Cir. 1992) .................................................................. 13

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024) ..................................................................... 18, 19, 20

*Lopez v. Heckler*,
 713 F.2d 1432 (9th Cir. 1983) .................................................................. 11

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) .............................................................. 10, 11

*Mims v. Arrow Fin. Servs., LLC*,
 565 U.S. 368 (2012) ................................................................................. 18

*Monsanto v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ................................................................................. 24

*NTEU and Dep't of Treasury, IRS*,
    60 F.L.R.A. 783 (2005) ................................................................................................ 18

*Nw. Forest Res. Council v. Glickman*,
    82 F.3d 825 (9th Cir. 1996) ......................................................................................... 12

*Pangea Legal Servs. v. DHS*,
    501 F.Supp.3d 792 (N.D. Cal. 2020) ........................................................................... 24

*PFLAG, Inc. v. Trump*,
    No. CV 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025) ................................ 24

*Regents of Univ. of Cal. v. DHS Sec'y*,
    908 F.3d 476 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) ............ 24

*Russell v. U.S. Dep't of the Army*,
    191 F.3d 1016 (9th Cir. 1999) ..................................................................................... 18

*Saul v. United States*,
    928 F.2d 829 (9th Cir. 1991) ....................................................................................... 18

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) .......................................................................................... 16

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ..................................................................................................... 20

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017) ..................................................................................................... 22

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ............................................................................................... 19, 20

*United States v. Fausto*,
    484 U.S. 439 (1988) ..................................................................................................... 19

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ..................................................................................................... 24

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ................................................................................... 24

*Veit v. Heckler*,
    746 F.2d 508 (9th Cir. 1984) ....................................................................................... 18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) ......................................................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................. 1, 14

**Federal Statutes**

5 U.S.C. §705 ........................................................................... 25

5 U.S.C. §903 ........................................................................... 15

5 U.S.C. §1103 .......................................................................... 19

5 U.S.C. §1105 .......................................................................... 19

5 U.S.C. §3502 .......................................................................... 15

5 U.S.C. §7117(a)(1) .................................................................... 18

5 U.S.C. §7134 .......................................................................... 19

5 U.S.C. § 7701 ......................................................................... 18

28 U.S.C. §1331 ......................................................................... 18

29 U.S.C. §793(b) ........................................................................ 7

38 U.S.C. §4212 ......................................................................... 7

**Rules**

Fed. R. Civ. P. 65(a) ................................................................... 10

Fed. R. Civ. P. 65(b)(3) ................................................................ 10

**Other Authorities**

John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage
    Foundation Legal Memorandum No. 4782 (Nov. 3, 2017) available at:
    www.heritage.org ..................................................................... 14

Lewis Caroll, *Through the Looking-Glass and What Alice Found There* ..................... 1

Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*,
    Heritage Foundation Legal Memorandum No. 210 (July 12, 2017) ....................... 14

**INTRODUCTION**

As this Court found in its May 9, 2025 Order granting Plaintiffs' Motion for TRO, "[t]he new presidential administration has made clear that it intends to change the way the federal government operates." ECF 85 at 1.[1] It is axiomatic that the President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Despite this bedrock constitutional law, President Donald Trump is implementing a plan to restructure the entire federal government through unconstitutional actions, for which he plainly does not have any authority. To effectuate this plan, the President issued his Workforce Executive Order, requiring all federal agencies to commence this "transformation" by engaging in large-scale RIFS and reorganizations, on the President's terms. Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, hereinafter "Workforce Executive Order" or "EO") (attached as App. A). Notwithstanding Defendants' attempts to mischaracterize the President's Order and agency implementation as a mere planning process for agency decision-making, the EO contains directives that all federal agencies "shall" implement, and federal agencies acting on these orders are proceeding to dismantle the government *now*. The President and the implementing agencies should not be permitted to dismantle the federal government in violation of the Constitution and federal law, and then claim at the conclusion of this case that it is too late to put the government back together.[2]

Based on briefing and argument on the Plaintiffs' Motion for Temporary Restraining Order ("TRO") (to which Defendants responded but did not submit any evidence), this Court concluded that Plaintiffs are likely to establish that Sections 3(c) and (e) of the Workforce Executive Order exceed

---

[1] The President has been quite clear about his plans, referring to this "**large scale structural reform**" the "**Manhattan Project of our time**." ECF 37-1 at 1 (citation provided) (emphasis added); *see also id.* ("**It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state**." (citing Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025); "**It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people**." Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025); "**I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid**." Remarks by President after Executive Order Signing, The White House (Feb. 18, 2025)) (emphases added).

[2] "All the King's horses and all the King's men — Couldn't put Humpty in his place again." Lewis Caroll, *Through the Looking-Glass and What Alice Found There*.

the President's lawful authority by directing the restructuring of entire agencies, elimination of agency programs and functions, and drastic reduction of the number of employees within every agency, all without *any* Congressional authorization, and therefore violate the fundamental separation of powers principles embodied in the U.S. Constitution.  ECF 85 at 26-32.  As this Court also held, Plaintiffs are also likely to prove that the President's implementing agencies—the Office of Management and Budget ("OMB"), Office of Personnel Management ("OPM"), and Department of Government Efficiency ("DOGE")—have exceeded their authority as well, and engaged in ultra vires actions in implementing this EO.  *Id.* at 32-34; App. B (Memo).  This Court further concluded that OMB and OPM's February 26, 2025 Memorandum implementing the EO ("Memo"), and the approvals of the Agency RIF and Reorganization Plans ("ARRPs") required by the EO and the Memo, violate the substantive and procedural provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq*.  ECF 85 at 34-38.  In that Order, this Court reserved judgment on the merits of two additional claims: whether DOGE violated the APA, and whether the Federal Agency Defendants violated the APA by acting arbitrarily and capriciously in implementing the EO through their ARRPs.  *Id.* at 38.  The Court issued a TRO halting further implementation of these unlawful government acts and orders, and set a schedule for Plaintiffs' preliminary injunction motion.[3]

Plaintiffs now hereby move for a preliminary injunction to restore the status quo pending the duration of this litigation.  As this Court recognized in granting the TRO, restoring and maintaining the status quo is necessary to protect both this Court's ability to grant effective relief and Congress's role in establishing and regulating the federal administrative agencies, and thereby restore the proper separation of powers enshrined in the Constitution, and to prevent irreparable harm.  ECF 85 at 2, 39-40.  Because Plaintiffs have already extensively briefed and provided evidence regarding the issues raised by Defendants' actions, and because this Court has written on many of the issues raised by this Motion, Plaintiffs incorporate by reference their prior briefing and evidence on the TRO Motion and Reply, as well as this Court's decision granting that Motion.  ECF 37, 70, and 85.  This brief

---

[3] The Government's "compliance" declaration raises more questions than it answers.  ECF 95, 95-1.  Defendants did not, for example, provide this Court with the requested explanation "detailing what additional steps, if any, *they* have taken to comply."  ECF 85 at 40 (emphasis added).  Defendants provided a declaration from counsel only, claiming privilege, not a factual explanation of the steps Defendants have actually taken to comply with this Court's order.

1    supplements that existing record with the following points:

2        1.    Plaintiffs update the record regarding agency actions, in particular actions that have

3    taken place and information and documents obtained after the filing of Plaintiffs' TRO briefing, and

4    briefly summarize some of the evidence to date.

5        2.    Plaintiffs have filed an amended complaint adding two Plaintiffs, SEIU Locals 521

6    and 1021, and one Federal Agency Defendant, the Peace Corps, and therefore address the evidence

7    pertaining to these parties.

8        3.    Plaintiffs address the record evidence to respond to Defendants' recent arguments that

9    misconstrue the nature and relevance of the ARRPs to the EO, Memo, and Plaintiffs' claims.

10        4.    Plaintiffs further address the merits of their constitutional and APA claims in light of

11    the current factual record.

12        5.    Plaintiffs address the scope of relief requested by this Motion.

13        Plaintiffs initially requested a TRO that temporarily paused further implementation of the EO

14    and Memo to allow this Court to hear this full preliminary injunction request.  Plaintiffs now ask the

15    Court to issue a preliminary injunction that maintains the proper, pre-unlawful conduct, status quo.

16    This relief is necessary to preserve this Court's ability to rule, in the end, that the President's actions

17    and agency implementation thereof are ultra vires and unlawful pursuant to the APA, to issue the

18    remedies the law provides for vacating such unlawful action, and to prevent the irreparable harm this

19    unprecedented and improper assertion of power is wreaking nationwide.  The scope and scale of the

20    relief requested are a function of the President's overreach and Defendants' continuing actions to

21    implement the unlawful EO, and do not exceed the proper authority of this Article III court.

22                                **BACKGROUND**

23    **I.    Additional Plaintiffs and Defendants**

24        Plaintiffs that previously moved for a TRO included six local government agencies, ten non-

25    profits, and eight labor unions representing federal and non-federal employees impacted by the EO.

26    Those Plaintiffs are now joined by SEIU Locals 521 and 1021, which represent workers who provide

27    critical child care, health care, and other services affected by the challenged reorganization and RIFs;

28    and Plaintiff Natural Resources Defense Council ("NRDC") joins this Motion.

PLS.' MEM. ISO MOT. FOR PRELIMINARY INJUNCTION, NO. 3:25-cv-03698-SI            3

1    Plaintiffs' amended complaint also adds the Peace Corps as a defendant.  On May 9, 2025,

2  public reports revealed that the Peace Corps is poised to implement the President's EO by "reduc[ing]

3  its global staff by 25 percent, potentially closing some of its 60 international posts," and cutting its

4  Washington, DC headquarters staffing even more drastically, terminating anywhere from 50 to 80%

5  of existing staff.  Black Decl. ¶¶12-14, Ex. A (AFSCME).

6  **II.     Restructuring and RIFs at Agencies Pursuant to the EO Are Causing Widespread
          Irreparable Harm**

7
         **A.     Ongoing Restructuring and RIFs Pursuant to the EO**
8
           As Plaintiffs have previously shown, federal agencies are currently implementing the ARRPs
9
   that the President required them to create and the Memo required them to submit to OMB/OPM for
10
   approval.  The uncontroverted record evidence to date establishes that the agencies are, in fact,
11
   following the President's orders to reorganize the entire federal government, including by eliminating
12
   offices and functions that the President and his agents direct; engaging in large-scale RIFs that greatly
13
   reduce the size of federal agencies; and transferring functions across agencies.  *See* ECF 37-1 at 12-
14
   29; ECF 70 at 2-3; *see also* ECF 96-1 ¶15, Ex. 1 at 2, 5 (Soriano Supp. Decl.).  The RIFs are plainly
15
   the centerpiece of the reorganization plans, and indeed, OMB and OPM ordered federal agencies to
16
   conduct RIFS *first*, and then arrange the pieces of what remains of these agencies.  ECF 37-1, App.
17
   A, B.  The evidence submitted to date conclusively demonstrates:
18
           1.     *Agencies confirm they are implementing the President's orders*.  Federal Agency
19
   Defendants have repeatedly stated that they are implementing the EO to conduct RIFs and other
20
   actions in service of reorganizing the government.  *See, e.g.*, ECF 70-2 Exs. A, B, C (*DOL*:
21
   communications and RIF notice stating that abolition of program office was based on Presidential
22
   order, and RIF "due to the impact of the [EO]"); ECF 96-1 ¶15 (*NSF*: RIF of Division of Equity for
23
   Excellence in STEM likely dictated by OPM, OMB, and DOGE); *accord* ECF 70-1 Ex. A (quoting
24
   USDA Secretary Rollins); ECF 37-1 at 14 (*AmeriCorps*: nearly all staff RIF'd per EO); ECF 70-1 ¶6,
25
   Ex. C (*EPA*: scientific research office cut per EO); ECF 37-14 at ¶¶9-12, Exs. A-D (*GSA*: RIFs and
26
   offices cut "[i]n support of the [EO]"); ECF 37-1 at 4-5 (*HHS*: cuts "proceeding in accordance with
27
   [EO]" including entire programs and offices); ECF 41-1 ¶15, Ex. C (*HUD*: large-scale RIFs in
28
   "[c]ompliance with [EO]"); ECF 37-1 at 24 (*NSF*: cutting half of staff under "orders from the White

1   House"); *id.* at 24-25 (*SBA*: 43% reduction per EO); *id.* at 25-26 (*SSA*: plans per EO include

2   "abolishment of organizations and positions" and RIFs); *id*. at 27 (*State*: consolidation, 15%

3   reduction per EO); *id.* (*Treasury*: 40% IRS cut per EO); *id*. at 5, 28 (*VA*: cuts to 2019 levels per EO).

4       OMB, OPM, and DOGE continue to implement the President's mandates by *directing*

5   *agencies to cut offices and functions and RIF their staff.* ECF 37-1 at 12 (NLRB, NSF); ECF 96-1

6   ¶¶7-8, 15 (Soriano Supp. Decl.) ("the Division [of Equity for Excellence in STEM] was not originally

7   included in the Phase 1 ARRP that NSF had submitted for OMB and OPM approval, and … OPM,

8   OMB, and DOGE instructed NSF leadership to eliminate the Division after reviewing and rejecting

9   the Phase 1 ARRP."); ECF 37-12 (Daly) (OMB rejected AmeriCorps ARRP for not including RIF).

10       Plaintiffs have submitted what appears to be the standardized format for Phase 2 ARRP

11   documents required by OMB/OPM: the "Agency ARRP Phase 2 Cover Sheet," recently disclosed to

12   a union by a federal agency. In that Agency ARRP Phase 2 Cover Sheet, OMB/OPM instructs that

13   "[e]ach Agency **is directed** to notate the figures defined in this sheet and reflect them with additional

14   context in their Phase 2 plans" including, inter alia, "**RIFs/Terminations**" conducted through 4/15

15   and between 4/15 and 9/30, with corresponding cost savings calculations. ECF 96-1, Ex. 1, Att. D

16   (Soriano Supp. Decl.) (emphases added). That document, along with other record evidence, makes

17   clear that RIFs are *not* the only actions being taken to implement the ARRPs. Rather, the ARRPs are

18   being used to implement the EO and Memo through a range of actions to achieve the "Anticipated

19   Reduction in FTEs." *Id*. Thus, consistent with the original OMB/OPM Memo, agencies are also

20   *directed* by OMB/OPM to detail the other actions required by these ARRPs (including but not limited

21   to hiring freezes, Deferred Resignation Program and other voluntary retirement measures, and

22   terminating other employees including probationary employees). *Id*.; *see also* ECF 37-1, App. B at 2

23   (Available Tools: "In their ARRPs, agencies should employ all available tools to effectuate the

24   President's directive for a more effective and efficient government and describe how they will use

25   each."); ECF 37-28 ¶¶13-14 & Ex. C (SSA); ECF 37-17 ¶17 (FDA); ECF 37-24 ¶14 (DOL); Black

26   Decl. ¶12 (Peace Corps). In disclosing that document, the agency explained to the union:

27       In accordance with President Trump's February 11, 2025 Executive Order titled
        "Implementing The President's 'Department of Government Efficiency' Workforce
28       Optimization Initiative," the Department of Government Efficiency (DOGE) instructed

(573 of 726), Page 573 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 573 of 726
Case 3:25-cv-03698-SI    Document 101-1    Filed 05/14/25    Page 12 of 56

[non-defendant agency] to reduce the agency's workforce through a Reduction In Force (RIF).

ECF 96-1, Ex. 1 at 5; *see also id*. at 6 ("[T]he AR[R]P Phase 1 was a pre-decisional document and submitted to OPM for approval. After submission of that report, DOGE instructed NEH to conduct a RIF on an expedited basis.").[4]  The President's agents rejected that agency's (and those of others like NSF) initial ARRPs and instructed them to cut substantially more staff.  *Id*. ¶¶7-8, 15.

 *2. Agencies are closing the offices and programs that the President eliminates.*  The EO requires agencies to RIF the employees who work in "all agency initiatives, components, or operations that *my Administration suspends or closes*" government-wide. App. A (§3(c)).  As this Court recognized in the TRO Order, that is exactly what agencies are doing.  ECF 85 at 2-4.

For example, the Department of Health and Human Services ("HHS") has shut down numerous statutorily mandated offices and programs.  The Administration for Children and Families terminated every employee administering a program to cover heating and cooling bills for millions of low-income households and eliminated the division overseeing a case management system tracking child abuse and neglect.  ECF 37-36 ¶¶22-23 (APHA).  The statutorily mandated National Institute for Occupational Safety and Health ("NIOSH"), which is part of the Centers for Disease Control ("CDC") within HHS, plans to implement deep cuts that will decimate NIOSH.  ECF 85 at 2-3 (citing ECF 41-4 & Pub. L. 91-596 322, 84 Stat. 1590, 1612 (1970)); *see also* ECF 41-4 ¶21 (AFGE; estimating that "93% of NIOSH employees … received RIF notices"); Mammel PI Decl. Ex. E. NIOSH RIFs also initially closed a federal screening program for black lung disease.  ECF 37-36 ¶25

---

[4] As Plaintiffs explained in opposing Defendants' Motion for Protective Order, the ARRPs produced to Plaintiffs were provided by a non-defendant agency.  ECF 96 at 4 & n.2.  It is noteworthy that with respect to that agency, the instructions from DOGE on timing and content of the cuts were mandatory and urgent:  on April 14, 2025, the agency wrote:  "**The Department of Government Efficiency (DOGE) instructed NEH to start the workforce restructuring and Reduction in Force (RIF) processes last week… [describing RIFs]… Therefore, NEH is already in the process of completing its Phase 2 workforce restructuring process *in compliance with the Executive Order and approved by DOGE*.**"  ECF 96-1 (Supp. Soriano Decl.) Ex. A at internal Att. D (emphases added).  This instruction from DOGE is consistent with the OMB/OPM memo instruction:  "ARRPs should also list the competitive areas for large-scale reductions in force, **the RIF effective dates (which may be a date prior to when the plan is submitted),** the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead."  App. B at 3 (emphasis added).  OMB/OPM/DOGE are plainly *approving* these cuts and demanding *compliance*, consistent with the plain language of the Memo.

1    (APHA).  At the Department of Labor ("DOL"), all positions with the Office of Federal Contract

2    Compliance Programs were given RIF notices because the office was being abolished.  ECF 85 at 3

3    (citing ECF 37-24).  While Congress has directed that DOL "shall promptly investigate" complaints

4    of discrimination against disabled workers and veterans by federal contractors, *id.* (citing 29 U.S.C.

5    §793(b), 38 U.S.C. §4212), the elimination of this office has made compliance with that mandate

6    impossible.  *See also* ECF No. 37-24 ¶9, Ex. C (AFGE; DOL has directed that enforcement efforts

7    cease). AmeriCorps has been similarly gutted, with over 80% of its staff placed on leave, leaving it

8    "unable to complete the day-to-day work required to keep the Agency running."  ECF 37-12 ¶¶14,

9    18, 20-22, 25-26, 36, Ex. A (AFSCME.  And the entire Office of Research and Development (an

10   arm of the Environmental Protection Agency ("EPA"), with 1155 chemists, biologists, toxicologists

11   and other scientists) will be dismantled, with more than 1500 EPA scientists informed they can

12   reapply for just 500 jobs elsewhere.  ECF 37-19 ¶¶8, 17, Exs. A, E (AFGE); ECF 70-1 Ex. D.

13           *3.  Functions are being transferred between agencies.*  Federal Defendant Agencies are also

14   transferring functions and offices *between* agencies. *See, e.g.*, ECF 37-26 ¶¶42-43 (SEIU; DOE

15   student aid office planned to move to SBA); ECF 70-1 ¶¶3-4, Ex. A (USDA plans potentially include

16   consolidating functions with up to seven other agencies across government, including housing and

17   firefighting); ECF 37-1 at 13, 26-27 (USAID functions transferred to Department of State)

18           *4.  Agencies are implementing the President's "large-scale" RIFs.*  Plaintiffs identified at

19   least seven agencies that had issued RIF notices as of the May 1 TRO Motion filing: AmeriCorps,

20   EPA, GSA, HHS, HUD, Labor, and the SBA.  ECF 37-1 at 12.  Additional agencies had announced

21   RIFs, ECF 70-1 Exs. L, H (DOT and Interior), or instituted RIFs, *id.* Ex. K (OPM), as of the May 8

22   Reply.  As of today, May 14, Plaintiffs have identified additional RIFs at the Department of State and

23   National Science Foundation.  Mammel PI Decl. Ex. A (State: employees "have begun to receive

24   informal notifications [that] their roles will be cut"; RIF notices will go out June 2); ECF 96-1 ¶15

25   (AFGE; NSF sent RIF notices to all employees working in Division of Equity for Excellence in

26   STEM on May 9, 2025). There are also imminent RIFs at the Peace Corps, Black Decl. ¶13

27   (AFSCME), and a RIF slated at the National Centers for Environmental Information in the National

28   Oceanic and Atmospheric Administration ("NOAA"), Mammel PI Decl. Ex. B.

1          **B.**     **Ongoing and Imminent Harms from the Reorganization and RIFs**

2         Plaintiffs' TRO evidence demonstrated detailed harms at each enjoined Defendant Federal

3 Agency. *See* ECF 37-1 at 14-29; ECF 70 at 12-13. These significant harms are either already

4 occurring or imminent. Many employees have been placed on immediate administrative leave, *e.g.*,

5 ECF 37-12 ¶20 (AmeriCorps); ECF 37-14 ¶11 (GSA); ECF 37-21 ¶18 (HHS); 37-16 ¶10 (DOL); and

6 others have already been subjected to RIFs, *see, e.g.*, ECF 37-13 ¶¶12-14 (EPA); ECF 41-1 ¶¶13-18

7 (HUD); ECF 37-18 ¶¶8-14 (SBA); ECF 96-1 ¶¶15, 18 (NSF; RIF notices sent but temporarily

8 suspended due to this Court's TRO). The harms directly stemming from the gutting of these agencies

9 range from local governments' and non-profits' loss of AmeriCorps' assistance in providing disaster

10 relief, public health services, wildfire mitigation, emergency management, and more, ECF 41-6 ¶¶8-

11 20 (King County), ECF 37-36 ¶39 (APHA); *see* ECF 37-1 at 25; to harms from the loss of USDA

12 programs including but not limited to food safety inspections, assistance in quarantining invasive

13 pests, and processing of food service and child and adult care programs, *see* ECF 37-1 at 26 (citing

14 declarations from Plaintiffs AFGE, Harris County, County of Santa Clara, King County, WWP,

15 NOFA, AFSCME, and AGU); to severe public health threats from cuts to the CDC, including

16 decreased ability to control outbreaks of contagious diseases such as measles, to improve prevention

17 of birth defects, and to treat drug-resistant STDs and stop disease transmission, ECF 37-1 at 19-21

18 (citing declarations); to termination of every employee administering the program that covers the

19 heating and cooling bills for millions of low-income households, and elimination of the division

20 overseeing a tracking of child abuse and neglect, ECF 37 at 20 (citing ECF 37-36 ¶¶22-23 (APHA)).

21         Added to this catalogue of harm detailed in Plaintiffs' TRO papers is additional evidence of

22 harms flowing from the evisceration of the Peace Corps, EPA, NIOSH, NOAA, USDA, CDC,

23 Department of Energy ("DOE"), and Department of Interior ("Interior").

24         **Peace Corps**: Planned RIFs will cause imminent harm to Plaintiff AFSCME's members who

25 will lose their jobs and be prevented from "the promotion of world peace and friendship through

26 public service" to which they "have dedicated [their] lives." Black Decl. ¶¶2, 14-15, 19. Plaintiff

27 AFSCME will itself be harmed by impairing its mission, depriving it of membership dues, and

28 forcing it to allocate resources and attention to responding to RIFs. *Id.* ¶¶15-16.

1       EPA:  The announced elimination of the Office of Research and Development ("ORD") will

2  impede the abatement of lead contamination in drinking water across the nation, including ongoing

3  NRDC programs that rely on ORD testing, technical support, and expertise.  Olson Decl. ¶¶19-27,

4  36-39 (NRDC).  The elimination of the Energy Star program, which was created at the direction of

5  Congress and certifies and identifies energy-efficient products for the information of business and

6  consumers, will severely hinder energy efficiency efforts, including NRDC's building efficiency

7  program.  Cunningham Decl. ¶¶2-12 (NRDC); Mammel PI Decl. Exs. C. D.

8       NIOSH:  RIFs have halted certification of personal protective equipment (PPE), without

9  which Santa Clara will be forced to discontinue clinically indicated medical procedures, to the

10  detriment of patients (and resulting loss of revenue), or to use equipment that is not certified and may

11  inadequately protect patients or workers or fail to comply with applicable regulations.  Supp.

12  Williams Decl. ¶¶8-¶9.  RIFs will also impair the County's ability to respond to the measles outbreak,

13  develop guidance that limits injury risk for its workforce, and protect its workers from industrial

14  chemical exposure.  *Id.* ¶¶9-15.

15       USDA:  The Animal and Plant Health Inspection Service ("APHIS") is responsible for

16  training and accrediting local officials to inspect agricultural products being exported to other

17  countries, of which Santa Clara County exports a considerable amount.  Supp. Williams Decl. ¶¶4-5

18  (Santa Clara).  Planned RIFs at APHIS could impair certification of local officials and grind

19  agricultural exports to a halt; even short delays may cause products to spoil, eat into farms' thin

20  margins, cause irreparable harm to local industry, and cause Santa Clara fiscal harm.  *Id.*

21       DOE, Interior, CDC, NOAA, EPA, NIOSH: These agencies maintain public databases of vital

22  scientific information on which researchers, including NRDC staff, regularly rely; loss or degradation

23  of these datasets due to cuts will obstruct important environmental and public health research and

24  policy initiatives.  McKinzie Decl. ¶¶7-20 (NRDC); Sass Decl. ¶¶6-13 (NRDC).

25       Appendix C to this brief is a chart identifying the agencies for which each Plaintiff asserts

26  harm.

27

28

**ARGUMENT**

I.    **This Court Should Enjoin Defendants' Implementation of Executive Order 14210 and the Resulting Agency RIF and Reorganization Plans**

Plaintiffs show (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; and (3) the balance of equities and (4) public interest support an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* Fed. R. Civ. P. 65(a), (b)(3).

A.    **Defendants' Government-wide Order and Actions Are Causing Ongoing, Nationwide Irreparable Harm and the Balance of the Equities and Public Interest Weigh Heavily in Favor of a Preliminary Injunction**

Plaintiffs have extensively documented irreparable harms they and their members face. ECF 37-1 at 12-29; ECF 70 at 12-14; ECF 85 at 14-17. As previously explained, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Hundreds of thousands of federal employee members of union and organizational Plaintiffs are at risk of employment termination, losing their incomes and long careers in public service as well as health insurance for themselves and their families, and even being required to relocate. ECF 37-1 at 13 n.24 (citing declarations; ECF 70 at 12); Black Decl. ¶¶2, 13-14, 19 (AFSCME); *see Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health benefits is irreparable harm). Workers who remain face degraded and dangerous working conditions and significantly increased workloads, risking termination for cause if they cannot cover the work of those RIF'ed. ECF 37-20 ¶37; *see also* ECF 37-35 ¶¶12-13 (SSA layoffs included staff who tested water for Legionnaire's Disease, which caused death of two employees several years ago); ECF 37-21 ¶32 (RIFs leave CDC employees with disabilities no way to seek accommodations); ECF 37-1 at 13, 45 n.58; 70 at 12 n.20. Local government Plaintiffs are suffering and will suffer irreparable harm from disruption of the federal services, sources, and support that they rely on, impeding their ability to serve and protect their residents, imposing direct fiscal harms, and necessitating the expenditure of substantial resources. ECF 37-1 at 14-29, 46; ECF 70 at 14 & nn. 22-26; Williams Supp. Decl ¶¶5-15 (Santa Clara). This monetary harm is irreparable because Plaintiffs cannot recover monetary damages in this case. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Non-profit organization Plaintiffs' members, and labor Plaintiffs' non-federal members, face irreparable injury from loss or degradation of important government services

they rely on, including difficulty obtaining government benefits, halting of critical scientific research, increased risks to public health, underenforcement of safety and labor standards, and environmental destruction.  *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (loss of government benefits is irreparable); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("[E]nvironmental injury, by its nature, … is … irreparable.") (citation omitted); ECF 37-1 at 14-29 (detailing injuries); ECF 70 at 12-13 (same).[5]

Defendants, on the other hand, have to date put forth no evidence of harm they will incur from preserving the status quo.[6]  To the extent they argue they will be required to temporarily retain employees they otherwise would have terminated under the EO and Memo, that purported harm pales by comparison to the injuries to Plaintiffs and their members.  *See Lopez*, 713 F.2d at 1437 ("Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.").  Moreover, Plaintiffs' requested preliminary injunction would *not* prevent the President from carrying out any *lawful* plan to reorganize the government—by obtaining authorization from Congress.  A preliminary injunction would simply help ensure that the President and agencies act constitutionally and in accordance with statutes, which "is always in the public interest."  *Melendres*, 695 F.3d at 1002.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the Executive Order and Agency Implementation are Unlawful

This Court should again reject Defendants' assertion that the EO and Memo provide only "guidance" for "planning."  ECF 85 at 31-34.  As discussed previously, the record evidence conclusively demonstrates that President Trump has ordered federal agencies to engage in a government-wide reorganization and to RIF massive numbers of employees in service of that reorganization.  The plain language of the EO and Memo mandate these actions and remove agency decision-making and discretion.  "As is true of interpretation of statutes, the interpretation of an

---

[5] Irreparable injuries also include deprivation of the ability to participate in notice-and-comment and harm to the organizations' mission, activities, and finances.  *See* ECF 37-1 at 45-46 (organizational and procedural injuries); ECF 70 at 14 (organizational injuries); Black Decl. ¶¶15-16 (harm to mission)
[6] Defendants' "compliance" declaration (ECF 95.1) identifies no difficulty complying with the Court's TRO.  At least one federal agency jumped at the chance:  NSF immediately reinstated employees and halted RIFs based on the TRO.  ECF 96-1 ¶19 & Ex. 4 (Soriano Supp. Decl.).

Executive Order begins with its text, which must be construed consistently with the Order's object and policy." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (cleaned up); *see also Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996). The Court should take President Trump at his word that the EO commences systemic "transformation," by "eliminating" what he perceives to be problematic aspects of government, as set forth in "Section 1. *Purpose.*" App. A ("To restore accountability to the American public, this order *commences a critical transformation* of the Federal bureaucracy. By *eliminating* waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.") (emphasis added).

The EO goes on in Section 3 (entitled, "Reforming the Federal Workforce to Maximize Efficiency and Productivity") to order agencies to take actions in mandatory language ("shall") that is not consistent with mere "guidance." *E.g., Kingdomware Techs., Inc. v. U.S.,* 579 U.S. 162, 172 (2016) ("It is generally clear that 'shall' imposes a mandatory duty."). The President is also plainly acting categorically with respect to all federal agencies and the entire federal workforce. Among these mandates imposed on all agencies, the President orders that agencies "shall" engage in mandatory "large-scale" RIFs. He then requires agencies to "prioritize" a list of required items that "shall" be included, expressly defining a sole exception. Nothing about the President's language is permissive or advisory. The structure of this EO, containing a list of mandatory items with an identified exclusion, reinforces the mandatory force, as the Ninth Circuit has concluded with respect to a parallel structure, and leads to the same conclusion:

> "Under the doctrine of '*inclusio unius est exclusio alterius*' (the inclusion of one is the exclusion of the other), 'when a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.' " .... The canon applies here. By specifically excluding grants "deemed necessary for law enforcement purposes," the Executive Order directs the Attorney General and the Secretary to cut all other grant programs.

*San Francisco,* 897 F.3d at 1239.

Finally, savings clause language, such as "consistent with applicable law," cannot override the EO's plain text: "Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *Id.* at 1239-40 (holding "distinguishable" *Building & Construction Trades Department v. Allbaugh*, 295

1    F.3d 28 (D.C. Cir. 2002)); *see also New York*, 133 F.4th at 70-71 (rejecting same argument regarding

2    funding freeze Executive Order).  This Court's conclusion at the TRO stage that the EO-imposed

3    mandatory actions in service of federal government reorganization, removing agency decision-

4    making and discretion (ECF 85 at 31-32), was supported by all applicable maxims of interpretation.

5        The same analysis applies to the Memo, which, like the EO, contains mandatory, not

6    permissive, language.  Like the President, OMB and OPM should be taken at their word.  And OMB

7    and OPM told Agency Heads that the EO was mandatory, stating that the EO "**directed** agencies to

8    'eliminat[e] waste, bloat, and insularity' in order to 'empower American families, workers, taxpayers,

9    and our system of Government itself.'"  App. B (emphasis added).  OMB and OPM confirmed the

10   RIFs were for the purpose of reorganization:  they required agencies to combine these in the same

11   ARRP document.  *Id*.  OMB and OPM imposed mandatory requirements for those ARRPs, not mere

12   guidance:  "the **instruction** that such plans be submitted to OMB and OPM"; requiring that agencies

13   "**will** submit" the plans for "**approval**" by required deadlines.  *Id*. (emphases added).

14       Defendants' portrayal of these documents as permitting agencies to exercise meaningful

15   discretion or to make their own considered decisions as to the offices or functions removed, size of

16   the cuts reflected in these plans, or timeframe under which they will be effectuated, is directly

17   contrary to the EO and Memo's plain language.  So too is the attempt to portray the Memo as simply

18   beginning an ongoing planning process:  the President ordered agencies to act and OMB/OPM

19   reinforced that directive by requiring submission of the initial phase of plans focusing on RIFs within

20   a *mere two weeks*, with the second to follow only a month later.  App. B.  Nor does Defendants'

21   attempt to rely on the later "report" dates as a basis for arguing that the ARRPs are mere planning

22   purposes to be revised ad infinitum (ECF 88-1 ¶6) work either:  the Memo separately defines "plans"

23   (for approval in March and April) and "reports" submitted later (plainly referring to how the

24   implementation of the approved plans is proceeding).  App. B.  The Memo also sets an ultimate

25   implementation deadline: "Phase 2 plans should be planned for implementation by September 30,

26   2025." *Id.*, App. B at 4.  As with the EO, this Court's conclusion regarding the mandatory orders

27   contained in the OMB/OPM directive is backed by all maxims of interpretation.  ECF 85 at 33-34.

28       Plaintiffs' evidence confirms the plain language of these documents:  agencies are following

1  the President and OMB/OPM's orders, by implementing plans that reflect the President's elimination

2  of programs and functions and by commencing large-scale RIFs.  *Supra* at 4-6.

3        From the plain language of the EO and the OMB/OPM Memo, and the uncontroverted record

4  that agencies are, indeed, implementing these mandatory orders, flows the inevitable conclusion that

5  Defendants' actions are ultra vires.  Defendants identify no specific source of Constitutional or

6  statutory authority for the President's actions, beyond general Article II supervisory powers, which in

7  Defendants' view give the President plenary power over the federal agencies.  But the Constitution is

8  predicated on the idea that Executive power is not unlimited:  "The President's power, if any, to issue

9  [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown*

10  *Sheet & Tube Co.*, 343 U.S. at 585.[7]  And where, as here, Congress has declined to reauthorize the

11  power to reorganize the federal government that the President needs to take such action, his power is

12  "at its lowest ebb."  *Id.* at 637 (Jackson, J., concurring); *accord San Francisco*, 897 F.3d at 1233-34.

13  There is no *real* dispute that the President lacks the authority to reorganize the federal government

14  without Congressional authorization.  *E.g.*, Paul J. Larkin, Jr. & John-Michael Seibler, *The*

15  *President's Reorganization Authority*, Heritage Foundation Legal Mem. No. 210, at 1, 3 (July 12,

16  2017) ("The President may create, reorganize, or abolish an office that he established, but he cannot

17  fundamentally reorganize the executive branch in direct violation of an act of Congress. … [T]he

18  President does not have constitutional authority to reorganize the executive branch on his own.").[8]

19        Nor can there be any real dispute that this EO does in fact order a reorganization of the entire

20  federal government—imposing a radical transformation of all federal agencies, at the same time, by

21  eliminating programs and functions, transferring functions between agencies, and ordering agencies

22  to restructure themselves through large-scale RIFs.  The actions the EO requires fall squarely within

23  the previously granted reorganization authority that expired in 1984, and which Congress, thus far,

24

---

25  [7] "Unchecked presidential power is not what the Framers had in mind."  ECF 85 at 1 (quoting amicus
brief filed by former federal officials, Dkt. No. 69-1 at 1).  Indeed, "[t]here can be no liberty where the
26  legislative and executive powers are united in the same person."  *Bowsher v. Synar*, 478 U.S. 714, 721-
22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961).

27  [8] *Accord* John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage
Foundation Legal Memorandum No. 4782, at 1-2 (Nov. 3, 2017) (recognizing that "[s]ince [*INS v.]*
28  *Chadha*, [462 U.S. 919 (1983)], sweeping reorganization of the federal bureaucracy requires the active
participation of Congress."), both available at:  www.heritage.org.

1    has *not* granted.  *See* 5 U.S.C. §903.

2         Defendants' argument regarding the Article II executive power to supervise agencies

3    necessarily piggybacks on the authority granted to those agencies by Congress.  But no statute

4    delegating authority to an agency (such as the statute addressing RIFs, 5 U.S.C. §3502) gives the

5    President the power to reorganize the government.  ECF 85 at 27-28.[9]  Indeed, 5 U.S.C. §3502

6    predates the last congressional authorization of Presidential reorganization authority in 1984.  Pub. L.

7    89-554, Sept. 6, 1966, 80 Stat. 428-29.  That conclusion is further supported by the EO and

8    OMB/OPM Memo's directions, which go far beyond asking agencies to exercise their own statutory

9    authority and discretion.  The President has imposed government-wide, categorical requirements that

10   include the (1) mandate to commence imposing "large-scale" RIFs across all agencies; (2) removal of

11   agency decision-making power and transfer of that authority to OMB/OPM/DOGE; (3) requirement

12   that agencies RIF employees in programs and functions that the President and his agents eliminate;

13   (4) requirement that agencies maximally RIF and eliminate all non-statutory mandated functions

14   (with the President and his agents defining those requirements), regardless of the agencies' prior

15   assessment of need or reasons for those functions;  and (5) directive to prioritize government shut-

16   down levels of staffing that cannot, by definition, support proper agency function.[10]

17        This Court has thus correctly concluded that Plaintiffs are likely to succeed on claims that the

18   President's order that agencies implement a reorganization on his mandated terms and conditions,

19   including through RIFs for the purpose of reorganization, and the consolidation, transfer, and

20   elimination of agency functions, usurp legislative authority and are unconstitutional and ultra vires.

21   ECF 85 at 26-32; *see Chen v. I.N.S.*, 95 F.3d 801, 805 (9th Cir. 1996) ("the Executive Order lacked

22   the force and effect of law because it was never grounded in a statutory mandate or congressional

23

---

24   [9] This Court also correctly concluded that no statute authorizes OMB, OPM or DOGE to assume the
     authority to direct agencies to act in the manner that they have here.  ECF 85 at 32-34.  Defendants

25   effectively seek to cloak these agencies in the President's borrowed power, but to the extent the
     President has none, neither do OMB, OPM, or DOGE.

26   [10]The Contingency Plans referenced in the EO and Memo, known as "Lapse Plans," set forth the
     minimum staffing needed (to protect, for example, against the destruction of property or loss of life)

27   when agencies receive no appropriations at all.  In such circumstances, agencies *by law cannot* perform
     their normal Congressionally authorized functions.  Dep't of Commerce, *Plan for Orderly Shutdown*

28   *Due to Lapse of Congressional Appropriations* (September 27, 2023), available at:
     https://www.commerce.gov/sites/default/files/2023-09/DOC-Lapse-Plan-2023.pdf.

1    delegation of authority"); *State v. Su*, 121 F.4th 1, 13 (9th Cir. 2024) ("In sum, the President cannot

2    issue an executive order instructing agencies to carry out [his] mandate" without Constitutional or

3    statutory authority); *San Francisco*, 897 F.3d at 1235 (enjoining implementation of unconstitutional

4    Executive Order).  This conclusion does not upend the Constitution, as Defendants have claimed.

5    Rather, it reestablishes the proper balance of authority between the democratically elected Congress

6    and the executive branch, as this Court previously concluded.

7         Likewise, this Court's prior conclusions that OMB, OPM, and DOGE's actions are ultra vires

8    apply with equal force to this motion.  ECF 85 at 34-37.  This Court need not decide whether DOGE

9    is subject to the APA (although for reasons explained by other courts, it is, notwithstanding

10   Defendants' attempts to cloak it within the Executive Office of the President—where OMB, which is

11   subject to the APA, is also housed).  *Id*. at 36.  Plaintiffs are likely to succeed on APA claims against

12   OMB and OPM for actions that exceed authority and fail to comply with notice-and-comment

13   rulemaking, for reasons previously given.  *Id*. at 37.  And while for purposes of this Motion

14   (including because Plaintiffs do not yet have access to the ARRPs) this Court need not reach

15   Plaintiffs' claims against OMB/OPM and the Federal Agency Defendants for engaging in arbitrary

16   and capricious action, it could, for the reasons provided by the First Circuit in *New York*, 133 F.4th at

17   70-71.  The President's and OMB/OPM's *categorical* instructions and the agencies' implementation

18   of those instructions are necessarily divorced from reasoned decision-making that takes into account

19   all appropriate factors (because the categorial instruction took into account nothing other than the

20   President's will to restructure government according to his plans).  *See* ECF 37-1 at 42-44.

21        **C.    This Court Has Jurisdiction Over All Plaintiffs' Claims**

22             **1.    Standing**

23        Plaintiffs have amply demonstrated Article III standing through the TRO briefing and

24   accompanying declarations, which Plaintiffs incorporate.  *See* ECF 37-1 at 44-46 & nn. 57-63 (citing

25   to plaintiff declarations); ECF 70 at 12-14 & nn. 19-27.

26        New plaintiffs SEIU Local 521 and SEIU Local 1021, and new movant NRDC, also have

27   Article III standing.  Local 521's members include employees at an early learning services program

28   in Santa Clara who have been notified that they will be laid off on July 1, 2025 unless the federal

1   Head Start program is functional and able to renew the grant—but all the federal employees with

2   whom the local program staff previously worked have been removed from their positions.  Woodard

3   Decl. ¶9; *see also id.* ¶¶10-12; ECF 37-26 ¶27 (impacts on Local 521 members who are family child

4   care providers and depend on federal agencies' technical assistance).  Local 1021's members are also

5   severely impacted by actions taken to implement the Executive Order, including cuts to federal Head

6   Start programs, which will harm members who work at those programs; members who work as

7   counselors, care coordinators, case managers and more, who are directly impacted by HHS's

8   shuttering of its Substance Abuse and Mental Health Services Administration; and health care worker

9   members whose ability to provide services is impacted by the lack of normal operations at the Social

10  Security Administration and its effect on Medicare and Medi-Cal processing.  *See* ECF 37-30.

11          NRDC's members are injured by the environmental harm that results from staffing and

12  program cuts at environmental agencies.  *See, e.g.*, Asmutis-Silvia Decl. ¶¶4-19, 23-26 (NOAA cuts

13  will inhibit member's ability to respond to whale strandings and increase endangered whales' risk of

14  extinction).  NRDC also has standing to sue because the elimination of programs at EPA, CDC,

15  NIOSH, Interior, DOE, and NOAA "directly affects and interferes with [NRDC's] core business

16  activities" of research, policy analysis, advocacy, and public education to protect public health and

17  the environment.  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

18  NRDC's activities are hindered by the loss of these agencies' research, data, and collaboration, and

19  NRDC will be required to divert and expend resources to try to fill the gaps.  *See* McKinzie Decl.

20  ¶¶7-20; Sass Decl. ¶¶6-13; Olson Decl. ¶¶19-27, 36-39; Cunningham Decl. ¶¶5-13; *Fellowship of*

21  *Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023)

22  (organization has standing where government's "behavior has frustrated its mission and caused it to

23  divert resources in response to that frustration of purpose").

24                    **2.      Administrative Channeling**

25          Plaintiffs have explained, and this Court correctly concluded, that the Court has subject matter

26  jurisdiction over Plaintiffs' claims challenging a government-wide Presidential Executive Order and

27  agencies' implementation of that order, and that no Plaintiff is required to "channel" its claims.  ECF

28  37-1 at 46-48; ECF 70 at 10-11.  The claims of NRDC and the SEIU Locals are no more "channeled"

than those of the existing government, non-profit organization, and labor union Plaintiffs.  The

Court's authority to hear the claims of these Plaintiffs has not been removed, implicitly, by Congress.

*See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28

U.S.C. §1331 should hold firm against 'mere implication flowing from subsequent legislation'").

Defendants' argument appears to be that, because Congress created administrative agencies to

handle *some* claims by employees involving federal employment, *all* claims bearing on federal

employees are excluded from federal court.[11]  To the contrary, as the Supreme Court recently

cautioned, "a statutory review scheme [that precludes district court jurisdiction] does not necessarily

extend to every claim concerning agency action." *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185

(2023); *Kerr v. Jewell*, 836 F.3d 1048, 1052-53 (9th Cir. 2016).

Plaintiffs do not, as Defendants previously argued, attempt to evade an inapplicable

procedure: they simply bring *different claims* than what those statutory schemes are designed for, by

challenging ultra vires Presidential action and ensuing violations of the APA, which fall under well-

established express federal jurisdiction.  28 U.S.C. §1331.  Far more textual indication of

Congressional intent is needed before removing the "command" of APA review of government

action.  *Dep't of Commerce v. New York*, 588 U.S. 752, 771-72 (2019); *see also Loper Bright Enters.

v. Raimondo*, 603 U.S. 369, 391-93 (2024) ("The text of the APA means what it says.").

NRDC and the SEIU Locals are situated similarly to the local government entities, nonprofit

organizations, and non-federal sector labor unions, in that the two administrative agencies that

Defendants invoke—the Merit Systems Protection Board ("MSPB") and Federal Labor Relations

Authority ("FLRA")—could never hear these Plaintiffs' claims.[12]  The SEIU Locals (like AFSCME

and SEIU) do not represent federal employee workers: their members are child care, health care, and

---

[11] ECF 60 (TRO Opp.) at 23.  While the Ninth Circuit has channeled individual employee claims against
employing agencies, it has never done so with respect to a third-party claim, nor to any challenge of a
government-wide Executive Order or its implementation through OMB or OPM.  *See Veit v. Heckler*,
746 F.2d 508 (9th Cir. 1984); *Saul v. United States*, 928 F.2d 829 (9th Cir. 1991) (individual employee);
*Russell v. U.S. Dep't of the Army*, 191 F.3d 1016 (9th Cir. 1999) (same).

[12] *See* 5 U.S.C. §7701 (MSPB appeals limited to "employee" or "applicant" claims challenging
employer actions listed in §7512); §7703 (appeal rights similarly limited); §§7103(a)(1), 7118 (FLRA:
individual, labor organization, or agency); §7123 (FLRA: appeal rights similarly limited).  The FLRA
expressly cannot hear disputes arising from "government-wide" action.  *NTEU and Dep't of Treasury,
IRS*, 60 F.L.R.A. 783, 783 (2005); 5 U.S.C. §7117(a)(1).

other service providers whose jobs are impacted by the EO-directed reorganization and RIFs.  *See, e.g.*, ECF 41-5 ¶¶7-49 (O'Brien); ECF 37-3 ¶¶4-11 (Adler); ECF 37-22 ¶¶3-14 (Jefferies); ECF 41-3 ¶¶3, 6-15 (Nelson).  Those impacted members are third parties to any relationship between federal employees and their employing agencies.  As the Ninth Circuit recently noted, the notion that Congress intended such third-party plaintiffs' claims to be sent to these agencies lacks any support. *AFGE v. OPM*, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) ("Nor have appellants demonstrated—under existing authority—that they are likely to establish that Congress has channeled the organizational plaintiffs' claims to administrative agencies."); *see also Feds for Med. Freedom v. Biden*, 63 F.4th 366, 375 (5th Cir.) (en banc), *judgment vac'd as moot*, 144 S.Ct. 480 (2023) (employee organization challenge to government-wide federal employee vaccine mandate was not channeled to MSPB or FLRA).  Defendants previously invoked *United States v. Fausto*, 484 U.S. 439, 455 (1988) (ECF 60 at 25), which involved an employee's attempt to challenge a personnel action by his employing agency; nothing in that decision requires channeling of third-party claims or claims involving government-wide action simply because they impact federal employment.

Moreover, the concept of "channeling" is based entirely on an implied doctrine, which cannot exist divorced from the underlying statutory text.  *E.g.*, *Loper Bright Enters.*, 603 U.S. at 391-92; *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).  Any such separation would contravene a host of APA precedent, which requires exceptions to judicial review to be read narrowly.  *Dep't of Commerce*, 588 U.S. at 771-72 (holding that judicial review in APA is mandatory); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 601-02 (2016) (holding that administrative review provisions did not foreclose APA review); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23 (2018) (holding that express exceptions to APA review must be construed narrowly to effectuate purposes of the Act).  The Congress that enacted the CSRA and FSLMRS referenced the APA at least three times (5 U.S.C. §§1103, 1105, 7134) and cannot be said to have silently demonstrated an intent to eliminate the bedrock principle of APA review.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional

1    intention that such a result should follow.").[13]

2    Defendants try to shoehorn Plaintiffs' claims into this doctrine by mischaracterizing them as

3    challenging only specific RIF decisions.  But the shoe does not fit.  The EO, Memo, and ARRPs are

4    not covered employment actions.  The MSPB hears only challenges to covered employment actions

5    and the FLRA cannot hear any claim involving a "government-wide rule" at all.  *Supra*, n.12.

6    Applying the three-part analysis from *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13

7    (1994), this Court correctly concluded that all of the claims at issue in this case—involving

8    constitutional separation of powers issues and APA challenges to the implementation of government-

9    wide Executive Order and OMB/OPM Memorandum—fail all three factors. ECF 85 at 23-35.  As to

10    the first factor, meaningful judicial review of these claims would be foreclosed because no Plaintiff

11    can ever sue the President, OMB, OPM, or DOGE before these agencies, and even the federal

12    employee labor unions cannot sue the Federal Agency Defendants for arbitrary and capricious

13    ARRPs implementing a government-wide Executive Order.  *Thunder Basin*, 510 U.S. at 207.

14    Moreover, "meaningful" judicial review must account for the type of claim and relief Congress

15    intended, particularly for APA claims (for which the Supreme Court has said judicial review years

16    after agency adjudication is not meaningful, *Hawkes*, 578 U.S. at 601-02).

17    As to the second factor, Plaintiffs' claims are "wholly collateral" to the CSRA's scheme

18    because they do not challenge individual adverse personnel actions or employer actions under a

19    contract; they concern separation of powers issues and challenge the substantive and procedural

20    lawfulness of the EO and its implementation.  *Thunder Basin*, 510 U.S. at 212.

21    And as to the third, the labor agencies have no particular expertise in resolving constitutional

22    and administrative law questions.  *Loper Bright Enters.*, 603 U.S. at 399.

23    This Court's correct ruling should be extended to the new Plaintiffs as well.

24

25

26    ---

[13] This Court also correctly held that the claims brought by the federal union Plaintiffs are not of the
type that Congress intended to be heard by administrative agencies.  ECF 85 at 23-24.  While

27    employees and their labor representatives can bring *certain* claims before these agencies, they cannot
bring *these* claims involving constitutional separation of powers issues and APA challenges to the

28    implementation of government-wide Executive Order and OMB/OPM Memorandum, for the same
reasons explained above.

II.    **Plaintiffs' Proposed Relief Is Necessary to Maintain the Status Quo for the Duration of this Litigation and to Prevent Ongoing Nationwide Irreparable Harm**

Intervention in the form of a preliminary injunction is necessary to protect the status quo and this Court's authority to enter relief ultimately vacating and remedying unlawful government action. Plaintiffs first describe the injunction they seek and then discuss legal issues pertaining to that relief.

A.    **Plaintiffs' Proposed Injunction**

As set forth in Plaintiffs' motion and proposed order, Plaintiffs seek a preliminary injunction that enjoins and/or stays Defendants OMB, OPM, DOGE, and the Federal Agency Defendants from implementing or enforcing Sections 3(c) and (e) of the EO or any portion of the Memo, including any OMB/OPM approval or disapproval of ARRPs, DOGE directives to eliminate programs or staff, or Federal Agency Defendant implementation of ARRPs, including but not limited to elimination, consolidation, or transfer of programs, functions, or offices; issuance or execution of RIF notices; or placement of employees on administrative leave, among any other actions required by the ARRPs.

Plaintiffs seek further to enjoin DOGE to rescind and take no further action to enforce any prior orders or directives regarding ARRPs, and to enjoin Federal Agency Defendants to rescind and cease enforcement of previous actions to enforce the EO or Memo, including by rescinding RIFs, restoring offices, programs, and functions, and transferring employees to administrative leave status.

Finally, Plaintiffs request that the Court set deadlines for Defendants to provide a proposed compliance plan, for Plaintiffs to review and respond to that plan, and for a joint submission to the Court of an agreed-upon plan or Defendants' proposal and Plaintiffs' objections.

B.    **The Injunction Protects the Status Quo**

The status quo is "the legally relevant relationship between the parties before the controversy arose." *Fellowship of Christian Athletes*, 82 F.4th at 684-85. Thus, in *Doe #1 v. Trump*, the Ninth Circuit squarely rejected the government's argument that implementation of the challenged government action constituted the relevant status quo for purpose of a preliminary injunction: "In the government's re-imagining of the status quo in this context, this factor would always tip in the government's favor, effectively rendering the Court powerless to exercise its discretion[.]" 957 F.3d 1050, 1068-69 (9th Cir. 2020). Instead, the Ninth Circuit held that it was the government's action

1   "that altered the status quo for the Plaintiffs." *Id.* at 1068.  Likewise here, the last uncontested status

2   before the "controversy arose" was prior to the President's unconstitutional EO, prior to

3   OMB/OPM's unlawful Memo and any unlawful DOGE directions, and prior to any Federal

4   Defendant Agency action implementing these unlawful directives, including by (but not limited to)

5   RIFs and actions reorganizing agencies pursuant to the unlawful EO and Memo.  The requested

6   preliminary injunction restores that status quo.

7       To be clear, the requested injunction would not order *reinstatement* of employees to former

8   federal employment.  As far as Plaintiffs are aware, no employees have yet been separated from

9   service due to the EO and Memo; they have received RIF notices and, in some cases, been placed on

10  paid administrative leave in advance of separation.  ECF 37-1 at 12, ECF 70 at 13 & nn. 27-28.  The

11  injunction would thus require only that Defendants undo actions taken to implement the EO and

12  Memo by, *inter alia*, rescinding pending RIF notices and allowing employees to resume work rather

13  than be paid the same amount and receive the same benefits to remain on paid administrative leave.

14  While, as here, "it is sometimes necessary to require a party who has recently disturbed the status quo

15  to reverse its actions, … such an injunction restores, rather than disturbs, the status quo ante."

16  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

## C.   The Scope of the Injunction Is Necessitated by the Scope of Defendants' Government-Wide Actions and Extent of the Harm to Plaintiffs

18      It is axiomatic that "courts must tailor the scope [of injunctions] 'to meet the exigencies of the

19  particular case.'"  *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee*

20  *Assistance Project*, 582 U.S. 571, 580 (2017)).  Broad relief is appropriate when it is "'*necessary* to

21  give prevailing parties the relief to which they are entitled.'"  *Azar*, 911 F.3d at 583 (quoting *Bresgal*

22  *v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)) (emphasis in *Azar*).

23      As an initial matter, it would be impossible to take a piecemeal approach to relief here.

24  Plaintiffs have shown injury to themselves and their members across the country. And the harms

25  Plaintiffs complain of arise from implementation of the EO, which is impacting Federal Agency

26  Defendants' ability to provide key public services throughout the country, ranging from the loss of

27  food safety inspections, farm certifications, food service programs, and research by USDA, with

28  impacts to local governments, as well as Plaintiffs Western Watersheds Project, Northeast Organic

1   Farming Association, American Geophysical Union, and to unions like AFSCME (impacts to federal,

2   state, and local employee members) and AFGE (impacts to federal members);[14] to the devastation

3   wreaked by gutting HHS and its ability to maintain, *inter alia*, lead exposure testing, monitoring and

4   prevention of infectious diseases, research and funding to prevent overdose, suicide, drowning, motor

5   vehicle crashes, and other injuries, support of Head Start programs, safety inspections for mines, and

6   research into reducing cancer risks for firefighters, with impacts on AFGE's federal employee

7   members, on unions representing state and local employees (SEIU and AFSCME), on nonprofit

8   Plaintiffs American Public Health Association and NRDC, and on each of the local government

9   Plaintiffs.[15]  Plaintiffs are harmed by Defendants' actions occurring all across the country, and in

10  centralized offices, that are far from the physical location of the Plaintiffs and their members.[16]  It

11  would be nearly impossible, if not impossible, for the Court to slice and dice injunctive relief,

12  creating a patchwork among Plaintiffs' members—who are spread throughout the country—and the

13  harms emanating from layoffs, reorganization of agencies, and cuts to agency services.  *Cf. City &*

14  *Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020) (limiting injunction to California's

15  geographical boundaries because plaintiffs operated within "neat geographic boundaries," while

16  distinguishing case from one "involving plaintiffs that operate and suffer harm in a number of

17  jurisdictions, where the process of tailoring an injunction may be more complex").

18          Further, where, as here, the action complained of is unconstitutional not simply as applied to

19  certain plaintiffs, but across the board, a nationwide injunction is appropriate and necessary.  *See*

---

[14] ECF 37-59 ¶¶23-28 (Chicago); ECF 37-46 ¶¶10-12 (Harris County); ECF 37-37 ¶¶18-21 (NOFA); ECF 37-40 ¶¶28-33 (WWP); ECF 37-45 ¶19 (AGU); ECF 37-4 ¶¶14-24 (AFSCME); ECF 37-31 ¶¶15-24 (AFGE).

[15] ECF 37-36 ¶¶12-34 (APHA); ECF 37-56 ¶¶4-5, 7-8 (San Francisco); ECF 37-52 ¶¶6-23 (Chicago); ECF 37-54 ¶¶37-43 (Baltimore); ECF 37-46 ¶¶13-26 (Harris County); ECF 41-6 ¶¶33-34 (King County); ECF 37-58 ¶¶35-39 (Santa Clara County); ECF 37-21 ¶¶22-28 (AFGE); ECF 41-4 ¶¶21-31 (AFGE); ECF 41-5 ¶¶4-16 (AFSCME); ECF 37-30 ¶¶7-16 (SEIU); Olson Decl. ¶¶29-38 (NRDC).

[16] Plaintiff unions and nonprofit organizations are not geographically limited.  *See, e.g.*, ECF 37-23 ¶2 (AFGE); ECF 37-26 ¶4 (SEIU); ECF 37-36 ¶2 (APHA); ECF 37-39 ¶2 (ARA).  Plaintiff cities and counties' injuries derive not only (or even mainly) from termination of federal employees employed therein, but also the evisceration of federal programs that are based in Washington, D.C. or throughout the country. *See, e.*g., McKinzie Decl. ¶¶7-20 (NRDC); ECF 37-46 ¶¶12-26 (Harris County); ECF 37-47 ¶4(c) (San Francisco County); ECF 41-6 ¶¶22(e), 29-31 (King County); Williams Supp. Decl. ¶¶5-15 (Santa Clara); ECF 37-59 ¶¶4-6 (Chicago); ECF 37-57 ¶¶5-7 (Chicago); ECF 37-56 ¶¶4-10 (San Francisco); ECF 37-54 ¶¶15-19 (Baltimore).

1    *County of Santa Clara v. Trump*, 250 F.Supp.3d 497, 539 (N.D. Cal. 2017), quoted in *PFLAG, Inc. v.*

2    *Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *24 (D. Md. Feb. 14, 2025).  It would make no

3    sense for this Court to rule that the actions of the President, OMB, OPM, and DOGE are ultra vires

4    and should be enjoined only as to members of the Plaintiffs and to residents of the Plaintiff local

5    governments, and yet could somehow otherwise be permitted to continue.

6      Separately, the APA's directive to "hold unlawful and set aside agency action," is not limited

7    by "geographic boundaries."  *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir.

8    2020).  Thus, the "ordinary result [in an APA case] is that the rules are vacated—not that their

9    application to the individual petitioners is proscribed.'"  *Regents of Univ. of Cal. v. DHS Sec'y*, 908

10   F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) (cleaned up);

11   *accord Pangea Legal Servs. v. DHS*, 501 F.Supp.3d 792, 827-28 (N.D. Cal. 2020).

12     **D.    The Proposed Injunction Does Not Exceed the Equitable Powers of this Court**

13     This Court is well within both its intrinsic equitable powers and the APA to require

14   Defendants to rescind their unlawful actions.  Federal courts have the equitable power to grant

15   injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v.*

16   *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *American Sch. of Magnetic Healing v.*

17   *McAnnulty*, 187 U.S. 94, 110 (1902)).  "[W]hen district courts are properly acting as courts of equity,

18   they have discretion unless a statute clearly provides otherwise."  *U.S. v. Oakland Cannabis Buyers'*

19   *Coop.*, 532 U.S. 483, 496 (2001); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The

20   essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each

21   decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.").

22     Further, under the APA, courts are empowered to "'set aside' [unlawful] agency action,"

23   which is "more than a mere non-enforcement remedy."  *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct.

24   1, 2 n.1, (2023) (Kavanaugh, J., concurring in the denial of the application for stay) (Mem.).  The "set

25   aside" remedy also encompasses "the power to 'strike down' an agency's work," so that "the

26   disapproved agency action is treated as though it had never happened."  *Id.*; *see also Monsanto v.*

27   *Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (recognizing vacatur as a presumptively

28   appropriate remedy for APA violation); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279,

**Add.588**

1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.").  "Vacatur [of

agency action] retroactively undoes or expunges a past [agency] action. … [V]acatur unwinds the

challenged agency action."  *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir.

2021).  Thus, in this case, the standard remedy of vacatur includes the rescission of the actions taken

to date to implement the EO, including through the ARRPs, and including but not limited to

unlawfully issued RIF notices, DOGE directives, ARRP approvals, and administrative leave

placements, because only that will actually "undo[]" or "expunge[]" the unlawful agency action.  *Id.*

This injunction is also consistent with 5 U.S.C. §705's broad grant of authority to "issue all necessary

and appropriate process to postpone the effective date of an agency action or to preserve status or

rights pending conclusion of the review proceedings" to "the extent necessary to prevent irreparable

injury."  5 U.S.C. §705.  Such an order enjoining the actions *caused* by the EO does not preclude the

government from planning, proposing, and engaging in action authorized by Congress, but to do so

the government would need to comply with all applicable laws, including the APA.  *Cf. NTEU v.

Vought*, D.C. Circuit Case No. 25-5091 (Apr. 28, 2025 Order:  lifting stay pending appeal to allow

district court's injunction of further RIFs, where stay order permitted RIFs based on agency's

"particularized assessment" and defendants issued RIFs of "nearly 90 percent of agency employees").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and

enter the accompanying proposed preliminary injunction.


DATED: May 14, 2025                          Stacey M. Leyton
                                             Barbara J. Chisholm
                                             Danielle E. Leonard
                                             Corinne Johnson
                                             Alice X. Wang
                                             Robin S. Tholin
                                             Aaron Schaffer-Neitz
                                             ALTSHULER BERZON LLP
                                             177 Post St., Suite 300
                                             San Francisco, CA 94108
                                             Tel.: (415) 421-7151
                                             Fax: (415) 362-8064
                                             sleyton@altshulerberzon.com
                                             bchisholm@altshulerberzon.com

Add.589

1    dleonard@altshulerberzon.com

2    By: /s/ Danielle Leonard

3    *Attorneys for All Union and Non-Profit Organization*
4    *Plaintiffs*

5
     Elena Goldstein (pro hac vice)
6    Skye Perryman (pro hac vice)
     Tsuki Hoshijima (pro hac vice)
7    DEMOCRACY FORWARD FOUNDATION
     P.O. Box 34553
8    Washington, D.C. 20043
     Tel: (202) 448-9090
9    Fax: (202) 796-4426
     egoldstein@democracyforward.org
10   sperryman@democracyforward.org
11

12   By: /s/ Elena Goldstein

13   *Attorneys for All Union and Non-Profit Organization*
     *Plaintiffs (except NRDC) and for Plaintiffs City of*
14   *Chicago, IL; Martin Luther King, Jr. County, WA;*
     *Harris County, TX; and City of Baltimore, MD*
15

16
     Jules Torti (pro hac vice)
17   PROTECT DEMOCRACY PROJECT
     82 Nassau St., #601
18   New York, NY 10038

19   Erica J. Newland (pro hac vice)
20   Jacek Pruski (pro hac vice)
     PROTECT DEMOCRACY PROJECT
21   2020 Pennsylvania Ave., N.W., Suite 163
     Washington, D.C. 20006
22   Tel: 202-579-4582
     jules.torti@protectdemocracy.org
23   erica.newland@protectdemocracy.org
     jacek.pruski@protectdemocracy.org
24

25   By: /s/ Jules Torti

26   *Attorneys for All Union and Non-Profit Organization*
27   *Plaintiffs (except NRDC)*

28

1

2

3

4

5

Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

6

By: */s/ Norman L. Eisen*

7

8

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

9

10

11

12

13

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

14

By: */s/ Rushab Sanghvi*

15

16

17

*Attorney for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and AFGE
locals*

18

19

20

21

22

23

Teague Paterson (SBN 226659)
Matthew Blumin (pro hac vice)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

24

By: */s/ Teague Paterson*

25

26

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees, AFL-CIO (AFSCME)*

27

28

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,

1      AFL-CIO
    1800 Massachusetts Ave., N.W.
2      Washington, D.C. 20036
    Tel: (202) 730-7428
3      steven.ury@seiu.org

4  By: /s/ Steven K. Ury

5

6  *Attorney for Plaintiff Service Employees International*
    *Union, AFL-CIO (SEIU)*

7

8      David Chiu (SBN 189542)
    City Attorney
9      Yvonne R. Meré (SBN 175394)
    Chief Deputy City Attorney
10     Mollie M. Lee (SBN 251404)
    Chief of Strategic Advocacy
11     Sara J. Eisenberg (SBN 269303)
    Chief of Complex and Affirmative Litigation
12     Molly J. Alarcon (SBN 315244)
    Alexander J. Holtzman (SBN 311813)
13     Deputy City Attorneys
    OFFICE OF THE CITY ATTORNEY FOR THE CITY
14     AND COUNTY OF SAN FRANCISCO
    1390 Market Street, 7th Floor
15     San Francisco, CA 94102
    molly.alarcon@sfcityatty.org
16     alexander.holtzman@sfcityatty.org

17

18 By: /s/ David Chiu

19

20 *Attorneys for Plaintiff City and County of San Francisco*

21     Tony LoPresti (SBN 289269)
    COUNTY COUNSEL
22     Kavita Narayan (SBN 264191)
    Meredith A. Johnson (SBN 291018)
23     Raphael N. Rajendra (SBN 255096)
    Hannah M. Godbey (SBN 334475)
24     OFFICE OF THE COUNTY COUNSEL
    COUNTY OF SANTA CLARA
25     70 West Hedding Street, East Wing, 9th Floor
    San José, CA 95110
26     Tel: (408) 299-5900

27

28 By: /s/ Tony LoPresti

1

2

*Attorneys for Plaintiff County of Santa Clara, Calif.*

3

4

David J. Hackett (pro hac vice)
General Counsel to King County Executive & Special
Deputy Prosecutor

5

Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor

6

Erin King-Clancy (pro hac vice app. forthcoming)
Senior Deputy Prosecuting Attorney

7

OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION

8

401 5th Avenue, Suite 800
Seattle, WA 98104

9

(206) 477-9483
David.Hackett@kingcounty.gov

10

aholcomb@kingcounty.gov
aclancy@kingcounty.gov

11

12

By: */s/ David J. Hackett* ___ ___

13

*Attorneys for Plaintiff Martin Luther King, Jr. County*

14

15

Sharanya Mohan (SBN 350675)
PUBLIC RIGHTS PROJECT

16

490 43rd Street, Unit #115
Oakland, CA 94609

17

Tel: (510) 738-6788
sai@publicrightsproject.org

18

By: */s/ Sharanya Mohan* _____

19

20

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,
Harris County, TX, and King County, WA*

21

22

Christian D. Menefee
Harris County Attorney

23

24

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant

25

Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel

26

Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division

27

Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division

28

R. Chan Tysor (pro hac vice)
Senior Assistant County Attorney

Alexandra "Alex" Keiser (pro hac vice)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel.: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice app. forthcoming)
Lucy Prather (IL ARDC 6337780) (pro hac vice)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By: */s/ Stephen J. Kane*

*Attorneys for Plaintiff City of Chicago*

Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming)
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947

1              sara.gross@baltimorecity.gov

2        By: */s/ Sara Gross*

3              *Attorneys for Plaintiff City of Baltimore*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Appendix A

**Federal Register**

Vol. 90, No. 30

Friday, February 14, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14210 of February 11, 2025

## Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.

**Sec. 2**. *Definitions.* (a) "Agency" has the meaning given to it in section 3502 of title 44, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States Code, and includes individuals who serve in the executive branch and who qualify as employees under that section for any purpose.

(e) "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f) "Law enforcement" means:

(i) engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii) the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g) "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h) "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

**Sec. 3**. *Reforming the Federal Workforce to Maximize Efficiency and Productivity.* (a) *Hiring Ratio.* Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan). The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan. This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service. This ratio shall not apply to functions related to public safety, immigration

enforcement, or law enforcement. Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b) *Hiring Approval.* Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i) This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii) The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

(iii) Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

(c) *Reductions in Force.* Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

(d) *Rulemaking.* Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

(i) failure to comply with generally applicable legal obligations, including timely filing of tax returns;

(ii) failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

(iii) refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

(iv) theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

(e) *Developing Agency Reorganization Plans.* Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

(f) Within 240 days of the date of this order, the USDS Administrator shall submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

**Sec. 4.** *Exclusions.* (a) This order does not apply to military personnel.

(b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

(c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

**Federal Register** / Vol. 90, No. 30 / Friday, February 14, 2025 / Presidential Documents **9671**

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2025*.

[FR Doc. 2025–02762
Filed 2–13–25; 11:15 am]
Billing code 3395–F4–P

# Appendix B

 

**U.S. Office of
Management and Budget**

**U.S. Office of
Personnel Management**

# MEMORANDUM

**TO:**             Heads of Executive Departments and Agencies

**FROM:**      Russell T. Vought, Director, Office of Management and Budget;
                   Charles Ezell, Acting Director, Office of Personnel Management.

**DATE**:          February 26, 2025

**RE**:            Guidance on Agency RIF and Reorganization Plans Requested by
                  *Implementing The President's "Department of Government
                  Efficiency" Workforce Optimization Initiative*

## I.    Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

## II.    Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1.  Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

## III.    Available Tools

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each. Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

2

**Add.602**

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

## IV.    Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

## V. Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

4

**Add.604**

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

5

**Add.605**

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

## VI.    Exclusions

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("*CHCOs*"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

6

**Add.606**

### Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook.** RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

**Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)**

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

**Step 2: Planning, Preparation & Analysis (up to 30 days)**

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

**Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)**

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

**Step 4: RIF Implementation & Separation (Final Step)**

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

Appendix C

**Appendix C:  Plaintiff Declarations By Federal Defendant Agency, With Accompanying ECF Docket Numbers**

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| AmeriCorps | Blake (AFSCME) (37-6)<br>Daly (AFSCME) (37-12) | Benjamin (APHA) (37-36) | Dively (King County) (41-6) |
| Department of Agriculture | Kelley (AFGE) (37-23)<br>Soldner (AFGE) (37-31)<br>Bachelder (AFSCME) (37-4)<br>Blake (AFSCME) (37-6)<br>O'Brien (AFSCME) (41-5)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26) | Shultz (AGU) (37-45)<br>Davis (NOFA) (37-37)<br>Molvar (WWP) (37-40)<br>McKinzie (NRDC)* | Barton (Harris County) (37-46)<br>Dively (King County) (41-6)<br>Williams (Santa Clara County) (37-58)<br>Supp. Williams (Santa Clara County)*<br>Crispen (San Francisco) (37-49) |
| Department of Commerce | Kelley (AFGE) (37-23) | Shultz (AGU) (37-45)<br>Neubacher (CPANP) (37-41)<br>McKinzie (NRDC)*<br>Asmutis-Silvia (NRDC)*<br>Molvar (WWP) (37-40) | Leach (Baltimore) (37-54)<br>Velez (Chicago) (37-57)<br>Pena (Harris County) (37-55)<br>Dively (King County) (41-6)<br>Williams (Santa Clara County) (37-58)<br>Bechelli (San Francisco)<br>Jue (San Francisco) |
| Department of Energy | Braden (AFGE) (37-8)<br>Kelley (AFGE) (37-23) | Shultz (AGU) (37-45)<br>McKinzie (NRDC)* | Leach (Baltimore) (37-54)<br>Dively (King County) (41-6)<br>Jue (San Francisco) (37-53) |

1

(613 of 726), Page 613 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 613 of 726
Case 3:25-cv-03698-SI   Document 101-1   Filed 05/14/25   Page 52 of 56

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | Gabel (AFSCME) (37-15) | | |
| Environmental Protection Agency | Howell (AFGE) (37-19)<br>Kelley (AFGE) (37-23)<br>Dreyfus (AFGE Local 1236) (37-13)<br>Bailey (SEIU) (37-5)<br>Neuman (SEIU) (37-26) | Shultz (AGU) (37-45)<br>Cunningham (NRDC)*<br>McKinzie (NRDC)*<br>Olson (NRDC)*<br>Molvar (WWP) (37-40) | Leach (Baltimore) 37-54)<br>Ige (Chicago) (37-52)<br>Worthington (Chicago) (37-59)<br>Dively (King County) (41-6)<br>Williams (Santa Clara County) (37-58)<br>Jue (San Francisco) (37-53) |
| General Services Administration | Fabris (AFGE) (37-14)<br>Kelley (AFGE) (37-23)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26) | | |
| Department of Health and Human Services | Garthwaite (AFGE) (37-13)<br>Jacobs (AFGE) (37-21)<br>Kelley (AFGE) (37-23)<br>Niemeier-Walsh (AFGE) (41-4)<br>Gabel (AFSCME) (37-15)<br>O'Brien (AFSCME) (41-5)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26)<br>Woodard (SEIU Local 521)* | Benjamin (APHA) (37-36)<br>McKinzie (NRDC)*<br>Olson (NRDC)*<br>Sass (NRDC)* | Leach (Baltimore) (37-54)<br>Ige (Chicago) (37-52)<br>Barton (Harris County) (37-46)<br>Pena (Harris County) (37-55)<br>Dively (King County) (41-6)<br>Williams (Santa Clara County) (37-58)<br>Supp. Williams (Santa Clara County)*<br>Philip (San Francisco) (37-56) |

2

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | Prendiville (SEIU Local 1021) (37-30) | | |
| Department of Housing and Urban Development | Bobbitt (AFGE) (41-1)<br>Kelley (AFGE) (37-23)<br>O'Brien (AFSCME) (41-5)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26)<br>Woodard (SEIU Local 521)*<br>Wander (SEIU Local 1000) (37-34) | | Leach (Baltimore) (37-54)<br>Dively (King County) (41-6)<br>Williams (Santa Clara County) (37-58) |
| Department of the Interior | Cochran (AFGE) (41-2)<br>Kelley (AFGE) (37-23)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26) | Shultz (AGU) (37-45)<br>Neubacher (CPANP) (37-41)<br>McKinzie (NRDC)*<br>Molvar (WWP) (37-40) | Dively (King County) (41-6)<br>Williams (Santa Clara County) (37-58)<br>Bechelli (San Francisco) (37-47) |
| Department of Labor | Gamble (AFGE) (37-16)<br>Gamble Reply (AFGE) (70-2)<br>Levin (AFGE) (37-24)<br>Kelley (AFGE) (37-23)<br>O'Brien (AFSCME) (41-5)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26) | | Campos (Chicago) (37-48) |

3

**Add.611**

(615 of 726), Page 615 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 615 of 726
Case 3:25-cv-03698-SI   Document 101-1   Filed 05/14/25   Page 54 of 56

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| National Labor Relations Board | O'Brien (AFSCME) (41-5)<br>Neuman (SEIU) (37-26) | | |
| National Science Foundation | Kelley (AFGE) (37-23)<br>Soriano (AFGE) (37-32)<br>Supp. Soriano (AFGE) (96-1)<br>Adler (SEIU) (37-3)<br>Neuman (SEIU) (37-26) | Shultz (AGU) (37-45)<br>Molvar (WWP) (37-40) | |
| Peace Corps | Black (AFSCME)* | | |
| Small Business Administration | Gustafsson (AFGE) (37-18)<br>Kelley (AFGE) (37-23)<br>O'Brien (AFSCME) (41-5)<br>Neuman (SEIU) (37-26) | Phetteplace (MSA) (37-43) | Dively (King County) (41-6)<br>Bechelli (San Francisco) (37-47) |
| Social Security Administration | Couture (AFGE ) (37-11)<br>Kelley (AFGE) (37-23)<br>Wilson (AFGE Local 1122) (37-35)<br>Norman (AFGE Local 3172) (37-28)<br>O'Brien (AFSCME) (41-5)<br>Adler (SEIU) (37-3) | Fiesta (ARA) (37-39) | |

4

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | Prendiville (SEIU Local 1021) (37-30)<br><br>Jefferies (SEIU Local 1000) (37-22) | | |
| Department of State | Hunter (AFGE) (37-20)<br><br>Supp. Hunter (AFGE) (96-2)<br><br>Kelley (AFGE) (37-23)<br><br>Adler (SEIU) (37-3)<br><br>Neuman (SEIU) (37-26) | | Dively (King County) (41-6)<br><br>Williams (Santa Clara County) (37-58) |
| Department of Transportation | Kelley (AFGE) (37-23)<br><br>Blake (AFSCME) (37-6)<br><br>O'Brien (AFSCME) (41-5)<br><br>Bailey (SEIU) (37-5)<br><br>Neuman (SEIU) (37-26) | | Dively (King County) (41-6)<br><br>Leach (Baltimore) (37-54) |
| Department of Treasury | Kelley (AFGE) (37-23)<br><br>O'Brien (AFSCME) (41-5)<br><br>Adler (SEIU) (37-3)<br><br>Neuman (SEIU) (37-26) | Olson (CTR) (37-42) | |
| Department of Veterans Affairs | Burke (AFGE) (37-9)<br><br>Kelley (AFGE) (37-23)<br><br>Turner-Nichols (AFGE Local 2110) (37-33) | Shah (Common Defense) (37-44)<br><br>Eaton (Vote Vets) (37-38) | Dively (King County) (41-6)<br><br>Williams (Santa Clara County) (37-58) |

5

**Add.613**

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | Blake (AFSCME) (37-6)<br>O'Brien (AFSCME) (41-5)<br>Neuman (SEIU) (37-26)<br>Bailey (SEIU) (37-5) | | |

**\* Filed concurrently with Plaintiffs' Motion for Preliminary Injunction**

6

**Add.614**

1

2

3

4                         UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    AMERICAN FEDERATION OF                    Case No.  25-cv-03698-SI
     GOVERNMENT EMPLOYEES, AFL-CIO,
8    et al.,
                                               **ORDER RE: PRODUCTION OF**
9              Plaintiffs,                     **CERTAIN DISCOVERY DOCUMENTS**

10        v.                                   Re: Dkt. No. 88

11   DONALD J. TRUMP, et al.,

12             Defendants.

13

14         This order addresses the government's request to reconsider, rescind, and/or otherwise

15   modify the Court's order that the government must produce Agency RIF[1] and Reorganization Plans

16   (ARRPs) on an expedited basis.  Pursuant to the President's Executive Order 14210 and a February

17   26, 2025 joint memorandum, the Office of Management and Budget (OMB) and the Office of

18   Personnel Management (OPM) required the heads of federal departments and agencies to submit

19   "Phase 1" and "Phase 2" ARRPs by March 13 and April 14.  Dkt. No. 37-1, Exs. A, B.  In its May

20   9, 2025 order granting a temporary restraining order, the Court ordered the ARRPs of the federal

21   agency defendants produced (both the ARRPs the agencies submitted and the versions that OMB

22   and OPM approved).  Dkt. No. 85 at 40.

23         The government now argues that these plans "are simply irrelevant to future proceedings in

24   this Court," that the plans are covered by the deliberative process privilege, and that "[n]othing in

25   an ARRP irrevocably commits an agency to taking any specific step."  Dkt. No. 88 ("Mot.") at 3, 4

26   & n.4.  Meanwhile, heads of defendant agencies have announced their intent to lay off large swathes

27   _____

28         [1] A "RIF" is a reduction in force.

*United States District Court*
*Northern District of California*

of their agencies, and employees are receiving RIF notices.[2]  Based on the positions the parties have staked out thus far, it is clear this case is headed toward a factual dispute: did President Trump, OPM, OMB, and DOGE simply instruct agencies *to begin planning* for RIFs in the future and *provide guidance* on how to make those plans?  Or are these defendants *directing* agencies to make "large-scale" RIFs and to make them now?  If the government's position is to be believed—that the ARRPs are non-final planning documents that do not commit an agency to take any specific action— that begs another question: pursuant to *what*, then, are the agencies implementing their large-scale RIFs?

On May 9, 2025, this Court issued a temporary restraining order putting in place a two-week pause on implementation of RIFs at the defendant agencies, in order to preserve the status quo while this case can be more fully litigated.  At that point, the Court had received more than 1,000 pages of declarations in support of plaintiffs' position and no evidence to support the government's contentions.  The temporary restraining order is set to expire on May 23, 2025, and the Court set a preliminary injunction hearing for May 22 at 10:30 a.m.

Given the gravity of what defendants assert is at issue, and in the interest of transparency, the Court now reconsiders the question of whether defendants must provide copies of ARRPs to plaintiffs and the Court.

**BACKGROUND**

In its May 9, 2025 order, the Court ordered defendants to provide to the Court and to plaintiffs the following categories of documents: "(1) the versions of all defendant agency ARRPs submitted to OMB and OPM, (2) the versions of all defendant agency ARRPs approved by OMB and OPM, (3) any agency applications for waivers of statutorily-mandated RIF notice periods, and

---

[2] *See, e.g.*, Am. Compl. ¶ 20 & n.11 (March 27 press release that the Department of Health and Human Services plans to RIF 10,000 employees), ¶ 20 n. 13 (Environmental Protection Agency RIF notices sent to certain staff, and agency head targeting 65% budget cut), ¶ 213 & n.63 (March 21 Small Business Administration announcement of plan to reduce workforce by 43%, pursuant to Executive Order 14210), ¶¶ 251-252 (National Science Foundation's 37 divisions are being abolished and RIF notices to some staff went out on May 9).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (4) any responses by OMB or OPM to such waiver requests[.]"[3]  Dkt. No. 85 at 40.  The Court

2   ordered this production because it "requires more information to evaluate the individual ARRPs and

3   what roles OMB, OPM, and DOGE have played in shaping them."  *Id.* at 39.  The Court set a

4   production deadline of 4:00 p.m. (PDT) on May 13, 2025.  *Id.*

5          On May 11, 2025, defendants moved for a protective order or in the alternative for

6   reconsideration and request for an immediate administrative stay of the Court's discovery order.

7   Dkt. No. 88 ("Mot.").  Defendants support their arguments with a declaration from Stephen Billy, a

8   Senior Advisor in the Office of Management and Budget.  Dkt. No. 88-1 ("Decl. Billy").

9          The Court set a briefing schedule on defendants' motion and stayed the deadline for the

10  government to produce the materials until after the Court ruled on the motion.  Dkt. No. 92.

11  Plaintiffs have filed an opposition and the government has filed a reply.  Dkt. Nos. 96, 103.

12

13                                    **DISCUSSION**

14         Defendants invoke the deliberative process privilege to argue that they should not be

15  compelled to release the ARRPs.  As the Ninth Circuit has explained,

16         This privilege permits the government to withhold documents that reflect advisory
           opinions, recommendations and deliberations comprising part of a process by which
17         government decisions and policies are formulated. *NLRB v. Sears, Roebuck & Co.,*
           421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). It was developed to
18         promote frank and independent discussion among those responsible for making
           governmental decisions, *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87,
19         93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973), and also to protect against premature
           disclosure of proposed agency policies or decisions. *Coastal States Gas Corp. v.*
20         *Department of Energy,* 617 F.2d 854, 866 (D.C. Cir.1980). The ultimate purpose of
           the privilege is to protect the quality of agency decisions. *Sears,* 421 U.S. at 151, 95
21         S.Ct. at 1517.

22  *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).

23         To resolve whether the government may assert the deliberative process privilege to avoid

24  production of ARRPs involves asking several questions.  First, are the documents relevant to the

25  litigation?  If so, are the documents of the nature to be covered by the privilege—that is, are they

26

27         [3] Plaintiffs had asked for disclosure of "current versions" of ARRPs.  The Court provided

28  greater specificity in its order to assist in evaluating one of the core factual disputes between the
    parties: the extent of OMB/OPM/DOGE's involvement in directing the content of the ARRPs.

1    pre-decisional and deliberative?  Even if so, should the privilege be overridden by other

2    considerations?[4]  Finally, if the documents are ordered produced, should their disclosure be limited

3    by a protective order?

4         The challenge facing the Court is that the parties characterize the contents of the ARRPs in

5    starkly different terms.  According to the government's declaration, "Nothing in an ARRP, or its

6    review or approval by OPM or OMB, binds the agency to any particular course of action."  Decl.

7    Billy ¶ 5.  Moreover, "[a]n ARRP is never final and may change drastically as the agency's priorities

8    and thinking changes."  Mot. at 4 (citing Decl. Billy ¶ 6).  The government further asserts that

9    ARRPs "include highly sensitive information that would seriously undermine agency operations if

10   they were released," including labor negotiation strategy, reorganization plans that might hurt

11   agency recruitment and retention, and plans for regulatory changes or future appropriations requests.

12   Decl. Billy ¶ 4.  On the other hand, the evidence presented by plaintiffs so far in this litigation

13   suggest the plans are final agency decisions that have led to quick, tangible actions with widespread

14   effects.  Plaintiffs have received one ARRP from a non-defendant federal agency (the National

15   Endowment for the Humanities) and the contents of that plan do not neatly align with the

16   government's characterization of ARRPs in general.  *See* Dkt. No. 96-1, Ex. 1, Attachs. C, D.  The

17   Court sees no "highly sensitive information [that] would seriously undermine agency operations if

18   they were released," *see* Decl. Billy ¶ 4, though the Court acknowledges the government's position

19   that this ARRP is not representative of ARRPs in general and that plaintiffs attached only the Phase

20   2 cover sheet, not the full Phase 2 ARRP.

21        To assess whether the deliberative process privilege applies to the ARRPs of the federal

22   agency defendants in this case, the Court would benefit from a better understanding of their contents.

23   The Court therefore ORDERS as follows:

24        By Monday, May 19, 2025 at 12:00 p.m. (PDT), defendants shall submit to the Court for *in*

25

26

---

27        [4] The deliberative process privilege is qualified, not absolute.  *See Warner Commc'ns*, 742
     F.2d at 1161.  "A litigant may obtain deliberative materials if his or her need for the materials and

28   the need for accurate fact-finding override the government's interest in non-disclosure."  *Id.*
     (citations omitted).

United States District Court
Northern District of California

*camera* review the following documents for *four federal agency defendants*:[5] (1) the versions of

ARRPs submitted to OMB and OPM and (2) the versions of ARRPs approved by OMB and/or

OPM. Plaintiffs shall designate two of the agencies for which the ARRPs are to be produced and

shall provide those agency names to defendants by 10:00 a.m. (PDT) on Friday, May 16, 2025.

Defendants may designate the other two agencies for which it will provide ARRPs.

By Monday, May 19, 2025 at 12:00 p.m. (PDT), defendants will also provide the same

ARRPs to plaintiffs' counsel, but plaintiffs' counsel may not share the plans or their contents with

their clients or any third parties unless or until the Court orders otherwise.

The parties should be prepared to argue the merits of applying the deliberative process

privilege to the ARRPs at the May 22, 2025 hearing.

**IT IS SO ORDERED**.

Dated:   May 15, 2025

_____
SUSAN ILLSTON
United States District Judge

---

[5] Documents for *in camera* review may be mailed or hand-delivered to the Clerk's Office, clearly stamped "DO NOT FILE—IN CAMERA REVIEW."

Add.619    5

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

Counsel for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-03698-SI<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: May 22, 2025<br>Time: 10:30 am<br>Judge: Hon. Susan Illston<br>Place: San Francisco Courthouse<br>　　　Courtroom 1 |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

STANDARD OF REVIEW .............................................................................................. 4

ARGUMENT .................................................................................................................. 4

I.    Plaintiffs' Delay Warrants Denial of the PI Motion ............................................ 4

II.   Plaintiffs Satisfy None of the *Winter* Requirements ......................................... 6

    A.    Plaintiffs Are Unlikely to Succeed on the Merits of their Claims ......................... 6

        1.    The FSLMRS and CSRA Preclude District-Court Jurisdiction Over
            Plaintiffs' Challenge to the Workforce Executive Order and
            Workforce Memorandum ....................................................................... 6

        2.    The Workforce Executive Order and Workforce Memorandum are
            Not Reviewable .................................................................................... 12

        3.    The Workforce Executive Order is Lawful .............................................. 14

        4.    The Workforce Memorandum is Lawful ................................................... 18

    B.    The Remaining *Winter* Factors Likewise Favor the Government ....................... 19

III.  Any Relief Should Be Limited ......................................................................... 22

IV.   Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief ............... 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Alder* v. *Tennessee Valley Auth.*,
   43 F. Appx. 952 (6th Cir. 2002).................................................................................. 7

*American Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
   No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ................................. 8

*American Fed'n of Gov't Emps.*, AFL-CIO v. OPM,
   No. 25-cv-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) ............................... 8

*American Fed'n of Gov't Emps., AFL-CIO* v. *Trump*,
   929 F.3d 748 (D.C. Cir. 2019)......................................................................... 7, 8, 10, 11

*American Foreign Serv. Ass'n v. Trump*,
   No. 25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025)........................................ 8

*Arc. of Cal. v. Doulas*,
   757 F.3d 975 (9th Cir. 2014) .................................................................................... 4

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) .................................................................................... 22

*Axon Enters., Inc. v. FTC*,
   598 U.S. 175 (2023)........................................................................................... 11, 12

*Benisek v. Lamone*,
   585 U.S. 155 (2018).................................................................................................. 4

*Bennett v. Spear*,
   520 U.S. 154 (1997).................................................................................................. 13

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ............................................................................. 12, 17

*City and County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) .................................................................................. 17

*Common Cause v. Trump*,
   506 F. Supp. 3d 39 (D.D.C. Nov. 25, 2020) ........................................................... 17

*Dalton v. Specter*,
   511 U.S. 462 (1994).................................................................................................. 12

*Department of Education* v. *California*,
   145 S. Ct. 966 (2025)................................................................................................ 21

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ........................................................................... 19

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ......................................................................... 24

*Elgin v. Department of the Treas-ury*,
567 U.S. 1 (2012) ................................................................................... 7, 9, 10

*Env't Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ............................................................................. 6

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir.) ..................................................................................... 11

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ............................................................................ 24

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) .......................................................................... 22

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......................................................................................... 12

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) .......................................................................... 10

*Hanson v. Dist. of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........................................................................ 24

*Heckler v. Turner*,
468 U.S. 1305 (1984) ........................................................................................ 21

*Knight v. Department of Def.*,
332 F.3d 1362 (Fed. Cir. 2003) .......................................................................... 7

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) .......................................................................................... 13

*Lydo Enters., Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) ............................................................................ 5

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .......................................................................................... 22

*Markland v. OPM*,
140 F.3d 1031 (Fed. Cir. 1998) ........................................................................ 14

*Maryland v. U.S. Dep't of Agriculture*,
  No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ............................................ 8

*McKenna v. Dep't of Interior*,
  996 F.2d 1235 (Fed. Cir. 1993) .................................................................................. 15

*Monsanto Co.* v. *Geertson Seed Farms*,
  561 U.S. 139 (2010) ..................................................................................................... 21

*Myers v. United States*,
  272 U.S. 52 (1926) ....................................................................................................... 12

*National Treasury Emps. Union v. Trump*,
  No. 25-cv-420, 2025 WL 561080 (D.D.C. Feb. 20, 2025) ......................................... 6, 8

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ................................................................................................. 13, 15

*NLRB v. Cal. Pac. Med. Ctr.*,
  991 F.2d 536 (9th Cir. 1993) ........................................................................................ 5

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
  762 F.2d 1374 (9th Cir. 1985) ...................................................................................... 5

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ....................................................................................................... 12

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................................................. 20, 21

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ....................................................................................... 23

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ........................................................................................ 24

*Smith* v. *Department of the Army*,
  89 M.S.P.R. 82 (2001) .................................................................................................. 20

*Trump* v. *United States*,
  603 U.S. 593 (2024) ..................................................................................................... 14

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ....................................................................................................... 8

*United States* v. *Arthrex, Inc.*,
  594 U.S. 1 (2021) ......................................................................................................... 15

*United States* v. *Fausto,*
    484 U.S. 439 (1988) .................................................................. 7, 9

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................................................ 4

**Statutes**

5 U.S.C. § 704 ............................................................................... 13

5 U.S.C. § 1204(a)(2) ...................................................................... 7

5 U.S.C. § 1301 .............................................................................. 19

5 U.S.C. § 1302(b) .......................................................................... 19

5 U.S.C. § 3502 .............................................................................. 14

5 U.S.C. § 3502(a) .......................................................................... 19

5 U.S.C. § 3502(d)(1)(B) .................................................................. 16

5 U.S.C. § 5361(7) .......................................................................... 17

5 U.S.C. § 7105(a)(2) ........................................................................ 7

5 U.S.C. § 7123(a) ............................................................................ 7

5 U.S.C. § 7701(a) ........................................................................ 7, 9

5 U.S.C. § 7701(g) ...................................................................... 7, 20

5 U.S.C. § 7703(b)(1) ........................................................................ 7

5 U.S.C. § 1103(a)(5)(A) ................................................................. 19

5 U.S.C. § 1103(c) .......................................................................... 19

28 U.S.C. § 1331 ............................................................................ 11

31 U.S.C. § 503(b) .......................................................................... 19

**Executive Orders, Rules, and Regulations**

Exec. Order 14210,
    90 Fed. Reg. 9669 (Feb. 11, 2025) ........................ 6, 15, 17, 18, 19, 23

Fed. R. Civ. P. 65(a) ......................................................................... 4

Fed. R. Civ. P. 65(d)(1)(C) ............................................................... 22

5 C.F.R. Pt. 351 ................................................................................................................ 19

5 C.F.R. § 351.201(a)(2) ................................................................................................. 17

5 C.F.R. § 351.205 ........................................................................................................... 19

5 C.F.R. § 351.803(b) ...................................................................................................... 16

5 C.F.R. § 351.901 ......................................................................................................... 7, 9

**Other Authorities**

Elena Kagan, *Presidential Administration*,
    114 Harv. L. Rev. 2245 (2001) ................................................................................... 15

The Federalist No. 72, at 487 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ....................... 14

**INTRODUCTION**

Plaintiffs' motion for a preliminary injunction, ECF No. 101 (PI Motion), and memorandum in support, ECF No. 101-1 (PI Brief), confirm that this sprawling lawsuit and Plaintiffs' request for near government-wide relief does not belong in federal district court. The essence of Plaintiffs' Complaint and the PI motion is a challenge to the legality of steps taken by the Executive Branch—principally President Trump, the Office of Personnel Management (OPM), and the Office of Management and Budget (OMB)—to facilitate reductions in force (RIFs) within agency workforces. That is unquestionably a suit concerning "employee relations in the federal sector" and "federal labor-management relations," the subject matters that Congress enacted the Civil Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSLMRS) to govern, and which preclude district court jurisdiction here. And even if this Court had jurisdiction, Plaintiffs lack a viable Administrative Procedure Act (APA) or *ultra vires* cause of action to challenge the Workforce Executive Order or Workforce Memorandum in the abstract.

In any event, Plaintiffs' claims are meritless. Plaintiffs devote a significant portion of their PI Brief to describing actions that Agency Defendants[1] have allegedly taken pursuant to the Workforce Executive Order and Workforce Memorandum. But Plaintiffs do not even attempt to argue—let alone establish—that any of these agency activities or future agency activities are unlawful, in the sense of exceeding the relevant *agencies' authority* under their governing statutes or other legal sources. Nor could they. Federal law expressly permits RIFs, Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century, and judicial review of RIF decisions (in the Federal Circuit, not this Court), is highly deferential.

To succeed on the merits then, Plaintiffs must show that the Workforce Executive Order and Workforce Memorandum *necessarily* direct illegal agency action and *cannot* be implemented lawfully. That is not the case. The President plainly has constitutional and statutory authority to tell agencies how to exercise their own statutory authorities to conduct RIFs within the boundaries

---

[1] Again, for ease of reference Defendants use the term "Agency Defendants" and "agencies" in describing Defendants other than President Trump, OPM, OMB, and the United States DOGE Service (USDS). Defendants do not concede that all these components are properly characterized as agencies for purposes of the APA, FOIA, Federal Records Act, or any other purpose.

set by Congress. That is what the Workforce Executive Order does. The Order makes clear that RIFS may be conducted only where "consistent with applicable law," that in proposing RIFs, agencies should ensure that they do not eliminate any "subcomponents" that are "statutorily required" or prevent the performance of "functions" that are "mandated by statute or other law"; the Workforce Memorandum similarly reaffirms that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority." There is nothing plausibly unlawful about an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force" consistent with all applicable statutory restrictions. In granting a temporary restraining order (TRO),[2] the Court focused on the President's supposed lack of operative "statutory authority to reorganize the executive branch." But this is not a basis for challenging the Workforce Executive Order. A RIF is not a reorganization and, in any event, the Workforce Executive Order does not even arguably direct any reorganizations that conflict with agencies' statutory mandates. And although this Court faulted OPM and OMB for exceeding their authority by unilaterally ordering agencies to carry out RIFs, the Workforce Memorandum leaves that decision to agencies. Finally, to the extent the Court's previous analysis of the merits rested on a conclusion that the President lacks any authority to direct agencies how to exercise the statutory authority that the *agencies have*, that conclusion, is incorrect and upends both Article II and basic principles of democratic accountability.

The other *Winter* factors likewise weigh against relief. Plaintiffs do not establish irreparable harm sufficient to warrant relief. This Court primarily rested its contrary finding on the prospect of members of Plaintiffs unions being subjected to RIFs. That form of injury is by no means irreparable, as the Supreme Court has made clear. And any harm to Plaintiffs is outweighed by harm to the Government. A preliminary injunction would require the Government to retain—at taxpayer expense—thousands of employees whose continuance in federal service agencies have determined not to be in the public interest. That unrecoverable monetary loss is irreparable.

Any preliminary injunction should also be significantly narrower than the TRO Order (let

---

[2] Defendants contest that this Court's prior order is properly characterized as a TRO, but for ease of reference, Defendants will refer to it as a TRO here.

alone Plaintiffs' PI Motion, which inexplicably seeks relief even broader than they sought in their TRO Motion). For one, it should not extend beyond the parties to the litigation. For another, Defendants once again ask the Court to make clear that agencies may conduct RIFs under their existing authorities that are independent of the Workforce Executive Order and the process set forth in the Workforce Memorandum. In addition, any injunction should clearly and concretely identify what conduct is permitted and prohibited, and should be crafted to be no broader than necessary to prevent any irreparable harm to Plaintiffs. Respectfully, the TRO Order reflects neither of these limitations.

## BACKGROUND

Defendants incorporate by reference the statutory and regulatory background, and factual background set forth in their brief in opposition to Plaintiffs' motion for a preliminary injunction. *See* ECF No. 60 (TRO Opposition) at 5-17. In litigating against Plaintiffs' TRO Motion, Defendants did not make any factual representations and instead relied upon the Workforce Executive Order and Workforce Memorandum themselves, as well as other legal sources plainly establishing agencies' longstanding authority to conduct RIFs, which in turn establishes that the Workforce Executive Order and Workforce Memorandum can be implemented lawfully. We similarly do not make or rely on any factual representations here.

And indeed, no factual development is necessary to resolve Plaintiffs' preliminary injunction motion. Plaintiffs' legal theory, which this Court endorsed at the TRO stage, was that the Executive Order and Workforce Memorandum were facially unlawful. Plaintiffs PI Brief repeats this point. To be sure, Plaintiffs' PI Brief, like their TRO Reply, devotes significant space to discussing how components are supposedly implementing the Workforce Executive Order and Workforce Memorandum. *See* PI Brief at 4-11. But even Plaintiffs apparently do not believe that these allegations are relevant to the merits of their claims, since they frame these allegations only in terms of their alleged irreparable harm, *id.*, and their merits section does not discuss these purported agency-specific facts, *id.* at 11-16. And for good reason. If how an agency is implementing the Workforce Executive Order and Workforce Memorandum were relevant to the merits of Plaintiffs' claims, then that is just another way of saying that the Executive Order and

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

Memorandum *can* be implemented lawfully—in which case there would be no basis for enjoining implementation of them virtually across the Executive Branch. And the fact that Plaintiffs nominally bring two claims challenging agency actions does not change the analysis; neither claim is based on (or even discusses) any particular agency decision. ECF No. 103 at 12-13. Nor does Plaintiffs' preliminary injunction motion even attempt to develop an argument that any of the alleged agency activities they discuss are unlawful except by reference to the Workforce Executive Order and Workforce Memorandum.

## STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure empowers district courts to issue preliminary injunctions. *See* Fed. R. Civ. P. 65(a). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Id.* at 20.

## ARGUMENT

Plaintiffs satisfy none of the four *Winter* requirements, let alone all of them. Defendants incorporate by reference our previous arguments on this point (including our argument that Plaintiffs have not established standing, which we will not repeat here). *See* TRO Opposition at 22-48. Below, Defendants further respond to Plaintiffs' arguments while also explaining why, respectfully, the Court's previous analysis of these issues was incorrect.

## I.  Plaintiffs' Delay Warrants Denial of the PI Motion

The Court should deny a preliminary injunction on the threshold ground that Plaintiffs waited too long to seek this relief—a circumstance which weighs against finding that irreparable harm or the balance of the equities favor Plaintiffs. *See Arc. of Cal. v. Douglas,* 757 F.3d 975, 989 (9th Cir. 2014); *Benisek v. Lamone*, 585 U.S. 155, 160 (2018). As previously noted, Plaintiffs filed their motion for a TRO on May 1, more than eleven weeks after the President signed the Workforce Executive Order (on February 11, 2025), and more than nine weeks after OPM and OMB issued the Workforce Memorandum. They have since filed their PI Motion on May 14, more than three

months following issuance of the Workforce Executive Order. PI Motion; PI Brief. Plaintiffs'
delay forecloses preliminary injunctive relief. A "long delay before seeking a preliminary
injunction implies a lack of urgency and irreparable harm." *NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d
536, 544 (9th Cir. 1993); *see also Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374,
1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack
of urgency and irreparable harm"); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213
(9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in
weighing the propriety of relief"); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir.
2012) (holding that the district court properly considered the plaintiff's "delay in seeking a
preliminary injunction" when it found that "the balance of equities and the public interest"
"weighed against issuing a preliminary injunction").

The Court previously excused Plaintiffs' delay, stating that "[t]he details of the ARRPs
have only trickled into public view due to defendants' ongoing decision not to release the plans
publicly." TRO Opinion at 11. But Plaintiffs' claims are not based on the contents of any particular
ARRPs. The gravamen of Plaintiffs' claims, which this Court accepted, is that the Workforce
Executive Order and Workforce Memorandum are unlawful on their face and cannot be lawfully
implemented. Plaintiffs repeat this argument in their PI briefing. *See* PI Brief at 11 ("The plain
language of the EO and Memo mandate these actions and remove agency decision-making and
discretion."); *id.* at 16 ("The President's and OMB/OPM's *categorical* instructions and the
agencies' implementation of those instructions are necessarily divorced from reasoned decision-
making that takes into account all appropriate factors (because the categorial instruction took into
account nothing other than the President's will to restructure government according to his
plans).") And Plaintiffs' merits argument in their PI briefing focuses entirely on the supposed
illegality of the Executive Order and Memorandum. PI Brief at 11-16.[3] No further factual

---

[3] Any criticism of Defendants for not releasing the ARRPs is also mistaken since, as Defendants
have previously explained, ARRPs are predecisional and deliberative agency planning documents
that contain discussion of many topics aside from RIFs. If an agency actually decides to go forward
with steps that might affect Plaintiffs, Plaintiffs and the public will learn about those decisions
when they are made. ECF No. 103 at 7. Indeed, when final determinations have been made,

development was needed for Plaintiffs to challenge the Workforce Executive Order and Workforce Memorandum on their face.

The Court also noted that in another case "where other plaintiffs challenged Executive Order 14210 shortly after it was issued . . . the government's attorneys argued that plaintiffs' harm was too 'speculative' to establish injury.'" TRO Decision at 11 (quoting *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025)). But the Government's claim in that case that the asserted injury was "speculative" was based on the union's claim that it would lose membership and dues. *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025). And in any event Judge Cooper did not rely on that ground in denying relief; he concluded that the lawsuit was jurisdictionally barred by the CSRA and FSLMRS. *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-420, 2025 WL 561080, at *5-*8 (D.D.C. Feb. 20, 2025). More fundamentally, a party who seeks the extraordinary remedy of a TRO or a preliminary injunction is required to move with dispatch, and cannot delay seeking relief based on the *mere possibility* that the Government *might assert* that the motion is premature. That is particularly true here, when Plaintiffs seek to enjoin implementation of the Workforce Executive Order and Workforce Memorandum virtually across the government, based solely on the content of those documents.

## II. Plaintiffs Satisfy None of the *Winter* Requirements

### A. Plaintiffs Are Unlikely to Succeed on the Merits of their Claims

The likelihood-of-success factor "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). Plaintiffs can show no likelihood of success in their challenge to the Workforce Executive Order and the Workforce Memorandum. Neither may be challenged here and, even if they could, both are lawful.

#### 1. The FSLMRS and CSRA Preclude District-Court Jurisdiction Over Plaintiffs' Challenge to the Workforce Executive Order and Workforce Memorandum.

The CSRA "establish[es] a comprehensive system for reviewing personnel action taken

---

agencies are publicly releasing their final plans (*see, e.g.*, https://www.state.gov/building-an-america-first-state-department/).

against federal employees." *United States* v. *Fausto*, 484 U.S. 439, 455 (1988). It provides that "[a]n employee . . . may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. § 7701(a). In addition, "[a]n employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901; *see Alder* v. *Tennessee Valley Auth.*, 43 F. App'x 952, 956 (6th Cir. 2002) (describing a "reduction-in-force decision" as "a fundamental employment claim subject to MSPB review"), *cert. denied*, 537 U.S. 1112 (2003). The MSPB can order relief to prevailing employees, including reinstatement. 5 U.S.C. § 1204(a)(2), 7701(g). The Federal Circuit has exclusive jurisdiction to review final decisions of the MSPB, including decisions concerning RIFs. 5 U.S.C. § 7703(b)(1); *Knight v. Department of Def.*, 332 F.3d 1362, 1364 (Fed. Cir. 2003) (RIF demotion claim). The CSRA also includes the FSLMRS, which governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps., AFL-CIO* v. *Trump* (*AFGE*), 929 F.3d 748, 752 (D.C. Cir. 2019) (*AFGE v. Trump*). The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Congress has authorized review of the FLRA's decisions only in the courts of appeals, not in federal district courts. 5 U.S.C. § 7123(a).

This statutory framework precludes jurisdiction. Plaintiffs' suit concerns "employee relations in the federal sector" and "federal labor-management relations." *AFGE v. Trump*, 929 F.3d at 755 (citations and internal quotation marks omitted). Congress would not have enacted the "'elaborate' framework" of the CSRA and FSLMRS for reviewing federal-employee terminations and labor disputes, *Elgin v. Department of the Treasury*, 567 U.S. 1, 11 (2012) (citation omitted), while allowing an end-run around those procedures in the form of a preemptive district-court action like this one. The statutory scheme laid out in the CSRA and FSLMRS preclude jurisdiction here.

As this Court acknowledged, *see* TRO Opinion at 19-22, numerous courts in recent months and years have applied the same preclusion principle to similar federal-employment suits. *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 753, 761 (challenge to three executive orders governing

collective bargaining and grievance processes); *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) (termination of probationary employees); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352, 2025 WL 573762, at *8-*11 (D.D.C. Feb. 21, 2025) (challenge to employees' placement on administrative leave); *Nat'l Treasury Emps. Union*, 2025 WL 561080, at *5-*8 (challenge to terminations of probationary employees, anticipated RIFs, and deferred-resignation program); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459, at *1-*3 (D. Mass. Feb. 12, 2025) (challenge to deferred-resignation program); *but see Am. Fed'n of Gov't Emps.*, AFL-CIO v. OPM, No. 25-cv-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) (asserting jurisdiction over challenge to probationary-employee terminations).[4] And in concluding that the Court had jurisdiction over Plaintiffs' claims, the Court's TRO opinion seemed to acknowledge that it was departing from this weight of authority. *See* TRO Opinion at 22-23.

The Court's jurisdictional analysis was in error. The Court highlighted the "pre-implementation" nature of the suit, concluding that precluding Plaintiffs' suit would "foreclose meaningful judicial review" because they seek to challenge, in advance, "'large-scale reductions in force' happening rapidly across multiple agencies." TRO Opinion at 23. This distinction does not provide the Court with jurisdiction. In *Thunder Basin Coal Co. v. Reich*, the Supreme Court held that district-court jurisdiction was precluded by a scheme that did not permit *pre-enforcement review at all*. 510 U.S. 200, 212-16 (1994). The D.C. Circuit correctly recognized this in *AFGE v. Trump*. 929 F.3d at 755 ("The unions argue that the scheme does not provide for meaningful judicial review because they are unable to obtain 'pre-implementation' review of the executive orders or immediate relief barring all agencies from implementing the executive orders. This argument is foreclosed by the Supreme Court's decision in *Thunder Basin . . .*").

This Court also suggested that it was "unlikely" Congress intended to channel review of RIF claims because "employees' rights to appeal a RIF to the Merit Systems Protection Board comes not directly from statute but from regulation." TRO Opinion at 24; *see also* 5 C.F.R.

---

[4] Defendants explained in their TRO opposition why Judge Alsup's opinion in that case was incorrect but, in any event, clearly distinguishable from this case. *See* TRO Opposition at 30-31.

§ 351.901. But Congress expressly authorized MSPB review of "any action which is appealable to the Board under any law, rule, *or regulation*." 5 U.S.C. § 7701(a) (emphasis added). There is no reason to think Congress intended to allow federal employees to bypass available review in the MSPB and the Federal Circuit based merely on the *source* of their right to seek MSPB review.

The Court also emphasized that Plaintiffs raise "fundamental questions of executive authority and separation of powers," "not the individual employee or labor disputes [the MSPB and FLRA] customarily handle." TRO Opinion at 22, 24. Plaintiffs similarly assert that "they simply bring *different claims* than what those statutory schemes are designed for, by challenging ultra vires Presidential action and ensuing violations of the APA." PI Brief at 18. But again, this makes no difference. The plaintiffs in *Elgin v. Department of the Treasury*, 567 U.S. 1, 7 (2012) similarly raised "fundamental questions" concerning the Constitution's equal-protection guarantee when they challenged the Military Selective Service Act's requirement that men and only men are required to register. And the Court held that such claims were still precluded: Plaintiffs' "constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment." *Id.* at 22. And "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Id.*

So too here. What matters is that Plaintiffs challenge federal employment actions, most prominently RIFs. It makes no difference that *their theory* is that the Executive Order and Memorandum are unlawful. Indeed, when the federal government is the employer, practically any employment or labor-management-relations claim can be dressed up in constitutional garb. That is not a basis for bypassing the CRSRA and FSLMRS's exclusive schemes.

This Court further noted that, even if the union Plaintiffs and their members could seek relief under the FSLMRS and CSRA, the other Plaintiffs (such as nonprofits and local governments) could not. TRO Opinion at 25. But the Supreme Court has held that the CSRA's comprehensive remedial scheme precludes a federal district court action even if a particular plaintiff could not receive relief under the CSRA. *See Fausto*, 484 U.S. at 447-55. Indeed, the Court reached that conclusion in *Fausto* even though the plaintiffs there were federal employees. As then-Judge Roberts observed, even where "the CSRA provides no relief," it "precludes other

1    avenues of relief." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (citation

2    omitted). Since the CSRA precludes federal employees and their unions from *themselves* raising

3    claims or remedies that the CSRA does not recognize, third parties (indeed, on this theory,

4    presumably any third party who can clear the minimum threshold of establishing Article III

5    standing) cannot bypass Congress's comprehensive scheme to bring claims second-guessing the

6    Government's treatment of its employees in federal district court. *See* PI Brief at 19 (characterizing

7    these other Plaintiffs as "third parties to any relationship between federal employees and their

8    employing agencies").

9        Finally, to the extent specific consideration of the *Thunder Basin* factors is required, they

10   reinforce that Plaintiffs are required to channel their federal employment and labor disputes. The

11   first step under *Thunder Basin*—Congress's intent to preclude—is satisfied here. TRO Opposition

12   at 26-27. As to the factors under the second step, they too all support channeling. Both statutory

13   schemes provide meaningful judicial review over Plaintiffs' claims. TRO Opposition at 27. As

14   Defendants previously argued, affected employees can bring Plaintiffs' constitutional, *ultra vires*,

15   and related claims within the administrative scheme and, even if the FLRA and MSPB cannot

16   resolve them, a reviewing Court can. *See* TRO Opposition at 27. Plaintiffs have no meaningful

17   response. And although Plaintiffs complain that they could not obtain relief directly against the

18   President, OPM, OMB, or USDS, PI Brief at 20, that is irrelevant even if true; Plaintiffs do not

19   seek injunctive relief against the President here and any relief they receive against employing

20   agencies would be sufficient to redress any injuries associated with those agencies' RIFs. *See*

21   *AFGE v. Trump*, 929 F.3d at 758.

22       Nor are Plaintiffs' claims "wholly collateral" to the CSRA and FLRA scheme. Plaintiffs

23   say their claims "concern separation of powers issues and challenge the substantive and procedural

24   lawfulness of the EO and its implementation." PI Brief at 20. But again, Plaintiffs simply ignore

25   that, as the Supreme Court explained in *Elgin*, what matters for purposes of this inquiry is whether

26   the subject of Plaintiffs' challenge is a matter covered by the CSRA and FSLMRS schemes, not

27   how Plaintiffs describe the claims they are advancing. 567 U.S. at 22. Here, the subject of

28   Plaintiffs' actions is RIFs and related federal employment and labor matters; their contention that

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

the Workforce Executive Order and Memorandum are unlawful is simply the "vehicle" by which they seek to stop RIFs from taking place. *Id.*; TRO Opposition at 28. Plaintiffs ask "for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders." *AFGE v. Trump*, 929 F.3d at 760. Thus, "[t]heir challenge is not wholly collateral to the statutory scheme." *Id.*[5]

Finally, although Plaintiffs assert that "the labor agencies have no particular expertise in resolving constitutional and administrative law questions," PI Brief at 20, Plaintiffs contend that the Workforce Executive Order and Workforce Memorandum effectively compel agencies to engage in large-scale RIFs that are necessarily contrary to statute. The application of the RIF regulations, and the statutes governing agency operations are indeed matters on which administrative agencies have expertise. TRO Opposition at 28; *AFGE v. Trump*, 929 F.3d at 760 (reasoning that "[m]any of [plaintiffs] claims allege that the executive orders direct agencies to violate the Statute by refusing to bargain over mandatory subjects or by taking actions that are inconsistent with the duty to bargain in good faith" and that "[t]hese matters lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations'").[6]

---

[5] As explained in Defendants' TRO opposition, this case is fundamentally unlike *Axon Enters., Inc. v. FTC*, 598 U.S. 175 (2023), where the Supreme Court held that the claims at issue did not need to be channeled. In that case, the core of each plaintiffs' claim was that they were being subjected to "an illegitimate proceeding, led by an illegitimate decisionmaker," which qualified as a "here-and-now injury" that could not be remedied after the fact, because "[a] proceeding that has already happened cannot be undone." *Id.* at 191. Here, Plaintiffs' claims are not based on a claim that the administrative schemes are unconstitutionally structured or otherwise invalid. Nor is this case like *Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir.) (en banc) (since vacated as moot), where the Fifth Circuit rejected channeling arguments because it concluded that the subject of the challenge—a vaccine mandate—was not a personnel action covered by the CSRA. 63 F.4th at 375. *Contra* PI Brief at 19 (incorrectly characterizing this case as standing broadly for the proposition that "employee organization challenge to government-wide federal employee vaccine mandate was not channeled to MSPB or FLRA"). Plaintiffs' PI Brief relies on these inapt cases, without addressing Defendants' previous arguments.

[6] Plaintiffs claim the mantle of textualism, asserting, inter alia, that "the concept of 'channeling' is based entirely on an implied doctrine, which cannot exist divorced from the underlying statutory text." PI Brief at 19. But although Congress has empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction," it is an equally well-established canon that "[a] special statutory review scheme, . . . may preclude district courts from

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

## 2. The Workforce Executive Order and Workforce Memorandum are Not Reviewable

Statutory preclusion aside, neither the Workforce Executive Order nor the Workforce Memorandum may be reviewed in the abstract, as opposed to in a challenge to a specific reviewable final agency action implementing them. The President is not an agency, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and therefore "actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994). Thus, APA review of the Workforce Executive Order is unavailable here, as no one seems to dispute.

And even assuming that an *ultra vires* action outside of the APA's framework may some-times be cognizable, Plaintiffs' *ultra vires* claim is not. To even potentially state an *ultra vires* claim, Plaintiffs must clear at least two significant hurdles. First, the substantive standard for doing so is extremely high. An "officer may be said to act ultra vires only when he acts without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984). And second, Plaintiffs must show that the Executive Order directs conduct that the President lacks any authority whatsoever to direct even though the Executive Order does not direct agencies to take any actions inconsistent with law—to the contrary, it contains express language doing the opposite, emphasizing the need to comply with applicable law. *See infra* p. 17.

That standard is not met here. Federal law expressly recognizes that the Government may conduct RIFs, and the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)).

In nonetheless concluding that Plaintiffs were likely to succeed on the merits of their *ultra vires* claim, this Court in its TRO Opinion repeatedly framed the inquiry in terms of the President's supposed lack of authority to "broadly restructure federal agencies" and using similar language. TRO Opinion at 28; *see also id.* at 26 ("the President has neither constitutional nor, at this time,

---

exercising jurisdiction over challenges to federal agency action." *Axon*, 598 U.S. at 185. And even if Plaintiffs' textualist arguments were persuasive as a matter of first principles—which they are not—this Court is not writing on a blank slate. Supreme Court and lower court precedent clearly forecloses district court jurisdiction over the claims Plaintiffs assert here.

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

1    statutory authority to reorganize the executive branch"); *id.* at 28 ("large-scale reorganization of

2    the federal agencies stems from a long-standing partnership between the executive and legislative

3    branches"); *id.* at 29 ("The simple proposition that the President may not, *without Congress*,

4    fundamentally reorganize the federal agencies is not controversial."). The Court's prior analysis

5    rests on several misconceptions about the President's authority.

6        First, even if the Executive Order is properly framed as directing certain "reorganizations,"

7    this is not an area in which the President has "no authority whatever." To the contrary, in *Nixon v.*

8    *Fitzgerald*, 457 U.S. 731 (1982), the Supreme Court explained that "[i]t clearly is within the

9    President's constitutional and statutory authority to prescribe the manner in which" his

10    subordinates conduct their business, and "this mandate of office must include the authority to

11    *prescribe reorganizations* and reductions in force." *Id.* at 757 (emphasis added). And as discussed

12    in the next section explaining why the Workforce Executive Order is lawful, nothing in the

13    Executive Order directs "large-scale reorganization," let alone reorganizations that would violate

14    any agencies' organic statutes. *See infra* pp. 15-16. And as Defendants also discuss in that section,

15    to the extent the Court suggests that the President acts *ultra vires* when he directs agencies how to

16    exercise their *lawful* authority, *see* TRO Opinion at 31 ("agencies were not discussing a need for

17    large-scale RIFs prior to the President's order"), any such suggestion is plainly incorrect.

18        The Workforce Memorandum is also not reviewable because it is not "final agency action"

19    subject to APA review, 5 U.S.C. § 704—that is, action "mark[ing] the 'consummation' of the

20    agency's decisionmaking process" and "by which 'rights or obligations have been determined,' or

21    from which 'legal consequences will flow,'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations

22    omitted). Nothing in the Workforce Memorandum finally determines rights or obligations or

23    imposes legal consequences. While The Workforce Memorandum is a final draft (as the Court

24    emphasized, TRO Opinion at 35), but it is not agency action under the APA at all, let alone final

25    agency action. Instead, it sets forth a framework for preparation and review of proposed agency

26    RIF plans. Such a general programmatic document is not subject to APA review. *See Lujan v.*

27    *National Wildlife Fed'n*, 497 U.S. 871, 893 (1990). Indeed, as Defendants have already explained

28    at length, *see* ECF Nos. 88, 103, not *even the ARRPs themselves* are final agency action since they

1    are always subject to change and agencies are not bound to follow all of the recommendations,

2    strategies, and proposals ARRPs contain. The Workforce Memorandum—which contains OMB

3    and OPM's guidance on the *topics* ARRPs should address—is even more clearly not final agency

4    action.

5        **3.  The Workforce Executive Order is Lawful**

6        Even if the Court could review the Workforce Executive Order, it is plainly lawful. The

7    legal basis for the Executive Order is straightforward. Federal law expressly permits agencies to

8    conduct RIFs; Congress has consistently recognized agencies' authority to engage in RIFs since

9    the nineteenth century; and the federal government has repeatedly exercised its authority to

10   conduct RIFs, including in large-scale Presidentially-directed RIFs, most recently during the

11   Clinton Administration. 5 U.S.C. § 3502; TRO Opposition at 5-11. All of that has been done for

12   nearly 150 years with very little apparent legal controversy. And as the Federal Circuit—where

13   challenges to RIFs are properly channeled following required MSPB review—has explained,

14   "[w]e accord an agency wide discretion in conducting a reduction-in-force." *Markland v. OPM*,

15   140 F.3d 1031, 1033 (Fed. Cir. 1998). That being so, the President unquestionably had the

16   authority to direct agencies to conduct RIFs, consistent with law, in furtherance of his policy

17   objectives and with the guidance of OPM and OMB.

18       While this Court did not dispute that agencies may lawfully conduct RIFs, TRO Opinion

19   at 31, it treated as "evidence" of "unlawful action" the prospect that "the agencies are acting at the

20   direction of the President and his team" in planning and executing RIFs, *id.* To be clear, Defendants

21   do not dispute, and have never disputed, that agencies are required to comply with the Executive

22   Order and that they are implementing it. And there is nothing wrong with that—that is how Article

23   II *is supposed* to work. Our constitutional structure presumes that federal officers and agencies

24   will be "subject to [the President's] superintendence," *The Federalist* No. 72, at 487 (Alexander

25   Hamilton) (Jacob E. Cooke ed., 1961), and the President thus "bears responsibility for the actions

26   of the many departments and agencies within the Executive Branch," *Trump* v. *United States*, 603

27   U.S. 593, 607 (2024). Federal agencies depend for their "legitimacy and accountability to the

28   public [on] a 'clear and effective chain of command' down from the President, on whom all the

people vote." *United States* v. *Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (citation omitted); *see* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2331-2340 (2001). There is thus nothing plausibly unlawful about an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force" consistent with all applicable statutory restrictions.[7]

Of course, although an Executive Order cannot validly direct an agency to violate the law, the Workforce Executive Order does not do that. As noted above, the Court repeatedly faulted the Executive Order by reference to the President's supposed lack of authority to "reorganize," "fundamentally reorganize," or "broadly restructure." *See supra* pp. 12-13. The premise that the President and federal agencies have no reorganizational authority at all is incorrect. *Fitzgerald*, 457 U.S. at 757; *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (table) ("The decision to undertake a reorganization necessitating a [RIF] is within the discretion of the agency."). In any event, as Defendants noted, the Workforce Executive Order contains one sub-section—"Developing Agency Reorganization Plans"—dealing with organizational matters. Exec. Order 14210, § 3(e). And that subsection simply directs agencies to prepare a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," and states that the report should "discuss *whether* the agency or any of its *subcomponents*

---

[7] The Court's Production Order, *see* ECF No. 109, reflects a similarly limited conception of Executive Branch authority and, respectfully, also appears to misunderstand the Government's position.. *See id.* at 2 (asking whether there was "directing" to agencies to make "'large-scale' RIFs" or the provision of "guidance" and suggesting that this is a factual dispute between the parties); *id.* ("if ARRPs are non-final planning documents then "pursuant to *what*, then, are the agencies implementing their large-scale RIFs?"). But there is no factual dispute the Court needs to resolve. The Workforce Executive Order *does* direct action on the part of the agencies, and the ARRPs *are* part of the process by which the agencies determine how to implement the Order. The Government has never disputed either of these propositions. And it makes no difference whether the "directing" is "directing" RIFs on one hand or "providing guidance" about RIFs on the other, because he has unquestioned authority to do both, *provided that* any directives or guidance do not require the agency to violate any statutes or other sources of laws governing their activities. The Government's position, rather, is twofold: (1) the Executive Order, while mandatory, provides agencies with broad discretion to determine how to implement it consistent with any applicable legal restrictions; and (2) either way, the ARRPs are deliberative because they are subject to change, and an agency need not (and in many cases will not) implement all of the guidance, recommendations, and strategies set forth within them.

1    *should be* eliminated or consolidated." *Id.* (emphasis added). This is not a mandate to conduct any

2    reorganizations at all, let alone a directive to take any illegal action.

3            In holding otherwise, the Court reasoned that there is no action the agencies can take that

4    is not itself unlawful, because "[t]he evidence plaintiffs have presented paints a very different

5    picture: that the agencies are acting at the direction of the President and his team." TRO Opinion

6    at 31. But even if this is accurate, it does not support a claim that the Executive Order directs

7    agencies to violate the law. For one, it is entirely consistent to acknowledge—as the Government

8    does—that the Workforce Executive Order provides broad direction that agencies *must follow*,

9    while also noting that it does not direct *any specific actions* (and again, even if the Executive Order

10   *did direct specific actions*, there would be nothing wrong with that unless the specific directed

11   actions were *illegal*). And if the Court meant to suggest that agencies are engaging in broad-scale

12   restructuring in violation of agency-specific statutes—a contention that Plaintiffs have not

13   attempted to establish here—that would not mean that the *Executive Order itself* directs actions in

14   violation of the law.

15           And although this Court suggested the Executive Order raises statutory concerns because

16   it contemplates "large-scale" RIFs, TRO Opinion at 31, RIFs, like analogous layoffs in the private

17   sector, are often large-scale by their nature. *See* TRO Opposition at 9-11 (discussing RIFs after

18   World War II and President Clinton's 1993 order of a 4-percent reduction in the federal

19   workforce). And federal law explicitly recognizes that they will sometimes involve "the separation

20   of a significant number of employees." 5 U.S.C. § 3502(d)(1)(B); *see also* 5 C.F.R. § 351.803(b).

21   A large RIF that comports with the agency's statutory structure and function is just as lawful as a

22   small one. And since there is no prohibition on "large" RIFs, neither the RIF statute nor any other

23   legal source provides any judicially manageable standards in determining how to decide whether

24   a particular RIF qualifies as "large." A RIF itself is not a reorganization, which generally refers to

25   a changing an agency's structure either by legislation or internal agency directives, rather than the

26   elimination of positions within an existing agency structure. Thus, while a RIF can be conducted

27   because of a "reorganization," it can also be conducted for other reasons, such as "lack of work"

28

or "shortage of funds." 5 C.F.R. § 351.201(a)(2); *see, e.g.*, 5 U.S.C. § 5361(7). Nothing in the Executive Order directs unlawful action..

Were there any further doubt on this score, the Workforce Executive Order makes clear that any RIFs may be conducted only where "consistent with applicable law." Exec. Order 14210, § 3(c). The Order also states it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof," *id.* § 5(a)(i), and directs agencies to identify "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," *id.* § 3(e). Courts "cannot ignore . . . unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing" presidential directives, such as the Workforce Executive Order at issue here. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. Nov. 25, 2020) (majority opinion for three-judge district court).

Contrary to this Court's analysis, *see* TRO Decision at 32, the Ninth Circuit's decision in *City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), does not at all justify ignoring the Workforce Executive Order's repeated and unambiguous directives to agencies to comply with their governing statutes in conducting RIFs. As the Court noted, *San Francisco* involved a Presidential directive to "withhold all federal grants from so-called 'sanctuary' cities and counties[,]" TRO Opinion at 32. Because the Executive Order at issue there unambiguously directed action consistent with the law, giving effect to the Savings Clause would deprive the Order itself of any meaning. 897 F.3d at 1238 (declining to credit argument "that the Executive Order is all bluster and no bite"). By contrast, a directive to agencies to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law," does not even plausibly direct agencies to take action incompatible with law. Indeed, the Executive Order at issue here is on all fours with the D.C. Circuit's decision in *Allbaugh*, which the Ninth Circuit distinguished. 295 F.3d at 33 (rejecting Plaintiffs' argument that "notwithstanding the President's instruction that the Executive Order be applied only '[t]o the extent permitted by law,' a particular agency may try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute").

Plaintiffs' arguments are likewise unavailing on this point. Plaintiffs stress again that the Order states that it is intended to "commence[] a critical transformation of the Federal bureaucracy." Exec. Order 14210, § 1. Defendants underscored that this language—located in the Executive Order's "purpose" section—merely explains why President Trump issued the order and what he hopes will be accomplished by it. It does not by itself direct the agencies to do anything. This aspirational language does not direct anything by itself, nor is it a specific direction to agencies to violate the law. Plaintiffs note also that the Executive Order uses mandatory language. PI Brief at 12. But it provides agencies with broad discretion to determine how to implement it consistent with any applicable legal restrictions specific to their agency.

Plaintiffs also note that the Executive Order identifies certain offices that "shall be prioritized in the RIFs." Exec. Order 14210, § 3(c); PI Brief at 12. There is nothing improper about a President directing an agency to identify what the law allows, and then take whatever action is legally available to promote the President's priorities. Nothing in the Executive Order directs an agency to prioritize offices for RIFs even if an agency is not lawfully permitted to do so. To take one concrete example: the workforce Executive Order directs "components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations" to be prioritized in RIFs. Exec. Order 14210, § 3(c). Of course, if a particular agency's governing statutes *require* such components, the agency would presumably conclude that it was required to maintain those components—and in that scenario, the Workforce Executive Order directs the agency to follow the law. But there is nothing unlawful about the President directing that agencies prioritize such initiatives in exercising their *lawful* RIF authority.

### 4.  The Workforce Memorandum is Lawful

The Workforce Memorandum is likewise plainly lawful. It provides high-level guidance, setting forth principles that agency RIF Plans "*should* seek to achieve," tools that agencies "*should* employ" in developing ARRPs, and information that ARRPs "*should* include." ECF No. 37-1 App. B at 2, 4, 7 (emphases added). It states at least five times that agencies should only undertake actions that are consistent with their statutory authority. TRO Opposition at 37-38 & n.17. And it

1    repeatedly makes clear that agencies should not undertake any action that would impair service

2    delivery functions. *Id.* at 38 & n.18. And although the Workforce Memorandum states certain

3    topics ARRPs should address, it does not constrain agencies' discretion as to *how* they should

4    address them. Given all of this, Plaintiffs' contention that the Memorandum does not "permit[]

5    agencies to exercise meaningful discretion," PI Brief at 13, is mistaken.

6        Insofar as the Workforce Memorandum can be characterized as issuing directives to

7    agencies at all, such as by instructing them to submit Plans to OPM and OMB "for review and

8    approval" by specified dates, it falls comfortably within OPM's and OMB's statutory authorities

9    and the process established by the President in the Executive Order. OPM has express statutory to

10   "prescribe regulations for the release of competing employees in a reduction in force," 5 U.S.C.

11   § 3502(a), and other statutes supplement that authority*, see, e.g.*, 5 U.S.C. § 1301 (OPM "shall aid

12   the President, as he may request, in preparing the rules he prescribes under this title for the

13   administration of the competitive service"); 5 U.S.C. § 1302(b) (OPM "shall prescribe and enforce

14   regulations for the administration of the provisions of this title, and Executive orders issued in

15   furtherance thereof, that implement the Congressional poli-cy" governing, inter alia, preferences

16   for employee "retention"); *see also* 5 U.S.C. §§ 1103(a)(5)(A) and (c), 1104(b)(2). OPM exercised

17   those authorities in promulgating detailed, Executive-wide RIF regulations, 5 C.F.R. Pt. 351,

18   whose validity Plaintiffs do not question. Those regulations provide for OPM to "establish further

19   guidance and instructions for the planning, preparation, conduct, and review of reductions in force"

20   and to "examine an agency's preparations for reduction in force at any stage," 5 C.F.R. § 351.205,

21   which squarely encompasses OPM's directives here. As for OMB, that office is likewise statutorily

22   authorized to "establish general management policies for executive agencies" and "[f]acilitate

23   actions by . . . the executive branch to improve the management of Federal Government operations

24   and to remove impediments to effective administration." 31 U.S.C. §§ 503(b). Moreover, the

25   Executive Order directs agency heads to submit plans. Exec. Order 14210, § 3(e).

26   **B.  The Remaining *Winter* Factors Likewise Favor the Government**

27       A "court need not consider the other factors" if a movant fails to show a likelihood of

28   success on the merits. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

---

1    The Court accordingly need not and should not consider the other requirements. In any event, they

2    too favor the Government. As to irreparable harm, any harm to employees associated with RIFs

3    themselves are not irreparable. The MSPB may make wrongly removed employees whole through

4    reinstatement, retroactive benefits, backpay, and attorney's fees. 5 U.S.C. §§ 1204(a)(2), 7701(g).

5    Given these remedies, the Supreme Court has expressly held that loss of governmental

6    employment does not ordinarily qualify as irreparable harm. *See Sampson v. Murray*, 415 U.S. 61,

7    90 (1974). In its TRO opinion, the Court held that removed employees "will lose wages and health

8    benefits and, in some cases, may need to relocate." TRO Opinion at 38. Although aware of similar

9    circumstances in *Sampson*, the Supreme Court explained that these sorts of burdens common to

10   most losses of government employment are insufficient. *See* 415 U.S. at 92 n.68 ("[I]nsufficiency

11   of savings or difficulties in immediately obtaining other employment—external factors common

12   to most discharged employees and not attributable to any unusual actions relating to the discharge

13   itself—will not support a finding of irreparable injury"); *see also Smith* v. *Department of the Army*,

14   89 M.S.P.R. 82, 83 (2001) (noting remedial actions for life and health insurance for federal

15   employee reinstated after RIF).

16       The Court also noted *Sampson*'s qualification "that cases may arise in which the

17   circumstances surrounding an employee's discharge, together with the resultant effect on the

18   employee, may so far depart from the normal situation that irreparable injury might be found." 415

19   U.S. at 92 n.68. The Court found this exception applicable because "[t]he Court here is not

20   considering the potential loss of income of one individual employee, but the widespread

21   termination of salaries and benefits for individuals, families, and communities." TRO Opinion at

22   38. But as the plain language from this passage in *Sampson* makes clear, the Supreme Court was

23   talking about "circumstances surrounding *an employee's* discharge, together with the resultant

24   effect *on the employee*." 415 U.S. at 92 n.68 (emphasis added)—in other words, an extraordinary

25   injury to a particular employee. This does not mean that an injury "common to most discharged

26   employees" can be transformed into an irreparable one by multiplying it across a group of affected

27   employees. *Id.* Plaintiffs also heavily emphasize other types of alleged harm associated with RIFs,

28   allegedly suffered by other parties. *See* PI Brief at 9 (speculating that RIFs at EPA "will impede

the abatement of lead contamination in drinking water" and that other RIFs will allegedly impair a "County's ability to respond to the measles outbreak"). But assuming that those asserted speculative, indirect, downstream harms sufficed for standing, which they do not, irreparable injury for purposes of injunctive relief requires more. *See Monsanto Co.* v. *Geertson Seed Farms*, 561 U.S. 139, 162 (2010). If the employees who face RIFs are not entitled to injunctive relief as an equitable matter, it would turn equity on its head to grant injunctive relief based on more remote harms to third parties claiming that they are indirectly affected by the employees' treatment.

By contrast, this Court's TRO has inflicted—and a preliminary injunction will further inflict—irreparable harm on the Government and the public interest. Such orders prevent the implementation of agency RIFs pursuant to the Executive Order and Memorandum and seriously hampering agencies' control over their own administration. As the Supreme Court has observed, "the Government has traditionally been granted the widest latitude" in personnel matters and "the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (citation omitted). Even more concretely, the inevitable consequence of Plaintiffs' requested injunction against 22 components including 12 Cabinet-level Departments, *see* PI Motion at 1, is to compel federal agencies to keep large numbers of employees on the payroll without necessity, at unrecoverable taxpayer expense, thereby frustrating the government's efforts to impose budgetary discipline and build a more efficient workforce. The Supreme Court has expressed concern about the intrusion inflicted by a court order directing the reinstatement of a *single* government employee, *see Sampson*, 415 U.S. at 91-92; it follows that an order freezing much larger layoffs unquestionably inflicts substantial and irreparable injury on the government as an employer and steward of public funds. The Supreme Court has also recognized much smaller fiscal and administrative injuries as constituting irreparable harm. *See Department of Education v. California*, 145 S. Ct. 966 (2025) (stay granted where TRO permitted potentially unrecoverable drawdowns of $65 million in grant funds); *Heckler* v. *Turner*, 468 U.S. 1305, 1307-08 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay). And because the TRO broadly enjoins implementation of the Executive Order's directive to prepare for RIFs, it has sown confusion throughout the Executive Branch over what internal

administrative and planning actions agencies are permitted to undertake consistent with the order's terms. *See infra* p. 23.

### III. Any Relief Should be Limited

The Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that an injunction is appropriate, it should limit its scope in multiple respects.

First, the Court should limit relief to the named parties. Nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). In granting broader relief, this Court acknowledged that its order would "provide relief beyond the named parties," but it claimed that "to do otherwise is impracticable and unworkable, particularly where the agencies' RIF plans largely remain secret." TRO Opinion at 39. Plaintiffs repeat this point. PI Brief at 22-23. But it is up to the government to determine whether complying with a properly limited injunction is sufficiently unworkable that it should choose to extend broader relief to make it easier to comply. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("that is initially the National Government's problem, not ours").

Second, Defendants again request that the Court make clear that any injunction enjoining implementation of the Workforce Executive Order and/or Workforce Memorandum does not deprive any enjoined components of their preexisting authority to conduct RIFs and otherwise manage their workforce independent of the Executive Order and the ARRP process set forth in the Workforce Memorandum, authority this Court did not question.

Independent of these arguments, any injunction should be considerably narrower than the TRO Order and significantly narrower than the preliminary injunction Plaintiffs have requested. "Although a district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction, injunctive relief must be tailored to remedy the specific harm alleged." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024). An injunction also must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).

The TRO is not consistent with these principles. It broadly enjoined *all* implementation or enforcement "sections 3(c) and 3(e) of Executive Order 14210." TRO Opinion at 40. Because Section 3(c) directs agencies to "undertake preparations" for RIFs, the TRO limits agencies' latitude to engage in a wide variety of internal planning and organizational activities. By its literal terms, the TRO at least arguably prevents (to take just some examples), drafting of Federal Register notices or similar draft documents, discussions among agency staff and agency counsel about potential future RIFs that might be taken pursuant to the Executive Order, and any other preparatory activities. But mere preparations do not harm Plaintiffs, and the breadth of the TRO represents an unjustified intrusion into the internal affairs of a coequal branch of government. And by broadly enjoining preparations, the TRO runs afoul of the principle that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed," *Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016). Any preliminary injunction should be limited to discrete, clear actions that affect individual employees, and that are easily understood by any enjoined parties: issuance of new RIF notices or execution of existing notices pursuant to the Executive Order and Memorandum or, at most, these activities in addition to administrative leave placements, elimination or consolidation of programs or functions, transfer of functions or programs between the Agency Defendants taken pursuant to the challenged Executive Order and Memorandum. So limited to clear and identifiable prohibited actions, there is also no need for—and the Court should not order—"a proposed compliance plan" with the proposed review/response/objection process Plaintiffs propose, ECF No. 101 at 2. That laborious process is also demeaning to a coequal branch of government.

Finally, the Court should reject out of hand Plaintiffs' request "to rescind . . . any prior action taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum and/or the ARRPs." ECF No. 101 at 2. Although not entirely clear, Defendants understand Plaintiffs to seek restoration of the full state of affairs virtually government-wide as it existed on February 10 (the day before the Workforce Executive Order was issued), including by undoing completed actions. Thus, for example, although Plaintiffs allow that "the requested injunction would not order *reinstatement* of employees to former federal employment," that is only because, on Plaintiffs'

1    understanding, no employees have yet been separated, PI Brief at 22.

2         Notably, this is far broader than Plaintiffs' TRO motion which sought only prospective

3    relief. ECF No. 37 at 2 (seeking to enjoin "any further approval of" ARRPs, "any further" supposed

4    specified orders by USDS, "any further implementation," and "any further transfer of functions or

5    programs"); *see also* PI Brief at 3 (acknowledging that preliminary injunction motion extends

6    beyond what Plaintiffs requested in seeking a TRO). And any such backward looking relief would

7    be both highly burdensome and contrary to the principle that "courts must be 'institutionally wary

8    of granting relief that disrupts, rather than preserves, the status quo.'" *Hanson v. Dist. of Columbia*,

9    120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)).

10        Plaintiffs cite *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), and *Fellowship of Christian*

11   *Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023), for the

12   proposition that the "status quo" represents the state of affairs before the challenged assertedly

13   unlawful action. But in those cases the Ninth Circuit simply addressed whether enforcement of the

14   challenged action (a Presidential Proclamation in *Doe #1* and a school district policy in *Fellowship*

15   *of Christian Athletes*) represented the status quo for purposes of determining whether an injunction

16   enjoining its implementation should be subject to a higher standard. The courts there did not also

17   hold that it would be appropriate on a programmatic level to reach and attempt to unwind every

18   action that might have taken pursuant to the challenged action, including by subjecting the

19   government to a complex and judicially supervised "compliance plan." ECF No. 101 at 2. And in

20   any event, even if the relevant "status quo" were February 10 (and it is not), it would be an abuse

21   of discretion to issue an injunction requiring a virtual Executive Branch wide effort to restore the

22   world as it existed on that date, particularly since Plaintiffs waited more than three months to seek

23   that relief and did not seek it in their TRO Motion.

24        Finally, whether it grants or denies a preliminary injunction, the Court should leave in place

25   its directive to Plaintiffs' counsel not to "share the [ARRPs] or their contents with their clients or

26   any third parties unless or until the Court orders otherwise." ECF No. 109 at 5. Following the

27   disposition of this motion, Defendants intend to move the Court for an order requiring Plaintiffs'

28   counsel to destroy all copies of the disclosed ARRPs and to certify compliance with any such

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

order.

**IV.     Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief**

The Government repeats and incorporates by reference its argument that Plaintiffs should be required to post a security bond, as well as its argument about the appropriate scope of any such bond. TRO Opposition at 50.

<div align="center">

**CONCLUSION**

</div>

The Court should deny the motion for a preliminary injunction.

Dated: May 19, 2025                          Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

s/ Andrew M. Bernie
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

*Counsel for Defendants*

(655 of 726), Page 655 of 726
Case: 25-3034, 05/23/2025, DktEntry: 29.2, Page 655 of 726
Case 3:25-cv-03698-SI    Document 120    Filed 05/28/25    Page 1 of 21

1    Stacey M. Leyton (SBN 203827)
     Barbara J. Chisholm (SBN 224656)
2    Danielle E. Leonard (SBN 218201)
     ALTSHULER BERZON LLP
3    177 Post Street, Suite 300
     San Francisco, CA 94108
4    Tel. (415) 421-7151
     Fax (415) 362-8064
5    sleyton@altber.com
     bchisholm@altber.com
6    dleonard@altber.com
7
     Elena Goldstein (pro hac vice)
8    Skye Perryman (pro hac vice)
     Tsuki Hoshijima (pro hac vice)
9    DEMOCRACY FORWARD FOUNDATION
     P.O. Box 34553
10   Washington, D.C. 20043
     Telephone: (202) 448-9090
11   Fax: (202) 796-4426
     egoldstein@democracyforward.org
12   sperryman@democracyforward.org
     thoshijima@democracyforward.org
13

14   *Attorneys for Plaintiffs*
15
     [*Additional counsel and affiliations identified on signature page*]
16

17                    UNITED STATES DISTRICT COURT

18            FOR THE NORTHERN DISTRICT OF CALIFORNIA

19                      SAN FRANCISCO DIVISION

20

21   AMERICAN FEDERATION OF              Case No. 3:25-cv-03698-SI
     GOVERNMENT EMPLOYEES, AFL-CIO,
22   et al.,                             **PLAINTIFFS' REPLY IN SUPPORT OF**
                                         **MOTION FOR PRELIMINARY**
23              Plaintiffs,              **INJUNCTION**

24        v.

25
     DONALD J. TRUMP, in his official capacity
26   as President of the United States, et al.,

27              Defendants.

28

1

2

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

1.    Defendants cannot separate RIFs from the challenged reorganization of the
      government. ...........................................................................................................1

2.    Defendants cannot absolve OMB, OPM, and DOGE. ...........................................3

3.    Defendants overstate agencies' authority to RIF .................................................5

4.    Defendants concede they are not relying on facts or evidence. ............................7

5.    The scope of the proposed preliminary injunction is appropriate. ........................8

CONCLUSION ...............................................................................................................11

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*
    2025 WL 752378 (D.D.C. Mar. 10, 2025) ............................................................................. 8

*Allen v. Milligan*
    599 U.S. 1 (2023) ...................................................................................................................... 9

*Califano v. Yamasaki*
    442 U.S. 682 (1979) .................................................................................................................. 8

*Chrysler Corp. v. Brown*
    441 U.S. 281 (1979) .................................................................................................................. 5

*City & County of San Francisco v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ................................................................................................. 1

*Cnty. of Santa Clara v. Trump*
    250 F.Supp.3d 497 (N.D. Cal. 2017) ....................................................................................... 8

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
    603 U.S. 799 (2024) .................................................................................................................. 8

*Dep't of Homeland Sec. v. Regents of the Univ. of California*
    591 U.S. 1 (2020) ...................................................................................................................... 9

*Nat'l Council of Nonprofits v. OMB*
    2025 WL 368852 (D.D.C. Feb. 3, 2025) ................................................................................. 8

*Nat'l Council of Nonprofits v. OMB*
    2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................................................... 3

*New York v. Trump*
    133 F.4th 51 (1st Cir. 2025) ..................................................................................................... 3

*New York v. Trump*
    2025 WL 357368 (D.R.I. Jan. 31, 2025) .................................................................................. 8

*Nixon v. Fitzgerald*
    457 U.S. 731 (1982) .............................................................................................................. 6, 7

*PFLAG, Inc. v. Trump*
    2025 WL 685124 (D. Md. Mar. 4, 2025) ................................................................................. 8

*Widakuswara v. Lake*
    2025 WL 1166400 (D.D.C. Apr. 22, 2025) ............................................................................. 8

**U.S. Constitution**

U.S. Const. Article 1, § 9.........................................................................................................8

U.S. Const. Article II, § 3.......................................................................................................8

**Federal Statutes**

5 U.S.C.
    § 301 ...........................................................................................................................5, 6
    § 1103 ..............................................................................................................................4
    § 1105 ..............................................................................................................................4
    § 2301 ..............................................................................................................................6
    § 3101 ...........................................................................................................................5, 6
    §§ 3501-04 .......................................................................................................................5
    § 3502 ........................................................................................................................4, 5, 6

10 U.S.C.
    § 8012 ..............................................................................................................................6
    § 9013 ..............................................................................................................................6

31 U.S.C.
    §§ 501-507 .......................................................................................................................4
    § 503 ................................................................................................................................4
    § 1105 ..............................................................................................................................8

**Other Authorities**

5 C.F.R. pt. 351 ....................................................................................................................5

5 C.F.R. § 351.201................................................................................................................4

Exec. Order No. 12,839, § 1, 58 Fed. Reg. 8515 (Feb. 10, 1993)........................................6

1       Plaintiffs submit this brief reply to address arguments made by Defendants in opposition to

2  Plaintiffs' Motion for Preliminary Injunction.

**1.      Defendants cannot separate RIFs from the challenged reorganization of the government.**

4       Defendants insist that this case is only about the implementation of RIFs, which, they argue,

5  have nothing to do with reorganization of the government. *E.g*, Opp. at 1 ("the essence of Plaintiffs'

6  Complaint…"), 2 ("a RIF is not a reorganization…"), 16 (same). This defies not only the plain

7  language of the Executive Order ("EO") and implementing OMB/OPM Memorandum ("Memo"), but

8  also the record evidence. Indeed, the *sole purpose* of the RIFs is to effectuate the President's

9  "transformation" of federal agencies according to his vision of radical downsizing, including

10  eliminating *all* discretionary functions and the offices and programs he decides to eliminate. ECF 37-

11  1 App. A (EO, §§3, 4); App. B (ordering agencies to create ARRPs).[1]

12       In furtherance of this point, Defendants attempt to separate the President's orders regarding

13  RIFs and reorganization in different "subsections," and downplay the EO as "simply direct[ing]

14  agencies to prepare a report" with respect to reorganization. Opp. at 15. But Defendants eventually

15  concede that agencies are developing and implementing these ARRPs (including the RIFs) only

16  *because* of the President's order to transform the government. Opp. at 14. Defendants also do not

17  deny that the record is replete with examples of agencies cutting offices and programs that the

18  President deemed should be eliminated, and engaging in substantial internal and external

19  reorganizations that reflect large-scale RIFs and eliminate the positions and functions that the

20  Administration believes are not required by statute or considered "essential" during an agency

21  shutdown. Indeed, Defendants now concede that they are not contesting any facts. Opp. at 3.

22       Even if there could be any doubt regarding what the President has ordered, the OMB/OPM

23  Memo puts that to rest: all agencies government-wide are instructed that the President has "*directed*

24  them to 'eliminat[e] waste, bloat, and insularity.'" ECF 37-1, App. B at 1. All agencies are therefore

25  instructed to create a combined ARRP on an incredibly truncated timeline, which includes: "A

---

[1] Defendants ignore Ninth Circuit law in contending that the EO's purpose is irrelevant. Opp. at 18; *see City & County of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) ("As is true of interpretation of statutes, the interpretation of an Executive Order begins with its text, which must be construed consistently with the Order's object and policy." (internal quotations omitted)).

significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions

that are not required." *Id*. at 2. OMB and OPM further instruct:

> "Pursuant to the President's direction, agencies should focus on the *maximum elimination of functions that are not statutorily mandated* while driving the highest-quality, most efficient delivery of their statutorily-required functions" *and*

> "Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical…" *and*

> "Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas *for ARRPs*. [T]he agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination."

*Id*. (emphases added). Then, once the initial substantial RIFs are accomplished, the agencies are

further ordered to rearrange the pieces that are left, in the Phase 2 plans (which also include

"subsequent large-scale RIFs"). *Id.* at 4-6.

Defendants also do not contest the record evidence showing that OMB and OPM are

enforcing these requirements. For example, they do not dispute that the National Labor Relations

Board ("NLRB")'s mid-March ARRP, which stated that NLRB staff were necessary to perform the

agency's statutorily-mandated functions and therefore should not be RIF'd, was rejected by OMB

and OPM, which informed the agency it did not "meet expectations" and directed the NLRB to cut

staff. ECF 36, Ex. 1. Nor do they dispute that the same occurred to the National Science Foundation

("NSF") which was similarly told by OMB/OPM to go back to the drawing board and impose large

RIFs, and NSF complied by submitting a revised ARRP and issuing the RIFs required by OMB,

OPM, and DOGE. ECF 37-32 ¶¶8-14; ECF 96-1 ¶¶15-20.[2]

---

[2] While Plaintiffs lack access to OMB/OPM approvals and disapprovals and DOGE orders, Plaintiffs have uncovered and submitted evidence showing OMB/OPM is responding in writing to at least some agencies. ECF 36 Ex. 1 (NLRB); *see also* ECF 37-12 ¶24 (OMB rejected AmeriCorps ARRP for not including RIF). For example, OMB/OPM directed non-defendant agency National Endowment for the Humanities to modify its proposal dramatically to cut at least 70% of its staff and to start implementing the RIFs immediately. ECF 96-1 ¶¶6-13, Ex. 1 at 4-6 & Atts. D, I. Defendants have provided no counter-evidence.

The undisputed record shows that the President has ordered all agencies to reorganize *by* cutting the functions and positions that OMB/OPM determine are not mandated by statute, *regardless* of the reason Congress provided agencies with that discretion or appropriated funds for those programs and functions.  And that is exactly what agencies are doing, on an unprecedented scale.  *See* ECF 37-1, App A, B; ECF 37-1 at 12-29; ECF 70 at 1-35; ECF 101-1 at 11-13.[3]  While agencies may have some leeway in their proposals and recommendations to OMB and OPM (for OMB and OPM decision-making) regarding how and when to implement the actions that serve the purpose of reorganizing, the actions result from these unlawful order to reorganize.[4]

It matters not, as Defendants also contend here, that OPM's regulations discuss RIFs for the purpose of reorganization (Opp. at 16), because in this case the reorganization that the RIFs are effectuating *is not authorized by law*.  When a President wishes to implement such a plan to transform the government, the order of action required by the Constitution is:  propose a legislative plan to Congress, get Congressional approval, and *then* RIF, if Congress has approved the reductions.  By proceeding in the opposite order, without congressional authorization, the President violates the Constitution, and his implementing agencies violate the law, including the APA.

## 2. Defendants cannot absolve OMB, OPM, and DOGE.

Defendants attempt to shield OMB, OPM, and DOGE by claiming that the Federal Agency Defendants are, in fact, making all the decisions here (notwithstanding having conceded that they are not relying on any facts, (Opp. at 3).  But besides the mandatory language discussed above, and the requirement of OPM/OMB approval, Defendants ignore language limiting Agency Heads' discretion to grant exceptions to the requirements of the EO to a single basis (for "any position they deem necessary to meet national security, homeland security, or public safety responsibilities") while

---

[3] This Court correctly concluded in its TRO that the record includes many examples of Defendants cutting statutorily authorized programs as well.  ECF 85 at 2-4.

[4] *See, e.g., New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) (affirming conclusion that "any 'suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions' was 'disingenuous'"); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959 at *7 (D.D.C. Feb. 25, 2025) (rejecting contention that "countless federal agencies ... suddenly began exercising their own discretion to suspend funding across the board at the exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").

1   giving OPM broad authority to "grant exemptions from this order where those exemptions are

2   otherwise necessary and shall assist in promoting workforce reduction." ECF 37-1, App. A (§4).

3       Defendants' hypothesizing that agencies *could* implement these actions without OPM/OMB

4   approval entirely ignores the Memo's requirement of approval for *all* ARRPs. *See* ECF 37-1, App.

5   B. Defendants also ignore the language expressly stating that agencies *cannot* implement without

6   this particular OMB/OPM certification: "agencies or components that provide direct services to

7   citizens (such as Social Security, Medicare, and veterans' health care) *shall not implement any*

8   *proposed ARRPs* until OMB and OPM certify that the plans will have a positive effect on the delivery

9   of such services." ECF 37-1, App. B at 6 (emphasis added).

10      Defendants do not rehabilitate OMB and OPM on the law either. It is not "comfortably

11  within OPM's and OMB's statutory authorities" (Opp. at 19) for either agency to require other

12  agencies to engage in massive layoffs in service of a government-wide reorganization that includes

13  the "maximum elimination of functions" that OMB and OPM determined are not "required,"

14  pursuant to the President's EO and the Memo. ECF 37-1, App. A, B at 1-2. None of the statutes

15  cited by Defendants that delegate rule-making functions to OPM authorize OPM decision-making

16  authority regarding the fact, scale, or timing of actions reorganizing agencies or imposing RIFs. 5

17  U.S.C. §§1103, 1105, 3502. As OPM's own implementing regulations state: not OPM, but "*Each*

18  *agency* is responsible for determining the categories within which positions are required, where they

19  are to be located, and when they are to be filled, abolished, or vacated." 5 C.F.R. § 351.201. Nor do

20  OMB's statutorily authorized functions include wielding final decision-making authority over other

21  agencies' RIFs or reorganization plans. *See* 31 U.S.C. §§501-507; *see also* 5 U.S.C. §3502 (RIF

22  retention order statute, identifying no role for OMB). The Government cites only 31 U.S.C. §503,

23  which authorizes OMB to "establish general management policies for executive agencies" and to

24  "[f]acilitate actions by the Congress and the executive branch to improve the management of Federal

25  Government operations." 31 U.S.C. §503(b) and (b)(4). But the plain language of these provisions

26  does not extend to approving or rejecting the content or timing of RIF or reorganization plans.

27      The only remaining claimed source of authority for OMB and OPM is the EO itself. But the

28  President can only execute the laws, not make them. And Congress plainly gave basic employment

authority to the federal agencies, not OPM or OMB, 5 U.S.C. §3101, and the President has no

authority to *transfer* that delegated authority between agencies without congressional approval. And,

because the EO's directives are unlawful, OMB and OPM's Memorandum and any ARRP approvals

premised thereon are similarly without authority.

### 3. Defendants overstate agencies' authority to RIF.

Even if they were not acting pursuant to orders by the President and his implementing

agencies (which they are), agencies would abuse their discretion and act arbitrarily and capriciously

by: eliminating *every* discretionary function at the same time regardless of need or purpose,

eliminating the offices and programs the President dictates, and eliminating all positions not

considered "essential" during government shut-downs. Defendants erroneously contend that

Plaintiffs do not identify any independent basis to conclude that the agencies violate any statute even

if they were taking these actions on their own: across the board, agencies are violating the APA by

engaging in these reorganizations according to the President's required parameters.[5]

Defendants also misconstrue the relevant statutes to claim that agencies have unfettered

discretion to RIF employees, for any purpose at all. Congress has generally authorized agencies to

"employ such number of employees" that "Congress may appropriate for from year to year," 5 U.S.C.

§3101, and to "prescribe regulations for the government of his department, the conduct of its

employees, the distribution and performance of its business, and the custody, use, and preservation of

its records, papers, and property." *Id.* §301.[6] And while Congress has enacted a "Retention

Preference" that requires agencies to use a particular order of retention *if* conducting a RIF, 5 U.S.C.

§§3501-04, that retention order statute (and implementing regulations) *do not* independently provide

the authority to engage in a RIF, nor discuss the scope of that authority. 5 U.S.C. §3502; 5 C.F.R. Pt.

351. All of the historical statutes invoked by Defendants (Opp. at 1, "since the nineteenth

---

[5] Whether agencies *are also* violating any of their organic statutes or appropriations requirements is an additional issue, but Plaintiffs need not demonstrate each and every action in these ARRPs that violates some additional law, to demonstrate that the President and these agencies have violated the Constitution and the APA.

[6] Section 301 is known as the "housekeeping" statute and "authoriz[es] what the APA terms 'rules of agency organization procedure or practice' as opposed to 'substantive rules.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979).

1    century…") also address retention preference, not the source of authority to conduct a RIF.  *E.g.*, Ch.

2    287, §3, 19 Stat. 143, 169 (Aug. 15, 1876); *see also* Veterans' Preference Act of 1944, Pub. L. No.

3    78-359, §12, 58 Stat. 390 (predecessor of the modern 5 U.S.C. §3502).

4          The authority to conduct a RIF, like the general "housekeeping" and employment authority

5    delegated to agencies by Congress, is best understood as attendant to federal agencies' authority to

6    establish positions to carry out functions Congress has assigned them and to observe and respect

7    appropriations.  *E.g.*, 5 U.S.C. §301; §3101.  Thus, historically, prior Administrations have addressed

8    workforce reduction as part of the budget dialogue with *Congress*, and have *not* unilaterally ordered

9    government-wide RIFs, as the Government inaccurately asserts here.  Opp. at 14.  Again, President

10   Clinton did not order a RIF.  Exec. Order No. 12,839, §1, 58 Fed. Reg. 8515 (Feb. 10, 1993).[7]

11   President Clinton obtained *congressional authorization* for his buyout plans.  Federal Workforce

12   Restructuring Act of 1994, Pub. L. 103-226, 108 Stat. 111 (1994); *see* Exec. Order No. 12,839, 58

13   Fed. Reg. 8515 (Feb. 10, 1993).  When Congress has wanted to authorize the executive branch to

14   reduce the federal workforce, it has done so by legislation.  *See, e.g.*, Workforce Restructuring Act of

15   1994, 108 Stat. 116 (directing President to meet targets for reduction of federal civilian workforce);

16   Defense Authorization Amendments and Base Closure and Realignment Act, 102 Stat. 2623, 2627

17   (1988) (authorizing several rounds of closures of military installations that employed military and

18   civilian personnel), as amended by 104 Stat. 1485, 1808-14 (1990), and by 108 Stat. 2626 (1994),

19   and by 115 Stat. 1342 (2004); Federal Employees' Pay Act of 1945, Pub. L. 79-106, § 607(b), 59

20   Stat. 295 (granting budget director authority to set agency personnel ceilings and order reductions in

21   staffing), *repealed* 64 Stat. 843 (1950); *see also, generally*, 5 U.S.C. §2301 (merit system principles

22   constrain removal of civil service employees).

23          Finally, Defendants misconstrue *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), which involved

24   the President's authority with respect to *military departments* under Title 10 of the U.S. Code.  *Id.*

25   (citing the former 10 U.S.C. § 8012(b), now codified at 10 U.S.C. § 9013(g)); *see* Opp. at 13, 15.

26

27          [7] *See also* House Rep. 103-386, available at 1994 U.S.C.C.A.N. 49, 52 (Nov. 19, 1993) ("The
     [OMB] bulletin specified that neither it nor the Executive Order [No. 12839] authorized special early
28   out programs or *required agencies to undergo reductions-in-force*.") (emphasis added).

The President's constitutional authority over military departments as Commander in Chief, and how that impacts statutory authority over those departments, is not at issue in this case. The *Nixon* Court also cautioned, even as to the President's authority with respect to the military: "This is not to say that, in a given case, it would not be appropriate to raise the question whether an official—even a President—had acted within the scope of the official's constitutional and statutory duties." *Id.* at 761 n.4. That is the question here—whether the President acted ultra vires with respect to non-military agencies—and *Nixon* does not remotely answer it.

### 4. Defendants concede they are not relying on facts or evidence.

Defendants state they are relying on no facts to support their opposition: "Defendants did not make any factual representations" in opposition to Plaintiffs' Motion for Temporary Restraining Order ("TRO"), and "[w]e similarly do not make or rely on any factual representations here," Opp. at 1. However, Defendants' brief is actually rife with factual assertions. The following statements of fact are not supported by any evidence, as Defendants have expressly conceded:

- "ARRPs are always subject to change and agencies are not bound to follow all of the recommendations, strategies and proposals ARRPs contain" (Opp. at 14).

- "RIFS, like analogous layoffs in the private sector, are often large-scale by their nature" (Opp. at 16);

- "A RIF is not a reorganization" (Opp. at 2);

- "Of course, if a particular agency's governing statutes require such components, the agency would presumably conclude that it was required to maintain those components" (Opp. at 18) (emphasis removed);

- "[A]ny harm to employees associated with RIFs themselves are not irreparable" (Opp. at 20);

- "Such orders prevent the implementation of agency RIFs pursuant to the Executive Order and Memorandum and [sic] *seriously hampering agencies' control over their own administration.*" (Opp. at 21) (emphasis added);

- "[I]t follows that an order freezing much larger layoffs unquestionably inflicts substantial and irreparable injury on the government as an employer and steward of public funds" (Opp. at 21); and

- "[T]he inevitable consequence of Plaintiffs' requested injunction… is to compel federal agencies to keep large numbers of employees on the payroll without necessity, at

1

2

unrecoverable taxpayer expense, thereby frustrating the government's efforts to impose budgetary discipline and build a more efficient workforce." (Opp. at 21).

3    Defendants therefore concede that they are not relying on facts or evidence to support their

4 assertions of purported harm to the government's budget.  They also greatly overreach.  *Congress*,

5 not the President, sets the budget for the federal agencies, and it is for *Congress*, not the President, to

6 impose "budgetary discipline."  U.S. Const. art. 1, §9; *see also, e.g.,* 31 U.S.C. §1105(a) (requiring

7 the President to submit his *proposal* for federal budget to Congress no later than "on or after the first

8 Monday in January but not later than the first Monday in February of each year"). The President is

9 the steward of the laws that Congress enacts; he does not establish or alter those laws, and he does

10 not unilaterally determine the budget for the federal agencies.  *See* U.S. Const. art. II, §3.[8]  To the

11 extent that Defendants' assertions of "harm" effectively admit that the purpose of the President's EO

12 is to usurp congressional budgetary authority by slashing spending (and particularly spending on the

13 federal civil service)—the President simply has no authority to do that, for all the reasons previously

14 explained.

15    **5. The scope of the proposed preliminary injunction is appropriate.**

16    The scope of the unlawful action challenged in this litigation extends to the ARRPs created

17 for the *sole purpose* of effectuating the President, OMB, and OPM's unlawful orders, and being

18 implemented now, to effectuate those orders.  Defendants argue that relief should be limited to the

19 named parties, Opp. at 22, but the Supreme Court has long recognized that injunctions may properly

20

21    [8] *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 531 (N.D. Cal. 2017) ("Where Congress has

22 failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by

23 Congress if he does so."); *see also Widakuswara v. Lake*, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025) ("defendants' unwillingness to expend funds in accordance with the congressional

24 appropriations laws is a direct affront to the power of the legislative branch"); *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (President

25 lacks authority "to rescind or defer the funds Congress has appropriated); *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *19 (D. Md. Mar. 4, 2025) (President may not direct agencies to withhold

26 congressionally appropriated funds "in order to further an administrative policy"); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (OMB may not "interfer[e] with

27 Congress's appropriation of federal funds); *New York v. Trump*, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) ("The Executive Branch has a duty to align federal spending and action with the will of the

28 people as expressed through congressional appropriations, not through 'Presidential priorities.'").

1   benefit nonparties when "necessary to redress the [harm to the] complaining parties." *Califano v.*

2   *Yamasaki*, 442 U.S. 682, 702 (1979); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv.*

3   *Sys.*, 603 U.S. 799, 830-31 (2024) (Kavanaugh, J., concurring) ("[T]his Court has affirmed countless

4   decisions that vacated agency actions … rather than merely providing injunctive relief that enjoined

5   enforcement of the rules against the specific plaintiffs." (citations omitted)) (collecting cases).  This

6   is appropriate when there is no other workable way to provide complete relief, because the harm

7   cannot be selectively blocked only as to the named plaintiffs.  *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1,

8   17 (2023) (affirming grant of preliminary injunction of Alabama's redistricting plan in racial

9   gerrymandering case); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 9

10  (2020) (holding that agency rescission of a national immigration program "must be vacated").

11         As this Court previously correctly found, it would be "impracticable and unworkable" to

12  attempt to grant piecemeal relief that enjoins Defendants' unlawful reorganization of entire agencies

13  only to the extent that it affects Plaintiffs, but not otherwise.  ECF 85 at 39.  Plaintiffs demonstrated

14  actual and imminent harm to Plaintiffs and their millions of members across the country.  *See* ECF

15  37-1 at 13-29.[9]  As explained above, the President's orders are being implemented through ARRPs

16  that include eliminating entire offices, programs, and functions that the President decides to cut, and

17  to the "maximum extent" possible eliminating functions deemed non-essential for statutory mandates

18  (as determined by the President, OMB, and OPM), and *then* those decisions are being implemented

19  by RIFing federal employees.  Those impacted by the resulting RIFs include hundreds of thousands

20  of Plaintiffs' federal employee union members.  Rescinding individual union members' RIF notices

21  does little if there is no office or position to return to as the result of Defendants' reorganization.

22         Nor can injuries to Plaintiffs and their members due to the disruption and harm to government

23  services be redressed by piecemeal recission either.  For instance, the Social Security

24  Administration's agency-wide RIFs will drastically increase processing and assistance times and

25  impede or delay the provision of benefits nationwide, including to nonprofit defendant Alliance for

---

26

27       [9] *See also* ECF 37-39 ¶2 (Alliance for Retired Americans); ECF 37-26 ¶4 (SEIU); ECF 41-5 ¶3
    (AFSCME); ECF 37-23 ¶2 (AFGE); ECF 101-8 ¶3 (NRDC); ECF 37-44 ¶5 (Common Defense); ECF

28  37-45 ¶5 (AGU); ECF 37-43 ¶2 (Main Street Alliance); ECF 37-36 ¶2 (American Public Health
    Association); ECF 37-37 ¶1 (NOFA); ECF 37-41 ¶3 (CPANP); ECF 37-40 ¶4 (WWP).

1    Retired Americans' 4.4 million members.  ECF 37-1 at 26; ECF 37-39 at 1.  The reduction of Small

2    Business Administration ("SBA") staff by almost half will cause significant delays to loans, disaster

3    loan guarantees, and other services SBA provides to small businesses, harming nonprofit defendant

4    Main Street Alliance's 30,000 members nationwide.  ECF 37-1 at 25; ECF 37-43 at 1.  The expected

5    termination of 80,000 positions at Department of Veterans Affairs will severely hinder its ability to

6    provide health care, help veterans access other benefits, and process claims, harming nonprofit

7    Common Defense and its 40,000 veteran members (and their families) nationwide.  ECF 37-1 at 28-

8    29; ECF 37-44 ¶¶7-22; *see also* ECF 37-38 ¶¶2-19 (VoteVets has 2 million supporters nationwide);

9    ECF 37-5 ¶21.

10        The NSF's 50% staffing cuts will have devasting effects on scientific research and

11   technology, including on the 29,000 scientist members of nonprofit American Geophysical Union

12   ("AGU") in the United States.  ECF 37-1 at 24; ECF 37-45 ¶¶5, 21-26.  The National Oceanic and

13   Atmospheric Administration's ("NOAA") planned nationwide cuts will compromise public safety in

14   cities and counties nationwide that rely on NOAA's National Weather Service for real-time weather

15   information, data, and expertise.  ECF 37-1 at 16.  Interior's nationwide reorganization and

16   impending RIFs in service of that reorganization will undermine conservation, wildlife protection,

17   and public land management nationwide, including jeopardizing national parks and national wildlife

18   refuges, to the detriment of WWP's 14,000 members, Coalition to Protect America's National Parks'

19   4000 members, and local government Plaintiffs.  ECF 37-1 at 22-23; ECF 37-40 ¶¶4, 6-8, 10-22, 39.

20   These types of nationwide and indivisible harms are shown for every federal agency defendant

21   named in the preliminary injunction motion.  *See* ECF 37-1 at 12-29.

22        Defendants have presented no contrary evidence disputing Plaintiffs' showing of harm to

23   Plaintiffs across the entire country.  And they do not deny that these widespread cuts are imminent.

24   *See, e.g.*, Defs. App. for Stay, U.S. Supreme Court No. 24A1106 (May 16, 2025) at 29 ("[A]bout 40

25   RIFs in 17 agencies were in progress and are currently enjoined by the TRO.").  Contrary to

26   Defendants' assertion that "it is up to the government to determine whether complying with a

27   properly limited inunction is sufficiently unworkable," Opp. at 22, it is the province of this Court to

28   decide the appropriate scope of relief to remedy the Executive Branch's extensive unlawful actions.

2. Defendants also mis-portray Plaintiffs' requested relief as seeking to unwind the clock to a government-wide "state of affairs" as it "existed on February 10." Opp. at 23-24. Plaintiffs do no such thing. The record shows agencies began implementing the President's orders in roughly late March. *See, e.g.*, ECF 37-17 ¶¶7-9 (HHS March 27 RIF). Moreover, Defendants are well aware of the specific, concrete actions that each agency has taken to implement the President's EO, which are identified in the plans and timelines that agencies submitted to OMB/OPM, and which are well within this Court's ability to address to maintain the status quo. Contrary to Defendants' professed "confusion," the proposed PI does not preclude agencies from "planning." Opp at 21-22. Agencies may plan, including planning to request legislative approval. What Plaintiffs seek is to preclude them from *implementing* unlawful plans. And Plaintiffs have proposed a reasonable process by which any such confusion could be addressed by meeting and conferring to formulate a specific and concrete plan to implement any preliminary injunction. Alternatively, the Court could order Defendants to identify each action they have taken to implement or comply with the EO, Memo, and ARRPs, and order them to cease implementing those specified actions.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant Plaintiffs' Motion and enter the accompanying proposed preliminary injunction.

DATED: May 20, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne Johnson
Alice X. Wang
Robin S. Tholin
Aaron Schaffer-Neitz
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

1
2

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

3    Elena Goldstein (pro hac vice)
4    Skye Perryman (pro hac vice)
     Tsuki Hoshijima (pro hac vice)
5    DEMOCRACY FORWARD FOUNDATION
     P.O. Box 34553
6    Washington, D.C. 20043
     Tel: (202) 448-9090
7    Fax: (202) 796-4426
8    egoldstein@democracyforward.org
     sperryman@democracyforward.org

9
10   By: */s/ Elena Goldstein*

11   *Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*
12

13

14   Jules Torti (pro hac vice)
15   PROTECT DEMOCRACY PROJECT
     82 Nassau St., #601
16   New York, NY 10038

17   Erica J. Newland (pro hac vice)
18   Jacek Pruski (pro hac vice)
     PROTECT DEMOCRACY PROJECT
19   2020 Pennsylvania Ave., N.W., Suite 163
     Washington, D.C. 20006
20   Tel: 202-579-4582
     jules.torti@protectdemocracy.org
21   erica.newland@protectdemocracy.org
22   jacek.pruski@protectdemocracy.org

23   By: */s/ Jules Torti*

24   *Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*
25

26   Norman L. Eisen (pro hac vice app. forthcoming)
27   Spencer W. Klein (pro hac vice app. forthcoming)
     STATE DEMOCRACY DEFENDERS FUND
28   600 Pennsylvania Avenue SE #15180

Add.667

1  Washington, D.C. 20003
Tel: (202) 594-9958
2  Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org
3

4  By: */s/ Norman L. Eisen*

5  *Attorneys for All Union and Non-Profit Organization*
*Plaintiffs (except NRDC)*
6

7  Rushab Sanghvi (SBN 302809)
8  AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
9  80 F Street, NW
Washington, D.C. 20001
10  Tel: (202) 639-6426
Sanghr@afge.org
11

12  By: */s/ Rushab Sanghvi*

13  *Attorney for Plaintiffs American Federation of*
*Government Employees, AFL-CIO (AFGE) and AFGE*
14  *locals*

15

16  Teague Paterson (SBN 226659)
Matthew Blumin (pro hac vice)
17  AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
18  1625 L Street, N.W.
Washington, D.C. 20036
19  Tel: (202) 775-5900
TPaterson@afscme.org
20  MBlumin@afscme.org

21

22  By: */s/ Teague Paterson*

23  *Attorneys for Plaintiff American Federation of State*
*County and Municipal Employees, AFL-CIO (AFSCME)*
24

25  Steven K. Ury (SBN 199499)
26  SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO
27  1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
28  Tel: (202) 730-7428

Add.668

1            steven.ury@seiu.org

2     By: */s/ Steven K. Ury*

3            *Attorney for Plaintiff Service Employees International*
4            *Union, AFL-CIO (SEIU)*

5

6            David Chiu (SBN 189542)
             City Attorney
7            Yvonne R. Meré (SBN 175394)
             Chief Deputy City Attorney
8            Mollie M. Lee (SBN 251404)
             Chief of Strategic Advocacy
9            Sara J. Eisenberg (SBN 269303)
             Chief of Complex and Affirmative Litigation
10           Molly J. Alarcon (SBN 315244)
             Alexander J. Holtzman (SBN 311813)
11           Deputy City Attorneys
             OFFICE OF THE CITY ATTORNEY FOR THE CITY
12           AND COUNTY OF SAN FRANCISCO
             1390 Market Street, 7th Floor
13           San Francisco, CA 94102
             molly.alarcon@sfcityatty.org
14           alexander.holtzman@sfcityatty.org

15

16    By: */s/ David Chiu*

17           *Attorneys for Plaintiff City and County of San Francisco*

18

19           Tony LoPresti (SBN 289269)
             COUNTY COUNSEL
20           Kavita Narayan (SBN 264191)
             Meredith A. Johnson (SBN 291018)
21           Raphael N. Rajendra (SBN 255096)
             Hannah M. Godbey (SBN 334475)
22           OFFICE OF THE COUNTY COUNSEL
             COUNTY OF SANTA CLARA
23           70 West Hedding Street, East Wing, 9th Floor
             San José, CA 95110
24           Tel: (408) 299-5900

25

26    By: */s/ Tony LoPresti*

27           *Attorneys for Plaintiff County of Santa Clara, Calif.*

28
             David J. Hackett (pro hac vice)

1
General Counsel to King County Executive & Special
Deputy Prosecutor
2
Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
3
Special Deputy Prosecutor
Erin King-Clancy (pro hac vice app. forthcoming)
4
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
5
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
6
Seattle, WA 98104
(206) 477-9483
7
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
8
aclancy@kingcounty.gov

9
By: */s/ David J. Hackett* _____

10
*Attorneys for Plaintiff Martin Luther King, Jr. County*

11
Sharanya Mohan (SBN 350675)
12
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
13
Oakland, CA 94609
Tel: (510) 738-6788
14
sai@publicrightsproject.org

15
By: */s/ Sharanya Mohan* _____

16
*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,*
17
*Harris County, TX, and King County, WA*

18

19
Christian D. Menefee
Harris County Attorney
20
Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
21
Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)
22
Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)
23
Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)
24
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice)
25
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice)
26
Assistant County Attorney
1019 Congress, 15th Floor
27
Houston, Texas 77002
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tel.: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice app. forthcoming)
Lucy Prather (IL ARDC 6337780) (pro hac vice)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By: */s/ Stephen J. Kane*

*Attorneys for Plaintiff City of Chicago*

Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming)
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By: */s/ Sara Gross*

1          *Attorneys for Plaintiff City of Baltimore*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' REPLY ISO MOT. FOR PRELIMINARY INJUNCTION, NO. 3:25-cv-03698-SI          17

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

8

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

Case No. 25-cv-03698-SI

9

Plaintiffs,

**ORDER GRANTING PRELIMINARY
INJUNCTION**

10

v.

Re: Dkt. No. 101

11

DONALD J. TRUMP, et al.,

12

Defendants.

13

14           Presidents may set policy priorities for the executive branch, and agency heads may

15   implement them.  This much is undisputed.  But Congress creates federal agencies, funds them, and

16   gives them duties that—by statute—they must carry out.  Agencies may not conduct large-scale

17   reorganizations and reductions in force in blatant disregard of Congress's mandates, and a President

18   may not initiate large-scale executive branch reorganization without partnering with Congress.  For

19   this reason, nine Presidents over the last one hundred years have sought and obtained authority from

20   Congress to reorganize the executive branch.  Other Presidents—including President George W.

21   Bush, President Obama, and President Trump in his first term—asked Congress for agency

22   reorganization authority but did not receive it.

23           The defendants in this case are President Trump, numerous federal agencies, and the heads

24   of those agencies.  Defendants insist that the new administration does not need Congress's support

25   to lay off and restructure large swathes of the federal workforce, essentially telling the Court,

26   "Nothing to see here."  In their view, federal agencies are not reorganizing.  Rather, they have

27   simply initiated reductions in force according to established regulations and "consistent with

28   applicable law."  The Court and the bystanding public should just move along.

United States District Court
Northern District of California

1   Yet the role of a district court is to examine the evidence, and at this stage of the case the

2   evidence discredits the executive's position and persuades the Court that plaintiffs are likely to

3   succeed on the merits of their suit. On February 11, 2025, the President ordered agencies to plan

4   for "large-scale reductions in force" (RIFs) and reorganizations. The agencies began submitting

5   "Agency RIF and Reorganization Plans" for review and approval by the President's centralized

6   decisionmakers. Agencies then rapidly began to implement these reorganizations and large-scale

7   reductions in force (RIFs) without Congressional approval. In some cases, as plaintiffs' evidence

8   shows, agency changes intentionally or negligently flout the tasks Congress has assigned

9   them. After dramatic staff reductions, these agencies will not be able to do what Congress has

10   directed them to do.[1]

11   Defendants try to refute this conclusion by insisting there are no relevant facts to review. In

12

13   _____

[1] To illustrate what is at stake in this litigation, the Court highlights a few examples from the
evidence submitted by plaintiffs.

14   The National Institute for Occupational Safety and Health (NIOSH) is part of the Centers
for Disease Control in the Department of Health and Human Services. Dkt. No. 41-1 ("Decl.

15   Niemeier-Walsh AFGE") ¶ 5. There are (or were) 222 NIOSH employees in the agency's Pittsburgh
office that research health hazards faced by mineworkers. *Id.* ¶ 28. According to the union that

16   represents many of these employees, the department's reduction in force will terminate 221 of 222
of these positions. *Id.*

17   The federal Office of Head Start resides in the Department of Health and Human Services.
Plaintiff Santa Clara County, California runs a childcare and early learning program for 1,200

18   infants and preschoolers with funding from federal Head Start, but that funding expires June 30,
2025. Dkt. No. 37-26 ("Decl. Neuman SEIU") ¶ 21. County staff worked with Office of Head Start

19   employees to apply for a grant renewal, but those federal workers have now all been laid off and
their San Francisco office closed. *Id.* Unsure whether its funding will continue, the county has

20   notified more than one hundred early learning program workers that they might lose their jobs on
July 1, 2025. *Id.*

21   The Farm Service Agency in the U.S. Department of Agriculture provides specialized, low-
interest loans to small farmers not available from the private sector. Dkt. No. 37-37 ("Decl. Davis

22   NOFA") ¶¶ 20-21. After unprecedented flooding in 2024, one Vermont farmer asked the Farm
Service Agency for disaster assistance to plant a new crop, but the agency first had to inspect the

23   fields. *Id.* ¶ 28. Due to low staffing levels, the farmer had to wait three to four weeks for an
inspection and consequently missed the planting window that season. *Id.* The department now

24   reportedly intends to further reduce staff at the agency. *Id.* ¶ 18. Other farmers have reported their
contacts at the department have been laid off and the remaining staff are not familiar with their farms

25   or their projects. *Id.* ¶¶ 40-41.
The Social Security Administration seeks to reduce its workforce by 7,000 employees.

26   Dkt. No. 37-11 ("Decl. Couture AFGE") ¶ 9, Ex. C. Since staff reductions began, retirees have
reported long wait times to reach an agency representative on the phone, problems with the

27   agency's website, and difficulty making in-person appointments. Dkt. No. 37-39 ("Decl. Fiesta
ARA") ¶ 7. One individual got through to a representative only after eleven attempts to call, each

28   involving hours on hold. Dkt. No. 41-2 ("Decl. Nelson AFSCME") ¶ 12.

the face of dozens of declarations in support of plaintiffs, defendants have submitted only one sworn declaration by an agency official. Defendants fought the Court's order for them to disclose the most relevant documents—the agencies' RIF and reorganization plans themselves.

Defendants maintain that the federal agencies are acting of their own accord and not at the President's direction, asking this Court to review the relevant executive actions using tunnel vision and ignore whatever may be happening on the ground. Numerous courts have rejected similar arguments in recent months. *See New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (approving district court's finding that the "suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the Unleashing Guidance . . . [was] disingenuous"); *Am. Fed'n of Gov't Employees, AFL-CIO v. OPM*, No. 25-cv-1780-WHA, --- F. Supp. 3d ----, 2025 WL 820782, at *5-6 (N.D. Cal. Mar. 14, 2025) (rejecting the government's contention that OPM did not issue a "directive" to terminate probationary employees and stating, "even the fig leaf of agency discretion allowed for in the [OPM memo] was illusory"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, --- F. Supp. 3d ----, Civil Action No. 25-239 (LA), 2025 WL 597959, at *6-7 (D.D.C. Feb. 25, 2025) ("Defendants would have the court believe that countless federal agencies . . . suddenly began exercising their own discretion to suspend funding across the board at the exact same time. That would be a remarkable—and unfathomable—coincidence.").

Put simply, in this case, defendants want the Court to either declare that nine Presidents and twenty-one Congresses[2] did not properly understand the separation of powers, or ignore how the executive branch is implementing large-scale reductions in force and reorganizations. The Court can do neither. On May 9, 2025, the Court ordered defendants to pause their activities for two weeks while it received further arguments from the parties. Dkt. No. 85. Plaintiffs—a collection of unions, non-profit organizations, and local governments—now ask the Court to approve a preliminary injunction that pauses further RIFs and reorganization of the executive branch for the duration of

2 Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012).

Add.675 [3]

1    this lawsuit.  To preserve the status quo and protect the power of the legislative branch, the Court

2    GRANTS the motion.

3

4                                     **BACKGROUND**

5    **I.    Executive Order 14210 and the Challenged Memorandum**

6          On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the

7    President's 'Department of Government Efficiency' Workforce Optimization Initiative."  90 Fed.

8    Reg. 9669 (Feb. 11, 2025).  The order "commences a critical transformation of the Federal

9    bureaucracy[.]" *Id.* § 1.  Section 3(c) of the order states,

> Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

17   *Id.* § 3(c).  The order also directs agencies to submit a report within thirty days to the Office of

18   Management and Budget that "shall discuss whether the agency or any of its subcomponents should

19   be eliminated or consolidated."  *Id.* § 3(e).

20         In response to Executive Order 14210, the directors of the Office of Management and Budget

21   (OMB) and the Office of Personnel Management (OPM) sent a memo to heads of executive

22   departments and agencies on February 26, 2025.  Dkt. No. 37-1, Ex. B ("OMB/OPM Memo").  The

23   memo states that "tax dollars are being siphoned off to fund unproductive and unnecessary programs

24   that benefit radical interest groups while hurting hard-working American citizens.  [¶]  The

25   American people registered their verdict on the bloated, corrupt federal bureaucracy on November

26   5, 2024 by voting for President Trump and his promises to sweepingly reform the federal

27   government."  *Id.* at 1.  The memo instructed agency heads to submit Agency RIF and

28

*United States District Court*
*Northern District of California*

1    Reorganization Plans (ARRPs) to OMB and OPM for review and approval.  Agencies were directed

2    to submit a "Phase 1" ARRP by March 13, 2025—i.e., in two weeks—that included, among other

3    information, any Congressional statutes that established the agency, whether parts of the agency

4    should be eliminated, a list of essential positions, how the agency intends to reduce positions, a

5    "suggested plan for congressional engagement to gather input and agreement on major restructuring

6    efforts," and the agency's timeline for implementation.  *Id.* at 3-4.  The memo directs agencies to

7    submit "Phase 2" ARRPs by April 14, 2025 that include, among other information, all reductions

8    that will occur through RIFs, proposed relocations of offices from the Washington, D.C. area to

9    "less-costly parts of the country," "[a]n explanation of how the ARRPs will improve services for

10   Americans and advance the President's policy priorities," a certification that the ARRPs will

11   improve the delivery of direct services, and a timetable for implementation.  *Id.* at 4-6.  The memo

12   also instructs agencies to send monthly progress reports to OMB and OPM on May 14, June 16, and

13   July 16, 2025.  *Id.* at 6.  The memo excludes law enforcement, border security, national security,

14   immigration enforcement, public safety, military personnel, the Executive Office of the President,

15   and the U.S. Postal Service.  *Id.*

16

17   **II.    The Agency Defendants and Their Locations Within the Federal Bureaucracy**

18        **A.        The Central Agencies: OMB, OPM, and DOGE**

19        In 1970, Congress transferred OMB to the President's authority.  Reorganization Plan No. 2

20   of 1970, 84 Stat. 2085 (1970) (located at 5 U.S.C. Appendix, page 213).  In 1982, Congress codified

21   OMB's current location in the Executive Office of the President[3] at 5 U.S.C §§ 501-507.  In 1978,

22   Congress established OPM as an "independent establishment in the executive branch" and the

23   agency resides outside of the Executive Office of the President.  5 U.S.C. § 1101; Pub. L. No. 95-

24   454, Title II, § 201(a), 92 Stat. 1111, 1118 (1978).  In 2025, President Trump refashioned the U.S.

25

26

27        [3] "Established in 1939, the Executive Office of the President (EOP) consists of a
     group of federal agencies immediately serving the President."  Harold C. Relyea, Cong. Rsch. Serv.,
28   98-606, *The Executive Office of the President: An Historical Overview* (2008).

1    Digital Service—an office that President Obama created within OMB[4]—into the U.S. DOGE

2    Service via Executive Order 14158.   90 Fed. Reg. 8441 (Jan. 20, 2025).   DOGE is known

3    colloquially as the Department of Government Efficiency, but it derives no authority from statutes.

4

5    ### B.    The Other Federal Agency Defendants

6    The defendants include twenty-two other federal departments or agencies that are arguably

7    more public facing.  For ease of reference, this order refers to these defendants collectively as the

8    "federal agency defendants."  That term does not include OMB, OPM, or DOGE.  Fourteen of the

9    federal agency defendants are considered "executive departments" under 5 U.S.C. § 101 and have

10   been established by Congressional statute.[5]  *See, e.g.*, 7 U.S.C. § 2201 (USDA); 22 U.S.C. § 2651

11   (State); 38 U.S.C. § 301 (VA); 42 U.S.C. § 3532 (HUD).

12   Seven additional defendant agencies have a statutory basis elsewhere in the United States

13   Code and one was created by President Nixon under reorganization authority granted by Congress,

14   as follows:

15   Defendant AmeriCorps, known formally as the Corporation for National and Community

16   Service, received its current statutory formulation through the National and Community Service

17   Trust Act of 1993.  Pub. L. No. 103-82, Title II, §§ 202-03, 107 Stat. 785, 873 (1993) (codified at

18   42 U.S.C. § 12651 et seq.).   AmeriCorps is a "government corporation."   42 U.S.C. § 12651

19   (referring to 5 U.S.C. § 103).

20   Defendant Peace Corps was created by Congressional adoption of the Peace Corps Act in

21   1961.  Pub. L. No. 87-293, 75 Stat. 612 (1961) (now codified at 22 U.S.C. § 2501 et seq.).

22   Defendant General Services Administration (GSA) was established by Congress in the

23

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25   [4] *See* Clinton T. Brass and Dominick A. Fiorentino, Cong. Rsch. Serv., IN12493, *Department of Government Efficiency (DOGE) Executive Order: Early Implementation* (2025).

26   [5] These include the departments of Agriculture (USDA), Commerce, Defense, Energy, Health and Human Services (HHS), Homeland Security (DHS), Housing and Urban Development

27   (HUD), Justice (DOJ), Interior, Labor, State, Treasury, Transportation, and Veterans Affairs (VA). The only executive department not named in this suit is the Department of Education.  Plaintiffs' preliminary injunction request does not implicate the departments of Defense, Justice, or Homeland

28   Security. *See* Dkt. No. 101 at 1.

United States District Court
Northern District of California

1  Federal Property and Administrative Services Act of 1949.  Pub. L. No. 81-152, 63 Stat. 277 (1949).

2  The structure of the agency is now codified at 42 U.S.C. § 301 et seq.

3  Defendant National Labor Relations Board (NLRB) was created by the National Labor

4  Relations Act of 1935.  Pub. L. No. 74-198, ch. 372, 49 Stat. 449 (1935).  The structure of the agency

5  is codified at 29 U.S.C. § 153.

6  Defendant National Science Foundation (NSF) was established by the National Science

7  Foundation Act of 1950.  Pub. L. No. 81-507, ch. 171, 64 Stat. 149 (1950).  The structure of the

8  agency is codified at 42 U.S.C. § 1861 et seq.

9  Defendant Small Business Administration (SBA) was established by the Small Business Act

10  of 1953 as amended in 1958.  Pub. L. No. 85-536, 72 Stat. 384 (1958).  The structure of the agency

11  is now codified at 15 U.S.C. § 633 et seq.

12  Defendant Social Security Administration (SSA) was first established by Congress in the

13  Social Security Act of 1935, known at that time as the Social Security Board.  Pub. L. No. 74-271,

14  § 701 et seq., 49 Stat. 620, 635 (1935) (now codified at 42 U.S.C. § 901 et seq.).

15  Defendant Environmental Protection Agency (EPA) was created by the Reorganization Plan

16  No. 3 of 1970 under statutory reorganization authority granted to the President by Congress at that

17  time. 35 Fed. Reg. 15623, 84 Stat. 2086 (1970) (located at 5 U.S.C. Appendix, page 216).  Congress

18  later ratified the agency's creation by statute.  Pub. L. No. 98-532, 98 Stat. 2705 (1984).

19

20  **III.    Agency RIF and Reorganization Plans (ARRPs)**

21  Pursuant to the terms of the OMB/OPM February 26, 2025 memo, federal agencies were

22  directed to submit Phase 1 ARRPs by March 13, 2025 and Phase 2 ARRPs by April 14, 2025.

23  OMB/OPM Memo at 3-4.  Defendants have not publicly released these plans despite requests from

24  the public, employees, and members of Congress.  The Court has reviewed *in camera* the ARRPs

25  of four defendant agencies.  *See* Dkt. No. 109.

26  From the Court's understanding of the evidence filed in this case, an agency's action steps

27  in response to the OMB/OPM Memo would include the following: (1) submitting its ARRP to OMB

28  and OPM; (2) receiving approval of the ARRP by OMB and OPM, either formally or informally;

United States District Court
Northern District of California

1   (3) sending RIF notices; (4) placing employees on administrative leave; and (5) terminating

2   employees.

3        As described in sworn declarations submitted by plaintiffs, the federal agency defendants

4   are at different points along this continuum. In a May 16 filing, the Solicitor General told the

5   Supreme Court that his office "has been informed by OPM that about 40 RIFs in 17 agencies were

6   in progress and are currently enjoined by [this Court's May 9] TRO." Application for Stay, No.

7   24A1106 (U.S.), 29. From plaintiffs' evidence, these agencies include defendants HHS, HUD,

8   Labor, State, AmeriCorps, GSA, and SBA. After sending RIF notices to employees, agencies have

9   sometimes placed these employees on immediate administrative leave until the termination date set

10   by the RIF, usually sixty days after the notice. *See*, *e.g.*, Dkt. No. 37-14 ("Decl. Fabris AFGE") ¶¶

11   11-15. The earliest RIF termination date that the Court can discern from the declarations would

12   have been May 18, 2025, at which point some HUD employees would have been terminated but for

13   the Court's temporary restraining order. Dkt. No. 41-1 ("Decl. Bobbitt AFGE") ¶¶ 13-14, Exs. C,

14   D.

15        As directed by Executive Order 14210, the scale of the RIFs is "large." Here are some

16   examples. HHS is issuing RIF notices to 8,000-10,000 employees. Dkt. No. 37-17 ("Decl.

17   Garthwaite AFGE") ¶ 7, Ex. A. Reports indicate the Department of Energy has identified 8,500

18   positions as eligible for cuts, nearly half of its workforce. Dkt. No. 37-8 ("Decl. Braden AFGE")

19   ¶ 12, Ex. A. The National Oceanic and Atmospheric Administration is reportedly preparing a RIF

20   to reduce its workforce by more than half. Dkt. No. 37-40 ("Decl. Molvar WWP") ¶ 23. Reports

21   also suggest that HUD is preparing to cut half of its staff and close many field offices. Decl. Bobbitt

22   AFGE ¶¶ 9, 11, Exs. A, B. Department of Labor management have said internally that they intend

23   to cut the agency's headquarters staff by 70%. Dkt. No. 37-16 ("Decl. Gamble AFGE") ¶ 12.

24   Reports suggest the Internal Revenue Service in the Department of the Treasury plans to cut 40%

25   of its staff. Dkt. No. 37-42 ("Decl. Olson CTR") ¶ 10. The VA is planning to cut 83,000 positions.

26   Dkt. No. 37-5 ("Decl. Bailey SEIU") ¶ 12. AmeriCorps sent an email to employees announcing a

27   reorganization that will cut more than half of its workers. Dkt. No. 37-12 ("Decl. Daly AFSCME")

28   ¶ 14, Ex. A. National Science Foundation has been directed to cut about half of its 1,700 staff. Dkt.

No. 37-32 ("Decl. Soriano AFGE") ¶¶ 9-10, Ex. A.  The Small Business Administration announced it planned to cut its workforce by more than 40%.  Dkt. No. 37-18 ("Decl. Gustafsson AFGE") ¶ 6, Ex. A.

## IV.    Plaintiffs

The union plaintiffs in this case consist of the American Federation of Government Employees (AFGE) and four of its locals (Local 1122, Local 1236, Local 2110, and Local 3172); the American Federation of State, County and Municipal Employees (AFSCME); and the Service Employees International Union (SEIU) and three of its locals (Local 521, Local 1000, and Local 1021).  Eleven membership-based non-profit organizations have joined the unions as co-plaintiffs: Alliance for Retired Americans, American Geophysical Union, American Public Health Association, Center for Taxpayer Rights, Coalition to Protect America's National Parks, Common Defense Civic Engagement, Main Street Alliance, Natural Resources Defense Council, Northeast Organic Farming Association, VoteVets Action Fund, and Western Watersheds Project.  Six local governments have also joined the suit: Santa Clara County, CA; King County, WA; Baltimore, MD; Harris County, TX; Chicago, IL; and San Francisco, CA.

The plaintiffs in this action are discussed more fully in the Court's consideration of standing below.

## V.    Procedural History

Plaintiffs filed suit on April 28, 2025.  Dkt. No. 1.  The complaint alleges that President Trump's Executive Order 14210 is *ultra vires* and usurps Congressional authority, in violation of the Constitution's separation of powers (Claim One); that OMB, OPM, and DOGE also acted *ultra vires* or beyond their authority in implementing Executive Order 14210, including by issuing the OMB/OPM Memo (Claim Two); that the OMB/OPM Memo violated the Administrative Procedure Act (APA) in several ways (Claims Three through Five); and that the federal agency defendants' ARRPs also violate the Administrative Procedure Act (Claims Six and Seven).

On May 1, 2025, plaintiffs filed a motion for a temporary restraining order.  Dkt. No. 37-1

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ("TRO Mot.").  Per the Court's schedule, defendants filed an opposition on May 7, 2025, and

2  plaintiffs filed a reply the following day.  Dkt. Nos. 60 ("TRO Opp'n"), 70 ("TRO Reply").  The

3  Court received several briefs from *amici curiae*.  Dkt. Nos. 51, 69, 71, 75.  The Court heard oral

4  arguments on the motion on Friday, May 9, 2025 and issued a two-week temporary restraining order

5  (TRO) later that day.  Dkt. No. 85.

6  Defendants then asked the Court to reconsider a portion of that order that compelled

7  production of the ARRPs.  Dkt. No. 88.  The Court stayed that part of its order to receive further

8  briefing from the parties.  Dkt. No. 92.  After reviewing the parties' arguments, the Court ordered

9  defendants to produce a sampling of the ARRPs to the Court for *in camera* review and to plaintiffs'

10  counsel for their eyes only.  Dkt. No.  109.[6]

11  On May 14, 2025, plaintiffs filed an amended complaint, adding two local union plaintiffs

12  (SEIU Locals 521 and 1021) and one additional federal agency defendant (the Peace Corps).  Dkt.

13  No. 100.  Plaintiffs filed a motion for a preliminary injunction that same day.  Dkt. No. 101-1 ("PI

14  Mot.").  On May 19, 2025, defendants filed an opposition to the motion for a preliminary injunction.

15  Dkt. No. 117 ("PI Opp'n").  Plaintiffs replied on May 20, 2025.  Dkt. No. 120 ("PI Reply").  The

16  Court heard oral argument on the preliminary injunction motion on May 22, 2025.

17

18  **LEGAL STANDARD**

19  "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear

20  showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7,

21  22 (2008).  In order to obtain a preliminary injunction, the plaintiff "must establish that he is likely

22  to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

23  relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

24  *Id.* at 20 (citations omitted).  When the nonmoving party is the government, the final two factors

25  merge.  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418,

26

27  _____

28  [6] Though defendants provided the documents, the parties continue to dispute whether the ARRPs defendants provided are the versions "approved" by OMB and OPM.  *See* Dkt. No. 119.

United States District Court
Northern District of California

1  435 (2009)).

2       Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious

3  questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's

4  favor," so long as the other two *Winter* factors are also met. *All. for the Wild Rockies v. Cottrell*,

5  632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks and citation omitted). This

6  formulation recognizes a sliding scale approach, where "a stronger showing of one element may

7  offset a weaker showing of another." *Id.* at 1131, 1134-35.

8

9                                 **DISCUSSION**

10  **I.     Timing**

11       As at the TRO stage, defendants first argue that plaintiffs' motion for a preliminary

12  injunction should be denied because it was brought too late after the Executive Order and the

13  OMB/OPM Memo issued. TRO Opp'n at 19-22; PI Opp'n at 4-6. Defendants' argument is not

14  well-taken. Due to defendants' ongoing decision not to release the ARRPs publicly, the details of

15  the federal agency defendants' RIF and reorganization plans have come into public view only slowly

16  and at random. Moreover, in a case where other plaintiffs challenged Executive Order 14210 shortly

17  after it was issued, as defendants suggest should have been done here, the government's attorneys

18  argued that plaintiffs' harm was still too "speculative" to establish injury. *See Nat'l Treasury Emps.*

19  *Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025).

20  Defendants cannot have it both ways. If defendants' position is that people will find out about the

21  RIFs when the RIF notices begin to go out, then the Court finds that plaintiffs reasonably waited to

22  gather what information they could about the harm they may suffer from the Executive Order, the

23  OMB/OPM Memorandum, and the ARRPs before moving for emergency relief. When the harm

24  became readily apparent, they filed suit.

25

26  **II.    Standing**

27       Federal courts may only hear a case if plaintiffs can show they have standing to sue. *Spokeo,*

28  *Inc. v. Robins*, 578 U.S. 330, 338 (2016, revised May 24, 2016). "As a general rule, in an injunctive

1  case this court need not address standing of each plaintiff if it concludes that one plaintiff has

2  standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523

3  (9th Cir. 2009).

4       To establish standing to sue, plaintiffs must show an injury, trace that injury to the

5  defendants' conduct, and prove that courts can provide adequate redress for the injury.  *Lujan v.*

6  *Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury "must be concrete, particularized, and

7  actual or imminent."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation

8  marks and citation omitted).  To be imminent, a threatened injury must be "*certainly impending*"—

9  "allegations of *possible* future injury are not sufficient."  *Id.* (internal quotation marks, brackets, and

10  citations omitted).  Plaintiffs cannot base standing on a theory of harm that "relies on a highly

11  attenuated chain of possibilities."  *Id.* at 410.  The standing inquiry must be "rigorous" where the

12  court faces claims that Congress or the executive branch has acted unconstitutionally.  *Id.* at 408.

13       Organizational plaintiffs such as trade unions or membership-based non-profit organizations

14  have two paths to establish standing.  "[A]n association has standing to bring suit on behalf of its

15  members when: (a) its members would otherwise have standing to sue in their own right; (b) the

16  interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

17  asserted nor the relief requested requires the participation of individual members in the lawsuit."

18  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Organizations without

19  formal members may achieve associational standing if they are "the functional equivalent of a

20  membership organization."  *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002)

21  (citing *Hunt*, 432 U.S. at 342-45).

22       Injury may come in many forms.  The threat of a pending job loss constitutes a concrete

23  economic injury.  *Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1014 (N.D. Cal. 2007).  The

24  possible loss of federal funding is also sufficient to establish injury.  *Nat'l Urb. League v. Ross*, 508

25  F. Supp. 3d 663, 688 (N.D. Cal. 2020). A failure to provide relevant information can constitute

26  injury where one might be entitled to such information.  *Fed. Election Comm'n v. Akins*, 524 U.S.

27  11, 20 (1998).  While the Ninth Circuit has held an organization can meet the injury requirement by

28  showing it had to divert resources to fight a problem affecting the organization,  *La Asociacion de*

United States District Court
Northern District of California

1  *Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010), the

2  Supreme Court recently rejected organizations seeking standing "simply by expending money to

3  gather information and advocate against the defendant's action," *Food & Drug Admin. v. All. for*

4  *Hippocratic Med.*, 602 U.S. 367, 394 (2024).

5      With this framework in mind, the Court now turns to the question of standing as applied to

6  plaintiffs in this case. Since the Court need not address the standing of each plaintiff to proceed, so

7  long as it finds standing for at least one plaintiff, it limits its discussion below.

8

9      **A.    Injury**

10      The numerous plaintiffs in this case can be divided into three general groups, each with its

11  own set of alleged injuries.

12

13          **1.    Union Plaintiffs**

14      In the declarations filed in support of their motions for a temporary restraining order and

15  preliminary injunction, the union plaintiffs assert the following categories of harm.

16      First, and perhaps most obviously, they assert injury on behalf of their federal employee

17  members who have received RIF notices or who suffer under the looming threat of such notices.

18  *See*, *e.g.*, Dkt. No. 37-23 ("Decl. Kelley AFGE") ¶ 16. Second, they contend that their federal

19  employees who are not let go will be injured by significantly increased workloads. *See*, *e.g.*, Dkt.

20  No. 37-9 ("Decl. Burke AFGE") ¶ 21; Decl. Daly AFSCME ¶ 30. Third, they assert injury to the

21  unions themselves, in the form of "thousands of hours" of diverted staff resources and the loss in

22  dues revenue that will result from the loss of employee members. *See*, *e.g.*, Decl. Kelley AFGE ¶¶

23  12-13, 15, 20.

24      The unions also assert injury on behalf of their non-federal employee members who stand to

25  lose their jobs as a result of federal workforce reductions. For example, SEIU represents 6,000

26  federal contract workers at facilities that may face closure in the wake of staff reductions. Dkt. No.

27  37-3 ("Decl. Adler SEIU") ¶¶ 4, 9. These workers have lost their jobs during government

28  shutdowns, or in the recent contested closure of the U.S. Institute of Peace facility. *Id.* ¶¶ 5, 7. SEIU

1    Local 521 represents Head Start workers who have been informed they may lose their jobs on July

2    1, 2025, because staffing reductions at the Office of Head Start has created uncertainty about the

3    renewal of funding.  Dkt. No. 101-4 ("Decl. Woodard SEIU") ¶ 9.  Similarly, if staff reductions lead

4    to the delay in processing of Medicare enrollment or other federal funding sources like grant

5    payments, union members that work in sectors that depend on these revenue streams face layoffs.

6    As just two provided examples, AFSCME members work in local housing authorities and local

7    transit agencies that rely on a steady stream of federal funding.  Dkt. No. 41-5 ("Decl. O'Brien

8    AFSCME") ¶¶ 39-40, 45-46; Decl. Woodard SEIU ¶¶ 10-11.

9        At the TRO stage, defendants first argued that the unions do not show that a specific federal

10   employee has been harmed or will imminently be harmed.  TRO Opp'n at 32 (citing *Summers v.*

11   *Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  Defendants are factually mistaken and overstate their

12   legal case.  Factually, multiple declarants have asserted personal harm.  *See*, *e.g.*, Decl. Fabris AFGE

13   ¶ 10 (declarant received RIF notice); Dkt. No. 37-24 ("Decl. Levin AFGE") ¶¶ 14-15 (declarant

14   placed on same-day administrative leave); Decl. Bobbit AFGE, Ex. D (declarant received and

15   provided redacted list of employees in RIF notice).  As to the doctrine, the Court in *Summers* wanted

16   to ensure that injury had been specifically established by sworn affidavits.  The Ninth Circuit later

17   clarified that naming individuals is not necessary "when it is clear and not speculative that a member

18   of a group will be adversely affected by a challenged action and a defendant does not need to know

19   the identity of a particular member to defend against an organization's claims."  *Mi Familia Vota v.*

20   *Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).  It is not speculative here that the unions' members are

21   being harmed by defendants' challenged actions.

22       The unions also establish standing as organizations representing federal employees based on

23   impending direct financial harm to their organizations in the form of lower membership numbers

24   and lower dues.  *See*, *e.g.*, Decl. Kelley AFGE ¶¶ 12-13, 15, 20.

25       SEIU has also established standing based on the federal contract workers that it represents.

26   These workers have lost their jobs when federal facilities close.  Decl. Adler SEIU ¶¶ 5, 7.  The

27

28

14

United States District Court
Northern District of California

1   ARRPs are likely to result in the closure of more federal facilities,[7] and when that happens SEIU's

2   contract workers will lose their jobs.  This is not like the attenuated five-link chain of cascading

3   events in *Clapper*; given the breadth of the RIFs that have been announced, these injuries are

4   "certainly impending."  *See Clapper*, 568 U.S. at 410.

5       AFSCME also represents non-federal employee workers who rely on the federal workforce

6   to process grants to support their work.  In the Department of Energy's Weatherization Assistance

7   Program, reports indicate the number of federal staff will decrease by 75%.  Dkt. No. 37-15 ("Decl.

8   Gabel AFSCME") ¶ 11.  If or when these cuts are implemented, AFSCME workers at a non-profit

9   supported by this program will find it "extremely challenging to get the necessary grant money to

10  operate, and layoffs . . . are almost certain."  *Id.* ¶ 12.  While slightly more attenuated than the

11  contract workers' basis for standing, the Court finds that these facts support an independent basis

12  for standing as well.

13      Defendants have also challenged whether the employees who will be saddled with more

14  work will have experienced a concrete harm.  TRO Opp'n at 33.  The Court need not decide at this

15  stage whether this type of injury is sufficient for standing.

16

17          **2.     Non-Profit Plaintiffs**

18      All the non-profit organization plaintiffs have submitted declarations that detail the harms

19  that significant federal workforce reductions impose upon their members or the organizations

20  themselves.  Two consistent themes emerge from these declarations.  First, the organizations'

21  members benefit from services provided by federal employees, but significant staffing reductions

22  across various agencies impact their ability to continue to benefit.  Second, many of the

23  organizations assert that they have had to divert resources away from their primary mission to

24  respond to the impact of federal staffing cuts on their members.

25      As defendants note, the diversion of resources theory rests on shakier ground after *Food &*

26

27  ───────────────

28      [7] One of the principles to inform the ARRPs, per the OMB/OPM Memorandum, is "[a] reduced real property footprint."  OMB/OPM Memo at 2.

1   *Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024).[8]  But at least

2   some of the non-profit organization plaintiffs establish injury on other bases.  For example, the

3   American Geophysical Union attests that implementation of ARRPs will cause the organization to

4   lose membership, publication authors, and conference attendees, resulting in a loss of revenue to the

5   organization.  Dkt. No. 37-45 ("Decl. Shultz AGU") ¶¶ 9, 28-29.  Based on its past experience, the

6   Center for Taxpayer Rights suggests that its low-income members will see delays to the processing

7   of refunds that they rely on for day-to-day expenses.  Dkt. No. 37-42 ("Decl. Olson CTR") ¶¶ 35-

8   37.

9          The Court finds these types of harm sufficient to establish injury.  None are as attenuated as

10  the causal chain of events leading to potential injury in *Clapper*.  The Court reserves a full discussion

11  of standing for each non-profit plaintiff for a later stage.

12

13                    **3.      Local Government Plaintiffs**

14         To establish standing, a local government must assert a harm to its own "proprietary

15  interests," which "are as varied as a municipality's responsibilities, powers, and assets."  *City of*

16  *Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).  Proprietary interests include a local

17  government's ability to enforce regulations, collect revenue, and protect its natural resources.  *Id.*

18  at 1198.

19         The local government plaintiffs assert that large-scale reductions in the federal workforce

20  will jeopardize the timely delivery of many different federal funding streams that their budgets rely

21  on.  Baltimore also asserts a more direct financial injury in the form of lost municipal tax revenues,

22  given that 12,400 city residents are (or were) federal employees.  Dkt. No. 37-54 ("Decl. Leach—

23  Baltimore") ¶¶ 5-8.  The local governments also contend that they will be forced to expend more

24  resources in the absence of federal support, in areas like fighting wildfires or providing shelter.  Dkt.

25

26  _____

27         [8] The Supreme Court there denied standing when plaintiff organizations incurred costs
    opposing the government's actions but explained that organizations have standing when a
    defendant's acts "directly affected and interfered with [plaintiff's] core business activities."  *All. for*
28  *Hippocratic Med.*, 602 U.S. at 395.

1  No. 37-58 ("Decl. Williams—SCC") ¶¶ 24, 43.

2      The Court finds the local governments have standing on the basis of impending financial

3  harm. For example, King County has a budget that includes more than $200 million in federal

4  revenue for its operating budgets and $500 million in federal funds in its capital budget for 2025.

5  Dkt. No. 41-6 ("Decl. Dively—King County") ¶¶ 6, 8. The county communicates with staff across

6  multiple federal agencies to process grants and permits for capital projects; any delay in these

7  communications delays projects and increases costs. *Id.* ¶¶ 22, 26, 31, 33, 38. With large-scale

8  RIFs happening across agencies, such delay is likely.[9] As another example, Harris County Public

9  Health receives grants from the Centers for Disease Control and Prevention, an agency within

10  defendant HHS, but has begun to experience a delay in communication after HHS initiated its RIF.

11  Dkt. No. 37-46 ("Decl. Barton—Harris County") ¶¶ 23, 26.

12      Finding the above sufficient to establish standing for at least some of the local governments,

13  the Court reserves a fuller analysis for another day.

14

15          **4.**    **Procedural Injury**

16      Lastly, plaintiffs across all of the above categories assert a procedural injury for their notice-

17  and-comment claims, because they contend they would have submitted comments had they been

18  given a chance. *See*, *e.g.*, Dkt. No. 37-31 ("Decl. Soldner AFGE") ¶ 27. Some explained that they

19  provided comments in response to notices about similar proposals during President Trump's first

20  administration. *See*, *e.g.*, *id.*

21      A procedural injury must be related to a plaintiff's concrete interests. *Summers*, 555 U.S. at

22  496. As a collection of plaintiffs have established standing based on harm to their concrete interests,

23  the plaintiffs also have standing to challenge a lack of notice and comment procedures.

24

25

26

27        [9] As one example, King County believes the closure of HUD's regional office in Seattle will result in delays in disbursement of the County's $47 million in federal grant funds. Decl. Dively—

28  King County ¶¶ 37-38.

**B.       Causation and Redressability[10]**

Plaintiffs challenge three layers of action: the President's Executive Order, the OMB/OPM Memo issued pursuant to the Executive Order, and the agency ARRPs submitted pursuant to the memorandum.  The harm experienced by plaintiffs or imminently threatening them comes from the reorganizations and RIFs established by the ARRPs.  As many declarants have offered, the agencies had not talked about large-scale RIFs or reorganizations prior to President Trump's February 11, 2025 Executive Order.  *See, e.g.*, Decl. Bailey SEIU ¶ 10; Decl. Garthwaite AFGE ¶ 6.  These harms are fairly traceable to defendants' actions at all three levels; beyond the defendants, there are no intervening actors causing these harms.  *See Lujan*, 504 U.S. at 560.

Finally, the Court can redress the harms by vacating the unlawful actions as allowed by the APA and Supreme Court precedent.


**C.       Conclusion as to Standing**

At this preliminary injunction stage, the Court finds at least some collection of the plaintiffs have sufficient standing to bring their claims.


**III.     Subject Matter Jurisdiction—*Thunder Basin* Preclusion**

Courts generally have jurisdiction under 28 U.S.C. § 1331 to review federal government actions.  *Califano v. Sanders*, 430 U.S. 99, 105 (1977).  But Congress sometimes precludes district court review "by specifying a different method to resolve claims about agency action," *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023), often through channeling review to an adjudicative body within an agency.  In determining whether Congress has removed district court jurisdiction, courts ask two questions: whether "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction" and whether "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,

---

[10] Defendants do not specifically challenge causation or redressability in their opposition briefs, but the Court must complete the standing inquiry regardless.

1    561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).

2    When examining the second question—whether the particular claims should be channeled

3    to agency review—courts consider three factors from *Thunder Basin*: "First, could precluding

4    district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim

5    wholly collateral to the statute's review provisions? And last, is the claim outside the agency's

6    expertise?" *Axon*, 598 U.S. at 186 (internal quotation marks, brackets, and citations omitted).

7    Affirmative answers to these questions suggest that Congress did not intend to limit jurisdiction,

8    "[b]ut the same conclusion might follow if the factors point in different directions." *Id.* Together,

9    these factors recognize that agency action should rarely evade effective judicial review, but

10   channeling from a district court to an agency adjudication may be appropriate "in the matters [an

11   agency] customarily handles, and can apply distinctive knowledge to." *Id.*

12   Defendants argue that the Federal Service Labor-Management Relations Statute and the

13   Civil Service Reform Act of 1978 preclude district court jurisdiction over plaintiffs' claims. TRO

14   Opp'n at 23-31; PI Opp'n at 6-11. The Federal Service Labor-Management Relations Statute

15   established a Federal Labor Relations Authority to resolve issues related to collective bargaining

16   between federal employee unions and their employers, including "issues relating to the granting of

17   national consultation rights," "issues relating to determining compelling need for agency rules or

18   regulations," "issues relating to the duty to bargain in good faith," and "complaints of unfair labor

19   practices." 5 U.S.C. § 7105(a)(2). In passing the statute, Congress specified that its provisions

20   "should be interpreted in a manner consistent with the requirement of an effective and efficient

21   Government." *Id.* § 7101(b). The Civil Service Reform Act provides a mechanism for employees

22   who have suffered an adverse action to appeal to the Merit Systems Protection Board. 5 U.S.C.

23   §§ 7512, 7513(d); *see also* 5 U.S.C. § 1204 (delineating functions of the Board). The Civil Service

24   Reform Act of 1978 excluded reductions in force from the definition of "adverse action" appealable

25   to the Board. 5 U.S.C. § 7512(B); 5 C.F.R. § 752.401(b)(3). However, per federal regulations

26   issued by OPM, employees who have been furloughed, separated or demoted by a reduction in force

27

28

United States District Court
Northern District of California

1   can appeal to the Board. 5 C.F.R. § 351.901.[11]  Judicial review of final orders of both the Authority

2   and the Board is available at circuit courts. 5 U.S.C. §§ 7703, 7123(a).

3        Defendants' opposition cites to courts across the country that have begun to address this

4   question in the context of similar claims. On February 12, 2025, a District of Massachusetts court

5   declined to enjoin enforcement of the deadline for opting into a deferred resignation program. *Am.

6   Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *1-3 (D.

7   Mass. Feb. 12, 2025). The court determined the plaintiff unions lacked standing and that the claims

8   were precluded by the Federal Service Labor-Management Relations Statute and the Civil Service

9   Reform Act of 1978, which establish "exclusive procedures for disputes involving employees and

10   their federal employers and disputes between unions representing federal employees and the federal

11   government." *Id.*

12        In a February 20, 2025 ruling, a D.C. district court denied a temporary restraining order and

13   preliminary injunction because it found that the union plaintiffs were precluded by the Federal

14   Service Labor-Management Relations Statute under *Thunder Basin*. *Nat'l Treasury Emps. Union

15   v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025). There, the

16   plaintiffs sought to prevent the termination of probationary employees, anticipated large-scale RIFs,

17   and any renewal of deferred resignation programs. *Id.* at *1. The court determined that the unions'

18   claimed injuries—financial harm and loss of bargaining power—could be meaningfully reviewed

19   through the Federal Labor Relations Authority, even though that body could not resolve the unions'

20   constitutional claims. *Id.* at *6-7. The constitutional question could be revived in an appeal of the

21   Federal Labor Relations Authority's decision. *Id.* at * 7.

22        The next day, February 21, 2025, another D.C. district court rejected the injunctive relief

23   requested by two employee unions that sought to pause the administration's attempt to dismantle

24   the U.S. Agency for International Development. *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-

25   352 (CJN), 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025). The court held that while "at a high

26

27        [11] As defendants' TRO opposition noted, some employees may be precluded from appealing

28   to the Board under the terms of their collective bargaining agreements. TRO Opp'n at 9 n.4.

United States District Court
Northern District of California

1    level of generality and in the long run, plaintiffs' assertions of harm could flow from their

2    constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," the court

3    noted that "the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking

4    injunctive relief flow essentially from their members' existing employment relationships with

5    USAID." *Id.* at *7. The court held that the Federal Service Labor-Management Relations Statute,

6    the Civil Service Reform Act, and the Foreign Service Act of 1980 indicated that Congress intended

7    for these types of claims to be channeled first to the administrative review offered by those statutory

8    schemes. *Id.* at *8-10. The court noted that the Foreign Service Act's scheme was "even broader"

9    than the other two and reasoned that "plaintiffs have presented no irreparable harm they or their

10   members are *imminently* likely to suffer from the hypothetical future dissolution of USAID" absent

11   immediate judicial review. *Id.* The court concluded that it likely lacked jurisdiction, so plaintiffs

12   were unlikely to succeed on the merits of their claims. *Id.* at *11.

13   All three of the above opinions relied on *American Federation of Government Employees,*

14   *AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). In that case, federal employee unions challenged

15   executive orders regarding federal labor-management relations from President Trump's first term.

16   *Id.* at 753. The orders directed federal agencies to remove certain subjects from labor negotiations,

17   limit the time employees could spend on union affairs during their workday, and exclude disputes

18   over for-cause terminations from grievance proceedings. *Id.* The appellate court determined that

19   the unions' claims—some of which asserted that the Executive Orders violated the Federal Service

20   Labor-Management Relations Statute itself—must be channeled first to the Federal Labor Relations

21   Authority. *Id.* at 753-54, 761.

22   More recently, on April 22, 2025, in a case involving the administration's attempt to

23   dismantle the U.S. Agency for Global Media, the district court held that a conclusion that the claims

24   at issue "boiled down to a quotidian employment dispute . . . would ignore the facts on the record

25   and on the ground." *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *11

26   (D.D.C. Apr. 22, 2025). The district court determined that the administrative tribunals "have no

27   jurisdiction to review the cancelation of congressional appropriations" and that the case involved

28   administrative and constitutional law issues, separate from federal employment questions. *Id.* at

21

United States District Court
Northern District of California

1  \*11 n.22.  On appeal, however, a majority opinion from the D.C. Circuit determined that "[t]he

2  'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be

3  packaged together and 'laid before the courts for wholesale correction under the APA.'"

4  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at \*3 (D.C. Cir. May 3, 2025) (citation

5  omitted).

6  Finally, Judge Alsup of this district found that federal employee unions' challenge to the

7  OPM directive to agencies to terminate probationary employees should not be precluded based on

8  the *Thunder Basin* analysis.  *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780-WHA,

9  2025 WL 900057 (N.D. Cal. Mar. 24, 2025).[12]  First, the court decided that the *ultra vires* and APA

10  claims in that case would not benefit from the administrative expertise of the Federal Labor

11  Relations Authority or the Merit Systems Protection Board.  *Id.* at \*2.  It also found the claims

12  collateral to the review authority of those agencies, because the claims challenged executive power,

13  not a specific personnel action.  *Id.* at \*3.  Lastly, it determined that the district court offered the

14  only opportunity for meaningful judicial review.  *Id.* at \*4-5.  The court noted that probationary

15  employees could not appeal a decision to the Merit Systems Protection Board and distinguished the

16  claims in this case from the bargaining-related issues sent to the Federal Labor Relations Authority

17  in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir.

18  2019).  *Id.*[13]

19

20  **A.    Federal Employee Union Plaintiffs**

21  The Court starts its analysis with the union plaintiffs.  The Court agrees with Judge Alsup in

22  this district that the D.C. Circuit's 2019 decision in *AFGE v. Trump* is not particularly helpful to

23  _____

24  [12] The district court reversed its earlier decision finding preclusion under *Thunder Basin*, upon further briefing.

25  [13] The preliminary injunction in Judge Alsup's case is currently on appeal.  On April 8, 2025, the Supreme Court granted the government's application for an emergency stay of the injunction

26  pending appeal, stating that the non-profit organization plaintiffs on whose claims the original injunction was based had not sufficiently shown standing.  *OPM v. AFGE*, --- S. Ct. ----, No.

27  24A904, 2025 WL 1035208, at \*1 (S. Ct. Apr. 8, 2025) (citing *Clapper*).  On return to the district court, the case proceeded and the court granted relief as to the claims of the plaintiff unions and the

28  State of Washington.

United States District Court
Northern District of California

1    resolving the claims channeling question here. In that case, the claims involved executive orders

2    that touched directly on matters related to collective bargaining, which are central to the purpose of

3    the Federal Labor Relations Authority. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929

4    F.3d at 753-54, 761. To the extent that other recent orders rely on the 2019 opinion, the Court

5    disagrees with their reasoning. Here, the claims are far afield from the central concerns of the

6    Federal Labor Relations Authority, *see* 5 U.S.C. § 7105(a)(2), instead touching on fundamental

7    questions of executive authority and separation of powers.

8          Defendants also cite two opinions from the Fourth Circuit and the D.C. Circuit that found it

9    likely that plaintiffs with similar claims to those here would ultimately be channeled to

10    administrative review schemes. TRO Opp'n at 24-25 (citing *Widakuswara v. Lake*, No. 25-5144,

11    2025 WL 1288817 (D.C. Cir. May 3, 2025); *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248,

12    2025 WL 1073657 (4th Cir. Apr. 9, 2025)); PI Opp'n at 7-8. When considering out-of-circuit

13    authority, the Court looks to its persuasive value. *See Jones v. PGA TOUR, Inc.*, 668 F. Supp. 3d

14    907, 917 (N.D. Cal. 2023). The Fourth Circuit offers no reasoning for its conclusion that the district

15    court lacked jurisdiction, and this Court finds the dissenting opinion in that case more robust and

16    more persuasive. The D.C. Circuit provides slightly more (two paragraphs) on the question of

17    jurisdiction, but again the dissenting judge in that case centered the claims in the appropriate

18    context—the comprehensive dismantling of an entire agency—more concretely and persuasively

19    than the panel majority.

20          The Court now moves to its own application of *Thunder Basin*. Recognizing, as other courts

21    have, that the Federal Service Labor-Management Relations Statute and the Civil Service Reform

22    Act indicate an intent to limit jurisdiction in some instances, the Court turns to the second inquiry:

23    "whether the claims at issue are of the type Congress intended to be reviewed within the statutory

24    structure." *Free Enter. Fund*, 561 U.S. at 489 (internal quotation marks, brackets, and citation

25    omitted). The Court concludes the answer is no. To explain, the Court examines each of the three

26    *Thunder Basin* factors in turn, all of which favor a finding of subject matter jurisdiction.

27          First, precluding district court jurisdiction for the union plaintiffs at this time would foreclose

28    meaningful judicial review. Plaintiffs seek an opportunity to challenge "large-scale reductions in

1    force" happening rapidly across multiple agencies in the federal government.  In some offices or

2    agencies, nearly all employees are receiving RIF notices.  Defendants contend that plaintiffs must

3    take their concerns to what can be a prolonged administrative process and *then* appeal in order to

4    present their constitutional claim in federal court.  By that point, if they prevailed, they "would

5    return to an empty agency with no infrastructure" to support a resumption of their work.  *See*

6    *Widakuswara*, 2025 WL 1166400, at *11 n.22.

7         Defendants contend that *Thunder Basin* forecloses this line of argument but they overstate

8    the holding in that case.  *See* PI Opp'n at 8.  There, a mining company sought "pre-enforcement

9    injunctive relief" against a regulation that required the company to post union material or face a

10   penalty, arguing that the regulation conflicted with the National Labor Relations Act.  *Thunder*

11   *Basin*, 510 U.S. at 204-05.  The company also argued that it should not be channeled to the federal

12   Mine Act's comprehensive administrative review scheme because doing so would violate the

13   company's due process rights by forcing it to choose noncompliance and penalties or compliance

14   with an unlawful regulation.  *Id.* at 205.  In reviewing the statute, the Supreme Court found the Mine

15   Act "facially silent with respect to pre-enforcement claims" but ultimately held the company's

16   "statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals"

17   after administrative review.  *Id.* at 208-09, 215.  Importantly, however, the Court determined that

18   "neither compliance with, nor continued violation of, the statute will subject petitioner to a serious

19   prehearing deprivation."  *Id.* at 216.  In other words, the company would not suffer any serious harm

20   from having to go first through the administrative tribunal, because any penalty was only due after

21   exhausting appellate review.  *Id.* at 218.  Plaintiffs here face a very different situation.  They cannot

22   continue business as usual as they wind their way through the administrative scheme with the goal

23   of reaching an appellate court.  Rather, they face immediate and life-altering consequences in the

24   absence of prompt judicial review.

25        Second, the claims at issue here are wholly collateral to the review authority of the Federal

26   Labor Relations Authority and the Merit Systems Protection Board.  As noted above, this lawsuit

27   involves questions of constitutional and statutory authority and the separation of powers.  Federal

28   employees are simply the ones to suffer most immediately the collateral damage of the allegedly

United States District Court
Northern District of California

24

unlawful actions. In other words, "[t]he plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work of [their offices or agencies] and shutting [them] down." *See Widakuswara*, 2025 WL 1288817, at *8 (Pillard, J., dissenting). Moreover, employees' rights to appeal a RIF to the Merit Systems Protection Board come not directly from statute but from regulation. *See* 5 C.F.R. § 351.901;[14] *see also* 5 U.S.C. § 7512(B) (excluding reductions in force from the review provisions for "adverse actions"). When Congress did not directly specify Board review for reductions-in-force claims, it seems unlikely that Congress intended the Merit Systems Protection Board to be the *exclusive* avenue for such claims, let alone claims that involve broader questions about constitutional and administrative law. The same holds true for the Federal Labor Relations Authority—Congress desired that body's enabling statute to be interpreted "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b). There is nothing efficient about sending constitutional claims to a body that cannot decide them, only to wait for an opportunity to appeal.[15] *See Elgin*, 567 U.S. at 25 (Alito, J., dissenting) ("I doubt that Congress intended to channel petitioners' constitutional claims into an administrative tribunal that is powerless to decide them[.]").

Third, the claims here involve issues related to the appropriate distribution of authority to and within the executive branch, not the individual employee or labor disputes these two

---

[14] 5 U.S.C. § 7701 arguably provides *indirect* statutory authority with its rather circular proposition: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." Defendants argue that it does not matter whether the authority for Board review was direct or indirect. PI Opp'n at 8-9. The Court disagrees: when the question is about what Congress intended, it matters that Congress chose not to provide an administrative path to RIF challenges themselves.

[15] In *Elgin v. Department of Treasury*, the Supreme Court decided that there was no exception to Civil Service Reform Act exclusivity for constitutional challenges to federal statutes, in that case a statute that bars those who fail to register for the draft from federal employment. 567 U.S. 1, 12 (2012). The Court held that plaintiffs were obliged to wait to present their constitutional claim to the Federal Circuit after proceeding through the Merit Systems Protection Board. *Id.* at 21. However, the *Elgin* plaintiffs sought to vindicate their own personal rights to employment. Here, plaintiffs confront an issue much larger in scope: how to interpret the constitutional structure of the federal government. And while the *Elgin* plaintiffs were likely to have a job and an agency to return to in the event they eventually won their case after winding through two layers of administrative and judicial review, the same cannot be said in this case.

administrative bodies customarily handle. The heart of this case does not concern whether agencies followed established RIF regulations and procedures—subject matters within the administrative tribunals' expertise—but whether agencies were unlawfully instructed to initiate large-scale RIFs and reorganizations in the first place. As the Supreme Court has repeated, "agency adjudications are generally ill suited to address structural constitutional challenges." *Axon,* 598 U.S. at 195. Neither the Merit Systems Protection Board nor the Federal Labor Relations Authority have special expertise to bear on the questions in this suit.

## B.    Other Plaintiffs

The rest of the plaintiffs in this case, including the non-profit organizations, the local governments, and the unions in their capacity representing non-federal employees, do not have access to the Federal Labor Relations Authority or the Civil Service Reform Act. Even if the union plaintiffs should be channeled out of court—and this Court thinks they should not—the *Thunder Basin* factors weigh against claims channeling even more strongly when applied to these other plaintiffs. Defendants fail to show how the cases they cite—involving challenges by federal employees—support the channeling of constitutional and APA claims by non-federal employees, including federal contract workers, non-profit organizations on behalf of their members, or local governments. In *U.S. v. Fausto*, cited by both defendants and the *amici* states who filed a brief in support of defendants, the Supreme Court held that a type of employee that received lesser privileges in the Civil Service Reform Act was not entitled to district court review that was denied to employees with greater privileges under the Act, because holding otherwise would have flipped the structural logic of the Act. 484 U.S. 439, 448-49 (1988). But the Civil Service Reform Act says nothing at all about non-federal employee unions, non-profit organizations, or local governments. The Court is not persuaded that, when Congress created the Merit Systems Protection Board or the Federal Labor Relations Authority, it intended for constitutional and APA claims by these sorts of plaintiffs to be precluded from federal court. *See Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (in denying an emergency stay, finding the government had not shown it was likely to establish that Congress intended to channel claims

1    by non-profit organizations to the same administrative agencies).

2

3    **IV.    Analysis of the *Winter* Factors**

4         The Court now proceeds to the *Winter* factors, examining whether plaintiffs have established

5    they are likely to succeed on the merits, whether they are likely to suffer irreparable harm in the

6    absence of preliminary relief, if the balance of equities tips in their favor, and whether an injunction

7    is in the public interest. *See Winter*, 555 U.S. at 22.

8

9         **A.    Likelihood of Success on the Merits**

10         **1.    *Ultra Vires***

11         Plaintiffs' first and second claims for relief allege that President Trump, OMB, OPM, and

12   DOGE have violated the separation of powers and therefore acted *ultra vires* by ordering agencies

13   to engage in large-scale RIFs and reorganizations.  They challenge Executive Order 14210, the

14   OMB/OPM Memo, as well as any other actions and orders of OMB, OPM, and DOGE to implement

15   the President's Executive Order.

16         "When an executive acts *ultra vires*, courts are normally available to reestablish the limits

17   on his authority." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated and remanded*

18   *on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (quoting *Dart v. United States*,

19   848 F.2d 217, 223 (D.C. Cir. 1988)).  The ability to enjoin unconstitutional action by government

20   officials dates back to the courts of equity, "reflect[ing] a long history of judicial review of illegal

21   executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320,

22   327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72

23   L.Q. Rev. 345 (1956)).  Where the President exceeds his authority, the district court may declare the

24   action unlawful and an injunction may issue. *Sierra Club*, 963 F.3d at 891 (explaining that, in

25   *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), "The [Supreme] Court never

26   questioned that it had the authority to provide the requested relief.").

27

28

United States District Court
Northern District of California

### a.    Presidential Authority

Plaintiffs are likely to succeed on their claim that the President's Executive Order 14210 is *ultra vires*, as the President has neither constitutional nor, at this time, statutory authority to reorganize the executive branch.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.  And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute."  *Youngstown*, 343 U.S. at 587.

Article I of the U.S. Constitution vests in Congress the legislative power.  U.S. Const. art. I, § 1.  "To Congress under its legislative power is given the establishment of offices, [and] the determination of their functions and jurisdiction . . . ."  *Myers v. United States*, 272 U.S. 52, 129 (1926).  "Congress has plenary power over the salary, duties, *and even existence* of executive offices."  *Free Enter. Fund*, 561 U.S. at 500 (emphasis added).  While "[t]he President may create, reorganize, or abolish an office that *he* established," the Constitution does not authorize him "to enact, to amend, or to repeal statutes."  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (emphasis added); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

In 1952, the Supreme Court struck down an Executive Order by President Truman, who had ordered the Secretary of Commerce to seize most of the nation's steel mills to prevent strikes from halting steel production during the Korean War.  *Youngstown,* 343 U.S. at 582.  Although various statutes authorized the President to seize property under certain circumstances, none of the statutory conditions had been met, and so the President claimed the seizures were lawful pursuant to his constitutional authority.  In reviewing whether the district court's preliminary injunction to stop enforcement of the order was proper, the Supreme Court explained, "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."  *Id.* at 585.  Where President Truman lacked both constitutional and statutory authority to seize the steel mills, the Supreme Court affirmed the district court injunction.  *Youngstown* applies here.

1   Defendants do not claim that Executive Order 14210 issued under the President's constitutional

2   powers. *See* PI Opp'n at 14-18. Rather, they attempt to fit the President's actions into existing

3   statutory authority. Such statutory authority, however, is plainly lacking. The Ninth Circuit has

4   explained,

> Justice Jackson's *Youngstown* concurrence provides the operative test
> in this context:
>
>> When the President takes measures incompatible with
>> the expressed or implied will of Congress, his power
>> is at its lowest ebb, for then he can rely only upon his
>> own constitutional powers minus any constitutional
>> powers of Congress over the matter. Courts can sustain
>> exclusive presidential control in such a case only by
>> disabling the Congress from acting upon the subject.
>> Presidential claim to a power at once so conclusive and
>> preclusive must be scrutinized with caution, for what
>> is at stake is the equilibrium established by our
>> constitutional system.

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018) (quoting *Youngstown*,

343 U.S. at 637-38 (Jackson, J., concurring)).

As history demonstrates, the President may broadly restructure federal agencies only when

authorized by Congress. "Although the U.S. Constitution vests in Congress the authority to organize

the Executive Branch,[] former presidential administrations have asked Congress to grant expedited

government reorganization authority to execute cross-agency government reorganizations more

efficiently." S. Rep. No. 115-381, at 4 (2018). Since 1932, when President Hoover was the first

President to request and receive such reorganization authority, Congress has granted this authority

to nine different Presidents, both Republican and Democrat. *Id.*; John W. York & Rachel Greszler,

*A Model for Executive Reorganization*, Heritage Found. Legal Memorandum No. 4782, at 3 (Nov.

3, 2017), available at: https://www.heritage.org/sites/default/files/2017-11/IB4782.pdf

[https://perma.cc/59KD-JVU5] (hereinafter, "Heritage Found. Legal Memorandum No. 4782").

According to a Senate Report issued during President Trump's first term in office, "[b]etween 1932

and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were

implemented and 33 were affirmatively rejected by Congress." S. Rep. No. 115-381, at 4 (2018).

The most recent statutory authorization for a President to conduct a governmental reorganization

United States District Court
Northern District of California

1    expired December 31, 1984.  *See* 5 U.S.C. § 905(b); Henry B. Hogue, Cong. Rsch. Serv., R44909,

2    *Executive Branch Reorganization* 6-7 & n.23 (2017) (hereinafter, "CRS R44909").

3         The brief of *amicus curiae* Constitutional Accountability Center recounts the long history of

4    Congress exercising its "power to restructure and abolish federal agencies as it finds necessary . . . ."

5    Dkt. No. 51-1 at 6-9.  Defendants' TRO opposition brief also recounts this long history, which

6    supports the proposition that large-scale reorganization of the federal agencies stems from a long-

7    standing partnership between the executive and legislative branches.  *See* TRO Opp'n at 5-6 (citing,

8    *inter alia*, 19 Stat. 169; 37 Stat. 413; the Veterans' Preference Act of 1944; the Federal Employee

9    Pay Act of 1945; the 1966 recodification and amendment of the Veterans' Preference Act of 1944).

10        The last time Congress gave the President reorganization authority demonstrates what

11   Congress considered to be a "reorganization."   In 5 U.S.C. § 902, Congress defined a

12   "reorganization" as "a transfer, consolidation, coordination, authorization, or abolition, referred to

13   in section 903 of this title."   Section 903 then specified what a reorganization plan might entail,

14   including:

15            (1) the transfer of the whole or a part of an agency, or of the whole or
             a part of the functions thereof, to the jurisdiction and control of
16           another agency;

17            (2) the abolition of all or a part of the functions of an agency, except
             that no enforcement function or statutory program shall be abolished
18           by the plan;

19            (3) the consolidation or coordination of the whole or a part of an
             agency, or of the whole or a part of the functions thereof, with the
             whole or a part of another agency or the functions thereof;

20            (4) the consolidation or coordination of part of an agency or the
21           functions thereof with another part of the same agency or the
             functions thereof;

22            (5) the authorization of an officer to delegate any of his functions; or

23            (6) the abolition of the whole or a part of an agency which agency or
             part does not have, or on the taking effect of the reorganization plan
24           will not have, any functions.

25   5 U.S.C. § 903.  As noted above, the President's authority to submit a reorganization plan to

26   Congress under this chapter expired in 1984.  *See id.* § 905(b).  Since Congress first enacted this

27   statute in 1966, Congress extended the deadline for presidential reorganization plans several times

28   but has not done so again since 1984.  *See* Pub. L. No. 89-554, 80 Stat. 378, 396 (1966); Pub. L. No.

91-5, 83 Stat. 6 (1969); Pub. L. No. 92-179, § 4, 85 Stat. 576 (1971); Pub. L. No. 95-17, § 2, 91 Stat. 29, 32 (1977); Pub. L. No. 96-230, 94 Stat. 329 (1980); Pub. L. No. 98-614, 98 Stat. 3192 (1984).

In recent history, the congressional check on executive reach has stopped Democratic and Republican presidents alike from restructuring federal agencies. Presidents George W. Bush, Barack Obama, and Donald Trump (in his first term) all sought but did not receive Congressional approval to reorganize the executive branch. CRS R44909 at 7; H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018). Indeed, during the first months of his first term in office, President Trump attempted a large-scale reorganization of federal agencies when he issued Executive Order 13781, entitled, "Comprehensive Plan for Reorganizing the Executive Branch." *See* 82 Fed. Reg. 13959 (Mar. 16, 2017). That order called for agency heads to submit plans within 180 days "to reorganize the agency, if appropriate, in order to improve the efficiency, effectiveness, and accountability of that agency." *Id.* The accompanying legislation, however, died in Congress. *See* H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018).

The simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial: constitutional commentators and politicians across party lines agree that "sweeping reorganization of the federal bureaucracy requires the active participation of Congress." *See* Heritage Found. Legal Memorandum No. 4782 at 1-2; *see also* Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Found. Legal Memorandum No. 210, at 1 (July 12, 2017), available at: https://www.heritage.org/political-process/report/the-presidents-reorganization-authority [https://perma.cc/2T7K-H6EY] (". . . to accomplish major reorganization objectives, [the President] will need explicit statutory authority from Congress . . ."); Ronald C. Moe, Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority: Review and Analysis* 2 (2001) ("It is Congress, through law, that determines the mission of agencies, personnel systems, confirmation of executive officials, and funding, *and ultimately evaluates whether the agency shall continue in existence*.") (emphasis added). As conservative former government officials and advisors note in their *amicus* brief, House Representative James Comer (R-Kentucky) has introduced the Reorganizing Government Act of 2025. *See* Dkt. No. 69-

United States District Court
Northern District of California

1   1 at 3 n.3 (citing H.R. 1295, 119th Cong. (2025)).  The bill would allow "Congress to fast-track

2   President Trump's government reorganization plans by renewing a key tool to approve them swiftly

3   in Congress."  Press Release, House Committee on Oversight and Government Reform, Chairman

4   Comer and Senator Lee Introduce Bill to Fast-Track President Trump's Government Reorganization

5   Plans (Feb. 13, 2025), https://oversight.house.gov/release/chairman-comer-and-senator-lee-

6   introduce-bill-to-fast-track-president-trumps-government-reorganization-plans/

7   [https://perma.cc/3XSV-TKWL].  The bill contemplates that the President must partner with

8   Congress on a government reorganization effort, acknowledging that presidential "reorganization

9   authority . . . was last in effect in 1984[.]" *Id.*

10        In their brief, defendants assert that judicial review of the Executive Order is unavailable,

11   citing *Dalton v. Specter*, 511 U.S. 462, 470 (1994).[16]  PI Opp'n at 12; TRO Opp'n at 34.  The facts

12   of *Dalton* could not be more different from the scenario here.  In *Dalton*, the Supreme Court held

13   that judicial review of the President's decision is unavailable "[w]here a statute . . . commits

14   decisionmaking to the discretion of the President."  511 U.S. at 476-77.  At issue in *Dalton* was a

15   decision by the President to close the Philadelphia Naval Shipyard, pursuant to the Defense Base

16   Closure and Realignment Act of 1990.   The Act provided for the Secretary of Defense, following

17   notice and public comment, to prepare closure recommendations, which then went to Congress and

18   to an independent commission, which then held public hearings and prepared a report, which then

19   went to the President for approval, following which Congress then could enact a joint resolution of

20   disapproval.  *Id.* at 464-65.  As discussed further below regarding the APA claims, nothing close to

21   this level of procedure has occurred here, at least as far as the record shows.  More importantly,

22   *Dalton* challenged Presidential action taken pursuant to statutory authority that Congress delegated

23   to the President.  Thus, defendants misread plaintiffs' *ultra vires* theory against President Trump.

24   Plaintiffs' claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs

25

---

26       [16] Defendants appear to conflate the *ultra vires* and APA claims, arguing that President
   Trump is not subject to the APA and that his Executive Order is not reviewable under APA

27   standards.  *See* TRO Opp'n at 34.  However, plaintiffs do not sue President Trump under the APA,
   and the APA claims challenge the carrying out of the Executive Order by OPM, OMB, DOGE, and

28   the federal agency defendants but do not challenge the Executive Order itself as violating the APA.

United States District Court
Northern District of California

1  claimed.  Instead, Claim One is about the President acting without *any* authority, constitutional or

2  statutory.

3  Nor is the Court persuaded that the President's authority derives from a right articulated in

4  *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), as defendants claim.  *See* PI Opp'n at 13.  That case

5  examined the scope of presidential immunity from a lawsuit for damages brought by a former Air

6  Force analyst who lost his job during a departmental reorganization.  In deciding whether the

7  President should be immune from such suits, the Supreme Court explained, "It clearly is within the

8  President's constitutional and statutory authority to prescribe the manner in which the Secretary will

9  conduct the business *of the Air Force*.  See 10 U.S.C. § 8012(b).[17]  Because this mandate of office

10  must include the authority to prescribe reorganizations and reductions in force, we conclude that

11  petitioner's alleged wrongful acts lay well within the outer perimeter of his authority."  *Fitzgerald*,

12  457 U.S. at 757 (emphasis added).  The reorganization and RIF authority referenced in the case,

13  therefore, was derivative of the President's military authority.  No President in the 40-plus years

14  since *Fitzgerald* has used that case to justify reorganizing federal agencies more broadly.[18]

15  As a group of conservative former government officials and advisors have written to the

16

17  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

18  [17] This statute is now codified at 10 U.S.C. § 9013(g).  *See* Pub. L. No. 99-433, Title V, § 521(a)(3), 100 Stat. 1055, § 8013 (1986); Pub. L. No. 115-232, Div. A, Title VIII, § 806(c), 132 Stat. 1833 (2018).

19  [18] Defendants further argue that in the 1990s the Clinton Administration engaged in "large-

20  scale Presidentially-directed RIFs[.]" PI Opp'n at 14 (citing 5 U.S.C. § 3502; TRO Opp'n at 5-11).  This misstates history.  Defendants rely on President Clinton's *Executive Order 12839—*

21  *Reduction of 100,000 Federal Positions*, which issued the month after he took office.  But that Executive Order says nothing about RIFs.  Rather, it states that "positions shall be vacated through

22  attrition or early out programs established at the discretion of the department and agency heads."  Exec. Order 12839, § 1, 58 Fed. Reg. 8515 (Feb. 12, 1993); *see also* House Rep. 103-386,

23  *available at* 1994 U.S.C.C.A.N. 49, 52 (Nov. 19, 1993) (stating that the OMB bulletin on implementing Executive Order 12839 "specified that neither it [the bulletin] nor the Executive Order

24  authorized special early out programs or required agencies to undergo reductions-in-force.").

Moreover, this Court cannot ignore the issues of scale and timing.  Executive Order 12839

25  directed that agencies "shall eliminate not less than 4 percent of its civilian personnel positions . . . over the next 3 fiscal years."  Exec. Order 12839 § 1.  One of the questions to be litigated in this

26  case, and which will require further development of the factual record, is whether the RIFs here are so extensive that they essentially "eliminate" Congressionally-created agencies or prevent those

27  agencies from fulfilling their statutory mandates.  A related but separate question will be whether defendants' actions were taken so hastily as to constitute arbitrary and capricious action under the

28  APA.

United States District Court
Northern District of California

1   Court, "Unchecked presidential power is not what the Framers had in mind. . . .  By proclaiming

2   and implementing Executive Order 14210, the President has usurped for himself the power to

3   restructure entire federal agencies, which can only be accomplished through the constitutionally

4   mandated collaboration between the President and Congress."  Dkt. No. 69-1 at 1.  Defendants

5   themselves state in their brief: "[A]n officer may be said to act *ultra vires* 'only when he acts without

6   any authority whatever.'"  TRO Opp'n at 44 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*,

7   465 U.S. 89, 101-02 n.11 (1984) (internal quotation marks omitted)).  This is precisely what

8   plaintiffs here have alleged.

9

10              **b.     Authority of OPM, OMB, and DOGE**

11          Plaintiffs also assert that the actions by OPM, OMB, and DOGE in implementing the

12   Executive Order are *ultra vires* and therefore unlawful.  Plaintiffs argue that none of these defendants

13   "possesses authority to order agencies to reorganize, to engage in 'large-scale' RIFs, or to usurp the

14   decision-making authority delegated by Congress."  TRO Mot. at 35.

15

16          **OPM:** The question of whether the President, acting without Congress, may engage in *en*

17   *masse* termination of rank-and-file employees was recently litigated in a case involving the

18   termination of probationary employees at numerous federal agencies.  In issuing a temporary

19   restraining order, Judge Alsup of this district found plaintiffs likely to succeed on their *ultra vires*

20   claim, explaining, "No statute — anywhere, ever — has granted OPM the authority to direct the

21   termination of employees in other agencies."  *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-

22   cv-1780-WHA, 2025 WL 660053, at *4 (N.D. Cal. Feb. 28, 2025).[19]  Rather, as laid out in statute,

23   "Each Executive agency . . . may employ such number of employees of the various classes

24   recognized by chapter 51 of this title [regarding classification] as Congress may appropriate for

25   from year to year."  5 U.S.C. § 3101.  With regard to OPM in particular, Congress vested the Director

26   of OPM with a number of functions, none of which include the termination of employees from, or

27

28          [19] The preliminary injunction in Judge Alsup's case is currently on appeal.

1   the restructuring of, other federal agencies outside of OPM.  *See* 5 U.S.C. § 1103(a).  In the

2   probationary employee case, "OPM concede[d] that it lacks the authority to direct firings outside of

3   its own walls . . . ."  *Am. Fed'n of Gov't Emps.,* 2025 WL 660053, at *5.

4        Defendants cite a host of statutes and regulations that they assert provides OPM with the

5   authority to issue the OMB/OPM Memo.  *See* PI Opp'n at 19.  Upon review of the laws cited, the

6   Court finds that none support the authority that OPM now claims.  By contrast, 5 C.F.R. § 351.201

7   specifies that "*[e]ach agency* is responsible for determining the categories within which positions

8   are required, where they are to be located, and when they are to be filled, abolished, or vacated."  5

9   C.F.R. § 351.201(a)(1) (emphasis added).

10

11        **OMB:**  Housed within the Executive Office of the President, OMB, like OPM, has its

12   functions laid out in statute.  *See* 31 U.S.C. §§ 501-507.  None of the statutes authorize OMB to

13   terminate employees outside of OMB or to order other agencies to downsize, nor do defendants

14   point to any such authority in their brief.  *See also Nat'l Council of Nonprofits*, 2025 WL 597959,

15   at *15 ("the structure and provisions of Section 503 strongly suggest that OMB occupies an

16   oversight role" and 31 U.S.C. § 503(a)(5) "further indicates that OMB's role is mainly supervisory,

17   rather than directly active").  Defendants cite only to 31 U.S.C. § 503(b), which empowers the

18   Deputy Director to "establish general management policies for executive agencies and perform . . .

19   general management functions[.]"  *See* PI Opp'n at 19.  Nothing in that subsection remotely

20   authorizes the level of direction over other agencies that plaintiffs challenge here.

21

22        **DOGE:** As plaintiffs rightly note, DOGE "has no statutory authority at all."  TRO Mot. at

23   37.  DOGE was created by Executive Order out of the United States Digital Service and is housed

24   in the Executive Office of the President.  *See* Exec. Order No. 14158.  DOGE therefore could not

25   have been acting pursuant to statutory authority in ordering large-scale RIFs and reorganizations of

26   the workforces at the defendant federal agencies.

27                                    * * *

28        In sum, no law gives OPM, OMB, or DOGE the authority to direct other federal agencies to

United States District Court
Northern District of California

1    engage in large-scale terminations, restructuring, or elimination of that agency itself. Such action

2    far exceeds the bounds of any authority that Congress vested in OPM or OMB, and, as noted, DOGE

3    has no statutory authority whatsoever. "[A]n agency literally has no power to act . . . unless and

4    until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

5

6                          **c.        The Challenged Executive Actions**

7            Having examined whether the President and OPM, OMB, and DOGE have authority to direct

8    other federal agencies to conduct large-scale RIFs and reorganizations, the Court now turns to the

9    executive actions challenged in this case: Executive Order 14210, the OMB/OPM Memo, and other

10   implementation steps by OMB, OPM, and DOGE.

11           In defendants' interpretation, there is no unlawful action here because the President did not

12   order the agencies to take any specific actions, and OMB and OPM were merely providing guidance

13   about how agencies should conduct RIFs. Defendants would have the Court look only to the

14   Executive Order and the OMB/OPM memo, arguing that "no factual development is necessary to

15   resolve Plaintiffs' preliminary injunction motion." PI Opp'n at 3; *see also id.* at 15 n.7 ("But there

16   is no factual dispute the Court needs to resolve.").

17           The evidence plaintiffs have presented tells a very different story: that the agencies are acting

18   at the *direction* of the President and his team. At this stage, the Court has now reviewed *in camera*

19   the ARRPs from four of the federal agency defendants.[20] Those plans support plaintiffs' contention

20   that the agencies' understanding is that OMB/OPM "approval," whether formal or otherwise, is a

21   necessary triggering step in the agencies' current RIF and reorganization processes. Other evidence

22   in the record supports this. For instance, an official at the Department of Labor attributes the RIF

23   to Executive Order 14210, citing section 3(c) of that order specifically. Dkt. No. 70-2 ("Decl.

24   Gamble AFGE ISO Reply") ¶ 6, Ex. B. Plaintiffs have come forward with evidence that some of

25   the federal agency defendants have been pressured to institute RIFs on a larger scale than what the

26   ────────────────────

27       [20] The Court will not disclose the specific contents of the ARRPs while defendants' motion
     for a protective order remains pending. *See* Dkt. No. 88.

28

United States District Court
Northern District of California

agencies themselves initially sought to do in their plans. *See* Dkt. No. 36, Ex. 1 (April 29 news article that OMB deemed NLRB's proposed cuts to be inadequate); Decl. Soriano NSF ¶¶ 8-14 (reports that OMB, OPM, and DOGE rejected NSF's phase 1 ARRP that lacked large-scale RIFs and directed large-scale RIFs instead); Decl. Daly AFSCME ¶ 24 (OMB rejected AmeriCorps' mid-March ARRP that did not recommend RIFs).   In interpreting the Executive Order and the OMB/OPM Memo, the Court cannot ignore the evidence showing that agencies have received extrinsic instructions on how to interpret and respond to these documents.

Moreover, while defendants go to lengths to focus on the "RIF" side of what is happening, the factual record indicates the RIFs are not easily separated from the reorganization.  Defendants argue that "federal law expressly permits RIFs, the governing statute expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century." TRO Opp'n at 35.  Maybe so.  But the RIFs at issue here appear inextricably intertwined with broad agency reorganization, which the President undoubtedly cannot undertake without Congress.  Indeed, when arguing that agencies are making their final ARRPs public, defendants point to a press release where Secretary of State Marco Rubio announces "a comprehensive reorganization plan."  *See* PI Opp'n at 5 n.3; Marco Rubio, *Building an America First State Department*, U.S. Department of State, Apr. 22, 2025, https://www.state.gov/building-an-america-first-state-department [https://perma.cc/MV3Z-6GX5]; *see also* Dkt. No. 37-20 ("Decl. Hunter AFGE") Ex. I (department fact sheet linking reorganization and RIFs).  Defendants' proposition that RIFs can be conducted for reasons such as a "lack of work" or "shortage of funds" is irrelevant when they provide no evidence to suggest those were the reasons for the RIFs at issue here.  *See* PI Opp'n at 16-17.  The OMB/OPM Memo, as plaintiffs note, "confirmed the RIFs were for the purpose of reorganization: they required agencies to combine these in the same document."  PI Mot. at 13 (citing OMB/OPM Memo).  The memo requires ARRPs be submitted in two "phases": Phase 1 for "initial agency cuts and reductions" and Phase 2 for "more productive, efficient agency operations going forward." OMB/OPM Memo at 3-4.  Or, as plaintiffs observe: "OMB and OPM ordered federal agencies to conduct RIFS *first*, and then arrange the pieces of what remains of these agencies." PI Mot. at 4.

1  Even looking to the text of the Executive Order and the OMB/OPM Memo, as defendants

2 encourage this Court to do, these documents are not so permissive as defendants claim. The

3 Executive Order mandates that "Agency Heads *shall* promptly undertake preparations *to initiate*

4 *large-scale reductions in force* (RIFs), consistent with applicable law," including submitting plans

5 that "shall discuss whether the agency or any of its subcomponents should be eliminated . . . ." Exec.

6 Order 14210 § 3(c), (e) (emphasis added). The Executive Order directs agencies to prioritize RIFs

7 of "[a]ll offices that perform functions not mandated by statute or other law[,]" regardless of any

8 impact on the agency's overall ability to perform its required functions. And the order directs

9 prioritization of RIFs of "all agency initiatives, components, or operations that *my* Administration

10 suspends or closes." *Id.* § 3(c) (emphasis added). In other words, the President will suspend or

11 close agency operations, and that agency must then be prioritized for a RIF.[21] The Executive Order

12 also gives OPM the authority to "grant exemptions from this order," undercutting defendants'

13 argument that OPM's role is merely advisory. *See* Exec. Order 14210 § 4(c).

14  The OMB/OPM Memo interprets Executive Order 14210 as a directive. It states that the

15 Executive Order "*directed* agencies to 'eliminat[e] waste, bloat, and insularity[;]'" that "President

16 Trump *required* that 'Agency Heads shall promptly undertake preparations to initiate large-scale

17 reductions in force (RIFs) . . .[;]'" and that "President Trump also *directed* that, **no later than March

18 13, 2025,** agencies develop Agency Reorganization Plans." OMB/OPM Memo at 1 (italics added).

19 The memo states, "Pursuant to the President's direction, agencies should focus on the maximum

20 elimination of functions that are not statutorily mandated . . . ." *Id.* at 2. The memo specifies, "Each

21 agency *will submit* a Phase 1 ARRPs [sic] to OMB and OPM *for review and approval* **no later than

22 March 13, 2025.**" *Id.* at 3 (italics added); *see also id.* at 4 (agencies shall submit Phase 2 ARRP "to

23 OMB and OPM for review and approval" by April 14). "Phase 1 ARRPs *shall* focus on initial

24 agency cuts and reductions." *Id.* at 3 (emphasis added). "Phase 2 plans *shall* outline a positive

25 vision for more productive, efficient agency operations going forward[,]" with Phase 2 to "be

26 planned for implementation by September 30, 2025." *Id.* at 4 (emphasis added). The Memo further

27

28  [21] On the present record, this appears to be what is happening. *See* Decl. Gamble AFGE ISO Reply ¶¶ 4-6, Ex. B.

United States District Court
Northern District of California

1    instructs that "agencies or components that provide direct services to citizens (such as Social

2    Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB

3    and OPM certify that the plans will have a positive effect on the delivery of such services." *Id.* at

4    3, 6.  Thus, for some of the federal agency defendants, such as the Social Security Administration,

5    the memo explicitly instructs that the agencies cannot implement proposed plans without OMB and

6    OPM approval.  Defendants' position that the memo simply "provides high-level guidance, setting

7    forth principles" for what the ARRPs should seek to do, *see* PI Opp'n at 18, is belied by the

8    mandatory nature of what the memo actually instructs.  Like other directives from the current

9    administration, the Court finds the memo "amounted to a command, not a suggestion."  *See New*

10   *York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025).

11           Defendants also argue that the Executive Order and OMB/OPM Memo are lawful because

12   they tell agencies to comply with the law.  This argument falls short on three grounds.  First, the

13   Court need not give the savings clauses in the Executive Order and OMB/OPM Memo the weight

14   defendants attribute to them.  As defendants note in their papers, "[a] consistent-with-law provision

15   does not categorically immunize an Executive Order or similar directive from review."  TRO Opp'n

16   at 40.  The Ninth Circuit, in considering "whether, in the absence of congressional authorization,

17   the Executive Branch may withhold all federal grants from so-called 'sanctuary' cities and

18   counties[,]" rejected the government's argument that the words "consistent with law" saved an

19   otherwise unlawful Executive Order.  *San Francisco*, 897 F.3d at 1231, 1239-40.    The court

20   explained, "'It is a commonplace of statutory construction that the specific governs the general[,]' .

21   . . [and t]he Executive Order's savings clause does not and cannot override its meaning." *Id.* at 1239

22   (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).  Like the

23   Ninth Circuit in the "sanctuary cities" case, this Court is not persuaded by the government's reliance

24   on *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir.

25   2002).  *See* PI Opp'n at 17.  "*Allbaugh* is distinguishable.  Because the Executive Order

26   unambiguously commands action, here there is more than a 'mere possibility that some agency

27   might make a legally suspect decision.'" *See San Francisco*, 897 F.3d at 1239-40 (citing *Allbaugh*,

28   295 F.3d at 33).  Likewise here, the mandatory language of the Executive Order, and of the

Add.711 [39]

1   OMB/OPM Memo interpreting it, create more than a mere possibility of unlawful action if the

2   federal agencies do the large-scale RIFs and reorganizations that are commanded.

3          Second, the Court is not convinced that a directive to respect statutory mandates is a message

4   the agencies have actually received, as the scale of workforce terminations raise significant

5   questions about some agencies' or sub-agencies' capacities to fulfill their statutory missions.  For

6   example, it appears the Department of Health and Human Services is planning to practically wipe

7   out the National Institute for Occupational Safety and Health, an office established by Congress.

8   Decl. Niemeier-Walsh AFGE ¶ 28 ("my understanding is that approximately 93% of NIOSH

9   employees have received RIF notices"); Pub. L. No. 91-596 § 22, 84 Stat. 1590, 1612 (1970).  The

10  cuts to AmeriCorps have reduced agency staff from more than 700 to around 150, a number so small

11  that those remaining cannot fulfill the agency's statutory duties.  Decl. Daly AFSCME ¶¶ 25, 30-

12  31.  Other agencies have plans to reduce staff by 50% or more, a level that raises serious questions

13  about their ability to fulfill the responsibilities Congress has bestowed upon them.  And it is

14  understandable that agencies have interpreted the directives from the President and OMB, OPM,

15  and DOGE to require these cuts when President Trump has made public statements about the federal

16  workforce such as: "obviously, they're paying millions of people that shouldn't be paid" and "It is

17  the policy of my Administration . . . to commence the deconstruction of the overbearing and

18  burdensome administrative state."  *See* TRO Mot. at 1 n.1 (citing Remarks by President after

19  Executive Order Signing, The White House (Feb. 18, 2025); Exec. Order No. 14219, 90 Fed. Reg.

20  10583 (Feb. 19, 2025)); *cf. San Francisco*, 897 F.3d at 1238 ("consideration of those statements

21  suggests that the Administration's current litigation position is grounded not in the text of the

22  Executive Order but in a desire to avoid legal consequences").

23          Third, even if agencies consider all their organic statutory mandates, the executive branch

24  still cannot reorganize at this scale without authority from Congress.  What plaintiffs allege—and

25  what defendants have so far failed to refute—is that Executive Order 14210 and the

26  OMB/OPM/DOGE actions to implement it reach so broadly as to exceed what the President can do

27  without Congress.  In the last presidential reorganization law, Congress defined executive branch

28  reorganizations as including transfers of functions between agencies, abolition of some functions of

United States District Court
Northern District of California

(716 of 726), Page 716 of 726

1  an agency, and consolidations of different components within or between agencies.  *See* 5 U.S.C.

2  § 903.  Based on the Court's review of plaintiffs' evidence and the submitted ARRPs, these acts are

3  taking place now, following direction from the Executive Order and the OMB/OPM Memo.  This is

4  not an instance of the President using his "inherent authority to exercise 'general administrative

5  control of those executing the laws,'" *see* TRO Opp'n at 4, because Congress has passed no agency

6  reorganization law for the President to execute.  Congress may choose to do so.  But as of today,

7  Congress has not.[22]

8       The Court finds plaintiffs have shown a likelihood of success on the merits of Claim One,

9  which alleges that Executive Order 14210 usurps Congress's Article I powers and exceeds the

10  President's lawful authority.  Plaintiffs are also likely to succeed on the merits of their *ultra vires*

11  claims (Claim Two) against OPM, OMB, DOGE, and their Directors.

12

13            **2.      APA Claims**

14       Plaintiffs also challenge, as violative of the APA: the OMB/OPM Memo; OPM and OMB's

15  approvals of specific agencies' ARRPs; and "DOGE's directives to specific agencies requiring cuts

16  to programs and staffing[.]"  TRO Mot. at 37-38.  Plaintiffs' Third through Seventh Claims assert

17  violations of the Administrative Procedure Act against OMB, OPM, DOGE, and their directors,

18  under 5 U.S.C. § 706(2)(A), (C), and (D), and against the federal agency defendants, under 5 U.S.C.

19  § 706(2)(A) and (C).

20       The APA provides, in relevant part, that

21            The reviewing court shall--

22            . . . **(2)** hold unlawful and set aside agency action, findings, and
              conclusions found to be--

23

24       ───────────────
         [22] *Amici* the State of Montana et al. filed a brief in support of defendants.  Dkt. No. 71-1.

25  They argue, among other things, that "Article II provides the President with broad authority to
    manage the federal workforce. . . , and the courts have recognized it for more than two centuries

26  except in limited circumstances not relevant here."  *Id.* at 3 (citing *Trump v. United States*, 603 U.S.
    593, 609 (2024)).  However, a closer read of the cited decision shows that the removal power at

27  issue involved "executive officers of the United States *whom he has appointed*."  *See Trump*, 603
    U.S. at 609 (emphasis added).  The removal of Presidentially-appointed officers is simply not at

28  issue in this case.

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . .

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law; . . . .

5 U.S.C. § 706(2).

### a.        Final Agency Action

The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Because plaintiffs do not allege that any action here was made reviewable by statute, the threshold question is whether the challenged actions constitute "final agency action." If not, this Court is without subject matter jurisdiction to decide the APA claim. *See San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 580 (9th Cir. 2017).

The Supreme Court has explained that "two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process . . . —it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). The Supreme Court has "long taken" a "pragmatic approach" to the question what constitutes final agency action. *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

The record presently before the Court indicates that the challenged actions are final agency actions under the APA. While the ultimate impacts of the RIFs may yet be unknown (in part due to defendants' refusal to publicize the ARRPs), and while certain ARRPs may still be awaiting OMB/OPM approval, nowhere do defendants assert that the OMB/OPM Memo itself is subject to change or is in draft form. These actions—the issuance of the OMB/OPM Memo and the approvals of the ARRPs—are done and final. *See San Francisco Herring Ass'n*, 946 F.3d at 578 ("The Park Service does not suggest it is still in the middle of trying to figure out its position on whether it has

United States District Court
Northern District of California

1    jurisdiction over the waters [at issue] . . .").  An agency engages in "final" action, for instance, when

2    it "state[s] a definitive position in formal notices, confirm[s] that position orally, and then send[s]

3    officers out into the field to execute on the directive." *Id.* at 579.

4        So have OMB, OPM, DOGE, and their directors done here.  The OMB/OPM Memo required

5    agencies to submit Phase 1 ARRPs by March 13 and Phase 2 ARRPs by April 14.  As alleged, the

6    ARRPs "are only effectuated by OMB and OPM (and DOGE) approval."  Amended Compl. ¶ 14.

7    Defendants argue that the ARRPs are living documents, always subject to change.  But they have

8    neither released those plans nor submitted any evidence, save one scant declaration, to shed light on

9    how the ARRP process works.  The evidence plaintiffs presented on how the ARRP approval process

10   has actually played out shows that at least three defendant agencies initially submitted an ARRP that

11   "did not include plans for large-scale RIFs" and that OMB, OPM, and DOGE rejected this plan "and

12   directed the agency to implement large-scale RIFs instead."  Decl. Soriano AFGE ¶¶ 8-9 (NSF); *see*

13   *also* Decl. Daly AFSCME ¶ 24 (AmeriCorps); Dkt. No. 36, Ex. 1 (NLRB).  "It is the imposition of

14   an obligation or the fixing of a legal relationship that is the indicium of finality of the administrative

15   process."  *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979).  Based on the record to date,

16   the Court finds the OMB/OPM Memo and OMB/OPM approval of the ARRPs constitute final

17   agency action under the APA.

18       At this time, the Court will refrain from opining on whether DOGE's actions are subject to

19   review under the APA.  The record is less developed as to DOGE's actions and would benefit from

20   further factual development.  Nevertheless, having found above that any actions by DOGE in

21   directing other federal agencies to engage in large-scale RIFs is *ultra vires*, the Court need not reach

22   the APA question specifically in order for injunctive relief to cover DOGE.  *See League of*

23   *Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 &

24   n.3; *Cmty. Legal Servs. in East Palo Alto v. United States Dep't of Health & Human Servs.*, --- F.

25   Supp. 3d ----, No. 25-cv-2847-AMO, 2025 WL 1233674, at *8 (N.D. Cal. Apr. 29, 2025) (plaintiffs

26   "need only show a likelihood of success on one claim to demonstrate likelihood of success in support

27   of a preliminary injunction").

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### b.    Merits

The Court likewise reserves ruling on the merits of the APA claim asserting arbitrary and capricious action by OMB, OPM, and DOGE (Claim Four) and the APA claims asserted against the federal agency defendants (Claims Six and Seven).  As previously discussed, a full review of the ARRPs will significantly aid the Court's review of the merits of these APA claims.

Plaintiffs' Third Claim—that OMB, OPM, DOGE, and their directors violated the APA by taking action not in accordance with law and exceeding statutory authority—overlaps with the analysis of the *ultra vires* claim.  For the reasons already stated above, plaintiffs have shown a likelihood of success on their claim that at least OPM and OMB are acting outside their statutory authority by directing large-scale layoffs and reorganizations at other federal agencies.

Plaintiffs' Fifth Claim alleges that OMB, OPM, DOGE, and their directors violated the APA by engaging in "rule-making" without publication and opportunity for notice and comment.  In their TRO brief, defendants asserted, incorrectly, that OPM has simply promulgated regulations as they are statutorily authorized to do.  *See* TRO Opp'n at 44 ("Congress expressly empowered OMB [sic] to promulgate regulations governing RIFs, and OPM has done just that."); *see also id.* at 35 ("the governing statute expressly directs OPM to promulgate regulations governing RIFs . . ."); *id.* at 1, 7-8, 40-41 (citing 5 U.S.C. § 3502).[23]  OPM did not promulgate regulations here.  Promulgating a regulation would have required a public process, including notice and comment under the APA.  *See* 5 U.S.C. § 553.  This did not occur.  Plaintiffs have shown a likelihood of succeeding on their claim that OPM and OMB engaged in rule-making without notice and comment required by the APA, in issuing the OMB/OPM Memo and in approving the ARRPs.

### B.    Irreparable Harm

The Court discussed plaintiffs' injuries in the standing section above, but in the context of

---

[23] 5 U.S.C. § 3502 states, in part, that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to-- (1) tenure of employment; (2) military preference . . .; (3) length of service; and (4) efficiency or performance ratings."  5 U.S.C. § 3502(a).

the *Winter* analysis the Court must also consider whether this injury is irreparable. Plaintiffs assert that constitutional violations constitute irreparable injury, including violations of the separation of powers. TRO Mot. at 48-49. Plaintiffs assert that union members will face irreparable harm when they lose their wages and health benefits and, in some cases, may need to relocate. *Id.* As the Ninth Circuit has noted, "[l]ack of timely access to health care poses serious health risks," especially for individuals with chronic health conditions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008). The Court agrees that these losses constitute irreparable harm and notes, from its review of plaintiffs' declarations and the ARRPs submitted *in camera*, that some RIF terminations were scheduled to begin mid-May or soon thereafter. On May 16, 2025, the government told the Supreme Court "that about 40 RIFs in 17 agencies were in progress and are currently enjoined by the TRO." Application for Stay, No. 24A1106 (U.S.), 29.

Further, facing the potential loss of federal funding, the local government plaintiffs experience irreparable harm when they are forced to plan how to mitigate that loss. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537-38 (N.D. Cal. 2017). These plaintiffs cannot recover damages via an APA claim, making their monetary loss irreparable. *See Cal. v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Defendants and their supportive *amici* states argue from *Sampson v. Murray* that plaintiffs have not made a sufficient showing of irreparable harm. In *Sampson*, the Supreme Court considered whether to enjoin the dismissal of a single employee and determined the plaintiff had not made a sufficient showing of irreparable harm "in this type of case," even though the plaintiff would suffer at least a temporary loss of income. *Sampson v. Murray*, 415 U.S. 61, 63, 89-90, 92 (1974). But the Court also recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. The present case, simply put, is not the same "type of case" as *Sampson*. The Court here is not considering the potential loss of income of one individual employee, but the widespread termination of salaries and benefits for individuals, families, and communities. Moreover, given the scale and speed of defendants' actions, if the reorganization continues, the agencies will not easily return to their prior level of operations.

1    This is irreparable harm.

2

3    **C.    Balance of Interests**

4        The last two factors—assessing the harm to the opposing party and weighing the public

5    interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  In this

6    context, these factors require the Court to ask whether pausing the government's large-scale RIFs

7    and reorganizations harms the government more than it benefits the plaintiffs.  Defendants have

8    argued that there is no public interest in injunctive relief because its actions are lawful.  TRO Opp'n

9    at 48.  This argument fails, as the Court has found it likely that defendants' actions are not lawful.

10   The Court notes again that its order does not prevent the President from exercising his Article II

11   powers; it prevents him from exercising Congress's Article I powers.

12       Defendants further argue that a continued injunction would "frustrat[e] the government's

13   efforts to impose budgetary discipline and build a more efficient workforce."  PI Opp'n at 21.  As

14   plaintiffs note in their reply, the Constitution gives Congress the power—and responsibility—of the

15   purse.  PI Reply at 8 (citing U.S. Const. art. 1, § 9).  Further, the fact that defendants have placed

16   many employees on paid administrative leave for the duration of the RIF notice period—rather than

17   have them to continue working for their pay—undercuts their ostensible concern for efficient and

18   effective government.[24]  So too do admissions from agency heads that cuts have been or might be

19   made too fast.  *See, e.g.*, TRO Mot. at 4-5 (defendant Kennedy stating, with regard to April

20   terminations of HHS employees: "[p]ersonnel that should not have been cut were cut . . . that was

21   always the plan . . .  we're going to do 80% cuts, but 20% of those are going to have to be reinstated,

22   because we'll make mistakes.").  Some of the ARRPs reviewed by the Court indicate that cuts may

23   be too deep or that cost savings will not be realized in the short term.  In sum, the Court does not

24   find that pausing hastily constructed and likely unconstitutional RIF and reorganization plans

25

26   ─────────────

27       [24] As *amicus curiae* Public Employees for Environmental Responsibility note in their brief, such widespread use of paid leave may also violate the Administrative Leave Act, 5 U.S.C. § 6329a. Dkt. No. 116-1.  Violation of this statute is not charged in the complaint and is not directly at issue

28   in this case.

*United States District Court*
*Northern District of California*

1    constitutes irreparable harm to the government.

2    Furthermore, the Court finds that injunctive relief as ordered below would serve the public

3    interest, because "[t]here is generally no public interest in the perpetuation of unlawful agency

4    action.  To the contrary, there is a substantial public interest in having governmental agencies abide

5    by the federal laws that govern their existence and operations."  *See League of Women Voters of*

6    *United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations

7    omitted).

8

9    **V.    Scope of Remedy and Order**

10    Providing relief beyond the named parties is appropriate where necessary to provide relief

11    to the named parties.  *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987).  The Court has

12    found that plaintiffs are likely to succeed on the merits of their challenges to Executive Order 14210,

13    the OMB/OPM Memo, and OMB/OPM's approval of the ARRPs.  The Court limits its injunction

14    to the named agency defendants, but acknowledges that its order as detailed below will provide

15    relief beyond the named plaintiffs.  To do otherwise remains impracticable and unworkable, in

16    particular considering the diversity of plaintiffs in this case.  *See City & Cnty. of San Francisco v.*

17    *Barr*, 965 F.3d 753, 766 (9th Cir. 2020) (noting that where "a case involve[es] plaintiffs that operate

18    and suffer harm in a number of jurisdictions . . . the process of tailoring an injunction may be more

19    complex").  To be sure, relief must be narrowly tailored, but narrowly tailored does not necessarily

20    mean small.  The Court's relief must be sized to fit the problems presented by the case, no more and

21    no less.

22

23    **A.    Prospective Relief**

24    For the foregoing reasons and for good cause shown, the Court therefore ORDERS as

25    follows:

26    IT IS HEREBY ORDERED that the agency defendants (as delineated
    below) and their officers or employees or any other individuals acting

27    under their authority or the authority of the President are hereby
    enjoined and/or stayed from taking any actions to implement or

28    enforce sections 3(c) and 3(e) of Executive Order 14210 or the

February 26, 2025 OMB/OPM Memorandum, including but not limited to:

(1) any further approval, disapproval, or certification of ARRPs by OMB and OPM, whether formal or informal, express or implied;

(2) any further waivers of statutorily-mandated RIF notice periods by OMB and OPM, whether formal or informal, express or implied;

(3) any further orders by DOGE, whether formal or informal, express or implied, to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs;

(4) any further implementation of ARRPs, including but not limited to the following actions, to the extent they are taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum:

> (a) execution of any existing RIF notices (including final separation of employees),

> (b) issuance of any further RIF notices,

> (c) placement of employees on administrative leave, and

> (d) transfer of functions or programs between the agency defendants.

However, this injunction shall not limit federal agency defendants from presenting reorganization proposals for legislative approval or engaging in their own *internal* planning activities without the involvement of OMB, OPM, or DOGE, provided that they do not implement any of the prohibited actions above.

This injunction shall apply to the following defendant agencies: OMB, OPM, DOGE (USDS), USDA, Commerce, Energy, HHS, HUD, Interior, Labor, State, Treasury, Transportation, VA, AmeriCorps, Peace Corps, EPA, GSA, NLRB, NSF, SBA, and SSA. Plaintiffs have presented evidence that these agencies are implementing, or preparing to soon implement, large-scale RIFs and reorganizations pursuant to the Executive Order and OMB/OPM Memo. *See* PI Mot. App'x C (identifying plaintiffs' submitted evidence for each agency). To the extent that defendants need clarification about whether certain activities are prohibited or allowed by the order, they may seek such clarification from the Court. By 3:00 p.m. (PDT) on Friday, May 30, defendants shall file a declaration verifying that all defendants have been given notice of this order and have taken steps to comply. The Court defers decisions about further compliance reporting to a later day.

## B.    Retrospective Relief

Plaintiffs further request that defendant DOGE and the federal agency defendants be ordered

to rescind earlier actions taken to implement the ARRPs, to restore the status quo prior to the likely unlawful action. Dkt. No. 101 ¶¶ 2-3. As the Ninth Circuit has stated, "the 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014). If the government issues a new policy that is challenged, the status quo is the situation before the issuance of the policy. *Id.*; *see also Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (holding a challenged presidential proclamation changed the status quo); *Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958, 963 (N.D. Cal. 2013) (holding, where a student challenged her disenrollment from a university, the status quo would be the "last uncontested status," which was the student's status as enrolled). Defendants contend that the "status quo" should not be set to before the Executive Order and, even if it was, argue "that it would be an abuse of discretion to issue an injunction requiring a virtual Executive Branch wide effort to restore the world as it existed" before February 11, 2025. PI Opp'n at 24.

The Court holds that Ninth Circuit authority squarely supports the conclusion that the status quo in this case, for purposes of an injunction, is the situation prior to the February 11, 2025 issuance of the challenged Executive Order 14210. However, the Court's ability to impose retrospective relief is limited by practical considerations.

> The Court therefore ORDERS that federal agency defendants (1) rescind any RIFs issued pursuant to Executive Order 14210 and (2) transfer any federal employees who were moved into administrative leave status to effectuate Executive Order 14210 back to the status they held prior to being placed on such leave; but the Court STAYS these two components of retrospective relief for the duration of any appeal of this injunctive order.

Plaintiffs may later ask for reconsideration of the stay with a specific showing of harm.

At the preliminary injunction hearing, defendants requested a stay of all injunctive relief, but the Court denies that request.

\* \* \*

In summary, the Court largely continues the prospective relief issued in its temporary restraining order, with some refinement. The Court also imposes limited retrospective relief, but stays the retrospective relief pending appeal.

Holding that the President, OMB, OPM, and DOGE have exceeded their authority naturally

United States District Court
Northern District of California

1    raises the question of precisely where the line should be drawn between executive and legislative

2    authority over agency reorganization.  But as Chief Justice Roberts once wrote, in certain cases

3    "[w]e have no need to fix a line . . . .  It is enough for today that wherever that line may be, this

4    [action] is surely beyond it."  *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 585.

5

6    **VI.    Rule 65(c) Security**

7            Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue

8    a preliminary injunction or a temporary restraining order only if the movant gives security in an

9    amount that the court considers proper to pay the costs and damages sustained by any party found

10   to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The district court retains

11   discretion "as to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067,

12   1086 (9th Cir. 2009) (internal quotation marks and citations omitted).

13           The government has requested that the Court require plaintiffs give security in an amount

14   "commensurate to the salaries and benefits the government must pay for any employees it would

15   prefer to separate from federal service but is unable to for the duration of any preliminary relief."

16   TRO Opp'n at 50; *see also* PI Opp'n at 25 (incorporating by reference defendants' arguments from

17   its TRO opposition).  The Court notes, first, that defendants have not provided support for security

18   in any fixed amount, and the Court cannot establish such an amount without the ARRPs or some

19   other evidence showing the anticipated financial impact.  Second, the Court finds there is significant

20   public interest underlying this action, particularly in light of the constitutional claims raised.  *See*

21   *Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015) (citing *Save Our*

22   *Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005)).  Although defendants allege they

23   will incur costs for retaining federal employees that they would prefer to separate, TRO Opp'n at

24   50, so too will the government incur costs if the RIFs are implemented hastily and unlawfully.

25   There is also indication in the record before the Court that agencies may not realize immediate cost-

26   savings for separating employees.  This consideration further weighs against the government's

27   request that plaintiffs be required to give security.  At this time, the Court will require that plaintiffs

28   post a nominal bond of $10 in total (not per plaintiff) by no later than Friday, May 30, 2025.

United States District Court
Northern District of California

**Add.722** 50

1

2

**CONCLUSION**

3        The Court reiterates the conclusion from its temporary restraining order.  The President has

4   the authority to seek changes to executive branch agencies, but he must do so in lawful ways and,

5   in the case of large-scale reorganizations, with the cooperation of the legislative branch.  Many

6   presidents have sought this cooperation before; many iterations of Congress have provided it.

7   Nothing prevents the President from requesting this cooperation—as he did in his prior term of

8   office.  Indeed, the Court holds the President likely *must* request Congressional cooperation to order

9   the changes he seeks, and thus issues a preliminary injunction to pause large-scale reductions in

10  force and reorganizations in the meantime.

11

12        **IT IS SO ORDERED**.

13  Dated:  May 22, 2025

14  _____

15  SUSAN ILLSTON
    United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28