Nos. 25-3030, 25-3034, 25-3293

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| American Federation of Government Employees, AFL-CIO, *et al.*,<br><br>    *Plaintiffs-Appellees*,<br><br>v.<br><br>Donald J. Trump, *in his official capacity as President of the United States*, *et al.*,<br><br>    *Defendants-Appellants*. | Nos. 25-3030, 25-3293<br><br>On Appeal from the U.S. District Court for the Northern District of California<br><br>D.C. No. 3:25-cv-03698-SI |
| *In re* Donald J. Trump, *in his official capacity as President of the United States, et al.*,<br><br>    *Petitioners-Defendants*. | No. 25-3034<br><br>On Petition for Writ of Mandamus to the U.S. District Court for the Northern District of California<br><br>D.C. No. 3:25-cv-03698-SI |

## SUPPLEMENTAL ADDENDUM TO OPPOSITION TO SUPPLEMENTAL EMERGENCY MOTION FOR STAY PENDING APPEAL / PETITION FOR WRIT OF MANDAMUS

Elena Goldstein
Skye Perryman
Tsuki Hoshijima
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090
egoldstein@democracyforward.org
sperryman@democracyforward.org

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
dleonard@altber.com

*Attorneys for Plaintiffs-Appellees/Real Parties in Interest\**
*\*Additional counsel and affiliations on signature pages of opposition brief*

## INDEX FOR SUPPLEMENTAL ADDENDUM

| Doc. | Description | Date | Page |
|------|-------------|------|------|
| 1 | Transcript of May 22, 2025 hearing | 5/22/2025 | Supp.Add.1 |

Pages 1 - 54

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

| | |
|---|---|
| AMERICAN FEDERATION OF ) | |
| GOVERNMENT EMPLOYEES, AFL-CIO, ) | |
| et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | **NO. 3:25-CV-03698-SI** |
| ) | |
| PRESIDENT DONALD J. TRUMP, in ) | |
| his official capacity as ) | |
| President of the United ) | |
| States, et al., ) | |
| ) | |
| Defendants. ) | |

San Francisco, California
Thursday, May 22, 2025

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiffs:

        ALTSHULER BERZON LLP
        177 Post Street, Suite 300
        San Francisco, California 94108
  BY: **DANIELLE E. LEONARD, ATTORNEY AT LAW**
      **STACEY M. LEYTON, ATTORNEY AT LAW**
      **CORINNE F. JOHNSON, ATTORNEY AT LAW**
      **BARBARA J. CHISHOLM, ATTORNEY AT LAW**

        DEMOCRACY FORWARD FOUNDATION
        PO Box 34553
        Washington, D.C. 20043
  BY: **TSUKI HOSHIJIMA, ATTORNEY AT LAW**

### (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter

2

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:

 3                        OFFICE OF THE CITY ATTORNEY
                         Sixth Floor - Fox Plaza
 4                       1390 Market Street
                         San Francisco, California 94102
 5               BY:   ALEXANDER J. HOLTZMAN, ATTORNEY AT LAW

 6                       OFFICE OF THE COUNTY COUNSEL
                         70 West Hedding Street
 7                       East Wing - Ninth Floor
                         San Jose, California 95110
 8               BY:   RAPHAEL N. RAJENDRA, ATTORNEY AT LAW

 9                       KING COUNTY EXECUTIVE
                         401 5th Avenue - Suite 800
10                       Seattle, Washington 98104
                 BY:   ALISON C. HOLCOMB, ATTORNEY AT LAW
11
     For Defendants:
12                       DEPARTMENT OF JUSTICE
                         Civil Division
13                       950 Pennsylvania Avenue NW
                         Washington, D.C. 20530
14               BY:   EMILY M. HALL
                       DEPUTY ASSISTANT ATTORNEY GENERAL
15
                         DEPARTMENT OF JUSTICE
16                       20 Massachusetts Avenue NW
                         Washington, D.C. 20530
17               BY:   ANDREW M. BERNIE
                       DEPUTY ASSISTANT ATTORNEY GENERAL
18

19

20

21

22

23

24

25
```

Supp.Add.2

| | |
|---|---|
| 1 | **Thursday - May 22, 2025**                    **10:42 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE COURTROOM DEPUTY:**  Audience and counsel, this is |
| 5 | just another reminder that these proceedings are being recorded |
| 6 | and streamed on Zoom.  Any additional recording is strictly |
| 7 | prohibited. |
| 8 | Now calling Civil Matter 25-cv-3698, American Federation |
| 9 | of Government Employees, AFL-CIO, et al., versus Trump, et al. |
| 10 | Counsel, please approach the podium and state your |
| 11 | appearances for the record, starting with the plaintiffs. |
| 12 | **MS. LEONARD:**  Good morning, Your Honor.  Danielle |
| 13 | Leonard from Altshuler Berzon. |
| 14 | Here with me at counsel table are Corinne Johnson, Stacey |
| 15 | Leyton, and B.J. Chisholm from Altshuler Berzon, and Tsuki |
| 16 | Hoshijima from Democracy Forward, as well as Ravi Rajendra from |
| 17 | the County of Santa Clara, and Alex Holtzman from the City and |
| 18 | County of San Francisco. |
| 19 | **THE COURT:**  Good morning. |
| 20 | **MR. BERNIE:**  Good morning, Your Honor.  Andrew Bernie |
| 21 | from the Department of Justice on behalf of defendants.  With |
| 22 | me at counsel table is Emily Hall, also from the |
| 23 | Department of Justice. |
| 24 | **THE COURT:**  Good morning. |
| 25 | **MR. BERNIE:**  Good morning. |

1          **THE COURT:**  We are here today to determine whether I

2    should convert the two-week temporary restraining order that I

3    issued almost two weeks ago into a permanent injunction -- a

4    preliminary injunction for the balance of the case; that would

5    be to continue the status quo until the case can be determined.

6          I appreciate what I believe to be the defendants' prompt

7    response to the order as it stood from what I understand, and

8    I'm grateful for that.

9          The preliminary injunction motion filed by plaintiffs

10   requested it continue -- that the TRO continue, and some

11   additional conditions are requested.

12         So I thought I would tell you what I'm thinking first, and

13   then you can discuss the matter with me.  We have had so much

14   briefing, though, that I do have some questions I'll put to you

15   first, and that would help me.

16         It is -- it is the case that presidents -- elections have

17   consequences.  Presidents can set policy priorities for the

18   executive branch, and agency heads may implement them; nobody

19   disputes that.  But Congress creates the federal agencies,

20   funds them, and gives them duties that, by statute, they must

21   carry out.

22         At this stage of the case, the legal history seems clear.

23   A president may not initiate a large-scale executive branch

24   reorganization without partnering with Congress.  To hold

25   otherwise would be telling 9 presidents and 21 congresses that

1    they misunderstood the Constitution.  I do not have that level

2    of self-confidence.

3         And agencies may not conduct large-scale reorganizations

4    and reductions in force in blatant disregard of Congress's

5    mandates whether the President orders them to or not.

6         The role of the district court is to examine the facts and

7    apply the law to the facts.  And given the number of agencies

8    named in the lawsuit, the scope of the -- the evidentiary scope

9    of this case is very large.

10        By their own admission, defendants have opted not to rely

11   on any factual representations in their oppositions.  On the

12   other side, plaintiffs have provided about 1,500 pages of

13   evidentiary support.

14        The defendants did provide several agency plans for

15   *in camera* review, which I appreciate.  The contents of those

16   plans does not dramatically change the Court's previous

17   understanding of this case; and since defendants maintain that

18   they are privileged, I won't be revealing any details in the

19   discussions that we have here in open court today.

20        However, overall, I do believe the evidence before

21   the Court suggests that plaintiffs will likely succeed on the

22   merits of their claims that the President, the Office of

23   Management and Budget, the Office of Personnel Management, and

24   DOGE have exceeded their authority by directing large-scale

25   reductions in force and reorganizations.

1      I believe injunctive relief, preliminary at this stage,

2  remains necessary to preserve the status quo and protect the

3  power of the legislative branch.  So I'm inclined to continue

4  the prospective relief with some refinement.

5      I've also considered, because plaintiffs have requested

6  it, retrospective relief.  And we can talk about that later.

7      What I'm considering doing is granting the retrospective

8  relief, but staying it at this time.  I'm concerned about the

9  effect of all of this litigation on the lives of the people who

10  are being affected, and being hired and rehired and furloughed;

11  and I think we need to preserve as much order as we can for

12  those -- for those people.

13      I want to emphasize that we're still at a very preliminary

14  stage of this case.  Upon receiving a fuller evidentiary

15  record, my conclusions may change, but the evidence before

16  the Court today strongly suggests that the recent actions of

17  the executive branch usurp the constitutional powers of

18  Congress.

19      So that's my thinking.  And what I would like to do before

20  we get into any general argument is, I have a couple of

21  questions for you.

22      The first question I have is for the Government.  You have

23  asked that the Court limit any relief to the named parties.

24  And the TRO limited relief to the -- just to the named

25  defendants, but I don't know how you would limit it to the

1  plaintiffs.

2      So that's my first question to you is:  How would you

3  envision I limit relief to the named parties in some different

4  way from what I've done?

5      **MR. BERNIE:**  Well, Your Honor, in terms of the scope

6  of the injunction, the belief that a nationwide injunction

7  shouldn't issue, I think -- we think the Court should limit the

8  injunction to any individual plaintiffs that the Court finds

9  have standing in irreparable harm, perhaps members of the

10  plaintiffs' union.

11      We acknowledge that it would be administratively --

12  I think we acknowledge that it would be administratively

13  difficult to -- to -- for the Government to comply with the

14  injunction just as to named parties.

15      But we would rely on, I think, Chief Judge Sutton's

16  opinion for the Sixth Circuit that says that that is -- that

17  that's a concern for the Government in terms of compliance; and

18  if the Government chooses to -- chooses -- determines that the

19  only administratively workable solution is to -- is to

20  effectively provide the relief nationwide, that that's

21  the Government's choice; but that as a general matter,

22  the Court should limit its injunction to any named parties who

23  have standing and have demonstrated entitlement to injunctive

24  relief rather than issue a nationwide injunction.  But --

25      **THE COURT:**  But how would that work?  I mean, how

1  would I say that?  How would I say it's only the plaintiffs?

2       MR. BERNIE:  I think -- I think -- I think

3  the Court -- I think the Court could limit it to any -- to any

4  individual members of the plaintiffs' union who have shown that

5  they have standing that they're in imminent risk of being

6  RIF'd.

7       And some of this gets into the substance of the

8  injunction.  As the Court is aware, we think that any

9  injunction should not enjoin preparatory steps and stuff like

10 that.  I mean, that's a slightly related issue.

11      But as a general matter, we think the Court should limit

12 it to any parties.  And that, again, the Government might

13 choose -- might choose to determine that the only

14 administratively workable solution is to provide it to

15 everyone.  But as Chief Judge Sutton said in his opinion for

16 the Sixth Circuit, that's ultimately a compliance decision for

17 the Government.

18      THE COURT:  Well, but you haven't said how I could do

19 it, how I could do it in the English language, to say this

20 order, if I find, is likely to be found to be unconstitutional

21 and can't be implemented with respect to the agencies who are

22 defendants in this case.

23      MR. BERNIE:  Right.  I think -- I think an injunction

24 would say the agencies are -- obviously -- you're asking about

25 the scope of the injunction.  Obviously, we don't agree that

```
 1   injunction is appropriate, but I -- we're not talking about

 2   that now; I understand.

 3       But I think it would be limited to any individuals --

 4   you know, members of -- members of the plaintiffs' -- of the

 5   plaintiff -- members of the plaintiff unions.

 6           THE COURT:  Okay.  Well, I hear what you've said.  I'm

 7   not sure that that's possible, but I hear what you've said.

 8           MR. BERNIE:  Fair enough.  Did you want me to stay at

 9   the podium, or should I --

10           THE COURT:  Oh, you may, sure.

11           MR. BERNIE:  Okay.

12           THE COURT:  I have a couple more questions.

13           MR. BERNIE:  Okay.

14           THE COURT:  So the next one is this:  From your

15   paper -- from the papers that you've submitted, it appears that

16   the individual federal agencies would be permitted to submit an

17   ARRP that calls for no RIFs?

18           MR. BERNIE:  I'm sorry, Your Honor?

19           THE COURT:  Well, you've indicated that these are

20   guidances and encouragements to the agencies but that the

21   agencies are making their own decisions on the RIFs.

22       So if an agency decided that it needed its employees and

23   couldn't really afford to cut them --

24           MR. BERNIE:  Sure.

25           THE COURT:  -- could it say so in its ARRP and
```

1    presents that to OMB?

2          **MR. BERNIE:**  I mean -- so I think so, Your Honor.  If

3    the agency determined that its -- that all of its functions

4    were statutorily required and it couldn't -- and it couldn't

5    implement the executive order consistent with applicable law

6    and the other principles, I think it could -- it could do that.

7    I'm not sure.

8          Our point for the ARRPs is -- and the workforce memorandum

9    and the executive order itself, is the executive order is

10   mandatory; we've never claimed otherwise.  But the executive

11   order leaves the agencies with very broad authority to look at

12   their own organic statutes and own authorities, including the

13   RIF statute and RIF regulation, determine what the law

14   requires, and make determinations using their lawful authority

15   that are consistent with the President's policy priorities as

16   set forth in the executive order.

17         I don't want to make any representations that any

18   individuals -- that any agency are or are not recommending no

19   RIFs; but if the agency determined that it could not -- it

20   could not engage in any RIFs consistent with applicable law,

21   the executive order directs them to follow the law.

22         **THE COURT:**  Well, didn't we have one example where

23   that's what the agency said and OMB and OPM said, "Well, that

24   just won't do"?

25         **MR. BERNIE:**  So, Your Honor --

**THE COURT:**  "Try again"?

**MR. BERNIE:**  So, Your Honor, my -- so my understanding -- and I want to make sure I'm careful about the representations for the Court.

Our position in this case from the beginning -- and I understand the Court's concerned about the record evidence. But our concern in this case from the very beginning is that this is a global challenge to an executive order and workforce memorandum.  It's not a challenge to individual agency actions. So we have not -- we don't think -- we think the question is what the executive order says on its face.

But I can try to answer the Court's question as best as I can, even though our client hasn't relied on it.

My understanding is that OMB and OPM, notwithstanding the review and approval function set forth in the memorandum, do not understand their role to be approving, vetoing, or formally signing off on ARRPs, and certainly not second-guessing the substantive determinations agencies make about how to implement the executive order consistent with their own statutory authorities.

So I don't think it's correct that OMB and OPM are rejecting ARRPs or directing RIFs that agencies don't make. But we have -- but as the Court acknowledged in -- in its opening presentation, and correct, we have not relied on factual representations in this case.  I understand the Court

1    may disagree, but we don't -- we think, in a global challenge

2    to the executive order in particular, what matters is what the

3    executive order says.

4         That's consistent, I think, with the Ninth Circuit's

5    decision in *San Francisco vs. Trump* -- which I think is the

6    most relevant precedent before this Court -- which we think,

7    even though the Court in that case disagreed with the

8    substantive determination the executive made, is actually quite

9    helpful to our position because it's exactly the type of

10   inquiry we think the Court should be suggesting.

11        But we -- we haven't really made any factual

12   representations, but that's my understanding of what OMB and

13   OPM understand their -- their role to be.

14        Hopefully, that's responsive to the Court's question.

15        **THE COURT:**  Well, I wonder if you could just say that

16   again, because that was my next question, which is:  What is

17   the role of OPM and OMB in approving and/or disapproving ARRPs?

18        **MR. BERNIE:**  So my understanding -- and, again, I want

19   to caveat this.  This hasn't been a significant part of my

20   case.  And, obviously, the federal government is obviously very

21   large.  There are hundreds of agencies.  So I don't want to

22   make representations about everything.

23        But my understanding is what OMB -- OMB and OPM do not

24   view their role -- and I think we've said this in

25   declarations -- as signing off on ARRPs.  Agencies can begin

ARRP implementation without receiving OMB and OPM's approval.

You know, I mean, I think as a practical matter, if an agency submitted -- there's -- I think there's perhaps some back-and-forth if an agency submits an ARRP that doesn't have certain things, that -- that doesn't address certain topics that OMB and OPM have directed that agencies should address in considering how to implement the executive order.

But, you know, again, this hasn't been part of our presentation -- case.  So I want to be careful with what I say.  But I don't think -- I don't think that OMB and OPM view their role as substantively second-guessing agencies' determinations.

The whole process set forth by the workforce memorandum is a process consistent with, you know, OPM's role as the centralizing force for the federal government on personnel matters and OMB's role as the centralizing force for budget matters, to give the agencies guidance.  They have this executive order which -- which, you know, like many executive orders on this subject, is vague and raises questions about agency compliance and gives agencies a framework for how to determine how they should implement the executive order.

And the workforce memorandum makes clear repeatedly that agencies should examine their own statutory authorities and determine what's lawful; that they should -- if any -- if they should determine what congressional engagement is necessary; that if any processes require notice and comment rulemaking,

1   that they will need to engage in that rulemaking.

2           THE COURT:  And they should do all of that within the,

3   like, three weeks that they were given to prepare their ARRPs?

4           MR. BERNIE:  No, no, not necessarily, Your Honor.

5       So that is a timeline for submitting the ARRPs, which are

6   agency planning documents; but as we have said -- as we have

7   said, I think, in public filings, the agencies -- agencies are

8   not obligated to take all of the steps set forth in the ARRPs.

9   ARRPs are subjects to change.

10      If there are particular steps, like, you know, the most

11  obvious example would be -- would be the notice period set

12  forth by statute in OPM regulations for providing notice for

13  employees who are subject to a reduction in force, the agencies

14  have to -- the agencies have to follow that -- follow that; and

15  nothing in the workforce executive order or the workforce

16  memorandum says otherwise.

17          THE COURT:  Same kind of question.  The memo, based on

18  the executive order, requires that the agencies certify that

19  the ARRPs will have a positive effect on the delivery of direct

20  services when direct services are at issue.

21      Have any such certifications been issued?

22          MR. BERNIE:  I'm -- I'm not sure.  But I meant

23  to bring -- I meant to bring that up to the -- to the lectern

24  with me.

25          THE COURT:  Oh, you may, sure.

1    **MR. BERNIE:**  Would the Court mind if I --

2    **THE COURT:**  Go get it.

3    **MR. BERNIE:**  Thank you.

4  So I think -- I think certain -- certain -- I think as

5 part of the workforce memorandum, that the -- the workforce

6 memorandum directs agencies to state whether they provide

7 direct services to citizens -- some agencies do and some

8 don't -- and say which direct services are they and then

9 certify that it will not have a negative effect.

10  I think it directs -- and, again, I'm reluctant to get

11 into privileged material that particular ARRPs direct, but

12 I think that -- I think that the workforce memorandum directs

13 that to be provided as part of Phase 2 ARRPs.

14  And so my understanding is that the Phase 2 ARRPs can

15 include that, if the workforce --

16    **THE COURT:**  Well, that was as of April 14th, I think.

17    **MR. BERNIE:**  Correct.  Yeah.  The agencies should

18 submit the Phase 2 ARRPs for review and -- for review and

19 approval no later than April 14th.  But, again -- and they

20 should have that certification.  And, again, these are

21 provisional planning documents.

22  And I guess -- I guess the one thing -- the one thing I

23 would say, Your Honor, is I can certainly appreciate

24 the Court's -- the Court's concern that perhaps the workforce

25 memorandum directs agencies to act under -- under expedited or

1  unreasonable time frames.  I can -- I can understand

2  the Court's concern.

3      I think a lot of that is ameliorated by the fact that

4  these are just planning documents that outline steps in the

5  future.  The agency doesn't have to take them.

6      But if -- and I understand the Court has laid out its

7  views and it's considered voluminous briefing.

8      But the one thing, if I can get sort of one thing across

9  this morning, it -- it would be this, which is, there is a

10  distinction between a challenge to an executive order and a

11  memorandum and a challenge to individual agencies' decisions.

12  If agencies do something that is unlawful, arbitrary and

13  capricious, is no -- and is not reasonably considered, there

14  are two possible -- there are two possible remedies for that.

15      The first, which we would say --

16          THE COURT:  How do we know what the agencies are

17  doing?

18          MR. BERNIE:  Well, if the --

19          THE COURT:  Who will tell us?

20          MR. BERNIE:  Well, if the agency does -- does any- --

21  well, for things like -- for things that actually affect

22  plaintiffs, like reductions in force, consolidations of

23  offices, anything that actually has an effect on plaintiffs,

24  those decisions will be disclosed when they're made.  And when

25  they're made, plaintiffs can challenge them.

1    And indeed, plaintiffs have challenged individual

2    decisions.  There was -- there was a hearing earlier this week

3    in Rhode Island by a group of states challenging certain

4    reorganizational and RIF matters at HHS.

5    My co-counsel was at a hearing earlier this week involving

6    certain RIFs at DHS.

7    There was a decision issued last night -- I can provide

8    copies of that decision to the -- to the Court and counsel --

9    involving a challenge to the -- could you just bring it --

10   involving a challenge to the Department of Education's RIFs and

11   certain reorganizational activities pursuant to -- pursuant

12   to -- pursuant in part due to the executive order.

13   I didn't -- didn't get a chance to put in a notice of

14   supplemental authority because it came in last night and I was

15   just flying in but -- in which Judge Friedman in the District

16   of D.C. declined to issue a preliminary injunction against

17   certain RIF-related matters at the Department of Education,

18   which -- and I guess I would -- I would say that this

19   illustrates two things that we think are very important in

20   determining the Court's role in this case.

21   First of all, we think Judge Friedman's decision

22   illustrates the sorts of things that a court would be doing in

23   considering an individual agency action; namely, doing what he

24   did in that case, which is looking to see if what the agency

25   did is consistent with its organic statutes and prevents the

```
 1   agency from performing its statutorily mandated functions.

 2         But beyond that, plaintiffs' theory in this case -- and

 3   I think this has to be their theory because they're globally

 4   challenging the executive order -- which is that the executive

 5   order cannot be lawfully implemented, and that it's like the

 6   executive order in City of San Francisco v. Trump.

 7         Well, in this case, I think you have a very able and

 8   experienced district judge concluding on the facts of that case

 9   that plaintiffs were unlikely to show that that particular

10   implementation was lawful.

11         We don't think that this is -- this case is anything like

12   the exec- -- the limited situation like in City of

13   San Francisco vs. Trump.  I could talk about that case briefly,

14   but if the Court -- the Court indicated it had some questions

15   for -- I mean, I don't want to step on any --

16              THE COURT:  No, no.  Go ahead.

17              MR. BERNIE:  -- questions the Court had.

18              THE COURT:  Talk about that.

19              MR. BERNIE:  So -- I mean -- so in that case -- which

20   we think is the most directly analogous case for how courts

21   should review an executive order on an ultra vires theory

22   with -- consistent with law clause, like this case -- the

23   executive order had a provision purporting to withhold grants

24   to cities that could not -- that willfully refused to comply

25   with a federal statute.  The Ninth Circuit held that that --
```

that that executive order was *ultra vires* and unlawful in all its applications because the executive branch, as a whole, had no power to add funding conditions that Congress had not prescribed.

And if you look at that decision, and Footnote 6 in particular, the Ninth Circuit made clear that there were absolutely zero grants the Department had identified to which this condition could be complied.

The court in that case declined to give effect to the savings clause because giving effect to the savings clause would mean that the executive order itself would have no meaning.

And I appreciate the Court's observation at the beginning, but I think this case is fundamentally different in that agencies do have authority to conduct, in certain cases, RIFs, including large-scale RIFs. We know that because 5 U.S.C. 3502 -- I think it's (d)(1)(B) -- recognizes the possibility of RIFs involving significant numbers of employees. OPM has codified that by regulation. They are not banned. They are simply subject to slightly -- to slightly evaluated notice requirements, a requirement that a state and the chief executive of a city be notified.

So I think -- by analogy, I think the Court can issue an injunction finding that this executive order is unlawful only if the executive branch, as a whole, has no authority to engage

1  in large-scale RIFs, and that's -- and we just don't think

2  that -- we just don't think that's the case; they clearly do.

3      How an agency complies in particular cases, whether it --

4  whether it -- whether it's consistent with the governing

5  statutes, whether its decisions are -- are arbitrary and

6  capricious, those sorts of claims can be brought, again, in one

7  of two ways.  We would say through the administrative scheme

8  prescribed in the CSRA and FSMR -- RS; but at most, in a

9  federal district court that would decide the issue based on --

10  based on the -- based on the record in that case and what the

11  agency specifically did.

12      The Court has also expressed concern about organiza- --

13  about -- about -- about the President's supposed lack of

14  authority to broadly restructure federal agencies without the

15  consent of Congress.  I want to address that directly.

16      I mean, I think we may have -- you know, it's possible

17  that we may have different views about the extent of the

18  President's authority to restructure.  But I don't think

19  the Court needs to reach that in this case because, again, this

20  is a global challenge to an executive order.

21      All the executive order says is for -- agencies should

22  issue a report determining whether certain components should be

23  abolished, consolidated, et cetera.  Agencies may make

24  different decisions, and those decisions can be considered on

25  their merits.

1    I mean, we know that agencies have some housekeeping

2    authorities to consolidate, to eliminate components that aren't

3    statutorily required.  I mean, I think examples of that are --

4    are legion.

5        I mean, just to take an example, I mean, I'm an employee

6    of the Department of Justice's Environment and Natural

7    Resources Division.  I'm on detail to the Civil Division.

8    During the Biden administration, ENRD -- there was an Office of

9    Environmental Justice established in ENRD, and this

10   administration eliminated it.  There's -- an Office of Tribal

11   Justice was founded within DOJ a few years earlier.  Agencies

12   make decisions all the time to consolidate certain HR functions

13   at headquarters.

14       Again, there may be certain steps that an agency take that

15   there will be debates about whether it goes beyond the agency's

16   authority, and such that congressional involvement -- but

17   the -- the -- the appropriate form for that is challenges to

18   those cases.

19       I guess -- I guess the only thing I would say is that

20   before taking the step -- and I understand that the Court has

21   thought carefully about this case.  Before taking the serious

22   step of globally enjoining not just -- not just an action of

23   the executive branch, but an executive order of the President,

24   it's incumbent to do that based on what the executive order

25   says, not on plaintiffs' allegations about how plaint- -- how

1    agencies are allegedly implementing it, and to do so only if

2    the executive order has no valid applications.

3        And we respectfully submit that that is -- that that is

4    simply not the -- that that is simply not the case here.

5            THE COURT:  Why do you think in the past all those

6    presidents have requested congressional authorization to

7    reorganize the executive agencies?

8            MR. BERNIE:  Your Honor, there -- I'm not -- I'm not

9    saying that -- I'm not saying that there might not be some

10   reorganizations down the road that do require -- that do

11   require -- I'm not conceding that they are.  But, like, again,

12   the question before the Court is just whether -- from our

13   perspective, is just whether President Trump acted *ultra vires*

14   when he act- -- asked agencies to study these questions.

15       But I don't -- but to answer the Court's question --

16           THE COURT:  When he asked agencies to study these

17   questions?  That's how you view this order?

18           MR. BERNIE:  What's that?

19           THE COURT:  You view this order as a request that

20   agencies study the question?

21           MR. BERNIE:  Well, no.  I mean, I -- not just that.  I

22   mean, well, the report -- the executive order just -- just --

23   just asked the agencies to prepare a report determining whether

24   any of their components or the agency itself should be

25   abolished, consolidated, et cetera.

1      If the agency issues a report and concludes that they can

2  take certain actions consistent with applicable law, then

3  I think that they can do that.

4      But the executive -- my point is simply that the executive

5  order itself, unless you think agencies -- agencies have no

6  authority to engage in any reorganizational activity

7  whatsoever, the executive order itself doesn't command action

8  inconsistent with the law.

9      And, again, we think the solution to that is -- is to

10  allow the agencies to implement the executive order and allow

11  plaintiffs to challenge implementations that they dislike

12  rather than --

13      **THE COURT:**  Then they could find out what those

14  implementations are after they're implemented.  That's the

15  plan?

16      **MR. BERNIE:**  Well, I think -- I think that --

17  respectfully, Your Honor, I think that's -- that's the norm in

18  every -- in almost every -- almost -- again, I'm not conceding

19  that -- we have our channeling arguments.  I'm not conceding

20  there be APA.

21      But in almost every -- most of the time when an agency

22  does something, it's -- whether it's an APA case or otherwise,

23  it's a challenge to an agency -- to something the agency has

24  done, not -- not a challenge to something the agency is

25  thinking about doing or plans to do, subject to potentially

1    superseding plans in the future.

2         But, again, I mean, we -- as -- so we do think that the

3    executive order here is lawful.  And just with -- with respect

4    to --

5              THE COURT:  Well, I just would note it's entitled

6    "Implementing The President's 'Department of Government

7    Efficiency' Workforce Optimization Initiative"; right?

8         That's the name of it, "Implementing."

9              MR. BERNIE:  Right.

10             THE COURT:  It's not advising about how you might

11   consider.

12             MR. BERNIE:  Oh, no, no, no.  Again, to be clear,

13   like, the executive order requires implementation.  We've never

14   said that it's not -- we've never said that it's not mandatory.

15        But the question of whether it's mandatory is separate

16   from the question of what it mandates.  And it gives agencies

17   broad authority to determine what their legal authority is and

18   pursue it consistent with the President's policy preferences.

19        And we think, in terms of the President's authority, if an

20   agency has lawful authority to do something, we think it's a

21   basic -- basic in the structure of Article II that the

22   President has authority to -- to direct the agencies -- as long

23   as the President's directives don't direct the agency to

24   violate the law, direct the agencies how to exercise their

25   statutory authorities.

1    We think that's clear from a number of -- clear from the
2  structure of the Constitution, but also the D.C. Circuit's
3  decision in the *Alba* case, which we cite, in which the
4  Ninth Circuit distinguished in -- distinguished in the *City of*
5  *San Francisco* case but didn't disagree with.  It's not binding
6  on this Court, we recognize, but it's a unanimous decision by
7  an ideologically diverse panel in that case.
8    And what you had in that case was a presidential condition
9  requiring contractors and bidders -- prohibiting them from
10  either requiring or -- or prohibiting entry into certain labor
11  agreements.  And the Court said two things which we think are
12  directly relevant in this case.
13    First of all, the Court said that the Pres- -- that if
14  agencies had authority to impose a requirement like this, the
15  President has -- had authority, Article II, to direct the
16  agency on the performance of their lawful duties.
17    And also the Court acknowledged that there might be
18  certain agency-specific statutes that prohibited -- that
19  prohibited following the President's directive.  And it said
20  that didn't mean that implementation of the executive order
21  should be enjoined.  It simply means, because there was a
22  consistent with law clause in that case, like there is here,
23  that the executive order directed the agencies to follow the
24  law in that case, as it does here.
25    I'm happy to -- so -- and in terms of the workforce

1    memorandum, we continue to just think that -- first of all, we

2    just don't think it's agency action.  We think that the

3    ARRPs -- I -- the Court said it didn't really influence your

4    thinking about the case, and also don't really want to

5    address -- address the details of that in open session.

6        But as we've said in public filings, we think the ARRPs

7    themselves are pre-decisional and deliberative because --

8    because they don't bind the agency to anything.

9        But the workforce memorandum is a step beyond even -- even

10   that, in that all it does is tell the agency what they

11   should -- topics they should include in the ARRPs.

12       And I guess the one thing I would say about -- if

13   the Court is still inclined, at the conclusion of this hearing,

14   to follow its initial inclination on injunctive relief, is --

15   is any injunction should be limited to what plaintiffs are

16   actually complain- -- complaining about and what the Court

17   finds is problematic.

18       So what plaintiffs are really complaining about is that

19   the review -- what they see as the review and approval

20   requirement takes away agencies' discretion to decide for

21   themselves.

22       As I just said, I don't think that's how this works.  But,

23   at most, we think that -- we think there's nothing wrong with

24   OPM and OMB initiating this process which is calling for the

25   ARRPs to include these topics.

1    So if the Court is still inclined to issue injunctive

2    relief, I guess I would -- I would ask the Court to consider

3    whether -- the only injunction we think, at most, would be

4    necessary would be an injunction directing that OPM and OMB

5    can't condition an agency's implementation of ARRPs on their

6    approval.

7    I mean, I'm not -- we don't think that injunction is --

8    would be appropriate either.  I'm not necessarily suggesting my

9    OPM and OMB clients would be -- would be happy with that.  But,

10   I mean, it would certainly -- it's certainly -- I don't see any

11   plausible argument that -- that outside that review and

12   approval requirement, there's anything problematic about OMB

13   and OPM setting forth guidance -- and we certainly don't think

14   there's anything wrong with the substance of this guidance

15   which doesn't tell agencies what to decide; it simply tells

16   agencies what to include and -- and consistently tells them to

17   make decisions consistent with their own statutory authorities.

18   And then -- so I know the Court originally called me up to

19   ask questions.  Were there any other --

20           **THE COURT:**  No, that's fine.

21           **MR. BERNIE:**  Okay.

22           **THE COURT:**  That's fine.  Thank you very much.

23           **MR. BERNIE:**  Okay.  Thank you very much.  Appreciate

24   it.

25           **THE COURT:**  Ms. Leonard?

1          **MS. LEONARD:**  Thank you, Your Honor.  I'm going to

2     take the questions about the merits issues that you were

3     discussing with opposing counsel first, and then my colleague

4     Ms. Leyton is going to take some of the questions about that --

5     where you started, regarding the scope of the inunction issues.

6          We have fundamental differences with what government

7     counsel is presenting with respect to what this executive order

8     says and what the OMB/OPM memorandum implementing that

9     executive order says and what they do with respect to the

10    agencies.

11         And our argument, unlike counsel's, is derived directly

12    from the language of the orders and the record evidence before

13    the Court of what is happening.

14         We don't live in the hypothetical world that the

15    government counsel wants to litigate this case based on where

16    OPM is just -- and OMB are just issuing a request for planning

17    documents that may be implemented into the future and not

18    directing what is happening at these agencies.

19         The real world that we live in, the record evidence is

20    before this Court that OMB and OPM are making the decisions

21    here.  They are saying what to cut, when to cut, where to cut.

22    And all they're asking the agencies to do is to come forward

23    with a plan for how to implement the categorical directives

24    that they've been given by the President and OMB and OPM.

25         One particular point with respect to the language of the

1   memorandum, counsel indicated that, once again, in this

2   hypothetical world that they appear to be living in, that OMB

3   and OPM are not making any decisions.  The language on page 6

4   of the memorandum that I believe Your Honor was referring to

5   says [as read]:

6        "Finally, agencies or components that provide

7        direct services to citizens shall not implement any

8        proposed ARRPs until OMB and OPM certify that the

9        plans will have a positive effect on the delivery of

10       services."

11       How is that not approval, Your Honor?  They cannot

12   implement until we say that you can implement.  And that is

13   exactly what they're doing.  They're not just doing it for the

14   direct services, though the record is very clear that that is

15   what they're doing.  They're doing it across the board.

16       And the evidence before the Court shows that OMB and OPM,

17   when the agencies are coming forward and saying "Our functions

18   are statutorily required" -- NSF, AmeriCorps, others -- "Our

19   functions are statutorily required" -- EPA -- "We want to keep

20   them.  Do not do this to us," OMB and OPM are saying:  Cut and

21   cut now.

22       Your Honor was absolutely correct in the TRO analysis that

23   the President and OMB/OPM and DOGE lack any authority, whether

24   under the Constitution or any statute, to order a large-scale

25   reorganization like this.  But there's a further unlawfulness

1  that I want to specifically address.  The manner in which the

2  agencies are being directed to act, not just the fact of the

3  reorganization but the manner in which that that reorganization

4  is being ordered to take place is a key to the unlawfulness of

5  this order and the relief that plaintiffs are requesting.

6      And this is why:  There are two specific things in the

7  executive order and the OMB/OPM memorandum that provide

8  categorical direction as to how to implement the President's

9  orders, and I will identify both of them.

10     But if -- but as a sidenote, Your Honor, if there's any

11  doubt as to what the executive order means, I think all you

12  have to do is look at what OMB and OPM say it means in the

13  memorandum to clarify that doubt.

14     I don't think there's any doubt that when the President

15  says "Prioritize in large-scale RIFs to eliminate any functions

16  or people that are not required by statute" -- when he says

17  "prioritize" he means "do it."

18     And OMB and OPM put that into effect through their

19  memorandum saying -- counsel says it only says "should."  Well,

20  "You should include this and bring it to us, and we have a

21  review and approval power, and we'll reject it if you don't do

22  it" means it's mandatory, Your Honor.

23     So the two things that agencies are categorically required

24  to do:  Number 1, eliminate any programs and offices that the

25  President and his agents say to eliminate.

1    AmeriCorps, gone.  The Office of Federal Contract

2  Compliance and Labor, gone.  The Office of Research and

3  Development at EPA, gone.

4    That's Number 1.  That is blatantly outside of authority.

5  That does not rely on the agencies' own discretion and

6  authority as they're trying to piggyback into the Article II

7  power.  That is blatantly outside of authority.

8    So that's Number 1.  Categorical instruction:  You must do

9  this and then RIF anyone who is in those offices.

10   But Number 2 is equally important.  Number 2 is the

11  fundamental instruction that agencies must eliminate all

12  non-mandatory functions and the people who perform them.

13   Over and over I just heard opposing counsel say, "If it's

14  not required by statute" -- required -- "then agencies have the

15  authority to cut it."  Well, agencies do things that are

16  authorized by statutes but not specifically required every day,

17  Your Honor, and those are things that are crucial to the proper

18  functioning of federal agencies.

19   The Government -- the President's order here mandates --

20  and through the OPM memorandum, it's very clear -- mandates

21  cutting anything that is not statutorily required.  It's

22  page -- the best crystallization of this is on page 2 of the

23  OMB memorandum where they talk about the principles to inform

24  the ARRPs.  They say [as read]:

25         "We want you to impose a significant reduction

1    in the number of full-time equivalent positions by

2    eliminating positions that are not required."

3    Then right below that [as read]:

4        "Pursuant to the President's direction, agencies

5    should focus on the maximum elimination of functions

6    that are not statutorily mandated."

7    This is the categorical directive that is outside of the

8    President/OMB/OPM's/DOGE authority and also is profoundly

9    arbitrary and capricious for OMB and OPM to require every

10   agency to engage in.  It is profoundly arbitrary and capricious

11   if the agencies did it on their own.

12   You cannot ignore what it takes for an agency to be a

13   properly functioning agency in all of the ways that are

14   authorized by Congress and strip to the bone, just to leave

15   behind the functions that Congress specifically says are

16   required.  That's one of the most fundamental problems with

17   this executive order.

18   And agencies engage, as I said, in non-statutory mandated

19   functions all the time.  Statutes don't often mention the

20   people who clean the bathrooms, Your Honor, or --

21       **THE COURT:**  But don't the agencies have the authority

22   to cut back on those non-mandated functions if they want to?

23       **MS. LEONARD:**  So if they engaged in reasoned

24   decision-making and decided themselves that that was necessary,

25   sure, they could do that.  But that's not what's happened here.

 1    They've been told:  Cut all of them across the board.

 2         They have not been allowed -- no one has made the decision

 3    with respect to the agencies' needs and functions as to whether

 4    that decision is necessary.  They've been told to cut all of

 5    them, Your Honor.  They are sacrificing agency function at the

 6    altar of workforce reduction.

 7         The purpose of this is to cut, cut, cut, not to consider

 8    what agency function is really necessary.  That's the

 9    fundamental problem with this, Your Honor.

10         It is not within the President's authority to order

11    agencies to abuse their discretion.  It is not within OPM or

12    OMB's authority to order agencies to abuse their discretion.

13    And that is exactly what they have done here.

14         The agencies cannot function properly without the people

15    who fix the roof, who repair the cars, who file the paperwork,

16    who do the trainings, who -- the list goes on and on and on of

17    things that are not specifically mandated.

18         And we believe that what they are interpreting -- what OMB

19    and OPM is -- and DOGE is interpreting "statutorily required"

20    to mean is specifically mentioned by statute.  Agencies do so

21    much more than that and need so much more than that to be

22    functioning, and they have ignored that and ordered them

23    across-the-board, categorical:  Eliminate all of those

24    positions.

25         And this is very akin to the funding freeze case, *New York*

1   *v. Trump*, out of the First Circuit, where the Court -- the
2   First Circuit said it matters not that there could have been
3   under -- you know, any agency, if it had taken the time, could
4   have looked at each of the grants and decided to put a pause
5   for certain reasons.  What this is, is a categorical directive
6   that requires the agencies to defy that.
7        And how do we know that?  Agencies are not permitted here,
8   as counsel has suggested by these mandatory orders, to say no.
9   They're not permitted to make the determination of whether
10  eliminating those, what they call, discretionary functions is
11  necessary for the -- for all the reasons that -- that agencies
12  know to look at their statutes and what Congress has expected
13  of them and wants of them and the proper functioning of the
14  agency under the housekeeping statute and all of that.
15       They're not permitted to make that decision.  They are
16  being told:  This is what you are cutting.  Go figure out how.
17       And the ARRPs are the "go figure out how" to hit the
18  categorical cuts that the administration is mandating.
19       And, of course, they're complicated.  These are
20  complicated, cabinet-level departments, very large, independent
21  agencies like EPA.  They're struggling to put together plans to
22  achieve what OMB and OPM and DOGE are forcing them to do.
23       And when they -- as we've said and as the record reflects,
24  when they have come forward and said, "We want to keep these --
25  these positions"; the NSF, "We want to keep our scientists,

1   because what we do is important to the functioning of the

2   agency and is statutorily mandated," OMB, OPM, DOGE:  No.  RIF

3   them now.

4        And that's exactly what's happened, Your Honor.  That

5   categorical directive of -- both parts, the cut all the offices

6   and functions that we direct, and specifically non-statutorily

7   required functions, that is outside the President,

8   OMB/OPM/DOGE's authority, and it is part and parcel of why this

9   executive order is so unlawful, in addition to what I would

10  call the top-line argument that the President is engaging in an

11  unconstitutional reorganization.

12       It's both the fact of that reorganization and how it's

13  being implemented through this executive order that is so key.

14       It's also key to the scope of relief that we are asking

15  for in the injunction aimed at the ARRPs and all the ways that

16  these plans and directives -- these categorical directives are

17  being implemented now by these agencies.

18       And as I said, my colleague will address the scope of

19  relief questions further, but I wanted to make that link

20  between that important argument and basis for saying why this

21  is so unlawful, because when you order across an agency that

22  all discretionary functioning be cut, what remains, Your Honor?

23  Is it a functioning agency?  Can people do the jobs that are

24  mentioned by Congress in the specific statutes if there is no

25  one to do the paperwork, make the travel arrangements, all the

1    other -- all the other functions?

2      And I'm not trying to say that it's only administrative

3    jobs that are not mentioned specifically by statute; it's so

4    much more than that.  But I think that this administration

5    discounts the value of that work and the need for that work to

6    have a fully functioning agency, and I think that that is

7    really, really profoundly problematic, Your Honor.

8        **THE COURT:**  And you think that the declarations and

9    other materials that you've supported -- that you've provided

10    support what you just said as a matter of fact?

11        **MS. LEONARD:**  I believe that they do, Your Honor, yes.

12      And I think that you can look at the face of the executive

13    order as well and the OMB memorandum and see that categorical

14    directive, and then supported by the evidence that we've shown

15    which links it to the harm that -- that -- that those actions

16    will have across the entire country.  That is what we have

17    attempted to do.  The President cannot remove the agency's

18    ability to make that assessment.

19      And now, if the President had stepped in and actually made

20    that assessment himself for any particular agency -- okay,

21    these are all the agencies' needs -- we might be having a

22    different conversation.  But what he did was impose a

23    government-wide, categorical directive:  Eliminate all of those

24    functions later, and rearrange the pieces of the agencies

25    afterwards to fit.

1    That is unlawful, Your Honor.

2    Briefly, on the *City and County of San Francisco*, just to

3  respond -- I think we've addressed this clearly in our

4  papers -- but what the Ninth Circuit said there is that a

5  savings clause cannot -- it's not an escape clause to get out

6  from under the specific language and directives of the

7  executive order.

8    And what I've just described is the mandatory language in

9  the executive order:  Prioritize the offices and programs we're

10 going to cut and all non-statutorily mandated functions going

11 down, in the executive order, to government shutdown levels of

12 staffing.

13    There is nothing more arbitrary and capricious than that,

14 Your Honor.  But that is the language of the executive order.

15 OMB and -- OMB and OPM confirm it in their directive.  And the

16 savings clause of, "Oh, but also go comply with the law," if

17 those things are in direct tension, which they are, then the

18 savings clause doesn't save anything.

19    Final agency action.  It is absolutely not the case that

20 this Court, under the APA or otherwise, needs to wait until

21 every single action implementing an unlawful directive has

22 happened and made public in order to act to stop it.  That is

23 profoundly wrong.

24    The APA has never meant that, Your Honor.  The APA looks

25 at who's making the decision.  And we have the decision-makers

1  here, Your Honor.  We know who's making the decision under

2  these -- this executive order and the memorandum because

3  they've said it in the document itself.  OMB/OPM, they're

4  making the decisions about the contents of the plan and the

5  timing.

6      We shouldn't forget the timelines for the actions

7  implementing are -- a major part of the ARRP.  That's in the

8  memorandum.  It says:  Give us the timeline.  What actions are

9  you taking to hit the President's directives and when?  And

10 we'll approve that too.

11     That's what's happening here.  The decisions have been

12 made at the level of approving the ARRPs.

13     What the Government said to the Supreme Court when they

14 went up on the stay from the TRO is that Your Honor's TRO

15 stopped 40 RIFs at 17 agencies.  Those had been approved,

16 Your Honor.

17     There cannot be a shred of doubt that there are actual

18 concrete actions under the ARRPs that go well beyond RIFs.

19 Those ARRPs go well beyond RIFs.  They're hitting

20 reorganization and they're hitting reduction through specific

21 concrete actions that have been approved.  They're not

22 pre-decisional.  And that is absolutely something, under the

23 APA and the equitable authority of this Court, that this Court

24 can enjoin.

25     With that, unless Your Honor has any further questions

```
 1   about the merits, I will happily turn things over to my

 2   colleague Ms. Leyton.

 3           THE COURT:  All right.  That's fine.  And I wanted to

 4   ask -- I'll hear from you in a second.

 5       But, Mr. Bernie, have any federal employees been

 6   terminated by RIFs implemented under this executive order?

 7           MR. BERNIE:  Can I have a second, Your Honor?

 8           THE COURT:  Yeah.

 9               (Co-counsel confer off the record.)

10           MR. BERNIE:  So I think -- I think, Your Honor, that

11   there have -- I mean, there have certainly been -- there have

12   certainly been removals from service that are outside of this

13   executive order, like the probationary litigation before

14   Judge Alsup.

15       I don't think -- I'm not positive, but I don't think that

16   any reduction -- I mean, RIF notices were issued, I think, but

17   I don't think that any reductions in force were finalized

18   before the Court's TRO.

19       Typically, there's a 60-day notice period, which can be --

20   which can be reduced to 30 days with OPM's permission under

21   certain circumstances.  I could -- I could check into that.

22   But I don't think any RIFs pursuant to this executive order

23   have been -- were -- were completed before the TRO, if

24   that's --

25           THE COURT:  Thank you.
```

1          **MR. BERNIE:** Yeah.

2          **THE COURT:** Ms. Leyton.

3          **MS. LEYTON:** Thank you, Your Honor.

4      I'd like to begin by addressing the question that

5  Your Honor raised at the beginning of this hearing which was

6  the appropriate question about what this Court would do if it

7  were to limit the injunction to the named plaintiffs.

8      As Your Honor well knows, courts are not to issue vague

9  injunctions where the defendant does not know how to comply,

10  and the defendant has already raised some concern about their

11  compliance questions.

12      And there is no possible way that this injunction could be

13  limited to only the plaintiffs.  And there's a reason why

14  the Government has not suggested how that could happen because

15  there is not a possible way to do that.

16      The scope of injunctive relief is dictated by the nature

17  and extent of the violation and by the nature and extent of the

18  injury to the plaintiffs.  Here, both require an injunction --

19  stopping the ARRPs and the implementation of the EO and the

20  memo at the agencies where we have shown harm.

21      There is an order that is an order that applies to all of

22  these agencies, that requires the stripping down of the

23  agencies to only what this administration views as their

24  necessary statutory functions, that directs the agencies to

25  strip down to lapse-related levels when there are gaps in

1    appropriations.

2        And the directive to those -- those directives cannot be

3    remedied through pinpoint injunctive relief.  These agencies

4    are interdependent entities.  If this Court were to order the

5    restoration of the food inspectors for the Department of

6    Agriculture, but not to order the -- but not to order a stop to

7    the RIFs of those who are arranging the travel for those

8    individuals, those who are arranging the inspections, then the

9    harm cannot be remedied.  And that is exactly why this Court

10   should order the -- the preliminary injunction that we have

11   requested.

12       I would also point out that this is the presumptive remedy

13   under the Administrative Procedures Act.  It's vacatur of the

14   rule, and this circuit has held that that applies at the

15   preliminary injunctive relief stage in cases like *East Bay*

16   *Sanctuary*.

17       We've demonstrated multiple violations of the APA here.

18   And so that, in addition to the fact that it is really just

19   impossible to disentangle the harm -- and we've shown at each

20   of the 19 agencies where we have sought injunctive relief,

21   irreparable injury to plaintiffs in this case.  Where we

22   haven't shown irreparable injury, we have not sought injunctive

23   relief as to that agency.  And so that is relief that the

24   plaintiffs have shown entitlement to.

25       I would also point out that the Government relied on an

1    opinion by Judge Sutton.  That was not an opinion of the

2    Sixth Circuit; that was a concurring opinion by Judge Sutton.

3    He did author the majority decision, but the part that

4    the Government is relying on was in his single-judge

5    concurrence.

6         In the Ninth Circuit, this circuit has made clear that

7    this Court does not need to close its eyes to the practical

8    effects of how an injunction would be implemented.

9         In cases like *East Bay Sanctuary* and *City of San Francisco*

10   *vs. Barr*, when deciding whether to geographically limit an

11   injunction, for example, the Court looks at the nature of the

12   injury to the plaintiff and whether an injunction is

13   susceptible of neat geographic boundaries.

14        Here, it is not possible to impose those neat geographic

15   boundaries, nor is it possible to impose boundaries based on

16   the particular injuries to each of the -- of the multiple

17   plaintiffs that we have demonstrated, and that's precisely why

18   the Government does not suggest a way to do so.

19        I'd also like to address the Government's alternative

20   suggested limit, which was, I believe, that the Court should

21   prevent OMB and OPM from conditioning implementation of the

22   ARRPs on their approval.

23        I'd like to just begin by saying --

24             **THE COURT:**  Say that again.

25             **MS. LEYTON:**  I believe that it was that the -- that

1    the alternative injunctive relief was that the agencies'

2    implementation of the ARRPs would not be conditioned on whether

3    they received OMB or OPM approval.

4         A fundamental problem with that suggestion is that OMB and

5    OPM have already approved many of these ARRPs and have already

6    rejected approval of a number of ARRPs.

7         I think this Court mentioned one of the examples.  I would

8    just like to point the Court's attention to the four examples

9    that are in the record, not because defendants have disclosed

10   these but because they have been disclosed through other means.

11        We have the example of AmeriCorps in the Daly declaration,

12   which is 37-12 on the docket, that the agency did not want to

13   terminate their employees and were told that they had to.

14        We have the National Labor Relations Board, and that is

15   attached to the Chisholm declaration, Docket 36.  We know that

16   the National Labor Relations Board said that they could not

17   reduce staff and that OMB sent back a memo saying, "Does not

18   meet expectations."  They were told that they could not -- they

19   could not do what the agency wanted to do.

20        We have the National Science Foundation and the National

21   Endowment for the Humanities.  National Endowment for the

22   Humanities is not a defendant we are seeking a TRO -- a

23   preliminary injunction from, but NSF is.  And those can be

24   found in the Soriano declaration and the supplemental Soriano

25   declaration at 37-32 and 96-1.

1       The agency did not feel that it could terminate the
2  employees and engage in the RIFs that the administration
3  wanted, and they were told that they had to.
4       The other problem, of course, is that the agencies are
5  operating under an unlawful directive, the executive order.
6  And so, even aside from the OPM/OMB-required approval, they are
7  being directed to do what the President has -- has ordered,
8  which is an unlawful order for a reorganization without
9  Congressional approval.
10      We have evidence in the record that DOGE and -- that
11  the -- that DOGE both -- DOGE has people within the agencies
12  that are directing the agencies to make specific cuts, to
13  consolidate specific offices, to -- to RIF employees.  And OMB
14  and OPM are telling them to do that while disclaiming that they
15  are formally approving anything, even though that is required
16  for the agencies to implement.  So it would not be possible to
17  remedy the plaintiffs' injuries by imposing that more limited
18  injunction.
19      I would also just like to address the Court's questions
20  about possibly issuing a stay.  As this -- this -- my colleague
21  has pointed out, the APA does not require plaintiffs to wait
22  until after a cut has been made and after the impact is felt in
23  order to pursue injunctive relief.
24           THE COURT:  Well, what I was -- what I was thinking
25  about was, you're requesting that people who have already been

```
 1    put on administrative leave be taken off of that and put back

 2    in place to work, which, frankly, makes a lot of sense

 3    because -- it doesn't make sense to have employees sitting

 4    around and not working.

 5         But leaving that aside, I'm concerned that there are a

 6    number of requests for stay.  They've not been acted on, and I

 7    don't know what will happen.  But for people who are being

 8    ping-ponged back and forth, I feel that's very difficult for

 9    them.

10         So prospective relief, which is what I granted two weeks

11    ago, would not have quite that same effect.  So I was wondering

12    why you want me to grant relief to those who've already been

13    put on furlough.

14         And then, so what I was thinking was grant -- if it's a

15    matter of the time clock running, grant the relief you request,

16    but stay it so that people just don't have to be moving around

17    before they know what the final rules are going to be.

18         MS. LEYTON:  And, Your Honor, we share the Court's

19    concern about the ping-ponging of employees and their

20    understanding of their job situation.  And that is something

21    that has occurred, even aside from any injunctions, where

22    the Government has terminated or RIF'd people and then decided

23    that it actually needed those individuals and brought them

24    back.  And we -- we share that concern.

25         THE COURT:  Well, and there are statements from
```

```
 1    Secretary Kennedy suggesting that that's what their plan was.

 2         MS. LEYTON:  Exactly.  RIF everybody and then bring

 3    20 percent back, possibly, acknowledging that that would be

 4    part of what would take place through the HHS RIFs.

 5         What we would ask is that if there is any stay on

 6    implementation of some of the aspects of the preliminary

 7    injunction, that we -- that it be limited such that we have

 8    some opportunity to come back in to demonstrate ongoing harm

 9    from the placement of people on administrative leave to the

10    extent that we could seek relief in -- in the future, even if

11    there were a stay on some aspects of the injunctive relief.

12         Our position is that the status quo is that those people

13    were in their jobs and not on administrative leave; but to the

14    extent that the Court is concerned about that harm, we would

15    want to be able to come in and demonstrate that their placement

16    on administrative leave is causing harm to the plaintiff cities

17    and counties, to the -- to the plaintiff organizations,

18    particularly the HHS RIFs, which occurred very immediately and

19    resulted in placement of people on administrative leave.  So

20    that -- that is what we would request.

21         And the other thing that I think would be key is, we've

22    talked about what we've requested in terms of a preliminary

23    injunction is that we need very detailed compliance reports.

24    The Government has objected to any requirement that they meet

25    and confer with the plaintiffs.  We believe that that is the
```

 1    most streamlined and efficient way for us to be able to present

 2    any disputes to this Court.

 3        But as Your Honor knows, in response to the TRO, it was a

 4    mere two-page declaration stating -- or two-page submission

 5    saying:  We directed our clients to comply.

 6        We don't know what each agency has or has not done.  We

 7    have some concerns that there may have been consolidation of

 8    offices or that some of the terminations of probationary

 9    employees were pursuant to ARRPs, were directed by DOGE and/or

10    by OPM and OMB.

11        And the only way to be able to ensure compliance with

12    this Court's order is to make sure that the defendants are

13    submitting detailed compliance reports and that they are

14    showing any ARRPs that have been approved, as my colleague

15    argued, that we should be able to look at that so that we know

16    what is happening pursuant to these ARRPs as opposed to

17    pursuant to some other executive order or some other

18    administrative action that we have not challenged.

19        And unless Your Honor has questions...

20        **THE COURT:**  No.  That's good.

21    Anything else you want to add?

22        **MR. BERNIE:**  Just a few points, Your Honor.

23        First of all, respectfully, I believe Ms. Leonard stressed

24    that the -- with respect to the executive order mandates --

25    mandates elimination of all statutorily required functions and

1  employees.  Respectfully, that's just not what the executive

2  order says.

3      What the executive order says is that all offices that

4  perform functions not mandated by statute or other law shall be

5  prioritized in the RIFs.  And that makes sense --

6      **THE COURT:**  Well, it says:  Agencies should focus on

7  the maximum elimination of functions that are not statutorily

8  mandated.

9      **MR. BERNIE:**  So that's -- that's from the workforce --

10  that's from the workforce memorandum.  And "maximum

11  elimination" doesn't mean elimination of everything.

12      It makes sense that in prioritizing certain areas for

13  RIFs, the agency is focused on non-statutory and non-essential

14  functions.  It wouldn't make sense to focus on -- to focus on

15  statutorily mandated functions.  But that doesn't mean that

16  every statute -- every employee that is non-essential, every

17  component that is not statutorily mandated is going to be

18  eliminated.

19      And on the same note, the reference to 2019 and shutdown

20  levels, what the -- I think it's important to understand what

21  the workforce memorandum says on this point.

22      What it says -- and this is on page 2 of the workforce

23  memorandum.  What it says is that [as read]:

24          "The agencies should determine competitive areas

25      for positions not typically designated as essential

1      during a lapse in appropriations."

2      And what it says is that when making this determination,

3  they should refer to the functions in the plan submitted to OMB

4  in 2019 as the starting point for making this determination.

5      The reason it says 2019, I believe, is because in -- as

6  the Court may recall, at 2018 into 2019, there was a prolonged

7  shutdown in the federal government, so agencies had to make the

8  determination.  That doesn't mean that every competitive --

9  that every competitive area that is -- that is identified as

10  non-essential, that all of the employees in those competitive

11  areas, are necessarily going to be RIF'd.

12      And I think that that extrapolation points to a

13  fundamental problem with this lawsuit, which is:  Plaintiffs,

14  respectfully, are trying to have it both ways -- or,

15  respectfully, trying to do two things, but not fully doing

16  either.

17      They're try- -- they want to challenge an executive order

18  on its face, but they don't want to be constrained by the text

19  of the executive order, which is what's required.

20      They also want to challenge what agencies are doing, but

21  they don't want to develop any sort of granular assessment

22  of -- they don't want to limit their relief to individual

23  agency actions, and they don't want to make arguments or try to

24  establish that agencies are acting in violation of their

25  gov- -- of their governing statutes.

1      They have to pick one or the other, and they've chosen to

2  bring a global claim.  And we think that the executive order is

3  lawful, and that's the end of it.

4      But the one thing I would say, Your Honor, is a lot of

5  opposing counsel's presentation was directed at the workforce

6  memorandum.  We think the workforce memorandum is entirely

7  lawful.  We take the point.  We haven't submitted evidence.  We

8  don't -- we don't think that what they're saying is --

9  reflects -- but -- but the point is, is even if they're right

10  about all that, we don't think there should be any injunction.

11      But at the very least, we think the agencies should be

12  allowed to implement the executive order on their own, because

13  the executive -- because all of these complaints about what OPM

14  and OMB are doing, are -- are -- are entirely -- are entirely

15  divorced from the executive order.

16      The executive order -- which has to be judged, we think,

17  on its text -- is lawful.  So at the very least, agencies

18  should be allowed to implement it.  And if they do something

19  that -- we don't think they will, but if they do something that

20  is contrary to law, arbitrary and capricious, that can be

21  potentially challenged either administratively or, if our

22  channeling arguments are rejected, in a district court.

23      Finally, I want to address the pre- -- the compliance

24  point with another aspect of the injunction.  First of all,

25  I think counsel mentioned that the opinion I referenced was a

1    concurrence.  I apologize.  I didn't realize -- it's not

2    binding on the Court either way, but I apologize for that --

3    for that error.  I didn't realize that.

4        We -- but a signif- -- and I understand the Court was

5    acting on a short time frame last time, but a significant

6    problem we have in the -- with the previous TRO entered by

7    the Court is specifically the -- its application to preparatory

8    steps.

9        I mean, if -- if we -- if an agency wants to take steps

10   like drafting documents, having meetings where ARRPs are

11   discussed, all of those sort of common internal agency steps

12   are at least arguably covered by the injunction.  And so we

13   think if this Court is inclined to enter an injunction, it

14   should -- it should extend to specific things that affect

15   employees.  I mean, we set that forth in our briefing.  That

16   way, it would be clear, like what the agency can and can't do.

17       And in terms of compliance, the -- the types of things

18   they're talking about, like RIFs, consolidations, these are

19   things that -- that agencies announce or plaintiffs will be

20   aware of when they happen.  And if the injunction is

21   sufficiently clear, there's no need for the very complex

22   compliance regime they're imagining.

23       I mean, I understand them to be criticizing the

24   declaration we previously submitted.  I don't think it would

25   have been feasible for us to furnish 20-plus declarations under

1   that timetable telling exactly what the agencies are doing.

2   But rest assured that we have invested considerable resources

3   in complying with the previous TRO.  And although we -- we

4   don't think injunctive relief should issue, we will invest --

5   we will do the same for any order that the Court issues here.

6        Finally, the Court mentioned staying any -- any

7   retrospective aspect of the preliminary injunction.  If

8   the Court does -- is inclined to enter a preliminary injunction

9   of any kind, we would ask -- similar to we did at the last

10  hearing, we would ask that it be stayed pending appeal.  And if

11  the Court doesn't -- isn't inclined to grant a stay pending

12  appeal, that it note, like it did in the TRO opinion, that it

13  was denying that relief.

14       I'm just -- there's been a lot -- been a lot of briefing

15  in this case, so I'm just trying to save the parties and the

16  Court from unnecessary motions practice.

17       Finally, there have, obviously, been a lot of other issues

18  in the case, channeling jurisdiction, that we've briefed and we

19  continue to adhere to.  I assume the Court -- I assume that

20  the Court doesn't want to get into any of that today, but if

21  the Court has any questions --

22            **THE COURT:**  I don't have questions on that.

23            **MR. BERNIE:**  Okay.  Or anything else.  Okay.

24       All right.  Well, we -- we certainly adhere to our

25  previous arguments, but I don't think -- and our voluminous

1    briefing, but we don't have -- I don't think we have anything

2    else.  So, thank you.

3         **THE COURT:**  Okay.  Thank you.

4    Anything else?

5         **MS. LEONARD:**  To the extent that opposing counsel for

6    the Government and all of the agency defendants before

7    this Court which he represents is suggesting what agencies

8    could be doing to implement this executive order, I

9    respectfully submit, Your Honor, that the defendants know

10   exactly what they are doing, and they are refusing to put it

11   before the Court.

12        There are actions with respect to -- the ARRPs Phase 1 and

13   Phase 2 have been prepared.  They've been submitted to OMB and

14   OPM.  We believe that they have been approved or rejected

15   according to the process that they have set up, including, as

16   my colleague mentioned, meets expectations or doesn't,

17   expectations of OMB and OPM and DOGE and the President to

18   implement the categorical directives they've been given.

19        And make no mistake, they are categorical, Your Honor.

20   When you say "You should do this," and then the hammer is

21   enforcement by OMB and OPM, that is a categorical directive,

22   Your Honor.

23        And they've taken the decision-making away from the

24   agencies.  And they want to suggest, knowing very well what the

25   agencies are doing, that they could potentially be doing

1   something other than what the President has told them to do.

2   And that is just not an appropriate representation for counsel

3   for these agency defendants to be making when they refuse to

4   talk about the facts.  There are facts.  They just refuse to

5   put them before the Court.

6       I think that's how -- that is all I would like to say in

7   response to that.

8       Thank you very much, Your Honor.

9           **THE COURT:**  All right.  Thank you.  Thank you.

10      All.  The matter is submitted.

11      We're adjourned.

12          **THE COURTROOM DEPUTY:**  That concludes our calendar.

13              (Proceedings adjourned at 11:57 a.m.)

14                  ---o0o---

1

2          **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Friday, May 23, 2025

7

8

9

10                    *Ana Dub*

11   _____

12            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13            CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25